1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
GUY CARPENTER & COMPANY, LLC and MARSH  :      07 CIV. 3580 (DLC)
& McLENNAN COMPANIES, INC.,         :
                                    :        PRETRIAL
                    Plaintiffs,     :      SCHEDULING ORDER
                                    :
         -v-                        :
                                    :
JULIAN SAMENGO-TURNER, RON WHYTE, and  :
MARCUS HOPKINS,                     :
                    Defendants.     :
                                    :
------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __5/22/07__

DENISE COTE, District Judge:

     As set forth at the pretrial conference held pursuant to
Rule 16, Fed.R.Civ.P., on May 21, 2007, the following schedule
shall govern the further conduct of pretrial proceedings in this
case:

     The following motions will be served by the dates indicated
     below.

     Defendants' motion to dismiss

     -    Motion served by **May 24, 2007**
     -    Opposition served by **June 8, 2007**
     -    Reply served by **June 15, 2007**

     At the time any Reply is served the moving party shall
     supply two courtesy copies of all motion papers to Chambers
     by delivering them to the Courthouse Mailroom, 8th Floor,
     United States Courthouse, 500 Pearl Street, New York, New
     York.

     SO ORDERED:

Dated:    New York, New York
          May 22, 2007

                              _____
                                   DENISE COTE
                              United States District Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

GUY CARPENTER & COMPANY, LLC and          :
MARSH & McLENNAN COMPANIES, INC.,          :          INDEX No: 07 CIV 3580

             Plaintiffs,          :          Complaint

        - against -          :

JULIAN SAMENGO-TURNER, RON WHYTE,          :
and MARCUS HOPKINS,                        :

           Defendants.          :

------------------------------------------------- x

      Plaintiffs Guy Carpenter & Company, LLC, formerly Guy Carpenter & Company,

Inc., ("Guy Carpenter") and Marsh & McLennan Companies, Inc. ("MMC") (collectively

"plaintiffs"), by their attorneys Kramer Levin Naftalis & Frankel LLP, for their complaint

against defendants Julian Samengo-Turner ("Samengo-Turner"), Ron Whyte ("Whyte"), and

Marcus Hopkins ("Hopkins") (collectively, "defendants"), allege as follows:

<u>Introduction</u>

      1.   This is an action for breach of contract arising out of defendants'

participation in the "Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock

Award Plan" ("the Plan") and their respective violations of the terms and conditions of the

Agreements each defendant executed in connection with the November 1, 2005 awards granted

under the Plan (the "Agreements"). Under the express terms of the Agreements, defendants are

each required to cooperate with Marsh or any of its subsidiaries or affiliates, including Guy

Carpenter, and specifically to "provide to the Company such information relating to [their] work

for the Company or [their] other commercial activities as the Company may from time to time

reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]." Having received from Guy Carpenter written, reasonable requests for information in accordance with this provision, defendants have refused to cooperate. Not only are such refusals unambiguous breaches of defendants' contractual obligations to provide such cooperation, but they are a blatant and unlawful attempt to prevent plaintiffs from determining whether defendants are in compliance with other terms of the Agreements. Specifically, plaintiffs have reason to believe that defendants, directly and/or in concert with other individuals at their announced, next employer, are and have been targeting, soliciting and recruiting numerous Guy Carpenter employees to terminate their employment with Guy Carpenter to join Integro Insurance Brokers. Any such activities constitute separate violations of the Agreements.

2.    Further, under the express terms of the Agreements, defendants are not permitted to engage in Detrimental Activity, which includes employment with or otherwise being interested in a competitor of plaintiffs. Defendants engaged in Detrimental Activity and breached their Agreements by accepting employment with or otherwise becoming interested in Integro Insurance Brokers on or before April 5, 2007. Under the Agreements, defendants therefore are required to return compensation that they received pursuant to the Plan within one year prior to their engaging in such Detrimental Activity. Despite proper written demand, they have failed to do so.

3.    Accordingly, by this action, plaintiffs seek (a) a mandatory injunction ordering defendants to cooperate with plaintiffs in accordance with their contractual obligations under the Agreements and (b) damages proximately caused by defendants' breaches of the Agreements.

KL3 2589853.5

<u>The Parties, Jurisdiction and Venue</u>

4.     MMC is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, New York, New York 10036.  MMC is a public company listed on the New York Stock Exchange and owns a number of the leading risk management and human capital consulting companies, including Marsh, Inc. ("Marsh"), Guy Carpenter, Mercer Human Resource Consulting and Kroll Inc.

5.     Guy Carpenter is a leading risk and reinsurance intermediary and a wholly owned subsidiary of MMC.  Guy Carpenter is a Delaware corporation with its principal place of business at One Madison Avenue, New York, New York 10010.

6.     Upon information and belief, Samengo-Turner is a citizen of the United Kingdom and resides at 17 Kyrle Road, London, SW11 6BD, England.

7.     Upon information and belief, Whyte is a citizen of the United Kingdom who resides at Oak Rise, 193 World's End Lane, Chelsfield, Kent, BR6 6AT, England.

8.     Upon information and belief, Hopkins is a citizen of the United Kingdom who resides at 1 Belmont Road, London, SW4 0BZ, England.

9.     This action for breach of contract arises under the terms of the Agreements.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  MMC and Guy Carpenter are citizens of Delaware and New York and defendants are subjects of a foreign state (the United Kingdom).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

KL3 2589853.5

10.    Venue is properly laid in this district pursuant to 28 U.S.C. § 1391 and pursuant to paragraph VI.N of the Agreements.

Defendants' Employment With Plaintiffs

11.    Samengo-Turner's employment with Guy Carpenter commenced on or about September 23, 1991.  On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Samengo-Turner co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.

12.    Whyte's employment with Guy Carpenter commenced on or about September 20, 1988.  On or about April 3, 2007, Whyte gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.

13.    Hopkins's employment with Guy Carpenter commenced on or about April 10, 2000.  On or about April 3, 2007, Hopkins gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Hopkins was head of Guy Carpenter's U.K. facultative reinsurance operation.

14.    Defendants' employment with Guy Carpenter was, and continues to be, governed by their respective employment agreements with plaintiffs.

