**5**

98/13/14/1527L
17th November 1997

J&H Marsh & McLennan (Services) Ltd.
The Bowring Building
Tower Place
London EC3P 3BE
Telephone 0171 357 1000
Fax       0171 929 2705

**J&H MARSH &
MCLENNAN**

**PERSONAL**
Mr J Samengo-Turner
50 Winsham Grove
London  SW11 6NE

Dear Mr Samengo Turner

We are pleased to be able to detail the following Terms and Conditions of Employment which are being issued to all former Johnson & Higgins and former Bowring staff in the new J&H Marsh & McLennan organisation and come into effect from 1st January 1998.

**APPOINTMENT**

Your appointment is as stated in your appointment letter or as subsequently amended.  Your job grade is 15 and the date you commenced employment is 23rd September 1991.

Your employer is J&H Marsh & McLennan (Services) Ltd (hereafter referred to as 'the Company').

Where the term 'Group' is used in this Agreement, it shall mean Marsh & McLennan Companies Inc., and any subsidiary or associated companies.

**REMUNERATION**
                    REDACTED
Your basic annual salary is|          |paid monthly in arrears.

You will be eligible for consideration for an annual cash bonus related to your own performance and the performance of the company.  Any bonus award will not be pensionable, nor will it be included in the calculation of any benefit payments.  Further details are attached.

Any entitlement to a lunch or luncheon vouchers or equivalent payment is shown in the summary contained in the Information Pack.

**COMPANY MEDICAL EXPENSES SCHEME**

You are eligible for membership of the Company Medical Expenses Scheme and you will find details in the Information Pack.

**COMPANY CAR**

If you are entitled to the use of a company car, the value will be determined by your job grade at the time of purchase.  Insurance, tax and all servicing charges are met by the company. Cars are replaced at 60,000 miles or after 4 years whichever is the sooner.  However in certain circumstances the company reserves the right to ask you to keep a car for longer.

Unless your car is provided for business use, you may choose to accept a non-pensionable cash alternative of 30% p.a. of your individual permitted value. If at a later date you decide to accept the offer of a car, the cash alternative will be withdrawn. You may also accept a car at a lower value than that to which you are entitled and receive a downsizing allowance of 25% of the difference between the on road cost of the car purchased and your permitted value. These allowances are available either at the time you first become entitled to the use of a company car or when your car becomes due for renewal.

The use of the car is in accordance with the company car policy.

## DRIVING LICENCE

Employees who are eligible for a company car or are required to drive a company vehicle must be in possession of a valid and current driving licence. If at any time you are banned from driving for a period, you must notify the Company immediately. If the ban affects your ability to carry out your role, the Company will consider transferring you to an alternative position. If the Company is unable to locate a suitable alternative position, it will be necessary to terminate your contract of employment.

## HOURS OF WORK

Your normal hours of work unless specified differently in your appointment letter, subsequently amended or agreed otherwise by your manager are 9.30 a.m. to 5.30 p.m. (London) or 9.00 a.m. to 5.00 p.m. (outside London) Monday to Friday with a one hour break for lunch to be taken at a time to be agreed with your manager. It may be necessary to vary or increase these hours from time to time where business or operational requirements demand it.

## PLACE OF WORK

Your place of work is at J&H Marsh & McLennan offices in the City of London.

However during the course of your employment you may be required to work at an alternative location within reasonable travelling distance of your initial place of work.

For staff whose job requires regular business travel, as part of your duties you will be required to travel to client and other J&H Marsh & McLennan offices.

## TRADING WITH LLOYD'S OF LONDON

If your position requires you to trade with Lloyd's either face to face or electronically, Lloyd's bylaws require you to pass the Lloyd's Introductory Test unless you currently hold, or have held (in relevant circumstances), a Lloyds Security Pass. If you need to pass the test and this is not achieved within the required time period, the Council of Lloyd's will bar you from trading. The Company will therefore have to consider transferring you to a suitable alternative position. If none is available, your contract of employment will be terminated.

## HOLIDAYS

Holiday pay is calculated on your basic annual salary. In addition to Bank and other Public Holidays, paid annual holiday entitlement for full time staff is set out below:

|  | Staff in Grades 1 to 8 | Staff in Grades 9 and above |
|---|---|---|
| At commencement: | 20 | 25 |
| At 2 years' continuous service: | 21 | 25 |
| At 4 years' continuous service: | 22 | 25 |
| At 6 years' continuous service | 23 | 25 |
| At 8 years' continuous service: | 24 | 25 |
| At 10 years' continuous service: | 25 | 25 |

Staff who have continuous service as below may, in addition to normal holiday entitlement, take a one-off long service holiday in the year of qualification:

| Continuous Service | Additional Leave in anniversary year | Total Leave in that year |
|---|---|---|
| 15 years) | 2 days | 27 days |
| 20 years) | | |
| 25 years) | | |
| 30 years) | 3 days | 28 days |
| 35 years) | | |
| 40 years) | 5 days | 30 days |
| 45 years) | 5 days | 30 days |

The following general conditions also apply:

a)    The holiday year runs from 1st January to 31st December.

b)    The Personnel Department will calculate holiday entitlement for part-time staff.

c)    Staff will only qualify for additional holiday entitlement in a year due to service or to a job grade change if the service anniversary or regrading takes place up to and including 1st July.  If this occurs between 2nd July and 31st December, the revised entitlement will not apply until the following holiday year.

d) Staff, in the year of their joining or leaving the service of the Company, will be entitled to a proportion of their annual holiday entitlement based on the number of complete calendar months worked in that year. For those entitled to 20 to 22 working days annual holiday, the scale will be 2 working days per completed calendar month and for those granted 23 to 25 days, the scale will be 2.5 working days per completed month subject to an overriding maximum of the annual entitlement. A member of staff who is summarily dismissed from the service of the Company will forfeit any claim to accrued holiday entitlement.

e) Staff are not entitled to any additional holidays and subject to h) below, during service, no payment will be made in lieu of holidays not taken.

f) At management discretion, a maximum of one week's holiday entitlement may be carried forward to the first quarter of the following year, if abnormal work pressure has prevented full holiday entitlement from being taken within the calendar year.

g) Holidays must be arranged in accordance with departmental requirements. Staff may not normally take more than ten working days' leave at any one time. All holiday must be agreed with management prior to booking.

h) Staff leaving the Company should normally take any residual holiday entitlement (as specified in d) above) during their notice period. However, subject to management agreement, payment may be made in lieu of holidays not taken. Similarly, if holidays have been taken in excess of the entitlement at the time of leaving, an appropriate deduction will be made from the final salary payment. Calculations of holiday pay owed by or to the Company will be made on basic annual salary.

## ABSENCE THROUGH SICKNESS OR INJURY

Details of occupational sick pay and statutory sick pay and the reporting procedures for staff absence through illness and injury are attached and form part of the contract of employment.

## OTHER ABSENCE

Payment for absence for other reasons will be at the discretion of the Company.

Payment of salary and any other allowances will be suspended automatically after three working days of absence without explanation. The Company will make efforts to contact the absent member of staff to discuss reasons for the absence and the likely date of return. However, if unexplained absence extends beyond ten working days, the Contract of Employment will be regarded as terminated without the required period of notice being given.

## PENSION

You are eligible to become a member of the J&H Marsh & McLennan Group Pension Fund ('the Fund') if you are aged at least 20 but less than 63, normally employed in the UK and not a temporary employee. While you have the right to join the Fund, there is no requirement to do so. You will be made a member of the Fund with contributions deducted from salary unless you confirm in writing that you do not wish to join.

Contributions to the Fund are currently 3% of pensionable salary. In addition, there is a supplementary scheme for senior staff, currently those graded 14 and above, which provides enhanced retirement benefits.

A Contracting Out Certificate is in force for all members of the Fund. The Rules of the Fund may be inspected on request in the Pensions Department. A summary of the eligibility criteria and benefits is contained in the Information Pack and an explanatory booklet is available from the Pensions Department.

The Normal Retirement Date for both men and women is at age 65.

If your salary is above the earnings cap (£84,000 per annum with effect from 6th April '97) and you joined the Company on or after 1st June 1989, you are affected by the provisions of the Finance Act 1989 (leaflet available from the Pensions Department). You will be covered for life assurance of 4 x your basic salary but premiums for the part above the cap will lead to an income tax charge.

If when eligible you are not a member of the Fund, you must by law either participate in a Personal Pension Plan or alternatively the State Earnings Related Pension Scheme. Please note that you may not legally contribute to a Personal Pension Plan as well as the Fund. You should not join the Fund if you wish to contribute to a Personal Pension.

