**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUY CARPENTER & COMPANY, LLC and MARSH & McLENNAN COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JULIAN SAMENGO-TURNER, RON WHYTE, and MARCUS HOPKINS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )  Case No. 07 – CV- 3580 (DC) |

**DEFENDANT RON WHYTE'S APPENDIX OF UNPUBLISHED CASES**
**CITED IN BRIEFING ON MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**DUE TO LACK OF PERSONAL JURISDICTION AND FORUM *NON CONVENIENS***

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

*Attorneys for defendant Ron Whyte*

# TABS 1 - 3

# Table of Contents

|  | Tab |
|---|---|
| *Albon v. Naza Motor Trading*, (2007) 2 All E.R. (Comm.) 719 ............................ | 1 |
| *Anselmo v. Univision Station Group, Inc.*, No. 92 Civ. 1471 (RLC), 1993 WL 17173 (S.D.N.Y. Jan. 15, 1993) ................................................................. | 2 |
| *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc.*, 00 Civ. 1248 (RWS), 2000 U.S. Dist. LEXIS 15088 (S.D.N.Y. Oct. 11, 2000) ............................................ | 3 |
| *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432 (S.D.N.Y. July 22, 1996) ................................................ | 4 |
| *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 95 Civ. 7685 (RPP), 1996 U.S. Dist. LEXIS 11064 (S.D.N.Y. Aug. 1, 1996) ................................................ | 5 |
| EU Council Regulation (EC) No. 44/2001, Sec. 5, Art. 20 ............................... | 6 |
| *Freeplay Music, Inc. v. Cox Radio, Inc.*, 04 Civ. 5238 (GEL), 2005 U.S. Dist. LEXIS 12397 (S.D.N.Y. June 22, 2005)................................................................. | 7 |
| *GCG Int'l, Inc. v. Eberhardt*, 05 Civ. 2422 (DC), 2005 U.S. Dist. LEXIS 23877 (S.D.N.Y. Oct. 17, 2005) ................................................................. | 8 |
| *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96 Civ. 2064 (RWS), 1997 WL 53184 (S.D.N.Y. Feb. 11, 1997) ........................................................ | 9 |
| *PaineWebber Inc. v. WHV, Inc.*, 95 Civ. 0052 (LMM), 1995 U.S. Dist. LEXIS 6514 (S.D.N.Y. May 12, 1995) ................................................................. | 10 |
| *Pieczenik v. Dolan*, 03 Civ. 6336 (SAS), 2003 U.S. Dist. LEXIS 23295 (S.D.N.Y. Dec. 29, 2003) ..................................................................... | 11 |
| *Saab v. Citibank, N.A.*, No. 00 Civ. 6784 (BSJ), 2001 WL 1382577 (S.D.N.Y. Nov. 7, 2001) ............................................................................ | 12 |
| *Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, 00 Civ. 9227 (GEL), 2001 U.S. Dist. LEXIS 3001 (S.D.N.Y. Mar. 20, 2001) ................................................ | 13 |
| *Spencer Trask Ventures, Inc. v. Archos S.A.*, 01 Civ. 1169 (LAP), 2002 U.S. Dist. LEXIS 4396 (S.D.N.Y. Mar. 15, 2002) ........................................................ | 14 |
| *Swithenbank Foods Ltd v. Bowers*, (2002) 2 All E.R. (Comm.) 974, 981 (Q.B.) ......... | 15 |

*Varnelo v. Eastwind Transp., Ltd.,* 02 Civ. 2084 (KMW)(AJP), 2003 U.S. Dist. LEXIS 1424 (S.D.N.Y. Feb. 3, 2003) ……………………………………………………    16

*Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co., Ltd.*, 00 Civ. 9605 (DFE), 2002 U.S. Dist. LEXIS 789 (S.D.N.Y. Jan. 16, 2002) ……………………………………………    17

# TAB
# 1

WestlawUK

2007 WL 2907

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

Nigel Peter Albon (trading as N A Carriage Co) v. Naza Motor Trading SDN BHD (A company incorporated with limited liability in Malaysia), Tan Sri Dato Nasimuddin Amin (Male)
Case No: HC05C02150
[2007] EWHC 9 (Ch)

High Court of Justice Chancery Division

Ch D

Before: Mr Justice Lightman

Tuesday 23rd January 2007

**Representation**

Mr David Waksman QC & Mr Adrian Jack (instructed by Sheridans , Whittington House, Alfred Place, London WC1E 7EA) for the Claimant.

Mr Stephen Nathan QC & Dr Colin Ong (instructed by Finers Stephens Innocent , 179 Great Portland Street, London W1W 5LS) for the Respondents.

**Judgment**

Mr Justice Lightman:

**Introduction**

**1** The Claimant ("Mr Albon") is a dealer in motor cars resident in England. He trades as "NA Carriage". Mr Albon's wife ("Mrs Albon") is also his bookkeeper and has control of much of the administration of NA Carriage. Mr Albon is in financial difficulties which (it is his case) are occasioned by the defaults by the Defendants in payment of the sums due to him the subject of the claims in this action. The First Defendant ("Naza Motors") is a substantial Malaysian company involved in the motor car business. The Second Defendant ("Mr Nasim") is the principal shareholder in and a director of Naza Motors. Mr

Nasim is a wealthy Malaysian businessman resident in Kuala Lumpur who has a house and other property in London. His children were educated here and he visits England often. I shall refer to Naza Motors and Mr Nasim together as "the Defendants".

**2** Mr Albon and Mr Nasim have been close friends and Mr Albon and Naza Motors have had business dealings (including partnership ventures) with each other for many years in England, Malaysia and South Africa. They have now have fallen out in a big way over the disputes the subject of this litigation.

**3** In this action, which was commenced on the 10th August 2005, Mr Albon makes four heads of claim:

i) the first is against Naza Motors in respect of alleged overpayments totalling over £5 1/2 million made in the course of performance or intended performance of an oral agreement made between Mr Albon and Naza Motors referred to as the "UK Agreement". The UK Agreement provided that Naza Motors should export cars from Malaysia to the United Kingdom, that Mr Albon should sell those cars here as agent for Naza Motors and that the profit on such sales should be shared between them. Mr Albon contends that the UK Agreement also provided for the sale and export from England to Malaysia of cars by Mr Albon to Naza Motors ("reverse trades"). The repayment of the overpayments is claimed on the grounds that the payments were made without consideration and under the mistake of fact that the monies paid were due and owing. The existence of the UK Agreement is common ground but there are disputes as to when and where it was made, and as to many of its terms (and in particular whether it included provision for reverse trades) and as to whether there has been any overpayment;

ii) the second is against Mr Nasim. It is to recover the same sum as is claimed against Naza Motors in respect of the alleged overpayments. The claim is made against Mr Nasim on the basis that the monies were paid at the direction of Naza Motors to Mr Nasim, that the payments were made without consideration and under the mistake of fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                                    Page 2

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

that the monies paid were due and owing and (quite remarkably and unexplained) that notwithstanding the fact that Mr Albon (who had access to all relevant information) had no such knowledge, Mr Nasim (who did not have such access) did know that the monies were not due and owing. An attempt to justify the grant of permission in respect of this claim was sensibly abandoned by Mr Albon as unmaintainable in the course of the hearing;

iii) the third is against Naza Motors for just over £1 million and arises under what is referred to as "the South African Agreement". This was an oral agreement under which Naza Motors agreed to pay to Mr Albon commission on cars sourced by him from South Africa and supplied to Naza Motors in Malaysia. The primary issue between the parties in respect of this claim is whether the South African Agreement provided for payment as commission of £250 per car, in which case the full commission has been paid, or £1000 per car, in which case the balance of £750 is prima facie payable, subject only to limitation defences;

iv) the fourth (which is referred to as "the Expenses Agreement") is against Mr Nasim for just less than £200,000 and arises from Mr Albon's alleged payment of personal expenses of Mr Nasim in London. The existence of the agreement is in issue as are whether the payments alleged were made pursuant to it, whether any liability under it has already been discharged and as to the existence of limitation defences.

### History

4 From 1995 until September 1997 Mr Albon sold and exported cars from England to Naza Motors in Malaysia. (There is apparently a dispute whether Naza Motors owes Mr Albon some £355,909 in respect of this trading period.) In or about September 1997 the Malaysian economy collapsed leaving Naza Motors with a large number of expensive luxury cars imported from Europe which it could not sell in Malaysia. This led to the negotiation of an agreement between Naza Motors and Mr Albon for the export by Naza Motors of those cars to England and the sale of those cars in England by Mr Albon as agent for Naza Motors. The first shipment of cars to England left Malaysia on the 27th November 1997 and arrived in England on the 20th December 1997. The bulk of shipments took place in 1998. The last invoice date for cars supplied from Malaysia (and accordingly the date on which the last car was shipped from Malaysia)

was the 11th August 1999. Mr Albon's evidence is to the effect that the sales by Mr Albon of imported cars started to diminish in 2001 and tailed off completely in 2002 when only seven cars were sold. (I disregard for this purpose the sale this year of a car stolen from HM Customs and Excise and recovered in July this year.)

5 Mr Abdullah, Naza Motors' internal audit manager, came to England to conduct an audit of vehicles delivered as at 15th July 1998. The significance of documents prepared by him is the subject of an acute dispute as is the date of his being sacked by Naza Motors and whether he was biased. In September 1998 Customs and Excise seized some 477 of the cars but later released them. At some date in 1999 Mr Albon once again began selling and exporting cars to Naza Motors in Malaysia. Mr Albon says that reverse trades commenced on the 23rd March 1999. Naza Motors says that they commenced in September 1999. They certainly began in earnest at the end of November 1999.

6 The 10th August 1999 (being 6 years before the filing of the Claim Form) is potentially a significant date for limitation purposes in this action. I do not intend in this judgment to make any finding as to the date when any particular debt crystallised: that must be a matter for the judge at the trial. I intend only to set out what it appears on the evidence and submissions to be the case. Apart from four payments, all payments made by Mr Albon to Mr Nasim pursuant to the UK Agreement were made before this date, but many reverse trades appear to postdate it and there was continuing expenditure by Mr Albon until the end of 2000. The limitation period only began when the debt crystallised. 72 of the 134 payments claimed under the Expenses Agreement predate the 10th August 1999.

7 On the 11th June 2003 Mrs Albon wrote to Mr Nasim requesting him to agree the account which she enclosed.

8 In July 2003 Mr Albon visited and stayed with Mr Nasim in Malaysia. According to the Defendant (but denied by Mr Albon) during this visit and in particular on the 29th July 2003 Mr Albon and Mr Nasim signed a joint venture agreement ("the JVA") at the offices of Naza Motors. The JVA provides for arbitration of all disputes (including the claims between the parties arising out of the UK

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 3

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

Agreement) by arbitration in Malaysia in accordance with Malaysian law and for each party to nominate an arbitrator. Mr Albon states that his signature on the JVA is a forgery. According to Mr Albon (but denied by the Defendants) on the occasion of this visit Mr Nasim pressed Mr Albon to agree the account of dealings between the parties prepared by Mrs Albon. Mrs Albon subsequently sent a series of faxes to Naza Motors chasing them to agree the accounts submitted by her for agreement and in particular faxes dated: (a) the 22nd March 2004 (to which Naza Motors replied that they had hardly started the process of reconciling figures); (b) the 26th May 2004 (to which Naza Motors replied that they had to get their files from their old office); and (3) on the 6th August 2004 (to which there was apparently no reply).

