**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

GUY CARPENTER & COMPANY, LLC and ）
MARSH & McLENNAN COMPANIES, INC., ）
                                  ）    Case No. 07 – CV- 3580 (DC)
        Plaintiffs,               ）
                                  ）
v.                                ）
                                  ）
JULIAN SAMENGO-TURNER, RON        ）
WHYTE, and MARCUS HOPKINS,        ）
                                  ）
        Defendants.               ）
_____ ）


**DEFENDANT RON WHYTE'S APPENDIX OF UNPUBLISHED CASES**
**CITED IN BRIEFING ON MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**DUE TO LACK OF PERSONAL JURISDICTION AND FORUM _NON CONVENIENS_**


                    John P. Barry (JB 6489)
                    Mark A. Saloman (MS 5764)
                    Proskauer Rose LLP
                    One Newark Center, 18th Floor
                    Newark, New Jersey 07102
                    973.274.3200
                    973.274.3299 (Fax)

                    _Attorneys for defendant Ron Whyte_


# TABS 4 - 6

### Table of Contents

|  | Tab |
|---|---|
| *Albon v. Naza Motor Trading*, (2007) 2 All E.R. (Comm.) 719 ………………………… | 1 |
| *Anselmo v. Univision Station Group, Inc.*, No. 92 Civ. 1471 (RLC), 1993 WL 17173 (S.D.N.Y. Jan. 15, 1993) ………………………………………………… | 2 |
| *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc.*, 00 Civ. 1248 (RWS), 2000 U.S. Dist. LEXIS 15088 (S.D.N.Y. Oct. 11, 2000) ………………………………… | 3 |
| *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432 (S.D.N.Y. July 22, 1996) ………………………………… | 4 |
| *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 95 Civ. 7685 (RPP), 1996 U.S. Dist. LEXIS 11064 (S.D.N.Y. Aug. 1, 1996) ………………………………… | 5 |
| EU Council Regulation (EC) No. 44/2001, Sec. 5, Art. 20 …………………………… | 6 |
| *Freeplay Music, Inc. v. Cox Radio, Inc.*, 04 Civ. 5238 (GEL), 2005 U.S. Dist. LEXIS 12397 (S.D.N.Y. June 22, 2005)…………………………………………… | 7 |
| *GCG Int'l, Inc. v. Eberhardt*, 05 Civ. 2422 (DC), 2005 U.S. Dist. LEXIS 23877 (S.D.N.Y. Oct. 17, 2005) ………………………………………………… | 8 |
| *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96 Civ. 2064 (RWS), 1997 WL 53184 (S.D.N.Y. Feb. 11, 1997) ………………………………………… | 9 |
| *PaineWebber Inc. v. WHV, Inc.*, 95 Civ. 0052 (LMM), 1995 U.S. Dist. LEXIS 6514 (S.D.N.Y. May 12, 1995) ………………………………………………… | 10 |
| *Pieczenik v. Dolan*, 03 Civ. 6336 (SAS), 2003 U.S. Dist. LEXIS 23295 (S.D.N.Y. Dec. 29, 2003) ………………………………………………………… | 11 |
| *Saab v. Citibank, N.A.*, No. 00 Civ. 6784 (BSJ), 2001 WL 1382577 (S.D.N.Y. Nov. 7, 2001) ………………………………………………………… | 12 |
| *Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, 00 Civ. 9227 (GEL), 2001 U.S. Dist. LEXIS 3001 (S.D.N.Y. Mar. 20, 2001) ……………………………… | 13 |
| *Spencer Trask Ventures, Inc. v. Archos S.A.*, 01 Civ. 1169 (LAP), 2002 U.S. Dist. LEXIS 4396 (S.D.N.Y. Mar. 15, 2002) ……………………………………… | 14 |
| *Swithenbank Foods Ltd v. Bowers*, (2002) 2 All E.R. (Comm.) 974, 981 (Q.B.) ……… | 15 |

*Varnelo v. Eastwind Transp., Ltd.,* 02 Civ. 2084 (KMW)(AJP), 2003 U.S. Dist. LEXIS 1424 (S.D.N.Y. Feb. 3, 2003) …………………………………………………………. 16

*Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co., Ltd.*, 00 Civ. 9605 (DFE), 2002 U.S. Dist. LEXIS 789 (S.D.N.Y. Jan. 16, 2002) …………………………………………… 17

# TAB
# 4

**BREINDEL & FERSTENDIG, Plaintiff, -against- WILLIS FABER & DUMAS LIMITED, Defendant.**

**95 Civ. 7905 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 10432*

**July 22, 1996, Decided**
**July 24, 1996, FILED**

**DISPOSITION:** [*1] WFD's motion to dismiss the complaint on the grounds of forum non conveniens denied. WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims. WFD's motion for summary judgment denied without prejudice to renew as against Breindel's negligence and gross negligence claims. Decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits. Stay of discovery lifted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff law firm brought suit against defendant, a London-based reinsurance broker, for legal fees. The broker moved for summary judgment and to dismiss the complaint for forum non conveniens.

**OVERVIEW:** The broker contended that English courts were more convenient or, in the alternative, that the claims for breach of contract and fiduciary duty, negligent or fraudulent misrepresentation, negligence, and gross negligence should be summarily dismissed. The court held that (1) the unavailability of a jury trial or punitive damages and the lack of opportunity to take pretrial depositions did not render suit in England clearly unsatisfactory; (2) although both parties had a significant interest in having the dispute decided at home, the action involved money owed to a New York law firm for services performed solely in this country; (3) the law firm failed to establish any contractual relationship with or duty owed to it by the broker; and (4) the law firm failed to show that the broker acted as its agent or that

any other relationship existed to give rise to a fiduciary duty.

**OUTCOME:** The court denied dismissal for forum non conveniens and of the negligence claims, granted summary judgment on the breach of contract and fiduciary duty and negligent misrepresentation claims, reserved decision on summary judgment on fraud, and lifted the stay on discovery.

**COUNSEL:** For BREINDEL & FERSTENDIG P.C., plaintiff: Howard Breindel, Breindel & Ferstendig P.C., New York, NY.

For WILLIS FABER & DUMAS LIMITED, defendant: Michael Zweig, Loeb and Loeb, New York, NY.

**JUDGES:** SIDNEY H. STEIN, U.S.D.J. Magistrate Judge Andrew J. Peck

**OPINION BY:** SIDNEY H. STEIN

**OPINION:**

OPINION AND ORDER

SIDNEY H. STEIN, DISTRICT JUDGE:

Plaintiff, a New York City law firm, has brought this action pursuant to the Court's diversity jurisdiction against defendant, a London-based reinsurance broker, for legal fees allegedly due plaintiff for services rendered in this country for several of [*2] defendant's clients located in London and Italy. Defendant has moved: (1) to dismiss the complaint on the ground of forum non conveniens and (2) for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56*. For the reasons that follow, defendant's motion to dismiss for forum non

conveniens is denied, and its motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff Breindel & Ferstendig ("Breindel") is a law firm organized as a New York professional corporation, with its office in New York City. (Compl. P1; Affidavit of Howard Breindel, sworn to on March 14, 1996, at P1.) Defendant Willis Faber & Dumas Ltd. ("WFD") is a British insurance and reinsurance broker with its principal place of business in London, England. (Compl. P2; Declaration of Heather Hunter, sworn to on February 15, 1996, at P2.)

Augusta Assicurazioni S.p.A. ("Augusta"), an Italian insurance company, agreed to insure Bieffe Helmets S.R.L. ("Bieffe") for products liability claims made against Bieffe. (Hunter Decl. P3.) In late 1991, WFD placed a contract of reinsurance for Augusta with several underwriters associated with Lloyd's of London and a number [*3] of London company market insurers (collectively, the "Underwriters"). (Hunter Decl. P3.)

In that same year, the Underwriters retained Solin & Breindel, apparently the predecessor of Breindel, as lead counsel for various products liability claims against Bieffe in this country. (Hunter Decl. P4; Breindel Aff. P23.) WFD took no part in the decision to retain Breindel, but did notify Breindel by letter dated December 20, 1991 of its retention by the Underwriters. (Hunter Decl. PP4, 5.) Additionally, Augusta retained Breindel to represent it with regard to the products liability claims. (Hunter Decl. P4.)

WFD served as a "conduit" between the Underwriters and Breindel -- Breindel would submit to WFD statements regarding fees owed it by the Underwriters; WFD would then determine how much was owed by each underwriter and inform the Underwriters of their respective debts; the Underwriters would then submit payment to WFD; and, finally, WFD would forward payment to Breindel. (Hunter Decl. P7; Breindel Aff. PP28, 32; Declaration of Joanne Whittaker, dated April 4, 1996, at P6.) WFD received no payment or anything else of value from Breindel for these services, and states that it performed [*4] these services solely for the convenience of Augusta, its client. (Hunter Decl. P5; Whittaker Decl. P3; Declaration of Bruce Carruthers, dated April 4, 1996, at P11; Reply Declaration of Heather Hunter, dated April 3, 1996, at PP16, 22.) According to Breindel, this is the usual custom and practice for underwriters associated with Lloyd's (Breindel Aff. PP24-25), but WFD disputes this. (Whittaker Decl. P7; Carruthers Decl. P11; Hunter Reply Decl. P17.)

Breindel states that it "reposed its trust and confidence" in WFD to collect and transmit to Breindel the monies due it. (Breindel Aff. P43.) Breindel also states that it had no control over how and when WFD billed the Underwriters, nor when WFD chose to transfer the monies to Breindel. (Breindel Aff. P43(a)(1)). Breindel further states that it did not know the location or identity of the claims manager of any Underwriter except for that of the lead Underwriter, or how much was paid by each Underwriter, or when. (Breindel Aff. P43(b)).

WFD has distributed to Breindel all payments owed it by the Underwriters. (Hunter Decl. P8; Breindel Aff. P36; Whittaker Decl. P9; Carruthers Decl. P12; Hunter Reply Decl. P21.) However, Breindel states [*5] that WFD performed its function as an intermediary "in a dilatory, negligent, unprofessional and inefficient manner" (Breindel Aff. P36(a)), by, among other things, failing to keep accurate records of its activities and delaying payment of funds provided by Augusta and the Underwriters in order to take advantage of the "float," i.e., the interest that accrued during the delay. (Breindel Aff. PP36(b), 41, 43(c), 46).

WFD also agreed to reimburse Augusta for up to 95% of the deductible amount on Augusta's reinsurance contract, which was $ 200,000. (Hunter Decl. P9; Breindel Decl. PP28-30.) This agreement was reached apparently because of an error made by WFD: while the Bieffe/Augusta insurance contract provided that the $ 200,000 deductible did not apply to legal fees, so that all such fees would be paid by Augusta, the Augusta/Underwriters reinsurance contract brokered by WFD provided that the deductible does apply to legal fees. (Affirmation of David L. Ferstendig, dated March 15, 1996, at PP3-4.) Thus, absent an arrangement between Augusta and WFD, Augusta would be liable for all legal costs incurred rather than just 5% of those costs. (Ferstendig Aff. P5.) WFD states [*6] that it never assumed an obligation to Breindel to pay its legal fees. (Carruthers Decl. P10; Hunter Reply Decl. P19.)

