**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| GUY CARPENTER & COMPANY, LLC and ) <br> MARSH & McLENNAN COMPANIES, INC., ) <br> ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JULIAN SAMENGO-TURNER, RON ) <br> WHYTE, and MARCUS HOPKINS, ) <br> ) <br>     Defendants. ) <br> ) | Case No. 07 – CV- 3580 (DC) |

---

**DEFENDANT RON WHYTE'S APPENDIX OF UNPUBLISHED CASES**
**CITED IN BRIEFING ON MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**DUE TO LACK OF PERSONAL JURISDICTION AND FORUM *NON CONVENIENS***

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

*Attorneys for defendant Ron Whyte*

# TABS 7 - 9

# Table of Contents

| | Tab |
|---|---|
| *Albon v. Naza Motor Trading*, (2007) 2 All E.R. (Comm.) 719 ........................... | 1 |
| *Anselmo v. Univision Station Group, Inc.*, No. 92 Civ. 1471 (RLC), 1993 WL 17173 (S.D.N.Y. Jan. 15, 1993) ...................................................... | 2 |
| *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc.*, 00 Civ. 1248 (RWS), 2000 U.S. Dist. LEXIS 15088 (S.D.N.Y. Oct. 11, 2000) ........................................ | 3 |
| *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432 (S.D.N.Y. July 22, 1996) ................................................ | 4 |
| *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 95 Civ. 7685 (RPP), 1996 U.S. Dist. LEXIS 11064 (S.D.N.Y. Aug. 1, 1996) ................................................ | 5 |
| EU Council Regulation (EC) No. 44/2001, Sec. 5, Art. 20 ................................ | 6 |
| *Freeplay Music, Inc. v. Cox Radio, Inc.*, 04 Civ. 5238 (GEL), 2005 U.S. Dist. LEXIS 12397 (S.D.N.Y. June 22, 2005).................................................... | 7 |
| *GCG Int'l, Inc. v. Eberhardt*, 05 Civ. 2422 (DC), 2005 U.S. Dist. LEXIS 23877 (S.D.N.Y. Oct. 17, 2005) .................................................... | 8 |
| *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96 Civ. 2064 (RWS), 1997 WL 53184 (S.D.N.Y. Feb. 11, 1997) .................................................... | 9 |
| *PaineWebber Inc. v. WHV, Inc.*, 95 Civ. 0052 (LMM), 1995 U.S. Dist. LEXIS 6514 (S.D.N.Y. May 12, 1995) .................................................... | 10 |
| *Pieczenik v. Dolan*, 03 Civ. 6336 (SAS), 2003 U.S. Dist. LEXIS 23295 (S.D.N.Y. Dec. 29, 2003) .................................................... | 11 |
| *Saab v. Citibank, N.A.*, No. 00 Civ. 6784 (BSJ), 2001 WL 1382577 (S.D.N.Y. Nov. 7, 2001) .................................................... | 12 |
| *Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, 00 Civ. 9227 (GEL), 2001 U.S. Dist. LEXIS 3001 (S.D.N.Y. Mar. 20, 2001) .................................................... | 13 |
| *Spencer Trask Ventures, Inc. v. Archos S.A.*, 01 Civ. 1169 (LAP), 2002 U.S. Dist. LEXIS 4396 (S.D.N.Y. Mar. 15, 2002) .................................................... | 14 |
| *Swithenbank Foods Ltd v. Bowers*, (2002) 2 All E.R. (Comm.) 974, 981 (Q.B.) ......... | 15 |

*Varnelo v. Eastwind Transp., Ltd.,* 02 Civ. 2084 (KMW)(AJP), 2003 U.S. Dist.
LEXIS 1424 (S.D.N.Y. Feb. 3, 2003) ............................................................    16

*Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co., Ltd.*, 00 Civ. 9605 (DFE), 2002
U.S. Dist. LEXIS 789 (S.D.N.Y. Jan. 16, 2002) ...........................................    17

# TAB
# 7

LEXSEE 2005 US DIST. LEXIS 12397

**FREEPLAY MUSIC, INC., Plaintiff, -v- COX RADIO, INC., CUMULUS MEDIA, INC., ENTERCOM COMMUNICATIONS CORP., BEASLEY BROADCAST GROUP, INC., CITADEL BROADCASTING CORP., and VIACOM INC., Defendants.**

**04 Civ. 5238 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 12397*

**June 22, 2005, Decided**
**June 23, 2005, Filed**

**SUBSEQUENT HISTORY:** Complaint dismissed at, in part *Freeplay Music, Inc. v. Cox Radio, Inc., 2005 U.S. Dist. LEXIS 12402 (S.D.N.Y., June 22, 2005)*

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of personal jurisdiction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the owner of copyrights in certain musical compositions and sound recordings, sued defendants, corporate owners of various radio stations, charging violations of copyright and related claims. One of the defendants, a licensee which was incorporated in Delaware with its principal place of business in Florida, moved to dismiss for lack of personal jurisdiction.

**OVERVIEW:** Defendant's purchases of programming and licenses to broadcast copyrighted materials and its soliciting advertising for its stations in New York were insufficient to justify general jurisdiction. Defendant's stock buy-back venture was limited in purpose and temporary in duration and did not create a legal presence in New York. Neither defendant's New York credit facility nor web casts from a distant state supported a finding of general jurisdiction. The alleged contacts, taken singly or together, were insufficient to amount to doing business in New York under *N.Y. C.P.L.R. § 301*. As for jurisdiction under *N.Y. C.P.L.R. § 302(a)(1)*, the allegedly infringing conduct did not arise out of New York business transactions, defendant's contractual contacts were insufficient, and defendant did not transact business in New York when it simulcast its radio programming. As for § 302(a)(2), the websites were not

created nor maintained in New York. As for § 302(a)(3), there was no allegation that the unlicensed use took place in New York or that New York residents accessed the web casts. Plaintiff's economic loss was only a consequence of the conduct not the injury itself.

**OUTCOME:** The court granted defendant's motion to dismiss for lack of personal jurisdiction.

**COUNSEL:** Gabriel Fischbarg, Toptani Law Offices, New York, NY, for Plaintiff.

Bruce P. Keller, Debevoise & Plimpton LLP, New York, NY, for Defendant Beasley Broadcast Group, Inc.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION:**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Freeplay Music, Inc. ("Freeplay"), the owner of copyrights in certain musical compositions and sound recordings, brings this action against defendants, corporate owners of various radio stations, charging violations of copyright and related claims. In a separate opinion issued this day, the Court grants in part and denies in part a motion to dismiss for failure to state a claim by all defendants. This opinion addresses the motion to dismiss for lack of personal jurisdiction by one defendant, Beasley Broadcast Group, Inc. ("Beasley").

Freeplay alleges that Beasley's contacts with New York are sufficient to support personal jurisdiction over it. Beasley argues that Freeplay's conclusory allegations merely parrot the relevant statutory language, and that the actual facts alleged in the complaint are facially [*2] insufficient to support jurisdiction. n1 For the reasons that follow, Beasley's motion will be granted. Freeplay's request for jurisdictional discovery regarding Beasley's contacts with New York is denied.

n1 Freeplay's memorandum in opposition to Beasley's motion contains additional allegations not stated in its complaint. Although a motion to dismiss for lack of personal jurisdiction is normally decided based on the pleadings, the Court considers the additional allegations here in the interests of fairness and of a full and efficient consideration of the jurisdictional issues in this case.

## BACKGROUND

Freeplay is a New York corporation which creates musical compositions and sound recordings. Freeplay alleges that Beasley "produced, exploited and distributed in interstate commerce certain radio programming containing certain of [Freeplay's] compositions and sound recordings," when Beasley broadcast Freeplay's musical works "synchronized" with other audio works. (Compl. P17; P. 12(b)(6) Mem. at 3.) Freeplay [*3] holds the copyright registrations for the 155 musical compositions and sound recordings at issue in this action. (Compl. P15; see Compl. Exs. 1-9.) Freeplay contracted with Broadcast Music, Inc. ("BMI"), a performing rights society, to license permission to perform these compositions and recordings on Freeplay's behalf. (P. 12(b)(6) Mem. at 6.) Freeplay argues that although Beasley is licensed by BMI to perform the Freeplay musical works in question, that license does not grant Beasley the necessary "synchronization rights" that would allow Beasley to use Freeplay's musical works in the manner alleged. (P. 12(b)(6) Mem. at 3; Fischbarg 12(b)(6) Decl. P3, Ex. B.) See generally *Freeplay Music, Inc. v. Cox Radio, Inc., 2005 U.S. Dist. LEXIS 12402, No. 04 Civ. 5238 (GEL), 2005 WL    (S.D.N.Y. June 22, 2005).*

Beasley is a Delaware corporation with its principal place of business in Naples, Florida. (Compl. P8.) Beasley "produces, distributes, sell[s] and otherwise commercially exploit[s] radio programming" at its 41 radio stations. (Compl. P8; Fischbarg 12(b)(6) Decl. Ex. F.) Beasley alleges, and Freeplay does not dispute, that it does not have an office or employees in New York, that it does not [*4] own or operate a radio station in New York, and that none of its stations' over-the-air broadcast signals can reach New York. (Beasley Decl. P7.) Several of Beasley's radio stations, however, have websites accessible in New York through which the stations simulcast their radio broadcasts. (P. Mem. 3; Fischbarg Decl. P6, Ex. E.)

