UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GUY CARPENTER & COMPANY, LLC and )
MARSH & McLENNAN COMPANIES, INC., )
                          )    Case No. 07 – CV- 3580 (DC)
       Plaintiffs, )
                           )
v. )
                           )
JULIAN SAMENGO-TURNER, RON )
WHYTE, and MARCUS HOPKINS, )
                           )
       Defendants. )

---

**DEFENDANT RON WHYTE'S APPENDIX OF UNPUBLISHED CASES
CITED IN BRIEFING ON MOTION TO DISMISS PLAINTIFFS' COMPLAINT
DUE TO LACK OF PERSONAL JURISDICTION AND FORUM *NON CONVENIENS***

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

*Attorneys for defendant Ron Whyte*

# TABS 10 - 12

# Table of Contents

| | Tab |
|---|---|
| *Albon v. Naza Motor Trading*, (2007) 2 All E.R. (Comm.) 719 ………………………… | 1 |
| *Anselmo v. Univision Station Group, Inc.*, No. 92 Civ. 1471 (RLC), 1993 WL 17173 (S.D.N.Y. Jan. 15, 1993) ………………………………………………………… | 2 |
| *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc.*, 00 Civ. 1248 (RWS), 2000 U.S. Dist. LEXIS 15088 (S.D.N.Y. Oct. 11, 2000) …………………………………… | 3 |
| *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432 (S.D.N.Y. July 22, 1996) ……………………………………… | 4 |
| *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 95 Civ. 7685 (RPP), 1996 U.S. Dist. LEXIS 11064 (S.D.N.Y. Aug. 1, 1996) ……………………………………… | 5 |
| EU Council Regulation (EC) No. 44/2001, Sec. 5, Art. 20 …………………………… | 6 |
| *Freeplay Music, Inc. v. Cox Radio, Inc.*, 04 Civ. 5238 (GEL), 2005 U.S. Dist. LEXIS 12397 (S.D.N.Y. June 22, 2005)…………………………………………………….. | 7 |
| *GCG Int'l, Inc. v. Eberhardt*, 05 Civ. 2422 (DC), 2005 U.S. Dist. LEXIS 23877 (S.D.N.Y. Oct. 17, 2005) …………………………………………………………... | 8 |
| *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, No. 96 Civ. 2064 (RWS), 1997 WL 53184 (S.D.N.Y. Feb. 11, 1997) ……………………………………………….. | 9 |
| *PaineWebber Inc. v. WHV, Inc.*, 95 Civ. 0052 (LMM), 1995 U.S. Dist. LEXIS 6514 (S.D.N.Y. May 12, 1995) ………………………………………………………… | 10 |
| *Pieczenik v. Dolan*, 03 Civ. 6336 (SAS), 2003 U.S. Dist. LEXIS 23295 (S.D.N.Y. Dec. 29, 2003) ..………………………………………………………………... | 11 |
| *Saab v. Citibank, N.A.*, No. 00 Civ. 6784 (BSJ), 2001 WL 1382577 (S.D.N.Y. Nov. 7, 2001) …………………………………………………………………………… | 12 |
| *Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, 00 Civ. 9227 (GEL), 2001 U.S. Dist. LEXIS 3001 (S.D.N.Y. Mar. 20, 2001) …………………………………….. | 13 |
| *Spencer Trask Ventures, Inc. v. Archos S.A.*, 01 Civ. 1169 (LAP), 2002 U.S. Dist. LEXIS 4396 (S.D.N.Y. Mar. 15, 2002) …………………………………………….. | 14 |
| *Swithenbank Foods Ltd v. Bowers*, (2002) 2 All E.R. (Comm.) 974, 981 (Q.B.) ……… | 15 |

*Varnelo v. Eastwind Transp., Ltd.,* 02 Civ. 2084 (KMW)(AJP), 2003 U.S. Dist.
LEXIS 1424 (S.D.N.Y. Feb. 3, 2003) ……………………………………………     16

*Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co., Ltd.*, 00 Civ. 9605 (DFE), 2002
U.S. Dist. LEXIS 789 (S.D.N.Y. Jan. 16, 2002) ………………………………     17

# TAB
# 10

LEXSEE 1995 U.S. DIST. LEXIS 6514

**PAINEWEBBER INCORPORATED, Plaintiff, - against - WHV, INC. AND WENTWORTH, HAUSER AND VIOLICH, INC., Defendants.**

95 Civ. 0052 (LMM)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 6514*

**May 12, 1995, Decided
May 16, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investment firm brought a breach of contract action against defendants, two corporations, to recover fees the corporations owed the firm for advising one of the corporations in the sale of its assets to the other. The corporations filed a motion to dismiss for lack of personal jurisdiction and improper venue, or alternatively, to transfer the action to the Northern District of California.

**OVERVIEW:** The corporations' sole places of business were in California. The investment firm's New York office became, under a written agreement, the advisor to one of the corporations in its sale of its assets to the other. The court granted the corporations' motion to dismiss for lack of personal jurisdiction. The court held that it did not have personal jurisdiction over the corporations pursuant to the New York Long-Arm Statute, *N.Y. C.P.L.R. 302(a)(1)*, because their telephone calls to New York, their occasional meetings in New York, and the investment firm's execution of the agreement in New York, did not constitute sufficient contacts with New York to constitute transacting business in that state under *N.Y. C.P.L.R. 302(a)(1)*. The court held that the acts of the investment firm as one of the corporation's agent in New York could not form the basis for the exercise of personal jurisdiction in an action between the agent and the principal. The court also held that it lacked personal jurisdiction over the corporations pursuant to the general jurisdictional statute, *N.Y. C.P.L.R. 301*, because the corporations were not doing business in New York with any permanence or continuity.

**OUTCOME:** In the investment firm's breach of contract action against the corporations seeking fees allegedly owed to the investment firm for advising one corporation in the sale of its assets to the other corporation, the court granted the corporations' motion to dismiss the investment firm's action for lack of personal jurisdiction. The court denied the investment firm's motion to transfer venue as moot.

**COUNSEL:**      [*1]      For PAINEWEBBER, INCORPORATED, plaintiff: Lewis R. Clayton, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

For WENTWORTH, HAUSER AND VIOLICH, INC., a State of Washington Corporation, defendant: Martin S. Hyman, Golenbock, Eiseeman, Assor & Bell, New York, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiff, PaineWebber Incorporated ("PaineWebber"), brought this action for breach of contract against defendants WHV, Inc. ("WHV") and Wentworth, Hauser and Violich, Inc. ("Wentworth") (collectively "Defendants"). Defendants now move to dismiss the complaint for lack of personal jurisdiction and improper venue pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(3)* and *28 U.S.C. § 1391*. In the alternative,

1995 U.S. Dist. LEXIS 6514, *

Defendants seek to transfer the action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below Defendants' motion is granted and the case dismissed for lack of personal jurisdiction.

## I. Facts

The following are the uncontested facts as presented by the parties. PaineWebber is a Delaware corporation involved in the investment business with offices in a number of states including New York and California. WHV is a California corporation with its principal place of business in San Francisco, California. (Violich Decl. P 3.) Wentworth is a Washington corporation having a sole place of business in San [*2] Francisco, California. (Donahoe Aff. PP 2-3.) WHV and Wentworth have never had a place of business outside of California; have never maintained any business, representatives, offices, agents or employees in the State of New York; and have never advertised at any time in New York. (Id. at PP 4-7; Donahoe Aff. PP 4-5.)

In 1989, Kent Penwell ("Penwell"), an employee at PaineWebber's San Francisco office, at his own initiative, contacted Bradford Hearsh ("Hearsh"), a managing director at PaineWebber in New York, and informed him that WHV might be interested in selling its assets. (Violich Aff. P 8.) As a result, Hearsh initiated a contact with WHV and flew to San Francisco on more than one occasion in 1989 to negotiate a contract between PaineWebber and WHV regarding the sale of WHV's assets. (Id. at P 9.) The negotiations were conducted in person in San Francisco and during telephone conferences between San Francisco and New York. (Hearsh Aff. P 7; Violich Aff. P 10.) WHV's representative never went to New York for negotiations. (Violich Aff. P 10.)

Following the negotiations, PaineWebber presented a letter agreement ("Agreement") to WHV (Ex. A attached to Hearsh Aff.), which WHV [*3] signed in San Francisco (Violich Aff. P 9), and PaineWebber signed in New York. (Hearsh Aff. P 7.) According to the Agreement, PaineWebber was to act as a financial adviser and an exclusive agent for purposes of sale of WHV stock and/or assets. (Ex. A attached to Hearsh Aff. at 1.) During the duration of the Agreement, PaineWebber researched the market and prepared a marketing brochure and a list of potential buyers. (Hearsh Aff. PP 9-10.) Most of the work was done in PaineWebber's New York office. (Id. at P 11.) During the term of PaineWebber's engagement, WHV's representatives had meetings with PaineWebber in New York on three occasions. (Id. at P 14.)

