**EXHIBIT A-8**

# 10

Exhibit A   160

This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933.

The date of this prospectus is November 16, 2005

## MARSH & McLENNAN COMPANIES
## 2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN

Terms and Conditions of November 1, 2005 Guy Carpenter Special Long Term Incentive Grant

REDACTED

This award ("*Award*") in the amount of _____, granted effective November 1, 2005 (the "*Grant Date*") under the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan (the "*Plan*"), is subject to the terms and conditions of the Plan and the additional terms and conditions below (the "*Agreement*"). At the sole discretion of MMC (as hereinafter defined), this amount may be paid, subject to the terms set forth below, in either cash or the equivalent value of readily tradable MMC shares, which value shall be measured as described below. In recognition of your potential for future contributions to the success of MMC, this Award is intended to strengthen the mutuality of interest between you and MMC's shareholders and to serve as an appropriate additional incentive to remain with MMC or any of its subsidiaries or affiliates (collectively, the "*Company*"). For purposes of this Agreement, "*MMC*" means Marsh & McLennan Companies, Inc. and any successor thereto.

I.  **AWARD VESTING AND DISTRIBUTION**

A.  **Award Vesting**

   (1)  *Scheduled Vesting.* Subject to your continued employment and to any performance adjustments (as described below), 10% of the aggregate Award will vest on November 1, 2006, an additional 10% of the aggregate Award will vest on January 31, 2007, an additional 20% of the aggregate Award will vest on January 31, 2008, an additional 20% of the aggregate Award will vest on January 31, 2009, and the remaining 40% of the aggregate Award will vest on January 31, 2010.

   (2)  *Performance Adjustments.* For each of the fiscal years 2006, 2007 and 2008, if MMC management determines that Guy Carpenter's Performance Target for that fiscal year has been met or exceeded, the percentage of the aggregate Award that will vest on January 31 of the year following that determination shall be increased

NY:987859.6

Exhibit A 161

by 10% from that set forth in Section I.A(1). Each such 10% additional vested portion of the Award shall reduce the amount of the Award otherwise scheduled to vest on January 31, 2010. By way of example, should the Performance Targets be met or exceeded for each of the years 2006, 2007 and 2008, then 10% additional Award shall vest the following January 31 for each year (20% total in 2007, 30% in 2008, 30% in 2009) so that only the remaining 10% (instead of 40%) shall vest on January 31, 2010. For purposes of this Section I.A, the term "*Performance Target*" shall mean Guy Carpenter's target net operating income margin for a fiscal year as set by MMC management.

B. **Award Distribution**

(1) <u>In General</u>. Payment of the portion of an Award that becomes vested on a vesting date (an "*Installment*") shall be in cash or shares of MMC common stock (valued at their Fair Market Value on the vesting date), as determined by MMC. Except as provided in Section I.B(2), such payment shall be made as soon as practicable after vesting, and in no event later than 60 days after vesting. Payment is conditioned on your (i) signing and returning a copy of these Terms & Conditions to the Company at the address listed above the signature line hereof and (ii) satisfaction of any applicable withholding taxes with respect to the Installment.

For purposes of this Agreement, "*Fair Market Value*" as of a valuation date means the average of the high and low selling prices of MMC common stock on the New York Stock Exchange on the trading day immediately preceding such valuation date.

(2) <u>Covered Employees</u>. Notwithstanding any other provision herein, for any employee determined by the Compensation Committee of the MMC Board of Directors (the "*Committee*") to be likely to be a covered employee within the meaning of Section 162(m)(3) of the Internal Revenue Code of 1986, as amended (the "*Code*") in the year an Installment vests, payment of such Installment shall be postponed until the earlier of (i) the earliest date at which the Committee reasonably anticipates that the deduction of the payment of such Installment will not be limited or eliminated by application of Section 162(m) of the Code or (ii) the calendar year in which the such employee terminates employment. According to Internal Revenue Service regulations, "covered employees" include (1) the chief executive officer of MMC as of the last day of the year and (2) the four highest-paid executive officers of the Company, other than the chief executive officer, who are employed on the last day of the year.

