# EXHIBIT A-10

# 12

**Q1 2007 Marsh & McLennan Companies, Inc. Earnings Conference Call - Final**
8 May 2007
Voxant FD (FAIR DISCLOSURE) WIRE

OPERATOR: Welcome to MMC's conference call. First-quarter 2007 financial results and supplemental information were issued earlier this morning. They are available at MMC's Web site at www.mmc.com .

Before we begin, I would like to remind you that remarks made today may include statements relating to future events or results which are forward looking statements as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to inherent risks and uncertainties. In particular, references during this conference call to anticipated or expected results of operations for 2007 are forward-looking statements and MMC's actual results may be affected by a variety of factors. Please refer to MMC's most recent SEC filings, as well as the Company's earnings release, which are available on the MMC Web site, for additional information on factors that could cause actual results to differ materially from those expressed or implied in any forward-looking statements made today.

I will now turn the conference over to Mr. Michael Cherkasky, President and CEO of MMC. Please go ahead, sir.

MICHAEL CHERKASKY, PRESIDENT, CEO, **MARSH & MCLENNAN** COMPANIES, INC.: Thank you and good morning, everyone. Thanks for joining us for MMC's first-quarter 2007 conference call. I'm Michael Cherkasky. Joining us today are Matt Bartley, our CFO, and Brian Storms, COO of Marsh. Also with us is Mike Bischoff, head of Investor Relations.

I'm going to talk about key elements of the quarter. Brian will then update you on Marsh. Matt will then follow. Then we will take some questions.

Let me first start by saying that I like where MMC is today and I like our quarter. MMC is doing what we said we would do at our Investor Day in December. Our margin is up, our operating income is up, our revenues are up, our financial flexibility is increasing, and our expenses are under control. At the same time, our transformation of this company is on track and is and will continue to make us a more profitable, a more reliable company. In the areas where we had some revenue shortfalls, they are limited, and we believe temporary.

MMC's first-quarter performance illustrates the diversification, strength and potential of MMC. This is a theme we've talked about in the past and will come back to later this morning.

MMC's revenues were $2.8 billion in this year's first quarter, an increase of 5% compared with last year, 1% on an underlying basis. Excellent expense control allowed us to leverage our revenue growth into a 15% increase in operating income to $387 million; 22% growth in pretax income to $335 million; and a 10% increase in margin to 13.8%. This is MMC's highest level of profitability in all three categories since the second quarter of 2004.

Our Consulting segment, made up of Mercer HR and Mercer Specialty, continued to show very strong growth in both revenue and profitability. This segment grew revenues 13% and is on track to do more than $4.5 billion in annual revenues this year. At the same time, we boosted our operating profits 22% year-over-year and our margin grew to 12.2%, over a 100 basis points improvement from last year's full-year margin. The MMC Consulting segment is a big business,

MIKE BISCHOFF: Meyer, Mike Bischoff -- it's not just an issue of rates; it's the issue of client retention. As Mike indicated in his remarks, client retentions were up not only last year but also the first quarter January renewal for our clients as well.

MEYER SHIELDS: Okay, thanks. As a follow-up, there has been a few significant headlines of I guess employee defections, whether it's Integro facultative re or Beecher Carlson in Atlanta. Can you give us an update in terms of the turnover you're seeing from client-facing folks and how that compares to previous years and quarters?

MICHAEL CHERKASKY: Yes. First, I'm going to handle the reinsurance. Obviously, we did have a defection to Integro in the reinsurance. By the way, it's so fascinating is we are not having defections in the brokerage business to Integro. In fact, they are coming the other way. I think this is a temporary blip. What is very rewarding is that we are attracting people in the reinsurance business. So it really isn't -- there is a war for talent but it's going both ways and I think, because of Integro's position, they make more of a headline about it than maybe others.

Brian, on the brokerage business?

BRIAN STORMS: Yes, a very positive story to tell there as well. I mean, obviously, we measure very carefully our voluntary turnover rates. Our voluntary turnover rates I'm happy to report in the first quarter were down at historically low levels.