15.    Under the terms of their respective employment agreements with plaintiffs, defendants are currently in six (6) month "notice periods," meaning that they remain employed by plaintiffs and continue to receive compensation from plaintiffs.  As current

-4-

KL3 2589853.5

employees, defendants also continue to have all the fiduciary and related duties and obligations to plaintiffs that are associated with such employment.

16.    In addition, by the terms of their respective employment agreements with plaintiffs, defendants are not permitted for specific periods of time during and after their notice period to solicit, entice, induce, or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs.

Defendants' Participation in the Plan and Defendants' Obligations Under the Agreements

17.    MMC offers various incentive compensation plans to its employees in order to strengthen the mutuality of interest between MMC and its employees and to provide appropriate incentives for employees to remain with MMC and its subsidiaries or affiliates.

18.    During the course of their employment with plaintiffs, each of the defendants participated in the "Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan."

19.    In connection with the grants of their November 2005 Awards under the Plan, each defendant agreed in writing to abide by the terms and conditions of the Plan as well as the additional terms and conditions set forth in Agreements related to the Plan. (Redacted versions of defendants' Agreements are attached as Exhibits A - C). Throughout the Agreements, MMC and its subsidiaries or affiliates are referred to together as "the Company."

20.    On or about November 1, 2005, Messrs. Samengo-Turner, Whyte and Hopkins were granted Awards under the Plan, which were subject to vesting in specified percentages on various future dates. (*See* Exhibits A - C).

KL3 2589853.5

21.    Messrs. Samengo-Turner, Whyte and Hopkins agreed to the terms of the Awards by executing the Agreements.

22.    As of April 2007, 20% of the Awards granted to each defendant had vested. (*See* Exhibits A - C, Section I.A(1)).  Defendants received cash payments of the vested portions of their Awards as follows:  Samengo-Turner received £77,110, Whyte received £61,688 and Hopkins received £46,266.

23.    Significantly, the Agreements require each defendant to "provide to the Company such information relating to [their] work for the Company or [their] other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]." (the "Cooperation Clause").  (*See* Exhibits A - C, Section II.E).  The Cooperation Clause applies to defendants "during and after [their] employment with the Company." (*See id.*).

24.    Compliance with the Cooperation Clause is mandatory; there is no prerequisite that plaintiffs demonstrate any potential breach of participants' obligations under the Agreement in order to be entitled to the benefits of the Cooperation Clause.

25.    In addition, the Agreements provide for "Cancellation and Rescission" of the Awards granted under the Plan if a defendant engages in any "Detrimental Activity," as defined in the Agreements, during the 12 month period following any vesting of the Award. (*See* Exhibits A - C, Section I.C).  Cancellation and Rescission includes return of amounts already distributed to a participant during the one year period preceding any such Detrimental Activity. (*See* Exhibits A - C, Section I.C(2)(a)).

26.     The definition of Detrimental Activity applicable to defendants is set forth
in Schedule II.D of the Agreements, since defendants' principal place of employment at the time
they gave notice of their resignations was the United Kingdom.  (*See* Exhibits A - C, Section
II.D).

27.     According to Schedule II.D of the Agreements, Detrimental Activity
includes "enticing, inducing or encouraging an Employee to leave or seek to leave his or her
position with the Company or any Associated Company for the purpose of being involved in or
concerned with either the supply of Competitive Services or a business which competes with or
is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless
of whether or not that Employee acts in breach of his or her contract of employment (either
written or implied) with the Company or any Associated Company by doing so."  (*See* Exhibits
A - C, Schedule II.D, Section 2(a)(iv)).

28.     In addition, Detrimental Activity includes, "to any material extent
undertaking, carrying on or being employed, engaged or interested in any capacity in the supply
or proposed supply of Competitive Services within the Territory."  (*See* Exhibits A - C, Schedule
II.D, Section 2(a)(i)).  Under Schedule II.D, Competitive Services is defined as "services
identical to or competitive with those which at the expiry of the Relevant Period the Company or
any Associated Company was supplying or negotiating or actively and directly seeking to supply
to a Client for the purpose of a Relevant Business."  (*See id.* at Section 5).  Relevant Business is
defined as "the business of the Company or any Associated Company in which, pursuant to your
duties, you were materially involved at any time during the Relevant Period."  (*See id.*).
Relevant Period "means . . . , where your employment has ended, the period of 12 months ending
on the Termination Date."  (*See id.*).

KL3 2589853.5

29.     Defendants agreed to independent non-solicitation covenants which are separately enforceable.  Under Schedule II.D of the Agreements, defendants agreed not to "[e]ntice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a business which competes with either the supply of Competitive Services or a business which competes with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing." (*See* Exhibits A - C, Schedule II.D, Section 4).

30.     The Agreements further provide that "[t]he Company and [defendants] irrevocably submit to the exclusive jurisdiction and venue of any state or federal court located in the County of New York for the resolution of any dispute over any matter arising from or related to the Award . . . .  Moreover, both [defendants] and the Company (i) acknowledge that the forum stated in this Section VI.N has a reasonable relation to this Award and to the relationship between [defendants] and the Company and that the submission to the forum will apply, (ii) waive, to the extent permitted by law, any objection to personal jurisdiction or to the laying of venue of any action or proceeding covered by this Section VI.N and (iii) agree not to commence any such action or proceeding in any forum other than the forum stated in this Section VI.N and (iv) agree that, to the extent permitted by law, a final and non-appealable judgment in any such action or proceeding in any such court will be conclusive and binding on [defendants] and the Company." Defendants also agreed to trial of these claims by the Court "WITHOUT A JURY." (*See* Exhibits A - C, Section VI.N).

-8-

31.     The Agreements also provide that "[n]otwithstanding anything to the contrary (except with regard to the Schedule II.D, if applicable), this Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. (*See* Exhibits A - C, Section VI.O).

32.     Schedule II.D, Section 6 provides that Schedule II.D "will be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York." Because the Cooperation Clause in the Agreements is outside the the of the scope of Schedule II.D, all disputes concerning that clause must be submitted for adjudication in a New York court and interpreted under New York law, in accordance with Section IV.O of the Agreements.