## NOTICE

Your employment with the Company may be terminated by the Company or by you, by giving notice in writing as follows:

a)  Prior to completion of 26 weeks' service - not less than 7 days

b)  Between 26 weeks' and 4 years' service - not less than 4 complete weeks

c)  Between 4 years' and 12 years' service - not less than 1 week for every year of continuous employment

d)  After more than 12 years' service - not less than 12 weeks

Notice for all staff in Job Grade 10 and above is 12 weeks for either party irrespective of length of service with the Company. At the discretion of the company, during the notice period staff may be required not to attend the office, but must be available for work should this be required. The Company also reserves the right to make payment in lieu of notice to you instead of requiring you to work your notice.

## CONFIDENTIAL INFORMATION AND COPYRIGHT

You must neither during nor after your employment with the Company disclose or permit to be disclosed to any person, firm or Company, any confidential information of the Company or of any other member of the Group. Confidential information includes but is not limited to information relating to the Group's clients and prospective clients, insurance markets, technology, know how, technical information, business plans and finances whether or not such information is recorded in documentary form or computer disk or tape.

The Company remains the owner of all property (including copyright and similar commercial rights) and all work produced in the course of your employment with the Company.

## DISCLOSURE

At no time, whether before or after the termination of your employment, are you to disclose in any way, or use for your or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any Group company unless such disclosure or use is required by law, or you have been authorised so to do by your Chief Executive.

## INFORMATION SECURITY POLICY

Employees must be aware of and adhere to the J&H Marsh & McLennan Information Security Policy, a copy of which is attached.  Failure to comply with the provisions of this policy may lead to disciplinary action up to and including termination of employment.

## COMPETING BUSINESS

You must not during your employment with the Company be concerned or interested directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance, or mortgage broker or agent or be personally employed or engaged in any of these capacities without having first gained the written consent of the Company.

You must not within a period of one year after the termination of your employment, directly or indirectly, either on your own account or for any other person, firm or company, canvass or solicit clients of the Company or any other member of the Group with whom you had contact at any time during the 18 months preceding termination of your contract.

The restrictions contained in this clause are considered reasonable by the parties but in the event that any such restriction shall be found to be void by a court of law but would be valid if some part thereof were deleted or amended or the period or area of application reduced then such restriction shall apply with such modifications as may be necessary to make it valid effective and enforceable.

## DISCIPLINE AND GRIEVANCES

The Disciplinary Procedure is designed to help and encourage all employees to achieve and maintain required standards of conduct, attendance and job performance.

The Grievance Procedure is designed to provide a means by which employees who have a grievance relating to employment may seek a remedy.

The Company's Disciplinary Rules are designed to facilitate the efficient conduct of the Company's business and to provide a reasonable working environment for all employees.  The Rules give examples of offences that will be regarded as misconduct or gross misconduct. These lists are by no means exhaustive, and other offences not listed may be regarded as falling in either category.

The procedures and rules are in accordance with the ACAS Code of Practice on Disciplinary Practice and Procedure in Employment and are attached. The rules and procedures are not contractual terms of employment.

If you are dissatisfied with any disciplinary decision made against you during your employment, you may appeal to the next level of management. Appeals must be in writing within two days of receipt of written confirmation of the disciplinary decision.

If you have a grievance related to your employment, you should first discuss it with your departmental manager.

## CONVICTIONS

You are required to disclose any conviction which is not spent by virtue of the Rehabilitation of Offenders Act 1974. Similarly, if you receive any conviction during your employment, it should be disclosed to the Company.

If your conviction affects your employment with the Company, it may be necessary to terminate your contract of employment. A conviction which the company considers irrelevant to the job will not be taken into consideration.

## MEMBERSHIP OF TRADE UNIONS

While you have the right to join an Independent Trade Union and to take part in its activities, there is no requirement to do so. There are no collective agreements in existence which directly affect your terms and conditions.

This contract supersedes any previous Contracts of Employment.

Please acknowledge your acceptance of these Terms & Conditions of Employment by signing and dating the enclosed copy of this letter and returning it to Louise Piner, Group Personnel Department, London by 16th January 1998.

Please do not hesitate to raise any queries with myself.

Yours sincerely

**Graham Clague**
**Group Personnel Manager**

Signed        ....................................

Company/Dept    Roshem development group, M.M.G.B

Date        22. 12.97

**6**

Marcus Hopkins contract14plus.doc

Marsh Corporate Services Ltd
40 Trinity Square
London EC3N 4DJ
Telephone  020 7357 1000
Fax         020 7929 2705

Monday, 10 April 2000

# MARSH

**PERSONAL**
Marcus Hopkins
1 Belmont Road
London
SW4 0BZ

*Start Date.*

Dear Marcus

Following recent discussions with Michael Duffy, I am pleased to confirm our offer of employment as follows:

**APPOINTMENT**

Your appointment will be as a Senior Vice President, Grade 16, in the Facultative Broker Practice, Guy Carpenter and Co Ltd.  Your employment will commence on a date to be advised, as will your continuous employment with the Company.  Please advise your start date in the space provided at the end of this letter. This is not a temporary or fixed term contract.

Your employer will be Marsh Corporate Services Ltd. (hereafter referred to as "the Company").

Where the term "Group" is used in this Agreement, it shall mean Marsh & McLennan Companies, Inc ("MMC"), and any Associated Companies.

"Associated Company" shall mean any company which for the time being is (whether directly or indirectly):

(i)     a subsidiary (as defined by Section 736 of the Companies Act 1985) of MMC;
(ii)    a company over which MMC has control within the meaning of Section 840 of the Income and Corporation Taxes Act 1988;  or
a subsidiary undertaking of MMC as defined by Section 258 of the Companies Act 1985.

**REMUNERATION**

REDACTED

Your basic annual salary will be at the rate of[          ], paid monthly in arrears.

For each working day you will be entitled to a lunch in the staff restaurant or to a luncheon voucher dependant upon your location.

1

Registered Number 3053552 England
Registered Office No. 1, The Marsh Centre
London E1 8DX

An **MMC** Company

**BONUS**

You will be eligible for consideration for an annual discretionary cash bonus related to your own performance and the performance of the Company. Any bonus award will not be pensionable, nor will it be included in the calculation of any benefit payments.

<strong>REDACTED</strong>

You will also be entitled to receive a bonus of up to _____, which will be dependent upon the bonus you may receive from your current employer. If you receive less than _____ from your current employer for your 1999-2000 bonus we will pay you the difference to make the total value of the bonus _____ **REDACTED**

To compensate for the loss of your Heath shares, we will offer either _____ worth of DSU's which will vest three years after the date that they are granted, or if they are unavailable at that time we will pay a total of _____ in three equal annual instalments (i.e. 2001, 2002 and 2003). The first payment will be made to you twelve months after you commence employment with Guy Carpenter and Co Ltd.

**MEDICAL EXPENSES SCHEME**

You are eligible for membership of the Marsh Medical Expenses Scheme and details will be issued early next year.

**COMPANY CAR**

<strong>REDACTED</strong>

The company will provide for your use a car the value of _____ which is be determined by your job grade at the time of purchase. Insurance, tax, maintenance, repairs and all servicing charges are met by the Company. Normally Company cars are replaced at 60,000 miles or after 4 years, whichever is the sooner. However, in certain circumstances the Company reserves the right to ask you to keep a car for longer.

If you do not wish to accept the offer of a car and unless the car is provided for business use, a non-pensionable cash alternative of 30% p.a. of the above value is available. If, at a later date, you decide to accept the offer of a car, the cash alternative will be withdrawn. You may also decide to accept a car at a lower value to that which you are entitled and receive a downsizing allowance of 25% of the difference between the on-the-road cost of the car purchased and your permitted value. These allowances are available either at the time you first become entitled to the use of a car or when your car becomes due for renewal.

The use of the car is in accordance with the Company's car policy as amended from time to time.

**DRIVING LICENCE**

Employees who are eligible for a Company vehicle must hold a valid and current driving licence. If at any stage you are banned from driving for a period, you must notify the Company immediately. If the ban affects your ability to carry out your role, the Company

2

will consider transferring you to an alternative position. If we are unable to locate a suitable alternative position, it will be necessary to terminate your contract.

## HOURS OF WORK

Your normal hours of work will be from 9.30 am to 5.30 pm, Monday to Friday, with a one hour break for lunch. It may be necessary to vary these hours from time to time where operational requirements demand it.

At certain times it may be necessary to ask you to work longer hours according to the needs of the business.

## PLACE OF WORK

You will work in the Marsh offices in Aldgate House. However, during the course of your employment, you may be required to work at an alternative location within reasonable travelling distance of your initial place of work.

If your job demands business travel as part of your duties, you will be required to travel to clients and other Marsh offices.