9 On the 25th October 2004 an agreement ("the October Agreement") was signed between (amongst others) (1) Mr Albon; (2) Naza Motors; and (3) Mr Nasim. The October Agreement recited (in clause 2.2) that there existed disputes between Mr Albon and Mr Nasim in respect of various motor vehicle transactions between Mr Nasim, Naza Motors and Mr Albon; provided (in clause 3.4) that certain monies belonging to Mr Albon and Mr Nasim should be held by nominated attorneys pending resolution of the amounts due to either of them in respect of all dealings between them; in clause 3.6 that an independent person should conduct a reconciliation of the sums due between the parties; in clause 3.7 authorised the attorneys to pay the monies held in accordance with the reconciliation arrived at; and provided (in clause 7) that the October Agreement should be governed by South African law. This agreement has no relevance on this application save as an indicator that all parties appeared comfortable with the resolution of disputes in South Africa according to South African law.

10 On the 12th January 2005 the Inland Revenue served a statutory demand on Mr Albon in the sum of £2.09 million. On the 9th September 2005 the Inland Revenue issued a bankruptcy petition against Mr Albon for the reduced sum of £ 1,070,496 following a payment on account and the giving of credit in respect of the indebtedness. The relevance of this indebtedness is that no disclosure was made of it on the application for permission to serve out of the jurisdiction.

11 Mr Albon states that he wrote a letter dated the 15th June 2005 to Mr Nasim at the address of Naza Motors headed: "Re Yourself, Naza Motors SND and NA Carriage Co". This letter was in effect a letter before action. It elicited no response. The Defendants deny receipt of the letter. The Claim Form was issued on the 10th August 2005 and the Particulars of Claim are dated the 16th August 2005. On a without notice application, made on paper only by Mr Albon on the 23rd August 2005 supported by a witness statement of his solicitor Mr Daniel, Master Bragge made an order granting him permission to serve the proceedings on the Defendants in Malaysia. On the 28th October 2005 Mr Albon's Malaysian solicitors sent the Claim Form and Particulars of Claim to the Defendants (together with other documents) by way of purported service. Attempts at service were made in November 2005. The Defendants instructed a Malaysian firm of advocates, Shafee & Co, as their solicitors in respect of the claim against them, but on the 24th November 2005 by letter of that date Shafee and Co stated that they had no instructions to accept service on behalf of either of the Defendants. By the 21st November 2005, the Defendants had instructed Messrs Finers Stephens Innocent LLP ("FSI") to act for them here and they lodged an Acknowledgement of Service indicating an intention to defend the claim and contest jurisdiction. This was later withdrawn by consent. On the 18th January 2006 on a further without notice application by Mr Albon Master Bragge made an order for service on the Defendants in Malaysia by alternative means at the offices of Shafee & Co and service by this means took place on the 7th February 2006. On the 13th March 2006 the Defendants made the application now before me to set aside the orders permitting service outside the jurisdiction and for substituted service and seeking a stay.

12 By his first witness statement dated the 13th March 2006 on behalf of the Defendants Mr Nasim invoked the arbitration clause in the JVA and on the 16th December 2005 the Defendants gave Notice of Dispute as a precursor to arbitration under the JVA. On the 17th February 2006 the Defendants nominated an arbitrator and gave notice of arbitration. In the arbitration proceedings the Defendants seek an account and estimate the value of their claim against Mr Albon to be £15 million. They have not served a Statement of Claim because Mr Albon has refused to nominate an arbitrator. At

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 4

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

present the arbitration is stayed as a result of an anti-arbitration injunction granted to Mr Albon on a without notice application by Warren J on the 22nd May 2006 and extended after a with notice hearing on the 23rd May 2006 until a further hearing of the injunction application or further order.

**The Applications**

13 There are now before the Court the following applications:

i) the Defendants' applications of the 13th March 2006 to set aside:

a) the order of 26th August 2005 permitting ... .. outside the jurisdiction; and

b) the order of the 13th January 2006 permitting alternative service on the Defendants;

ii) Naza Motors' application to stay these proceedings under section 9 of the Arbitration Act 1996                        ;

iii) Mr Albon's application dated the 16th May 2006 to continue the anti-suit injunction against arbitration proceedings in Malaysia (with consequential amendment of the Particulars of Claim);

iv) Mr Albon's application dated the 23rd March 2006 for inspection of the original of the JVA and for the agreement to be examined and tested by an expert.

14 By agreement between the parties as the first stage in determining these applications I have heard argument limited to whether the order permitting service on the jurisdiction ought to be set aside and this judgment is concerned only to resolve that issue. For this purpose I shall leave aside any consideration of the JVA and the arbitration proceedings commenced in Malaysia. I confine my consideration to the questions whether the decision of the Master should stand that this court had jurisdiction and that it should exercise jurisdiction to determine the claims made by Mr Albon in this action. I should recognise at once the very full and expert assistance which I have received from Counsel.

**Relevant Principles**

15 To obtain the order permitting service outside the jurisdiction, Mr Albon needed to show: (1) a good arguable case that each claim made fell within the one or more of the Gateways under CPR Rule

6.20      which he relied on as applicable. What a good arguable case means depends on the Gateway concerned and whether the issue can or will be revisited at trial. Generally speaking the applicant for permission must show a strong probability that the claim falls within the letter and spirit of the Gateway, and this requirement is strict if once permission is given that issue will never thereafter be investigated; (2) on the merits that there was a serious issue to be tried, that is to say there is a real question to be tried. This is a lesser hurdle than good arguable case; (3) that England is clearly the appropriate forum, that is to say that England is the forum in which the claim can be tried most suitably for the interest of all parties and the ends of justice; and (4) that the court should in its discretion grant permission.

16 The first issue before me is whether Mr Albon satisfied these requirements on the material before the Master. The second issue is whether on the fuller evidence and full argument available on the inter partes hearing before me the conditions are now satisfied. The court has a discretionary power to waive any procedural irregularity: see CPR 3.10 . Further the court has a curative jurisdiction to cure or allow to be cured purely mechanistic irregularities in the application for permission if there is good reason or cause to do so: see ABCI v Banque Franco-Tunisienne [2002] 1 Lloyds Rep 511 ("ABCI") affirmed [2003] EWCA Civ 205 . The court cannot allow reliance on a new and different Gateway: see Metall Und Rohstaff AG v Donaldson Lufkin [1990] 1 QB 391 at 436 (d)-(e) and Abci at paragraphs 43, 45 and 68. The most that it can do in that regard is to allow the applicant to make a fresh application for permission at the hearing itself: see Youell v. Kara Mara Shipping [2000] 2 Ll.Rep 202 and Abci at paragraph 66. The third issue on this application is whether on the application for permission Mr Albon breached his duty to make full and frank disclosure and the consequences of any such breach and in particular whether the order granting permission to serve outside the jurisdiction ought to be set aside.

17 The bulk of the evidence and argument at this hearing has been addressed to this third issue. The strict obligation or high duty of a party making a without notice application has been authoritatively stated as follows: "To enable the court properly to exercise its discretion the evidence in support of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                                Page 5

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

application should set out the facts relevant to the court's consideration of the grant of permission with care and in sufficient detail to enable the court to reach a properly informed decision": Dadourian Group International Inc v. Simms [2006] 1 WLR 249 at 256 paragraph 41. The witness statement in support of the application must set out clearly and unambiguously the relevant information. It is not sufficient to include an exhibit a careful examination of which may reveal such information. The witness statement must specifically call attention to the need of the judge to examine any exhibit for this purpose. The ambit of the obligation is confined to material reasonably required by the judge to determine whether or not the court should assume jurisdiction. The court exercises what has been variously referred to as "disciplinary control" and a "regulatory power" in respect of non-disclosure on such an application. For this purpose the court is concerned whether it is satisfied that the claim falls within the letter and spirit of the Gateway relied on and that there is a serious issue to be tried, but it is not further concerned with the merits of the case and who is likely to succeed in the action. Where there have been deficiencies in the evidence, the form of application or presentation on the application for permission, the court is not for that reason obliged to discharge the order granting permission. A wrongful non-disclosure (at any rate if not deliberate) though a serious matter will not automatically require the court to set aside the order granting permission if such a sanction is disproportionate or would be contrary to the overriding objective of dealing with the case justly: a costs or some other sanction may alone be appropriate. (The Defendants conceded at the opening of their submissions and accordingly it was common ground at the hearing that any non-disclosure by Mr Daniel on Mr Albon's application for permission in this case was not deliberate and that he had no deliberate intention to mislead the court. No intimation was given at that stage that a distinction was being drawn between Mr Daniel and Mr Albon or that there was an allegation of a deliberate non-disclosure or of an intention to mislead the court on the part of Mr Albon.) It may not advance the objective of dealing with a case justly to decline jurisdiction if e.g. there are serious questions to be tried arising out of contracts containing (expressly or by implication) English choice of law and jurisdiction clauses and in respect of which England is clearly the proper

forum: see MRG (Japan) Ltd v Engelhard Metals Japan Ltd [2004] 1 Lloyd's Rep 731

**18** If (and only if) I hold that the Defendants' application to set aside the order granting permission should be refused and that the court has jurisdiction and should otherwise exercise jurisdiction to determine the claims by Mr Albon against the Defendants will it be necessary at a subsequent hearing to focus and hear argument upon two further issues. The first is the legal impact of the JVA and the arbitration proceedings in Malaysia. I must then decide where the issues between Mr Albon and the Defendants should be tried and in particular the issue as to the genuineness or otherwise of the JVA. The choice is between determination in Malaysia by the arbitrators or the Malaysian court or in England by this court. The second is whether the order for alternative substituted service should stand or be set aside.

**The Gateways**

**19** Before I consider the position in respect of each of the claims in turn I must say word about the form of the Application Notice on the application to the Master for permission. Mr Albon needed to show a good arguable case that each claim fell within at least one of the (potentially overlapping) Gateways under CPR Rule 6.20 . CPR 6.20 (so far as material) provides that a claim form may be served out of the jurisdiction with the permission of the court if--

"(5) a claim is made in respect of a contract where the contract--

(a) was made within the jurisdiction;

...

(c) is governed by English law;

(6) a claim is made in respect of a breach of contract committed within the jurisdiction

(15) a claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction."

**20** The Application Notice in this regard is by common consent misleading, for it states that the claims in the action are made in respect of three contracts which were made within the jurisdiction and which were governed by English law, namely the UK Agreement, the South African Agreement and the Expenses Agreement. But Mr Albon's case on the application as made in the supporting witness

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                      Page 6

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

statement of his solicitor Mr Daniel states that: (1) in case of the UK Agreement the court should grant permission on the grounds set out in CPR Rule 6.20(5)(c)        (agreement governed by English law) and 6.20(6)        (claim in respect of breach committed within the jurisdiction); (2) in case of the South African Agreement the court should grant permission on the ground set out in CPR Rule 6.20(6)        ; (3) in case of the Expenses Agreement on the grounds set out in CPR Rule 6.20(5)(a)        (contract made within the jurisdiction) and (c)        and Rule 6.20(6)        . The Application Notice makes no reference to the claim against Mr Nasim or its relevant Gateway. This misleading statement does not stand alone. There are other such defaults (since cured if curable) e.g. the failure in Mr Daniel's evidence in support of the application for permission to state that Mr Albon believed that his claim had a reasonable prospect of success (see CPR 6.21(1)(b)        ). In a word the application and evidence on the application for permission were prepared and placed before the Master without proper care and attention.