WFD states that it generally did not act as a "conduit" between Breindel and Augusta, but rather that those two entities usually -- although not always -- dealt with one another directly. (Hunter Decl. P10; Whittaker Decl. P4; Hunter Reply Decl. P20; Breindel Aff. P32.) Augusta, however, always made its payments directly to Breindel. (Breindel Aff. P32; Whittaker Decl. P4; Hunter Reply Decl. P20.)

Breindel states that WFD delayed and then ceased reimbursing Augusta for WFD's 95% share of the amounts paid for attorneys' fees up to the deductible amount. (Breindel Aff. P33; Pl.'s ex. P.) As a consequence, Augusta stopped paying Breindel. (Breindel Aff. P33; Pl.'s ex. P.) Augusta currently owes

Breindel $ 68,000, but is unwilling to pay unless it is assured that WFD will reimburse it. (Breindel Aff. P35.)

WFD intends to call as witnesses at trial certain of its employees and persons associated work the Underwriters, all of whom reside and work in London. (Hunter Decl. P12; Hunter Reply Decl. P8.) All of WFD's business records are maintained in or near London. (Hunter [*7] Reply Decl. P7.)

Breindel brought this action on September 11, 1995, and WFD served this motion five and one half months later. By order dated February 28, 1996, Magistrate Judge Leonard Bernikow stayed all discovery pending resolution of this motion.

## DISCUSSION

A. Forum Non Conveniens

1. Waiver

Breindel argues first that WFD waived its right to move to dismiss for forum non conveniens because of its undue delay in bringing the motion. However, *Fed. R. Civ. P. 12(h)* is not applicable to such a motion. See *Leif Hoegh & Co. v. Alpha Motor Ways, Inc., 534 F. Supp. 624, 626 (S.D.N.Y. 1982); Snam Progetti S.p.A. v. Lauro Lines, 387 F. Supp. 322, 322-23 (S.D.N.Y. 1974).* Moreover, similar periods of delay have been held not to constitute a waiver. See *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 170 (S.D.N.Y. 1995)* (six months); *Snam Progetti, 387 F. Supp. at 323* (five months); cf. *Cerro De Pasco Copper Corp. v. The Alabama, 109 F. Supp. 856, 858 (S.D.N.Y. 1952)* (court did not consider motion to dismiss for forum non conveniens where defendant waited three and a half years before moving). n1

n1 Although the delay in this case does not constitute a waiver, the Court will consider the delay when determining whether the forum is inconvenient. See section A.3 infra.

[*8]

2. An Alternative Forum

The initial inquiry when analyzing a motion to dismiss for forum non conveniens is whether there exists an adequate alternative forum, "because application of the doctrine 'presupposes at least two forums in which the defendant is amenable to process.'" *Murray v. British Broadcasting Corp., 81 F.3d 287, 292 (2d Cir. 1996)* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S. Ct. 839, 842, 91 L. Ed. 1055 (1947)); see also Bybee v. Oper der Standt Bonn, 899 F. Supp. 1217, 1222 (S.D.N.Y. 1995).*

This requirement "is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'" *Murray, 81 F.3d at 292* (quoting *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22, 102 S. Ct. 252, 265 n.22, 70 L. Ed. 2d 419 (1981)).* Breindel does not dispute that WFD, a London-based entity, is amenable to suit in England.

Rather, Breindel cites three reasons why England is not an adequate forum: the unavailability of a jury trial or punitive damages, and the lack of opportunity to take pretrial depositions. None of these [*9] conditions, however, renders suit in England "clearly unsatisfactory." See *Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 129 (2d Cir. 1987)* (per curiam) (unavailability of treble damages did not make Philippines inadequate forum); *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse, 652 F. Supp. 1289, 1295-96 (S.D.N.Y. 1987)* (unavailability of jury trial does not render **foreign forum** inadequate); *id. at 1296* (where considerable **discovery** had already taken place and where dismissal would be conditioned on movant's consent to **use** products of **discovery** in alternative forum, absence of **discovery** in that **forum** did not render it inadequate); see also *id. at 1295* (procedures in **foreign forum** need not be identical to those in United States to be adequate, so long as they are not "wholly devoid of due process") (internal quotation marks omitted). Accordingly, England is an adequate alternative forum.

3. Application of the Gilbert Factors

Once an alternative forum is identified, the Court must apply the public and private interest factors first set forth in *Gilbert, 330 U.S. at 508-09, 67 S. Ct. at 843,* "to determine whether the convenience of the parties [*10] and the ends of justice would best be served by dismissing the action." *Murray, 81 F.3d at 293.* However, the plaintiff's choice of forum is to be given great deference, see *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 265; Murray, 81 F.3d at 290; Bybee, 899 F. Supp. at 1222,* especially where the plaintiff has chosen its "home forum." *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 266; see Murray, 81 F.3d at 290.* As this Court has written, "in order to prevail, defendant[] must show that the balance is strongly in favor of litigating in [the alternative forum] in order to overcome the substantial weight accorded plaintiff's choice of forum." *Bybee, 899 F. Supp. at 1222.*

The public interest factors include: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having controversies decided at home"; (3) "the interest in having the trial in a forum that is familiar with the law

governing the action"; (4) "the avoidance of unnecessary problems in conflict of laws or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray, 81 F.3d at 293.* [*11]

The parties have not demonstrated that the courts of London are any more or less congested than is the Southern District of New York. Moreover, both localities have a significant interest in having this dispute decided at home -- the action involves money allegedly owed to a New York law firm for services performed solely in this country, which also calls into question transactions in the London insurance market.

As for the applicable law, although WFD argues that certain of Breindel's claims must be analyzed pursuant to English law, it does not identify any conflicts between English law and the law of New York, and indeed has cited solely New York law in seeking summary judgment. In any event, while the Court "makes no pretense that it could" apply English law "as knowledgeably or as efficiently as" an English court, *Bybee, 899 F. Supp. at 1223,* the application of the law of another English common law jurisdiction "does not impose a significant burden on this Court." Gordon v. Long Bay (1980) Ltd., 1995 *U.S. Dist. LEXIS 11721, 94 Civ. 2141 (SHS), 1995 WL 489474,* at *4 (S.D.N.Y. Aug. 16, 1995). Finally, the fifth factor militates slightly toward allowing the suit to be brought in England, because the [*12] parties apparently would not have the right to a jury trial in that event.

The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) "the availability of compulsory process for attendance of unwilling witnesses"; (3) "the cost of obtaining attendance of willing witnesses"; (4) "issues concerning the enforceability of a judgment"; and (5) "all other practical problems that make trial of a case easy, expeditious, and inexpensive -- or the opposite." *Murray, 81 F.3d at 294.*

The private interest factors do not weigh in either party's favor. For example, while all of Breindel's documentary evidence is located in New York, WFD's documents are kept in or near London. Similarly, although many of the witnesses Breindel intends to call are located in New York and are therefore within the subpoena power of this Court, many of the witnesses WFD would call are located in London, and are presumably subject to compulsory process in a London court. In addition, although there is evidence in the record that principals of Augusta would be unwilling to travel from Italy to London for judicial proceedings, there is no reason for the Augusta principals to be [*13] any more or less willing to travel to New York instead of London; accordingly, this factor aids neither party.

The parties have not identified any issues relating to the enforceability of a British judgment in New York or vice-versa, nor have they identified any other issues relating to the relative ease, expeditiousness, or expense of trial in the respective fora.

Moreover, WFD's delay in making this motion of over five months after the complaint was filed and until shortly before discovery was due to close, while not egregious enough to constitute a waiver of the right to move, demonstrates that this forum is not as inconvenient to WFD as it now claims. See *Rodriguez v. Orion Schiffahrts-Gesellschaft Reith & Co., 348 F. Supp. 777, 779 (S.D.N.Y. 1972).* Last, the aspects of the British system that Breindel contends render it inadequate -- especially the absence of trial by jury -- while insufficient to render it "wholly devoid of due process," *ACLI, 652 F. Supp. at 1295* (internal quotation marks omitted), also weigh on the side of denying the motion to dismiss.

In sum, the Gilbert factors do not weigh "strongly in favor" of dismissal. *Bybee, 899 F. Supp. at 1222.* [*14] Accordingly, the motion to dismiss on the grounds of forum non conveniens is denied.

B. Summary Judgment

"Summary judgment may be granted only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (quoting *Fed. R. Civ. P. 56(c)*); see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen, 64 F.3d at 79* (citations omitted) (quoting *Lund's, Inc. v. Chemical Bank, 870 F.2d 840, 844 (2d Cir. 1989)).*

Breindel has set forth six claims for relief: breach of contract, breach of fiduciary duty, negligent misrepresentation, fraudulent misrepresentation, negligence, and gross negligence. n2 WFD argues that it is entitled to summary judgment on each claim. The Court will discuss each claim in turn in light of the foregoing [*15] standard.

n2 Although Breindel contends that it has also stated claims for conversion and unjust enrichment, they are not pled in the complaint and will not be considered. Although pleadings by a party proceeding pro se ordinarily are construed extremely liberally, see *Haines v.*

*Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 595-96, 30 L. Ed. 2d 652 (1972)* (per curiam); *Pino v. Ryan, 49 F.3d 51, 52-53 (2d Cir. 1995)*, the same does not hold true where the pro se party is an attorney or law firm, see *Leeds v. Meltz, 898 F. Supp. 146, 149 (E.D.N.Y. 1995)*, aff'd, *85 F.3d 51 (2d Cir. 1996)*.