In addition to Beasley's websites, Freeplay alleges that Beasley has several other forms of contact with New York. Beasley radio stations syndicate radio programming produced in New York such as "The Howard Stern Radio Show," "Imus in the Morning," "ABC News," and "Bloomberg Radio News." (Fischbarg Decl. P3, Ex. B.) Beasley executives travel to New York approximately four times per year to meet with investment bankers. (P. Mem. 1.) Beasley executives have also spoken at radio industry conferences and seminars in New York at least six times since 2002. (Id. at 2.) New York companies purchase advertising time on Beasley radio stations. (Id.) Beasley also makes payments to performing rights societies based in New York, such as BMI and the American Society of Composers, Authors, and Publishers, for licenses to perform certain musical works. (Id.) Beasley [*5] has contracted with the New York investment bank Harris Nesbitt in connection with a $ 25 million stock buy-back scheduled to be completed within the next year. (Id. at 1-2, citing D. Mem. 4.) In March 2004, Beasley announced the completion of a $ 225 million revolving credit facility, funded by a consortium of lenders, and jointly arranged by two New York banks, Harris Nesbitt and Bank of New York. (Id.)

## DISCUSSION

### I. Legal Standard

On a motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2),* the plaintiff bears the burden to establish jurisdiction. *In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003).* Where no jurisdictional discovery has been conducted, the plaintiff need only establish a prima facie case, and allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff. *CutCo Indus. Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* The motion must be denied if those allegations suffice as a matter of law. *Magnetic Audiotape, 334 F.3d at 206.*

A federal court [*6] sitting in diversity may exercise jurisdiction over a foreign defendant if the defendant is amenable to process under the law of the forum state. *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 105, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).* In New York, a court may

exercise general jurisdiction over a non-domiciliary under New York Civil Practice Laws and Rules ("C.P.L.R.") § 301, and long-arm jurisdiction under C.P.L.R. § 302. The exercise of personal jurisdiction must also comport with constitutional due process requirements under *International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945). Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 37 (2d Cir. 2001).*

## II. General Jurisdiction in *New York: C.P.L.R. § 301*

Under C.P.L.R. § 301, a New York court may exercise jurisdiction over a defendant "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its presence in the state." *Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir.1998).* "A defendant [*7] is doing business such that jurisdiction pursuant to § 301 is appropriate if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Mantello v. Hall, 947 F. Supp. 92, 97 (S.D.N.Y. 1996),* quoting *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990).* This standard has been described as "stringent," because a defendant who is found to be doing business in New York in a permanent and continuous manner "may be sued in New York on causes of action wholly unrelated to acts done in New York." *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001),* quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 198 (2d Cir. 1990).*

Courts have relied on the following "traditional indicia" when "deciding whether a foreign corporation is doing business in New York . . .: (1) the existence of an office in New York; (2) the solicitation of business in New York; (3) the existence of bank accounts or other property in New York; and (4) presence of employees of the foreign defendant [*8] in New York." *Mantello, 947 F. Supp. at 97,* citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).* Freeplay contends that its allegations regarding Beasley's activity demonstrate Beasley's legal presence in New York, even though Beasley has no office in New York, and no employees working on a regular basis in New York. Freeplay's allegations, however, do not show that Beasley has a permanent or continuous presence in New York sufficient to justify a finding of general jurisdiction.

Beasley's licenses and radio programming purchases from New York corporations are insubstantial activity to warrant general jurisdiction in New York. New York courts have held that "obtaining licenses is not 'doing business'" for the purposes of general jurisdiction.

*Mantello, 947 F. Supp. at 98.* Further, "the purchase of goods from New York by a defendant, even if on large scale, would not, in an of itself, amount to 'doing business' within the state." *Agency Rent A Car System, Inc v. Grand Rent A Car Corp., 916 F. Supp. 224, 229 (E.D.N.Y. 1996),* rev'd on other grounds, *98 F.3d 25 (2d Cir. 1996).* [*9] Therefore, Beasley's purchases of programming and licenses to broadcast copyrighted materials are insufficient to justify general jurisdiction.

Similarly, Freeplay's allegation that Beasely solicits advertising for its radio stations from New York companies reflects a mere business relationship insufficient to confer general jurisdiction. *Reers v. Deutsche Bahn AG, 320 F. Supp. 2d 140, 155 (S.D.N.Y. 2004).* Solicitation of business contracts can reach a level sufficient to support general jurisdiction only through "extensive conduct directed toward or occurring in New York." *Id. at 150.* Even actual advertising within New York is not considered to reach the level of substantial solicitation that would suffice for general jurisdiction. See, e.g. *Muollo v. Crestwood Vill. Inc., 155 A.D.2d 420, 547 N.Y.S.2d 87, 88 (2d Dept. 1989)* (finding defendant's advertisements in the New York Times and on the radio insufficient to support personal jurisdiction); see also *Holness v. Maritime Overseas Corp., 251 A.D.2d 220, 676 N.Y.S.2d 540, 543 (1st Dept. 1998)* ("New York has no jurisdiction over a foreign defendant company whose only contacts with New York are advertising [*10] and marketing activities plus representatives' occasional visits to New York."). Freeplay's allegations do not suggest that Beasley solicited advertising from local New York businesses, or advertising that was directed toward a New York audience, as opposed to advertising from national companies incorporated or headquartered in New York. Freeplay's allegation that Beasley solicits business from New York companies does not show that Beasley solicited that business in New York, or that the solicitation was extensive or substantial. Thus, Beasley's advertising contracts with New York companies are insufficient to justify general jurisdiction.

Freeplay also alleges (and Beasley acknowledges) that Beasley has a contract with the New York bank Harris Nesbitt for the purposes of a $ 25 million stock buy-back. Regarding the stock buy-back, New York courts "accord[] foreign corporations substantial latitude" in connection with management of their securities on New York-based stock exchanges without subjecting themselves to New York jurisdiction for unrelated occurrences. *Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 97 (2d. Cir. 2000);* see also *Reers, 320 F. Supp. 2d at 156* [*11] ("The fact that [defendant's] stock may be purchased in New York, and that [defendant] retains New York-based market makers to assist in its sales of stock, is another important factor but is insufficient to

confer general jurisdiction."). Beasley's stock buy-back venture is limited in purpose and temporary in duration such that it does not create legal presence in New York.

Bank accounts can be grounds for general jurisdiction because they are a permanent locus of property or assets within the state. However, a "bank account[] standing alone cannot create jurisdiction unless [it is] used for 'substantially all' of [the defendant's] business." Id. n2 Freeplay alleges in a conclusory manner that Beasley runs its "day-to-day operations" through a revolving credit facility jointly administered by Harris Nesbitt and the Bank of New York (P. Mem. 2), but fails to make any specific allegations as to the role the credit facility plays in Beasley's business. By definition, however, a "credit facility" is a financing arrangement, not an operational bank account. See generally GE Commercial Finance Corporate Lending, Frequently Asked Questions, at http://www.gelending. [*12] com/Clg/Resources/lendingFAQs.html. Plaintiff's allegation thus appears to assert, at most, that Beasley's "day-to-day operations" are financed entirely by borrowing through this credit facility, and not that its ordinary payroll and checking transactions are performed through the credit facility. Generally, "[a] single financing arrangement, such as [a] credit facility, is insufficient to constitute the continuous and systematic activity required to warrant the exercise of general personal jurisdiction." *Int'l Telecom, Inc. v. Generadora Electrica del Oriente S.A., 2002 U.S. Dist. LEXIS 9452, No. 00 Civ. 8695 (WHP), 2002 WL 465291, at *2 (S.D.N.Y. 2002).* Therefore, Freeplay's allegation regarding Beasley' credit facility is insufficient to support a finding of general jurisdiction. n3

n2 Factors that have led courts to conclude that a bank account is a "substantial" part of a defendant's business include: (1) receipt and deposit of substantial portion of company revenue, (2) use for payment of employees, (3) use for payment of expenses, and (4) assistance from bank personnel in carrying out company business. *United Rope Distrib., Inc. v. Kimberly Line, 785 F. Supp. 446, 450-451 (S.D.N.Y. 1992).* [*13]

n3 Further, Beasley's relationship to Harris Nesbitt and the Bank of New York via the credit facility does not amount to the type of true principal/agent relationship that, in other contexts, might serve as a basis for general jurisdiction. To be considered an "agent," the banks "must be primarily employed by the defendant and not engaged in similar services for

other clients." *Jacobs, 160 F. Supp. 2d at 737.* Neither of these conditions exist in this case. Hence, the relationship between Beasley and the banks cannot serve as a basis for general jurisdiction.