In 1993, WHV started negotiations with Laird, Norton Trust Company ("Laird"), a Washington state

corporation, for the purchase of WHV's assets. (Ex. B to Hearsh Aff.; Hearsh Aff. P 4.) Laird incorporated a subsidiary, Wentworth, on September 20, 1993 and on or about April 24, 1994, Wentworth purchased substantially all of WHV's assets. (Hearsh Aff. P 4.) PaineWebber assisted WHV in this transaction by preparing financial models evaluating the transaction and analyzing the purchase contract. (Id. at P 15.)

Defendants are [*4] members of PaineWebber's "wrap-free" program in which PaineWebber markets the services of certain investment managers to PaineWebber's clients. (Hearsh Aff. P 6.) This program is based in, and managed from, PaineWebber's office in Weehawken, New Jersey. (Fox Decl. PP 4-5.)

PaineWebber brought this action for breach of contract alleging Defendants refusal to pay fees owed to PaineWebber for services performed under the Agreement.

## II. Personal Jurisdiction

Defendants move for dismissal of the action arguing insufficient contacts with New York state and lack of personal jurisdiction.

Subject matter jurisdiction in this action is based on the diversity of citizenship. In a diversity action, a court must apply the jurisdictional provisions of the forum state to determine whether personal jurisdiction exists over a nonresident defendant. See *Savin v. Ranier, 898 F.2d 304, 306 (2d Cir. 1990)* (citing *Arrowsmith v. United Press Int'l, 320 F.2d 219, 222-25 (2d Cir. 1963)* (en banc)). The Court must apply New York's long-arm jurisdiction statute (New York Civil Practice Law and Rules (C.P.L.R.) § 302) or general jurisdiction statute (C.P.L.R. § 301), and construe the pleadings [*5] and affidavits in the light most favorable to the plaintiff. See *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985).*

### A. New York Long-Arm Jurisdiction

Under *New York C.P.L.R. § 302(a)(1)*, jurisdiction is proper when: (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business. *United States Theatre Corp. v. Gunwyn/Lansburgh Ltd., 825 F. Supp. 594, 595 (S.D.N.Y. 1993)* (citing *McGowan v. Smith, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (Ct. App. 1981)).*

A defendant is "transacting business" when it has "purposefully availed" itself of conducting business in New York thus invoking the benefits and protection of New York laws. *McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (Ct. App. 1967)* (citing *Hanson v. Denckla, 357 U.S. 235,*

*253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)).* A court must look at the totality of circumstances to determine the existence of purposeful activity and may not subject the defendant to jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *Cutco Industries* [*6] *v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986); see also, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* It is the "nature and quality" and not the amount of New York contacts which determine the purposeful activity. *Standard Enterprises, Inc. v. Bag-It, Inc. 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987).* The requisite "minimum contacts" must provide a fair warning to the defendant of a possibility of being subject to courts of the forum state. *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (Ct. App. 1988)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)).*

PaineWebber argues that the negotiation of the Agreement during telephone conferences held between San Francisco and New York, the execution of the Agreement by PaineWebber in New York, the performance of the Agreement in New York, and three visits of WHV representatives to PaineWebber's office in New York amount to "transacting business" in New York. The Court disagrees.

WHV's telephone calls to, and occasional meetings in, New York lack the requisite "nature and quality." Telephone calls [*7] are insignificant for purposes of jurisdiction except when defendants use the telephone to actively participate in business transactions in New York. *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)* (finding jurisdiction over a defendant who participated in an auction by telephone); *PaineWebber, Inc. v. Westgate Group, Inc., 748 F. Supp. 115, 119 (S.D.N.Y. 1990)* (finding frequent phone calls and telecopies to PaineWebber's office in New York insufficient for jurisdictional purposes when the defendant did not intend to transact business in New York); *United States Theatre, 825 F. Supp. at 596* (finding defendant's "substantial" communication with the plaintiff in New York insufficient to find jurisdiction when the defendant never intended to do business in New York).

Similarly, occasional meetings in the forum state that are exploratory, unproductive or insubstantial are insufficient to establish requisite contacts with the state. *PaineWebber, 748 F. Supp. at 115* (finding a meeting in New York insufficient to meet the "transacting business" standard when a purchase agreement modified at the meeting was negotiated in [*8] Texas); *Pryor v. Haisfield, 1990 U.S. Dist. LEXIS 14197, 1990 WL 165687 (S.D.N.Y.)* (exploratory meetings in New York when defendant contracted for services to be performed

in New York insufficient); *Saudi Computer Aided Translation v. Weidner Comm., 663 F. Supp. 1104 (S.D.N.Y. 1987)* (an unproductive and insubstantial meeting in New York may be insufficient to constitute transacting business).

In the instant case, WHV's telephone communications with PaineWebber were used to complete contract negotiations initiated by PaineWebber and commenced in San Francisco. The purpose of the communications was not to project WHV into the New York market but to obtain services to sell WHV's stock or assets. WHV representatives never came to New York to negotiate the contract. In fact, during the three-year duration of the Agreement, WHV representatives came to New York only for three minor meetings. These meetings did not involve contract negotiations, no contracts were signed, and the March 2, 1993 meeting was unproductive since it did not, as planned, result in the expansion of PaineWebber's efforts to sell WHV. (Hearsh Aff. P 14.) These events were no more than "random" and "attenuated."

The fact that PaineWebber [*9] signed and performed the Agreement in New York with full knowledge of WHV does not bring WHV's random contacts with the State up to the level of "purposeful availment". The signing of the Agreement by PaineWebber in New York is not dispositive as to WHV when WHV signed the Agreement in California. *Standard Wine & Liquor Co. v. Bombay Spirits Co., 20 N.Y.2d 13, 281 N.Y.S.2d 299, 228 N.E.2d 367 (Ct. App. 1967).* In Standard Wine, the court found the signing of the contract in New York by the plaintiff insignificant when the defendant, who had no offices, telephone number, employees or business accounts in the State, signed the contract in Scotland.

The fact that PaineWebber performed services for WHV in New York is also not sufficient to subject WHV to New York jurisdiction. When the defendant contracts for services to be performed in New York but does not seek out a New York forum and connections with New York, as WHV did here, it may not, without more, be subjected to personal jurisdiction. *Pryor v. Haisfield, 1990 U.S. Dist. LEXIS 14197, 1990 WL 165687 (S.D.N.Y.).*

PaineWebber also relies on the language of C.P.L.R § 302(a)(1) that "a court may exercise personal jurisdiction over any non-domiciliary [*10] . . . who in person or through an agent: transacts any business within the state . . ." PaineWebber argues that it was WHV's agent in New York. This is irrelevant to this motion. Even if PaineWebber were WHV's agent in New York, which the Court need not decide for this motion, the acts of an agent may not be used to subject the defendant to

jurisdiction when the suit is between the agent and the principal. *Laufer v. Ostrow, 55 N.Y.2d 305, 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 (Ct. App. 1982).*

In short, PaineWebber initiated discussions with WHV, WHV did not solicit PaineWebber's services regarding the sale of WHV's assets, did not travel to New York to negotiate or execute the Agreement, did not request that services be performed in New York, and did not seek business or sale of its assets in New York. In fact, WHV sold its assets to a Washington corporation. The location of PaineWebber in New York was irrelevant to WHV. The services could have been equally well performed by PaineWebber or any other investment corporation located elsewhere in the country. Under the circumstances, WHV's contacts with New York were sporadic and insufficient to provide "fair warning" of the possibility [*11] of being subject to the courts of this state. This Court has no personal jurisdiction over WHV under C.P.L.R. 302(1)(a).

The Court can have personal jurisdiction over Wentworth, the other defendant in this case, only if there is jurisdiction over WHV. This is because PaineWebber's only allegation regarding Wentworth is that Wentworth is a mere continuation of WHV and its successor in liability and jurisdiction. As decided above, the Court has no jurisdiction over WHV under C.P.L.R. § 302(1)(a) and, therefore, has no jurisdiction over Wentworth.

### B. General Jurisdiction

Under *New York C.P.L.R. § 301*, New York courts have jurisdiction over nonresident defendants, including corporations, if the defendant has been "doing business" in the state. A defendant corporation is "doing business" if the aggregate of the corporation's activity "is such that it may be said that the corporation is present in the State 'not occasionally or casually, but with a fair measure of permanence or continuity.'" *Laufer, 449 N.Y.S.2d at 458* (quoting *Tauza Susquehanna Coal Co., 220 N.Y. 259, 267 (1917)).*

The classic indicia of doing business in New York include maintaining a local address and [*12] telephone number, bank accounts or property, and employees or representatives in the State. *Pneuma-Flo Systems, Inc. v. Universal Mach. Corp., 454 F. Supp. 858, 861 (S.D.N.Y. 1978).* PaineWebber does not allege that WHV or Wentworth ever exhibited any of the above indicia. In

fact, PaineWebber does not explicitly argue jurisdiction under C.P.L.R. § 301. It does argue, however, that Defendants had contacts with the State by participating in PaineWebber's "wrapfree" program in which PaineWebber offered Defendant's services to PaineWebber's customers. Since the cause of action in this case does not arise out of the "wrap-free" program, Defendants' contacts with the State under this program may only be relevant under C.P.L.R. § 301.