C. **Cancellation and Rescission of Award**

(1) <u>Detrimental Activity</u>. For purposes of this Agreement, except to the extent Schedule II.D is applicable to you and therefore the definition set forth there governs, "*Detrimental Activity*" means:

(a) the rendering of services, of a type similar to the services you provided to the Company or in a capacity similar to the capacity you were in with the

- 2 -

    Company, for any person or organization, or otherwise engaging directly or indirectly in any business, if either (i) such person, organization, or business is or becomes competitive with the Company, or (ii) the rendering of services to such organization or business is or becomes prejudicial to or in conflict with the interests of the Company;

(b)    the unauthorized disclosure or misuse of proprietary or confidential information of the Company or its employees or customers;

(c)    activity that results (or if known could result) in termination of your employment for your misappropriation of assets of the Company; willful misconduct in the performance of your duties; material violation of a written code of conduct applicable to you; breach of fiduciary duty or breach of trust; conviction of a felony, or of any other crime involving moral turpitude; imprisonment for any crime; or any other action likely to bring substantial discredit to the Company;

(d)    diverting or attempting to divert from the Company business of any kind, including, without limitation, interference with any business relationship with suppliers, customers, licensees, licensors, or contractors;

(e)    directly or indirectly, soliciting, diverting, or taking away, in whole or part, any clients or prospects of the Company who, within the two-year period prior to your termination of employment, were solicited or serviced directly or indirectly by you or by anyone directly or indirectly under your supervision, or with whom during such period you had any business relationship, for the purpose of offering products or services competitive with those offered by the Company;

(f)    attempting to recruit or solicit, or aid in the recruitment or solicitation of, any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any actual or prospective competitor of the Company; or

(g)    a breach of your obligations under Section II.A, II.B, II.C or, if applicable, Schedule II.D.

The "*Rescission Period*" with respect to an Installment means the 12-month period beginning on such Installment's vesting date.

(2)    <u>Cancellation and Rescission</u>.

(a)    If you engage in any Detrimental Activity prior to or during the Rescission Period with respect to an Installment, then except as provided in Section I.C(2)(c), (i) that Installment and any future Installments shall be canceled and (ii) any delivery of cash or MMC common stock with respect to the Installment shall be rescinded promptly following MMC's discovery of

- 3 -

    such Detrimental Activity but no later than two years after the last day of the Rescission Period.

(b)  In the event of a rescission pursuant to Section I.C(2)(a), you shall (i) return to MMC all cash and/or shares of MMC common stock that you have not disposed of and that were delivered to you with respect to such Installment, and (ii) pay to MMC an amount equal to the cash and/or the Fair Market Value on the vesting date of the shares of MMC common stock that you have disposed of and that were delivered to you upon the vesting of such Installment.

(c)  The provisions of Section I.C(2)(a) shall not apply following your termination of employment unless (i) such termination resulted from your voluntary resignation or retirement or (ii) you engaged in Detrimental Activity described in Section I.C(1)(c).

(3)  <u>Reasonableness of Provision</u>. You agree that the cancellation and rescission provisions of the Plan and this Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture is the penalty for engaging in Detrimental Activity.

II.  <u>COVENANTS</u>

A.  <u>Notification Prior to Voluntary Termination</u>

(1)  You agree that at any time hereafter while you remain employed by the Company, you will provide 60 days' prior written notice (the "*Notice Period*"), in accordance with Section V.J, of your intention to terminate employment at MMC (whether by retirement or other voluntary termination).

(2)  (a)  Throughout the Notice Period, the Company shall have the obligation to pay you your base salary at normal pay intervals and shall continue to provide benefits to you on the same basis as other employees. Upon receipt of such notice, the Company shall have no obligation to pay you any bonus for work done during the Notice Period or any calendar year period in which notice was given.

(b)  Notwithstanding Section II.A(2)(a), the Company, in its sole discretion, may at any time during the Notice Period give written notice to you that it waives its right to the full Notice Period. Should the Company choose to exercise that right and waive some or all of the Notice Period, the Company may, as of the date of that notice, cease to make any further payment of base salary to you and immediately terminate your employment with the Company.

(3)  You will remain obligated to perform any or all of your regular job duties requested of you by the Company during this Notice Period (unless shortened pursuant to Section II.A(2)(b)). Moreover, throughout this Notice Period (unless

- 4 -

NY:987859.6

shortened by the Company pursuant to Section II.A(2)(b)), you will remain an employee of the Company with all attendant fiduciary duties, including, without limitation, your duties of loyalty and confidentiality to the Company.