We are, for the first time in a long time, as we get more and more proactive, aggressively recruiting. I say with great confidence we are winning the war for talent in the brokers business right now. Our business model, the success that we're beginning to see -- we are winning the war for talent. It's still a pretty irrational market out there; we are seeing competitors offering multi-year deals with lots of guarantees, things that any rational -- we're not going to do. But in terms of our ability to win the war for talent, it's really going in our favor and as the year progresses, you will see the impact of that.

MEYER SHIELDS: Okay, thank you very much.

OPERATOR: Terry Shu, JPMorgan.

TERRY SHU, ANALYST, JPMORGAN: I don't know whether you touched on it. In the quarter, I'm guessing that you did not benefit from higher commission rates? It was a question about contingents but actually the underlying rates. Were you able to get higher commission rates to offset the lost contingents? Was there a trend towards that or is it still out there?

BRIAN STORMS: This is Brian. If you look at our rates, which is not just commissions, it's fees, a large percentage of our big client book is a fee business, those have been pretty consistent throughout the quarter. We are not seeing any change in the overall level that we charge clients. What we are seeing is expansion of services, which unrelates to brokerage commissions, but as it relates to that issue, no, there has been no change.

TERRY SHU: The other point is the headwinds from the declining property/casualty premium rates. I think, because the industry is at record profitability, we're probably looking at a soft rate environment for the foreseeable future. All of the big brokers are talking about improving margins. Is it not a very difficult challenge, as we look ahead, to be able to do that when you're going to continue to see headwinds from declining rates?

# 13

# Herbert Smith

**Strictly Private & Confidential**
Julian Samengo-Turner
17 Kyrler Road
London
SW11 6BD

**BY COURIER**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28

www.herbertsmith.com

Our ref
2090/3159
Your ref

Date
5 April 2007

Dear Sir,

**Guy Carpenter**

We are instructed by Guy Carpenter and associated companies, including your employer, Marsh Corporate Services Limited, and Marsh & McLennan Companies, Inc. (together, "GC").

1. It has come to GC's attention that you are intending to work for a competing business, Integro Limited. This would be in flagrant breach of your contractual obligations to GC referred to in the letter to you dated 3 April 2007 and would result in the cancellation and rescission of the awards made to you under the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan (the "Plan"). In addition, our client has reason to believe that you may already be directly or indirectly soliciting GC employees for the purposes of Integro's business, in breach of your duties as an employee of GC.

2. You have received two awards under the Plan (amounting, in total, to £77,110). However, joining Integro will amount to engaging in Detrimental Activity within the Rescission Period (both terms as defined in the Plan, as applicable to UK employees). Further, if you have in fact solicited GC employees to join Integro, that also constitutes engaging in Detrimental Activity and as such is a further breach of your obligations under the Plan. Accordingly, pursuant to Section IC(2)(b) of the Plan, you must:

    (a)    Return all cash and/or shares of MMC common stock that you have not disposed of; and

    (b)    Pay to MMC an amount equal to the cash and/or the Fair Market Value (as defined in the Plan) on the vesting date of the MMC common stock that you have disposed of.

3. You have a specific obligation pursuant to Section IIE of the Plan, as well as your general obligations as an employee, to provide GC with such information as is reasonably requested by GC in order to establish whether or not you are in compliance with your obligations under the

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310989. It is regulated by the Law Society of England and Wales. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications.

10/7638158_3

Herbert Smith in association with

# Herbert Smith

Date 5 April 2007
Letter To  Julian Samengo-Turner

Plan and as a GC employee.

4.  Accordingly, we are instructed to require from you answers to the following questions, by no later than 4pm on Wednesday 11 April 2007:

   (a)   When did you commence discussions with Integro about employment with them? Who initiated the discussions? With whom at Integro did you meet and/or have discussions and on how many occasions? When and where was each such meeting and/or discussion?