Defendants' Resignations and Hiring By Integro

33.     Integro Insurance Brokers ("Integro") is an insurance brokerage firm with its principal place of business at 3 Times Square, 9th Floor, New York, New York 10036.

34.     Integro offers "Competitive Services" as defined in the Agreements. (*See* Exhibits A - C, Schedule II.D, Section 5).

35.     Upon information and belief, Integro was founded in May 2005 by three former MMC executives.

36.     At or shortly after the time defendants announced their resignations from Guy Carpenter, plaintiffs learned that defendants were hired by Integro.

37.     On April 5, 2007, at the commencement of defendants' respective six (6) month "notice periods," Integro issued a press release announcing "the formation of an international insurance and reinsurance business unit to be based in London." The press release states that "Integro announced *the hiring* of Julian Samengo-Turner and Ron Whyte, who will lead the new unit and join the board of Integro in the U.K." Further, the press release states that "Messrs. Samengo-Turner and Whyte *formerly* led Guy Carpenter's global facultative reinsurance business unit." Regarding Hopkins, the press release states that Hopkins is "[a]lso joining Integro and its U.K. board" and that Hopkins was "*previously* head of Guy Carpenter's U.K. facultative reinsurance operation." (*See* Exhibit D, emphases added). Similarly, the April 9, 2007 edition of Business Insurance magazine attributes to Integro the announcement that the defendants have "joined" Integro and were "formerly" or "previously" with Guy Carpenter.

38.     Upon information and belief, at least eleven Guy Carpenter employees in the facultative reinsurance group (including the defendants) have been recruited or approached, either directly or indirectly, by Integro. Upon information and belief, defendants aided in the solicitation and recruitment of these Guy Carpenter employees, who directly or indirectly reported to them (including each other).

<u>Defendants' Failure to Cooperate</u>

39.     Upon learning of defendants' hiring by Integro and the solicitation of other Guy Carpenter employees who defendants supervised, counsel for plaintiffs sent letters to each defendant dated April 5, 2007 (the "April 5 letters") seeking information pursuant to Section II.E of the Agreements to ascertain whether defendants were honoring their obligations. Specifically, pursuant to the Cooperation Clauses, plaintiffs requested that defendants answer questions relating to the circumstances surrounding defendants' hiring by Integro and

defendants' discussions of their hirings with current Guy Carpenter employees in order for plaintiffs "to establish whether or not [defendants] are in compliance with [their] obligations under the Plan and as a GC employee" (the "Requests"). Plaintiffs requested that defendants provide responses to the Requests in the April 5 letters by April 11, 2007. (*See* Exhibits E - G).

40.    Plaintiffs requested that defendants provide responses to the Requests in the April 5 letters by April 11, 2007.

41.    On April 11, 2007, defendants' counsel responded by letter indicating that defendants could not respond to the Requests by April 11, 2007 because Whyte and Hopkins were on vacation. However, defendants' counsel stated that they were "hoping to take detailed instructions from all three clients by mid next week and will revert as soon as we reasonably can thereafter." (*See* Exhibit H).

42.    In subsequent communications by their counsel, including a letter dated April 19, 2007, defendants have failed to provide answers to the Requests or otherwise provide cooperation as required by the Cooperation Clauses. (*See* Exhibit I at 5).

43.    To date, defendants have failed to cooperate and have not responded to the Requests.

<u>Defendants' Failure to Return Cash Received Under the Plan</u>

44.    In the April 5 letters, plaintiffs reminded defendants that "joining Integro" amounts to Detrimental Activity in violation of their Agreements. (*See* Exhibits E - G at 1).

45.    Accordingly, pursuant to Section I.C(2)(b) of the Agreements, plaintiffs requested that defendants: "(a) [r]eturn all cash and/or shares of MMC common stock that [they]

-11-

KL3 2589853.5

have not disposed of; and (b) [p]ay to MMC an amount equal to the cash and/or the Fair Market

Value (as defined in the Plan) on the vesting date of the MMC common stock that [they] have

disposed of." (*See* Exhibits E- G).

      46.     To date, Defendants have failed to return the cash they received despite

the fact that they have engaged in Detrimental Activity.

### First Claim for Relief

      47.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 46 of the complaint.

      48.     Defendants Samengo-Turner, Whyte and Hopkins have failed to cooperate

as requested by plaintiffs constituting express breaches of Section II.E of their respective

Agreements.

      49.     Plaintiffs have no adequate remedy at law.

### Second Claim for Relief

      50.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 46 of the complaint.

      51.     By accepting employment with, "joining," and otherwise becoming

interested in the supply or proposed supply of Competitive Services (as defined in Schedule II.D

of the Agreements) via Integro, Plaintiffs have engaged in Detrimental Activity (as also defined

in Schedule II.D of the Agreements).

KL3 2589853.5

52.    Defendants have failed, in violation of their obligations under the Agreements, to return any of the cash they received under the Plan.

WHEREFORE, Plaintiffs respectfully requests that the Court:

(i)    issue a mandatory injunction ordering defendants to comply with the Cooperation Clauses set forth the Agreements; to immediately provide responses to the Requests set forth in the April 5 letters; and to promptly provide responses to any future Requests made by plaintiffs under the Cooperation Clauses, including without limitation requests for in-person interviews by plaintiffs and their counsel;

(ii)    award to plaintiffs damages for defendants' breach of contract as a result of their failure to return the amounts paid to them under the Agreements: £77,110 from Samengo-Turner, £61,688 from Whyte, and £46,266 from Hopkins, plus interest; and

(iii)    award to plaintiffs the costs and disbursements of this action; and

(iv)    grant such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          May 4, 2007

                                    Kramer Levin Naftalis & Frankel LLP

                                    By: _____
                                        Barry H. Berke (BB-1421)
                                        Robert N. Holtzman (RH-9525)
                                        Rachel M. Manne (RM-7151)
                                    1177 Avenue of the Americas
                                    New York, New York  10022
                                    (212) 715-9100
                                    Attorneys for Plaintiffs