## TRADING WITH LLOYD'S OF LONDON

If your position requires you to trade with Lloyd's either face to face or electronically, Lloyd's bylaws require you to pass the Lloyd's Introductory Test unless you currently hold, or have held (in relevant circumstances), a Lloyd's Security Pass. If you need to pass the test and this is not achieved within the required time period, the Council of Lloyd's will bar you from trading. The Company will therefore have to consider transferring you to a suitable alternative position. If none is available, your contract will be terminated.

## CONDITIONS OF EMPLOYMENT

This offer is made subject to the following conditions;-

- the receipt of references and a medical questionnaire (enclosed) both of which are satisfactory to the Company. If you join before these have been obtained and approved, the Company reserves the right to terminate the employment by giving minimum statutory notice or equivalent pay in lieu.

- confirmation that the Company may lawfully employ you in the UK. This will require you to produce satisfactory evidence of your National Insurance Number (eg. your P45 or P46) and other satisfactory evidence of your entitlement eg. Passport, Birth Certificate and other documents that the Company may require).

3

## HOLIDAYS

Holiday pay is calculated on your basic annual salary. In addition to Bank and other Public Holidays, the paid annual holiday entitlement for full-time staff is set out below - :

|  | Staff in Grades 1 to 8 | Staff in Grades 9 & above |
|---|---|---|
| At commencement: | 22 | 26 |
| At 3 years' continuous service: | 23 | 26 |
| At 6 years' continuous service: | 24 | 26 |
| At 9 years' continuous service: | 25 | 26 |
| At 12 years' continuous service: | 26 | 26 |

Staff who have continuous service as below may, in addition to normal holiday entitlement, take a one-off long service holiday in the year of qualification:

| Continuous Service | Additional Leave in anniversary year | Total Leave in that year |
|---|---|---|
| 15 years) | 2 days | 28 days |
| 20 years) | | |
| 25 years) | | |
| 30 years) | 3 days | 29 days |
| 35 years) | | |
| 40 years) | 5 days | 31 days |
| 45 years) | | |

The following general conditions also apply:

a)     The holiday year runs from 1st January to 31st December.

b)     The HR Department will calculate holiday entitlement for part-time staff.

c)     Staff will only qualify for additional holiday entitlement in a year due to service or to a job grade change if the service anniversary or regrading takes place up to and including 1st July. If this occurs between 2nd July and 31st December, the revised entitlement will not apply until the following holiday year.

d)     Staff, in the year of their joining or leaving the service of the Company, will be entitled to a proportion of their annual holiday entitlement based on the number of complete calendar months worked in that year. For those entitled to 22, 23 or 24 working days annual holiday, the scale will be 2.0 working days per completed calendar month to a maximum of 22, 23 or 24 working days. Similarly, for those granted 25 or 26 days, the scale will be 2.5 working days per completed month, subject to an overriding maximum of the annual entitlement. A member of staff who is summarily dismissed from the service of the Company will forfeit any claim to accrued holiday entitlement.

e)     Staff are not entitled to any additional holidays and subject to h) below, during service, no payment will be made in lieu of holidays not taken.

4

f)    At management discretion, a maximum of one week's holiday entitlement may be carried forward to the first quarter of the following year, if abnormal work pressure has prevented full holiday entitlement from being taken within the calendar year.

g)    Holidays must be arranged in accordance with departmental requirements. Staff may not normally take more than ten working days' leave at any one time.

Staff leaving the Company should normally take any residual holiday entitlement (as specified in d) above) during their notice period. However, subject to management agreement, payment may be made in lieu of holidays not taken. Similarly, if holidays have been taken in excess of the entitlement at the time of leaving, an appropriate deduction will be made from the final salary payment. Calculations of holiday pay owed by or to the Company will be made on basic annual salary.

## ABSENCE THROUGH SICKNESS OR INJURY

Details of company sick pay, statutory sick pay, and the reporting procedure for staff absent through illness and injury are contained in the attached document. Matters relating to reporting of absence form part of the contract of employment.

## OTHER ABSENCE

Payment for absence for other reasons will be at the discretion of the Company.

Payment of salary and any other allowances will be suspended automatically after three working days of absence without explanation. The Company will make efforts to contact the absent member of staff to discuss reasons for the absence and the likely date of return. However, if unexplained absence extends beyond ten working days, the Contract of Employment will be regarded as terminated without the required period of notice being given.

## PENSION

You are eligible to become a member of the Marsh Group Pension Fund ("the Fund") if you are aged at least 20 but less than 63, normally employed in the UK and not a temporary employee. While you have the right to join the Fund, there is no requirement that you do so. Contributions to the Fund are currently 3% of pensionable salary

A Contracting Out Certificate is in force for all members of the Fund. The Rules of the Fund may be inspected on request in the Pensions Department. A summary of the eligibility criteria and benefits are contained in an explanatory booklet which is available from the Pensions Department.

The Normal Retirement Date for both men and women is at age 65.

If your salary is above the earnings cap (£90,600 per annum with effect from 6th April 1999) and you joined the Company on or after 1st June 1989, you are affected by the provisions of the Finance Act 1989 (leaflet available from the Pensions Department). You will be covered

5

for life assurance of 4 x your basic salary but premiums for the part above the cap will lead to an Income Tax charge.

If, when eligible, you are not a member of the Fund, you must by law either participate in a Personal Pension Plan or alternatively the State Earnings Related Pensions Scheme. Please note that you may not legally contribute to a Personal Pension Plan as well as the Fund. You should not join the Fund if you wish to contribute to a Personal Pension.

You will be made a member of the Fund with contributions deducted from salary at the current rate of 3% of Pensionable Salary, unless you confirm in writing to the Pensions Department London that you do not wish to join.

## NOTICE

Your employment with the Company may be terminated by the Company or by you, by giving notice in writing as follows:

|  | Grades 1-9 | Grades 10-15 | Grades 16 & above |
|---|---|---|---|
| Prior to completion of 5 years' service | 1 month | 3 months | 6 months |
| 5 years' or more service | 3 months | 3 months | 6 months |

At the discretion of the Company, during the notice period, employees may be required not to attend the office, but must be available for work should this be required. The Company may in its absolute discretion give you a payment in lieu of salary and other contractual benefits calculated at the date of termination for all or part of this period. There should be no expectation on your part that you will receive such a payment. It is expressly agreed that there are no circumstances in which you can require the Company to make a payment in lieu to you and the existence of this clause does not prevent the Company electing to terminate your employment summarily and pay you compensation for its early termination.

If the Company wishes to terminate your employment or if you wish to leave its employment before the expiry of the notice and whether or not either party has given notice to the other under that paragraph, the Company may require you to perform duties not within your normal duties or special projects or may require you not to attend for work for a period equivalent to the notice period required to be given by you to terminate the contract. For so long as you are not required to work during such period, you will remain an employee of the Company. You will continue to receive your salary and other contractual entitlements and to be bound by all the terms of this Agreement. You will not directly or indirectly work for any person, have any contact with any Client of the Group or, for business purposes, any such employee without the prior written agreement of the Company.

On the termination of your employment or upon the Company exercising its rights under the previous paragraph, you will at the request of the Company resign without claim for compensation from any directorships (referred to in the Companies Act 1985 Sect 741) held by you in the Group. If you fail to do so, the Company may nominate someone on your

behalf to sign such documents and to take such other steps as are necessary to give effect to such resignations.

## CONFIDENTIAL INFORMATION AND COPYRIGHT

You must neither during nor after your employment with the Company disclose or permit to be disclosed to any person, firm or company, any confidential information of the Company or of any other member of the Group. Confidential information includes but is not limited to information relating to the Group's clients and prospective clients, insurance markets, technology, know how, technical information, business plans and finances whether or not such information is recorded in documentary form or computer disk or tape.

The Company remains the owner of all property (including copyright and similar commercial rights) and all work produced in the course of your employment with the Company.

## DISCLOSURE

At no time, whether before or after the termination of your employment, are you to disclose in any way, or use for your or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any Group company unless such disclosure or use is required by law, or you have been authorised to do so by your Chief Executive.

## INFORMATION SECURITY POLICY

Employees must be aware and adhere to the Marsh Corporate Services Information Security Policy, a copy of which is attached. Failure to comply with the provisions of this policy may lead to disciplinary action up to and including termination of employment.

## DATA PROTECTION

You agree to the Company and any other company in the Group holding and processing, both electronically and manually, the data which it or they collect relating to you in connection with your employment provided that this is either for the purpose of its or their businesses or the administration and management of its employees or for the purpose of complying with applicable laws, regulations and procedures.

## COMPETING BUSINESS

You must not during your employment with the Company be concerned or interested directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance, or mortgage broker or agent or be personally employed or engaged in any of these capacities without having first gained the written consent of the Company.