## UK Agreement

21  I turn first to the question whether the permission granted should be set aside so far as it relates to claims in respect of the UK Agreement. In summary Mr Albon's pleaded case in respect of the UK Agreement is as follows: (1) he agreed with Naza Motors: (a) to sell on behalf of Naza Motors cars which Naza Motors exported from Malaysia to England on terms that he should be entitled to be paid and retain a share of the net profits on sale (after deduction of the import price costs and expenses to be ascertained on an audit after the carrying out of the UK Agreement) and should be obliged to pay Naza Motors the sale price less costs and expenses; and (b) Mr Albon would make payments on account of the sums due to Naza Motors and/or would to ship cars to Naza Motors in Malaysia the purchase price for which would be part of the account between the parties under the UK Agreement; (2) the UK Agreement was initially oral but subsequently on the 1st December 1997 was reduced to writing in the form of an unsigned memorandum ("the Memorandum"); (3) between November 1997 and 2000 Mr Albon as agent for Naza Motors sold cars and incurred expenditure and such sales gave rise to the net profit of £ 5,213,241.46; (4) Naza Motors' share of profits was

either £3,388.606 if (as alleged by Mr Albon) it was entitled to 65% of the profits or £3,649,269.02 if (as alleged by the Defendants) it was entitled to 70%; (5) Mr Albon exported from England to Malaysia and sold cars to Naza Motors to the agreed value of £4,817,626; (6) Mr Albon at the direction of Naza Motors paid Mr Nasim £ 20,404,205.39 which involved an overpayment of £ 5,831,494.73 arising as to £753,000 in respect of sales as agent of cars in the United Kingdom and as to the balance of £4,747,000 in respect of cars exported and sold to Naza Motors in Malaysia; (7) Mr Nasim as the controlling mind of Naza Motors knew or should have known that the money was not due and was paid under a mistake of fact; (8) after the ending of the UK Agreement the Defendants was obliged under the terms of the UK Agreement to agree an audited figure for the sums due between the parties but failed to do so and in breach of duty failed to carry out an audit. The relief sought is an order for payment of £5,831,494.73 or £ 5,570,832.66 and interest.

22  In his witness statement in support of the application Mr Daniel, after stating that his witness statement was made from personal knowledge based on instructions and information from Mr Albon and his review of the documents relevant to this matter, went on:

"5. I am informed by the Claimant and his wife and verily believe that the terms of the UK agreement were incorporated in a handwritten document dated 1st December 1997. This provides for profits to be split 35 per cent to the Claimant and 65 per cent to the First Defendant. A copy of the agreement ["the Memorandum"] is now produced and shown to be marked 'AD.1'. Subsequently, I am aware that the Second Defendant has asserted that the profit sharing agreement was 30 per cent to the Claimant and 70 per cent to the First Defendant ....

11. The imports under the UK agreement ended in 1999 .... Whilst the UK agreement was being performed the Claimant sent very substantial sums on account of monies due under the UK agreement. Only a small proportion of these monies were sent to the First Defendant. The rest of the monies were sent to accounts controlled by the Second defendant.

13. ... A lot of the payments to the Defendants and others at their direction is at pages 51-54 [exhibit] AD4.

14. The claim against the First Defendant under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 7

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

the UK agreement is one which I believe has reasonable prospects of success. The First Defendant's address is 115 Menara Naza, Jln Raja Muda Abdul Aziz, kg. Baru 50300 Kuala Lumpar, Malaysia. The Court, I submit, should grant permission to serve outside the jurisdiction on the grounds in CPR Rule 6.20(5)(c) and Rule 6.20(6) . The UK agreement is most closely connected with England and should be presumed to be governed by English law. The obligation to pay is one owed to the Claimant in England.

15. Limitation is only an issue in relation to claims over six years old. In relation to those however there are what I submit are acknowledgements of the Claimant's claims sufficient to extend the limitation period."

(This last statement is made in relation to his claims generally and not exclusively in relation to his claims "in respect of the UK Agreement").

**23** The Memorandum is a two page manuscript scrap of paper in the handwriting of Mrs Albon which reads as follows:

"1-12-97

Accept & acknowledge that after the deduction of reasonable selling & processing expenses of imported motor vehicles, both parties to pay their taxes, VAT, & other governmental duties separately.

We also accept & acknowledge, at a prior notice, Naza Motor [ will] can send their auditors from Malaysia to inspect our books for the benefit of Naza --

Both parties accept & acknowledge that on any imported cars, NA Carr would retain 35% of the net profit ([and] after deduction of above) and 65% [illegible] Naza Motors who is the exporter & financier of each consignment."

**24** It is common ground that there was an oral agreement between the parties for the import of cars from Malaysia to England, that in England Mr Albon should sell the cars to customers in England on behalf of Naza Motors and that the profits should be shared between Mr Albon and Naza Motors. Mr Albon performed his services. There is a disagreement whether the UK Agreement was made at Mr Nasim's house in England as contended by Mr Albon, or Malaysia as contended by the Defendants; whether the proper law regulating the agreement was English (as contended by Mr Albon) or Malaysian (as contended by the Defendants); whether (as contended by Mr Albon) the UK

Agreement was an umbrella agreement encompassing cars exported by Mr Albon from England to Naza Motors in Malaysia or whether such exports were the subject of one or more entirely separate agreements; whether Mr Albon's profit share was 35% as he contends or 30% as contended by the Defendants; and whether Mr Albon could sell the imported cars at the best price which he could obtain (as he contends) or only at the price fixed by Mr Nasim (as the Defendants contend). Naza Motors denies that any sum is due to Mr Albon, but (remarkably) they have failed to produce any accounts and refused to disclose the breakdown of their claim in Malaysia.

**(a) Gateway**

**25** The first question raised is whether Mr Albon showed a good arguable case that his claim in respect of the UK Agreement fell within CPR 6.20(5) . For this purpose it is necessary first to decide the (as yet) unresolved issue whether for the purposes of CPR 6.20(5) a claim "in respect of a contract" must be a contractual claim. If the claim must arise under a contract, I do not think that Mr Albon's claim (as pleaded) satisfies this requirement. It is not pleaded or alleged that there was any term of the UK Agreement requiring repayment of any overpayments (nor is this pleaded or conceded by the Defendants). The right to repayment is pleaded as arising by reason of the fact that overpayment was made under a mistake of fact that the monies were due and owing and accordingly the claim is made in restitution. Whilst the philosophy held sway for many years that a claim for money had and received or in pursuance of an ineffective contract gave rise to a (quasi) contractual obligation to repay (see e.g. Sinclair v. Brougham [1919] AC 398 ) and this view was carried over to and reflected in the construction and application of RSC Order 11 , the predecessor of CPR 6.20 (see e.g. Bowling v. Cox [1926] AC 751 ) and this is echoed in the 2006 White Book (see Part 6.21.34), with the coming of age of the law of restitution based on the principle of unjust enrichment that philosophy has now been consigned to history: see e.g. West Deutsche Landesbank Girozentrale v. Islington BC [1996] AC 669 at 710, 718 and 738 and Kleinwort Benson Ltd v. Glasgow City Council [1999] 1 AC 153 at 167. It is to be noted that there is a separate and distinct Gateway for claims in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 8

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

restitution (see CPR 6.20(15)        ) and permission was neither sought nor granted for service out of the jurisdiction of a claim under that Gateway.

**26** But in my judgment claims under Gateway 6.20(5) are not confined to claims arising under a contract. It extends to claims made "in respect of a contract" and the formula "in respect of" (tested by reference to English law) is wider than "under a contract": see e.g. Tatum v. Reeve [1893] 1 QB 44        . The provision in the CPR        is in this regard deliberately wider than the provision in its predecessor RSC Order XI        . In this regard, unlike Mr Nathan (counsel for the Defendants) I do not think that any assistance is obtained from the decision in Kleinwort Benson v. Glasgow City Council [1991] 1 AC 153        at 162 and 167. In that case the House of Lords was concerned with section 16 and 17 of the Civil Jurisdiction and Judgments Act 1982 which (subject to certain modifications) incorporated the Brussels Convention into the law of the United Kingdom. One modification effected to Title 11 of the Convention was to the following effect:
"5. A person domiciled in a part of the United Kingdom may, in another part of the United Kingdom, be sued: (1) in matters relating to a contract, in the courts for the place of performance of the obligation in question; ..."
In the context of the formula of words there used, and in particular the reference to the place of performance of the obligation in question, there is postulated the existence of a contract giving rise to an obligation of performance in the country whose courts are to have jurisdiction.

**27** Accordingly the formula of words in CPR 6.20(5)        "in respect of a contract" does not require that the claim arises under a contract: it requires only that the claim relates to or is connected with the contract. That is the clear and unambiguous meaning of the words used. No reference is necessary for this purpose to authority and none were cited beyond Tatum v. Reeve        supra. If such reference were needed, I would find support in a passage which I found after I had reserved judgment in the judgment of Mann CJ in Trustees Executors and Agency Co Ltd v Reilly [1941] VLR 110        at 111:
"The words 'in respect of' are difficult of definition, but they have the widest possible

meaning of any expression intended to convey some connection or relation between the two subject-matters to which the words refer."

**28** In my judgment the claim in restitution in this case satisfies this requirement, for the UK Agreement expressly provides for an audit after the carrying out of the agreement and for payments and the supply of cars "on account". It may be that Mr Albon could have pleaded as an implied term of the UK Agreement that Naza Motors should repay any overpayment found to have been made on the audit or account taken after the agreement for provision of services came to an end. He did not however plead. Nor is it suggested by the Defendants that he should have done so. In default of such contractual obligation, a like obligation on the part of Naza Motors must arise in restitution in respect of overpayments made on account under and pursuant to the agreement. Claims in contract and restitution to repayment are (so far as necessary for this purpose) overlapping alternatives. The necessary relationship and connection between the claim and the UK Agreement is established.

**(b) Proper Law**

**29** I must now turn to the next question which is whether the UK Agreement is governed by English law. The relevant law is contained in the Rome Convention        which (so far as is material) has been incorporated in the law of the United Kingdom by the Contracts (Applicable Law) Act 1990        ("the 1990 Act"). The relevant legal principle is that a contract is governed by the law of the country with which it is most closely connected. For this purpose there is a presumption ("the Presumption") that the contract is most closely connected with the country where the party who is to effect the performance which is characteristic of the contract has at the time of conclusion of the contract his habitual residence or, in case of a body corporate or unincorporated, its central administration. If the contract is entered into in the course of the trade or profession of the party who is to effect the performance which is characteristic of the contract, the Presumption is that the contract is most closely connected will be the country in which the principal place of business of that party is situated, or where under the terms of the contract the performance is to be effected through a place of business other than the principal place of business, the country in which that other place of business is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                    Page 9

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

situated. The Presumption will not apply if the characteristic performance cannot be determined. The Presumption is rebuttable, but is rebutted and should be disregarded only if it appears from the circumstances as a whole that the contract is more closely connected with another country: see Dicey, Morris & Collins, The Conflict of Laws, 14th ed pp.1580 and 1587.