### 1. Breach of Contract

Breindel, conceding that there is no express contract between it and WFD, asserts that the conduct of the parties has given rise to an "implied-in-fact" contract. Pursuant to New York law, n3 "[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of [*16] the parties as indicated by their conduct." *Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 330 N.E.2d 414, 420, 369 N.Y.S.2d 400, 408 (1975)* (citations omitted); see also *AEB & Assocs. Design Group, Inc. v. Tonka Corp., 853 F. Supp. 724, 731 (S.D.N.Y. 1994); Estate of Argersinger, 168 A.D.2d 757, 758, 564 N.Y.S.2d 214, 215 (3d Dept. 1990).*

n3 As noted above, although WFD asserts that English law applies to certain of Breindel's claims, both parties rely exclusively on New York law in addressing WFD's motion for summary judgment, and neither party has identified any relevant conflict between New York and English law. Therefore, the Court will apply the law of New York. See *PI. Inc. v. Quality Prods., Inc, 907 F. Supp. 752, 760 n.3 (S.D.N.Y. 1995);* see also *Wood v. Mid-Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991); Schreiber v. Camm, 848 F. Supp. 1170, 1174 (D.N.J. 1994).*

Breindel has identified the course of conduct that, it claims, gave rise to an implied-in-fact contract between it and WFD. [*17] Normally, however, a contract is implied in fact "when one party seeks to collect the benefit due it in return for a benefit it has conferred on the other party." *Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 1996 WL 306564*, at *12 (S.D.N.Y. 1996). Here, Breindel seeks to hold WFD responsible for perceived defects in WFD's performance "without any corresponding obligation on" Breindel. Id. Breindel has failed, in other words, to identify any consideration it has conferred on WFD, and consideration is an element essential to the existence of any contract, whether express or implied-in-fact. See id.; *Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.,*

*726 F. Supp. 1411, 1419 (S.D.N.Y. 1989); Argersinger, 168 A.D.2d at 758, 564 N.Y.S.2d at 215.*

Because there is no evidence in the record that the services allegedly supplied by WFD to Breindel were supported by any consideration, Breindel has failed to show that there is a genuine issue of material fact as to the existence of an implied-in-fact contract between those parties. Accordingly, WFD's motion for summary judgment is granted as against Breindel's breach of contract claim, [*18] and that claim is dismissed.

### 2. Breach of Fiduciary Duty

Pursuant to New York law, "a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Scott v. Dime Sav. Bank of New York, FSB, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995)* (internal quotation marks and alteration omitted), aff'd, *1996 U.S. App. LEXIS 3948, 1996 WL 98782* (2d Cir. Mar. 5, 1996). To determine the existence of such a relationship, "'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'" Id. (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991)*, rev'd on other grounds, *967 F.2d 742 (2d Cir. 1992)*). In order to give rise to a fiduciary relation, the trust and confidence "reposed by one party must be accepted by the other party," *Litton Indus., 767 F. Supp. at 1231,* and must be reposed justifiably. See *In re Windsor Plumbing Supply Co., 170 Bankr. 503, 525 (Bankr. E.D.N.Y. 1994)*. In general, a fiduciary duty does not arise from a conventional, [*19] arms-length business relationship "'absent extraordinary circumstances.'" *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992)* (quoting *National Westminster Bank, U.S.A. v. Ross, 130 Bankr. 656, 679 (S.D.N.Y. 1991)*, aff'd sub nom., *Yaeger v. National Westminster, 962 F.2d 1 (2d Cir. 1992)*); see also *Oursler v. Women's Interart Center, Inc., 170 A.D.2d 407, 408, 566 N.Y.S.2d 295, 297 (1st Dept. 1991)*.

The relationship that exists here is essentially one between an attorney and its clients' agent. Breindel has cited, and the Court has uncovered, no case where such an attenuated and indirect relationship was found to constitute a fiduciary relation. To the contrary, the cases uniformly stand for the proposition that even where a direct business relationship exists between two parties, that alone is insufficient to render the relationship a fiduciary one. See, e.g., *Liebowitz, 927 F. Supp. 688, 1996 WL 306564*, at *20; *Village On Canon v. Bankers Trust Co., 920 F. Supp. 520, 532 (S.D.N.Y. 1996)*;

1996 U.S. Dist. LEXIS 10432, *

*Northeast Gen. Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 162-64, 624 N.E.2d 129, 131-32, 604 N.Y.S.2d 1, 3-4* [*20] (1993).

It follows then that where, as here, there is not a direct business relationship, whatever relation exists is not a fiduciary one, absent special circumstances suggesting otherwise. See *Cumisky v. James River Corp., Civ. A. No. CV-93-1975 (DGT), 1995 WL 520021,* at *7 (E.D.N.Y. Aug. 17, 1995); *Windsor Plumbing Supply, 170 Bankr. at 526.*

Breindel asserts that the Lloyd's Code of Practice, which provides, inter alia, that "insurance brokers shall at all times conduct their business with utmost good faith and integrity" and "shall establish and maintain an adequate system of control over its transactions and records," imposes a fiduciary duty on WFD vis-a-vis Breindel. However, whatever duty these provisions impose on WFD are for the benefit of its clients -- such as Augusta and the Underwriters -- not its clients' attorneys. See *Cumisky, 1995 WL 520021,* at *7.

Moreover, it is unclear whether these provisions impose a fiduciary duty on WFD or instead simply constitute precatory statements of commendable business practices. It is not tenable to infer from those provisions a fiduciary relationship between WFD and its clients, and then to extend that fiduciary [*21] relationship to Breindel -- its clients' attorneys -- and then to impose the sequelae of that designation upon WFD. See id. at *8.

Breindel states that it reposed trust in WFD to invoice the Underwriters and Augusta for Breindel's services, to transfer funds to Breindel, and to keep accurate records, and to perform all these tasks in good faith. It also states that, because it did not know the identity of any of the claims managers at any of the Underwriters except the lead Underwriter, it was forced to rely on WFD's good faith in performing its functions.

Breindel, however, does not deny that Augusta and the Underwriters -- not WFD -- were its clients; that it could have ascertained the identities of the claims managers at any of the Underwriters; and that it at all times knew the identities of the contact persons at Augusta and the lead Underwriter. Nor does Breindel claim that it ever manifested dissatisfaction to its clients with their method of paying their bills; that WFD somehow prevented it from doing so; or that it was obligated to acquiesce in this method simply because it was the "custom and practice" in the London insurance market. See *Teachers Ins. and Annuity* [*22] *Ass'n of America v. Wometco Enter., Inc., 833 F. Supp. 344, 350 (S.D.N.Y. 1993).* In short, if Breindel reposed trust and confidence in WFD, there is no evidence that this was required, justified, acceptable to WFD, or anything more than a "'unilateral investment of confidence.'" *Litton*

*Indus., 767 F. Supp. at 1231-32* (quoting *United States v. Reed, 601 F. Supp. 685, 715* (S.D.N.Y.), rev'd in part on other grounds, *773 F.2d 477 (2d Cir. 1985)).*

While Breindel correctly notes that the question of whether a fiduciary relationship exists is essentially a factual one, it has produced no evidence from which one might infer such a relationship. As demonstrated above, Breindel has not shown that there existed any contract between it and WFD. Nor has it shown that WFD acted as its agent, or that any other relationship existed between the two entities so as to give rise to a fiduciary duty.

In this respect, the case is similar to *Philan Ins. Ltd. v. Frank B. Hall & Co., 748 F. Supp. 190, 197-98 (S.D.N.Y. 1990),* in which the court was faced with the question of whether a reinsurance intermediary owed a fiduciary duty to the reinsurer or the reinsured in relation to the intermediary's [*23] transfer of premiums from the latter to the former. The court there concluded (1) that the answer depended on "the specific factual situation demonstrating the parties' intent," *id. at 197;* and (2) that the "plaintiffs possessed [and therefore could allege] no facts to support their conclusory allegations" of a fiduciary relation, *id. at 198,* and dismissed plaintiffs' claim. See also *Teachers Ins. and Annuity Ass'n of America, 833 F. Supp. at 350; Compania Sud-Americana de Vapores, 785 F. Supp. at 425-27.*

Here, too, Breindel has produced no evidence to support its claim that the relationship between it and WFD was a fiduciary one. Accordingly, WFD's motion for summary judgment is granted as against Breindel's claim for breach of fiduciary duty, and that claim is dismissed.

### 3. Negligent Misrepresentation

"Under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes [it] a fiduciary duty." *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992);* see also *Gruntal & Co. v. San Diego Bancorp, 901 F. Supp. 607, 615 (S.D.N.Y. 1995); Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1232 (S.D.N.Y. 1995).* But [*24] see *In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749, 769 (S.D.N.Y. 1996)* (asserting that fiduciary relationship is sufficient but not necessary to support claim for negligent misrepresentation). Because, as noted, Breindel has produced no evidence from which a reasonable trier of fact could conclude that WFD owed it a fiduciary duty, its claim for negligent misrepresentation must fail. Accordingly, WFD's motion for summary judgment is granted as to this claim as well, and it is dismissed.

### 4. Fraudulent Misrepresentation

1996 U.S. Dist. LEXIS 10432, *

To prevail on a claim for fraud pursuant to New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).* A plaintiff may also prove fraud through concealment of information that the defendant was duty-bound to disclose. See id.

Breindel's claim for fraudulent misrepresentation is based on WFD's alleged "omission [*25] and failure to advise [Breindel] that [WFD] was collecting [Breindel's] monies and not timely transferring them to [Breindel]." (Pl.'s Mem. of Law at 36.) The only fact in the record that arguably supports such a claim consists of Breindel's assertion that WFD "collected hundreds of thousands of dollars from [the] Underwriters, belonging to [Breindel] and then delayed the transmission of said funds to [Breindel], to take advantage of the 'float.'" (Breindel Aff. P36(b)).

However, Mr. Breindel fails to establish that he has personal knowledge of this fact as required by *Fed. R. Civ. P. 56(e)*, and Breindel offers no other evidence that would substantiate this claim. Breindel does not, for example, provide the date that any particular payment was made to WFD by the Underwriters and the corresponding date that the same payment was transmitted from WFD to Breindel. Absent such proof, a reasonable trier of fact could not conclude simply from Mr. Breindel's statement that WFD committed fraud against Breindel.

However, before discovery was stayed in this matter, WFD had been ordered to produce documents in its possession, if any, that show when it received payments from the [*26] Underwriters. (Order dated February 15, 1996, at 2.) Counsel for WFD had advised the court that no such documents exist, but that he would verify this information from WFD. (Order dated February 15, 1996, at 2.) It appears that discovery was stayed before counsel for WFD had the opportunity to either verify that no documents existed that are responsive to this request, or to produce the documents if they do, in fact, exist. (Breindel Aff. P46.) Moreover, Breindel had noticed the deposition of a WFD employee with knowledge of the manner in which WFD receives funds from insurers and transmits them to defense counsel such as Breindel (Pl.'s ex. C), but this deposition apparently never took place due to the then-existing stay of discovery.

It appears that permitting discovery to go forward would be essential to permit Breindel to present facts in opposition to WFD's motion for summary judgment motion seeking dismissal of Breindel's fraud claim. Therefore, pursuant to *Fed. R. Civ. P. 56(f)*, decision on the motion for summary judgment with regard to this claim is reserved pending completion of discovery as noted above. Within 60 days of the date of this order, the parties may submit supplemental [*27] affidavits with regard to the fraud claim, after which the Court will make a final determination.

5. Negligence and Gross Negligence

WFD asserts correctly that, pursuant to New York law, "a party may not maintain a claim for negligence if the purported claim is merely a claim for breach of contract." *Eugene Iovine Inc. v. Rudox Engine and Equipment Co., 871 F. Supp. 141, 146 (E.D.N.Y. 1994),* aff'd, *62 F.3d 1412 (2d Cir. 1995).* However, the Court has determined that no contract, express or implied-in-fact, existed between Breindel and WFD, and therefore a negligence claim may lie.