Freeplay also alleges that Beasley's radio broadcasts are available in New York via their websites. However, "the fact that a foreign corporation has a website accessible to New York is insufficient to confer jurisdiction under C.P.L.R. § 301." *Spencer Trask Ventures, Inc. v. Archos S.A., 2002 U.S. Dist. LEXIS 4396, No. 01 Civ. 1169 (LAP), 2002 WL 417192, at *6 (S.D.N.Y. Mar. 18, 2002).* Unlike a conventional radio station that requires a nearby physical presence in order to broadcast to a given geographical region, a webcast can be [*14] transmitted to a distant state without any further indicia of permanence in that state such as an office or employees. "Moreover, even if such an exercise of jurisdiction were proper under *§ 301,* it would not be permissible under the *Due Process Clause* [of the *Fourteenth Amendment to the U.S. Constitution*] absent, at a minimum, an allegation that . . . the website was purposefully directed toward New York." *Drucker Cornell v. Assicurazioni Generali S.p.A. Conso., 2000 U.S. Dist. LEXIS 2922, No. 97 Civ. 2262 (MBM), 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000).*

It is undisputed that Beasley's radio stations, business premises, and employees are all located outside New York, and that the broadcast signals from none of its stations are heard in New York. The occasional and insubstantial contacts alleged by plaintiff, taken singly or together, are insufficient to amount to "doing business" in New York. Accordingly, Freeplay fails to allege any facts that justify general jurisdiction over Beasley.

## III. New York's Long-Arm Statute: C.P.L.R. § 302

A. Transacting Business in *New York: C.P.L.R. § 302(a)(1)*

Under C.P.L.R. *§ 302(a)(1),* New York courts have specific jurisdiction over [*15] "any non-domiciliary [who] transacts any business within the state or contracts anywhere to supply goods or services in the state." "A nondomiciliary 'transacts business' under C.P.L.R. *§ 302(a)(1)* when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo, 806 F.2d at 365* (internal citations omitted). The "ultimate determination" as to whether a foreign defendant "transacts business" in New York is made based on the totality of the circumstances. *Agency Rent A Car, 98 F.3d at 29.* The Second Circuit has said that a "variety of factors" may be considered in making this

determination, including: (1) whether the defendant has an on-going contractual relationship with a New York corporation, (2) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires franchises to send notices [*16] and payments into the forum state or subjects them to supervision by the corporation in the forum state. Id. "Cumulative minor activities that, individually, may be insufficient, may suffice . . . as long as the cumulative effect creates a significant presence within the state." *O'Brien v. Hackensack Univ. Med. Ctr., 305 A.D.2d 199, 760 N.Y.S.2d 425, 427 (1st Dept. 2003)*. Jurisdiction is only proper under this statutory provision where the cause of action "arises out of the subject matter of the business transacted." *Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000)*. "A suit will be deemed to have arisen out of a party's activities in New York if there is an 'articulable nexus,' or 'substantial relationship,' between the claims asserted and the actions that occurred in New York." *Henderson v. I.N.S., 157 F.3d 106, 123 (2d Cir. 1998)* (internal citations omitted).

Individually, each of Freeplay's allegations with respect to Beasley's relationships with New York enterprises might not necessarily be sufficient to support a finding that Beasley transacts business in New York. See, e.g., *J.L.B. Equities, Inc. v. Ocwen Fin. Corp., 131 F. Supp. 2d 544, 551 n.3 (S.D.N.Y. 2001)* [*17] (finding that defendant did not transact business in New York even though defendant held a New York bank account and had various other business communications with New York parties). Taken together, however, Freeplay's allegations could show that Beasley has "on-going contractual relationship[s] with New York corporation[s]," and could therefore support a finding that Beasley transacts business in New York. *Agency Rent A Car, 98 F.3d at 29*.

Nevertheless, jurisdiction fails under § 302(a)(1) because the infringing conduct in question cannot be said to have arisen out of these business transactions. "For a tort claim to arise out of transaction of business in New York, the connection between the transaction and the claim must be direct." *Mantello, 947 F. Supp. at 100*. No relationship exists between Beasley's business transactions in New York and the alleged copyright infringement. Therefore, Beasley's contractual contacts with New York are not a proper basis for jurisdiction under C.P.L.R. § 302(a)(1).

The case is different with respect to Beasley's maintenance of a website through which internet users in New York could access the programming [*18] of at least some of Beasley's radio stations. Freeplay's claims arise from the production and broadcast of such programming. Accordingly, if the maintenance of such websites constitute their transaction of business in New York, Freeplay's claims would have a significant nexus with those transactions.

The internet has complicated questions of personal jurisdiction. Although Second Circuit case law provides little guidance on this subject, Judge Sweet has aptly summarized the state of the law as it has developed around the country:

> The courts have identified a spectrum of cases involving a defendant's use of the internet. At one end are cases where the defendant makes information available on what is essentially a 'passive' web site. This use of the internet has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant. At the other end of the spectrum are cases in which the defendant clearly does business over the internet, such as where it knowingly and repeatedly transmits computer files to customers in other states. Finally, occupying the middle ground are cases [*19] in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction.

*Citigroup, 97 F. Supp. 2d at 565* (citations omitted). Although this "sliding scale" model provides a useful guide to how courts have approached such claims in the recent past, it does not amount to a separate framework for analyzing internet-based jurisdiction, and traditional statutory and constitutional principles remain the touchstone of the inquiry. See *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C., 297 F. Supp. 2d 1154, 1160-61 (W.D. Wisc. 2004)* (rejecting notion that sliding scale framework represents a "specialized test" for internet jurisdiction, but finding that "the website's level of interactivity may be one component of a determination whether a defendant has availed itself purposefully of the benefits or privileges of the forum state"); *Winfield Collection, Ltd. v. McCauley, 105 F. Supp. 2d 746, 750 (E.D. Mich. 2000)* ("The ultimate question can still as readily be answered by [*20]

determining whether the defendant did, or did not, have sufficient 'minimum contacts' in the forum state.").

Beasley's alleged broadcast of sound compositions over its stations' websites cannot serve as a basis for jurisdiction under § 302(a)(1). Although there may be interactive elements to the websites, the simulcasts of the radio broadcasts are as passive an enterprise as are the radio broadcasts themselves. See *Realuyo v. Villa Abrille, 2003 U.S. Dist. LEXIS 11529, No. 01 Civ. 10158 (JGK), 2003 WL 21537754, at *6 (S.D.N.Y. July 8, 2003)* (finding that the "sheer availability" of an allegedly defamatory article on the defendant's website, "where it can be downloaded in New York at no cost" could not be considered a transaction of business sufficient to sustain jurisdiction under either C.P.L.R. § 302(a)(1) or due process). Freeplay also fails to allege that New York residents ever accessed Beasley websites for the purposes of listening to Beasley radio station simulcasts. It stretches the meaning of "transacting business" too far to subject defendants to personal jurisdiction in any state merely for operating a website, however commercial in nature, that is capable of reaching customers in [*21] that state, without some evidence or allegation that commercial activity in that state actually occurred or was actively sought. Cf. *Citigroup, 97 F. Supp. 2d at 566* (finding personal jurisdiction where bank not only maintained website equipped to take loan applications and provide online chat with bank representatives, but also engaged in direct mail solicitation of New York businesses). Therefore, Beasley does not transact business in New York when it simulcasts its radio programming via its websites, and is not subject to jurisdiction under *§ 302(a)(1)*.