PaineWebber neither alleges nor shows that Defendants solicited New York customers and business through the "wrap-free" program. Nor does PaineWebber allege that Defendants performed services for PaineWebber's New York customers or that the program had any significant contact with the State. In fact, Defendants assert that the program is distributed and managed from New Jersey. (Fox Decl. PP 4-5.) PaineWebber's only allegation is that Defendants made [*13] approximately $ 1 million through the program. (Hearsh Aff. P 6.) The amount of money made by a defendant is not indicative, without more, of whether the defendant was doing business in New York. See *Nordic Bank PLC v. Trend Group, Ltd., 619 F. Supp. 542, 565-566 (S.D.N.Y. 1985).* In Nordic Bank, the court found that, even though defendants marketed in excess of $ 100 million of commercial paper through brokerage firms, the contacts with New York were sporadic and limited.

Defendants' contacts with New York were not sufficiently continuous and permanent to amount to "doing business" in the State. Jurisdiction under C.P.L.R. § 301 is not present.

### III. Conclusion

For the reasons set out above, Defendants' motion is granted and the action is dismissed for lack of personal jurisdiction over Defendants. The alternative motion to transfer the action pursuant to *28 U.S.C. § 1404 (a)* is denied as moot.

Dated: May 12, 1995
New York, New York

SO ORDERED.

LAWRENCE M. McKENNA

U.S.D.J.

# TAB
# 11

GEORGE PIECZENIK, Plaintiff, -against- PETER DOLAN, PAMELA HAY, "JOHN DOES" 1 THROUGH 59, BRISTOL-MYERS SQUIBB CO., CAMBRIDGE ANTIBODY TECHNOLOGY GROUP, DOMANTIS, MEDICAL RESEARCH COUNCIL-LABORATORY OF MOLECULAR BIOLOGY, THE COMMISSIONER OF PATENTS AND TRADEMARKS OF THE UNITED STATES PATENT OFFICE, AN AGENCY OF THE DEPARTMENT OF COMMERCE, and THE COMMISSIONER OF FOOD AND DRUGS, Defendants.

03 Civ. 6336 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 23295*

December 29, 2003, Decided
December 30, 2003, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at, in part, Motion denied by *Pieczenik v. Cambridge Antibody Tech. Group, 2004 U.S. Dist. LEXIS 4127 (S.D.N.Y., Mar. 16, 2004)*

**PRIOR HISTORY:** *Pieczenik v. Dyax Corp., 265 F.3d 1329, 2001 U.S. App. LEXIS 20497 (Fed. Cir., 2001)*

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of personal jurisdiction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant council moved to dismiss, for lack of personal jurisdiction and lack of subject matter jurisdiction, plaintiff doctor's action alleging patent infringement.

**OVERVIEW:** The doctor failed to allege facts sufficient to support a finding of personal jurisdiction over the council under N.Y. C.P.L.R. 301. The doctor did not provide any basis upon which to infer that the council was "doing business" in New York. The doctor alleged that council scientists went to New York to speak and present new discoveries and accept awards, but such speaking engagements did not amount to "doing business" in New York. The court also did not have jurisdiction under N.Y. C.P.L.R. 302(a)(1) as to any of the claims. As to the breach of contract claim, the document assumed for argument's sake to be a contract was negotiated in England, and that did not amount to transacting business in New York. As to patent infringement, the doctor did not allege that the relevant licenses were negotiated or executed in New York. As to the doctor's claims that the council owned unidentified patents that were invalid in light of his own patents, the council was not alleged to have transacted business in New York in connection with those patents. As to his RICO claim, he again failed to allege facts relating to the conspiracy that would suggest a connection between New York and the council.

**OUTCOME:** The motion to dismiss for lack of personal jurisdiction was granted.

**COUNSEL:** George Pieczenik, Plaintiff, Pro se, New York, New York.

For Medical Research Council, Defendant: Stephen S. Rabinowitz, Esq., Pennie & Edmonds LLP, New York, New York.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION:**

2003 U.S. Dist. LEXIS 23295, *

## OPINION AND ORDER

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Dr. George Pieczenik, appearing pro se, commenced this action against numerous defendants alleging patent infringement. Dr. Pieczenik further alleges that patents owned by defendants are invalid in light of his '363 and '448 patents. n1 Defendant MRC now moves to dismiss the action against it on two grounds: (1) lack of personal jurisdiction and (2) lack of subject matter jurisdiction. The MRC also argues that the RICO claims against it should be dismissed under *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons set forth below, the MRC's motion to dismiss for lack of personal jurisdiction is granted. n2

> n1 Pieczenik also alleges that the Medical Research Council Laboratory of Molecular Biology ("MRC"), Cambridge Antibody Technology Group, PLC ("CAT"), and Domantis, Inc. ("Domantis") colluded with Dyax Corp. "to create artificial scientific collaborations and agreements ... to give the impression of Dyax being more than a 'virtual' patent licensing company." Second Amended Complaint ("SAC") P 53 (articulating Racketeer Influenced and Corrupt Organizations, *18 U.S.C. § 1961 et seq.*, ["RICO"] claim). Pieczenik also appears to be alleging that this collusion resulted in a breach of contract by the MRC. See id. P 36.

[*2]

> n2 Because the motion to dismiss based on lack of personal jurisdiction is granted, I will not address subject matter jurisdiction or failure to state a RICO claim.

## I. BACKGROUND

### A. The Moving Defendant

The MRC has its principal place of business in Cambridge, England. Pieczenik alleges that there is personal jurisdiction over the MRC in New York because the MRC: (1) entered into contracts with a New York resident (Pieczenik), n3 (2) sends MRC scientists to speak in New York, n4 (3) granted licenses to New York citizens, n5 (4) uses legal counsel with offices in New York, n6 and (5) has a majority ownership interest in CAT and an undisclosed interest in Domantis. n7

n3 See SAC P 36.

n4 See 11/2/03 Letter to the Court from Dr. George Pieczenik ("11/2 Pl. Ltr.") at 2. Prior to the November 5, 2003 conference, the parties exchanged letters relating to Pieczenik's jurisdictional arguments. The parties agreed at the November 5, 2003 pre-motion conference that the MRC's pre-conference letter of October 30, 2003 should be deemed the motion, and Pieczenik's letter of November 2, 2003 should be considered his opposition papers relating to the MRC's motion. Transcript of November 5, 2003 Pre-Motion Conference ("Tr.") at 24. Due to some of the potentially inflammatory language contained in Pieczenik's letter, the parties' agreed that Pieczenik would redact and resubmit his letter for docketing. Pieczenik resubmitted his letter after this motion was fully submitted on November 26, 2003 (i.e., after the MRC had submitted its reply papers). In addition to redacting the letter as discussed on November 5, he added some new material. See 12/19/03 Letter to the Court from Dr. Pieczenik ("12/19 Pl. Ltr."). For instance, Pieczenik added the following language:

> My condition for removing the MRC from the Amended Complaint is that it put a plaque up on its walls announcing my suggestion of monoclonals to Cesar Milstein, my demonstrating that acrylamide gels resolve by one nucleotide to Fred Sanger, my creation and then reduction to practice of the first combinatorial laboratory at the MRC and their allowing me to work in their laboratories on any experiment I may wish in the future at their expense and preserving my rights.

Id. at 2. Although Pieczenik should have understood from the conference held on November 5, see Tr. at 27, that he was not entitled to append new arguments to his existing letter, because (1) he is proceeding pro se and is therefore entitled to some leeway in his submissions and (2) because the additional information does not relate to the jurisdictional issue, I will consider both letters as plaintiff's opposition for purposes of deciding this motion.

2003 U.S. Dist. LEXIS 23295, *

In violation of my individual rules and procedures, plaintiff also submitted a sur-reply, dated November 26, 2003. See 11/26/03 Letter to the Court from Dr. George Pieczenik ("11/26 Pl. Ltr."). Because the method by which the parties agreed to submit this motion was unorthodox, I will also consider this letter for purposes of this motion.

[*3]

n5 See SAC PP 25-27.

n6 See 11/2 Pl. Ltr. at 3.

n7 See SAC PP 8, 36. Martin Wood disputes this, stating, "The MRC does not own or occupy any premises or operate any facility in the State of New York, has no telephone number, postal address, bank accounts or agent for service of process in the State of New York, and is not licensed to do business in the State of New York." 10/29/03 Declaration of Martin Wood, MRC Technology's Director of Licensing and Agreements ("Wood Decl.") P 4.