(4) You understand and agree that the obligations set out in this Section II.A shall remain in full force and effect regardless of whether your employment with the Company terminates before or after (a) the full vesting of your Award on January 31, 2010 or (b) any exercise by the Company of its rights under Section I.C.

B. <u>General Non-Solicitation Agreement</u>

(1) You understand and agree that for the one-year period following your termination of employment, you will not, directly or indirectly, solicit, divert, take away, accept, or service, in whole or in part, any clients or prospects of the Company that within the two-year period prior to your termination of employment were solicited or serviced directly or indirectly by you or by anyone directly or indirectly under your supervision. You also agree that during this one-year period you will not (i) make known to any person, firm, or corporation the names or addresses of any current employees or customers of the Company, or any information pertaining to them or (ii) attempt to recruit or solicit, or aid in the recruitment or solicitation of, any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any competitor of the Company.

(2) You understand and agree that the obligations set out in this Section II.B shall remain in full force and effect regardless of whether your employment with the Company terminates before or after (a) the full vesting of your Award on January 31, 2010 or (b) the exercise by the Company of its rights under Section I.C.

C. <u>Confidentiality</u>

Without prejudice to any other duties and obligations you owe to the Company, whether stated in this agreement or otherwise, you acknowledge that you are subject to an ongoing duty of confidentiality to the Company, and therefore notwithstanding the termination of your employment, you will not, except with the prior written consent of the Company or as required by law, divulge or communicate to any third party or make use of any trade secrets or confidential information relating to the business of the Company, including, without limitation, secrets and information relating to corporate strategy, business development plans, intellectual property, business contacts, names of actual and potential clients and their requirements, terms of business with such clients and potential clients, terms of employment of employees, annual budgets, management accounts and other financial information concerning the business of the Company.

D. <u>Notice and Non-Solicitation Provisions Applicable to Employees Working in the UK</u>

The terms of the attached Schedule II.D shall apply if, and only if, notice of termination of your employment with the Company or the termination of your employment is at a time when your principal place of employment for the Company is the United Kingdom

- 5 -

NY:987859.6

(as defined in clause 1 of Schedule II.D). The remaining terms of this Agreement shall continue in effect when Schedule II.D is applicable except to the extent those terms are inconsistent with Schedule II.D, in which case the terms of Schedule II.D shall control.

E.  **Cooperation**

You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement.

F.  **Disclosure**

You hereby specifically authorize the Company to contact your future employers to determine your compliance with this Agreement or to communicate the contents of this Agreement to such employers. You further specifically authorize the Company, in its sole discretion and without your further permission, to furnish copies of the Agreement to any client or prospective client of the Company and to indicate that the Company has entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon your compliance with this Agreement.

G.  **Non-Exclusivity of Rights**

Neither you nor the Company intends to waive or release the applicability of any other employment duties or obligations you and the Company may have or owe to each other, now or hereafter, unless such duties or obligations conflict with those set forth in this Agreement. In particular, you and the Company acknowledge that any more extensive duties or obligations you may owe the Company by law or contract, now or hereafter, with regard to the subject matter of Sections II.A through II.C and, if applicable, Schedule II.D, shall not be considered to conflict with, or otherwise be released or waived by, this Agreement.

H.  **Injunctive Relief**

You understand and agree that the Company shall be entitled to temporary, preliminary, and permanent injunctive relief to prevent any threatened or actual breach by you of the terms of Section II.A, II.B, II.C or, if applicable, Schedule II.D. This right is not intended to limit in any way the Company's rights to similar or additional remedies for your breach of any portion of this Agreement.

III.  **RIGHTS OF AWARD RECIPIENTS**

This Award is an unfunded and unsecured promise to pay or deliver (or cause to be paid or delivered) to you, subject to the terms and conditions of this Agreement and the terms and conditions of the Plan, cash or shares of MMC common stock as soon as practicable after vesting or as otherwise provided herein. Unless and until the vesting conditions of the Award have been satisfied and cash or shares of MMC common stock have been paid or delivered to you in

Exhibit A   166

accordance with the terms and conditions described herein, you have only the rights of a general unsecured creditor and you have none of the attributes of ownership to such shares of stock.

## IV. TERMINATION OF EMPLOYMENT

If your employment with the Company terminates, your right to any part or all of the Award shall be as follows:

### A. Death

In the event your employment is terminated because of your death, any unvested portion of the Award will vest at such termination of employment.