   (b)   Do you have a written offer of employment or engagement from Integro? If so, please provide a copy. If not, do you have an oral offer? If so, please state all material terms of such offer.

   (c)   When do you expect to commence your employment or engagement with Integro? What will be your job title and duties?

   (d)   Is Integro aware of the terms of your employment contract with GC and of the Plan? To whom at Integro have copies of your contract and/or the Plan been provided?

   (e)   Have you informed any GC client of your resignation? If so, please provide details of who you informed, when, how and what was said.

   (f)   Have you discussed with any GC employee the fact that you are leaving GC? If so, please provide details of who you informed, when, how and what was said.

   (g)   Have you discussed with any GC employee (including, in particular, any employees of GC itself and of Marsh) the possibility that such employee might also leave GC? If so, please provide details of who you spoke to, when, how and what was said. What, if any, offer was made or is to be made to that employee? In particular, please provide details of your discussion with Mark Newman on or about 3 April 2007.

   (h)   Are you aware of any discussions between any GC employee and any Integro employee since 1 June 2006 about such employee leaving GC for Integro? If so, please provide details of who was involved in such discussions, when and how the discussion took place and what was said.

   (i)   Have you made any plans to visit or speak to any GC employee or client during your garden leave? If so, whom, when, where and for what purpose?

5.  In addition, we are also instructed to require from you by no later than 4pm on Wednesday 11 April:

   (a)   your written undertaking that you will strictly comply with your obligations as a GC employee and, in particular, with the obligations referred to in the letter to you dated 3 April 2007 and the obligations set out in the Plan; and

   (b)   the return of all documents and other property belonging to GC or its clients or relating to the business of GC or its clients (including electronic or other copies of such

# Herbert Smith

Date 6 April 2007
Letter To Julian Samengo-Turner

documents or property).

You should be aware that our client is also entitled, inter alia, to damages in respect of any breach by you of your obligations and to an injunction to prevent any breach of your ongoing duties as an employee, including those obligations that continue after the end of your employment with GC. Our client's rights in these respects, and generally, are specifically reserved.

Please note that you must preserve all documents and records (including computer, mobile telephone and home telephone records), which may relate to the issues raised in this letter. Any destruction of such documents or records may result in Court sanctions against you.

We look forward to hearing from you as soon as possible and, in any event, no later than 4pm on Wednesday 11 April.

Yours faithfully,

*Herbert Smith LLP*

Exhibit A   204

10/7638158_3

3

Herbert Smith in association with

# Herbert Smith

**Strictly Private & Confidential**
Ron Whyte
Oak Rise
193 World's End Lane
Chelsfield
Kent
BR6 6AT

**BY COURIER**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28

www.herbertsmith.com

Our ref
2090/3159
Your ref

Date
5 April 2007

Dear Sir,

**Guy Carpenter**

We are instructed by Guy Carpenter and associated companies, including your employer, J&H Marsh & McLennan and Sedgwick, and Marsh & McLennan Companies, Inc. (together, "GC").

1.  It has come to GC's attention that you are intending to work for a competing business, Integro Limited. This would be in flagrant breach of your contractual obligations to GC referred to in the letter to you dated 3 April 2007 and would result in the cancellation and rescission of the awards made to you under the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan (the "Plan").

2.  You have received two awards under the Plan (amounting, in total, to £61,688). However, joining Integro will amount to engaging in Detrimental Activity within the Rescission Period (both terms as defined in the Plan, as applicable to UK employees). Accordingly, pursuant to Section IC(2)(b) of the Plan, you must:

    (a)   Return all cash and/or shares of MMC common stock that you have not disposed of; and

    (b)   Pay to MMC an amount equal to the cash and/or the Fair Market Value (as defined in the Plan) on the vesting date of the MMC common stock that you have disposed of.

3.  You have a specific obligation pursuant to Section IIE of the Plan, as well as your general obligations as an employee and director of Guy Carpenter & Company Limited, to provide GC with such information as is reasonably requested by GC in order to establish whether or not you are in compliance with your obligations under the Plan and as a GC employee and director.