KL3 2589853.5

**3**

Company Registration No: 3053552

MARSH SERVICES LIMITED

Report and Financial Statements

26 December 2005

LD3
COMPANIES HOUSE          95
                        26/10/2006

MARSH SERVICES LIMITED

REPORT AND FINANCIAL STATEMENTS 2005

## CONTENTS

| | Page |
|---|---|
| DIRECTORS' REPORT | 1 |
| STATEMENT OF DIRECTORS' RESPONSIBILITIES | 4 |
| INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF MARSH SERVICES LIMITED | 5 |
| PROFIT AND LOSS ACCOUNT | 7 |
| STATEMENT OF TOTAL RECOGNISED GAINS AND LOSSES | 7 |
| BALANCE SHEET | 8 |
| NOTES TO THE ACCOUNTS | 9 |

**MARSH SERVICES LIMITED**

## DIRECTORS' REPORT

The directors present their annual report and the audited financial statements of Marsh Services Limited (the 'Company') for the period from 1 January 2005 to 26 December 2005.

### REVIEW OF ACTIVITIES AND FUTURE DEVELOPMENTS

During the period under review, the Company continued to provide employee services to certain UK companies within the Marsh group. These activities are expected to continue for the foreseeable future.

During 2005, the payroll function was outsourced to ADP.

On 20 and 21 December 2005, the Company received £60,000,000 and £60,120,000 respectively by way of interest-free loan from another group company. The loan, which is repayable on demand was provided to enable the Company to pay additional pension funding and to reduce the pension fund deficit.

### POST BALANCE SHEET EVENT

On 28 December 2005, the Company paid £120,120,000 into the Marsh & McLennan Companies UK Limited pension fund. On 1 April 2006 Marsh UK Pension Fund ("the Fund") benefit formula was altered. With effect from that date benefits in respect of service up to 1 April 2006 continue to be calculated on a Final Salary basis. Benefits in respect of service after that date will be calculated on a Career Revalued basis.

### CHANGE OF ACCOUNTING REFERENCE DATE

The Company shortened its accounting reference date to 26 December in the current period.

### RESULTS AND DIVIDENDS

The results of the Company for the financial period ended 26 December 2005 are set out on page 7.

The Company reports a profit on ordinary activities after taxation for the financial period of £58,079,000 (2004 - £33,036,000).

The directors do not recommend the payment of a final dividend (2004 - £nil).

### FINANCIAL INSTRUMENTS

The company is exposed to financial risk through its financial assets and liabilities. The key financial risk is that the proceeds from financial assets are not sufficient to fund the obligations arising from liabilities as they fall due. The most important components of financial risk are interest rate risk, currency risk, credit risk, liquidity risk, cash flow risk and price risk. Due to the nature of the company's business and the assets and liabilities contained within the company's balance sheet the only financial risks the directors consider relevant to this company are credit risk and liquidity risk. These risks are mitigated by the nature of the debtor balances owed, with these due from other group companies who are able to repay these if required.

*1*

**MARSH SERVICES LIMITED**

## DIRECTORS' REPORT (continued)

### DIRECTORS

The directors who served throughout the period, except as noted, were as follows:

| | |
|---|---|
| Mr M W Cooper-Mitchell | (Resigned 31 December 2005) |
| Mr G E Davies | (Appointed 1 January 2006) |
| Mrs J A Elms | |
| Miss T E Foster | (Resigned 24 May 2005) |
| B J Howett | (Chairman) (Appointed 20 May 2005) |
| Mr A A Hyland | (Resigned 30 March 2005) |

### INDEMNITY

The Company has put in place an indemnity in the Articles of Association to indemnify directors and officers of the Company against losses or liabilities sustained in the execution of their duties of office. The indemnity is a qualifying third party indemnity provision under s309A and s309B of the Companies Act 1985, as amended by the Companies (Audit, Investigations and Community Enterprise) Act 2004.

### DIRECTORS' INTERESTS

The Company's ultimate parent company is Marsh & McLennan Companies, Inc., a company registered in the State of Delaware, USA. As the ultimate parent company is a body corporate incorporated outside Great Britain, the directors are exempt from the requirement to notify the Company of interests in shares in other group companies outside Great Britain. There are no other interests requiring disclosure.

### EMPLOYEE INVOLVEMENT

Employees are provided with information on a regular basis concerning the activities and performance of the companies within the group. This is achieved by the circulation of management bulletins and in-house magazines. In addition, regular meetings of representatives of management and staff are held to seek the views of employees upon matters likely to affect their interests.

The group operates two Savings Plans which enable staff to purchase shares in the Common Stock of Marsh & McLennan Companies, Inc. The SAYE Plans operate over three and five year periods and the Stock Purchase Plan operates on the basis of a one year savings period.

### EMPLOYMENT OF DISABLED PERSONS

Applications for employment by disabled persons are always fully considered bearing in mind the respective aptitudes and abilities of the applicant concerned. In the event of members of staff becoming disabled, every effort is made to ensure that their employment with the Company continues and the appropriate training is arranged. It is the policy of the Company that the training, career development and promotion of disabled persons should, as far as possible, be identical to that of a person who is fortunate enough not to suffer from a disability.

### ELECTIVE RESOLUTIONS

In accordance with Section 379A of the Companies Act 1985, the Company has elected to dispense with the laying of accounts and reports before the Company in general meeting, the holding of annual general meetings and the obligation to appoint auditors annually.

2

MARSH SERVICES LIMITED

## DIRECTORS' REPORT (continued)

### AUDITORS

Deloitte & Touche LLP will continue as auditors of the Company.

Approved by the Board of Directors
and signed on behalf of the Board

A H M Cormack
Secretary

23 October   2006

*3*

MARSH SERVICES LIMITED

## STATEMENT OF DIRECTORS' RESPONSIBILITIES

The directors are responsible for preparing the Annual Report and the financial statements. The directors have chosen to prepare the accounts for the company in accordance with United Kingdom Generally Accepted Accounting Practice.