You shall not for a period of one year following the termination of your employment, less such period if any as you are required not to attend for work by the Company, directly or

7

indirectly, either on your own account or for any other person, firm or company, in competition with the Company, or any other member of the Group:

(i)    solicit or canvass insurance business from;
(ii)   transact, handle or in any way deal with the insurance business of, any person, firm or company who in the period of 12 months preceding termination of your employment was a client of the Company or the Group and with whom during such a period, you, in the course of employment, had dealings.

You shall not, for a period of 12 months following termination of your employment, less such period as you are required not to attend for work by the Company either directly or indirectly, solicit or entice away from the Company or the Group any employee with whom you had dealings in the 12 months preceding termination of your employment and who is engaged in the business of insurance broking or offer employment or engagement to any such employee.

The previous two paragraphs only apply if your actions are in connection with the supply or proposed supply of Competitive Services. Competitive Services are services which compete with those the Company or any other member of the Group was supplying or seeking to supply to clients at the time your employment was terminated for the purpose of the business or businesses with which you were materially involved at any time during the last 12 months of your employment.

Each sub paragraph and part of such sub paragraph of this paragraph constitutes an entirely separate and independent restriction and does not operate or limit any other obligation owed by you, whether that obligation is express or implied by law. If any restriction is held to be invalid or unenforceable by a court of competent jurisdiction it is intended and understood by the parties that such invalidity or unenforceability will not affect the remaining restrictions.

## DISCIPLINE AND GRIEVANCE PROCEDURES

The Disciplinary Procedure is designed to help and encourage all employees to achieve and maintain required standards of conduct, attendance and job performance.

The Grievance Procedure is designed to provide a means by which employees who have a grievance relating to employment may seek a remedy.

The Company's Disciplinary Rules are designed to facilitate the efficient conduct of the Company's business and to provide a reasonable working environment for all employees. The Rules give examples of offences that will be regarded as misconduct or gross misconduct. These lists are by no means exhaustive, and other offences not listed may be regarded as falling in either category. The procedures and rules are in accordance with the ACAS Code of Practice on Disciplinary Practice and Procedure in Employment and are attached.

If you are dissatisfied with any disciplinary decision made against you during your employment, you may first appeal to the next level of management. Appeals must be in writing within two working days of receipt of written confirmation of the disciplinary decision.

8

If you have a grievance related to your employment, you should first discuss it with your departmental manager.

These rules and procedures do not form part of the contractual terms of employment and give rise to no rights of entitlements of employees of the company.

## CONVICTIONS

You are required to disclose any conviction which is not spent by virtue of the Rehabilitation of Offenders Act 1974. Similarly, if you receive any conviction during your employment, it should be disclosed to the Company.

If your conviction affects your employment with the Company, it may be necessary to terminate your contract of employment. A conviction which the company considers irrelevant to the job will not be taken into consideration.

## MEMBERSHIP OF TRADE UNIONS

While you have the right to join an Independent Trade Union and to take part in its activities, there is no requirement to do so. There are no collective agreements in existence which directly affect your terms and conditions.

The Staff Manual, which does not form part of the contract of employment and which contains details of Company policies and procedures and Staff Benefits will be sent to you under separate cover. This is not a contractual document but it supports your Contract of Employment and there may be additional information to complete and return to us related to you Benefits. We are in the process of updating the Manual to reflect the new Marsh organisation and this will be issued to employees in due course.

Enclosed is a pack which gives general information on a range of topics related to your employment with the Company.

If you wish to accept this offer of employment, please sign and return the enclosed copy of this letter along with the health questionnaire and confirm the date on which you will be able to commence employment. This document forms your contract of employment. I have also enclosed a Marsh Corporate Services application form which I would be grateful if you could complete and return to me.

I hope that you will have a long and rewarding career with the Group. If there are any matters that you wish to raise concerning your employment, please contact me.

Yours sincerely,

Chantal Commercial
HR Officer

9

Signed

Date                        13ᵗʰ April, 2000

Confirmed Starting Date              T B A

Pension Fund Membership    YES/NO      (Delete as Appropriate)

*7*

# MARSH

Marsh Services Ltd
Human Resource Group
Tower Place
London
EC3R 5BU
020 7357 1000  Fax  020 7357 3872
www.marsh.co.uk

**Private & Confidential**
Mr J Samengo-Turner
17 Kyrler Road
London
SW11 6BD

20th January 2006

Dear Julian

I am pleased to confirm the amendment detailed below to your contract of employment. These changes will take effect from 1 January 2006, however, this does not affect your continuous service which started on 23rd September 1991.

1. **REMUNERATION**                    **REDACTED**
   Your basic annual salary will increase to         in April 2006 when you will receive a backdated payment to 1 January 2006.

   Should you resign from the Company before 1 April 2006 or be dismissed on the grounds of misconduct, you will not be entitled to receive any backdated payments.

2. **RESTRICTIVE COVENANTS**
   You agree to be bound by the provisions of Schedule 1.

All other terms and conditions remain unchanged.

Please sign and return a copy of this letter indicating your acceptance of the above amendments to your existing terms and conditions of employment.

Yours sincerely

Lynsey Mansfield
**Head of Guy Carpenter UK HR**

---

I accept the amendments to my contract of employment on the terms and conditions detailed above.

Signed by employee ..................................... / Date .....25 / 1 / 2006

SCHEDULE 1

1.    **RESTRICTIVE COVENANTS**

1.1    Without prejudice to Clause 1 (Appointment), during the Appointment and in the case of each of the sub-paragraphs (a)-(c) for the periods expressed after the termination of the Appointment less (in the case of paragraph 1.1(a) any period during which you are not required to attend for work pursuant to notice period , you will not (except with prior written consent of the Board) directly or indirectly do or attempt to do any of the following:

(a)    for 12 months entice, induce or encourage a Client to transfer or remove custom from the Company or any Associated Company;

(b)    for 12 months solicit or accept business from a Client for the supply of Competitive Services; or

(c)    for 12 months entice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment with the Company or any Associated Company by so doing and regardless of whether the Relevant Business is within or outside the Region.

1.2    For the purpose of this paragraph 1:

(a)    "Competitive Services" means goods or services identical or similar to or competitive with those which at the expiry of the Relevant Period the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a Client for the purpose of a Relevant Business;

"Client" means a person:

who is at the expiry of the Relevant Period or who was at any time during the Relevant Period a Client of the Company or any Associated Company (whether or not goods or services were actually provided during such period) or to whom at the expiry of the Relevant Period the Company or any Associated Company was actively and directly seeking to supply goods or services, in either case for the purpose of a Relevant Business; and

with whom you or an Employee in a Relevant Business reporting directly to you have had dealings at any time during the Relevant Period or and/or for whom you were responsible and/or about whom you were in possession of confidential information, in any such case in the performance of your or their duties to the Company or any Associated Company.

(b)    "Employee" means a person who is employed by or who renders services to the Company or any Associated Company in a Relevant Business and/or who has responsibility for Clients of the Company or any Associated Company or influence over them and/or who is in possession of confidential information about the Group's business and who in any such case was so employed or so rendered services during the period of 12 months ending on the last day on which you actively worked during the Appointment for the Company or any Associated Company and who had dealings with you during that period.

(c)    "Region" means England, Wales, Scotland and/or Northern Ireland and any other country or state in which the Company or any Associated Company is operating or planning to operate at the expiry of the Relevant Period. A business of the Company or any Associated Company will be operating within the Region at the expiry of the Relevant Period if a Relevant Business has been conducted or promoted during the Relevant Period. A business will be operating within the Region if either any such business in which you are to be involved is located or to be located within the Region or it is conducted or to be conducted wholly or partly within the Region;



# MARSH

Marsh Services Ltd
Human Resource Group
Tower Place
London
EC3R 5BU
020 7357 1000  Fax  020 7357 3872
www.marsh.co.uk

**Private & Confidential**

Mr M Hopkins
1 Belmont Road
London
SW4 0BZ

Our ref:   533727

21 June 2005

Dear Marcus

I am pleased to confirm the amendment detailed below to your contract of employment. This change will take effect from 1 July 2005, however, this does not affect your continuous service which started on 2 October 2000.

1.  **REMUNERATION**
    Your basic annual salary will increase to     **REDACTED**

2.  **RESTRICTIVE COVENANTS**
    You agree to be bound by the provisions of Schedule 1.

All other terms and conditions remain unchanged.

Please sign and return a copy of this letter indicating your acceptance of the above amendments to your existing terms and conditions of employment.

Yours sincerely

Gillian Rainey
**HR Manager**

---

I accept the amendment to my contract of employment on the terms and conditions detailed above.

Signed by employee                                    Date 18- 7 - 05.