**30** Wherever the UK Agreement was made, there can be no doubt that English law is the law with which the UK Agreement is most closely connected. The Presumption is triggered and not displaced. England was the habitual residence of Mr Albon when he entered into the UK Agreement and the characteristic performance of the UK Agreement was the provision of his agency services in England in return for which he was to be remunerated. There are relevant factors with Malaysia. The cars were to be exported from Malaysia to England. The reverse trades were sales of cars to Malaysia from England. Malaysia was the principal place of business of Naza Motors and Mr Albon had a duty to account and pay to him there any sum due. There is a dispute which I cannot resolve as to where the contract was made. But on balance the closest connection is undoubtedly with England.

(c) *Merits*

**31** I am satisfied that there is a serious issue to be tried. There is no dispute that an agency agreement along the lines of the UK Agreement was entered into. There are no doubt hurdles for Mr Albon to overcome at the trial, most particularly as to the terms providing for reverse trades. There is no reference to that term in the Memorandum. (For this reason, no doubt, it is denigrated by the Defendants as "the hidden agreement".) Mr Albon makes a substantial case that independent of his evidence the parties proceeded on the basis that the reverse sales were "part of the UK Agreement". Mrs Albon supplied to Naza Motors with accounts stating and including the sum due in respect of reverse trades and no objection was taken by Naza Motors to those accounts. There is raised by Naza Motors the defence of limitation. The limitation period commenced when the balance between the parties was to be ascertained after the carrying out of the UK Agreement. But there is a serious issue as to when this period began and as to when the last cars were sold in the UK (the year 2000 given in the Particulars of Claim in the light of Mr Albon's

evidence requires amendment to 2002), when the last cars were transported to Malaysia and when Mr Albon incurred the final item of expenditure in performance of his agency duties. Reviewing the relevant facts and arguments in the light of the parties' submissions, I need only say that Mr Albon has the required prospect of successfully surmounting this hurdle.

(d) *Forum*

**32** The appropriate forum for resolution of the disputes relating to the UK Agreement is plainly here. English law is the proper law. The characteristic performance of the contract (the provision of agency services) was here. Mr Albon had his habitual residence here. Mr Nasim had a house here and had real links to this country. Malaysia had no equivalent connection. As I said above I leave aside at this stage consideration of the JVA and the arbitration proceedings commenced in Malaysia. I leave open the impact of the JVA and those proceedings on my decisions in this judgment.

(e) **Discretion**

**33** Subject only to the question of non-disclosure, I have no doubt that the Master was right in exercising his discretion to grant permission when the application for permission was made and that today the position is the same. The UK Agreement has given rise to disputes which both parties recognise require determination: the only issue is where and how they should be decided.

(f) **Non-Disclosure**

**34** As I have already stated, the issue of non-disclosure has loomed large dwarfing all the other issues in the evidence, documentation and submissions. I have been invited by the Defendants to pursue an elaborate, detailed and time consuming examination of material whose significance and meaning is a matter for the trial, when full evidence and argument can and will be addressed. I did not think that this application called for this exercise on the issue of non-disclosure and for this reason at one stage of the hearing I cut short Mr Nathan's submissions on this issue. But I subsequently decided that any short cut that I might direct in this regard might well in the end complicate rather than simplify the proceedings and I accordingly invited Mr Nathan to complete what he had to say and gave

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                     Page 10

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

consequential directions. I remain of the view however that the time and energy concentrated on this issue has been disproportionate.

35 There are a number of defaults in disclosure by Mr Albon on the application for permission with which I ought to deal. The Memorandum was a very different form of document in three respects from that which the Particulars of Claim and Mr Daniels' witness statement said that it was. (1) It is a copy of a copy and not a copy of the original. Mr Albon maintained until the second day of this hearing that the original had been seized (with other documents) by Customs and Excise and not returned. On the second day of the hearing it was disclosed that the original had indeed been returned with the other documents seized but Mr Albon had never examined what had been returned. (2) The Memorandum sets out only a limited number of the terms which Mr Albon claimed to have agreed with Naza Motors and in particular it made no reference to the fact that the UK Agreement was an umbrella agreement providing for the export of cars by Mr Albon to Naza Motors in Malaysia. The Memorandum only evidenced a limited number of the terms which Mr Albon says were agreed. This contradiction between what appears in the pleading and the evidence is unexplained and will require explanation at any trial. (3) According to a later witness statement of Mr Albon the Memorandum was not executed on the 1st December 1997 after the date of the oral agreement. The first shipments of cars were made in December 1997 at which time the terms were broadly agreed, and at a meeting in London in January 1998 the terms were "firmed up", the oral agreement was made and the Memorandum was executed back dated to the date of the start of importation namely the 1st December 1997. (4) The general statement in the witness statement of Mr Daniel that in relation to claims in the action that were over 6 years old there were acknowledgements of Mr Albon's claim, sufficient to extend the limitation period was not correct in respect of the claims under the UK Agreement. (It is in fact Mr Albon's case that there is no such (otherwise statute barred) claim.)

36 The Defendants' case on non-disclosure has expanded since the first allegation of non-disclosure in their letter of the 22nd December 2005 (non-disclosure of the JVA) and the first witness statement of Ms Amin, Naza Motors' in-house legal adviser of the 13th March 2006 (non-disclosure of the arbitration clause in the JVA and limitation defences). It is not surprising if Mr Albon may not in his evidence have kept up with the flood of new material and allegations which followed a great part of which is in reality (as I have already said) directed to the issue as to who is likely to succeed in this action. Mr Nathan has conscientiously taken me through a large body of detailed evidence which (he maintains) reveals non-disclosure of a multitude of matters, for example "missing cars" for which (it is alleged) Mr Albon has failed to account, the "true state of the Accounts", and "remittances wrongly claimed". I do not think that it was incumbent on Mr Albon to deal (least of all in any detail) with every allegation of non-disclosure as it arose. For a person now of very limited means to have to meet a case presented in this way by a very wealthy opponent would be oppressive and run foul of the obligation of the court to deal with the case justly ensuring that the parties are on an equal footing and in ways that are proportionate to the financial position of each party. After anxious consideration I have concluded that it is not appropriate on this application to conduct the necessary mini-trial to arrive at findings on the partial evidence before the court on the many issues of non-disclosure raised before me beyond those to which I have referred. Such satellite litigation is to be avoided. This is most particularly the case since in his address to me (as I have already said) Mr Nathan disavowed any suggestion of any intention to mislead on the part of Mr Daniel; and the implication in the circumstances was that there was no such suggestion in respect of Mr Albon. I do not think that it was open to the Defendants at a later stage of the hearing in submissions to allege that Mr Daniels or Mr Albon had such an intention. In any event I find that there was no intention to mislead on the part of Mr Daniel or Mr Albon. In a word having carefully reviewed Mr Nathan's submissions and the evidence on which he relied I do not think that any finding on the issues raised could or should affect the outcome of this application.

37 It is sufficient to express my conclusion on non-disclosure briefly. I have carefully considered the evidence and the parties' submissions. Whilst in no way condoning the slipshod way Mr Albon's solicitor handled the application at the end of the day I think that the Master correctly gave permission in respect of the claims under the UK Agreement and I do not think that any non-disclosure can or should have had any impact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 11

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

on his decision. In the exercise of my curative jurisdiction and my discretion, notwithstanding the mechanistic irregularities and the non-disclosures in respect of the UK Agreement (and indeed in respect of the other claims), justice requires that I should sustain his decision. To set aside the Master's order on the grounds of the deficiencies in disclosure and the errors and omissions would be disproportionate and contrary to the overriding objective of dealing with the case justly. There are serious issues to be tried: there are claims under the UK Agreement by both parties which both parties have made plain they require to be adjudicated, though there is a dispute as to the appropriate forum. I have decided that English law is the proper law and England is the proper forum. In all the circumstances I therefore refuse the order sought by Naza Motors on their application. This is however a proper case for the imposition of a sanction as to costs. I shall hear argument later as to what that sanction should be.

38 I should mention one novel allegation of non-disclosure made by Mr Nathan. He contends that the existence of the statutory demand and the fact that some £ 1 million was outstanding to the Revenue when the application for permission was made were facts requiring disclosure but undisclosed, for the impecuniosity of Mr Albon and the fact that Mr Albon was likely to be unable to meet any adverse order for costs were relevant when the Master had to decide whether to grant permission and (if so) whether to grant permission conditional e.g. upon the provision of security for payment of costs. I have been referred to no guidance on the question whether such facts should be disclosed. I incline to the view that there are cases where such facts may well be relevant to the exercise of the jurisdiction to subject a foreigner to this exorbitant jurisdiction and where such a condition may be imposed. But I think that the fact is of limited relevance in a case where the claim is so obviously and closely connected with this jurisdiction as it is in the present case, that there is a real issue requiring determination and that the failure to disclose in this case does not carry any real weight on the issue whether permission should be set aside.

**(b) South African Agreement**

39 I can deal with the claims under the South African Agreement shortly. The Agreement was for

Mr Albon to source motor cars in South Africa for shipment to Naza Motors in Malaysia. Mr Albon says that the agreement provided for payment by Naza Motors to him of £1000 per car so sourced, that through two South African companies managed by a South African Mr Shimoni, Boulders Beach and Danwet D19, he exported 1454 cars to Naza Motors in South Africa and that Naza Motors paid only £250 per car (using the same to discharge Mr Albon's liability to his subagent Mr de Stefano) but failed to pay the balance of £750 There is a dispute where the agreement was made. The only material connection with England is that Mr Albon's habitual residence is here. The only Gateway relied on at the application before the Master was that the breach (the non-payment of the full commission) occurred in England because (whether the proper law was English or South African) the duty of Naza Motors as debtor was to search out and pay Mr Albon at Mr Albon's habitual residence in England and that accordingly Naza Motors failed in its duty here. For this purpose reliance is placed on the presumption that South African law is the same as English law which is not displaced in the absence of expert evidence that South African law is different in this regard from English law.

40 It may well be that this claim falls within the letter of the Gateway. I very much doubt if it falls within the spirit. On the evidence before me it is I think clear that South African law is the proper law of the South African Agreement, however is resolved the question where it was made. The place of making may well be fortuitous in the case such as the present of continuing dealings between the parties. Undoubtedly South Africa is the country with which it is most closely connected. That is the place of performance characteristic of the contract, namely the provision of Mr Albon's services. That fact does not trigger the Presumption (see paragraph 29 above). Indeed the Presumption would favour England as the place of Mr Albon's principal place of business. But the Presumption is rebutted as it is quite clear from the circumstances as a whole that the South African Agreement is more closely connected with South Africa. South Africa is likewise the suitable forum for the resolution of the disputes between the parties according to South African law. (I have already pointed out that the October Agreement provides some indication that the parties were comfortable with the resolution of disputes in South Africa according to South African law.) This remains the position notwithstanding the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                                    Page 12

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

trial in England according to English law of the quite distinct claims and issues under the UK Agreement. Naza Motors agrees to submit to the jurisdiction in South Africa. I do not think that there is any need for Naza Motors to go beyond this and enter into any commitment e.g. not to apply for security for costs or not to avail themselves of limitation defences in South Africa. No substantial grounds for doing so have been advanced. Mr Albon could and should have sued in South Africa. If the choice of forum were between England and Malaysia because (for some reason) South Africa were to be discounted, the suitable forum would on balance be Malaysia, Naza Motors home state.