The extent of the parties' briefing on the negligence and gross negligence claims consists of WFD's statement, without citation, that "WFD had no legal duty to Breindel and thus may not be liable to Breindel for negligence." (Def.'s Mem. of Law at 23.) The Court declines to reach the issue in the absence of briefing by the parties. Accordingly, WFD's motion for summary judgment as against Breindel's negligence and gross negligence claims is denied without prejudice to renew.

**CONCLUSION**

For the reasons stated above:

(1) WFD's motion to dismiss the complaint on the grounds of forum [*28] non conveniens is denied.

(2) WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* is granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims.

(3) WFD's motion for summary judgment is denied without prejudice to renew as against Breindel's negligence and gross negligence claims.

(4) The Court reserves decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits within sixty days of the date of this order.

(5) The stay of discovery is lifted.

DATED: New York, New York

July 22, 1996

SO ORDERED:

1996 U.S. Dist. LEXIS 10432, *

SIDNEY H. STEIN, U.S.D.J.

# TAB
# 5

**CAMPANIELLO IMPORTS, LTD. and CAMPANIELLO IMPORTS OF FLORIDA INC., Plaintiffs, -v- SAPORITI ITALIA S.P.A., SERGIO SAPORITI, RAFFAELE SAPORITI, GIDATEX S.R.L., and DARIO FILIPPINI, Defendants.**

**95 Civ. 7685 (RPP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 11064*

**August 1, 1996, Decided**
**August 2, 1996, FILED**

**DISPOSITION:** [*1] Individual defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* granted. Motion to dismiss the complaint pursuant to *Fed. R. Civ. P. 9(b)* and *12(b)(6)* made by Gidatex and the Saporiti defendants granted. Plaintiffs' claims against Gidatex dismissed on the ground that they subject to mandatory arbitration pursuant to *9 U.S.C. § 3.* n9

n9 In light of these findings it was not necessary to consider defendants' claim that they were entitled to a different forum on the grounds of forum non conveniens.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Before the court were motions to dismiss the unjust enrichment, fraud, and misrepresentation complaint filed by plaintiff importers against defendants, two foreign exporters and their individual representatives. Defendants' motions were filed pursuant to *Fed. R. Civ. P. 9(b), 12(b)(2) and (6)*, and also *9 U.S.C.S. § 3.* The dispute arose out of the importers' agreement to import and sell furniture for the exporters.

**OVERVIEW:** After the importers reached an agreement with the first exporter, they filed a breach of contract and misrepresentation suit against the first exporter. With foreign court approval, the first exporter attempted to resolve its financial difficulties through an agreement with the second exporter whereby the second would lease the business assets of the first. The second exporter then entered into the agreement at issue with the importers, on the condition that they would drop their

legal action. Thereafter, the importers filed the action before the court and claimed that the exporters fraudulently induced them to drop the previous lawsuit. The court agreed with the individual defendants' assertions that the court had no jurisdiction over them, even as agents of their respective corporations. The allegations of fraud were made on information and belief and did not address actions taken or statements made by any of the exporters with the specificity required by *Fed. R. Civ. P. 9(b).* Finally, under the Federal Arbitration Act, *9 U.S.C.S. § 3*, the issues raised by the complaint had to be arbitrated pursuant to the parties' agreement.

**OUTCOME:** The court granted the individual defendants' motion to dismiss. The court also granted the motion to dismiss the complaint as to the corporate defendants because plaintiffs had not pleaded fraud with the requisite particularity and failed to state a cause of action for fraud distinct from the claim for breach of contract. Finally, the court dismissed the claims against the successor corporation because they were subject to mandatory arbitration.

**COUNSEL:** APPEARANCES

Counsel for Plaintiffs: Sylvor & Richman, L.L.P., New York, New York, By: Iris S. Richman, Esq.

Counsel for Defendants:

For Defendant Saporiti Italia S.P.A., Sergio Saporiti, Raffaele Saporiti, and Gidatex S.R.L.: Pavia Harcourt,

1996 U.S. Dist. LEXIS 11064, *

New York, New York, By: Debra Guzov, Esq., David Botwinik, Esq.

For Defendant Dario Filippini: Whitman Breed Abbott & Morgan, New York, New York, By: Thomas G. Bailey, Jr., Mario G. Murphy.

**JUDGES:** ROBERT P. PATTERSON, JR., U.S.D.J.

**OPINION BY:** ROBERT P. PATTERSON, JR.

**OPINION:**

### OPINION AND ORDER

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Defendants, Saporiti Italia S.P.A. ("Saporiti"), Sergio Saporiti ("Sergio"), Raffaele [*2] Saporiti ("Raffaele") (collectively the "Saporiti defendants"), and Gidatex S.R.L. ("Gidatex") move for an order:

> (1) dismissing the complaint pursuant to *Rule 9(b) of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P.") for failure to plead fraud with particularity; and
>
> (2) dismissing the complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a cause of action for fraud.

The Saporiti defendants also move to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* on the grounds that the claims asserted in this action are barred by the doctrine of res judicata.

Defendants, Sergio, Raffaele, and Dario Filippini ("Filippini") (collectively the "individual defendants") move pursuant to *Fed. R. Civ. P. 12(b)(2)* to dismiss the complaint on the ground that this Court lacks personal jurisdiction over them.

Gidatex moves for an order dismissing the amended complaint, or in the alternative staying this action, pursuant to *9 U.S.C. § 3* on the ground that the claims asserted against it are subject to mandatory arbitration.

For the following reasons, defendants' motions are granted and plaintiffs' claims against all defendants are dismissed.

### BACKGROUND [*3]

Plaintiff, Campaniello Imports, Ltd. ("Campaniello"), is a New York corporation and has its principal place of business in this district. (Amended Complaint filed February 13, 1995 ("Complaint") P4.) Plaintiff, Campaniello Imports of Florida, Inc.

("Campaniello Florida"), is a Florida corporation whose principal place of business is located in Miami, Florida. (Id. P5.) Plaintiffs are owned and managed by Thomas Campaniello, a United States citizen who is a resident of New York City, New York. (Id. P6.)

Defendant Saporiti is an Italian corporation, and its principal office is in Besnate, Italy. (Id. P7.) Saporiti is engaged in the production and sale of luxury furniture and related products. (Id.) Prior to September 23, 1993, Saporiti was owned and controlled by Sergio and Giorgio Saporiti ("Giorgio"). (Id. PP7, 8.) On January 11, 1994 Giorgio sold his interest in Saporiti to Raffaele, Sergio's son. (Id. P8.)

Both Raffaele and Sergio are Italian citizens who reside permanently in Italy. (Declaration of Raffaele Saporiti dated December 19, 1995 ("Raffaele Decl.") P18; Declaration of Sergio Saporiti dated December 19, 1995 ("Sergio Decl.") P2.) Neither Raffaele [*4] nor Sergio maintain a residence, bank account or other assets in New York or anywhere in the United States, and in their declarations they both state that they have never engaged in any business in the State of New York on their own behalf. (Raffaele Decl. PP19-21; Sergio Decl. PP3-5.)

Defendant, Gidatex is an Italian corporation whose principal office is in Gallarate, Italy. (Complaint P9.) Defendant, Filippini is the principal officer, shareholder and director of Gidatex. (Id.; Declaration of Dario Filippini dated December 20, 1995 ("Filippini Decl.") P1.) Filippini is an Italian citizen and resides permanently in Gallarate, Italy. (Filippini Decl. P14.) He does not maintain a residence, domicile, bank account, or other personal assets in the State of New York or elsewhere in the United States and performs nearly all of his work in Italy. (Id. PP15-16.) Filippini has submitted a declaration in which he states that he has been in New York twice, both times for vacation. In August 1985 Filippini was introduced to Thomas Campaniello in New York in a personal context, but no business of any kind was discussed by them at that time. (Id. P17.)

Under the terms of an agreement [*5] signed on May 22, 1974, Thomas Campaniello was engaged by Saporiti to serve as its exclusive importer and sales agent. (Complaint P17.) On May 29, 1974, Thomas Campaniello organized plaintiff, Campaniello, to serve as a vehicle to carry out the terms of the May 22, 1974 agreement and to secure a lease for a showroom that the parties contemplated would be opened in New York. (Id. P18.)

In 1981 the scope of the exclusive agency was extended to include territories in the Caribbean and Central and South America, and Campaniello was designated as the exclusive importer of the "Saporiti"

line of furniture for the territories covered by the exclusive agency agreement. (Id. P31.)

In March 1994, plaintiffs commenced an action in this Court against the Saporiti defendants alleging breach of contract, fraud, and misrepresentation and demanding an accounting (the "1994 litigation"). (Affidavit of David A. Botwinik sworn to on March 1, 1996 ("Botwinik Aff.") P2, Ex. A; Raffaele Decl. PP6, 7.)

In April 1994, Saporiti filed for a "Concordato Preventivo" under Italian law. This is a mechanism whereby a company encountering financial difficulties can enter into arrangements with its creditors, [*6] subject to the approval of the Italian court. (Filippini Decl. P5; Raffaele Decl. P4.)

On May 18, 1994, with the approval of the Italian Court, Gidatex entered into an agreement with Saporiti for the lease of the business assets of Saporiti. Under the agreement, Saporiti retained its liquid assets and accounts receivable and remained responsible for its debts, and Gidatex was given the option to purchase the business assets of Saporiti. n1 (Filippini Decl. P6.) Plaintiffs allege that on May 18, 1994, Filippini also telephoned Thomas Campaniello in New York; told him that he, Filippini, was the new owner and sole administrator of the Saporiti business; indicated that he wanted to continue the arrangements between Saporiti and plaintiffs; and stated that if plaintiffs agreed to discontinue their lawsuit, he would give plaintiffs a favorable contract to continue as the exclusive representative and agent for the Saporiti line of furniture. (Complaint P55.)

n1 None of the parties has submitted a copy of the May 18, 1994 Agreement between Gidatex and Saporiti. Therefore, the exact terms of the agreement have not been reviewed by the Court.

[*7]

On June 14, 1994, plaintiffs and Gidatex entered into an agreement which provided in part that plaintiffs would ". . .undertake to cancel and withdraw from the [1994 litigation] and acknowledge that they have no further claims relating to each and any prior relationship with Saporiti Italia, S.p.A."; that Gidatex would grant plaintiffs ". . .exclusive sales rights. . .until March 31, 1995 for those products which form part of 'Saporiti Italia' collection in the following countries: U.S.A., Mexico, Guatemala, Costa Rica, Panama, Venezuela, Colombia, Caribbean Islands"; that "in the event Gidatex srl were to exercise its option to purchase Saporiti, the exclusive sales agreement would be extended for an

additional 5 years until March 31, 2000"; and that "Campaniello Imports Ltd. undertakes to meet a minimum purchase budget for the period commencing June 15, 1994 and terminating March 31, 1995 equal to 1 billion lire." (Filippini Decl. P8, Ex. C.)