B. Tortious Action Within *New York: C.P.L.R. § 302(a)(2)*

Alternatively, under C.P.L.R. § 302(a)(2), a foreign defendant may be subject to personal jurisdiction in New York if he "commits a tortious act within the state." New York courts have interpreted the statutory language "within the state" literally, such that jurisdiction is only proper over a defendant who commits a tortious act when the defendant is physically present in the state. See *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 28 (2d. Cir. 1997)* ("The official Practice Commentary to C.P.L.R. § 302 explains that 'if a New Jersey [*22] domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb, [New York case law] would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary in an action by an injured New York plaintiff.'"). In copyright claims, § 302(a)(2) jurisdiction exists only when the allegedly infringing work is offered, displayed or sold in New York. *Mantello, 947 F. Supp. at 101.*

It appears that Freeplay means to allege that because the infringing sound compositions were broadcast via Beasley websites, they were made available in New York such that jurisdiction under C.P.L.R. § 302(a)(2) is appropriate. However, "although it is in the very nature of the internet that the allegedly infringing [material] contained in these web sites can be viewed anywhere, this does not mean that the infringement occurred everywhere." *Citigroup, 97 F. Supp. 2d at 567.* "Courts have held that in the case of web sites displaying infringing [material] the tort is deemed to be committed where the web site is created and/or maintained. *Id. at 567*; see also *Bensusan, 126 F.3d at 29* (holding [*23] that a jazz club in Missouri with the same name as a famous jazz club in New York was not to be subject to jurisdiction under § 302(a)(2) on ths basis of its website since the website was created and maintained in Missouri). Freeplay makes no assertions that the websites were created or maintained in New York, and thus, Beasley is not subject to jurisdiction under § 302(a)(2).

C. Tortious Action Outside *New York: C.P.L.R. § 302(a)(3)*

Under C.P.L.R. § 302(a)(3), a foreign defendant may be subject to personal jurisdiction in New York if he "commits a tortious act without the state causing injury to person or property within the state . . . if he . . . (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." "Courts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a 'situs-of-injury' test, . . . locating the 'original event which caused the injury.'" *DiStefano v. Carozzi, Inc., 286 F.3d 81, 84 (2d Cir. 2001).* The original event is "distinguished [both] from the initial tort [and] from the [*24] final economic injury. Id. For New York courts to have jurisdiction over a tortfeasor outside of New York, the first injury resulting from the tort must be felt inside New York. See, e.g., *Hermann v. Sharon Hosp., Inc., 135 A.D.2d 682, 522 N.Y.S.2d 581, 583 (2d Dept. 1987)* (finding that the first injury was felt outside of New York when a New York plaintiff received negligent medical treatment in Connecticut, even though the plaintiff continued to feel the injury when she returned to New York).

Freeplay has alleged that Beasley used its copyrighted sound recordings and musical compositions without the requisite "synchronization license." In cases of commercial torts, "the place of injury will usually be located where the 'critical events associated with the dispute took place.'" *Rolls-Royce Motors, Inc. v. Charles Schmitt & Co., 657 F. Supp. 1040, 1054.* In this case, the "critical events" are Beasley's alleged unlicensed use of

2005 U.S. Dist. LEXIS 12397, *

Freeplay's recordings and compositions. Yet, Freeplay has not alleged that the Beasley's unlicensed use took place in New York, or even that New York residents accessed Beasley's webcasts and listened to the infringing sound performances. [*25] Freeplay claims only economic loss as a result of the alleged unlicensed use of their copyrighted material. Any economic loss suffered, however, is only a consequence of the injurious unlicensed use and is not the injury itself. See *Plunket v. Doyle, 2001 U.S. Dist. LEXIS 2001, No. 99 Civ. 11006 (KMW), 2001 WL 175252, at *3 (S.D.N.Y. Feb. 22, 2001)* (finding a New York copyright holder is injured where the infringing use occurred, and "the mere fact that the plaintiff resides in New York and therefore ultimately experiences a financial loss there is not a sufficient basis for jurisdiction under *§ 302(a)(3)*").

Therefore, jurisdiction under C.P.L.R. *§ 302(a)(3)* is not justified.

**CONCLUSION**

Defendant's motion to dismiss for lack of personal jurisdiction is granted.

SO ORDERED.

Dated: New York, New York

June 22, 2005

GERARD E. LYNCH

United States District Judge

# TAB
# 8

GCG INTERNATIONAL, INC., Plaintiff, - against - KLAUS EBERHARDT and
HERBERT MULLER, Defendants.

05 Civ. 2422 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2005 U.S. Dist. LEXIS 23877*

October 17, 2005, Decided
October 17, 2005, Filed

**DISPOSITION:** [*1] Motion to **dismiss** for lack of **personal jurisdiction** granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action for breach of contract, breach of fiduciary duty, and related claims arising out of an agreement to effectuate a change in control and ownership of a publicly held German corporation in 2001, defendant individuals moved to **dismiss** for lack of **personal jurisdiction** and forum non conveniens.

**OVERVIEW:** With the exception of one meeting that took place in London, all of the meetings and negotiations between defendants and plaintiff took place in Germany, and the managed buy-outs (MBO) agreements were executed in Germany. Likewise, most documents relevant to the transaction were written in German and located in Germany. Plaintiff contended that specific jurisdiction existed under *N.Y. C.P.L.R. § 302(a)(1)* as the implementation of defendants' scheme and breaches arose out of defendants' actions in the United States generally, and specifically in New York. The most that could be said of the complaint and supporting papers was that they alleged that, as part of the MBO transaction, some subsidiaries of the company defendants worked for in the United States might have been restructured, and that defendants might have retained the services of a German affiliate of a New York-based investment bank. This was not "transacting business" in New York for purposes of § 302(a)(1). Plaintiff also failed to establish general jurisdiction under N.Y. C.P.L.R. § 301; there was no allegation or indication that either defendant ever had any contact with New York in connection with the transaction.

**OUTCOME:** Defendants' motion to **dismiss** for lack of **personal jurisdiction** was granted. The court therefore did not address the prong of the motion seeking **dismissal** for forum non conveniens.

**COUNSEL:** MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C., Attorneys for Plaintiff, By: Kevin Ainsworth, Esq., Seth R. Goldman, Esq., New York, NY.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Attorneys for Defendants, By: Jerome S. Hirsch, Esq., Timothy G. Nelson, Esq., New York, NY.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION:**

### MEMORANDUM DECISION

**CHIN, D.J.**

This is an action for breach of contract, breach of fiduciary duty, and related claims arising out of an agreement to effectuate a change in control and ownership of a publicly held German corporation in 2001. Before the Court is defendants' motion to **dismiss** for lack of **personal jurisdiction** and forum non conveniens. For the reasons that follow, the motion is granted.

### STATEMENT OF THE CASE

For purposes of this motion, the facts as alleged in the complaint are assumed to be true. Additional facts, as to which there does not appear to be a genuine dispute, are drawn from the submissions of the parties.

2005 U.S. Dist. LEXIS 23877, *

## 1. The Parties

Plaintiff GCG International, Inc. ("GCG"), is a Delaware corporation with its headquarters in [*2] New York City. (Compl. P2). GCG is an entity related to General Capital Group Beteiligungs GmbH ("General Capital"), a German private equity firm specializing in managed buy-outs ("MBOs") n1 and related transactions. (Id. PP2, 6). General Capital is not a party to this lawsuit, but was the entity involved in the transactions at issue. GCG purports to have been assigned General Capital's rights with regard to this lawsuit. (von Stumm Decl. P1). The circumstances of the purported assignment are unclear, as the parties have not informed the Court of when it allegedly occurred, nor have they supplied the Court with a copy of any assignment agreement. The complaint states simply that "[GCG] is the successor in interest to [General Capital]." (Compl. P2). The affidavit of Ferdinand von Stumm states that "[GCG] was assigned rights by [General Capital] against the defendants herein." (von Stumm Aff. P1). For purposes of this motion the Court assumes there was a valid assignment.

> n1 An MBO, also known as "going private," is "the process by which a publicly held company has its outstanding shares purchased by an individual or by a small group of individuals in order to obtain complete ownership and control." David L. Scott, Wall Street Words 168 (1997); see also http://www.investopedia.com/terms/m/mbo.asp (last visited October 17, 2005).

[*3]

Defendant Klaus Eberhardt ("Eberhardt") is a life-long resident and citizen of Germany. (Eberhardt Decl. P1). Since January 1, 2000, Eberhardt has been the chairman of the board of management of Rheinmetall AG ("Rheinmetall"), a German corporation headquartered in Dusseldorf, Germany. (Id. P5; Compl. P3).