**B. Jurisdictional Allegations**

**1. Contract Between Pieczenik and the MRC**

Pieczenik alleges that the MRC signed agreements with a New York resident (Pieczenik), which "gives this Court jurisdiction, thereby." n8 The "contract" is a letter from an MRC employee n9 to Pieczenik, briefly describing the terms of Pieczenik's employment (for several months in 1987 and 1988) as a visiting scientist at the MRC. n10 Specifically, the contract prospectively addressed the filing of patents during the period of Pieczenik's research at the MRC. n11 Both parties entered into the agreement while Pieczenik [*4] was living in **England**. n12 Pieczenik alleges that when he entered into the agreement, he was a New York **resident**. n13 He does not allege that this contract was negotiated in New York, signed by either party in New York, or performed in New York. However, Pieczenik alleges that the contract was faxed to him in New York years later "because [he] didn't have a copy of it." n14

n8 SAC P 36.

n9 This employee is probably Gordon Koch, although that is not evident from the letter that Pieczenik submitted, which is cut off above the

signature line. See 7/20/87 Letter to George Pieczenik from Gordon Koch, MRC employee ("Koch Ltr."), Ex. B to SAC. Attached with the letter is a form filled out by Pieczenik (listing his local address as a hotel in Cambridge and his permanent home address, which is a New York residence) and a document entitled "Notes for the Guidance of Visiting Scientific Workers" dated February 1981, which was signed by Pieczenik in March of 1988. The series of documents apparently all relate to the Koch Letter and Pieczenik's tenure as a visiting scientist and were all signed and negotiated by the parties in England. See Tr. at 22-24. As such, I will consider these documents as a single "contract," entered into in England.

[*5]

n10 See Tr. at 22.

n11 See id.; see also Koch Ltr.

n12 See Tr. at 22.

n13 See 11/2 Pl. Ltr. at 1.

n14 Tr. at 23.

**2. MRC Scientists Visiting New York**

Pieczenik alleges that the MRC has "always sent scientists to New York to speak and present its discoveries; even Plaintiff's discoveries." n15 Additionally, Pieczenik alleges that the MRC and its scientists have "gotten grants from NY institutions such as the Rockefeller Foundation through out [sic] its whole history. MRC scientists have always presented work, phage antibodies, inter alia, at New York Universities ... and received awards from such institutions." n16

n15 11/2 Pl. Ltr. at 2.

n16 Id.

**3. License Agreements**

Pieczenik alleges that the MRC has licensed rights under its phage display patents in "New York, the United States and the world," thereby infringing and contributing to infringement of his '363 and [*6] '448

2003 U.S. Dist. LEXIS 23295, *

patents. n17 The MRC disputes this, alleging that the "MRC has never granted licenses under its phage display patents to any entity located in the State of New York, although some of the MRC's licensees are free to grant sublicenses internationally." n18 Moreover, "apart from one license to a Japanese company, the MRC has licensed its phage display patents only to entities located in the United Kingdom." n19 Finally, the MRC states that it does not "control, direct, or supervise the activities of its licensees in granting sublicenses under the MRC's phage display patents." n20

n17 SAC P 25; see also id. PP 26-27.

n18 Wood Decl. P 5.

n19 Id.

n20 Id.

### 4. Legal Counsel in New York

Pieczenik argues that "having legal council [sic] as agents in New York is grounds for jurisdiction. Several of the MRC patents in this area of phage display and combinatorial libraries have and still use firms with offices in New York, i.e., Katten Muchin Zavis Rosenman, Rogalskyj & Weyand, [*7] et al." n21 The MRC states that "all of the United States patents and patent applications owned or co-owned by the MRC have been prosecuted by patent attorneys or patent agents located in Illinois, Virginia and California and the MRC has never used patent attorneys or agents located in the State of New York for prosecuting its phage display patents." n22

n21 11/2 pl. Ltr. at 2.

n22 Wood Decl. P 5. Even assuming that Pieczenik is correct and the MRC does "still use firms with offices in New York," 11/2 Pl. Ltr. at 3, the fact that a law firm maintains an office in New York is insufficient to confer jurisdiction. This is particularly true where, as here, the law firm in question is not even a New York-based firm.

### 5. Ownership in CAT and Domantis

Pieczenik alleges that the MRC has a "major ownership interest in CAT and undisclosed interest in Domantis." n23 CAT is incorporated in Australia and has its principal place of business in Cambridge, England. n24 Domantis is a Delaware corporation that operates [*8] scientific laboratories in Cambridge, England and has commercial offices in Cambridge, Massachusetts. n25 According to Wood, the MRC owns approximately 1.6% of the shares in CAT and 11% of the shares of Domantis. n26

n23 SAC P 8.

n24 See id. P 7.

n25 See id. P 5.

n26 See Wood Decl. P 5. Pieczenik's contentions regarding the MRC's ownership interest in CAT and Domantis warrant only brief discussion. First, neither CAT nor Domantis is alleged to have any significant ties to New York. Second, even assuming that CAT and Domantis do business in or have engaged in relevant business activities in New York, and assuming that the MRC has a majority ownership in CAT, Pieczenik fails to allege that the MRC exercises any control over the activities of CAT. As the Second Circuit has explained:

> Where [] the claim is that the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the State ... For New York courts to have personal jurisdiction in that situation, the subsidiary must be either an "agent" or a "mere department" of the foreign parent ... To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary does all the business which [the parent corporation] could do were it here by its own officials ... In determining whether the subsidiary is a "mere department" of the parent ... the court must consider four factors ... common ownership ...; financial dependency of the subsidiary on the parent corporation; [] the

degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and [] the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

*Jazini v. Nissan Motor Co., 148 F.3d 181, 184-85 (2d Cir. 1998)* (quotation marks and citations omitted) (articulating the basic standard governing the New York presence of a parent through its subsidiary in the context of *section 301 of New York's Civil Practice Law and Rules*); see also Realuyo v. Villa Abrille, 2003 U.S. Dist. LEXIS 11529, No. 01 Civ. 10158, 2003 WL 21537754, at *6 n.3 (S.D.N.Y. July 8, 2003) ("Although a foreign parent corporation may be subject to the Court's long-arm jurisdiction based on the activities of a subsidiary, the subsidiary must [be] an agent or mere department of the corporation."). For the foregoing reasons, Pieczenik's allegations that the MRC holds a majority ownership in CAT and an undisclosed interest in Domantis cannot establish personal jurisdiction over the MRC in New York.

[*9]

## II. LEGAL STANDARD n27

n27 It should be noted that inasmuch as "this case relates to the infringement of patents [it] is [] governed by the law of the Federal Circuit." Hypoxico, Inc. v. Colorado Altitude Training LLC, 2003 U.S. Dist. LEXIS 11862, No. 02 Civ. 6191, 2003 WL 21649437, at *1 (S.D.N.Y. July 14, 2003). The Federal Circuit's approach to evaluating a defendant's motion to dismiss for lack of personal jurisdiction is consistent with that of the Second Circuit. See 2003 U.S. Dist. LEXIS 11862, at *2. Moreover, "when determining a personal jurisdiction case under Federal Circuit law, this Court must first apply the state long-arm statute and then determine whether asserting jurisdiction would violate federal due process." Id.

Upon motion, a court is obligated to dismiss an action against a defendant over which it has no personal jurisdiction. n28 A plaintiff bears the ultimate burden of establishing, by a preponderance of the evidence, that the court has jurisdiction over the defendant. n29 However, "prior to discovery, [*10] a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." n30 A plaintiff "can make this showing through his own affidavits and supporting materials[,] containing an averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant." n31 Thus, a court may consider materials outside the pleadings, n32 but must credit the plaintiff's averments of jurisdictional facts as true. n33 "Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." n34

n28 See *Fed. R. Civ. P. 12(b)(2)*; see also *In re Ski Train Fire in Kaprun, Austria on November 11, 2000 (Siemens Austria), 230 F. Supp. 2d 403, 406 (S.D.N.Y. 2002).*

n29 See *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)*; *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).*

[*11]

n30 *Jazini, 148 F.3d at 184* (citations and quotation marks omitted); see also *Koehler v. Bank of Berm., Ltd., 101 F.3d 863, 865 (2d Cir. 1996).*

n31 *Whitaker v. American Telecasting Inc., 261 F.3d 196, 208 (2d Cir. 2001)* (citations and quotation marks omitted).

n32 See *Hsin Ten Enter. USA, Inc. v. Clark Enter., 138 F. Supp. 2d 449, 452 (S.D.N.Y. 2000).*

n33 See *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).*

n34 *A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)*; see also *Whitaker, 261 F.3d at 208.*

The determination of whether a federal court has personal jurisdiction over a defendant is a two-step

process. First, the court must determine whether the plaintiff has shown that the defendant is subject to personal jurisdiction under the forum state's laws. n35 Second, the court must evaluate whether its assertion of jurisdiction pursuant to the forum state's laws comports with the requirements of [*12] due process. n36

n35 See *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27*; *Met Life, 84 F.3d at 567.*

n36 See *Bensusan Rest. Corp., 126 F.3d at 27*; *Met Life, 84 F.3d at 567.* Because the MRC is not subject to personal jurisdiction under New York's jurisdictional statutes, it is unnecessary to address the constitutional requirements for personal jurisdiction.