### B. Permanent Disability

In the event your employment is terminated due to your total and permanent disability, as determined under MMC's long-term disability program, any unvested portion of the Award will vest at such termination of employment.

### C. All Other Employment Terminations

For all other terminations of employment, all of your rights, title and interest in and to any unvested portion of the Award shall be forfeited on the date of such termination of employment.

For purposes of this Agreement, your employment will be treated as terminated when you are no longer employed by MMC or any affiliate or subsidiary of MMC. For the avoidance of doubt, in the event of a sale or similar transaction involving Guy Carpenter as a result of which Guy Carpenter ceases to be a subsidiary of MMC, your employment will be deemed terminated even if your employment with Guy Carpenter continues after the sale.

## V. CHANGE IN CONTROL PROVISIONS

### A. Change in Control

Upon the occurrence of a "Change in Control" of MMC, as defined in the Plan, any unvested part of the Award will vest on the date of the Change in Control, and, except as provided in the following sentence, shares of MMC common stock or cash, as determined by MMC in its sole discretion, will be distributed to you as soon as practicable thereafter, but in no event later than 60 days following the Change in Control. If, in the Change in Control transaction, shareholders of MMC receive consideration consisting of cash or other property (including securities of a successor or parent corporation), there shall be delivered to you the consideration which you would have received in such transaction had you been, immediately prior to such transaction, a holder of that number of shares of MMC's common stock having a Fair Market Value immediately prior to the Change in Control equal to the portion of the Award that became so vested.

NY:987859.6

- 7 -

Exhibit A    167

B. <u>Additional Payment</u>

Should the vesting and payment of any Installments (the "*Accelerated Installments*") be accelerated because of a Change in Control, all or part of the value of such Accelerated Installments may be subject to a 20% federal excise tax under Section 4999 of the Code (the "*Excise Tax*"). The Excise Tax is imposed when the value, as determined by applicable regulations, of payments in the nature of compensation contingent on a Change in Control (including an amount reflecting the value of the accelerated vesting of deferred compensation) equals or exceeds three times the average of your last five years' W-2 earnings.

If a Change in Control occurs and the vesting of your Award is accelerated, MMC will determine if the Excise Tax is payable by you. If Excise Tax is payable by you, MMC will pay to you, within 30 days of making the determination, an amount of money (the "*Additional Payment*") such that after payment of applicable federal, state and local income taxes, employment taxes and any Excise Tax imposed upon the Additional Payment, you will retain an amount of the Additional Payment equal to the portion of the Excise Tax allocable (as determined by MMC in a manner consistent with applicable regulations) to the Accelerated Installments. If the Additional Payment, after payment of applicable taxes, is later determined to be less than the amount necessary to reimburse you for the portion of the Excise Tax you owe that is allocable to the Accelerated Installments, a further payment will be made to you. If the Additional Payment, after payment of applicable taxes, is later determined to be more than the amount necessary to reimburse you for the portion of the Excise Tax you owe that is allocable to the Accelerated Installments, you will be required to reimburse MMC for such excess.

VI. **OTHER PROVISIONS**

A. The Company is not liable for the non-issuance or non-transfer, or for any delay in the issuance or transfer, of any shares of common stock due to you, which results from the inability of the Company to obtain, from each regulatory body having jurisdiction, all requisite authority to issue or transfer the shares, if counsel for the Company deems such authority necessary for the lawful issuance or transfer of any such shares.

B. The Award is subject to the terms and conditions of this Agreement and to the terms and conditions of the Plan, and your acceptance hereof shall constitute your agreement to all such terms and conditions and to the administrative regulations of the Committee. In the event of any inconsistency between this Agreement and the provisions of the Plan, the provisions of the latter shall prevail. All decisions of the Committee upon any questions arising under this Agreement or the Plan shall be conclusive and binding. Your acceptance of this Award constitutes your agreement that the shares of common stock acquired hereunder, if any, will not be sold or otherwise disposed of by you in violation of any applicable securities laws or regulations.

C. The Committee has full discretion and authority to control and manage the operation and administration of the Awards and the Plan. The Committee is comprised of at least two members of the MMC Board of Directors.