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310989. It is regulated by the Law Society of England and Wales. A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications.

10/7638158_2



Herbert Smith in association with
Gleiss Lutz and Stibbe

Exhibit A   206

# Herbert Smith

Date 5 April 2007
Letter To Ron Whyle

4. Accordingly, we are instructed to require from you answers to the following questions, by no later than 4pm on Wednesday 11 April 2007:

(a) When did you commence discussions with Integro about employment with them? Who initiated the discussions? With whom at Integro did you meet and/or have discussions and on how many occasions? When and where was each such meeting and/or discussion?

(b) Do you have a written offer of employment or engagement from Integro? If so, please provide a copy. If not, do you have an oral offer? If so, please state all material terms of such offer.

(c) When do you expect to commence your employment or engagement with Integro? What will be your job title and duties?

(d) Is Integro aware of the terms of your employment contract with GC and of the Plan? To whom at Integro have copies of your contract and/or the Plan been provided?

(e) Have you informed any GC client of your resignation? If so, please provide details of who you informed, when, how and what was said.

(f) Have you discussed with any GC employee the fact that you are leaving GC? If so, please provide details of who you informed, when, how and what was said.

(g) Have you discussed with any GC employee the possibility that such employee might also leave GC? If so, please provide details of who you spoke to, when, how and what was said. What, if any, offer was made or is to be made to that employee?

(h) Are you aware of any discussions between any GC employee and any Integro employee since 1 June 2006 about such employee leaving GC for Integro? If so, please provide details of who was involved in such discussions, when and how the discussion took place and what was said.

(i) Have you made any plans to visit or speak to any GC employee or client during your garden leave? If so, whom, when, where and for what purpose?

5. In addition, we are also instructed to require from you by no later than 4pm on Wednesday 11 April:

(a) your written undertaking that you will strictly comply with your obligations as a GC employee and director and, in particular, with the obligations referred to in the letter to you dated 3 April 2007 and the obligations set out in the Plan; and

(b) the return of all documents and other property belonging to GC or its clients or relating to the business of GC or its clients (including electronic or other copies of such documents or property).

You should be aware that our client is also entitled, inter alia, to damages and/or an account of profits in respect of any breach by you of your obligations and to an injunction to prevent any

# Herbert Smith

Date 6 April 2007
Letter To  Ron Whyte

breach of your ongoing duties as an employee and/or director, including those obligations that continue after the end of your employment and/or appointment as a director with GC. Our client's rights in these respects, and generally, are specifically reserved.

Please note that you must preserve all documents and records (including computer, mobile telephone and home telephone records), which may relate to the issues raised in this letter. Any destruction of such documents or records may result in Court sanctions against you.

We look forward to hearing from you as soon as possible and, in any event, no later than 4pm on Wednesday 11 April.

Yours faithfully,

*Herbert Smith LLP*


Herbert Smith in association with
Gleiss Lutz and Stibbe

3

Exhibit A  208

Exhibit A   209

# Herbert Smith

**Strictly Private & Confidential**
Marcus Hopkins
1 Belmont Road
London SW4 0BZ

**BY COURIER**

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28

www.herbertsmith.com

Our ref
2090/3159
Your ref

Date
5 April 2007

Dear Sir,

**Guy Carpenter**

We are instructed by Guy Carpenter and associated companies, including your employer, Marsh Corporate Services Limited, and Marsh & McLennan Companies, Inc. (together, "GC").

1.  It has come to GC's attention that you are intending to work for a competing business, Integro Limited.  This would be in flagrant breach of your contractual obligations to GC referred to in the letter to you dated 3 April 2007 and would result in the cancellation and rescission of the awards made to you under the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan (the "Plan").