Company law requires the directors to prepare such financial statements for each financial period/year which give a true and fair view in accordance with United Kingdom Generally Accepted Accounting Practice of the state of affairs of the company and of the profit or loss of the company for that period and comply with UK GAAP and the Companies Act 1985. In preparing those financial statements, the directors are required to:

(a)     select suitable accounting policies and then apply them consistently;

(b)     make judgements and estimates that are reasonable and prudent;

(c)     state whether applicable accounting standards have been followed;

(d)     prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985. They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

*4*

## INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF MARSH SERVICES LIMITED

We have audited the financial statements of Marsh Services Limited for the period ended 26 December 2005 which comprise the profit and loss account, the statement of total recognised gains and losses, the balance sheet and the related notes 1 to 21. These financial statements have been prepared under the accounting policies set out therein.

This report is made solely to the Company's members, as a body, in accordance with section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

### Respective responsibilities of directors and auditors

The directors' responsibilities for preparing the annual report and the financial statements in accordance with applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice) are set out in the statement of directors' responsibilities.

Our responsibility is to audit the financial statements in accordance with relevant United Kingdom legal and regulatory requirements and International Standards on Auditing (UK and Ireland).

We report to you our opinion as to whether the financial statements give a true and fair view in accordance with the relevant financial reporting framework and are properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the directors' report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and other transactions is not disclosed.

We read the directors' report and consider the implications for our report if we become aware of any apparent misstatements or material inconsistencies with the financial statements.

### Basis of audit opinion

We conducted our audit in accordance with International Standards on Auditing (UK and Ireland) issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

**INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF MARSH SERVICES LIMITED (continued)**

*Opinion*

In our opinion:

- the financial statements give a true and fair view, in accordance with United Kingdom Generally Accepted Accounting Practice, of the state of the company's affairs as at 26 December 2005 and of its profit for the period from 1 January 2005 to 26 December 2005; and

- the financial statements have been properly prepared in accordance with the Companies Act 1985.

*Deloitte & Touche LLP*

Deloitte & Touche LLP
Chartered Accountants and Registered Auditors
London

23 October 2006

**MARSH SERVICES LIMITED**

## PROFIT AND LOSS ACCOUNT
### For the period from 1 January 2005 to 26 December 2005

| | Notes | 2005 Period to 26 December £'000 | Year ended 31 December 2004 Restated (see note 17) £'000 |
|---|---|---|---|
| TURNOVER | 2 | 440,601 | 438,848 |
| Administrative expenses: | | | |
| - exceptional items | 4 | (28,251) | (24,559) |
| - other administrative expenses | | (329,291) | (366,714) |
| | | (357,542) | (391,273) |
| OPERATING PROFIT | | 83,059 | 47,575 |
| Interest payable and similar charges | 5 | (450) | - |
| Interest receivable and similar income | 6 | - | 40 |
| Other finance income/(charges) | 14c | 296 | (500) |
| PROFIT ON ORDINARY ACTIVITIES BEFORE TAXATION | | 82,905 | 47,115 |
| Tax charge on profit on ordinary activities | 9 | (24,826) | (14,079) |
| PROFIT ON ORDINARY ACTIVITIES AFTER TAXATION AND RETAINED PROFIT FOR THE FINANCIAL PERIOD/YEAR | 16 | 58,079 | 33,036 |

All transactions derive from continuing operations.

## STATEMENT OF TOTAL RECOGNISED GAINS AND LOSSES

| | Notes | 2005 Period to 26 December £'000 | 2004 Restated (see note 17) £'000 |
|---|---|---|---|
| Profit on ordinary activities after taxation | | 58,079 | 33,036 |
| Actuarial losses net of taxation | | (36,260) | (72,240) |
| Prior period adjustment | 17 | (324,072) | - |
| TOTAL RECOGNISED LOSSES IN THE PERIOD | | (302,253) | (39,204) |

MARSH SERVICES LIMITED

**BALANCE SHEET**
**26 December 2005**

| | Notes | 26 December 2005 £'000 | As at 31 December 2004 Restated (see note 17) £'000 |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Debtors | 10 | 168,188 | 130,239 |
| Cash at bank and in hand | | 130,643 | 3,694 |
| | | 298,831 | 133,933 |
| **CURRENT LIABILITIES** | | | |
| Creditors: Amounts falling due within one year | 11 | (296,207) | (161,435) |
| NET CURRENT ASSETS/(LIABILITIES) | | 2,624 | (27,502) |
| **TOTAL ASSETS LESS CURRENT LIABILITIES** | | 2,624 | (27,502) |
| PROVISIONS FOR CHARGES AND LIABILITIES | 12 | (23,039) | (22,274) |
| NET LIABILITIES BEFORE NET POST-RETIREMENT LIABILITY | | (20,415) | (49,776) |
| Net post-retirement liability | 14 | (274,941) | (267,400) |
| NET LIABILITIES | | (295,356) | (317,176) |
| | | | |
| **CAPITAL AND RESERVES** | | | |
| Called up share capital | 15, 16 | 1 | 1 |
| Profit and loss account | 16 | (295,357) | (317,177) |
| EQUITY SHAREHOLDERS' FUNDS | 16 | (295,356) | (317,176) |

These financial statements were approved by the Board on 23 October 2006 and signed on behalf of the Board by

Director   *Ryan Howett*

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS**
**Period ended 26 December 2005**

1. **ACCOUNTING POLICIES**

   **Basis of preparation of accounts**

   The financial statements are prepared under the historical cost convention and in accordance with applicable United Kingdom law and accounting standards. The particular accounting policies adopted are described below.

   **Interest income and expenses**

   Interest income and expenses are accrued on a day-to-day basis.

   **Taxation**

   Current tax, including UK corporation tax and foreign tax, is provided at amounts expected to be paid (or recovered) using the tax rates and laws that have been enacted or substantively enacted by the balance sheet date.

   **Deferred taxation**

   In accordance with FRS 19, deferred tax is provided in full on timing differences which result in an obligation at the balance sheet date to pay more tax, or a right to pay less tax, at a future date, at rates expected to apply when they crystallise based on current tax rates and law. Timing differences arise from the inclusion of items of income and expenditure in taxation computations in periods different from those in which they are including in financial statements. Deferred tax assets are recognised to the extent that it is regarded as more likely than not that they will be recovered. Deferred tax assets and liabilities are not discounted.