Page 2
21 June 2005
Mr M Hopkins

## SCHEDULE 1

1.  **RESTRICTIVE COVENANTS**

1.1  Without prejudice to Clause 1 (Appointment), during the Appointment and in the case of each of the sub-paragraphs (a)-(c) for the periods expressed after the termination of the Appointment less (in the case of paragraph 1.1(a) any period during which you are not required to attend for work pursuant to notice period , you will not (except with prior written consent of the Board) directly or indirectly do or attempt to do any of the following:

(a)  for 12 months entice, induce or encourage a Client to transfer or remove custom from the Company or any Associated Company;

(b)  for 12 months solicit or accept business from a Client for the supply of Competitive Services; or

(c)  for 12 months entice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment with the Company or any Associated Company by so doing and regardless of whether the Relevant Business is within or outside the Region.

1.2  For the purpose of this paragraph 1:

(a)  "Competitive Services" means goods or services identical or similar to or competitive with those which at the expiry of the Relevant Period the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a Client for the purpose of a Relevant Business;

"Client" means a person:

who is at the expiry of the Relevant Period or who was at any time during the Relevant Period a Client of the Company or any Associated Company (whether or not goods or services were actually provided during such period) or to whom at the expiry of the Relevant Period the Company or any Associated Company was actively and directly seeking to supply goods or services, in either case for the purpose of a Relevant Business; and

with whom you or an Employee in a Relevant Business reporting directly to you have had dealings at any time during the Relevant Period or and/or for whom you were responsible and/or about whom you were in possession of confidential information, in any such case in the performance of your or their duties to the Company or any Associated Company.

(d)     "Relevant Business" means any business of the Company or any Associated Company in which, pursuant to your duties, you were materially involved at any time during the Relevant Period.

(e)     "Relevant Period" means (during the Appointment) whilst you are employed and (after the termination of the Appointment) the period of 12 months ending on the last day of the Appointment or the period of the Appointment if shorter than 12 months.

1.3     Each sub-clause and part of such sub-clause of this paragraph 1 constitutes an entirely separate and independent restriction and does not operate to limit any other obligation owed by the Executive, whether that obligation is express or implied by law. If any restriction is held to be invalid or unenforceable by a court of competent jurisdiction, it is intended and understood by the parties that such invalidity or unenforceability will not affect the remaining restrictions.

1.4     You acknowledge that each of the restrictions in this paragraph 1 goes no further than is necessary for the protection of the Company's and each Associated Company's legitimate business interests.

1.5     Before accepting any offer of employment either during the Appointment or during the continuance of the restrictions in this paragraph 1, you will immediately provide to the person making such offer a complete signed copy of this Agreement.

**9**

This document constitutes part of a prospectus covering securities that have been
registered under the Securities Act of 1933.

The date of this prospectus is November 16, 2005

MARSH & McLENNAN COMPANIES
2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions of November 1, 2005 Guy Carpenter Special Long Term Incentive Grant

## REDACTED

This award ("*Award*") in the amount of            , granted effective November 1, 2005 (the
"*Grant Date*") under the Marsh & McLennan Companies 2000 Senior Executive Incentive and
Stock Award Plan (the "*Plan*"), is subject to the terms and conditions of the Plan and the
additional terms and conditions below (the "*Agreement*"). At the sole discretion of MMC (as
hereinafter defined), this amount may be paid, subject to the terms set forth below, in either cash
or the equivalent value of readily tradable MMC shares, which value shall be measured as
described below. In recognition of your potential for future contributions to the success of
MMC, this Award is intended to strengthen the mutuality of interest between you and MMC's
shareholders and to serve as an appropriate additional incentive to remain with MMC or any of
its subsidiaries or affiliates (collectively, the "*Company*"). For purposes of this Agreement,
"*MMC*" means Marsh & McLennan Companies, Inc. and any successor thereto.

I.    **AWARD VESTING AND DISTRIBUTION**

A.    **Award Vesting**

(1)    *Scheduled Vesting.* Subject to your continued employment and to any
performance adjustments (as described below), 10% of the aggregate Award will
vest on November 1, 2006, an additional 10% of the aggregate Award will vest on
January 31, 2007, an additional 20% of the aggregate Award will vest on January
31, 2008, an additional 20% of the aggregate Award will vest on January 31,
2009, and the remaining 40% of the aggregate Award will vest on January 31,
2010.

(2)    *Performance Adjustments.* For each of the fiscal years 2006, 2007 and 2008, if
MMC management determines that Guy Carpenter's Performance Target for that
fiscal year has been met or exceeded, the percentage of the aggregate Award that
will vest on January 31 of the year following that determination shall be increased

by 10% from that set forth in Section I.A(1). Each such 10% additional vested portion of the Award shall reduce the amount of the Award otherwise scheduled to vest on January 31, 2010. By way of example, should the Performance Targets be met or exceeded for each of the years 2006, 2007 and 2008, then 10% additional Award shall vest the following January 31 for each year (20% total in 2007, 30% in 2008, 30% in 2009) so that only the remaining 10% (instead of 40%) shall vest on January 31, 2010. For purposes of this Section I.A, the term *"Performance Target"* shall mean Guy Carpenter's target net operating income margin for a fiscal year as set by MMC management.

B.   **Award Distribution**

(1)   In General. Payment of the portion of an Award that becomes vested on a vesting date (an *"Installment"*) shall be in cash or shares of MMC common stock (valued at their Fair Market Value on the vesting date), as determined by MMC. Except as provided in Section I.B(2), such payment shall be made as soon as practicable after vesting, and in no event later than 60 days after vesting. Payment is conditioned on your (i) signing and returning a copy of these Terms & Conditions to the Company at the address listed above the signature line hereof and (ii) satisfaction of any applicable withholding taxes with respect to the Installment.

For purposes of this Agreement, *"Fair Market Value"* as of a valuation date means the average of the high and low selling prices of MMC common stock on the New York Stock Exchange on the trading day immediately preceding such valuation date.

(2)   Covered Employees. Notwithstanding any other provision herein, for any employee determined by the Compensation Committee of the MMC Board of Directors (the *"Committee"*) to be likely to be a covered employee within the meaning of Section 162(m)(3) of the Internal Revenue Code of 1986, as amended (the *"Code"*) in the year an Installment vests, payment of such Installment shall be postponed until the earlier of (i) the earliest date at which the Committee reasonably anticipates that the deduction of the payment of such Installment will not be limited or eliminated by application of Section 162(m) of the Code or (ii) the calendar year in which the such employee terminates employment. According to Internal Revenue Service regulations, "covered employees" include (1) the chief executive officer of MMC as of the last day of the year and (2) the four highest-paid executive officers of the Company, other than the chief executive officer, who are employed on the last day of the year.

C.   **Cancellation and Rescission of Award**

(1)   Detrimental Activity. For purposes of this Agreement, except to the extent Schedule II.D is applicable to you and therefore the definition set forth there governs, *"Detrimental Activity"* means:

(a)   the rendering of services, of a type similar to the services you provided to the Company or in a capacity similar to the capacity you were in with the

- 2 -

Company, for any person or organization, or otherwise engaging directly or indirectly in any business, if either (i) such person, organization, or business is or becomes competitive with the Company, or (ii) the rendering of services to such organization or business is or becomes prejudicial to or in conflict with the interests of the Company;

(b)  the unauthorized disclosure or misuse of proprietary or confidential information of the Company or its employees or customers;

(c)  activity that results (or if known could result) in termination of your employment for your misappropriation of assets of the Company; willful misconduct in the performance of your duties; material violation of a written code of conduct applicable to you; breach of fiduciary duty or breach of trust; conviction of a felony, or of any other crime involving moral turpitude; imprisonment for any crime; or any other action likely to bring substantial discredit to the Company;

(d)  diverting or attempting to divert from the Company business of any kind, including, without limitation, interference with any business relationship with suppliers, customers, licensees, licensors, or contractors;

(e)  directly or indirectly, soliciting, diverting, or taking away, in whole or part, any clients or prospects of the Company who, within the two-year period prior to your termination of employment, were solicited or serviced directly or indirectly by you or by anyone directly or indirectly under your supervision, or with whom during such period you had any business relationship, for the purpose of offering products or services competitive with those offered by the Company;

(f)  attempting to recruit or solicit, or aid in the recruitment or solicitation of, any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any actual or prospective competitor of the Company; or

(g)  a breach of your obligations under Section II.A, II.B, II.C or, if applicable, Schedule II.D.

The *"Rescission Period"* with respect to an Installment means the 12-month period beginning on such Installment's vesting date.

(2)  <u>Cancellation and Rescission.</u>

(a)  If you engage in any Detrimental Activity prior to or during the Rescission Period with respect to an Installment, then except as provided in Section I.C(2)(c), (i) that Installment and any future Installments shall be canceled and (ii) any delivery of cash or MMC common stock with respect to the Installment shall be rescinded promptly following MMC's discovery of

- 3 -

        such Detrimental Activity but no later than two years after the last day of the Rescission Period.