**41** It is unnecessary to explore the issue of non-disclosure in detail. It is sufficient to say that the Master's attention was not properly or adequately directed to a number of highly material facts:

i) Though Mr Albon states in paragraph 16 of his first witness statement dated the 16th May 2006 that invoices were raised at the end of each year, the only invoices prepared in respect of the years 1996 to 2003 are all dated the 5th March 2003 for the full sum of £1000 making no reference to the payment of £250;

ii) Mr Albon never pressed for payment or made any complaint about non-payment of the balance of £750 per car claimed prior to his letter before action dated the 15th June 2005 (which the Defendants deny receiving). These facts went to whether the claimed debt existed. Mr Albon did not refer to this omission or his later proffered improbable explanation for it, namely a desire not to financially embarrass the Defendants;

iii) No reference is made to the availability of a limitation defence in respect of the cars sourced before the 10th August 1999.

**42** There is no countervailing consideration requiring a trial of the issues relating to the South African Agreement in England. I would accordingly hold that permission should not have been granted. I set aside the order granting permission. This relief is both just and proportionate.

**(c) Expenses Agreement**

**43** The pleaded case in respect of the Expenses Agreement is very short. It is pleaded that: (1) Mr Albon made various payments on Mr Nasim's behalf at Mr Nasim's request; (2) Mr Nasim made

various payments to Mr Albon, but the sum of £ 193,820.92 has not been reimbursed to Mr Albon; and (3) a separate schedule would be served showing the outstanding sums. None was served though Mr Daniel exhibited AD2 to his witness statement. The relief claimed is payment of £ 193,820.92. Mr Daniel's witness statement states that: (1) Mr Albon regularly paid various expenses of Mr Nasim who had a house in England and educated his children here; (2) payments are set out on pages 55-56 of AD2; and (3) as regards any possible limitation defence, there had been payments on account. These payments on account were unparticularised and it is now conceded that there never were any.

**44** AD2 is headed "Personal Expenditure Paid On Behalf of Nasim". Under this heading are four columns headed respectively, Date, Payment to, Total and Explanation. The dates (and accordingly the payments) commenced on the 12th March 1998 and ended on the 25th November 2001. A large number of the explanations proffered are unilluminating and afford no explanation of the payments made. Most particularly inscrutable are the many explanations that "contras" or set-offs were made in respect of payments made by Mr Albon to e.g. "Naza Motors", "Naza Inv" and "Naza". Mr Daniels says nothing about the repayments or the "contras".

**45** Turning to the hurdles to the grant of permission by the Master in respect of the claims under this agreement I am satisfied that the requirement of each of the Gateways on which Mr Albon relied are satisfied, namely that the agreement was made in England, that the agreement was governed by English law and that the breach alleged occurred here. Further if there is to be any litigation to recover payments made England was clearly the suitable forum. But in my view the Master was sorely misled as to the merits in respect of two critical facts. First the claims in respect of half the payments made (namely made before the 11th August 1999) were statute barred: there was no basis for the statement that there had been acknowledgements and payments on account. Secondly the Master's attention was not drawn to the matter of the "credits" and the set-offs available. These failings are the more significant by reason of the further non-disclosures that Mr Albon never provided Mr Nasim with the relevant pages of AD2 or any equivalent nor even suggested that Mr Nasim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

owed him any money in respect of this expenditure at any time prior to the letter before action (a letter the Defendants deny receiving). The non-disclosures went to the heart of the application. If these matters had been drawn to the attention of the Master he would and should have refused permission to serve outside the jurisdiction any claim under the Expenses Agreement. On that ground I should and do set aside the grant of permission. This sanction is in my view both proportionate and in accordance with the overriding objective. I should add (though this is unnecessary for my decision) that I am in nowise reassured as to the merits of any part of this claim by the further evidence adduced since the hearing before the Master (e.g. paragraph 19 of the third witness statement of Mr Daniel). I am not satisfied that (without more) the off-setting is rendered ineffective by the alleged overpayments by Mr Albon to Naza Motors.

46 I accordingly set aside the grant of permission to pursue any claims under the Expenses Agreement.

Crown Copyright.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB
# 2

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Anselmo v. Univision Station Group, Inc.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Reynold V. ANSELMO, Plaintiff,
v.
UNIVISION STATION GROUP, INC., Univision
Holding, Inc., and Hallmark Cards, Incorporated,
Defendants.
No. 92 Civ. 1471(RLC).

Jan. 15, 1993.

Lowenthal, Landau, Fisher & Bring, P.C., New York
City (Lawrence L. Ginsburg, Charles S. Biener, of
counsel), for plaintiff.
Patterson, Belknap, Webb & Tyler, New York City
(Thomas C. Morrison, Judith Whittaker, Andrew L.
Tureff, of counsel), for defendants.

OPINION
ROBERT L. CARTER, District Judge.

I.

*1 In this diversity suit plaintiff Reynold V. Anselmo
seeks indemnification from the defendants Hallmark
Cards, Inc. ("Hallmark"), Univision Holdings, Inc.
("UH") and Univision Station Group, Inc. ("USG")
for liability he incurred in a suit brought against him
in the Southern District of New York ("the Caballero
suit"). The defendants have moved to dismiss for
improper venue pursuant to Rule 12(b)(3),
F.R.Civ.P., or to transfer pursuant to 28 U.S.C. §
1404(a), claiming that there is a forum selection
clause applicable to the parties which requires that
this suit be brought in the Central District of
California.

Prior to May, 1986, the plaintiff was a director and a
principal shareholder of Spanish International
Communications Corporation ("SICC") which was a
closely-held Delaware corporation engaged in the
broadcast of Spanish-language television. On July
19, 1986, defendant Hallmark entered into an
Acquisition Agreement ("Agreement") for the
purchase of all the outstanding stock of SICC.
Pursuant to that acquisition defendant USG is now
the successor corporation to SICC. Hallmark,

through wholly-owned subsidiaries, owns defendant
UH, the parent corporation of USG.

In September, 1989, Mr. Anselmo was found liable in
the Caballero suit, and in February, 1992 a
settlement agreement was reached. Plaintiff
instituted this suit because the defendants refused to
indemnify him.[FN1] The defendants assert that the
forum selection clause in the Agreement requires that
Mr. Anselmo bring this lawsuit in the Central District
of California.

II.

In order to enforce a forum selection clause, the court
must first determine whether the plaintiff's claims are
ones contemplated under the terms of the clause. If
the forum selection clause is applicable, the clause
should be enforced unless it is clearly shown that
enforcement would be unreasonable or unjust or that
the clause was obtained through fraud or
overreaching. Jones v. Weibrecht, 901 F.2d 17, 19
(2d Cir.1990).

The applicability of a forum selection clause is
governed by "objective consideration of the
language" of the clause. Mellon Stuart Co. v. North
River Insurance Co., 1990 WL 13168, *4 (S.D.N.Y.)
(Keenan, J.) (quoting New York v. Pullman, Inc., 477
F.Supp. 438, 442 (S.D.N.Y.1979) (Weinfeld, J.). In
this case, the relevant forum selection clause is
Article VII, Section 7.5 of the Agreement which
states as follows:
Any litigation relating to this Agreement shall be
brought before the United States District Court for
the Central District of California for determination in
Case No. CV-763451 MRP.[FN2]

Thus, the plaintiff's claims are ones contemplated by
the forum selection clause if they "relate to" some
portion of the Agreement.[FN3]

According to the defendants, the plaintiff's claims all
"relate to" Article VII, Section 7.6 of the Agreement
which contains the conditions under which the
successor corporation to SICC will defend and
indemnify present and former SICC directors.[FN4] In
his original complaint, the plaintiff included a claim
that he was entitled to indemnification pursuant to
Section 7.6. Since such a claim would be based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

the express language of the Agreement, it would clearly "relate to" the Agreement. However, after the defendants filed their motion to dismiss or transfer for improper venue, the plaintiff filed an Amended Complaint which dropped that claim; all other claims in the Amended Complaint are essentially identical to those in his original complaint.

*2 The plaintiff's elimination of the claim based on Section 7.6 does not necessarily circumvent the Agreement's forum selection clause. The clause contains the phrase "relating to" which is broad enough to encompass claims not explicitly grounded in the Agreement. Thus, each remaining claim in the plaintiff's Amended Complaint must be evaluated in light of the clause. A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if "the gist" of those claims is a breach of that relationship. *Bense v. Interstate Battery System, Inc.,* 683 F.2d 718, 720 (2d Cir.1982); *Coastal Steel,* 709 F.2d at 203; *Envirolite Enterprises, Inc. v. Glastechnische Industrie Peter Lisec Gesellschaeft M.B.H.,* 53 B.R. 1007, 1009 (S.D.N.Y.1985) (Carter, J.).

One of the plaintiff's claims is that USG and UH are obligated to indemnify him pursuant to a 1987 SICC Board of Directors Resolution. The 1987 Resolution clearly "relates to" the Agreement because it was adopted after the Agreement was signed, and it incorporates provisions of the Agreement's indemnification section.[FN5] Consequently, the plaintiff's tort claim alleging that Hallmark induced USG and UH to breach the 1987 Resolution must also "relate to" the Agreement.

The plaintiff also claims that USG and UH are obligated as the successors to SICC to uphold a 1985 SICC Board of Directors Resolution in which the board voted to indemnify him.[FN6] This claim does not "relate to" the Agreement because the 1985 Resolution was adopted before the Agreement came into existence in 1986.[FN7] Moreover, the forum selection clause by its terms applies only to litigation relating to "this Agreement," so it was not intended to govern disputes arising under the terms of earlier contracts or agreements between SICC and its officers and directors.[FN8] Consequently, the plaintiff's tort claim against Hallmark for inducing USG and UH to breach their obligations to him under the 1985 Resolution does not "relate to" the Agreement because the tort grew out of events which preceded the Agreement.

The plaintiff also claims that USG and UH are obligated to indemnify him pursuant to Delaware Corporation Law § 145(a) and § 145(f).[FN9] The defendants counter that section 145 does not furnish an independent basis for indemnification, and requires an implementing action by SICC's board of directors finding that Mr. Anselmo acted in good faith and in a manner reasonably believed to be in the best interests of the corporation. According to the defendants, such an implementing action was never adopted with respect to indemnifying Mr. Anselmo; however, the defendants overlook Mr. Anselmo's reliance on the 1985 Resolution and Article 8 of the SICC by-laws,[FN10] which was in force at the time the 1985 Resolution was adopted, and which allegedly made mandatory the provisions for permissive indemnification in § 145(a).[FN11]

*3 The defendants further argue that the SICC board could not have voted to indemnify Mr. Anselmo in 1985 because it was prior to the district court's decision in *Caballero.* However, § 145(a) does not require a prior judicial determination in favor of a director before indemnification, rather the corporation may indemnify the director if the board finds that the director acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation. *Green v. Westcap Corp. of Delaware,* 492 A.2d 260, 264 (Del.Super.1985). Since the plaintiff's Delaware state law claim is based on the 1985 Resolution and the corporate by-law in effect at that time, it does not "relate to" the Agreement which was not in effect at that time.