On July 7, 1994, this agreement was amended to include, among others, a provision which stated:

> Italian law will be the applicable law. Any dispute which might arise between the parties in relation to that which is the object of [*8] the present agreements shall be resolved by irritual arbitration before a panel of friendly compositors composed of Avv.ti [sic] Amedeo Travi and Sergio Fabrizi and by a third arbitrator who will act as President, appointed by the two arbitrators previously named, or in the event they cannot agree, by the President of the Tribunal of Busto Arsizio.

(Filippini Decl., Ex. D.)

Also on July 7, 1994, plaintiffs and the Saporiti defendants entered into a settlement agreement which was approved by an Italian court. (Id. P7, Ex. B.) The settlement agreement provided in part that plaintiffs ". . .would discontinue the lawsuits instituted before the Courts of New York against [the Saporiti defendants] waiving each and any claim against [the Saporiti defendants]." (Id., Ex. B.)

On August 8, 1994, pursuant to the July 7, 1994 settlement agreement, the parties submitted to this Court a stipulation of dismissal which stated in part: "All claims presented by the complaint herein shall be dismissed with prejudice as to all parties. (Id., Ex. B.) This stipulation was "so ordered" by Judge McKenna on August 17, 1994 and was filed on August 18, 1994. (Id.)

On October [*9] 16, 1995, plaintiffs commenced the instant action. The amended complaint dated February 13, 1996 n2 asserts a claim of unjust enrichment and two claims for fraud and misrepresentation, alleging that defendants (1) deceived and defrauded plaintiffs in order to induce them to agree to settle, withdraw their complaint and ". . .execute a settlement agreement outside the scope of the Concordato proceedings. . ." (complaint P93); (2) pretextually terminated plaintiffs' exclusive agency provided for by the June 14 agreement with Gidatex (id. P111); and (3) wrongfully "captured the valuable good

1996 U.S. Dist. LEXIS 11064, *

will in plaintiffs' territories that plaintiffs' efforts and investment created" (id. P127).

n2 The amended complaint is dated February 13, 1995, however, the chronology of events indicates that this is a typographical error and the correct date is February 13, 1996.

Plaintiffs seek to rescind the June 14, 1994 Agreement, as amended on July 7, 1994, with Gidatex and the July 7, 1994 agreement with Saporiti as well [*10] as the stipulation of settlement with prejudice (id. P114); demand an accounting of "any and all profits on any and all direct sales to customers in plaintiffs' exclusive territories that should have been credited to the account of plaintiff" (id. P124); and seek to enjoin defendants from making direct sales into plaintiffs' exclusive territories or entering into agreements with other importers or agents to license or contract the rights to sell the "Saporiti" line of furniture in these territories (id. P130).

DISCUSSION

I. Personal Jurisdiction

This court has jurisdiction over the subject matter of this action pursuant to *28 U.S.C. § 1332*. In diversity actions such as this one, courts must look to the law of the state in which it sits in order to answer questions of personal jurisdiction. Therefore, New York State law governs the issue of personal jurisdiction in this action. See, e.g., *Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963)*.

Although ultimately a plaintiff bears the burden of demonstrating personal jurisdiction by a preponderance of the evidence, at the commencement of litigation a plaintiff need only show a [*11] prima facie case for personal jurisdiction through its pleadings and affidavits. *Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981); A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)*. Furthermore, a plaintiff's complaint and "affidavits are to be construed, and any doubts are to be resolved, in the light most favorable to the plaintiff." *Editorial Musical Latino Americana, S.A. v. Mar Intern. Records, Inc., 829 F. Supp. 62, 64 (S.D.N.Y. 1993)*.

In this case plaintiffs contend that this Court has personal jurisdiction over defendants, all of whom are non-domiciliaries, pursuant to New York's Long Arm Statue, § 302 of the New York Civil Practice Law and Rules ("CPLR"), as a result of defendants' individual contacts with the state, their actions outside the state

which caused harm within the state, or the actions of their agents. (Complaint P2.) Plaintiffs also contend that personal jurisdiction exists as to each individual defendant due to his participation in a conspiracy to defraud plaintiffs. The individual defendants contest personal jurisdiction. The corporate defendants, Saporiti and Gidatex, do not.

A. CPLR § 302(a)(1) [*12]

Section *302(a)(1)* of the CPLR reads in pertinent part:

a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state . . . .

Under § *302(a)(1)*, personal jurisdiction exists over an out-of-state defendant only ". . .if two conditions are met: first, the non-domiciliary must 'transact business' within the state; [and] second, the claim against the non-domiciliary must arise out of that business activity." *Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)* (citations omitted). Any activity in New York which is asserted as the basis for long arm jurisdiction must have a substantial relationship to the cause of action. *McGowan v. Smith, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (N.Y. 1981)*; see also *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (N.Y. 1988)* (defendants' actions must be "purposeful" and there must be a "substantial relationship between the transaction and the claim asserted"); Nordic Bank [*13] *PLC v. Trend Group, Ltd., 619 F. Supp. 542, 567 (S.D.N.Y. 1985)* (cause of action asserted must arise out of the defendant's activities in New York). n3

n3 Section 302(a)(2) provides personal jurisdiction over any non-domiciliary, who in person or through an agent "commits a tortious act within the state . . . ." There is no claim in this case that defendants committed a tort within New York, and § 302(a)(2) is not asserted by plaintiffs as a basis for personal jurisdiction.

Plaintiffs' pleadings do not demonstrate that Filippini had contacts with New York which rose to the level of transacting business. Filippini's contacts with New York consist of correspondence with Campaniello (complaint P64) and a telephone call on May 18, 1994 (id. P55). This correspondence and telephone call were for the purpose of initiating and arranging the negotiations which eventually led to the June 14 and July 7, 1994 agreements between Gidatex and the plaintiffs. The negotiation of these agreements took place entirely [*14] in Italy. These contacts do not constitute the purposeful activity within the state of New York required by CPLR § 302(a)(1). See *Continental Field Service Corp. v. Itec International, Inc., 894 F. Supp. 151, 153-154 (S.D.N.Y. 1995)*(central question in the test for transacting business under CPLR 302(a)(1) is whether defendant has performed purposeful acts in New York in relation to the contract).

Defendants Sergio and Raffaele have conducted business activities within the state of New York at various times (complaint PP12, 16, 17, 26, 29, 30, 33, 112), but these activities were conducted on behalf of their employer, not on their own behalf (Sergio Decl. P5; Raffaele Decl. P21), and none of their activities alleged to have taken place in New York are substantially related to the causes of action asserted by plaintiffs in this case. Therefore, CPLR § 302(a)(1) does not provide a basis upon which this Court may exercise personal jurisdiction over Sergio and Raffaele.

Plaintiffs claim that Sergio and Raffaele fraudulently induced plaintiffs to sign a settlement agreement (complaint P89) and, in conjunction with Filippini, planned to impede plaintiffs' ability to meet the minimum [*15] purchase provisions of the June 14 agreement between Gidatex and Campaniello in order to justify a termination of that agreement (id. P91). The settlement agreement of June 14, 1994 and the subsequent agreement of July 7, 1994 were negotiated and signed in Italy. The actions of Sergio and Raffaele which were allegedly directed at hindering plaintiffs' efforts to comply with the Gidatex-Campaniello agreement also took place in Italy (id. P103). Accordingly, plaintiffs' cause of action does not arise out of Sergio's, Raffaele's, or Saporiti's activities in New York, and personal jurisdiction over Sergio and Raffaele does not exist under § 302(a)(1).

1. Long Arm Jurisdiction and Agency

In *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (N.Y. 1988),* the New York Court of Appeals held that the actions of a corporation could be attributed to an individual defendant and would support New York's assertion of jurisdiction over him. *Kreutter, 71 N.Y.2d at 467;* accord *Retail Software Services, Inc. v. Lashlee, 854 F.2d 18, 22 (2d Cir. 1988).*

In order to establish that a corporation acted as an individual's agent, the plaintiff must demonstrate [*16] that the corporation engaged in purposeful activities in New York in relation to the transaction in question; that the corporation did so for the benefit of and with the knowledge and consent of the individual officer; and that the officer exercised some control over the corporation in the transaction. *Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 983-984 (S.D.N.Y. 1992); Retail Software, 854 F.2d at 22; Kreutter, 71 N.Y.2d at 467.*

In an effort to attribute the activities of Gidatex and Saporiti to the individual defendants for the purposes of asserting jurisdiction under § 302(a)(1), plaintiffs contend that Gidatex served as Filippini's agent and that Saporiti was the agent of Sergio and Raffaele. This agency argument, however, does not overcome the threshold issue that plaintiffs' claims arise from transactions which took place outside of New York thus precluding jurisdiction under CPLR § 302(a)(1). *Cutco Industries Inc., 806 F.2d at 365* (holding that in order to assert jurisdiction under § 302(a)(1) claims against non-domiciliary must arise out of business activity within the state). Accordingly, it is not necessary to reach the issue of whether Gidatex [*17] or Saporiti in fact acted as agents of the individual defendants. n4

n4 Plaintiffs allege that Gidatex ". . .did not have sufficient capital resources of its own or management personnel to successfully acquire and operate and continue the business of defendant Saporiti Italia." (Complaint P104.) This alleged undercapitalization, however, is not sufficient to justify piercing Gidatex's corporate veil in an effort to obtain jurisdiction over Filippini. The plaintiffs have not alleged facts showing that Gidatex was a shell being used by Filippini to advance personal rather than corporate ends, nor have plaintiffs alleged any intermingling of Gidatex's and Filippini's finances, or lack of corporate formalities. The allegations do not demonstrate that Gidatex was the alter ego of Filippini and do not provide justification for piercing the corporate veil. See *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138-139 (2nd Cir. 1991).*

2. Long Arm Jurisdiction and Allegations of [*18] Conspiracy

Acts committed in New York by a co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject that out-of-state defendant to jurisdiction in New York under § 302(a) of the CPLR. See, e.g., *Lehigh Valley Industries, Inc. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260 (S.D.N.Y. 1991); Singer v. Bell, 585 F. Supp. 300, 302 (S.D.N.Y. 1984).* The bland assertion of a conspiracy or agency, however, is insufficient to establish jurisdiction. *Lehigh Valley Industries, Inc., 527 F.2d at 93-94; Singer, 585 F. Supp. at 303.* To establish jurisdiction on the basis of an alleged conspiracy, plaintiffs must allege facts demonstrating prima facie conspiracy, and must allege facts warranting the inference that the defendants were members of the conspiracy. *Singer, 585 F. Supp. at 303; see also Dixon v. Mack, 507 F. Supp. 345, 348 (S.D.N.Y. 1980).*

In this case, plaintiffs have failed to meet the threshold requirement of making a prima facie showing of conspiracy. The claims of conspiracy in the complaint consist of conclusory allegations that the individual defendants [*19] conspired with Saporiti and Gidatex as part of a ". . .scheme to make whatever promises and representations were necessary to induce plaintiffs to withdraw their action and enter into a new agreement which they would repudiate on false and contrived pretexts." (Complaint P60; see also id. at PP91, 93, 110.) Plaintiffs' claims of the existence of a conspiracy are not adequately supported by factual allegations, and therefore, plaintiffs may not attribute the acts or contacts of the alleged co-conspirators, Saporiti and Gidatex, to the individual defendants for the purpose of asserting personal jurisdiction under CPLR § **302(a)(1)**.