Defendant Herbert Muller ("Muller") is also a life-long resident and citizen of Germany. (Muller Decl. P1). Since 1995 he has worked for Rheinmetall in Dusseldorf and currently sits on the board of management. (Id. P5). During the relevant time period he was chief financial officer of Rheinmetall. (Compl. P4).

Eberhardt and Muller are sued as individuals. Rheinmetall is not a party to this lawsuit.

## 2. The Facts

Rheinmetall is a large international corporation with more than 150 subsidiaries in the electronics, defense, and automotive industries. (Compl. P7). In September of 2001, General Capital, believing that Rheinmetall was undervalued, approached Rheinmetall and proposed that it allow General Capital to structure an MBO. (Id. PP7-8). Representatives of General Capital met several times with representatives of Rheinmetall, including defendants Eberhardt [*4] and Muller, and in 2001 General Capital and defendants executed MBO agreements, whereby defendants entered into a partnership and joint venture with General Capital, with each partner entitled to an equal share of the profits. (Compl. PP9-10). In furtherance of the joint venture, General Capital obtained consent of the majority shareholders, developed financial planning such as holding structure and divestment of minority holdings, contacted potential investors (including several large investment banks), and coordinated the due diligence for the transaction. (Compl. PP11-16). The agreements contained no choice-of-law or forum selection clauses.

As part of the MBO transaction, the shares of a group of majority shareholders were to be placed in a holding company, and General Capital and defendants would hold exclusive options to acquire the shares. (Compl. P21). GCG alleges that defendants breached the MBO agreements by secretly entering into agreements with Rheinmetall whereby they secured and exercised options without General Capital's knowledge, "as a result of which they received very significant amounts" of money. (Compl. PP28-30). GCG claims that it is due 50% of the proceeds [*5] from defendants' exercise of their options. (Compl. P31).

With the exception of one meeting in October 2001 that took place in London, all of the meetings and negotiations between defendants and General Capital took place in Germany, and the MBO agreements were executed in Germany. (Eberhardt Decl. P8; Muller Decl. P8). Likewise, most documents relevant to the transaction, including the MBO agreements, are written in German and located in Germany. (Eberhardt Decl. P22; Muller Decl. P22).

## 3. Procedural History

GCG commenced this action by filing a complaint in New York State Supreme Court in December of 2004. Defendants removed the case to this Court pursuant to *28 U.S.C. §§ 1441 & 1446* on February 28, 2005. Defendants filed the present motion to **dismiss** for lack of **personal jurisdiction** and forum non conveniens on April 15, 2005.

### DISCUSSION

## 1. Personal Jurisdiction

### A) Applicable Law

On a motion to **dismiss** for lack of **personal jurisdiction** filed pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, "the plaintiff bears the burden of demonstrating that the court has jurisdiction [*6] over the defendant." *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)* (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)*). At the pleadings stage, a plaintiff is required only to make a prima facie showing of jurisdiction. *DiBella v. Hopkins, 187 F. Supp. 2d 192, 198 (S.D.N.Y. 2002)*. Where, as here, there has been no hearing or trial on the merits, "all pleadings and affidavits must be construed in the light most favorable to [plaintiff] and all doubts must be resolved in . . . plaintiff's favor." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)*.

In determining whether jurisdiction over a defendant has been established, the Court may consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment. See *Bensusan Restaurant Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996)*, aff'd, *126 F.3d 25 (2d Cir. 1997)*. Moreover, although a plaintiff's allegations are ordinarily accepted as true at the pleadings stage, on a motion to dismiss for lack [*7] of jurisdiction, where "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction -- and plaintiffs do not counter that evidence -- the allegation may be deemed refuted." *Schenker v. Assicurazioni Generali S.p.A., Consol., 2002 U.S. Dist. LEXIS 12845, No. 98 Civ. 9186 (MBM), 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)* (citations omitted).

In a diversity action, n2 **personal jurisdiction** is determined by the law of the state in which the district court sits. *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*. In New York, a foreign defendant may be subject to suit under C.P.L.R. § 301, which has been interpreted to permit a court to exercise jurisdiction if the defendant "has engaged in such a continuous and systematic course of 'doing business' . . . as to warrant a finding of its 'presence' in the jurisdiction." *Koehler v. Bank of Bermuda, Ltd., 101 F.3d 863, 865 (2d Cir. 1996)* (citation omitted). Sporadic business activity in New York will not meet this standard; rather, "the court must be able to say from the facts that the [defendant] is present in [*8] the state not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y.2d 28, 33-34, 565 N.E.2d 488, 563 N.Y.S.2d 739 (1990)* (citation omitted).

n2 Complete diversity exists because defendants are citizens of Germany and GCG is a Delaware corporation with its headquarters in New York. (Eberhardt Decl. P1; Muller Decl. P1; Compl. P2). As to the amount in controversy, the complaint simply alleges that plaintiff is owed half of the "significant amounts" that defendants allegedly realized from the exercise of their options. (Compl. PP30-31). It appears, however, that there is a "reasonable probability" that the amount in controversy exceeds $ 75,000, because the complaint alleges that the holding company that held the shares of the majority shareholder group paid $ 29 million for the shares (Compl. P24), and that defendants exercised their options and realized the "significant amounts" when the holding company sold the shares. (Compl. P30). See *Mehlenbacher v. Akzo Nobel Salt, Inc., 216 F.3d 291, 296 (2d Cir. 2000)*; see also Pl. Opp. Br. at 10 ("Defendants benefited . . . in an amount in excess of ten million dollars."). The Court therefore has subject matter jurisdiction under *28 U.S.C. § 1332*.

[*9]

If a foreign defendant has no continuous and systematic presence in New York such that it is subject to general jurisdiction under C.P.L.R. § 301, it still may be subject to specific jurisdiction under C.P.L.R. § 302(a)(1). Section 302(a)(1) sets forth a two-prong test for determining **personal jurisdiction**. It provides that a court may exercise **personal jurisdiction** over any non-domiciliary "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state," but only "as to a cause of action arising from" the transaction in question. *N.Y.C.P.L.R. § 302(a)(1)* (McKinney 2001). In other words, a plaintiff seeking to rely on *Section 302(a)(1)* must show first that the defendant transacted to supply goods or services in the state and second that the cause of action arises from that transaction. "Even one instance of purposeful activity directed at New York is sufficient to create jurisdiction, whether or not defendant was physically present in the State, as long as that activity bears a substantial relationship to the cause of action." *Corporate Campaign, Inc. v. Local 7837, United Paperworkers Int'l Union, 265 A.D.2d 274, 697 N.Y.S.2d 37, 39 [*10] (1st Dep't 1999)*.

Finally, any exercise of **personal jurisdiction** under New York statutes must comport with the requisites of due process. See *Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001)*.

**B) Application**

GCG asserts that jurisdiction exists under both *Section 302(a)(1)* (specific jurisdiction) and Section 301 (general jurisdiction). I discuss each in turn.

**1. *Section 302(a)(1)***

GCG first contends that specific jurisdiction exists under *Section 302(a)(1)* because "the implementation of Defendants' scheme and breaches arose out of Defendants' actions in the United States generally, and specifically in New York." (Pl. Opp. Br. at 8). GCG argues that (1) the MBO transaction included the restructuring of Rheinmetall subsidiaries in the United States, and that "it is highly likely and GCG understands that many of the contacts in connection with this restructuring . . . occurred in New York" (id.); (2) General Capital was wrongfully replaced as financial advisor by New York-based Goldman, Sachs & Co., a fact that is not alleged in the complaint n3 (id. at 5-6, 9-11); and (3) that "most importantly, the holding company which [*11] held the shares of the majority shareholder group . . . negotiated and then acquired the shares of [Rheinmetall] held by Wyser-Pratte Management, a New York investment fund." (Id. at 9). In sum, GCG argues that "Goldman Sachs, New York investors, New York investment firms, and the capital markets in New York were instrumental in the implementation of the Defendants' conduct that forms the basis of [the] Complaint." (Id. at 10).

> n3 In fact, it appears that defendants actually retained the services of a German affiliate of Goldman Sachs called Goldman Sachs & Co. oHG. (Rutzel Decl. P8).