## III. DISCUSSION

### A. *Section 301* n37

n37 Plaintiff fails to identify the statutory provisions on which his jurisdictional arguments are based. Accordingly, I will evaluate his jurisdictional arguments under both *sections 301 and 302.*

Under New York law, a foreign corporation can be sued for all purposes if it is present or "doing business" in the state. n38 Under this test, "a foreign corporation is amenable to suit in New [*13] York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." n39 That is, a "corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action ... if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" n40 "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York." n41

n38 See *N.Y. C.P.L.R. § 301* (McKinney 2003) (codifying caselaw that utilizes "doing business" standard); *Aerotel Ltd. v. Sprint Corp., 100 F. Supp. 2d 189, 191 (S.D.N.Y. 2000)* (interpreting *section 301*).

n39 *Aerotel Ltd., 100 F. Supp. 2d at 191-92* (quoting *Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 536, 227 N.E.2d 851, 281 N.Y.S.2d 41 (1967)).*

n40 *Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)* (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985)).*

[*14]

n41 *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001)* (quotation marks omitted). To determine whether a foreign corporation is doing business in New York, courts have focused on a traditional set of indicia, assessing whether the company: (1) has an office in the state; (2) has any bank accounts or other property in the state; (3) has a phone listing in the state; (4) does public relations work there; and (5) has individuals permanently located in the state to promote its interests. See *Wiwa, 226 F.3d at 98.* While plaintiff does not allege that the MRC has any of these five contacts, this alone does not mean that there is no jurisdiction under *section 301*. See *Met Life, 84 F.3d at 570* [degrees] ("Contacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole."); *Landoil Res. Corp. v. Alexander & Alexander, Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)* ("The Court must [] analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York.'") (quoting Weinstein, Korn & Miller, *New York Civil Practice, P 301.16, at 3-32)).*

[*15]

Pieczenik has failed to allege facts sufficient to support a finding of personal jurisdiction over the MRC under *section 301*. Pieczenik does not provide any basis upon which to infer that the MRC is "doing business" in New York. Plaintiff alleges that MRC scientists come to New York to speak and present new discoveries and accept awards, n42 but such speaking engagements do not amount to "doing business" in New York. n43

2003 U.S. Dist. LEXIS 23295, *

n42 See 11/2 Pl. Ltr. at 2.

N43 See *Landoil Res. Corp., 918 F.2d at 1044* (finding that sporadic business trips of short duration, made by different employees for purposes of solicitation, were insufficient to establish employer's systematic and continuous presence in New York).

Pieczenik also cryptically argues that "New York has a continuing historical relationship with England, the Queen and her dominions in that New York is not New Amsterdam." n44 The meaning of this statement is not entirely clear, but inasmuch as Pieczenik is asserting that the MRC, as a public [*16] entity established pursuant to Royal Charter, has a continuous presence in New York by virtue of the "historical" relationship between England and New York, he is mistaken.

n44 11/2 Pl. Ltr. at 3.

B. *Section 302(a)(1)*

Under *section 302 (a)(1)* of New York's long-arm statute, n45 a court may exercise personal jurisdiction over a nondomiciliary if "the nondomiciliary [] transact [s] business within the state, [and] the claim against the nondomiciliary [] arises out of that business activity." n46 A nondomiciliary "transacts business" in New York if it "purposefully avails [itself] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." n47 A court's determination of whether a defendant "transacts business" in New York is based on an assessment of the sum of the defendant's activities. n48 The Second Circuit has used the following factors to evaluate whether a defendant is "transacting business" in New York:

(1) whether the defendant has [*17] an on-going contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires notices and payments to be sent into the forum state or requires supervision by the corporation in the forum state. n49

n45 *Section 302 (a)(1)* reads, in relevant part: "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." *N.Y. C.P.L.R. § 302 (a)(1)* (McKinney 2003).

n46 *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* Because jurisdiction under *section 302 (a)(1)* requires consideration of whether a cause of action arose out of a party's transaction of business in New York, it is necessary to "determine the issue of personal jurisdiction separately for each cause of action asserted in the plaintiff's complaint." *Cosmetech Int'l LLC v. Der Kwei Enter. and Co., 943 F. Supp. 311, 317 (S.D.N.Y. 1996);* see also *Ainbinder v. Potter, 282 F. Supp. 2d 180, 184 (S.D.N.Y. 2003).*

[*18]

n47 *CutCo Indus., Inc., 806 F.2d at 365* (quoting *McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967));* see also *Fort Knox Music Inc. v. Baptiste, 203 F.3d 193, 196 (2d Cir. 2000)* ("The statute allows jurisdiction only over a defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'") (quotations marks omitted).

n48 See *Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors, 510 F.2d 870, 873 (2d Cir. 1975) .*

n49 *Hutton v. Priddy's Auction Galleries, Inc., 275 F. Supp. 2d 428, 439 (S.D.N.Y. 2003)* (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)).*

1. Breach of Contract Between the MRC and Pieczenik

Pieczenik argues that the "contract" between himself (a New York resident) and the MRC provides a basis for this Court to assert jurisdiction over the MRC. n50 His

argument fails because he has not alleged facts [*19] sufficient to support a finding that the MRC transacted business in New York. Assuming, arguendo, that the 1987 Koch letter and accompanying documents form a "contract," this contract was negotiated and entered into by both parties in England. n51 The "contract" does not contain a choice-of-law provision. While, under certain circumstances, a single contact or transaction may be sufficient to satisfy the "transacting business" standard, the formation of a contract in **England**, albeit between an English **citizen** and a New York **resident,** does not amount to "transacting business" in New York. The MRC did not purposefully avail itself of the laws of this forum simply because it entered into an agreement with a New York resident.

> n50 For support, Pieczenik relies on *Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L. Ed. 629 (1819)* (invalidating, pursuant to the *Contracts Clause,* state legislature's attempts to change and amend the charter of Dartmouth College). He argues "this contract between Plaintiff and the MRC is ... as valid as the contract creating Dartmouth College by King George III if not more so." 11/2 Pl. Ltr. at 1. But the *Woodward* case does not address whether jurisdiction over a non-domiciliary is proper under New York's jurisdictional statutes. Pieczenik also argues, in a "Memorandum of Law" attached to his Second Amended Complaint, that:

> Under the Bush Doctrine, George Bush directed United States armed forces into combat in Panama for the stated purposes of "safeguard [ing] American lives, restore [ing] democracy, preserv[ing] the Panama Canal treaties, and seizing Noriega to face federal drug charges in the United States." *United States v. Noriega, 746 F. Supp. 1506, 1511 (S.D. Fla. 1990).* The jurisdictional power of this Court under this Doctrine reaches all the way across the Atlantic, if not around the world to hold heads of governments under the jurisdiction of the US Courts for crimes committed in the US or against American citizens elsewhere.

Memorandum of Law to SAC P 1. The "Bush Doctrine" argument lacks merit for rather obvious reasons. The assertion of jurisdiction over a foreign military leader for narcotics-related crimes is hardly analogous to the assertion of jurisdiction over a foreign, publicly funded scientific entity for alleged patent infringement claims.

[*20]

> n51 This presents a wholly different situation from that involving negotiations conducted in New York. "Preliminary negotiations conducted in New York qualify as a 'transaction of business' if they have 'substantially advanced or were substantively important or essential to the formation' of a contract outside New York." *Ainbinder, 282 F. Supp. 2d at 187.*

## 2. Patent Infringement

Pieczenik claims that the MRC owns, uses, and has filed patents that infringe on his patents. n52 In connection with these activities, the MRC has allegedly licensed rights under its phage display patents in New York, which infringe and contribute to the infringement of his '363 and '448 patents. n53 Pieczenik fails adequately to allege facts conferring jurisdiction over the MRC in New York. He does not allege that the licenses were negotiated in or executed in New York. As the Federal Circuit explained to Pieczenik in a related case, "the grant of licensing rights to a New York corporation does not constitute the transaction of business within the meaning of the New York long- arm statute." n54 [*21] In the absence of forum-specific contacts rising to the level of "transacting business," this Court lacks authority to assert jurisdiction over the MRC as to the patent infringement claims.

> n52 See SAC P 24.

> n53 See id. PP 25-26.

> n54 *Pieczenik v. Dyax Corp., 265 F.3d 1329, 1335 (Fed. Cir. 2001).*

## 3. Patent Invalidity and Inventorship

Pieczenik alleges that the MRC owns unidentified patents that are invalid in light of his '363 and '448 patents. n55 Pieczenik also argues that he is entitled to be added as a named inventor on unidentified patents owned

by the MRC. n56 But Pieczenik does not allege any facts upon which this Court could find jurisdiction over the MRC as to these patents. Specifically, the MRC is not alleged to have transacted business in New York in connection with these patents. Accordingly, there is no basis under *section 302 (a)(1)* to assert personal jurisdiction over the MRC with respect to Pieczenik's claims of patent invalidity or inventorship.

n55 See id. PP 24, 27, 28; see also *35 U.S.C. § 102(e)*.

[*22]

n56 See SAC PP 36-37.