NY1987859.6

- 8 -

Exhibit A 168

D. The MMC Board of Directors may amend, alter, suspend, discontinue or terminate the Plan or the Committee's authority to grant awards under the Plan, except that, without the consent of an affected participant, no such action may materially adversely affect the rights of such participant under any award theretofore granted to him or her. Following the occurrence of a Change in Control (as defined in the Plan), the MMC Board of Directors may not terminate the Plan or amend the Plan with respect to awards that have already been granted in any manner adverse to employees.

E. The Committee may, in its sole discretion, amend the terms of the Award; provided, however, that if the Committee concludes that such amendment is likely to materially impair your rights with respect to the Award, such amendment shall not be implemented with respect to your Award without your consent. The Committee may delegate to any other individual or entity the authority to perform any or all of the functions of the Committee under this Agreement, and references to the Committee shall be deemed to include any such delegate.

F. During your lifetime, no right hereunder related to the Award shall be transferable except by will or the laws of descent and distribution. Any cash or shares that may be deliverable to you following your death shall be paid or delivered to the person or persons to whom your rights pass by will or the law of descent and distribution, and such payment or delivery shall completely discharge the Company's obligations under the Award.

G. This Award does not give you any right to continue to be employed by the Company for any specific duration, or restrict in any way, your right or the right of your employer to terminate your employment, at any time, for any reason, with or without cause or prior notice. This Award is a special one-time award, which does not form part of your ongoing compensation and is not taken into account in calculating any other compensation or benefits.

H. This Agreement shall be binding upon and inure to the benefit of the Company's successors and assigns. Without limiting the foregoing, the Company may, in its sole discretion, assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Company or to any transferee of all or a portion of the assets or business to which your employment relates.

I. No more than eight million (8,000,000) shares of MMC common stock (par value $1.00 per share), plus such number of shares remaining unused under pre-existing stock plans approved by MMC's stockholders, may be issued under the Plan. Employees of the Company will be eligible for awards under the Plan. MMC common stock is traded on the New York Stock Exchange under the symbol "MMC" and is subject to market price fluctuation. Shares of MMC common stock in respect of the Award may be obtained through open market purchases, treasury stock or newly issued shares.

J. Any notice required to be given under this Agreement shall be in writing and shall be deemed to have been given when personally delivered or when mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

- 9 -

NY:987859.6

Exhibit A   169

If to the Company to:

    Guy Carpenter & Company, Inc.
    Attention: General Counsel
    One Madison Avenue
    New York, New York 10010

If to you:

    At your home address on file with the Company.

K. You may obtain an account statement for your Award and more information by making a request to:

    Marsh & McLennan Companies, Inc.
    Attention: Senior Manager, Global Compensation
    Nov. 2005 Guy Carpenter Special Long Term Incentive Grant
    1166 Avenue of the Americas
    New York, New York 10036-2774
    Telephone: (212) 345-5000

L. The Plan is not qualified under Section 401(a) of the Code and is not subject to the provisions of the Employee Retirement Income Security Act of 1974. Your right to payment of your Award is the same as the right of an unsecured general creditor of the Company.

M. There are no investment fees associated with your Award, and MMC pays all administrative expenses associated with your Award.

N. The Company and you irrevocably submit to the exclusive jurisdiction and venue of any state or federal court located in the County of New York for the resolution of any dispute over any matter arising from or related to the Award. Any claims brought in such court, whether in law or in equity, shall be tried by the court WITHOUT A JURY and you and the Company hereby waive any and all rights you or it may have in any such litigation to a trial by jury. Moreover, both you and the Company (i) acknowledge that the forum stated in this Section VI.N has a reasonable relation to this Award and to the relationship between you and the Company and that the submission to the forum will apply; (ii) waive, to the extent permitted by law, any objection to personal jurisdiction or to the laying of venue of any action or proceeding covered by this Section VI.N in the forum stated in this Section VI.N, (iii) agree not to commence any such action or proceeding in any forum other than the forum stated in this Section VI.N and (iv) agree that, to the extent permitted by law, a final and non-appealable judgment in any such action or proceeding in any such court will be conclusive and binding on you and the Company.

O. Notwithstanding anything to the contrary (except with regard to Schedule II.D, if applicable), this Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles.