2.  You have received two awards under the Plan (amounting, in total, to £46,266).  However, joining Integro will amount to engaging in Detrimental Activity within the Rescission Period (both terms as defined in the Plan, as applicable to UK employees).  Accordingly, pursuant to Section IC(2)(b) of the Plan, you must:

    (a)   Return all cash and/or shares of MMC common stock that you have not disposed of; and

    (b)   Pay to MMC an amount equal to the cash and/or the Fair Market Value (as defined in the Plan) on the vesting date of the MMC common stock that you have disposed of.

3.  You have a specific obligation pursuant to Section IIE of the Plan, as well as your general obligations as an employee, to provide GC with such information as is reasonably requested by GC in order to establish whether or not you are in compliance with your obligations under the Plan and as a GC employee.

Herbert Smith LLP is a limited liability partnership registered in England and Wales with registered number OC310989.  It is regulated by the Law Society of England and Wales.  A list of the members and their professional qualifications is open to inspection at the registered office, Exchange House, Primrose Street, London EC2A 2HS.  We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications.

10/7638158_4



Herbert Smith in association with
Gleiss Lutz and Stibbe

Exhibit A   210

# Herbert Smith

Date 5 April 2007
Letter To Marcus Hopkins

4.  Accordingly, we are instructed to require from you answers to the following questions, by no later than 4pm on Wednesday 11 April 2007:

   (a)  When did you commence discussions with Integro about employment with them? Who initiated the discussions? With whom at Integro did you meet and/or have discussions and on how many occasions? When and where was each such meeting and/or discussion?

   (b)  Do you have a written offer of employment or engagement from Integro? If so, please provide a copy. If not, do you have an oral offer? If so, please state all material terms of such offer.

   (c)  When do you expect to commence your employment or engagement with Integro? What will be your job title and duties?

   (d)  Is Integro aware of the terms of your employment contract with GC and of the Plan? To whom at Integro have copies of your contract and/or the Plan been provided?

   (e)  Have you informed any GC client of your resignation? If so, please provide details of who you informed, when, how and what was said.

   (f)  Have you discussed with any GC employee the fact that you are leaving GC? If so, please provide details of who you informed, when, how and what was said.

   (g)  Have you discussed with any GC employee the possibility that such employee might also leave GC? If so, please provide details of who you spoke to, when, how and what was said. What, if any, offer was made or is to be made to that employee?

   (h)  Are you aware of any discussions between any GC employee and any Integro employee since 1 June 2006 about such employee leaving GC for Integro? If so, please provide details of who was involved in such discussions, when and how the discussion took place and what was said.

   (i)  Have you made any plans to visit or speak to any GC employee or client during your garden leave? If so, whom, when, where and for what purpose?

5.  In addition, we are also instructed to require from you by no later than 4pm on Wednesday 11 April:

   (a)  your written undertaking that you will strictly comply with your obligations as a GC employee and, in particular, with the obligations referred to in the letter to you dated 3 April 2007 and the obligations set out in the Plan; and

   (b)  the return of all documents and other property belonging to GC or its clients or relating to the business of GC or its clients (including electronic or other copies of such documents or property).

You should be aware that our client is also entitled, inter alia, to damages in respect of any breach by you of your obligations and to an injunction to prevent any breach of your ongoing duties as an

10/7638158_4

2

Herbert Smith in association with
Gleiss Lutz and Stibbe

Exhibit A  211

# Herbert Smith

Date 5 April 2007
Letter To Marcus Hopkins

employee, including those obligations that continue after the end of your employment with GC. Our client's rights in these respects, and generally, are specifically reserved.

Please note that you must preserve all documents and records (including computer, mobile telephone and home telephone records), which may relate to the issues raised in this letter. Any destruction of such documents or records may result in Court sanctions against you.

We look forward to hearing from you as soon as possible and, in any event, no later than 4pm on Wednesday 11 April.