   **Pension and other post retirement benefits**

   The Company adopted FRS17 'Retirement Benefits' in full in 2005.

   Regular valuations are prepared by an independent professionally qualified actuary employed within the Marsh & McLennan Companies UK Limited group. These determine the level of contributions required to fund the benefits set out in the rules of the plans and allow for the periodic increase of pensions in payment. Following the full adoption of FRS 17, the regular service cost of providing retirement benefits to employees during the year, together with the cost of any benefits relating to past service, is charged to operating profit in the year.

   A credit/(debit) representing the expected return on the assets of the retirement benefit schemes during the year is included within other finance income/(charges). This is based on the market value of the assets of the scheme at the start of the financial year.

   A charge within other finance income/(charges), representing the expected increase in the liabilities of the retirement benefit schemes during the year, is included within net interest. This arises from the liabilities of the scheme being one year closer to payment.

   The difference between the market value of assets and the present value of accrued pension liabilities is shown as an asset or liability in the balance sheet net of deferred tax.

   Differences between actual and expected returns on assets during the year are recognised in the statement of total recognised gains and losses in the year, together with differences arising from changes in assumptions.

   **Foreign exchange**

   Monetary assets and liabilities denominated in foreign currencies are translated into sterling at the rates of exchange ruling at the balance sheet date. Foreign currency transactions are translated into sterling at the rates of exchange at the dates the transactions occurred.

   All gains and losses arising from foreign exchange transactions are dealt with in the profit and loss account.

9

MARSH SERVICES LIMITED

## NOTES TO THE ACCOUNTS (continued)
### Period ended 26 December 2005

1.    ACCOUNTING POLICIES (continued)

*Cash flow statement*

The Company is exempt from producing a cash flow statement under FRS1 "Cash Flow Statements" (revised 1996) as more than 90% of the voting rights are owned by its ultimate parent undertaking. A consolidated cash flow statement can be found in the published accounts of the ultimate parent company Marsh & McLennan Companies, Inc.

2.    TURNOVER

*Turnover comprises service charges and other income from group companies and is taken to the profit and loss account in the year to which it relates. All turnover arises in the United Kingdom.*

3.    AUDIT FEES

The audit fee was borne by a fellow subsidiary undertaking during the current period and preceding year.

4.    ADMINISTRATIVE EXPENSES

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 £'000 |
|---|---|---|
| Exceptional items (see below) | 28,251 | 24,559 |

The exceptional item in 2005 is a charge of £28,251,000 (2004 - £24,559,000) relating to redundancy costs.

5.    INTEREST PAYABLE AND SIMILAR CHARGES

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 £'000 |
|---|---|---|
| Interest payable | 438 | - |
| Loss on foreign exchange | 12 | - |
| | 450 | - |

6.    INTEREST RECEIVABLE AND OTHER INCOME

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 £'000 |
|---|---|---|
| Interest receivable | - | 36 |
| Gain on foreign exchange | - | 4 |
| | - | 40 |

*10*

**MARSH SERVICES LIMITED**

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

7.    EMPLOYEE INFORMATION

Marsh Services Limited is the principal employing company within the Marsh & McLennan Companies UK Limited group.

Employee information contained in these financial statements relates to all personnel employed by Marsh Services Limited.

Further information regarding employee involvement is given in the directors' report of Marsh & McLennan Companies UK Limited.

Amounts paid in respect of employees and directors during the year include the following:

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 Restated (see note 17) £'000 |
|---|---|---|
| **Employee costs (including directors)** | | |
| Redundancy cost | 28,251 | 24,559 |
| Aggregate gross salaries and wages | 242,831 | 258,229 |
| Employers' national insurance contributions | 27,643 | 28,426 |
| Employers' pension contributions under the group pension scheme | 27,528 | 37,800 |
| | 326,253 | 349,014 |

| | Period ended 26 December 2005 No. | Year ended 31 December 2004 No. |
|---|---|---|
| The average monthly number of persons, including directors, employed by the company during the year was as follows: | | |
| Administration | 5,174 | 5,671 |
| Information systems | 150 | 167 |
| | 5,324 | 5,838 |

8.    DIRECTORS' EMOLUMENTS

The directors are also directors of fellow group undertakings. It is not practicable to allocate their emoluments between their services as directors of the Company and their services as directors of the fellow group undertakings. Consequently, their emoluments are shown in the Company where their main area of responsibility lies.

*11*

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

9.    TAX CHARGE ON PROFIT ON ORDINARY ACTIVITIES

|  | Period ended 26 December 2005 | Year ended 31 December 2004 Restated (see note 17) |
|---|---|---|
|  | £'000 | £'000 |
| **The taxation charge comprises:** | | |
| United Kingdom corporation tax at 30% (2004 - 30%) | 13,796 | 14,753 |
| Adjustments in respect of prior years | (5,573) | (96) |
| Total current tax | 8,223 | 14,657 |
| | | |
| Deferred taxation (note 13) | | |
| Current year | 11,075 | (618) |
| Prior year | 5,528 | 40 |
| Total deferred taxation | 16,603 | (578) |
| **Total tax charge on profit on ordinary activities** | 24,826 | 14,079 |

The tax assessed for the year is lower than that resulting from applying the standard rate of corporation tax in the UK of 30% (2004 - 30%). The differences are explained below:

|  | Period ended 26 December 2005 | Year ended 31 December 2004 Restated (see note 17) |
|---|---|---|
|  | £000 | £000 |
| Profit on ordinary activities before tax | 82,905 | 47,115 |
| | | |
| Expected tax charge at 30% thereon | 24,872 | 14,134 |
| Effects of: | | |
| | | |
| Adjustments in respect of prior years | (5,573) | (96) |
| Short-term timing differences | - | 1,236 |
| Movement in pension and post retirement benefit obligations | (11,076) | (617) |
| Total current tax | 8,223 | 14,657 |