(b)    In the event of a rescission pursuant to Section I.C(2)(a), you shall (i) return to MMC all cash and/or shares of MMC common stock that you have not disposed of and that were delivered to you with respect to such Installment, and (ii) pay to MMC an amount equal to the cash and/or the Fair Market Value on the vesting date of the shares of MMC common stock that you have disposed of and that were delivered to you upon the vesting of such Installment.

(c)    The provisions of Section I.C(2)(a) shall not apply following your termination of employment unless (i) such termination resulted from your voluntary resignation or retirement or (ii) you engaged in Detrimental Activity described in Section I.C(1)(c).

(3)    <u>Reasonableness of Provision.</u>  You agree that the cancellation and rescission provisions of the Plan and this Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture is the penalty for engaging in Detrimental Activity.

## II.   <u>COVENANTS</u>

### A.   <u>Notification Prior to Voluntary Termination</u>

(1)    You agree that at any time hereafter while you remain employed by the Company, you will provide 60 days' prior written notice (the "*Notice Period*"), in accordance with Section VI.J, of your intention to terminate employment at MMC (whether by retirement or other voluntary termination).

(2)    (a)    Throughout the Notice Period, the Company shall have the obligation to pay you your base salary at normal pay intervals and shall continue to provide benefits to you on the same basis as other employees. Upon receipt of such notice, the Company shall have no obligation to pay you any bonus for work done during the Notice Period or any calendar year period in which notice was given.

(b)    Notwithstanding Section II.A(2)(a), the Company, in its sole discretion, may at any time during the Notice Period give written notice to you that it waives its right to the full Notice Period. Should the Company choose to exercise that right and waive some or all of the Notice Period, the Company may, as of the date of that notice, cease to make any further payment of base salary to you and immediately terminate your employment with the Company.

(3)    You will remain obligated to perform any or all of your regular job duties requested of you by the Company during this Notice Period (unless shortened pursuant to Section II.A(2)(b)). Moreover, throughout this Notice Period (unless

NY:987859.6

shortened by the Company pursuant to Section II.A(2)(b)), you will remain an employee of the Company with all attendant fiduciary duties, including, without limitation, your duties of loyalty and confidentiality to the Company.

(4)    You understand and agree that the obligations set out in this Section II.A shall remain in full force and effect regardless of whether your employment with the Company terminates before or after (a) the full vesting of your Award on January 31, 2010 or (b) any exercise by the Company of its rights under Section I.C.

**B.    Underline Non-Solicitation Agreement**

(1)    You understand and agree that for the one-year period following your termination of employment, you will not, directly or indirectly, solicit, divert, take away, accept, or service, in whole or in part, any clients or prospects of the Company that within the two-year period prior to your termination of employment were solicited or serviced directly or indirectly by you or by anyone directly or indirectly under your supervision. You also agree that during this one-year period you will not (i) make known to any person, firm, or corporation the names or addresses of any current employees or customers of the Company, or any information pertaining to them or (ii) attempt to recruit or solicit, or aid in the recruitment or solicitation of, any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any competitor of the Company.

(2)    You understand and agree that the obligations set out in this Section II.B shall remain in full force and effect regardless of whether your employment with the Company terminates before or after (a) the full vesting of your Award on January 31, 2010 or (b) the exercise by the Company of its rights under Section I.C.

**C.    Confidentiality**

Without prejudice to any other duties and obligations you owe to the Company, whether stated in this agreement or otherwise, you acknowledge that you are subject to an ongoing duty of confidentiality to the Company, and therefore notwithstanding the termination of your employment, you will not, except with the prior written consent of the Company or as required by law, divulge or communicate to any third party or make use of any trade secrets or confidential information relating to the business of the Company, including, without limitation, secrets and information relating to corporate strategy, business development plans, intellectual property, business contacts, names of actual and potential clients and their requirements, terms of business with such clients and potential clients, terms of employment of employees, annual budgets, management accounts and other financial information concerning the business of the Company.

**D.    Notice and Non-Solicitation Provisions Applicable to Employees Working in the UK**

The terms of the attached Schedule II.D shall apply if, and only if, notice of termination of your employment with the Company or the termination of your employment is at a time when your principal place of employment for the Company is the United Kingdom

NY:987859.6

(as defined in clause 1 of Schedule II.D). The remaining terms of this Agreement shall continue in effect when Schedule II.D is applicable except to the extent those terms are inconsistent with Schedule II.D, in which case the terms of Schedule II.D shall control.

E.    <u>Cooperation</u>

You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement.

F.    <u>Disclosure</u>

You hereby specifically authorize the Company to contact your future employers to determine your compliance with this Agreement or to communicate the contents of this Agreement to such employers. You further specifically authorize the Company, in its sole discretion and without your further permission, to furnish copies of the Agreement to any client or prospective client of the Company and to indicate that the Company has entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon your compliance with this Agreement.

G.    <u>Non-Exclusivity of Rights</u>

Neither you nor the Company intends to waive or release the applicability of any other employment duties or obligations you and the Company may have or owe to each other, now or hereafter, unless such duties or obligations conflict with those set forth in this Agreement. In particular, you and the Company acknowledge that any more extensive duties or obligations you may owe the Company by law or contract, now or hereafter, with regard to the subject matter of Sections II.A through II.C and, if applicable, Schedule II.D, shall not be considered to conflict with, or otherwise be released or waived by, this Agreement.

H.    <u>Injunctive Relief</u>

You understand and agree that the Company shall be entitled to temporary, preliminary, and permanent injunctive relief to prevent any threatened or actual breach by you of the terms of Section II.A, II.B, II.C or, if applicable, Schedule II.D. This right is not intended to limit in any way the Company's rights to similar or additional remedies for your breach of any portion of this Agreement.

III.    <u>RIGHTS OF AWARD RECIPIENTS</u>

This Award is an unfunded and unsecured promise to pay or deliver (or cause to be paid or delivered) to you, subject to the terms and conditions of this Agreement and the terms and conditions of the Plan, cash or shares of MMC common stock as soon as practicable after vesting or as otherwise provided herein. Unless and until the vesting conditions of the Award have been satisfied and cash or shares of MMC common stock have been paid or delivered to you in

accordance with the terms and conditions described herein, you have only the rights of a general unsecured creditor and you have none of the attributes of ownership to such shares of stock.

## IV.    TERMINATION OF EMPLOYMENT

If your employment with the Company terminates, your right to any part or all of the Award shall be as follows:

### A.    Death

In the event your employment is terminated because of your death, any unvested portion of the Award will vest at such termination of employment.

### B.    Permanent Disability

In the event your employment is terminated due to your total and permanent disability, as determined under MMC's long-term disability program, any unvested portion of the Award will vest at such termination of employment.

### C.    All Other Employment Terminations

For all other terminations of employment, all of your rights, title and interest in and to any unvested portion of the Award shall be forfeited on the date of such termination of employment.

For purposes of this Agreement, your employment will be treated as terminated when you are no longer employed by MMC or any affiliate or subsidiary of MMC. For the avoidance of doubt, in the event of a sale or similar transaction involving Guy Carpenter as a result of which Guy Carpenter ceases to be a subsidiary of MMC, your employment will be deemed terminated even if your employment with Guy Carpenter continues after the sale.

## V.    CHANGE IN CONTROL PROVISIONS

### A.    Change in Control

Upon the occurrence of a "Change in Control" of MMC, as defined in the Plan, any unvested part of the Award will vest on the date of the Change in Control, and, except as provided in the following sentence, shares of MMC common stock or cash, as determined by MMC in its sole discretion, will be distributed to you as soon as practicable thereafter, but in no event later than 60 days following the Change in Control. If, in the Change in Control transaction, shareholders of MMC receive consideration consisting of cash or other property (including securities of a successor or parent corporation), there shall be delivered to you the consideration which you would have received in such transaction had you been, immediately prior to such transaction, a holder of that number of shares of MMC's common stock having a Fair Market Value immediately prior to the Change in Control equal to the portion of the Award that became so vested.

NY:987859.6

**B.**     **Additional Payment**

Should the vesting and payment of any Installments (the "*Accelerated Installments*") be accelerated because of a Change in Control, all or part of the value of such Accelerated Installments may be subject to a 20% federal excise tax under Section 4999 of the Code (the "*Excise Tax*"). The Excise Tax is imposed when the value, as determined by applicable regulations, of payments in the nature of compensation contingent on a Change in Control (including an amount reflecting the value of the accelerated vesting of deferred compensation) equals or exceeds three times the average of your last five years' W-2 earnings.