### III.

Since the Agreement's forum selection clause is not applicable to all of the plaintiff's claims, he argues that transfer is unwarranted because his case is broader than the forum selection clause. However, if the plaintiff asserted claims not governed by the forum selection clause simply to evade the clause, transfer or dismissal would be warranted. *Farmland Industries, Inc. v. Frazier-Parrott Commodities, Inc.,* 806 F.2d 848, 852 (8th Cir.1986); *see also Envirolite,* 53 B.R. at 1009.

Although the plaintiff demonstrated by dropping his claim based upon Section 7.6 of the Agreement that he does not wish his case to be decided by the California federal district court, a plaintiff is permitted to strategize as to the best forum for his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

case.[FN12]  There is insufficient evidence from which to conclude that the plaintiff's 1985 Resolution claim and related tort law claim or his Delaware state law claim are meant to evade the forum selection clause since at this time those claims do not appear to lack merit, nor is a breach of the Agreement the "gist" of those claims.  *See Bense,* 683 F.2d at 720.

No case within this jurisdiction has addressed how to respond when, for a reason other than evading the clause, only some of a plaintiff's claims are governed by a forum selection clause.  The closest case is *Lombardozzi v. Debroux,* 1992 WL 246872, *1 (N.D.N.Y.)* (Munson, J.) in which the court decided to remand a case to state court based on a forum selection clause in a settlement agreement which gave the state court "exclusive jurisdiction over any dispute arising out of or relating to the Settlement Agreement."  Although none of the plaintiff's claims were based on the settlement agreement, one of the defendant's affirmative defenses invoked the agreement.  The court held that "since at least one portion of the dispute 'arises out of' or 'relates to' the Settlement Agreement, the forum selection clause in that Agreement is clearly implicated." *Id.* at *3.

Courts in other jurisdictions have refused to dismiss or transfer a case which is broader than the forum selection clause.  However, unlike this case, most all of those cases involved additional defendants not bound by the forum selection clause and RICO and state law fraud claims which if successful would invalidate the contract containing the clause.  *See Farmland,* 806 F.2d at 852;  *General Environmental Science Corp. v. Horsfall,* 753 F.Supp. 664, 667-668 (N.D.Ohio 1990);  *Snider v. Lone Star Art Trading Co., Inc.,* 672 F.Supp. 977, 980 (E.D.Mich.1987), *aff'd without op.,* 838 F.2d 1215 (6th Cir.1988).[FN13]

*4 By contrast, in this case all the parties are bound by the forum selection clause for one of the plaintiff's main claims, the 1987 Resolution claim.  As for the claims in this case not governed by the forum selection clause, none are vastly different from those claims that are governed by the clause.  Rather, they merely provide alternative theories under which the plaintiff may be entitled to indemnification.  For these reasons, the Agreement's forum selection clause should be honored.  However, since some of the plaintiff's claims are independent of the forum selection clause, dismissal pursuant to Rule 12(b)(3) seems harsh;  transfer pursuant to 28 U.S.C. § 1404(a) is more appropriate.

The plaintiff has indicated, however, that he will withdraw all claims held by this court to be governed by the Agreement's forum selection clause.  Should the plaintiff follow through by filing a Second Amended Complaint withdrawing those claims, the forum selection clause would become inapplicable because no claims or affirmative defenses would be governed by it.  The plaintiff is entitled to try this case under his chosen theory keeping in mind that issue and claim preclusion may apply to future attempts to sue the defendants for indemnification.

For the foregoing reasons, the plaintiff has one month to file a Second Amended Complaint withdrawing those claims held to be governed by the Agreement's forum selection clause.  If an Amended Complaint is not filed within that time, this case will be transferred to the Central District of California for determination in Case No. CV-763451 MRP.

IT IS SO ORDERED.

> FN1. Although the defendants assert that Mr. Anselmo's liability in the *Caballero* suit did not arise by reason of his position as a director of SICC, the merits of plaintiff's claims for indemnification against the defendants are not relevant to deciding this motion because the defendants have moved only to dismiss or transfer for improper venue.

> FN2. The case referred to in Section 7.5 is a shareholder derivative suit against SICC and some of its directors, including Mr. Anselmo, commenced in California. Defendant's Exhibit E.  As part of the settlement agreement in that case, the SICC stockholders agreed to sell all of their stock or to vote in favor of any merger approved by a Sales Committee.  The district court supervised the bidding process, and approved Hallmark's bid to acquire SICC. Defendant's Exhibit D, E.

> FN3. Although Mr. Anselmo was not a signatory to the Agreement, he is bound by its forum selection clause.  The Agreement was implemented by a merger which required approval by the selling SICC stockholders, and Mr. Anselmo is an SICC stockholder.  Having ratified and adopted the Agreement, Mr. Anselmo and other shareholders could enforce its terms. Therefore, enforcement of the Agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

against Mr. Anselmo is appropriate if it is applicable to his claims. *See Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202-203 (3rd Cir.), *cert. den.,* 464 U.S. 938 (1983); *Dukane Fabrics International, Inc. v. M.V. "Hreljin",* 600 F.Supp. 202, 203 (S.D.N.Y.1985) (Lasker, J.); *Stephens v. Entre Computer Centers, Inc.,* 696 F.Supp. 636, 639 (N.D.Ga.1988).

FN4. Section 7.6 states: *Agreement to Defend and Indemnify.* From and after the Effective Time, the Surviving Corporation shall indemnify and hold harmless each present and former officer, director, employee and agent of SICC (the "Indemnified Parties") against any losses, claims, damages, liabilities, costs, expenses, judgments and amounts paid in settlement actually and reasonably incurred in connection with any threatened, pending or contemplated claim, action, suit proceeding, ..., by reason of the fact that such person is or was a director, officer, employee or agent of SICC, ..., arising out of or pertaining to any action or omission occurring on or prior to the Effective Time ... to the fullest extent permitted under Delaware law and the Bylaws of SICC presently in effect.... Defendant's Exhibit A at 46-49.

FN5. Specifically, the minutes of the August 3, 1987 board meeting at which the Resolution was adopted state that the Directors "considered the provisions of the Acquisition Agreement which authorize certain indemnification of officers and directors of the Corporation by the Corporation to the fullest extent of the General Corporation Law of the State of Delaware." Defendant's Exhibit I. After discussion, the following resolution was adopted:
RESOLVED, that Messrs. Anselmo, Villanueva and Kaufman in their capacities, respectively, as present and former officers and/or directors of the corporation shall be indemnified by the corporation with respect to the *Caballero* litigation to the fullest extent permissible under the General Corporation Law of Delaware *as is provided in the Acquisition Agreement;* provided that the authorization provided by this resolution is not intended to supersede or be inconsistent with any other resolutions

concerning the indemnification of such individuals with respect to the *Caballero* litigation previously adopted by this Board of Directors. *Id.* (emphasis added).

FN6. The minutes to the April 16, 1985 SICC Board of Directors Meeting state:
The Board discussed the lawsuits filed in the United States District Court for the Southern District of New York by the daughter of Eduardo Caballero ... The non-party directors determined that in their actions regarding the matters mentioned in the complaint, the defendant director, Mr. Anselmo ... acted in good faith and in a manner they reasonably believed to be in the best interests of the corporation [SICC], and upon motion duly made, seconded, and carried (Mr. Anselmo abstaining), it was
RESOLVED that this corporation is authorized to indemnify Reynold V. Anselmo and Julian M. Kaufman for any liability and expenses incurred by such defendants in the defense of said action to the maximum extent permitted by law; and
FURTHER RESOLVED that the corporation pay all legal expenses and costs incurred by said defendant directors in defending said lawsuit as they become due. Plaintiff's Exhibit B.

FN7. The defendants respond that the 1985 Resolution standing alone is insufficient to confer indemnification, and the Resolution must be considered in light of both the 1987 Resolution and Agreement; however, their response is premature because it attacks the merits of Mr. Anselmo's claim.

FN8. The defendants argue that Section 7.6 of the Agreement, supersedes the 1985 Resolution. Their assertion is based on Article VII, Section 7.9 of the Agreement which states as follows:
This Agreement constitutes the entire agreement among the parties to this Agreement, and supersedes all prior agreements and understandings, oral and written, among the parties to this Agreement with respect to the subject matter of this Agreement." Defendant's Exhibit A at 51.
In order to determine whether defendants are correct, Section 7.6 must be examined. By its terms Section 7.6 only supersedes indemnification decisions made after

Not Reported in F.Supp.                                                                                                Page 5
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

consummation of the acquisition.  *See infra* note 3; Article I, Sections 1.1(a); 1.2 (defining "Effective Time").  However, the plaintiff contends that the 1985 Resolution is a decision to indemnify made before the acquisition, so Section 7.6 is irrelevant.

FN9. Delaware Corporation Law Tit. 8, § 145(a) provides:  A corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation ... against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation....
Pursuant to Delaware Corporation Law, Tit. 8, § 145(f) a corporation can also grant indemnification rights beyond those provided by Section 145:  The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.
General Corporation Law, Limited Partnership Act and Business Trust Act (Michie 1991).

FN10. Although plaintiff has not provided the 1985 version of Article 8, of the SICC by-laws, he asserts that Article 8 of the Restated Certificate of Incorporation of USG is the same as the 1985 version. Article 8 of the USG by-laws states: "This corporation shall, to the fullest extent permitted by Delaware law, as in effect from time to time, indemnify all persons who are or were directors...."  Plaintiff's Exhibit C.

FN11. Under Delaware law, while a board

of directors may vote to indemnify its directors on a case-by-case basis, the board may also make mandatory the permissible indemnification rights of § 145 by means of a corporate by-law.  *Advanced Mining Systems, Inc. v. Fricke,* 1992 WL 187615 (Del.Ch.) at *1;  *see also* *Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343 (Del.S.Ct.1983);  *Heffernan v. Pacific Dunlop GNB Corp.,* 965 F.2d. 369 (7th Cir.1992).

FN12. Indeed, Mr. Anselmo is so determined to avoid the California courts that he is prepared to withdraw his claim based on the 1987 Resolution, as he did with his Section 7.6 claim, and rely on his remaining claims should this court find that his case should be transferred solely by reason of the 1987 Resolution.  Plaintiff's Memorandum in Opposition to Motion at 7.

FN13. Courts have also refused to honor forum selection clauses where the clause appears in a contracts or agreement insignificant to the main claim.  *Snider,* 672 F.Supp. at 980 (only one of six equally important documents in RICO claim contained forum selection clause);  *Lulling v. Barnaby's Family Inns, Inc.,* 482 F.Supp. 318, 321 (E.D.Wis.1980) (forum selection clause found in only one of four contracts, and one which contained clause was not the basic contract).