B. CPLR 302(a)(3)

Section 302(a)(3) of the CPLR permits jurisdiction over an out-of-state defendant:

> who in person or through an agent commits a tortious act without the state causing injury to person or property within the state. . .if he

> (i) regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial [*20] revenue from interstate or international commerce. . .
> .

CPLR § 302(a)(3).

Plaintiffs argue that CPLR § 302(a)(3) provides this Court with personal jurisdiction over Filippini, Sergio and Raffaele. This allegation fails, however, because plaintiffs have not adequately pleaded a cause of action for fraud under New York law and therefore have not alleged that the individual defendants committed a tort outside of New York.

Under New York law, there are numerous Appellate Division decisions which provide persuasive authority that ". . .a cause of action for fraud cannot exist when the fraud claim arises out of the same facts as a breach of contract claim with the sole additional allegation that the defendant never intended to fulfill its express contractual obligations." *PI, Inc. v. Quality Products, Inc., 907 F. Supp. 752, 761 (S.D.N.Y. 1995);* see, e.g., *Caniglia v. Chicago Tribune-New York News Syndicate, Inc., 204 A.D.2d 233, 612 N.Y.S.2d 146, 147 (1st Dept. 1994)*(when the fraud alleged related only to contracting party's alleged intent to breach contractual obligation, cause of action does not lie); *Guterman v. RGA Accessories, Inc., 196 A.D.2d 785,* [*21] *602 N.Y.S.2d 116, 117 (1st Dept. 1993); Gordon v. Dino De Laurentiis Corp., 141 A.D.2d 435, 529 N.Y.S.2d 777, 779 (1st Dept. 1988); Lustig v. Anywear, Inc., 145 A.D.2d 328, 535 N.Y.S.2d 694, 695 (1st Dept. 1988); Comtomark, Inc. v. Satellite Communications Network, Inc., 116 A.D.2d 499, 497 N.Y.S.2d 371, 372 (1st Dept. 1986); Trusthouse Forte Management, Inc., v. Garden City Hotel, Inc., 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (1st Dept. 1984); Spellman v. Columbia Manicure Manufacturing Co., Inc., 111 A.D.2d 320, 489 N.Y.S.2d 304, 307 (2nd Dept. 1985); Locascio v. Aquavella, 185 A.D.2d 689, 586 N.Y.S.2d 78, 79 (4th Dept. 1992).* See also *Papa's-June Music, Inc., v. McLean, 921 F. Supp. 1154, 1160-1161 (S.D.N.Y. 1996); Sudul v. Computer Outsourcing Services, 868 F. Supp. 59, 61-62 (S.D.N.Y. 1994); Vista Co. v. Columbia Pictures Industries, Inc., 725 F. Supp. 1286, 1294 (S.D.N.Y. 1989); D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc., 873 F. Supp. 786, 796 (E.D.N.Y. 1995)* (J. Wexler) (dismissing claim which "stated nothing more than breaches of promises of future performance that constitute the express terms of the

1996 U.S. Dist. LEXIS 11064, *

contract, not promises [*22] collateral or extraneous to the contract").

In this case, plaintiffs' allegations of fraud and misrepresentation consist of allegations that defendants did not intend to perform their contractual obligations. (Complaint PP82-89, 91.) Since the complaint fails to state a cause of action for fraud against any of the defendants, plaintiffs have failed to show that defendants engaged in tortious activity outside of New York, a requirement of CPLR § 302(a)(3).

Additionally, plaintiffs' fraud claim was not plead with particularity as required by *Fed. R. Civ. P. 9(b)* which requires plaintiffs to plead fraud with specificity by indicating:

> (1) precisely what statements or omissions were made, and in what documents or through what oral representations those statements were made, (2) the time and place of each such statement and the persons responsible for making (or, in the case of omissions, for no making) each such statement, (3) the content of such statements and the manner in which the statements mislead the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Lasky v. Shearson Lehman Brothers, Inc., 139 F.R.D. 597, 598 (S.D.N.Y. 1991)* (citing [*23] *Todd v. Oppenheimer & Co., Inc., 78 F.R.D. 415, 420-421 (S.D.N.Y. 1978)); see also Cosmas v. Hassett, 886 F.2d 8, 11 (2nd Cir. 1989).*

A number of plaintiffs' allegations are made on information and belief and they do not address actions taken or statements made by any of the defendants with the requisite specificity. (Complaint PP82-89, 91.) Additionally, many of the claims are made against multiple defendants lumped together and fail to distinguish among them. (Id.) See *Luce v. Edelstein, 802 F.2d 49, 54 n.1 (2d Cir. 1986); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974),* cert. denied *421 U.S. 976, 44 L. Ed. 2d 467, 95 S. Ct. 1976 (1975).* Accordingly, plaintiffs' claim of fraud does not stand against any of the defendants and CPLR § 302(a)(3) is rendered inapplicable as a basis for asserting personal jurisdiction over the individual defendants. n5

n5 Plaintiffs are barred from moving pursuant to *Fed. R. Civ. P. 60(b)* for relief from the stipulation of dismissal filed August 18, 1994 because the instant action was initiated on August 31, 1995, more than one year after the entry of the stipulation of dismissal.

*Rule 60(b) of the Fed. R. Civ. P.* states in part: "This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding. . . ." Since plaintiffs' fraud claims are dismissed, however, plaintiffs' attempt to assert an independent action fails. The stipulation of dismissal entered August 18, 1994 bars all claims which were or could have been asserted in the 1994 litigation.

[*24]

II. Arbitration

As a part of their June 14, 1994 agreement, amended on July 7, 1994, Gidatex and plaintiffs agreed to submit claims to arbitration. Therefore, a determination of whether Gidatex is entitled to a dismissal or stay requires an examination of the Arbitration Act. n6 Title *9 U.S.C. § 3* provides in part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

*9 U.S.C. § 3.* In this case, because the agreement is commercial and not entirely between citizens of the United States, the domestic provisions of the Arbitration Act are supplemented by the Convention on the Recognition of Foreign Arbitral Awards *(9 U.S.C. § 201* et seq.). n7 Article II(3) provides that at the request of one of the parties, the court [*25] shall ". . .refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." *9 U.S.C. § 201,* Article II(3).

n6 Because this Court lacks personal jurisdiction over Filippini, it is not necessary to determine whether the arbitration clause of the July 7, 1994 agreement includes claims against Filippini as an individual.

n7 The Convention has been ratified by both the United States and Italy. *9 U.S.C. § 201,* Article XVI(2).

Plaintiffs' contention that arbitration is inappropriate in this case because the agreement which includes the provision providing for arbitration was induced by fraud is not supported by the controlling precedent. In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967),* the Court examined § 4 of the Arbitration Act and determined that the statutory language does not permit federal courts to consider claims of fraud in the inducement of the contract [*26] generally. Applying these statutory limitations to § 3 of the Act, the Court held that when considering ". . .a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint Corp., 388 U.S. at 404-405.* The Court determined that when an agreement with a provision such as the one at issue here is in place, the arbitrator, not a federal court should hear claims that the agreement was induced by fraud. The federal courts should only become involved when the question focuses directly on whether the arbitration clause was induced by fraud. *Prima Paint Corp., 388 F.2d at 404-405.*

In *First Options of Chicago, Inc. v. Kaplan, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995),* the Court held that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options, 115 S. Ct. at 1924.* Plaintiffs contend that this holding undermines the validity of Prima Paint as precedent and claim that because there is no clear evidence that the parties intended to arbitrate claims of fraud [*27] in the inducement, this Court, as opposed to the arbitrator, must determine the arbitrability issue. Plaintiffs, however, misread the scope of First Options and mischaracterize the issues under consideration in this action as part of the "arbitrability" of dispute. *National Union Fire Insurance Co. v. Belco Petroleum Corp., 1996 U.S. App. LEXIS 15952, 1996 WL 367640 (2nd Cir. 1996).*

"The 'arbitrability' of a dispute comprises the questions of (1) whether there exists a valid agreement to arbitrate at all under the contract in question. . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement."

*National Union Fire Insurance Co., 1996 U.S. App. LEXIS 15952, 1996 WL 367640.* In First Options, the issue under consideration was whether certain individuals were bound to an arbitration agreement that they did not sign. Here, however, there is no question that Gidatex and plaintiffs signed an agreement which provides for arbitration. Therefore, the question becomes "whether a particular merit-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *First Options, 115 S. Ct. at 1924.* There is a presumption in favor of arbitration [*28] and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *National Fire Insurance Co., 1996 U.S. App. LEXIS 15952, 1996 WL 367640 at *6.*

Plaintiffs have alleged that the inclusion of an "arbitration-in-Italy clause" in the agreement was part of defendants' scheme to induce plaintiffs to withdraw their action and enter into a new agreement which defendants hoped to repudiate on false and contrived pretexts. (Complaint PP60, 98.) The complaint, however, does not demonstrate that the claims of fraudulent inducement and misrepresentation relate only to the arbitration clause, as opposed to the entire agreement. Instead, the complaint alleges fraud in the inducement of the contract generally and thus presents an issue to be considered by the arbitrator, not this Court. *Prima Paint Corp., 388 U.S. at 403-404; National Fire Insurance Co., 1996 U.S. App. LEXIS 15952, 1996 WL 367640.*

Accordingly, under the terms of the agreement between Gidatex and Campaniello, plaintiffs' claims against Gidatex must be submitted to an arbitrator. n8

n8 In her affidavit, Iris S. Richman, plaintiffs' counsel states that she has been advised by Amadeo Travi, an Italian attorney who represented the plaintiffs in the transactions culminating in the disputed documents, that he will not serve as an arbitrator thereunder, even if arbitration were directed by this Court because he believes that it would be improper to do so due to his representation of the plaintiffs in the underlying matter. The record does not, however, include any affidavit from Amadeo Travi stating that this is the case, nor is there any indication that Mr. Travi's prior representation renders his role in the arbitration improper. Often parties name arbitrators of their choosing who in turn select the third arbitrator. A determination that Mr. Travi's refusal to proceed negates the availability of arbitration cannot be based on plaintiffs' counsel's statement.