GCG's contentions in its brief are belied by its own pleadings. As alleged in the complaint, defendants here are two German citizens who live and work in Germany who are being sued for allegedly breaching contracts with a German company that were written in German and negotiated and executed in Germany. Specifically, with respect to their roles in the MBO transaction at issue, the complaint alleges that defendants: had [*12] several meetings with General Capital (Compl. P8); executed MBO agreements and agreed to a joint venture with General Capital in September 2001 (id. PP9-10); jointly (with General Capital) selected German tax and legal advisors (id.. P18); introduced the MBO plan to shareholders and won shareholder approval in November 2001 (id. P23); coordinated a strategy for public relations (id. P25); and breached the MBO agreements by proceeding with the transaction as structured by General Capital while conspiring to deprive General Capital of the benefits of the partnership. (Id. PP28-29).

With the exception of the one meeting that took place in London, all of these activities took place in Germany. (Eberhardt Decl. P17; Muller Decl. P17). In fact, apart from alleging that GCG is incorporated in Delaware and headquartered in New York (Compl. P2), an unidentified holding company purchased the shares of a New York investment fund in connection with the MBO (id. P24), and some "United States" investment funds recently purchased shares from the holding company (id. P30), the complaint does not contain a single reference to any activity that took place in the United States [*13]    generally, or New York in particular, let alone activity undertaken by defendants. GCG's assertions in its brief that considerations relating to the capital markets in New York played a role in the transaction are not properly considered by the Court on a motion to dismiss. See *Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)* ("Factual allegations contained in legal briefs or memoranda are . . . treated as matters outside the pleadings for purposes of *Rule 12(b)*."); *O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)* ("It is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

But even if these "facts" were properly before the Court, they would be insufficient as a matter of law to establish specific jurisdiction under *Section 302(a)(1)*. That section confers **personal jurisdiction** over defendants who "transact[] . . . business within the state or contract[] anywhere to supply goods or services in the state." *N.Y.C.P.L.R. § 302(a)(1)* (McKinney 2001). The Second Circuit has explained that several factors should be considered [*14]   in determining whether a foreign defendant transacts business in New York, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation;
>
> (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship;
>
> (iii) what the choice-of-law clause is in any such contract; and
>
> (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to

supervision by the corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004)* (citation omitted).

Put simply, none of these factors is alleged here. The agreements contain no choice-of-law clause. There is no allegation that any portion of the contracts that were allegedly breached were negotiated or executed in New York, nor that the fiduciary duties that were allegedly breached had any relation to New York, nor that any defendant visited New York for the purpose of meeting with parties to the [*15] contract. Moreover, it appears that GCG was recently incorporated in July 2004 (Hirsch. Decl. Ex. A), thus precluding the possibility -- if it had been pleaded -- that there was ever an on-going contractual relationship between plaintiff and defendants. (See also Eberhardt Decl. at P11; Muller Decl. at P11 (stating that defendants have never done business with GCG)).

In sum, the most that can be said of the complaint and supporting papers is that they allege that, as part of the MBO transaction, some Rheinmetall subsidiaries in the United States may have been restructured, and that defendants may have retained the services of a German affiliate of a New York-based investment bank. This is not "transacting business" in New York for purposes of *Section 302(a)(1)*, which requires an "articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., 362 F.3d at 23*.

**2. Section 301**

Nor has GCC established general jurisdiction under Section 301. Defendants are German citizens and residents with no alleged presence in New York, yet GCG asserts in its brief that "it is highly unlikely [*16] they do not have sufficient contacts [to establish general jurisdiction.]" (Pl. Opp. Br. at 11). If this were an allegation, it would not be a competent one. GCG also asserts that the Court should exercise jurisdiction over Eberhardt and Muller because they served as CEO and CFO, respectively, of a large German corporation with U.S. subsidiaries. (Pl. Opp. Br. 11-13). Again, even if

there were a competent allegation that Rheinmetall had a presence in New York, "it is well-settled that where a corporation is doing business in New York, an officer of the corporation does not subject himself[] individually to 301 jurisdiction unless he is doing business in [New York] individually." *United Mizrahi Bank Ltd. v. Sullivan, 2000 U.S. Dist. LEXIS 16157, No. 97 Civ. 9282 (LMM), 2000 WL 1678040, at *3 (S.D.N.Y. Nov. 6, 2000)* (citation omitted). Thus, for the Court to have jurisdiction over defendants under Section 301, "plaintiff must allege that they were doing business as individuals." Id. Assuming for a moment that plaintiff has adequately alleged that defendants were transacting business as individuals, there is no allegation or indication that either defendant -- as opposed to subsidiaries [*17] of the corporation for which they worked -- ever had any contact with New York in connection with this transaction.

**CONCLUSION**

Accordingly, the motion to **dismiss** for lack of **personal jurisdiction** is granted. The Court therefore does not address the prong of the motion seeking **dismissal** for forum non conveniens. The Court notes, however, that if it were to reach the issue, it would rule that this case should be litigated in Germany, for many of the same reasons discussed above. n4 The Clerk of Court shall enter judgment **dismissing** the complaint for lack of **personal jurisdiction,** and the Clerk is directed to close this case.

> n4 In this regard, the Court notes that apparently a lawsuit relating to this transaction has in fact been filed in Germany. (Eberhardt Decl. P3; Muller Decl. P3; von Stumm Aff. P2).

SO ORDERED.

Dated: New York, New York

October 17, 2005

DENNY CHIN

United States District Judge

**TAB
9**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LIZ CLAIBORNE, INC. and L.C. Licensing, Inc.,
Plaintiffs,
v.
MADEMOISELLE KNITWEAR, INC., individually
and d/b/a The Mill Ltd. Sweater Factory Outlet;
Charles Stefansky; Various John Does, Jane Does
and XYZ Companies, Defendants.
**No. 96 CIV. 2064 (RWS).**

Feb. 10, 1997.
As Amended Feb. 11, 1997.

Lewin & Laytin, P.C. New York City by Harley I.
Lewin, Richard B. Verner, G. Roxanne elings, Of
Counsel, for Plaintiffs.
Kaye, Scholer, Fierman, Hays & Handler, LLP New
York City by John W. Schryber, Ross D. Cooper,
Deborah K. Owens, Of Counsel, for Defendants.

*O P I N I O N*
SWEET, District Judge.
**\*1** Defendant Mademoiselle Knitwear Inc.
("Defendant" or "Mademoiselle") and Plaintiffs Liz
Claiborne, Inc. and L.C. Licensing ("Plaintiffs" or
"Claiborne") have made various motions. Upon the
parties' submissions and oral argument had before
this Court and for the reasons set forth below:

(1) Claiborne's motion to amend the complaint will
be granted;

(2) Mademoiselle's motion to compel deposition
testimony will be granted in part;

(3) Claiborne's cross-motion for a protective order
will be denied, provided, however, that the
depositions of Paul Charron and Laurie Keurian will
be limited to one-half day, and questions relating to
Claiborne's performance of the alleged contracts will
be prohibited;

(4) Claiborne's cross-motion to compel discovery will
be granted in part and denied in part;

(5) Claiborne's motion to extend the discovery

deadline pursuant to Rule 16(b) will be granted, and
the deadline extended to February 28, 1997 for the
limited purpose of completing outstanding discovery;
and

(6) The trial ready date will be adjourned to May 19,
1997.

*The Parties*

Plaintiff Liz Claiborne, Inc. is a "jobber" in the
garment industry. It contracts for the production of
apparel which it designs and ships. L.C. Licensing is
a wholly owned subsidiary of Liz Claiborne, Inc.
Both entities are Delaware corporations having their
principal places of business at 1441 Broadway, New
York, New York.

Defendant Mademoiselle, a garment manufacturer, is
a New York corporation with its principal place of
business at 930 Flushing Avenue, Brooklyn, New
York.

Defendant Charles Stefansky is an employee of
Mademoiselle.

Shraga Newhouse ("Newhouse") is President of
Mademoiselle. Claiborne seeks to amend the
complaint to add Newhouse, who was not originally
made a party to this action.

*Facts and Prior Proceedings*

The facts and prior proceedings of this case are set
forth in the previous opinions of the Court, *Liz
Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,*
No. 96 Civ. 2064, 1996 WL 346352 (S.D.N.Y. June
25, 1996), *Liz Claiborne, Inc. v. Mademoiselle
Knitwear, Inc.,* 1996 WL 668862 (S.D.N.Y. Nov. 19,
1996), familiarity with which is assumed. The facts
relevant to this motion are described below.