**5. RICO**

Pieczenik claims that Dyax, Domantis, the MRC, and CAT have colluded to "give the impression of Dyax being more than a 'virtual' patent licensing company." n57 In addition to allegations that certain unidentified defendants committed mail fraud, n58 Pieczenik asserts that "to the extent that communications were had with potential investors and pharmaceutical houses over ... [the MRC's] telephone [number] the foregoing also constituted wire fraud within the meaning of *18 U.S.C. § 1343*." n59 He does not, however, allege any facts relating to this conspiracy that would suggest a connection between New York and the MRC. In the absence of any forum-related contacts, personal jurisdiction over the MRC as to the RICO claims is lacking.

n57 Id. P 53.

n58 See id. P 59.

n59 Id. P 60.

**C. *Section 302 (a)(2)***

Under *section 302 (a)(2)*, personal [*23] jurisdiction over a non-domiciliary may be asserted over a defendant that "commits a tortious act within the state." n60 "Second Circuit decisions make it clear that the statutory provision requires that the tortious act itself physically be performed within New York State." n61 Pieczenik does not allege that the MRC engaged in activities in New York relating to its alleged patent infringement. n62 Thus, Pieczenik has failed to allege that MRC committed a tortious act within New York, and jurisdiction is lacking under *section 302(a)(2)*.

N60 *N.Y. C.P.L.R. § 302(a)(2)* (McKinney 2003).

n61 Westvaco Corp. v. Viva Magnetics Ltd., 2002 U.S. Dist. LEXIS 15476, No. 00 Civ. 9399, 2002 WL 1933756, at *2 (S.D.N.Y. Aug. 20, 2002).

n62 Similarly, Pieczenik does not allege that the MRC acted in New York with respect to the breach of contract or RICO claims.

**B. *Section 302(a)(3)***

Under *section 302 (a)(3)*, personal jurisdiction may be asserted over a non-domiciliary if the non-domiciliary "commits [*24] a tortious act without the state" injuring a person within New York, and either (i) "regularly does or solicits business, or engages in any other persistent course of conduct," or (ii) "derives substantial revenue from interstate commerce and expects or reasonably should expect the tortious act to have consequences in the state. n63

n63 *N.Y. C.P.L.R. § 302(a)(3)* (McKinney 2003).

Pieczenik fails adequately to allege that the MRC regularly does or solicits business in New York or derives substantial revenue from interstate or international commerce. n64 Accordingly, *section 302 (a) (3)* provides no basis for the assertion of personal jurisdiction over the MRC.

n64 Pieczenik argues that the MRC is not an eleemosynary institution because a website indicates that the MRC is pursuing international financing and collaborations. See 11/26 Pl. Ltr. (citing http://www.britishcouncil.org). Even crediting Pieczenik's allegation as true, as I must, it does not follow from the fact that the MRC is "pursuing international financing and collaborations" that the MRC derives significant revenue from international commerce. Moreover, the website cited by Pieczenik clearly states that the MRC is a "national organisation funded by the UK taxpayer" through "the UK Government" -- more precisely, through "an annual Grant in aid from Parliament via the Office of Science and Technology."
http://www.mrc.ac.uk/index/about.htm.

He further alleges that the MRC generates revenue through CAT and possibly Domantis. More precisely, he says, "One groom can't dance at two weddings at the same time. An eleemosynary institution cannot create a commercial enterprise whose shares are guaranteed by the Bank of New York and still pretend to be a pure research institution on the Cam watching the punts." 11/2 Pl. Ltr. at 1. But Pieczenik contends only that the MRC has a "major ownership interest in CAT and undisclosed interest in Domantis." SAC 8. He fails to allege fact sufficient to support a finding that the MRC derives substantial revenue from international commerce. Accordingly, Pieczenik fails to adequately allege that there is personal jurisdiction over the MRC pursuant to *section 302(a)(3)*.

[*25]

## IV. CONCLUSION

For the foregoing reasons, the MRC's motion to dismiss for lack of personal jurisdiction is granted. n65 The Clerk of the Court is directed to close this motion and dismiss the case against the MRC.

n65 Pieczenik requests "leave to amend in order to plead facts that could support a finding of jurisdiction under a conspiracy theory." 11/26 Pl. Ltr. But Pieczenik has been afforded several opportunities to amend his complaint and there is an insufficient basis to permit him to continue to do so ad infinitum. Accordingly, plaintiff's motion to replead jurisdictional facts is denied.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: December 29, 2003

# TAB
# 12

Westlaw.

Not Reported in F.Supp.2d                                                                                  Page 1
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Saab v. Citibank, N.A.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Ayoub-Farid Michel SAAB and Fadi Michel Saab,
Plaintiffs,
v.
CITIBANK, N.A., Defendant.
**No. 00 CIV. 6784(BSJ).**

Nov. 7, 2001.

*Decision & Order*

JONES, District J.

*1 On September 8, 2000, Plaintiffs Ayoub-Farid Michel Saab and Fadi Michel Saab (collectively "the Saabs") filed suit against Defendant Citibank, alleging that Citibank failed to use its best efforts, on behalf of itself and its affiliate, the Saudi American Bank ("SAMBA"), to carry out a promised private placement for the Golden Cedar Club Project, a real-estate development outside Beirut, Lebanon, owned by Plaintiffs. (Compl.¶ 1.) Plaintiffs are brothers, citizens of Lebanon and residents of Cyprus who jointly own the property in southern Beirut. (Compl.¶ ¶ 7, 8, 12.) They allege claims of actual fraud, constructive fraud, breach of fiduciary duty, inducement to or participation in breach of fiduciary duty, intentional misrepresentation, negligent misrepresentation, breach of oral contract, promissory estoppel, interference with contractual relations, interference with economic advantage, and negligent supervision against Citibank. (Compl. ¶ 3 .) On October 23, 2000, Defendant moved to dismiss the case for forum non conveniens. For reasons discussed below, Defendant's motion to dismiss is GRANTED.

## I. BACKGROUND

SAMBA was created in 1980 from Citibank's operations in Saudi Arabia when the Saudi Arabian government forced Citibank and other foreign banks to relinquish their controlling interests and to take minority ownership interests in their Saudi Arabian banks. Originally, Citibank held a forty percent interest in SAMBA, the maximum allowable under Saudi Arabian law. During the events in question,

Citibank held a thirty percent interest in SAMBA. (Compl.¶ 16.)

Upon taking a minority interest, Citibank entered into a Technical Management Agreement ("Management Agreement") with SAMBA, pursuant to which Citibank agreed to provide senior management to SAMBA, including the appointment of SAMBA's managing director, as well as training and other expertise. (Compl.¶ 17.) The precise level of control exerted by Citibank over SAMBA is unclear. Plaintiffs and Defendant dispute exactly what the Management Agreement entailed. However, SAMBA and Citibank were affiliated, and SAMBA represented that Citibank was its foreign partner. (Compl.¶ 28.) Citibank appointed three members to the SAMBA board, and James Collins, Chief Executive and Managing Director of SAMBA during the events in question, was a longtime Senior Vice President of Citibank. (*See* Mustill Decl. Ex. D ¶ 4; Compl. ¶ ¶ 20, 23.)

In 1994, the Saabs met with Mohamed Amersi, an attorney at Jones, Day, Reavis & Pogue, who recommended SAMBA to help them finance a real-estate project on their jointly-owned property. (Compl.¶ 15.) From September 11 to September 16, 1994, the Saabs met with SAMBA representatives to negotiate an agreement under which SAMBA would place shares in the real-estate project with investors. (Compl.¶ 19.) Plaintiffs contend that Citibank was represented at this meeting by James Collins. (Compl.¶ 20.) As part of its pitch, SAMBA referred to its previous successful placement of shares in the Solidere project in Lebanon. (Compl.¶ 21.) Plaintiffs claim that it was Citibank's close association with SAMBA that made them decide to accept the deal. (Compl.¶ 23.) Stating that it had the resources and ability to pursue the placement not only through its head office in Saudi Arabia but also through its Swiss and United Kingdom subsidiaries, SAMBA asked for global exclusivity in the real-estate project. (Compl.¶ 24-26.) Notably, however, the Placement Agreement contained an explicit carve-out excluding the United States. (Compl.¶ ¶ 24, 29.)

*2 On September 16, 1994, Plaintiffs and SAMBA entered into a Placement Agreement, under which SAMBA agreed to market the real-estate venture in two phases and to use its best efforts to promote the venture. (Compl.¶ 28.) Following the signing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

SAMBA began due diligence, conducted by Ghazi Dhoot of SAMBA's Corporate Finance and Investor Marketing Department. (Compl.¶ 35.)

Over the next few months, various circumstances led to delays. (Compl.¶ ¶ 36-40.) In January, 1995, SAMBA created a Merchant Banking Group headed by Michael Baker, and the project was shifted over to that Group. This caused further delays, and marketing did not begin until June. (Compl.¶ ¶ 41-44.) While there was early success in finding investors, efforts ground to a halt a month or two later. (Compl.¶ 45.) Dhoot resigned, numerous additional delays ensued, and the placement appeared to stall. (Compl.¶ ¶ 46-59.)