NY:987859.6

- 10 -

P.  It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated by an appropriate court (designated in Section VI.N or, if applicable, Schedule II.D) to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom such invalid term(s), and shall be reformed to the extent necessary to make the Agreement valid and enforceable in that jurisdiction. Such deletion and/or reformation shall apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

## VII. FEDERAL INCOME TAX CONSIDERATIONS

*The following is a summary of the United States Federal income tax consequences of Awards. This discussion does not address all aspects of the U.S. Federal income tax consequences that may be relevant to you in light of your personal investment or tax circumstances and does not discuss any state or local tax consequences of holding Awards. This section is based on the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations under the Code, and published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis. Please consult your own tax advisor concerning the application of the U.S. Federal income tax laws to your particular situation, as well as the applicability and effect of any state or local tax laws before taking any actions with respect to your Award.*

You will not be subject to tax upon the grant of an Award. Upon the vesting of an Installment, such Installment will be subject to FICA employment tax withholding. Upon the payment of cash or a distribution of shares of MMC common stock (or, in the event the second sentence of Section V.A is applicable, other property) pursuant to the Award, you will recognize as ordinary income an amount equal to the amount of cash and the Fair Market Value on the date of distribution of the shares of common stock (and/or other property) received. This amount of income will be subject to income tax withholding on the date of distribution. Your basis in any shares of common stock received will be equal to the Fair Market Value of the shares of common stock on the date of distribution, and your holding period in such shares will begin on the day following the date of distribution. In the taxable year in which you recognize ordinary income on account of cash or shares of common stock awarded to you, the Company generally will be entitled to a deduction equal to the amount of income recognized by you.

Notwithstanding any other provision herein, your Award may be subject to additional restrictions to ensure compliance with the requirements of Section 409A of the Code (regarding nonqualified deferred compensation) and regulations thereunder. The Committee intends to administer the Awards in accordance with Section 409A of the Code and reserves the right to make changes in the terms or operations of the Awards (including changes that may have retroactive effect) deemed necessary or desirable to comply with Section 409A of the Code. This means, for example, that the timing of distributions may be different from those described in this document or in other materials relating to the Award or the 2000 Employee Plan that do not yet reflect Section 409A of the Code and the regulations thereunder. If your Award is not in compliance with

- 11 -

Exhibit A   171

Section 409A of the Code, you may be subject to immediate taxation of all vested but unpaid awards under the 2000 Employee Plan that are subject to Section 409A of the Code, plus interest at the underpayment rate plus 1%, plus a 20% penalty.

## VIII. RESALE RESTRICTIONS

If you are an "affiliate" of MMC at the time you receive shares of MMC common stock in respect of your deferred stock units, your ability to resell those shares may be restricted. In order to resell such shares, you will be required either to observe the resale limitations of Rule 144 of the Securities Act of 1933, as amended (the "*Securities Act*"), or offer your shares for resale in compliance with another applicable exemption from the registration requirements of the Securities Act.

An "affiliate" is defined, for purposes of the Securities Act, as a person who directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, MMC. A "person" is defined to include any relative or spouse of the person and any relative of the person's spouse who has the same home as the person, any trust, estate, corporation or other organization in which the person or any of the foregoing persons has collectively more than 10% beneficial interest, and any trust or estate for which the person or any of the foregoing persons serves as trustee, executor or in any similar capacity. A person "controls, is controlled by or is under common control" with MMC when that person directly or indirectly possesses the power to direct or cause the direction of the management and policies of MMC whether through the ownership of voting securities, by contract or otherwise.

## IX. INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Annual Report on Form 10-K of MMC for its last fiscal year, MMC's Registration Statement on Form 8 dated February 3, 1987, describing MMC common stock, including any amendment or reports filed for the purpose of updating such description, and MMC's Registration Statement on Form 8-A/A dated January 26, 2000, describing the Preferred Stock Purchase Rights attached to the common stock, including any further amendment or reports filed for the purpose of updating such description, which have been filed by MMC under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), are incorporated by reference herein.

All documents subsequently filed by MMC pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, subsequent to the end of MMC's last fiscal year and prior to the filing of a post-effective amendment which indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing of such documents.

The Annual Report can be viewed on MMC's website at http://www.mmc.com/annualreport.html. Participants may receive without charge, upon written or oral request, a copy of any of the documents incorporated herein by reference and any other documents that constitute part of this Prospectus by contacting the Senior Manager, Global Compensation of MMC as indicated above.