Yours faithfully,

*Herbert Smith LLP*

10/7638158_4

3

Herbert Smith in association with
Gleiss Lutz and Stibbe

Exhibit A   212

# 14

| | |
|---|---|
| Address | **One America Square**<br>**Crosswall**<br>**London**<br>**EC3N 2PH** |
| Telephone | **020 7320 9000** |
| Fax | 020 7320 9111 |
| E-mail | lawyers@elbornes.com |
| Website | www.elbornes.com |
| DX | 1063 London-City |
| Lloyd's Line | 7819-0 |

11 April 2007

Our ref; ES/KCP
Your ref; 2090/3159

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS

# Elborne Mitchell
### SOLICITORS

Dear Sirs

**Our Clients; Ron Whyte, Julian Samengo-Turner, Marcus Hopkins**
**Re; Guy Carpenter**

We refer to your letters of 5 April addressed to our clients, the above named.  Please note our interest in this matter.

Your letters are in broadly the same terms (subject to the comments made below) and require detailed responses to a range of questions together with written undertakings and the return of company property by 4pm this afternoon, which is the Wednesday following the four day Easter bank holiday.  The letters were however dispatched to our clients last thing on the Thursday night before the Easter break.  We understand that the letter addressed to Mr Samengo-Turner was not in fact received by him (his address was mis-spelt) and we only have a faxed copy which was sent to us this morning.

It should come as no surprise to you that our clients cannot possibly comply with such a contrived timetable.  In any event, Mr Whyte is currently on vacation abroad and Mr Hopkins on vacation in the West Country.  We are hoping to take detailed instructions from all three clients by mid next week and will revert as soon as we reasonably can thereafter.

We can say the following meanwhile.  Our clients are aware of their obligations and intend to abide by them insofar as those obligations are enforceable against them and subject of course to your clients not being in repudiatory breach themselves.  Paragraphs 1 and 2 of your letters are couched as subjective futures and warn what might be the consequences of certain activities should they happen.  It would appear that you have no evidence of any "Detrimental Activity" and/or breach of confidence or duty having taken place.  If this is not the case, you should set out fully what that evidence is, so our clients can have a fair opportunity to address whatever concerns your clients may have.

Particularly in this regard, we note that you have intimated that Mr Samengo-Turner has attempted to solicit employees of your clients to join Integro.  Please advise us of the basis of this allegation and the means by which any evidence in support of it was obtained.

Regulated by the Law Society
Timothy Bramhall (senior partner)  Timothy Akeroyd  Alexandra Booth  Jonathan Bruce  Timothy Goodger

Exhibit A  214

11/04/2007  14:17   020-7320-9111            ELBORNE MITCHELL                    PAGE  03/03

As you are aware, our clients have been put on garden leave following their resignations from your clients. Will you please advise if and when a Code of Conduct will be issued to our clients in relation to their garden leave and if not, why not.   .

Can you also confirm whether it is your case that English law and jurisdiction apply to any dispute that may arise between our clients. We ask because the Non-Solicitation Agreement of 18 December 2006 on its face provides that *"this Agreement shall be governed by and construed in accordance with the laws of the State of New York"* and that *"any action or proceeding with respect to this Agreement and the Employee's employment shall be bought exclusively in the Supreme Court of the State of New York or New York County, or in the United States District Court for the Southern Division of New York and the parties agree to the jurisdiction thereof"*.

Plainly, if the relationships between our clients, even as to part, are governed by another code of law and the venue of any dispute resolution is not England and Wales, then our clients will need to take advice from lawyers practising in that other jurisdiction. Your clarification is therefore urgently requested.

We trust the above is clear and await hearing from you.

Yours faithfully

Elborne Mitchell

Exhibit A   215

# 15

|  |  |
|---|---|
| Address | One America Square<br>Crosswall<br>London<br>EC3N 2PR |
| Telephone | 020 7320 9000 |
| Fax | 020 7320 9111 |
| E-mail | lawyers@elbornes.com |
| Website | www.elbornes.com |
| DX | 1063 London-City |
| Lloyd's Line | 7819-0 |

19 April 2007

Our Ref      KCP/RJ/30947
Your Ref     2090/3159/30875525

**By Fax and Post**

Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS

# Elborne Mitchell
### SOLICITORS

Dear Sirs

**Our Clients:  Ron Whyte, Julian Samengo-Turner, Marcus Hopkins**
**Re:           Guy Carpenter**

We refer to your letter of 13 April 2007.