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

10.   **DEBTORS:**
      Amounts falling due within one year

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 Restated (see note 17) £'000 |
|---|---|---|
| Amounts owed by parent and fellow subsidiary undertakings | 123,501 | 75,747 |
| Amounts recoverable from other group undertakings in respect of taxation | 19,154 | 8,536 |
| Deferred tax (note 13) | 20,704 | 43,920 |
| Other debtors | 4,829 | 2,036 |
| | 168,188 | 130,239 |

11.   **CREDITORS:**
      Amounts falling due within one year

| | Period ended 26 December 2005 £'000 | Year ended 31 December 2004 £'000 |
|---|---|---|
| Bank overdraft | - | 15,448 |
| Amounts owed to other group undertakings | 238,648 | 100,001 |
| Other creditors | | |
| - Amounts due to other group undertakings in respect of taxation | 1,082 | 1,082 |
| Accruals and deferred income | 56,477 | 44,904 |
| | 296,207 | 161,435 |

12.   **PROVISIONS FOR LIABILITIES AND CHARGES**

| | At 1 Jan 2005 £'000 | Utilisation £'000 | Increase/ (release) £'000 | At 26 Dec 2005 £'000 |
|---|---|---|---|---|
| Post-retirement benefits | 11,764 | (423) | - | 11,341 |
| Incapacity provision | 10,510 | 350 | 838 | 11,698 |
| | 22,274 | (73) | 838 | 23,039 |

Post-retirement benefits other than pensions comprised prior year obligations for certain pensioners relating to healthcare and life assurance benefits over the remaining lives of those pensioners.

The Incapacity provision comprises the current value of expected future amounts payable to or on behalf on staff on the Long-Term Sick Scheme, net of amounts covered by insurance.

MARSH SERVICES LIMITED

## NOTES TO THE ACCOUNTS (continued)
Period ended 26 December 2005

13.    DEFERRED TAXATION

|  | Period ended 26 December 2005 | Year ended 31 December 2004 Restated (see note 17) |
|---|---|---|
| Provided | £'000 | £'000 |
| *Movements on the deferred taxation account were as follows:* | | |
| At 1 January | 43,920 | 55,294 |
| Charged to profit and loss account | (16,603) | 578 |
| Transfer to statement of total recognised gains and losses | (18,841) | (19,102) |
| Transfer to other group company | (80) | 6,640 |
| Movement in net post-retirement liability | 12,308 | 510 |
| At 31 December | 20,704 | 43,920 |

Analysis of deferred tax balance:

|  | Period ended 26 December 2005 | Year ended 31 December 2004 Restated (see note 17) |
|---|---|---|
|  | £'000 | £'000 |
| Short-term timing differences | 6,411 | 4,061 |
| Pension and post-retirement obligations | 14,293 | 39,859 |
|  | 20,704 | 43,920 |

The transfer to statement of total recognised gains and losses is the current year reversal of the tax relief for pension contributions made to cover an actuarial loss in the pension fund. Corporation tax relief for these payments is being spread over a number of years and there is an equal and opposite movement for current tax in the statement of total recognised gains and losses.

14.    PENSION SCHEME

a)    Financial assumptions

The group operates a defined benefit scheme in the UK. A full actuarial valuation was carried out at 31 December 2003 and updated to 26 December 2005 by a qualified actuary period employed within the Marsh & McLennan Companies UK Limited group. The major assumptions used by the actuary were (in nominal terms):

|  | At period end 26 Dec 2005 % | At year end 31 Dec 2004 % | At year end 31 Dec 2003 % |
|---|---|---|---|
| Rate of increase in salaries | 4.00 | 4.00 | 4.00 |
| Rate of increase of pensions in payment | 2.75 | 2.75 | 2.50 |
| Rate of increase of pensions in deferment | 2.75 | 2.75 | 2.50 |
| Discount rate | 4.70 | 5.30 | 5.40 |
| Inflation assumption | 2.75 | 2.75 | 2.50 |

*14*

MARSH SERVICES LIMITED

## NOTES TO THE ACCOUNTS (continued)
### Period ended 26 December 2005

14.    PENSION SCHEME (continued)

b)    Market value of assets and expected rates of return

| | At period end 26 Dec 2005 | | At year end 31 Dec 2004 | | At year end 31 Dec 2003 | |
|---|---|---|---|---|---|---|
| | % | £m | % | £m | % | £m |
| Equities | 7.1 | 1,127.7 | 7.5 | 934.1 | 7.8 | 811.7 |
| Government bonds | 4.1 | 371.7 | 4.3 | 258.2 | 4.8 | 241.0 |
| Non-government bonds | 4.7 | 341.3 | 5.3 | 371.6 | 5.4 | 350.0 |
| Property | 7.1 | 45.5 | 7.5 | 44.8 | 7.8 | 21.0 |
| Insured pensions | 4.7 | 5.6 | 5.3 | 1.1 | 5.4 | 1.0 |
| Cash | 4.5 | 9.6 | 4.8 | 0.3 | 3.8 | 4.5 |
| Total market value of assets | | 1,901.4 | | 1,610.1 | | 1,429.2 |
| Actuarial value of liability | | (2,294.2) | | (1,992.1) | | |
| Total deficit in the scheme | | (392.8) | | (382.0) | | |
| Effect of surplus cap | | - | | - | | |
| Recoverable deficit in the scheme | | (392.8) | | (382.0) | | |
| Related deferred tax asset | | 117.9 | | 114.6 | | |
| Net pension deficit | | (274.9) | | (267.4) | | |

c)    Analysis of the amounts charged to operating profits

| | Period ended 26 Dec 2005 £m | Year to 31 Dec 2004 £m |
|---|---|---|
| **Operating cost** | | |
| Current service cost | 42.3 | 37.8 |
| Curtailment gain | (15.2) | (1.2) |
| Past service cost | 1.7 | 0.3 |
| Total operating charge | 28.8 | 36.9 |
| **Finance cost** | | |
| Expected return on scheme assets | (103.3) | (92.9) |
| Interest on pension liabilities | 103.1 | 93.4 |
| Net finance (income)/charges | (0.2) | 0.5 |
| Total pension costs | 28.6 | 37.4 |

d)    Analysis of amounts recognised in statement of total recognised gains and losses

| | Period ended 26 Dec 2005 £m | Year to 31 Dec 2004 £m |
|---|---|---|
| Actual return less expected return on assets | 185.1 | 70.8 |
| Experience gains and losses on liabilities | 10.0 | (26.6) |
| Changes in assumptions | (246.9) | (147.4) |
| Actuarial loss recognised in statement of recognised gains and losses | (51.8) | (103.2) |