If a Change in Control occurs and the vesting of your Award is accelerated, MMC will determine if the Excise Tax is payable by you. If Excise Tax is payable by you, MMC will pay to you, within 30 days of making the determination, an amount of money (the "*Additional Payment*") such that after payment of applicable federal, state and local income taxes, employment taxes and any Excise Tax imposed upon the Additional Payment, you will retain an amount of the Additional Payment equal to the portion of the Excise Tax allocable (as determined by MMC in a manner consistent with applicable regulations) to the Accelerated Installments. If the Additional Payment, after payment of applicable taxes, is later determined to be less than the amount necessary to reimburse you for the portion of the Excise Tax you owe that is allocable to the Accelerated Installments, a further payment will be made to you. If the Additional Payment, after payment of applicable taxes, is later determined to be more than the amount necessary to reimburse you for the portion of the Excise Tax you owe that is allocable to the Accelerated Installments, you will be required to reimburse MMC for such excess.

**VI.**     **OTHER PROVISIONS**

**A.**     The Company is not liable for the non-issuance or non-transfer, or for any delay in the issuance or transfer, of any shares of common stock due to you, which results from the inability of the Company to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer the shares, if counsel for the Company deems such authority necessary for the lawful issuance or transfer of any such shares.

**B.**     The Award is subject to the terms and conditions of this Agreement and to the terms and conditions of the Plan, and your acceptance hereof shall constitute your agreement to all such terms and conditions and to the administrative regulations of the Committee. In the event of any inconsistency between this Agreement and the provisions of the Plan, the provisions of the latter shall prevail. All decisions of the Committee upon any questions arising under this Agreement or the Plan shall be conclusive and binding. Your acceptance of this Award constitutes your agreement that the shares of common stock acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

**C.**     The Committee has full discretion and authority to control and manage the operation and administration of the Awards and the Plan. The Committee is comprised of at least two members of the MMC Board of Directors.

D. The MMC Board of Directors may amend, alter, suspend, discontinue or terminate the Plan or the Committee's authority to grant awards under the Plan, except that, without the consent of an affected participant, no such action may materially adversely affect the rights of such participant under any award theretofore granted to him or her. Following the occurrence of a Change in Control (as defined in the Plan), the MMC Board of Directors may not terminate the Plan or amend the Plan with respect to awards that have already been granted in any manner adverse to employees.

E. The Committee may, in its sole discretion, amend the terms of the Award; provided, however, that if the Committee concludes that such amendment is likely to materially impair your rights with respect to the Award, such amendment shall not be implemented with respect to your Award without your consent. The Committee may delegate to any other individual or entity the authority to perform any or all of the functions of the Committee under this Agreement, and references to the Committee shall be deemed to include any such delegate.

F. During your lifetime, no right hereunder related to the Award shall be transferable except by will or the laws of descent and distribution. Any cash or shares that may be deliverable to you following your death shall be paid or delivered to the person or persons to whom your rights pass by will or the law of descent and distribution, and such payment or delivery shall completely discharge the Company's obligations under the Award.

G. This Award does not give you any right to continue to be employed by the Company for any specific duration, or restrict in any way, your right or the right of your employer to terminate your employment, at any time, for any reason, with or without cause or prior notice. This Award is a special one-time award, which does not form part of your ongoing compensation and is not taken into account in calculating any other compensation or benefits.

H. This Agreement shall be binding upon and inure to the benefit of the Company's successors and assigns. Without limiting the foregoing, the Company may, in its sole discretion, assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Company or to any transferee of all or a portion of the assets or business to which your employment relates.

I. No more than eight million (8,000,000) shares of MMC common stock (par value $1.00 per share), plus such number of shares remaining unused under pre-existing stock plans approved by MMC's stockholders, may be issued under the Plan. Employees of the Company will be eligible for awards under the Plan. MMC common stock is traded on the New York Stock Exchange under the symbol "MMC" and is subject to market price fluctuation. Shares of MMC common stock in respect of the Award may be obtained through open market purchases, treasury stock or newly issued shares.

J. Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been given when personally delivered or when mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

NY:987859.6

If to the Company to:

> Guy Carpenter & Company, Inc.
> Attention: General Counsel
> One Madison Avenue
> New York, New York 10010

If to you:

> At your home address on file with the Company.

K.   You may obtain an account statement for your Award and more information by making a request to:

> Marsh & McLennan Companies, Inc.
> Attention: Senior Manager, Global Compensation
> Nov. 2005 Guy Carpenter Special Long Term Incentive Grant
> 1166 Avenue of the Americas
> New York, New York 10036-2774
> Telephone: (212) 345-5000

L.   The Plan is not qualified under Section 401(a) of the Code and is not subject to the provisions of the Employee Retirement Income Security Act of 1974. Your right to payment of your Award is the same as the right of an unsecured general creditor of the Company.

M.   There are no investment fees associated with your Award, and MMC pays all administrative expenses associated with your Award.

N.   The Company and you irrevocably submit to the exclusive jurisdiction and venue of any state or federal court located in the County of New York for the resolution of any dispute over any matter arising from or related to the Award. Any claims brought in such court, whether in law or in equity, shall be tried by the court WITHOUT A JURY and you and the Company hereby waive any and all rights you or it may have in any such litigation to a trial by jury. Moreover, both you and the Company (i) acknowledge that the forum stated in this Section VI.N has a reasonable relation to this Award and to the relationship between you and the Company and that the submission to the forum will apply, (ii) waive, to the extent permitted by law, any objection to personal jurisdiction or to the laying of venue of any action or proceeding covered by this Section VI.N in the forum stated in this Section VI.N, (iii) agree not to commence any such action or proceeding in any forum other than the forum stated in this Section VI.N and (iv) agree that, to the extent permitted by law, a final and non-appealable judgment in any such action or proceeding in any such court will be conclusive and binding on you and the Company.

O.   Notwithstanding anything to the contrary (except with regard to Schedule II.D, if applicable), this Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles.

NY:987859.6

P.    It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated by an appropriate court (designated in Section VI.N or, if applicable, Schedule II.D) to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom such invalid term(s), and shall be reformed to the extent necessary to make the Agreement valid and enforceable in that jurisdiction. Such deletion and/or reformation shall apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

## VII.   FEDERAL INCOME TAX CONSIDERATIONS

*The following is a summary of the United States Federal income tax consequences of Awards. This discussion does not address all aspects of the U.S. Federal income tax consequences that may be relevant to you in light of your personal investment or tax circumstances and does not discuss any state or local tax consequences of holding Awards. This section is based on the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations under the Code, and published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis. Please consult your own tax advisor concerning the application of the U.S. Federal income tax laws to your particular situation, as well as the applicability and effect of any state or local tax laws before taking any actions with respect to your Award.*

You will not be subject to tax upon the grant of an Award. Upon the vesting of an Installment, such Installment will be subject to FICA employment tax withholding. Upon the payment of cash or a distribution of shares of MMC common stock (or, in the event the second sentence of Section V.A is applicable, other property) pursuant to the Award, you will recognize as ordinary income an amount equal to the amount of cash and the Fair Market Value on the date of distribution of the shares of common stock (and/or other property) received. This amount of income will be subject to tax withholding on the date of distribution. Your basis in any shares of common stock received will be equal to the Fair Market Value of the shares of common stock on the date of distribution, and your holding period in such shares will begin on the day following the date of distribution. In the taxable year in which you recognize ordinary income on account of cash or shares of common stock awarded to you, the Company generally will be entitled to a deduction equal to the amount of income recognized by you.

Notwithstanding any other provision herein, your Award may be subject to additional restrictions to ensure compliance with the requirements of Section 409A of the Code (regarding nonqualified deferred compensation) and regulations thereunder. The Committee intends to administer the Awards in accordance with Section 409A of the Code and reserves the right to make changes in the terms or operations of the Awards (including changes that may have retroactive effect) deemed necessary or desirable to comply with Section 409A of the Code. This means, for example, that the timing of distributions may be different from those described in this document or in other materials relating to the Award or the 2000 Employee Plan that do not yet reflect Section 409A of the Code and the regulations thereunder. If your Award is not in compliance with

- 11 -

Section 409A of the Code, you may be subject to immediate taxation of all vested but unpaid awards under the 2000 Employee Plan that are subject to Section 409A of the Code, plus interest at the underpayment rate plus 1%, plus a 20% penalty.

## VIII.  RESALE RESTRICTIONS

If you are an "affiliate" of MMC at the time you receive shares of MMC common stock in respect of your deferred stock units, your ability to resell those shares may be restricted. In order to resell such shares, you will be required either to observe the resale limitations of Rule 144 of the Securities Act of 1933, as amended (the "*Securities Act*"), or offer your shares for resale in compliance with another applicable exemption from the registration requirements of the Securities Act.