S.D.N.Y.,1993.
Anselmo v. Univision Station Group, Inc.
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)

END OF DOCUMENT

# TAB
# 3

1 of 1 DOCUMENT

**BOZELL GROUP, INC., Plaintiff, - against - CARPET CO-OP OF AMERICA ASSOCIATION, INC., d/b/a CARPET ONE, Defendant.**

**00 Civ. 1248 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 15088*

**October 11, 2000, Decided
October 13, 2000, Filed**

**DISPOSITION:** [*1] Motion for costs granted and the case dismissed for lack of personal jurisdiction.

**COUNSEL:** For Plaintiff: ERIC OSTERBERG, ESQ., Of Counsel, BROWN RAYSMAN MILSTEIN FELDER & STEINER, New York, NY.

For Defendant: NELSON L. MITTEN, ESQ., CHARLES S. KRAMER, ESQ., RANDY HAYMAN, ESQ., Of Counsel, RIEZMAN BERGER, St. Louis, Missouri.

GLENN M. KURTZ, ESQ., ALYCIA REGAN-BENENATI, ESQ., Of Counsel, WHITE & CASE, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.,**

Defendant Carpet Co-Op of America Association, Inc., d/b/a/ Carpet One ("Carpet One"), has moved to dismiss for lack of personal jurisdiction pursuant to *Rule 12(b)(6), Fed. R. Civ. P.*, or, in the alternative, for summary judgment pursuant to *Rule 56, Fed. R. Civ. P.* Plaintiff Bozell Group Inc. ("Bozell") opposes the motions and has moved for recovery of costs of service and filing pursuant to *Rule 4, Fed. R. Civ. P.* For the reasons stated below, the motion for costs is granted, and the case is dismissed for lack of personal jurisdiction.

**The Parties**

Bozell is an advertising agency that is incorporated and headquartered in New York.

Carpet One is a Delaware corporation with [*2] its principal place of business in Missouri that operates a nationwide cooperative of retail carpet dealers.

**Background**

The complaint in this action (the "Complaint") was filed on February 18, 2000. Bozell claims indemnity and breach of contract arising out of Carpet One's failure to honor celebrity endorsement contracts Bozell procured in its capacity as Carpet One's national advertising agency.

On May 2, 2000, Bozell filed the motion for costs. Carpet One filed its opposition to Bozell's motion for costs on May 24, 2000, and the motion was deemed fully submitted on May 26, 2000 upon the filing of Bozell's reply memorandum.

On May 9, 2000, Carpet One filed the motion to dismiss or for summary judgment. Bozell filed its opposition on July 10, and Carpet One filed its reply on July 25. The motion was deemed fully submitted on July 27, 2000.

Both the motion for costs and the motion for dismissal or summary judgment will be addressed in this opinion.

**Facts**

Except as otherwise noted, the following are undisputed facts as presented by the parties.

Some time prior to January 1998, Carpet One entered into negotiations with Bozell for a contract under which [*3] Bozell would act as Carpet One's national advertising agent. Representatives of Carpet One discussed the advertising plan with a Bozell representative at a meeting in New York on January 15, 1998 and again on March 15, 1998.

By agreement, between November 1997 and June 1998, Carpet One paid $ 50,000 per month for Bozell to arrange media buys for Carpet One, to locate and identify actors, celebrities and other talent who might be willing to endorse Carpet One and/or its products, and to perform other advertising services.

The parties dispute whether a final contract was ever formed and whether, once Contract One had approved the celebrity spokespersons Bozell procured, Contract One was required to contract with them directly in writing.

During this period, Bozell negotiated with potential spokespersons with respect to a potential agreement between the spokespersons and Carpet One. In particular, Bozell exchanged drafts of proposed Talent Agreements with representatives of Beatrice Arthur ("Arthur") and Estelle Getty ("Getty"), both most recently of "Golden Girls" fame. Both Arthur and Getty are represented by the William Morris Agency in New York ("WMA"), are members of the Screen [*4] Actors Guild ("SAG"), the union that represents all "principal performers" that act in commercials. Bozell is a party to the SAG 1997 Commercials Contract, which applies whenever a SAG member is employed in a commercial.

The parties disagree as to whether Carpet One ever gave Bozell approval to hire Arthur and Getty as spokespersons for Carpet One's national advertising campaign, but it is undisputed that Carpet One never executed a written contract with Arthur, Getty or their representatives. Neither Arthur nor Getty ever appeared in any advertisements for Carpet One.

On or about May 20, 1998, Carpet One informed Bozell that it wished to terminate the relationship as of May 31, 1998. In May 1998, Bozell claimed that Carpet One owed it certain monies. The parties contest whether Carpet One acknowledged owing Bozell any payments. The parties entered into settlement negotiations and, on or before July 20, 1998, Carpet One paid Bozell $ 295,468.

On or about July 20, 1998, Bozell signed a "Mutual Release" which provided that, in consideration for the $ 295,468, Bozell would forever release Carpet One and its related entities from "any and all actions, causes of actions, lawsuits, claims, [*5] counterclaims, demands . . . WHETHER NOW KNOWN OR UNKNOWN," arising out of the business relationship. (emphasis in original). From this broad release was a narrow "carve-out" exception, which provided in relevant part:

> Notwithstanding the foregoing, if [Arthur, Getty or their representatives] sue Bozell for damages or other relief for any claim

of any kind, arising out of, related to or connected with the negotiations of the proposed Getty/Arthur agreement whereby Getty and Arthur would have been engaged as spokespersons for Carpet One (the "Getty/Arthur Discussions"), Bozell reserves all Claims against ... Carpet One ..., including any claims for costs or attorneys fees or monetary relief of any type, provided, however, that this reservation of Claims only applies in the situation where ... Getty, and/or Arthur [or their representative] bring a lawsuit or claim in a legal proceedings against Bozell. In any such assertion of claims by Bozell against Carpet One, Bozell's damages shall be limited to the amount of damages, including costs and attorneys fees, awarded ... against Bozell.

*Mutual Agreement at 1-2 P 1*(a) (emphasis added).

Subsequently, [*6] SAG initiated an arbitration proceeding in California against Bozell and Carpet One (the "SAG Arbitration") alleging that the Talent Agreements with Arthur and Getty were binding despite the fact that no commercials were made, and seeking various types of relief. Upon receiving the SAG Arbitration, Carpet One notified SAG's counsel that it could not be compelled to arbitration, deemed SAG's claims to be frivolous, and demanded that it be dismissed from any arbitration proceeding. SAG thereafter agreed to and did dismiss Carpet One from the SAG Arbitration.

Bozell continued to participate in the SAG Arbitration and thereafter notified Carpet One of an intent to settle the claims asserted by SAG. Bozell asked Carpet One to participate in the proposed settlement. Carpet One refused. Nonetheless, Bozell settled the claim for $ 212,650, comprising $ 100,000 each to Arthur and Getty via their representatives, and $ 12,650 to the SAG Producers Pension & Health Plans. In consideration for these payments, the Settlement Agreement between Bozell and SAG provided that SAG would "forever release and discharge Bozell" and its related entities for any claims arising out of the aborted Arthur and [*7] Getty commercials.

Bozell then initiated the instant suit for breach of contract and indemnity against Carpet One for the amount of the SAG settlement. Bozell sent notice of the suit, a request for waiver of service of a summons, and return forms to Carpet One on February 23, 2000. Although Carpet One acknowledged receiving the mailings in late February of 2000, it did not return the waiver forms. Carpet One contends that there is "good

cause" excusing its failure to waive service. First, Carpet One initially responded to the receipt of the waiver request by offering to settle in a letter sent on March 2, 2000. In that letter, Carpet One contended that the claims were without merit, threatened to move for sanctions, and stated "in light of these problems, specifically the release and jurisdictional problem with New York venue, Carpet Co-Op is not prepared to execute a waiver of summons at this point." Bozell responded with a counteroffer by letter of March 17, 2000, and, in a separate letter, demanded return of the waiver form.

Carpet One wrote to Bozell on March 22, 2000 that it wished to avoid spending attorney's fees on researching waiver of service if there was a chance the matter [*8] would settle or be submitted to arbitration. In that letter, counsel for Carpet One stated "it is my understanding that your statement that my client has an obligation to return a waiver of service form is an overstatement of the law. Further, any 'obligation' which might otherwise exist would not exist where a suit such as yours is involved."

By letter of March 24, 2000, Bozell refused to continue settlement talks because the parties' positions were too far apart and stated "if your client chooses not to arbitrate, please return the waiver of service form." Carpet One claims that it opted not to return the waiver in reliance on this alleged promise from Bozell not to require waiver until the parties had established whether or not the case would proceed in federal court. Nonetheless, Bozell filed formal service and served Carpet One with the Complaint on April 4, 2000, after the 30-day period for return of the waiver forms had expired.

## Discussion

### I. Costs

A defendant may be compelled to pay the plaintiff's costs of service under the *Federal Rules of Civil Procedure. Rule 4* provides that:

> An individual, corporation, or association that is subject to service [*9] under subdivision (e), (f), or (h), and that receives notice of an action in the manner provided in this paragraph has a duty to avoid unnecessary costs of serving the summons. To avoid costs, the plaintiff may notify such a defendant of the commencement of the action and request that the defendant waive service of a summons.

*Fed. R. Civ. P. Rule 4(d)(2)*. Subdivision (h) provides guidelines for service on corporations and associations, a category in which Carpet One falls. *Fed. R. Civ. P. Rule 4(h)*. If a defendant fails to comply with a request to waive service of a summons, "the court shall impose the costs subsequently incurred in effecting service on the defendant unless good cause for the failure be shown." Id. These costs include the cost of service as well as a "reasonable attorney's fee" for a motion to collect costs. *Fed. R. Civ. P. Rule 4(d)(5)*. To trigger a defendant's obligation to pay, a plaintiff must, inter alia, (1) send a written notice and waiver request, (2) to an officer or agent of the defendant corporation (3) by first-class mail, including (4) notice of the consequences of failing to comply with the waiver request within 30 days, and (5) a prepaid [*10] reply envelope. *Fed. R. Civ. P. Rule 4(d)(2)(A-G)*.

In opposition to Bozell's motion, Carpet One takes the position that it is not responsible for the costs of service under this motion because Bozell never made an effort to determine whether the parties could agree upon these costs. This argument need not be addressed in detail. Carpet One has cited no authority for this contention and Rule 4 itself does not refer to any preference for negotiated agreements as to costs. A plaintiff has no burden to seek an out-of-court agreement as to costs to avert the need for a Rule 4 motion.

Moreover, Carpet One contends that its reliance on Bozell's "specific indication" that it would not require waiver is "good cause" excusing the failure to file the waiver form. Yet Bozell did not promise to excuse waiver, and even if it had done so, Rule 4 does not authorize the parties to contract around the waiver of service requirements. A review of the correspondence between counsel submitted as exhibits to the Kramer Affidavit reveals that Bozell stated only, "if your client chooses not to arbitrate, please return the waiver of service form." Carpet One construes this statement as a promise not to require [*11] compliance with a Federal Rule of Civil Procedure. The fact that Bozell "immediately began to institute the process to secure formal service" after the expiration of the period for return of waiver, (Def. Mem. at 4), suggests that Bozell did not intend to excuse any formalities required by the Rules.