[*29]

## CONCLUSION

This Court lacks personal jurisdiction over Filippini, Sergio, and Raffaele, and therefore the individual defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* is granted. The motion to dismiss the complaint pursuant to *Fed. R. Civ. P. 9(b)* and *12(b)(6)* made by Gidatex and the Saporiti defendants is granted because plaintiffs have not plead fraud with the requisite particularity and fail under the law of New York to state a cause of action for fraud distinct from a claim of breach of contract. Plaintiffs' claims against Gidatex are also dismissed on the ground that they are subject to mandatory arbitration pursuant to *9 U.S.C. § 3.* n9

n9 In light of these findings it was not necessary to consider defendants' claim that they were entitled to a different forum on the grounds of forum non conveniens.

IT IS SO ORDERED.

Dated: New York, New [*30] York

August 1, 1996

Robert P. Patterson, Jr.

U.S.D.J.

# TAB
# 6

# WestlawUK

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

**European Union Legislation**

Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

Official Journal L12, 16/01/2001 p. 1

© ELLIS Publications.

© European Communities.

Current through 8 May 2007

<Image in PDF format not available via Offline Print. View on westlaw.com.>

Text outline

Text

Index

Year (Dates)

References

Bibliographic Information

Text

COUNCIL REGULATION (EC) No 44/2001

of 22 December 2000

on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 61(c) and Article 67(1) thereof,

Having regard to the proposal from the Commission (1),

Having regard to the opinion of the European Parliament (2),

Having regard to the opinion of the Economic and Social Committee (3),

Whereas:

Copr. © West 2007 No Claim to Orig. Govt. Works

Page 1

---

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

(1) The Community has set itself the objective of maintaining and developing an area of freedom, security and justice, in which the free movement of persons is ensured. In order to establish progressively such an area, the Community should adopt, amongst other things, the measures relating to judicial cooperation in civil matters which are necessary for the sound operation of the internal market.

(2) Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound operation of the internal market. Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters and to simplify the formalities with a view to rapid and simple recognition and enforcement of judgments from Member States bound by this Regulation are essential.

(3) This area is within the field of judicial cooperation in civil matters within the meaning of Article 65 of the Treaty.

(4) In accordance with the principles of subsidiarity and proportionality as set out in Article 5 of the Treaty, the objectives of this Regulation cannot be sufficiently achieved by the Member States and can therefore be better achieved by the Community. This Regulation confines itself to the minimum required in order to achieve those objectives and does not go beyond what is necessary for that purpose.

(5) On 27 September 1968 the Member States, acting under Article 293, fourth indent, of the Treaty, concluded the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, as amended by Conventions on the Accession of the New Member States to that Convention (hereinafter referred to as the 'Brussels Convention') (4). On 16 September 1988 Member States and EFTA States concluded the Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, which is a parallel Convention to the 1968 Brussels Convention. Work has been undertaken for the revision of those Conventions, and the Council has approved the content of the revised texts. Continuity in the results achieved in that revision should be ensured.

(6) In order to attain the objective of free movement of judgments in civil and commercial matters, it is necessary and appropriate that the rules governing jurisdiction and the recognition and enforcement of judgments be governed by a Community legal instrument which is binding and directly applicable.

(7) The scope of this Regulation must cover all the main civil and commercial matters apart from certain well-defined matters.

(8) There must be a link between proceedings to which this Regulation applies and the territory of the Member States bound by this Regulation. Accordingly common rules on jurisdiction should, in principle, apply when the defendant is domiciled in one of those Member States.

(9) A defendant not domiciled in a Member State is in general subject to national rules of jurisdiction applicable in the territory of the Member State of the court seised, and a defendant domiciled in a Member State not bound by this Regulation must remain subject to the Brussels Convention.

(10) For the purposes of the free movement of judgments, judgments given in a Member State bound by this Regulation should be recognised and enforced in another Member State bound by this Regulation, even if the judgment debtor is domiciled in a third State.

(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.

(13) In relation to insurance, consumer contracts and employment, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules provide for.

(14) The autonomy of the parties to a contract, other than an insurance, consumer or employment contract,

Copr. © West 2007 No Claim to Orig. Govt. Works

Page 2

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 3

where only limited autonomy to determine the courts having jurisdiction is allowed, must be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

(15) In the interests of the harmonious administration of justice it is necessary to minimize the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States. There must be a clear and effective mechanism for resolving cases of lis pendens and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously.

(16) Mutual trust in the administration of justice in the Community justifies judgments given in a Member State being recognised automatically without the need for any procedure except in cases of dispute.

(17) By virtue of the same principle of mutual trust, the procedure for making enforceable in one Member State a judgment given in another must be efficient and rapid. To that end, the declaration that a judgment is enforceable should be issued virtually automatically after purely formal checks of the documents supplied, without there being any possibility for the court to raise of its own motion any of the grounds for non-enforcement provided for by this Regulation.

(18) However, respect for the rights of the defence means that the defendant should be able to appeal in an adversarial procedure, against the declaration of enforceability, if he considers one of the grounds for non-enforcement to be present. Redress procedures should also be available to the claimant where his application for a declaration of enforceability has been rejected.

(19) Continuity between the Brussels Convention and this Regulation should be ensured, and transitional provisions should be laid down to that end. The same need for continuity applies as regards the interpretation of the Brussels Convention by the Court of Justice of the European Communities and the 1971 Protocol (5) should remain applicable also to cases already pending when this Regulation enters into force.

(20) The United Kingdom and Ireland, in accordance with Article 3 of the Protocol on the position of the United Kingdom and Ireland annexed to the Treaty on European Union and to the Treaty establishing the European Community, have given notice of their wish to take part in the adoption and application of this Regulation.

(21) Denmark, in accordance with Articles 1 and 2 of the Protocol on the position of Denmark annexed to the Treaty on European Union and to the Treaty establishing the European Community, is not participating in the adoption of this Regulation, and is therefore not bound by it nor subject to its application.

(22) Since the Brussels Convention remains in force in relations between Denmark and the Member States that are bound by this Regulation, both the Convention and the 1971 Protocol continue to apply between Denmark and the Member States bound by this Regulation.

(23) The Brussels Convention also continues to apply to the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 299 of the Treaty.

(24) Likewise for the sake of consistency, this Regulation should not affect rules governing jurisdiction and the recognition of judgments contained in specific Community instruments.

(25) Respect for international commitments entered into by the Member States means that this Regulation should not affect conventions relating to specific matters to which the Member States are parties.

(26) The necessary flexibility should be provided for in the basic rules of this Regulation in order to take account of the specific procedural rules of certain Member States. Certain provisions of the Protocol annexed to the Brussels Convention should therefore be incorporated in this Regulation.

(27) In order to allow a harmonious transition in certain areas which were the subject of special provisions in the Protocol annexed to the Brussels Convention, this Regulation lays down, for a transitional period, provisions taking into consideration the specific situation in certain Member States.

(28) No later than five years after entry into force of this Regulation the Commission will present a report on its

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 4

application and, if need be, submit proposals for adaptations.

(29) The Commission will have to adjust Annexes I to IV on the rules of national jurisdiction, the courts or competent authorities and redress procedures available on the basis of the amendments forwarded by the Member State concerned; amendments made to Annexes V and VI should be adopted in accordance with Council Decision 1999/468/EC of 28 June 1999 laying down the procedures for the exercise of implementing powers conferred on the Commission (6),

HAS ADOPTED THIS REGULATION:

CHAPTER I

SCOPE

Article 1

1. This Regulation shall apply in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters.

2. The Regulation shall not apply to:

(a) the status or legal capacity of natural persons, rights in property arising out of a matrimonial relationship, wills and succession;

(b) bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings;

(c) social security;

(d) arbitration.

3. In this Regulation, the term 'Member State' shall mean Member States with the exception of Denmark.

CHAPTER II

JURISDICTION

Section 1

General provisions

Article 2

1. Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.

2. Persons who are not nationals of the Member State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that State.

Article 3

1. Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter.

2. In particular the rules of national jurisdiction set out in Annex I shall not be applicable as against them.

Article 4

1. If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall,

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 5

subject to Articles 22 and 23, be determined by the law of that Member State.

2.  As against such a defendant, any person domiciled in a Member State may, whatever his nationality, avail himself in that State of the rules of jurisdiction there in force, and in particular those specified in Annex I, in the same way as the nationals of that State.

Section 2

Special jurisdiction

Article 5

A person domiciled in a Member State may, in another Member State, be sued:

1.  (a)  in matters relating to a contract, in the courts for the place of performance of the obligation in question;

(b)  for the purpose of this provision and unless otherwise agreed, the place of performance of the obligation in question shall be:

  - in the case of the sale of goods, the place in a Member State where, under the contract, the goods were delivered or should have been delivered,

  - in the case of the provision of services, the place in a Member State where, under the contract, the services were provided or should have been provided,

(c)  if subparagraph (b) does not apply then subparagraph (a) applies;

2.  in matters relating to maintenance, in the courts for the place where the maintenance creditor is domiciled or habitually resident or, if the matter is ancillary to proceedings concerning the status of a person, in the court which, according to its own law, has jurisdiction to entertain those proceedings, unless that jurisdiction is based solely on the nationality of one of the parties;

3.  in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur;

4.  as regards a civil claim for damages or restitution which is based on an act giving rise to criminal proceedings, in the court seised of those proceedings, to the extent that that court has jurisdiction under its own law to entertain civil proceedings;

5.  as regards a dispute arising out of the operations of a branch, agency or other establishment, in the courts for the place in which the branch, agency or other establishment is situated;

6.  as settlor, trustee or beneficiary of a trust created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, in the courts of the Member State in which the trust is domiciled;

7.  as regards a dispute concerning the payment of remuneration claimed in respect of the salvage of a cargo or freight, in the court under the authority of which the cargo or freight, in the court under the authority of which the cargo or freight, in the question:

(a)  has been arrested to secure such payment, or

(b)  could have been so arrested, but bail or other security has been given;

provided that this provision shall apply only if it is claimed that the defendant has an interest in the cargo or freight or had such an interest at the time of salvage.

Article 6

A person domiciled in a Member State may also be sued:

Copr. © West 2007 No Claim to Orig. Govt. Works

---

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 6

1.  where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

2.  as a third party in an action on a warranty or guarantee or in any other third party proceedings, in the court seised of the original proceedings, unless these were instituted solely with the object of removing him from the jurisdiction of the court which would be competent in his case;

3.  on a counter-claim arising from the same contract or facts on which the original claim was based, in the court in which the original claim is pending;

4.  in matters relating to a contract, if the action may be combined with an action against the same defendant in matters relating to rights in rem in immovable property, in the court of the Member State in which the property is situated.

Article 7

Where by virtue of this Regulation a court of a Member State has jurisdiction in actions relating to liability from the use or operation of a ship, that court, or any other court substituted for this purpose by the internal law of that Member State, shall also have jurisdiction over claims for limitation of such liability.