On March 21, 1996, Claiborne filed the complaint in
this action seeking preliminary and permanent
injunctive relief against Mademoiselle, alleging
trademark counterfeiting, trademark infringement and
unfair competition/false designation of origin arising
under the Trademark Act of 1946, 15 U.S.C. § 1051,
*et seq.,* as amended by the Trademark Counterfeiting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 2
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Act of 1984, <u>Public Law 98-473</u> (the "Lanham Act"), and for trade name infringement, unfair competition, unfair trade practices, trademark dilution, fraud, breach of contract and breach of the covenant of good faith and fair dealing under the laws of the State of New York.

Newhouse was not originally named as a defendant in the complaint. Claiborne now contends that Newhouse personally approved the allegedly infringing sales at issue in this action.

*2 On March 4, 1996, the Blouse, Skirt, Sportswear, Children's Wear & Allied Workers' Union, Local 23-25, UNITE (the "Union"), a union representing workers at Mademoiselle, brought an Order to Show Cause to intervene for the purpose of compelling arbitration. By Opinion dated June 23, 1996, the Union's motion was denied.

The parties subsequently made various discovery motions. Several of the motions were disposed of by an order dated October 8, 1996 and an opinion dated November 19, 1996.

In its complaint, Claiborne specifically seeks "an order dissolving any further obligation by plaintiff to order the manufacture of merchandise from or conduct any other business activity with defendants." In the complaint, Claiborne refers to a 1995 agreement between Claiborne and the Union. There is no reference to any other agreement in the complaint.

Mademoiselle has urged an "unclean hands" defense in this action, claiming that Claiborne has manufactured evidence of trademark violations in order to escape its obligations under a number of alleged agreements: the 1995 agreement between Claiborne and the Union (the "Union Agreement"); a 1992 agreement to purchase 1.4 million sweaters per year through 1998 (the "1992 Agreement"); an unspecified agreement to purchase approximately one million lycra sweaters (the "Lycra Agreement"), and perhaps other agreements. Claiborne acknowledges the existence of the first contract, but disputes the existence of the other agreements. While Mademoiselle has asserted an unclean hands defense in this action, it has not asserted a counterclaim for breach of contract.

On December 30, 1996, Claiborne made a motion to amend its complaint to add Shraga Newhouse ("Newhouse"), president of Mademoiselle, as a defendant. The motion to amend was argued on January 15, 1997, at which time it was deemed fully submitted.

By letter dated January 21, 1997, Claiborne moved to extend the discovery deadline and the time for filing of an expert report and adjourn the ready trial date 30 days. On January 15, 1997, Mademoiselle filed a motion to compel two deposition witnesses to testify. On January 23, 1997, Claiborne filed a cross-motion for a protective order and seeking to compel discovery. Oral argument on these motions was heard on January 29, 1997, at which time they were considered fully submitted.[FN1]

> FN1. Issues related to a motion for sanctions and the filing of an expert report were resolved at the hearing. This order resolves all outstanding issues raised by the parties.

*Discussion*

I. *Plaintiff's Motion to Amend the Complaint*

Plaintiffs have moved, pursuant to <u>Rules 15(a)</u> and <u>21, Fed. R. Civ. P.</u>, to amend the complaint to add Newhouse as a defendant.[FN2] <u>Rule 15(a)</u> provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." <u>Rule 21</u> provides "[p]arties may be dropped or added by order of the court on motion of any party ... at any stage of the action and on such terms as are just."

> FN2. Plaintiffs' amended complaint also dismisses various John Doe, Jane Doe and ABC Company defendants, makes minor wording changes to the two paragraphs and deletes another paragraph. There is no objection to these amendments.

The determination whether to grant or deny a motion to amend is within the discretion of the district court. <u>Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 46 (2d Cir. 1983)</u>. Absent undue delay, bad faith or dilatory motive in seeking the amendment, or undue prejudice to the opposing party resulting from the amendment, leave to amend should be liberally granted. <u>Foman v. Davis, 371 U.S. 178, 182 (1962)</u>; <u>Geoffrey, Inc. v. Tanks R Us, Inc., No. CV-91-2521, 1992 WL 402964, *1 (E.D.N.Y. Dec. 30, 1992)</u>.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** Mademoiselle does not dispute that Newhouse is a proper defendant in this action. However, Mademoiselle contends that Claiborne has inexcusably delayed in bringing the instant motion, has brought the motion in bad faith and with a dilatory motive, and that Mademoiselle will suffer prejudice if leave to amend is granted. Specifically, Mademoiselle contends that Claiborne had knowledge of the facts upon which it bases this motion since July 1996 and has no excuse for waiting seven months to seek leave to amend. Mademoiselle speculates that Claiborne's motive is to delay the proceedings to prevent Mademoiselle from having its day in court to clear its name of Claiborne's allegations, which Mademoiselle insists were fabricated. Mademoiselle asserts that the addition of Newhouse as a defendant will prejudice their right to an expeditious trial, because Newhouse may have counterclaims and defenses not available to Mademoiselle, requiring time-consuming motion practice and discovery that otherwise would be unnecessary.

A considerable period of delay between the filing of the original complaint and a motion to amend may be grounds for denying a motion to amend. *See Sanders v. Thrall Car Mfg. Co., 582 F. Supp. 945, 952 (S.D.N.Y. 1983), aff'd, 730 F.2d 910 (2d Cir. 1984).* Ordinarily, such a delay will only be grounds for denying leave to amend when the delay causes prejudice to existing parties to the action. *H.L. Hayden Co. v. Siemens Medical Sys., Inc., 112 F.R.D. 417, 419 (S.D.N.Y. 1986).*

Here, approximately nine months elapsed from the time Claiborne's complaint was filed in March 21, 1996 until the filing of the motion to amend on December 30, 1996. Arguably, Claiborne had notice of the facts that provide the grounds for a claim against Newhouse in July 1996. Thus, there was a "delay" of approximately five months from the time at which such a motion could have been made until the time it was actually made. While Claiborne may not have filed this motion as expeditiously as possible, the delay here is not sufficiently extreme to overcome the liberal standard for granting leave to amend. The cases cited by Mademoiselle generally involved considerably longer delays than the delay here. *See, e.g. Thrall, 582 F. Supp. at 952* (denying leave to amend where period of delay was two and one-half years); *Hayden, 112 F.R.D. at 418-19* (two year interval from filing of complaint to motion to amend).

Moreover, the cases in which leave to amend has been denied involved a more manifest effort to disrupt the expeditious resolution of a case than is evident here. In both *Hayden* and *Sanders,* the plaintiffs sought to amend their complaints while previously filed dispositive motions attacking the pleadings were being briefed or *sub judice. Hayden, 112 F.R.D. at 419; Sanders, 582 F. Supp. at 951.* In *Sanders,* the plaintiff twice previously had sought and obtained leave to amend after the filing and briefing of motions to dismiss, thus requiring further briefing on motions already submitted. After granting the second motion, the court warned the plaintiff that further motions to amend would be viewed with disfavor. The court denied the third motion for leave to amend, which was also submitted while a motion to dismiss was *sub judice. Sanders, 582 F. Supp. at 951-52.* In contrast, this is Claiborne's first motion to amend the complaint, there are no dispositive motions pending, and, despite Mademoiselle's assertions, there is no strong pattern of delay attributable solely to the actions of Claiborne. Both parties have been extremely litigious in discovery to date.

**\*4** With respect to Mademoiselle's assertion of bad faith and dilatory motive, Claiborne has advanced a plausible justification for its delay in seeking leave to amend. In accordance with Rule 15(a), Claiborne sought consent in October 1996 to amend the complaint to add Newhouse as a defendant and add an alternative basis for its unfair competition claims. Such an attempt to obtain consent justifies some delay in filing a motion to amend. *See Journal Publishing Co. v. American Home Ins. Co., 771 F. Supp. 632, 637 (S.D.N.Y. 1991)* (permitting amendment of complaint after four years where, inter alia, plaintiffs attempted to obtain consent to addition of claims to avoid motion practice). In correspondence between the parties, Mademoiselle objected to the addition of an alternative basis for the unfair competition claim, on the grounds that such a claim is barred by the automatic bankruptcy stay. Claiborne reasonably delayed filing its motion while investigating Mademoiselle's objections to the proposed amended pleadings. Mademoiselle's speculation about nefarious motives for the timing of the motion is insufficient to warrant a denying leave to amend.

Mademoiselle also claims that it will be prejudiced by the addition of Newhouse, because the trial will inevitably be delayed by discovery and motion practice related to Newhouse's potential defenses and counterclaims. Mademoiselle contends that such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

delays will exacerbate its already difficult financial position. However, the potential for additional delay is difficult to assess in this case. Claiborne contends that it will move for summary judgment regardless of whether Newhouse is a party. Thus, final resolution of the case will be "delayed" by briefing, argument and judicial consideration of a dispositive motion regardless of the determination of this motion to amend. Newhouse will be able to present his defenses and appropriate counterclaims in conjunction with any summary judgment motion, thus minimizing any additional delay that would result from his addition as a defendant.