In 1997, Plaintiffs filed suit against SAMBA in London for breach of contract. (Compl.¶ 59.) Claiming that the contract was governed by Saudi Arabian law and that the relevant events were centered around Saudi Arabia, SAMBA moved to dismiss the action. *Saab and Another v. Saudi American Bank,* 1 WLR 1861, 1863 (1999). Plaintiffs argued that the principal breach had been made by the English office of SAMBA and that they had close personal connections to the forum. *Saab,* 1 WLR at 1881-82. They alleged that England was better suited for the witnesses, many of whom were residing in England or were British nationals, and, therefore, the suit was properly brought in England. (Karp Decl. Ex. 2 & 3.) The English court agreed and denied SAMBA's motion. *Saab,* 1 WLR at 1881-82.

Subsequently, on April 12, 2000, SAMBA made a formal offer to settle the proceedings and gave Plaintiffs twenty-one days to accept. Plaintiffs did not accept the offer within the time limit, but, on November 3, 2000, they applied to the court for permission to accept the offer. SAMBA agreed and the court granted permission. Acceptance has not been formally made, but the English court has already stayed the action pending formal acceptance. (Goldsmith Decl. ¶ 8.)

On August 8, 2000, Plaintiffs filed a second action in England against Mohamed Amersi and Jones, Day, Reavis & Pogue relating to those parties' role in the SAMBA deal. (Def.'s Reply Mem. at 3.)

## II. DISCUSSION

A district court has broad discretion when deciding whether to dismiss an action on the ground of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454

U.S. 235, 257 (1981); *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991). Although a foreign plaintiff's choice of forum is generally given less deference than the choice of an American plaintiff, *Piper,* 454 U.S. at 256, "some weight must still be given to a foreign plaintiff's choice of forum." *Murray v. British Broadcasting Corp .,* 81 F.3d 287, 290 (2d Cir.1996). A defendant seeking to dismiss a complaint on the basis of forum non conveniens "must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors ... the balance of convenience tilts strongly in favor of trial in the foreign forum." *Maganlal,* 942 F.2d at 167.

*3 In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947), the Supreme Court set forth the private and public interest factors that the district courts should consider. Private interests to be considered include "ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil,* 330 U.S. at 508. Public interest factors include administrative difficulties stemming from court congestion; the burden of imposing jury duty on a community with no relation to the litigation; the interest in having "localized controversies decided at home"; and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508-09. "The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice." *Maganlal,* 942 F.2d at 167.

### A. Deference to Plaintiff's Choice of Forum

There is a strong presumption in favor of a plaintiff's choice of forum; however, the court will give less deference to a plaintiff's choice when that plaintiff is foreign. *Piper,* 454 U.S. at 255-56. This does not mean that no deference will be given to a foreign plaintiff's choice of forum; dismissal for forum non conveniens is the exception, rather than the rule. *Maganlal,* 942 F.2d at 168. In fact, less deference is accorded a foreign plaintiff's choice of forum because it can often be assumed that a United States forum is not the most convenient forum in cases involving foreign plaintiffs. *Piper,* 454 U.S. at 255-56; *Murray,* 81 F.3d at 290. The general rule is that "deference increases as the plaintiff's ties to the forum increase." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 101 (S.D.N.Y.2000). "[T]he greater the plaintiff's ties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." *Id.* at 102.

Plaintiffs have made no real showing of convenience in this district. As already noted, Plaintiffs themselves are citizens of Lebanon, and at least one plaintiff maintains a home in England, where his wife resides, and where his daughter attended college. (Karp Decl. Ex. 3 ¶ 20.) Plaintiffs argue that the Southern District is more convenient and appropriate because Citibank is the true focus of this litigation and the key witnesses and documents will be found at Citibank. (Pls.' Mem. Opp'n at 6-7.) However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing. As discussed in more detail below, the location of witnesses and documents in this case actually favors dismissal of this case to a more convenient alternative forum.

Nearly all the alleged events giving rise to Plaintiffs' claims occurred in London, Lebanon or Saudi Arabia. The negotiations and representations by SAMBA took place in London, (Compl.¶¶ 19, 21), and the Placement Agreement was signed there, (Compl.¶ 29). Another relevant meeting took place in Beirut on October 22, 1994. (Compl.¶ 38.) Ghazi Dhoot promoted SAMBA in Saudi Arabia. (Compl.¶ 51.) These are but a few, representative examples. Additionally, most of the documents are in London or Saudi Arabia. (Karp Decl. Ex. 2 ¶ 19.4.) Any resolution of the claims against Citibank will necessarily involve consideration of the allegations lodged against SAMBA, and SAMBA's actions were to be undertaken primarily in London. (Mustill Decl. Ex. D ¶ 4.5; Karp Decl. Ex. 2 ¶¶ 14, 29.6.)

*4 In the initial suit filed against SAMBA in England, Plaintiffs fought tenaciously to keep the case in that forum. (Karp Decl. Ex. 2 & 3; Karp Decl. Ex. 4.) The English trial court agreed and denied SAMBA's motion to move the case to Saudi Arabia. *Saab,* 1 WLR at 1882-83. Moreover, the Complaint in the present case bears a striking similarity to that filed against SAMBA in England. (Mustill Decl. Ex. D.) Because Plaintiffs fail to make any showing of convenience, their choice of forum deserves only "some weight." *Murray,* 81 F.3d at 290.

### B. Adequate Alternate Forum

"Ordinarily, a foreign forum will be adequate when the defendant is subject to the jurisdiction of that forum." *Maganlal,* 942 F.2d at 167. An agreement by a defendant to submit to the jurisdiction of a foreign forum generally satisfies the requirement that there be an adequate alternate forum. *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74-75 (2d Cir.1998). A British court will be able to extend jurisdiction over Citibank in this case, (Mustill Decl.), and Citibank has agreed to accept jurisdiction in England, (Def.'s Mem. Supp. at 13-14).

The fact that the alternate forum has different laws and provides different causes of action or remedies, or lacks certain causes of action and remedies, does not bar adequacy. *DiRienzo v. Philip Services,* 232 F.3d 49, 57 (2d Cir.2000). The alternate forum is adequate so long as it "permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all." *Id.; see, e.g., Capital Currency Exchange, N.V. v. National Westminster Bank PLC* 155 F.3d 603, 610 (2d Cir.1998); *PT United,* 138 F.3d at 74; *Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 159 (2d Cir.1980) (*in banc* ).

There can be no doubt that Defendant has shown that England is an adequate alternative forum for this case. (*See* Mustill Decl. ¶¶ 5, 11-29.) Since the court has decided that England, the proposed alternative forum, is adequate, the court must now "balance public and private interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action." *Murray,* 81 F.3d at 293.

### C. Private Interest Factors

#### 1. Ease of Access to Sources of Proof-Documents

Plaintiffs argue that all the relevant documents are in the United States at Citibank's headquarters. (Pls.' Mem. Opp'n at 6-7.) However, the only specific document that Plaintiffs can name is the Management Agreement, which they concede they already possess as a result of the settlement in the English suit they filed against SAMBA. Plaintiffs only demand that document from Citibank because they claim to be unable to reveal its contents due to a confidentiality agreement signed as part of the settlement. (Pls.' Mem. Opp'n at 3 n. 4.) Their other requests for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 4
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

documents in the United States are vague and overly broad, seeking nearly all Citibank documents that have any connection to SAMBA. (Pls.' Mem. Opp'n App. A.) Citibank has already stated that they will provide any requested documents in London, and the SAMBA documents, crucial to proving the claim against Citibank, are available in SAMBA's English office. Thus, this factor weighs in favor of dismissal to a more convenient alternative forum.

2. Compulsory Process and Costs of Obtaining Witnesses

*5 Plaintiffs claim that three witnesses-James Collins, Michael Baker and Mohamed Amersi-reside in the United States. (Ayoub-Farid Michel Saab Aff. ("Saab Aff.") ¶ 9; Pls.' Mem. Opp'n at 5.) However, Michael Baker denies that he resides in the United States, (Baker Aff.), and it is unclear where Mohamed Amersi resides, (See Paterson Decl. Ex. 1). Moreover, both Baker and Amersi are British nationals, and Citibank has specifically secured the agreement of James Collins to appear in England. (Def.'s Reply Mem. at 7, 7 n. 7.) The other witnesses named-Nader Mousli, Ghazi Dhoot, Hafez Alawi, Ali Baruni and Stephen Paine-are either British nationals and/or reside in England, Switzerland, Lebanon or Saudi Arabia. (Saab Aff. ¶ 9; Pls.' Mem. Opp'n at 5; Def.'s Reply Mem. at 7.) All of these witnesses, with the exception of Baruni, were previously named in the SAMBA suit and were then listed by Plaintiffs as capable of appearing in England. (Karp Decl. Ex. 2.) In addition, Citibank has agreed to provide access to all of its employees and documents in London, (Def.'s Reply Mem. at 3), so the costs of producing witnesses and the difficulties associated with compulsory process will be minimized in that forum.