* * *

- 12 -

NY:987859.6

Exhibit A  172

BY CONSENTING TO THESE TERMS AND CONDITIONS, you agree to the following: (i) you have carefully read, fully understand and agree to all of the terms and conditions described herein, including Section I.C (regarding cancellation or rescission of your Award in the event you engage in certain competitive activities), Section II.A (regarding your obligation to give notice prior to voluntary termination), Section II.B (regarding your agreement not to solicit clients and employees following your termination of employment) and the Plan; and (ii) you understand and agree that this Agreement and the Plan constitute the entire understanding between you and the Company regarding the Award, and that any prior agreements, commitments or negotiations concerning the Award are replaced and superseded.

Please return a signed copy of these Terms & Conditions to the Company at the address below:

> Guy Carpenter & Company, Inc.
> Attention: Managing Director, Human Resources
> One Madison Avenue, 4th floor
> New York, New York 10010

_____
Participant's Signature

**Ron Whyte**
Participant's name

**510368**
Participant's Employee ID #

- 13 -

NY:987859.6

## SCHEDULE II.D

1. **BACKGROUND**

   Pursuant to Section II.D, this Schedule will apply to you if, and only if, your employment with the Company terminates at a time when your principal place of employment for the Company at that time is the UK ("a UK Employee"). It shall be for the Company to determine, in cases of doubt, where it considers your principal place of employment to be. For the avoidance of doubt, if your employment ends during a secondment to the United Kingdom, then your principal place of employment will be the UK. If your employment terminates following repatriation to the UK, after a period of secondment outside the UK, then your principal place of employment will be the UK. In the case of Clause 3 below (*Notice Period*), this place of employment test will be applied at the date at which notice is given.

2. **CANCELLATION AND RESCISSION OF THE AWARD**

   Following the termination of your employment, the definition of Detrimental Activity set out in this Schedule and the provisions of this Schedule shall apply in place of the definition given in the main body of this Agreement in Section I.C (1) (*Cancellation and Rescission of Award*) and any other contrary provisions of the Agreement. The Rescission Period remains as set out in the Agreement. It is expressly agreed that the Company's exercise of its powers under Section I.C (2) (*Cancellation and Rescission of Award*) shall not affect any other causes of action which the Company or the Group may have or any other rights or remedies arising out of the act or actions which amount to Detrimental Activity. Receipt of any sums or shares by the Company or the Group shall not be treated as satisfaction or compromise in whole or in part of any such causes of action.

   For the purposes of this Agreement if you are a UK Employee, "Detrimental Activity" means:

   (a) *(except with prior written consent of the Board of Directors of the Company) directly or indirectly doing or attempting to do any of the following:*

       (i) to any material extent undertaking, carrying on or being employed, engaged or interested in any capacity in the supply or proposed supply of Competitive Services within the Territory. Competitive Services will be provided within the Territory if any business in which you are to be involved is located or will be located or is conducted or will be conducted wholly or partly within the Territory; or

       (ii) enticing, inducing or encouraging a Client to transfer or remove custom from the Company or any Associated Company;

       (iii) soliciting or accepting business from a Client for the supply of Competitive Services; or

       (iv) enticing, inducing or encouraging an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the

                purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing; or

  (v)    the unauthorized disclosure or misuse of proprietary or confidential information of the Group or its employees or customers; or

  (vi)   any act or omission by you that results (or if known could result) in the termination of your employment by reason of any serious default or misconduct in or affecting the business of the Group. This may include but is not limited to your misappropriation of assets of the Group, willful misconduct in the performance of your duties, material violation of a written code of conduct applicable to you, the nature of a fiduciary duty or breach of trust, conviction of a criminal offence (including an offence relating to the insider dealing) other than one which in the opinion of the Company does not affect your position as an employee of the Company.

3. **NOTICE PERIOD**

If, during your employment, you are a UK Employee at any stage, and at that time notice of termination given, then for the avoidance of doubt the Notice Period referred to in Clause II.A(1) (*Notification prior to Voluntary Termination*) will be either the period specified in any contract of employment with the Company, or 60 days prior written notice, whichever is the longer and that period shall be deemed to be the Notice Period referred to in Clause II.A(1) of this Agreement. Clause II.A(2)(b) shall not apply to a UK Employee.