We had requested that you provide us with details of the breaches of confidence and/or duty which you have previously intimated against our clients in your letter of 5 April 2007.  Your letter of 13 April 2007 does not provide any such details.

You have stated that Mr Samengo-Turner made a call to Mr Newman on or about 3 April 2007 which was overheard by Mr Spiller. However, you do not state what was said during that call, if anything, which might be a cause of concern to your client.   Mr Samengo-Turner has been a long standing friend and colleague of Mr Newman during the best part of 20 years and the fact of the call being made is not disputed.  However, such contact clearly does not amount to a breach of Mr Samengo-Turner's employee obligations, if that is what is being suggested.

With respect, this matter cannot be left at the level of insinuation and innuendo.  If it is being said that Mr Samengo-Turner in some way breached his duties or obligations in the course of the call to Mr Newman please would you specify exactly in what respects it is alleged that he did so.

Your letter also indicates that other facultative brokers at Guy Carpenter have chosen to accept offers at Integro, including one Charles Waddington, but again you have not stated why or in what respects that fact might concern our clients.

It is not acceptable for you to make vague allegations of such a serious nature against our clients without substantiating them or even providing sufficient details of those allegations to

Regulated by the Law Society
Timothy Broomhall (senior partner)  Timothy Akroyd  Alexandra Booth   Jonathan Bruce   Timothy Goodger
                                    Edmund Stanley  Peter Tribe

Exhibit A   217

enable our clients properly to address them.    This is particularly so when you have used those general assertions of a breach as the platform for very detailed and comprehensive questioning of our clients, including on matters where we regard your client's entitlement to such information to be unfounded, for example, as to the terms of any package which might have been offered by Integro.

We would therefore ask you once again to please clearly set out the basis of the breach of confidence or duty which has been intimated against our clients in the letter of 5 April 2007 so that our clients can deal with those concerns.

We await your response as soon as possible on this matter.  With regard to the remainder of your letter of 5 April 2007, we have the following comments: -.

Re 1 and 2)  Your letter states that *"It has come to GC's attention that you are intending to work for a competing business, Integro Limited.  This would be in flagrant breach of your contractual obligations to GC referred to in the letter to you dated 3 April 2007 and would result in the cancellation and rescission of the awards made to you under the ...Plan"*

Our clients instruct us that they were quite open about their intention to join Integro at the time of their resignation from GC and indeed they themselves informed Lynsey Mansfield, Head of International HR, of this fact on 2 April 2007.  Even prior to their resignation, Mr Bromley of GC was informed on 31 March 2007 by Mr Samengo-Turner and Mr Whyte that they were intending to join Integro and he was informed by Marcus Hopkins that he was also intending to do so on 2nd April 2007.  This was not a matter which only subsequently came to your client's attention, as might be inferred from your letter.  Furthermore, our clients' intention to join a competing business does not, of itself, amount to a breach of their contractual obligations to GC.

As far as the Plan is concerned, we are considering the basis of your client's claim for repayment of awards made to our clients under the Plan.  In this regard, please would you  provide a breakdown of the amount and dates of the awards paid to each of our clients under the terms of the Plan.

Re 3 and 4)  We await your response on the alleged breaches of duties and obligations as sought above.

Re 5 a)      We confirm that our clients would be happy to sign written undertakings confirming that they will comply with their garden leave obligations.

Re 5 b)      We confirm that our clients do not have any such documents or other property belonging to GC or its clients other than mobile phone handsets which they are happy to return at your request.

We confirm that our clients are aware of their obligations to preserve all documents and records which may relate to this matter.  Likewise, we would request that you confirm that your client is aware of its duties in this regard and in particular to retaining the telephone

records evidencing the time and duration of the call apparently made or received by Mr Spiller on or about 3 April 2007.

Yours faithfully

**Elborne Mitchell**

Exhibit A  219