15

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

14.   PENSION SCHEME (continued)

e)   Movements in liability during the period/year

| | Period ended 26 Dec 2005 £m | Year to 31 Dec 2004 £m |
|---|---|---|
| Deficit of scheme at beginning of period/year | (382.0) | (302.5) |
| Movement in year: | | |
| Current service cost | (42.3) | (37.8) |
| Contributions | 69.6 | 61.1 |
| Past service costs | (1.7) | (0.3) |
| Curtailment | 15.2 | 1.2 |
| Other finance income/(costs) | 0.2 | (0.5) |
| Actuarial loss | (51.8) | (103.2) |
| Deficit of scheme at end of period/year | (392.8) | (382.0) |

The actuarial valuation at 26 December 2005 showed an increase in the deficit from £382.0m to £392.8m. Improvements in benefits costing £1.7m were made in 2005 and contributions increased to £69.6m.

f)   History of experience gains and losses

| | Period ended 26 December 2005 £m | Year ended 31 December 2004 £m |
|---|---|---|
| Actual return less expected return: | | |
| Amount | 185 | 71 |
| % of scheme assets at end of period/year | 10% | 4% |
| Experience gains and losses on scheme liabilities: | | |
| Amount | 10 | (27) |
| % of scheme liabilities at end of period/year | 0% | (1%) |
| Total amount recognised in statement of total recognised gains and losses: | | |
| Amount | (52) | (103) |
| % of scheme liabilities at end of period/year | (2%) | (5%) |

15.   CALLED UP SHARE CAPITAL

| | 2005 £'000 | 2004 £'000 |
|---|---|---|
| Authorised, called up, allotted and fully paid: | | |
| Ordinary shares of £1 each | 1 | 1 |

*16*

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

16.   RECONCILIATION OF MOVEMENTS IN SHAREHOLDERS' FUNDS

| | Share capital £'000 | Profit and loss account £'000 | Total £'000 |
|---|---|---|---|
| As at 1 January 2005 as previously reported | 1 | 6,896 | 6,897 |
| Prior period adjustment (see note 17) | - | (324,072) | (324,072) |
| Retained profit for the financial period/year | - | 58,079 | 58,079 |
| Actuarial loss on pension liability net of taxation | - | (36,260) | (36,260) |
| As at 26 December 2005 | 1 | (295,357) | (295,356) |

| | Share capital £'000 | Profit and loss account £'000 | Total £'000 |
|---|---|---|---|
| As at 1 January 2004 as previously reported | 1 | 2,671 | 2,672 |
| Prior period adjustment (see note 17) | - | (280,644) | (280,644) |
| Retained profit for the financial year | - | 33,036 | 33,036 |
| Actuarial loss on pension liability net of taxation | - | (72,240) | (72,240) |
| As at 31 December 2004 | 1 | (317,177) | (317,176) |

17.   PRIOR PERIOD ADJUSTMENT

The following adjustments have been made to opening shareholders' funds as a result of the adoption of FRS17 "Retirement Benefits" in full in 2005.

| | December 2004 £'000 | December 2003 £'000 |
|---|---|---|
| Post-retirement liability (net of deferred tax) | 267,400 | 211,750 |
| Reversal of SSAP24 pension prepayment | 80,960 | 98,420 |
| Deferred tax on SSAP24 pension prepayment | (24,288) | (29,526) |
| Total prior period adjustments recognised in the statement of total recognised gains and losses | 324,072 | 280,644 |

18.   RELATED PARTY TRANSACTIONS

Advantage has been taken of the exemption under Financial Reporting Standard 8 not to disclose transactions between entities, 90% or more of whose voting rights are controlled within the Marsh & McLennan Companies, Inc., Group.  There were no other related party transactions during the year.

MARSH SERVICES LIMITED

**NOTES TO THE ACCOUNTS (continued)**
**Period ended 26 December 2005**

19.    **CONTINGENT LIABILITIES**

The Company participates in a sterling cash pooling arrangement with Barclays Bank PLC. Each member of the pool guarantees against all losses incurred as a result of the failure of any other pool member. The other pool members are; Marsh Treasury Services Limited, Marsh & McLennan Companies UK Limited, Marsh Corporate Services Limited, Marsh Limited, Marsh UK Group Limited, Price Forbes Limited, Tower Hill Limited, Tower Place Developments Limited, Marsh International Broking Holdings Limited, MMC Capital Limited, Kroll Ltd and Mercer Oliver Wyman Ltd.

20.    **POST BALANCE SHEET EVENT**

On 28 December 2005, the Company paid £120,120,000 into the Marsh & McLennan Companies UK Limited pension fund. On 1 April 2006 Marsh UK Pension Fund ("the Fund") benefit formula was altered. With effect from that date benefits in respect of service up to 1 April 2006 continue to be calculated on a Final Salary basis. Benefits in respect of service after that date will be calculated on a Career Revalued basis.

21.    **IMMEDIATE AND ULTIMATE PARENT COMPANIES**

The Company's immediate parent company is Marsh UK Group Limited, incorporated in Great Britain and registered in England and Wales. The Company's ultimate parent company and controlling entity is Marsh & McLennan Companies, Inc., incorporated in the state of Delaware, USA.

The largest group in which the results of Marsh Services Limited are consolidated is that headed by Marsh & McLennan Companies, Inc. The smallest group in which they are consolidated is that headed by Marsh & McLennan Companies UK Limited, registered in England and Wales. The consolidated accounts of Marsh & McLennan Companies UK Limited and of Marsh & McLennan Companies, Inc. are available to the public and may be obtained from:

Companies House
Crown Way
Cardiff
CF14 3UZ

and also from:

The Company Secretary
Marsh & McLennan Companies UK Limited
1 Tower Place West
Tower Place
London
EC3R 5BU