An "affiliate" is defined, for purposes of the Securities Act, as a person who directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, MMC. A "person" is defined to include any relative or spouse of the person and any relative of the person's spouse who has the same home as the person, any trust, estate, corporation or other organization in which the person or any of the foregoing persons has collectively more than 10% beneficial interest, and any trust or estate for which the person or any of the foregoing persons serves as trustee, executor or in any similar capacity. A person "controls, is controlled by or is under common control" with MMC when that person directly or indirectly possesses the power to direct or cause the direction of the management and policies of MMC whether through the ownership of voting securities, by contract or otherwise.

## IX.  INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

The Annual Report can be viewed on MMC's website at http://www.mmc.com/annualreport.html. Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting the Senior Manager, Global Compensation of MMC as indicated above.

*      *      *

- 12 -

BY CONSENTING TO THESE TERMS AND CONDITIONS, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described herein, including Section I.C (regarding cancellation or rescission of your Award in the event you engage in certain competitive activities), Section II.A (regarding your obligation to give notice prior to voluntary termination), Section II.B (regarding your agreement not to solicit clients and employees following your termination of employment) and the Plan; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding the Award, and that any prior agreements, commitments or negotiations concerning the Award are replaced and superseded.

Please return a signed copy of these Terms & Conditions to the Company at the address below:

    Guy Carpenter & Company, Inc.
    Attention:  Managing Director, Human Resources
    One Madison Avenue, 4th floor
    New York, New York  10010

Participant's signature

Julian Samengo-Turner
Participant's name

510341
Participant's Employee ID #

NY:987859.6

## SCHEDULE II.D

1. **BACKGROUND**

Pursuant to Section II.D, this Schedule will apply to you if, and only if, your employment with the Company terminates at a time when your principal place of employment for the Company at that time is the UK ("a UK Employee"). It shall be for the Company to determine, in cases of doubt, where it considers your principal place of employment to be. For the avoidance of doubt, if your employment ends during a secondment to the United Kingdom, then your principal place of employment will be the UK. If your employment terminates following repatriation to the UK, after a period of secondment outside the UK, then your principal place of employment will be the UK. In the case of Clause 3 below (*Notice Period*), this place of employment test will be applied at the date at which notice is given.

2. **CANCELLATION AND RESCISSION OF THE AWARD**

Following the termination of your employment, the definition of Detrimental Activity set out in this Schedule and the provisions of this Schedule shall apply in place of the definition given in the main body of this Agreement in Section I.C (1) (*Cancellation and Rescission of Award*) and any other contrary provisions of the Agreement. The Rescission Period remains as set out in the Agreement. It is expressly agreed that the Company's exercise of its powers under Section I.C (2) (*Cancellation and Rescission of Award*) shall not affect any other causes of action which the Company or the Group may have or any other rights or remedies arising out of the act or actions which amount to Detrimental Activity. Receipt of any sums or shares by the Company or the Group shall not be treated as satisfaction or compromise in whole or in part of any such causes of action.

For the purposes of this Agreement if you are a UK Employee, "Detrimental Activity" means:

(a)     *(except with prior written consent of the Board of Directors of the Company) directly or indirectly doing or attempting to do any of the following:*

   (i)      to any material extent undertaking, carrying on or being employed, engaged or interested in any capacity in the supply or proposed supply of Competitive Services within the Territory. Competitive Services will be provided within the Territory if any business in which you are to be involved is located or will be located or is conducted or will be conducted wholly or partly within the Territory; or

   (ii)     enticing, inducing or encouraging a Client to transfer or remove custom from the Company or any Associated Company;

   (iii)    soliciting or accepting business from a Client for the supply of Competitive Services; or

   (iv)     enticing, inducing or encouraging an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the

purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing; or

(v)  the unauthorized disclosure or misuse of proprietary or confidential information of the Group or its employees or customers; or

(vi)  any act or omission by you that results (or if known could result) in the termination of your employment by reason of any serious default or misconduct in or affecting the business of the Group. This may include but is not limited to your misappropriation of assets of the Group, willful misconduct in the performance of your duties, material violation of a written code of conduct applicable to you, the nature of a fiduciary duty or breach of trust, conviction of a criminal offence (including an offence relating to the insider dealing) other than one which in the opinion of the Company does not affect your position as an employee of the Company.

3.  **NOTICE PERIOD**

If, during your employment, you are a UK Employee at any stage, and at that time notice of termination given, then for the avoidance of doubt the Notice Period referred to in Clause II.A(1) (*Notification prior to Voluntary Termination*) will be either the period specified in any contract of employment with the Company, or 60 days prior written notice, whichever is the longer and that period shall be deemed to be the Notice Period referred to in Clause II.A(1) of this Agreement. Clause II.A(2)(b) shall not apply to a UK Employee.

During the Notice Period the Company will not be under any obligation to provide you with any work, or to require you to undertake any duties for it, and may require you to remain absent from any or all offices of the Group. Alternatively the Company may require you to undertake duties outside the normal range of duties you have previously performed, during any Notice Period. This paragraph is without prejudice to any rights which the Company may have under any contract of employment with you, in relation to its rights during any Notice Period.

4.  **GENERAL – NON-SOLICATION AGREEMENT**

Section II.B(1) of the Agreement (*General Non-Solicitation Agreement*) will not apply to you, if you are a UK Employee on the cessation of your employment. Instead you agree that (except with the prior written consent of the Board of Directors of the Company) you will not, for a period of 12 months from the date of termination of employment directly or indirectly do or attempt to do anything of the following:

2

- Entice, induce or encourage a Client to transfer or remove custom from the Company or any Associated Company;
- Solicit or accept business from a Client for the supply of Competitive Services.
- Make known to any person, firm or corporation, the names or addresses of any current employees or customers of the Company or any confidential or sensitive information pertaining to them; or
- Entice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing.

For the avoidance of doubt, Section II.B (2) of the Agreement will continue to apply to you.

It is expressly agreed that your obligations under Clauses 2 and 4 of this Schedule are entirely freestanding and separate. The parties acknowledge that their intention is that the exercise by the Company or the Group of rights under one of the Clauses shall not affect the exercise of its or their rights under the other Clause. It is expressly agreed that a single action by you may result in action being taken against you both in connection with Clauses 2 and 4.

5.    **DEFINITIONS APPLYING TO THIS SCHEDULE**

"Client" means a person:

(i)     who was at any time during the Relevant Period a client of the Company or any Associated Company (whether or not services were actually provided during such period) or to whom at the expiry of the Relevant Period the Company or any Associated Company was actively and directly seeking to supply services, in either case for the purpose of a Relevant Business;

(ii)    with whom you or an Employee in a Relevant Business reporting directly to you or for whom you had management responsibility had dealings at any time during the Relevant Period or were in possession of confidential information about such client in the performance of your, his or her duties to the Company or any Associated Company.

Where services are supplied through another broker or intermediary a "Client" also means

3

the assured or reassured and the broker or intermediary in respect of such services.

"Competitive Services" means services identical or similar to or competitive with those which at the expiry of the Relevant Period the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a Client for the purpose of a Relevant Business;

"Relevant Business" means the business of the Company or any Associated Company in which, pursuant to your duties, you were materially involved at any time during the Relevant Period.

"Employee" means a person who is employed by or who renders services to the Company or any Associated Company in a Relevant Business in a managerial capacity or who has client responsibility or influence over clients or knowledge of confidential information about such clients and who in any such case was so employed or so rendered services during the Relevant Period and who had dealings with you during that period.

"Relevant Period" means during your employment, the period of your employment and where your employment has ended, the period of 12 months ending on the Termination Date.

"Territory" means England, Wales, Scotland and/or Northern Ireland and any other country or, in the United States, any State, in which the Company or any Associated Company is operating or planning to operate Relevant Business as the expiry of the Relevant Period.

References to a person include an individual, firm, corporation and any other organization however it is constituted and words denoting the singular include the plural and vice versa.

The words "Associated Company" mean any company which for the time being is:

(i)      a subsidiary (as defined by Section 736 of the Companies Act 1985) of Marsh & McLennan Companies Inc ("MMC") or any holding company of the Company;

(ii)     A company over which MMC has control within the meaning of Section 416 of the Income and Corporation Taxes Act 1988; or

(iii)    A subsidiary undertaking of MMC as defined by Section 258 of the Companies Act 1985.

References to retirement include both voluntary retirement, at your request, and compulsory retirement, at the request of the Company or at the contractual retirement age for your position, or the normal retirement age for individuals in your position.

The words "the Group" mean MMC, the Company and any Associated Company.

For the purpose of this Schedule only, the Company will be the company in the Group

4

which is your employer.

6.   **GENERAL**

This Schedule will be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York.

Each sub-clause and part of such sub-clause of this Schedule constitutes an entirely separate and independent restriction and does not operate to limit any other obligation owed by you, whether that obligation is express or implied by law. If any restriction is held to be invalid or unenforceable by a court of competent jurisdiction, it is intended and understood by the parties that such invalidity or unenforceability will not affect the remaining restrictions.