Even if Bozell's statement could fairly be construed as a promise not to require waiver of service, the Rules do not authorize the parties to contract around the waiver requirements. The Rules provide that where, as here, the waiver of service and notice of suit are properly sent and received, a defendant who fails to return the waiver form within 30 days "shall" pay a plaintiff's costs. *Fed. R. Civ. P. Rule 4(d)(2)*. n1 Although out of court agreements are

certainly preferable to motions from the perspective of judicial economy, the language of Rule 4 is mandatory. Bozell could not have contracted out of the waiver requirements even if it had so desired.

n1 Although not argued here, it should be noted that neither of Carpet One's initial defenses -- that the lawsuit lacked merit and that the court did not have jurisdiction -- constitutes "good cause" excusing the failure to return the waiver of service forms under Rule 4. See *Morales v. SI Diamond Technology, Inc., 1999 U.S. Dist. LEXIS 2964, 43 Fed. R. Serv. 3d 1200 (S.D.N.Y. 1999)* (holding that lack of merit in the Complaint is not "good cause" to excuse failure to return waiver form); *Fed. R. Civ. P. Rule 4(d)(1)* ("A defendant who waives service of a summons does not thereby waive any objection to the venue or to the jurisdiction of the court over the person of the defendant.").

[*12]

No good cause having been shown, Carpet One is ordered to reimburse Bozell for its costs of service, including a reasonable attorney's fee for the preparation of the motion for costs, for a total of $ 1,103.00, pursuant to Rule 4(d)(2), (5).

**II. Personal Jurisdiction**

In diversity actions such as this one, personal jurisdiction over the parties is determined by the law of the state in which the court sits, in this case New York. *Premier Lending Services v. J.L.J. Assocs., et al., 924 F. Supp. 13 (S.D.N.Y. 1996);* see *Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963).* New York law provides two mechanisms by which to assert jurisdiction over a defendant, general jurisdiction and personal jurisdiction pursuant to a long-arm statute. In addition, the exercise of personal jurisdiction under New York law is circumscribed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Metro. Life Ins. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996); Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963).* The plaintiff has the burden of proving that the [*13] court has personal jurisdiction over the defendant. See *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)* (citation omitted).

**A. General Jurisdiction**

There may be general jurisdiction over a defendant under section 301 of the New York Civil Practice Law and Rules ("CPLR") if the defendant "does business" in New York. CPLR § 301. A defendant should be deemed to be "doing business" in New York only if the aggregate of the corporation's activity "is such that it may be said that the corporation is present in the State, not occasionally or casually, but with a fair measure of permanence or continuity." *PaineWebber, Inc. v. WHV, Inc., 1995 U.S. Dist. LEXIS 6514, *11, No. 95 Civ. 6514 (LMM), 1995 WL 296398, *4 (S.D.N.Y. May 16, 1995)* (quoting *Laufer v. Ostrow, 55 N.Y.2d 305, 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 (Ct. App. 1982));* see *Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (Ct. App. 1917)* (Cardozo, J.).

Typical indicia of an ongoing corporate presence in a state include maintaining a local address and telephone number, property, or employees in the state. See *Landoil Resources Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir. 1980); [*14] PaineWebber, 1995 WL 296398,* at *4; *Pneuma-Flo Systems, Inc. v. Universal Mach. Corp., 454 F. Supp. 858, 861 (S.D.N.Y. 1978).* Although Carpet One does not have corporate offices or employees in New York, Bozell contends that Carpet One "does business" in New York because it is a nationwide cooperative that is continuously "negotiating agreements . . . purchasing carpet . . . shipping carpet . . . purchasing advertising services and advertising . . . and licensing the Carpet One name to the retailers." (Bozell Mem. at 7.)

However, this allegation is made in a declaration by John Roth, who is a senior partner in Bozell and does not claim to have any personal knowledge of Carpet One's business practices other than its advertising plans with Bozell itself. (See Roth Aff. PP 1, 4, 5.) In fact, Carpet One does not "ship" or "purchase" carpet, own stores or have employees in New York, and licenses its name to independently owned retailers via transactions in Missouri. (Marcarelli Aff. P 4.)

Mere nominal affiliation with independent New York retailers does not give Carpet One a sufficiently permanent presence to justify asserting general jurisdiction [*15] under CPLR § 301. See *Beacon Enterprises, Inc. v. Mary Rose Menzies, 715 F.2d 757 (2d Cir. 1983)* (finding no general jurisdiction where "defendant has no manufacturing facilities, no sales office, no advertising offices, no agents or distributors in the Southern District of New York or elsewhere in the state of New York at this time," despite occasional mail order sales to New York); *Dunn v. Southern Charters, Inc., 506 F. Supp. 564, 567 (E.D.N.Y. 1981)* (solicitation of orders for defendant's products through independent agents and publications insufficient to provide general jurisdiction).

Bozell contends that the two visits to New York by Carpet One executives in January and March of 1998 evidence Carpet One's corporate presence in New York.

However, two meetings taking place over the course of three months do not confer general jurisdiction. over Carpet One. See *Landoil, 918 F.2d at 1045-46* (holding thirteen short trips over eighteen months insufficient to establish § 301 jurisdiction); *Aquascutum of London, Inc. v. S.S. American Champion, 426 F.2d 205, 211-12 (2d Cir. 1970)* (visits to solicit business in New [*16] York "every few months" insufficient); *Hoffritz For Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57-58 (2d Cir. 1985)* (fifty-four visits to New York to discuss business with plaintiff insufficient); *New World Capital Corp. v. Poole Truck Line, Inc., 612 F. Supp. 166, 172 (S.D.N.Y. 1985)* (eight visits over four years insufficient); *Savoleo v. Couples Hotel, 136 A.D.2d 692, 693, 524 N.Y.S.2d 52, 52 (App. Div. 1988)* ("occasional" business trips to New York insufficient)).

### B. Long-Arm Jurisdiction

Second, New York's long-arm statute provides that a court may exercise personal jurisdiction over a non-domiciliary defendant who: (1) transacted business in New York, (2) if the cause of action arises out of the business transacted. CPLR § 302(a)(1); see *PaineWebber, 1995 WL 296398 at *2*. Each claim in a cause of action must arise out of the transaction of business or the contract to supply goods or services. See *Morrison v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 501 (S.D.N.Y. 2000)*.

### 1. Transacting Business

A defendant "transacts business" in New York under CPLR § 302 when it has [*17] "purposely availed" itself of the opportunity to conduct business here, and thereby benefits and protections of New York law. *Sterling Nat. Bank and Trust Co. of New York v. Fidelity Mtge. Investors, 510 F.2d 870, 873 (2d Cir. 1975); McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (Ct. App. 1967)* (citing *Hanson v. Denckla, 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228* (253 (1958)).

The existence of purposeful activity should be considered in the totality of the circumstances, and jurisdiction should not be asserted against a defendant based upon "random" or "fortuitous" contacts. *Cutco Industries v. Naughton, 806 F.2d 361, 365; see Burger King v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*. It is the "nature and quality," not the number of contacts, that determine whether activity is purposeful. *Standard Enterprises, Inc. v. Bag-It, Inc., 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987)*. As a rule, the "minimum contacts" must provide a defendant with notice that it might be subjected to suit in courts of the forum state. [*18] *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (Ct.*

*App. 1998)* (citing *Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174)*.

It cannot be said that two trips to New York and a few phone calls constitute "purposeful availment" of New York law. See *Cortland Line Co. v. Vincent, 1999 U.S. Dist. LEXIS 7190, *11, No. 98- CV-259, 1999 WL 305369, *3 (N.D.N.Y. May 7, 1999)* (finding no § 302 jurisdiction despite numerous telephone calls and a single trip to New York). The fact that the meetings and calls involved New York was incidental; Carpet One is based in Missouri and planned a nationwide advertising campaign and did not project itself into New York through these contacts. Moreover, there were only two meetings during which Carpet One executives were physically present in New York. The meetings took place three months apart, were not part of a systematic pattern of New York visits, and did not result in any contract being signed. These contacts do not rise to the level of "transacting business" required for § 302 jurisdiction. Cf. *George Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977) [*19]* (finding jurisdiction under § 302(a)(1) when the defendant "was physically present in New York at the time the contract, establishing a continuing relationship between the parties, was negotiated and made . . . ."). n2

> n2 Moreover, even if Bozell were acting as Carpet One's agent in negotiating with WMA for Arthur and Getty's appearances, Bozell's conduct in New York could not be attributed to Carpet One in analyzing whether or not Carpet One had sufficient contacts with New York to confer jurisdiction. *Stein v. Microelectronic Packaging, Inc., 1999 U.S. Dist. LEXIS 11375, *16, No. 98 Civ. 8952(MBM), 1999 WL 540443, *5 (S.D.N.Y. July 26, 1999); Laufer, 55 N.Y.2d at 312, 449 N.Y.S.2d at 460*.

### 2. Nexus between Contacts with New York and the Asserted Claim

Even if the contacts asserted here did rise to the level of "transacting business" in New York, the instant claims for breach of contract and indemnity did not "arise out of" those contacts as is required for § 302 jurisdiction. A claim "arises out [*20] of" the transaction of business when there is a "substantial nexus" between the transaction of business and the cause of action sued upon. See *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 31 (2d Cir. 1996); Nassar v. Florida Fleet Sales, 69 F. Supp. 2d 443, 446 (S.D.N.Y. 1999); McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981)* (requiring an

"articulable nexus" between claims asserted and transaction of business in New York").

Bozell asserts that the requisite nexus stems from the fact that Carpet One's executives visited New York twice to discuss Bozell's advertising strategy in what Bozell claims to have been "important" and "crucial" meetings. Personal jurisdiction based upon meetings in the forum state is warranted only if the meetings were substantial. See *PaineWebber, 1995 WL 296398,* at *3.

Yet even if they were "important" to Carpet One's overall business strategy, these meetings were mere "link[s] in the chain of events leading to the claim[s] for which relief is sought." *Xedit Corp. v. Harvel Indus. Corp., 456 F. Supp. 725, 729 (S.D.N.Y. 1978).* [*21] The claim asserted in this action is that Carpet One must indemnify Bozell for the cost of Bozell's settlement with SAG over the cancelled Arthur and Getty commercials, and that Carpet One breached its contract to Bozell in failing to pay. The meetings gave rise to a marketing plan, which led to Bozell's solicitation of and contracting with Arthur and Getty to appear in Carpet One commercials, an agreement which in turn was repudiated by Carpet One, which led to the initiation and settlement of arbitration against Bozell, which Carpet One refused to join, which, finally, led to the instant claims for indemnity and breach of contract. The two meetings were simply not proximate enough to the acts claimed in this suit for them to confer personal jurisdiction under § 302. See Weinstein, Korn & Miller, *New York Civil Practice § 302.05,* at 3-80) ("The defendants' New York activities must be substantially proximate to the allegedly unlawful acts before the cause of action can be said to arise out of those activities.").

Bozell has not shown that the two claims it asserts in this action arose out of Carpet One's transaction of business in New York. This court has no personal jurisdiction [*22] over the defendant under CPLR § 302(a)(1).

### Conclusion

For the foregoing reasons, the motion for costs is granted and the case is dismissed for lack of personal jurisdiction.

It is so ordered.

**New York, NY**
**October 11, 2000**

    **ROBERT W. SWEET**

    **U.S.D.J.**