Section 3

Jurisdiction in matters relating to insurance

Article 8

In matters relating to insurance, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

Article 9

1.  An insurer domiciled in a Member State may be sued:

(a)  in the courts of the Member State where he is domiciled, or

(b)  in another Member State, in the case of actions brought by the policyholder, the insured or a beneficiary, in the courts for the place where the plaintiff is domiciled,

(c)  if he is a co-insurer, in the courts of a Member State in which proceedings are brought against the leading insurer.

2.  An insurer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

Article 10

In respect of liability insurance or insurance of immovable property, the insurer may in addition be sued in the courts for the place where the harmful event occurred. The same applies if movable and immovable property are covered by the same insurance policy and both are adversely affected by the same contingency.

Article 11

1.  In respect of liability insurance, the insurer may also, if the law of the court permits it, be joined in proceedings which the injured party has brought against the insured.

2.  Articles 8, 9 and 10 shall apply to actions brought by the injured party directly against the insurer, where such direct actions are permitted.

Copr. © West 2007 No Claim to Orig. Govt. Works

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 7

3. If the law governing such direct actions provides that the policyholder or the insured may be joined as a party to the action, the same court shall have jurisdiction over them.

Article 12

1. Without prejudice to Article 11(3), an insurer may bring proceedings only in the courts of the Member State in which the defendant is domiciled, irrespective of whether he is the policyholder, the insured or a beneficiary.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 13

The provisions of this Section may be departed from only by an agreement:

1. which is entered into after the dispute has arisen, or

2. which allows the policyholder, the insured or a beneficiary to bring proceedings in courts other than those indicated in this Section, or

3. which is concluded between a policyholder and an insurer, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which has the effect of conferring jurisdiction on the courts of that State even if the harmful event were to occur abroad, provided that such an agreement is not contrary to the law of that State, or

4. which is concluded with a policyholder who is not domiciled in a Member State, except in so far as the insurance is compulsory or relates to immovable property in a Member State, or

5. which relates to a contract of insurance in so far as it covers one or more of the risks set out in Article 14.

Article 14

The following are the risks referred to in Article 13(5):

1. any loss of or damage to:

(a) seagoing ships, installations situated offshore or on the high seas, or aircraft, arising from perils which relate to their use for commercial purposes;

(b) goods in transit other than passengers' baggage where the transit consists of or includes carriage by such ships or aircraft;

2. any liability, other than for bodily injury to passengers or loss of or damage to their baggage:

(a) arising out of the use or operation of ships, installations or aircraft as referred to in point 1(a) in so far as, in respect of the latter, the law of the Member State in which such aircraft are registered does not prohibit agreements on jurisdiction regarding insurance of such risks;

(b) for loss or damage caused by goods in transit as described in point 1(b);

3. any financial loss connected with the use or operation of ships, installations or aircraft as referred to in point 1(a), in particular loss of freight or charter-hire;

4. any risk or interest connected with any of those referred to in points 1 to 3;

5. notwithstanding points 1 to 4, all 'large risks' as defined in Council Directive 73/239/EEC (7, as amended by Council Directives 88/357/EEC (8) and 90/618/EEC (9), as they may be amended.

Copr. © West 2007 No Claim to Orig. Govt. Works

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 8

Section 4

Jurisdiction over consumer contracts

Article 15

1. In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5, if:

(a) it is a contract for the sale of goods on instalment credit terms; or

(b) it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or

(c) in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

2. Where a consumer enters into a contract with a party who is not domiciled in the Member State but has a branch, agency or other establishment in one of the Member States, that party shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that State.

3. This Section shall not apply to a contract of transport other than a contract which, for an inclusive price, provides for a combination of travel and accommodation.

Article 16

1. A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or in the courts for the place where the consumer is domiciled.

2. Proceedings may be brought against a consumer by the other party to the contract only in the courts of the Member State in which the consumer is domiciled.

3. This Article shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 17

The provisions of this Section may be departed from only by an agreement:

1. which is entered into after the dispute has arisen; or

2. which allows the consumer to bring proceedings in courts other than those indicated in this Section; or

3. which is entered into by the consumer and the other party to the contract, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which confers jurisdiction on the courts of that Member State, provided that such an agreement is not contrary to the law of that Member State.

Section 5

Jurisdiction over individual contracts of employment

Article 18

1. In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

Copr. © West 2007 No Claim to Orig. Govt. Works

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 9

2. Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

Article 19

An employer domiciled in a Member State may be sued:

1. in the courts of the Member State where he is domiciled; or

2. in another Member State:

(a) in the courts for the place where the employee habitually carries out his work or in the courts for the last place where he did so, or

(b) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

Article 20

1. An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 21

The provisions of this Section may be departed from only by an agreement on jurisdiction:

1. which is entered into after the dispute has arisen; or

2. which allows the employee to bring proceedings in courts other than those indicated in this Section.

Section 6

Exclusive jurisdiction

Article 22

The following courts shall have exclusive jurisdiction, regardless of domicile:

1. in proceedings which have as their object rights in rem in immovable property or tenancies of immovable property, the courts of the Member State in which the property is situated.

However, in proceedings which have as their object tenancies of immovable property concluded for temporary private use for a maximum period of six consecutive months, the courts of the Member State in which the defendant is domiciled shall also have jurisdiction, provided that the tenant is a natural person and that the landlord and the tenant are domiciled in the same Member State;

2. in proceedings which have as their object the validity of the constitution, the nullity or the dissolution of companies or other legal persons or associations of natural or legal persons, or of the validity of the decisions of their organs, the courts of the Member State in which the company, legal person or association has its seat. In order to determine that seat, the court shall apply its rules of private international law;

3. in proceedings which have as their object the validity of entries in public registers, the courts of the Member State in which the register is kept;

Copr. © West 2007 No Claim to Orig. Govt. Works

Page 10

OJ 2001 L12/1
EU: Regulation (EC) No 44/200:
Celex No. 301R0044

4. in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of a Community instrument or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office under the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, the courts of each Member State shall have exclusive jurisdiction, regardless of domicile, in proceedings concerned with the registration or validity of any European patent granted for that State;

5. in proceedings concerned with the enforcement of judgments, the courts of the Member State in which the judgment has been or is to be enforced.

Section 7

Prorogation of jurisdiction

Article 23

1. If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. Such an agreement conferring jurisdiction shall be either:

(a) in writing or evidenced in writing; or

(b) in a form which accords with practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned.

2. Any communication by electronic means which provides a durable record of the agreement shall be equivalent to 'writing'.

3. Where such an agreement is concluded by parties, none of whom is domiciled in a Member State, the courts of other Member States shall have no jurisdiction over their disputes unless the court or courts chosen have declined jurisdiction.

4. The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between these persons or their rights or obligations under the trust are involved.

5. Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 13, 17 or 21, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 22.

Article 24

Apart from jurisdiction derived from other provisions of this Regulation, a court of a Member State before which a defendant enters an appearance shall have jurisdiction. This rule shall not apply where appearance was entered to contest the jurisdiction, or where another court has exclusive jurisdiction by virtue of Article 22.

Section 8

Examination as to jurisdiction and admissibility

Copr. © West 2007 No Claim to Orig. Govt. Works

<table>
<tr><td>

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 11

**Article 25**

Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 22, it shall declare of its own motion that it has no jurisdiction.

**Article 26**

1. Where a defendant domiciled in one Member State is sued in a court of another Member State and does not enter an appearance, the court shall declare of its own motion that it has no jurisdiction unless its jurisdiction is derived from the provisions of this Regulation.

2. The court shall stay the proceedings so long as it is not shown that the defendant has been able to receive the document instituting the proceedings or an equivalent document in sufficient time to enable him to arrange for his defence, or that all necessary steps have been taken to this end.

3. Article 19 of Council Regulation (EC) No 1348/2000 of 29 May 2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters (10) shall apply instead of the provisions of paragraph 2 if the document instituting the proceedings or an equivalent document had to be transmitted from one Member State to another pursuant to this Regulation.

4. Where the provisions of Regulation (EC) No 1348/2000 are not applicable, Article 15 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters shall apply if the document instituting the proceedings or an equivalent document had to be transmitted pursuant to that Convention.

**Section 9**

Lis pendens - related actions

**Article 27**

1. Where proceedings involving the same cause of action and between the same parties are brought in the courts of different Member States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.

2. Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

**Article 28**

1. Where related actions are pending in the courts of different Member States, any court other than the court first seised may stay its proceedings.

2. Where these actions are pending at first instance, any court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the court first seised has jurisdiction over the actions in question and its law permits the consolidation thereof.

3. For the purposes of this Article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

**Article 29**

Where actions come within the exclusive jurisdiction of several courts, any court other than the court first seised shall decline jurisdiction in favour of that court.

**Article 30**

Copr. © West 2007 No Claim to Orig. Govt. Works

</td><td>

OJ 2001 L12/1
EU: Regulation (EC) No 44/2001
Celex No. 301R0044

Page 12

For the purposes of this Section, a court shall be deemed to be seised:

1. at the time when the document instituting the proceedings or an equivalent document is lodged with the court, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have service effected on the defendant, or

2. if the document has to be served before being lodged with the court, at the time when it is received by the authority responsible for service, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have the document lodged with the court.

**Section 10**

Provisional, including protective, measures

**Article 31**

Application may be made to the courts of a Member State for such provisional, including protective, measures as may be available under the law of that State, even if, under this Regulation, the courts of another Member State have jurisdiction as to the substance of the matter.

**CHAPTER III**

RECOGNITION AND ENFORCEMENT

**Article 32**

For the purposes of this Regulation, 'judgment' means any judgment given by a court or tribunal of a Member State, whatever the judgment may be called, including a decree, order, decision or writ of execution, as well as the determination of costs or expenses by an officer of the court.

**Section 1**

Recognition

**Article 33**

1. A judgment given in a Member State shall be recognised in the other Member States without any special procedure being required.

2. Any interested party who raises the recognition of a judgment as the principal issue in a dispute may, in accordance with the procedures provided for in Sections 2 and 3 of this Chapter, apply for a decision that the judgment be recognised.

3. If the outcome of proceedings in a court of a Member State depends on the determination of an incidental question of recognition that court shall have jurisdiction over that question.

**Article 34**

A judgment shall not be recognised:

1. if such recognition is manifestly contrary to public policy in the Member State in which recognition is sought;

2. where it was given in default of appearance, if the defendant was not served with the document which instituted the proceedings or with an equivalent document in sufficient time and in such a way as to enable him to arrange for his defence, unless the defendant failed to commence proceedings to challenge the judgment when it was possible for him to do so;

3. if it is irreconcilable with a judgment given in a dispute between the same parties in the Member State in

Copr. © West 2007 No Claim to Orig. Govt. Works

</td></tr>
</table>