Accordingly, Claiborne's motion to amend the complaint will be granted. <u>FN3</u>

> <u>FN3.</u>  Claiborne has agreed that it will not pursue a claim for breach of the covenant of good faith and fair dealing against Newhouse.

## II. *Mademoiselle's Motion to Compel Deposition Testimony*

Mademoiselle has moved to compel two witnesses, Sid Estreicher ("Estreicher") and Richard Owen ("Owen"), to respond to deposition questions that were objected to on grounds other than privilege. Claiborne objected to a variety of questions, at the time asserting primarily that the questions were not relevant. Claiborne now contends that Mademoiselle's questioning in this area is an attempt to obtain discovery for a threatened breach of contract action, and that such improper and abusive discovery is not permitted. Claiborne did not assert these grounds for objection or move for a protective order at the deposition.

<u>Rule 30(c), Fed. R. Civ. P.</u>, states that all objections made at the time of deposition shall be noted, but that "the examination shall proceed, with the testimony being taken subject to the objections." <u>Rule 30(d)(1)</u> provides that a deponent may be instructed not to answer "only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to present a motion [to cease an abusive deposition or for a protective order]." Absent a claim of privilege, instructions not to answer questions at a deposition are generally improper. *See* <u>National Microsales Corp. v. Chase Manhattan Bank,</u> 761 F. Supp. 304, 307 (S.D.N.Y. 1991); <u>Gould Investors v. General Ins. Co.,</u> 133 F.R.D. 103, 104 (S.D.N.Y. 1990); *see also* <u>Furniture World, Inc. v. D.A.C. Thrift</u> <u>Stores,</u> Inc., 168 F.R.D. 61, 63 (D.N.M. 1996) (under <u>Rule 30(d)(1)</u>, question's lack of relevance is not proper ground for instructing witness not to answer).

**\*5** Most of the questions to which Claiborne objects relate to the existence and terms of alleged agreements between Mademoiselle and Claiborne for the purchase of knit garments. Mademoiselle contends that questions about these agreements are relevant to its "unclean hands" defense, in that the agreements, which Claiborne wished to escape, provided a motivation for Claiborne to manufacture evidence of trademark infringement. Claiborne contends that these agreements, whose existence Claiborne disputes, are not relevant to this case, but only to a "threatened" breach of contract claim by Mademoiselle against Claiborne. They argue that because Mademoiselle has not brought counterclaims on the alleged contracts, discovery in this action relating to the contracts should be barred as abusive.

When the purpose of a discovery request is to gather information in proceedings other than the pending suit, discovery should be denied. <u>Oppenheimer Fund, Inc. v. Sanders,</u> 437 U.S. 340, 352 n.17 (1978). While the existence and terms of the various alleged contracts would undoubtedly be relevant to an action for breach of those contracts, their existence and terms are also relevant to Mademoiselle's defense of unclean hands. Mademoiselle contends that Claiborne manufactured evidence and attempted to induce infringing sales in order to avoid its obligations to order merchandise from Mademoiselle. The existence and terms of the alleged contracts are relevant to this defense, in that they make it more likely that Claiborne would be motivated to manufacture evidence that would be grounds for avoidance or dissolution of contractual agreements. *See* <u>Fed. R. Evid. 401</u> ("'Relevant evidence' means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.")<u>FN4</u> While the existence of the Union contract, whose existence and terms are not in dispute, may provide evidence of motive, this does not mean that the other alleged agreements are merely cumulative. These agreements, which Mademoiselle asserts were larger than the Union agreement and whose existence Claiborne disputes, could provide greater motive for Claiborne to take the extreme measures that Mademoiselle alleges in its affirmative defense.

> <u>FN4.</u>  The standard for discoverability of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 5
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

information under the Federal Rules of Civil Procedure is lower than the standard for admissibility of evidence under Rule 401, Fed. R. Evid. Rule 26(b), Fed.R.Civ.P., states that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the to the subject matter involved .... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Moreover, Claiborne itself took considerable deposition testimony of Mademoiselle witnesses regarding the existence and terms of the alleged agreements. If Claiborne's inquiry into the existence of the contracts was proper, it is difficult to see how Mademoiselle's inquiry into the same subject matter is improper.

Accordingly, Mademoiselle's motion to compel deposition testimony will be granted. However, no questions regarding Claiborne's performance or breach of the alleged agreements will be permitted. The relevance of such information to the present action, which does not allege breach of contract, is tenuous at best, and treads closer to the prohibition on using discovery in one action to gather information for use in another. The witnesses will answer all other questions, except for those which he or she is directed not to answer on grounds of attorney-client privilege or trade secret. When a witness is so directed, a statement will be placed on the record indicating the time of the allegedly privileged communication, the parties to the communication, and a general statement of the subject matter of the communication.

### III. *Claiborne's Cross Motion for a Protective Order*

**\*6** Claiborne has also moved for a protective order that would: (1) preclude further questioning of Estreicher and Owen; and (2) quash the depositions of Paul Charron, Claiborne's Chief Executive Officer and Chairman of the Board, and Lori Keurian, Claiborne's Deputy General Counsel. As discussed in Part II of this opinion, the questioning of Estreicher and Owen will proceed.

The deposition of Charron will proceed, but will be limited to one-half day. The deposition of Keurian will also proceed, again limited to one-half day. Moreover, no questioning on Claiborne's

performance or non-performance of any alleged contracts will be permitted. The parties are directed to schedule Charron's deposition so as to minimize the disruption of his schedule.

### IV. *Claiborne's Cross Motion to Compel Discovery*

Claiborne has cross-moved to compel responses to requests for admissions and to produce a large number of sweaters for inspection.

With respect to the requests for admissions, Mademoiselle's representations in its January 20, 1997 letter and at page 9 of their "Reply Memorandum in Further Support of Defendants' Motion to Compel and Defendants' Memorandum in Opposition to Plaintiffs' Fourth Motion for a Protective Order and Plaintiffs' First Motion to Compel" to Requests Numbered 10-12 and 17-18 shall be deemed Defendant's response, subject to Federal Rules of Civil Procedure 11, 26(e) and 37. Defendants are ordered to respond to Requests Numbered 4-6, 13-14 and 19-20. With respect to Requests 19-20, Mademoiselle is directed to respond to the requests as clarified in Claiborne's letter of January 13, 1996 at page 6.

Claiborne's motion to compel compliance with their third request for inspection of garments that did not have a Liz Claiborne tag will be denied. Claiborne contends that inspection of these garments is relevant to their claim of unfair competition, which may include a claim that Mademoiselle displayed non-Claiborne goods in close proximity to nearly identical Claiborne goods, thus unfairly trading on Claiborne's good will and reputation. The inspection will be denied, because the inspection of 50,000 garments would be unduly burdensome and not reasonably calculated to provide information relevant to their unfair competition claim that could not be obtained by other means, since the inspection of garments in the factory will provide little information about the retail display of those garments. Claiborne will not be permitted to inspect an enormous number of garments in an effort to rule out every theory upon which it may base its pleaded claims, without a more substantial showing of likelihood that the theory is supportable.

### V. *Scheduling Matters*

In view of outstanding discovery, Claiborne's motion to extend the discovery deadline pursuant to Rule

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

16(b) will be granted, and the deadline extended to February 28, 1997 for the limited purpose of completing outstanding discovery.

The trial ready date will be adjourned to May 19, 1997.

*Conclusion*

**\*7** For the reasons set forth above:

(1) Claiborne's motion to amend the complaint is hereby granted;

(2) Mademoiselle's motion to compel deposition testimony is hereby granted in part, in accordance with this opinion;

(3) Claiborne's cross motion for a protective order is hereby denied, provided, however, that the depositions of Paul Charron and Laurie Keurian will be limited to one-half day, and questions relating to Claiborne's performance of the alleged contracts will be prohibited;

(4) Claiborne's motion to compel discovery is hereby granted in part and denied in part, in accordance with this opinion;

(5) Claiborne's motion to extend the discovery deadline is hereby granted, and the deadline extended to February 28, 1997 for the limited purpose of completing outstanding discovery; and

(6) The trial ready date is hereby adjourned to May 19, 1997.

It is so ordered.

S.D.N.Y.,1997.
Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.