D. Public Interest Factors

Although the private interests identified by the parties all weigh in favor of dismissal in this case, the court must go on to consider the public interest factors affecting the decision to dismiss as well. See Blanco v. Banco Industrial de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir.1993) (Gulf Oil "commands inquiry into relevant public interest factors."); see also Gulf Oil, 330 U.S. at 503.

1. Court Congestion

A district court may properly consider its caseload in determining the appropriateness of retaining an action. See Piper, 454 U.S. at 241. However, the Second Circuit has recently pointed out that, for purposes of a forum non conveniens motion, court congestion is no longer a significant concern in the Southern District of New York. Guidi v. Inter-Continental Hotels Corp. 224 F.3d 142, 147 n. 5 (2d Cir.2000). Though it remains a factor to be considered, court congestion does not affect the analysis in this case.

2. Local Interest in the Controversy

When most of the events took place in a foreign forum or forums and involve mostly foreign parties, the United States and its citizens have less interest in the resolution of the action than the foreign forum. See, e.g., Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1234 (2d Cir.1994); Allstate Life Ins. Co. v. Linter Group, Ltd., 994 F.2d 996, 1002 (2d Cir.), cert. denied, 510 U.S. 945 (1993); Bybee v. Oper Der Standt Bonn, 899 F.Supp. 1217, 1223 (S.D.N.Y.1995). This community has limited connection to the litigation and would be ill-served by imposing this case on a local jury. Although Citibank's headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign, with the sole exception of Mr. Collins. Though Plaintiff alleges that there are other, unknown witnesses, mere allegations are not sufficient to connect the community to litigation.

*6 If the allegations of Plaintiffs regarding Citibank's control of SAMBA are true, they do raise an interest on the part of the United States in ensuring the legitimate practices of banks. As a general proposition, the United States does have a substantive interest in governing its banks according to one set of rules. Cf., e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F.Supp.2d 282, 292-93 (S.D.N.Y.2000) (holding that the duties owed by American reinsurance companies must be governed according to one set of rules and that the United States has the greatest substantive interest in determining that standard). This is the only real interest favoring retention of this case in its present forum. However, other circumstances, including the identities of witnesses and parties and the locations of relevant events, demonstrate that there is extremely little local interest in this controversy. Moreover, "a single factor is rarely dispositive," DiRienzo v. Philip

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Services Corp.,* 232 F.3d at 57.

### 3. Familiarity with the Law

Although "this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate," *Piper,* 454 U.S. at 260 n. 29, the near certainty that the court would have to apply foreign law in this case is a factor favoring dismissal. *See, e.g., Gulf Oil,* 330 U.S. at 509 (finding it more appropriate to have a case heard in a forum "at home with the ... law that must govern the case); *Scottish Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1234 (2d Cir.1996).

### a. Choice of Law-Tort Claims

The choice-of-law provision in the contract between Plaintiffs and SAMBA states, "[t]his agreement and each party's rights and obligations hereunder shall be governed by and construed in accordance with the laws and regulations of the Kingdom of Saudi Arabia." (Goldsmith Decl. Ex. A at 7.) There is no need to decide whether the provision requires Plaintiffs' tort claims to be litigated under Saudi Arabian law because, regardless of whether the provision applies or not, those claims must be analyzed under foreign law. On the one hand, if the court finds that Citibank was a party to the agreement and applies the choice-of-law provision to the tort claims, Saudi Arabian law will apply. On the other hand, if the court analyzes the tort claims under New York choice-of-law principles, English law will apply.

In analyzing tort claims, New York has adopted an "interest analysis," which requires the court to apply the law of the jurisdiction with the greatest interest in the litigation. *Krock v. Lipsay* 97 F.3d 640, 645 (2d Cir.1996). To determine the greater interest, the court must consider two things: "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.*
In all interest analyses, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.... The respective importance of each of those contacts is determined by the nature of the law in question. Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws, whereas those cases concerning loss allocation will turn in significant part on the domiciles of the parties.

*7 *Id.* at 646.

Since the present case entails conduct-regulating laws and the parties are domiciled in different countries, the locus of the tort will be determinative. Plaintiffs claim that New York should be the locus of the tort because decisions regarding the fate of their project were made at Citibank headquarters in New York.[FN1] However, London was the locus of the majority of the actions, from negotiations through promotion of the investment, relevant to the tort claims in this case. The misrepresentations allegedly made by Citibank occurred during negotiations in London, and the alleged tortious injuries were caused, if not directly in England, by SAMBA's English office. Since the alleged fraudulent actions occurred in England, England is the locus of the tort. *See Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1074 (S.D.N.Y.1992). Since England has the greatest interest in this case, under New York law English law would be applied to the tort claims.

> FN1. Citing *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112 (2d Cir.1984), and *Sussman v. Bank of Israel,* 801 F.Supp. 1068 (S.D.N.Y.1992), *aff'd,* 990 F.2d 71 (2d Cir.1993), Plaintiffs also assert that the law of a bank's headquarters must be applied whenever activities occurring within those headquarters are at issue. However, both *Ferer* and *Sussman* are distinguishable because in each case the location of the bank's headquarters was also the locus of the tortious activities.

### b. Choice of Law-Contract Claims

A determination of which law should govern Plaintiffs' contract claims depends on the application of the choice-of-law provision in the contract signed by SAMBA and Plaintiffs. That provision declared Saudi Arabian law as the law governing "this agreement and each party's rights and obligations hereunder." (Goldsmith Decl. Ex. A at 7.) Since Citibank is the defendant in this suit, not SAMBA, the choice-of-law provision would seem inapplicable. However, Plaintiffs are maintaining that Citibank might qualify as a "party" within the meaning of the provision because SAMBA is controlled by Citibank. For the purposes of this motion, however, the court need not decide whether the provision is controlling.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Like the analysis governing the tort claims, here it is sufficient to consider which law would govern in either case.

If the choice-of-law provision is applicable, then Saudi Arabian law would govern the contract claims. If the choice-of-law provision is not applicable, then New York conflicts-of-law rules would apply. New York courts again perform an "interest analysis" and hold that the "the law of the jurisdiction having the greatest interest in the litigation controls." *Wm. Passalacqua Builder's v. Resnick Developers*, 933 F.2d 131, 137 (2d Cir.1991). That interest is determined by inquiry into a number of factors, including "the place of: (1) contracting, (2) negotiation of the contract, (3) performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.*

The place of negotiation and contracting was England. (Compl.¶ ¶ 19, 29.) The place of performance was worldwide, but specifically excluded the United States. (Compl.¶ ¶ 24, 29.) The subject matter of the contract, the project, was located in Lebanon. (Compl.¶ 1.) The citizenship, domiciles, residences and places of incorporation and business of the parties include England, Cyprus, Saudi Arabia, Switzerland and the United States. (Compl. ¶ ¶ 7, 8, 9, 20; Pls.' Mem. Opp'n at 5-6.) Based on these factors, England clearly has a greater interest in this litigation than the United States. Therefore, should the should the choice-of-law provision not apply, English law would be applied to the contract claims.

**8* This court is, therefore, being asked to consider a case in which no American law is at issue and all questions would likely be resolved under foreign law. While this court is presumably capable of analyzing both English and Saudi Arabian law, in this case it is appropriate for English courts to decide questions of English law. Moreover, English courts can analyze Saudi Arabian law as easily as American courts. Thus, the factor considering familiarity with the law weighs heavily in favor of dismissal.

### 4. Other Factors

Currently, there is a first-filed action pending before an English court dealing with the same series of transactions and alleging similar claims against the law firm of Jones, Day, Reavis & Pogue and

Mohamed Amersi. (Paterson Decl. Ex. 1.) In the interests of efficiency, the avoidance of duplicative litigation, and consistency of result, this suit would be better off consolidated with the pending English suit, or, at the very least, litigated in the same forum. Plaintiffs, however, chose not to inform this court that such an action was pending. The reasonable inference is that Plaintiffs were aware this court would prefer to defer litigation while a foreign court considered pending litigation on the same issues, particularly since decisions in either court could have a significant impact on the other pending case.

### E. Deference to Pending Foreign Proceeding

Since the court is dismissing this case on grounds of forum non conveniens, the court need not address Defendant's argument that this case should be stayed or dismissed in deference to actions pending in England.

### III. CONCLUSION

Balancing the *Gulf Oil* factors strongly favors England as a more convenient alternative forum in this case. In addition to maintaining close connections to England, Plaintiffs are foreign and, therefore, deserve less deference in their choice of forum. Many of the witnesses reside in England or are British nationals; moreover, Citibank has agreed to produce any required documents and witnesses in England. The alleged events occurred primarily in England, and foreign law will apply to both the tort and contract claims. While court congestion is not a significant factor here, this community has limited interest in the controversy, and it would unfairly burden a local jury to hear this case. Finally, this suit would best be considered in tandem with the suit currently pending in England dealing with the same alleged events that was filed prior to the present suit. For the foregoing reasons, Defendant's motion to dismiss for forum non conveniens is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2001.
Saab v. Citibank, N.A.
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.