During the Notice Period the Company will not be under any obligation to provide you with any work, or to require you to undertake any duties for it, and may require you to remain absent from any or all offices of the Group. Alternatively the Company may require you to undertake duties outside the normal range of duties you have previously performed, during any Notice Period. This paragraph is without prejudice to any rights which the Company may have under any contract of employment with you, in relation to its rights during any Notice Period.

4. **GENERAL – NON-SOLICATION AGREEMENT**

Section II.B(1) of the Agreement (*General Non-Solicitation Agreement*) will not apply to you, if you are a UK Employee on the cessation of your employment. Instead you agree that (except with the prior written consent of the Board of Directors of the Company) you will not, for a period of 12 months from the date of termination of employment directly or indirectly do or attempt to do anything of the following:

2

- Entice, induce or encourage a Client to transfer or remove custom from the Company or any Associated Company;
- Solicit or accept business from a Client for the supply of Competitive Services.
- Make known to any person, firm or corporation, the names or addresses of any current employees or customers of the Company or any confidential or sensitive information pertaining to them; or
- Entice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing.

For the avoidance of doubt, Section II.B (2) of the Agreement will continue to apply to you.

It is expressly agreed that your obligations under Clauses 2 and 4 of this Schedule are entirely freestanding and separate. The parties acknowledge that their intention is that the exercise by the Company or the Group of rights under one of the Clauses shall not affect the exercise of its or their rights under the other Clause. It is expressly agreed that a single action by you may result in action being taken against you both in connection with Clauses 2 and 4.

5. **DEFINITIONS APPLYING TO THIS SCHEDULE**

"Client" means a person:

(i) who was at any time during the Relevant Period a client of the Company or any Associated Company (whether or not services were actually provided during such period) or to whom at the expiry of the Relevant Period the Company or any Associated Company was actively and directly seeking to supply services, in either case for the purpose of a Relevant Business;

(ii) with whom you or an Employee in a Relevant Business reporting directly to you or for whom you had management responsibility had dealings at any time during the Relevant Period or were in possession of confidential information about such client in the performance of your, his or her duties to the Company or any Associated Company.

Where services are supplied through another broker or intermediary a "Client" also means

3

the assured or reassured and the broker or intermediary in respect of such services.

"Competitive Services" means services identical or similar to or competitive with those which at the expiry of the Relevant Period the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a Client for the purpose of a Relevant Business;

"Relevant Business" means the business of the Company or any Associated Company in which, pursuant to your duties, you were materially involved at any time during the Relevant Period.

"Employee" means a person who is employed by or who renders services to the Company or any Associated Company in a Relevant Business in a managerial capacity or who has client responsibility or influence over clients or knowledge of confidential information about such clients and who in any such case was so employed or so rendered services during the Relevant Period and who had dealings with you during that period.

"Relevant Period" means during your employment, the period of your employment and where your employment has ended, the period of 12 months ending on the Termination Date.

"Territory" means England, Wales, Scotland and/or Northern Ireland and any other country or, in the United States, any State, in which the Company or any Associated Company is operating or planning to operate Relevant Business as the expiry of the Relevant Period.

References to a person include an individual, firm, corporation and any other organization however it is constituted and words denoting the singular include the plural and vice versa.

The words "Associated Company" mean any company which for the time being is:

(i)     a subsidiary (as defined by Section 736 of the Companies Act 1985) of Marsh & McLennan Companies Inc ("MMC") or any holding company of the Company;

(ii)    A company over which MMC has control within the meaning of Section 416 of the Income and Corporation Taxes Act 1988; or

(iii)   A subsidiary undertaking of MMC as defined by Section 258 of the Companies Act 1985.

References to retirement include both voluntary retirement, at your request, and compulsory retirement, at the request of the Company or at the contractual retirement age for your position, or the normal retirement age for individuals in your position.

The words "the Group" mean MMC, the Company and any Associated Company.

For the purpose of this Schedule only, the Company will be the company in the Group

4

Exhibit A   177

which is your employer.

6. **GENERAL**

This Schedule will be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York.

Each sub-clause and part of such sub-clause of this Schedule constitutes an entirely separate and independent restriction and does not operate to limit any other obligation owed by you, whether that obligation is express or implied by law. If any restriction is held to be invalid or unenforceable by a court of competent jurisdiction, it is intended and understood by the parties that such invalidity or unenforceability will not affect the remaining restrictions.