# EXHIBIT A-12

# 2

Westlaw.

Not Reported in F.Supp.                                                                                              Page 1
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Anselmo v. Univision Station Group, Inc.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Reynold V. ANSELMO, Plaintiff,
v.
UNIVISION STATION GROUP, INC., Univision
Holding, Inc., and Hallmark Cards, Incorporated,
Defendants.
**No. 92 Civ. 1471(RLC).**

Jan. 15, 1993.

Lowenthal, Landau, Fisher & Bring, P.C., New York
City (Lawrence L. Ginsburg, Charles S. Biener, of
counsel), for plaintiff.
Patterson, Belknap, Webb & Tyler, New York City
(Thomas C. Morrison, Judith Whittaker, Andrew L.
Tureff, of counsel), for defendants.

OPINION
ROBERT L. CARTER, District Judge.

I.

**\*1** In this diversity suit plaintiff Reynold V. Anselmo
seeks indemnification from the defendants Hallmark
Cards, Inc. ("Hallmark"), Univision Holdings, Inc.
("UH") and Univision Station Group, Inc. ("USG")
for liability he incurred in a suit brought against him
in the Southern District of New York ("the *Caballero*
suit"). The defendants have moved to dismiss for
improper venue pursuant to Rule 12(b)(3),
F.R.Civ.P., or to transfer pursuant to 28 U.S.C. §
1404(a), claiming that there is a forum selection
clause applicable to the parties which requires that
this suit be brought in the Central District of
California.

Prior to May, 1986, the plaintiff was a director and a
principal shareholder of Spanish International
Communications Corporation ("SICC") which was a
closely-held Delaware corporation engaged in the
broadcast of Spanish-language television. On July
19, 1986, defendant Hallmark entered into an
Acquisition Agreement ("Agreement") for the
purchase of all the outstanding stock of SICC.
Pursuant to that acquisition defendant USG is now
the successor corporation to SICC. Hallmark,

through wholly-owned subsidiaries, owns defendant
UH, the parent corporation of USG.

In September, 1989, Mr. Anselmo was found liable in
the *Caballero* suit, and in February, 1992 a
settlement agreement was reached. Plaintiff
instituted this suit because the defendants refused to
indemnify him.<u>FN1</u> The defendants assert that the
forum selection clause in the Agreement requires that
Mr. Anselmo bring this lawsuit in the Central District
of California.

II.

In order to enforce a forum selection clause, the court
must first determine whether the plaintiff's claims are
ones contemplated under the terms of the clause. If
the forum selection clause is applicable, the clause
should be enforced unless it is clearly shown that
enforcement would be unreasonable or unjust or that
the clause was obtained through fraud or
overreaching. *Jones v. Weibrecht*, 901 F.2d 17, 19
(2d Cir.1990).

The applicability of a forum selection clause is
governed by "objective consideration of the
language" of the clause. *Mellon Stuart Co. v. North
River Insurance Co.*, 1990 WL 13168, \*4 (S.D.N.Y.)
(Keenan, J.) (quoting *New York v. Pullman, Inc.*, 477
F.Supp. 438, 442 (S.D.N.Y.1979) (Weinfeld, J.). In
this case, the relevant forum selection clause is
Article VII, Section 7.5 of the Agreement which
states as follows:
Any litigation relating to this Agreement shall be
brought before the United States District Court for
the Central District of California for determination in
Case No. CV-763451 MRP.<u>FN2</u>

Thus, the plaintiff's claims are ones contemplated by
the forum selection clause if they "relate to" some
portion of the Agreement.<u>FN3</u>

According to the defendants, the plaintiff's claims all
"relate to" Article VII, Section 7.6 of the Agreement
which contains the conditions under which the
successor corporation to SICC will defend and
indemnify present and former SICC directors.<u>FN4</u> In
his original complaint, the plaintiff included a claim
that he was entitled to indemnification pursuant to
Section 7.6. Since such a claim would be based on

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

the express language of the Agreement, it would clearly "relate to" the Agreement. However, after the defendants filed their motion to dismiss or transfer for improper venue, the plaintiff filed an Amended Complaint which dropped that claim; all other claims in the Amended Complaint are essentially identical to those in his original complaint.

*2 The plaintiff's elimination of the claim based on Section 7.6 does not necessarily circumvent the Agreement's forum selection clause. The clause contains the phrase "relating to" which is broad enough to encompass claims not explicitly grounded in the Agreement. Thus, each remaining claim in the plaintiff's Amended Complaint must be evaluated in light of the clause. A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if "the gist" of those claims is a breach of that relationship. _Bense v. Interstate Battery System, Inc.,_ 683 F.2d 718, 720 (2d Cir.1982); _Coastal Steel,_ 709 F.2d at 203; _Envirolite Enterprises, Inc. v. Glastechnische Industrie Peter Lisec Gesellscheaft M.B.H.,_ 53 B.R. 1007, 1009 (S.D.N.Y.1985) (Carter, J.).

One of the plaintiff's claims is that USG and UH are obligated to indemnify him pursuant to a 1987 SICC Board of Directors Resolution. The 1987 Resolution clearly "relates to" the Agreement because it was adopted after the Agreement was signed, and it incorporates provisions of the Agreement's indemnification section.[FN5] Consequently, the plaintiff's tort claim alleging that Hallmark induced USG and UH to breach the 1987 Resolution must also "relate to" the Agreement.

The plaintiff also claims that USG and UH are obligated as the successors to SICC to uphold a 1985 SICC Board of Directors Resolution in which the board voted to indemnify him.[FN6] This claim does not "relate to" the Agreement because the 1985 Resolution was adopted before the Agreement came into existence in 1986.[FN7] Moreover, the forum selection clause by its terms applies only to litigation relating to "this Agreement," so it was not intended to govern disputes arising under the terms of earlier contracts or agreements between SICC and its officers and directors.[FN8] Consequently, the plaintiff's tort claim against Hallmark for inducing USG and UH to breach their obligations to him under the 1985 Resolution does not "relate to" the Agreement because the tort grew out of events which preceded the Agreement.

The plaintiff also claims that USG and UH are obligated to indemnify him pursuant to Delaware Corporation Law § 145(a) and § 145(f).[FN9] The defendants counter that section 145 does not furnish an independent basis for indemnification, and requires an implementing action by SICC's board of directors finding that Mr. Anselmo acted in good faith and in a manner reasonably believed to be in the best interests of the corporation. According to the defendants, such an implementing action was never adopted with respect to indemnifying Mr. Anselmo; however, the defendants overlook Mr. Anselmo's reliance on the 1985 Resolution and Article 8 of the SICC by-laws,[FN10] which was in force at the time the 1985 Resolution was adopted, and which allegedly made mandatory the provisions for permissive indemnification in § 145(a).[FN11]

*3 The defendants further argue that the SICC board could not have voted to indemnify Mr. Anselmo in 1985 because it was prior to the district court's decision in _Caballero._ However, § 145(a) does not require a prior judicial determination in favor of a director before indemnification, rather the corporation may indemnify the director if the board finds that the director acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation. _Green v. Westcap Corp. of Delaware,_ 492 A.2d 260, 264 (Del.Super.1985). Since the plaintiff's Delaware state law claim is based on the 1985 Resolution and the corporate by-law in effect at that time, it does not "relate to" the Agreement which was not in effect at that time.

### III.

Since the Agreement's forum selection clause is not applicable to all of the plaintiff's claims, he argues that transfer is unwarranted because his case is broader than the forum selection clause. However, if the plaintiff asserted claims not governed by the forum selection clause simply to evade the clause, transfer or dismissal would be warranted. _Farmland Industries, Inc. v. Frazier-Parrott Commodities, Inc.,_ 806 F.2d 848, 852 (8th Cir.1986); _see also Envirolite,_ 53 B.R. at 1009.

Although the plaintiff demonstrated by dropping his claim based upon Section 7.6 of the Agreement that he does not wish his case to be decided by the California federal district court, a plaintiff is permitted to strategize as to the best forum for his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

case.[FN12]  There is insufficient evidence from which to conclude that the plaintiff's 1985 Resolution claim and related tort law claim or his Delaware state law claim are meant to evade the forum selection clause since at this time those claims do not appear to lack merit, nor is a breach of the Agreement the "gist" of those claims.  *See Bense,* 683 F.2d at 720.

No case within this jurisdiction has addressed how to respond when, for a reason other than evading the clause, only some of a plaintiff's claims are governed by a forum selection clause.   The closest case is *Lombardozzi v. Debroux,* 1992 WL 246872, *1 (N.D.N.Y.)* (Munson, J.) in which the court decided to remand a case to state court based on a forum selection clause in a settlement agreement which gave the state court "exclusive jurisdiction over any dispute arising out of or relating to the Settlement Agreement."   Although none of the plaintiff's claims were based on the settlement agreement, one of the defendant's affirmative defenses invoked the agreement.   The court held that "since at least one portion of the dispute 'arises out of' or 'relates to' the Settlement Agreement, the forum selection clause in that Agreement is clearly implicated."  *Id.* at *3.

Courts in other jurisdictions have refused to dismiss or transfer a case which is broader than the forum selection clause.   However, unlike this case, most all of those cases involved additional defendants not bound by the forum selection clause and RICO and state law fraud claims which if successful would invalidate the contract containing the clause.  *See Farmland,* 806 F.2d at 852;  *General Environmental Science Corp. v. Horsfall,* 753 F.Supp. 664, 667-668 (N.D.Ohio 1990);  *Snider v. Lone Star Art Trading Co., Inc.,* 672 F.Supp. 977, 980 (E.D.Mich.1987), *aff'd without op.,* 838 F.2d 1215 (6th Cir.1988). [FN13]

*4 By contrast, in this case all the parties are bound by the forum selection clause for one of the plaintiff's main claims, the 1987 Resolution claim.   As for the claims in this case not governed by the forum selection clause, none are vastly different from those claims that are governed by the clause.   Rather, they merely provide alternative theories under which the plaintiff may be entitled to indemnification.   For these reasons, the Agreement's forum selection clause should be honored.   However, since some of the plaintiff's claims are independent of the forum selection clause, dismissal pursuant to Rule 12(b)(3) seems harsh;   transfer pursuant to 28 U.S.C. § 1404(a) is more appropriate.

The plaintiff has indicated, however, that he will

withdraw all claims held by this court to be governed by the Agreement's forum selection clause.   Should the plaintiff follow through by filing a Second Amended Complaint withdrawing those claims, the forum selection clause would become inapplicable because no claims or affirmative defenses would be governed by it.   The plaintiff is entitled to try this case under his chosen theory keeping in mind that issue and claim preclusion may apply to future attempts to sue the defendants for indemnification.

For the foregoing reasons, the plaintiff has one month to file a Second Amended Complaint withdrawing those claims held to be governed by the Agreement's forum selection clause.   If an Amended Complaint is not filed within that time, this case will be transferred to the Central District of California for determination in Case No. CV-763451 MRP.

IT IS SO ORDERED.

> FN1. Although the defendants assert that Mr. Anselmo's liability in the *Caballero* suit did not arise by reason of his position as a director of SICC, the merits of plaintiff's claims for indemnification against the defendants are not relevant to deciding this motion because the defendants have moved only to dismiss or transfer for improper venue.

> FN2. The case referred to in Section 7.5 is a shareholder derivative suit against SICC and some of its directors, including Mr. Anselmo, commenced in California. Defendant's Exhibit E.   As part of the settlement agreement in that case, the SICC stockholders agreed to sell all of their stock or to vote in favor of any merger approved by a Sales Committee.   The district court supervised the bidding process, and approved Hallmark's bid to acquire SICC. Defendant's Exhibit D, E.

> FN3. Although Mr. Anselmo was not a signatory to the Agreement, he is bound by its forum selection clause.   The Agreement was implemented by a merger which required approval by the selling SICC stockholders, and Mr. Anselmo is an SICC stockholder.   Having ratified and adopted the Agreement, Mr. Anselmo and other shareholders could enforce its terms. Therefore, enforcement of the Agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit A  245**

against Mr. Anselmo his claims. *See Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202-203 (3rd Cir.), *cert. den.,* 464 U.S. 938 (1983); *Dukane Fabrics International, Inc. v. M.V. "Hreljin",* 600 F.Supp. 202, 203 (S.D.N.Y.1985) (Lasker, J.); *Stephens v. Entre Computer Centers, Inc.,* 696 F.Supp. 636, 639 (N.D.Ga.1988).

FN4. Section 7.6 states: *Agreement to Defend and Indemnify.* From and after the Effective Time, the Surviving Corporation shall indemnify and hold harmless each present and former officer, director, employee and agent of SICC (the "Indemnified Parties") against any losses, claims, damages, liabilities, costs, expenses, judgments and amounts paid in settlement actually and reasonably incurred in connection with any threatened, pending or contemplated claim, action, suit proceeding, ..., by reason of the fact that such person is or was a director, officer, employee or agent of SICC, ..., arising out of or pertaining to any action or omission occurring on or prior to the Effective Time ... to the fullest extent permitted under Delaware law and the Bylaws of SICC presently in effect.... Defendant's Exhibit A at 46-49.

FN5. Specifically, the minutes of the August 3, 1987 board meeting at which the Resolution was adopted state that the Directors "considered the provisions of the Acquisition Agreement which authorize certain indemnification of officers and directors of the Corporation by the Corporation to the fullest extent of the General Corporation Law of the State of Delaware." Defendant's Exhibit I. After discussion, the following resolution was adopted:
RESOLVED, that Messrs. Anselmo, Villanueva and Kaufman in their capacities, respectively, as present and former officers and/or directors of the corporation shall be indemnified by the corporation with respect to the *Caballero* litigation to the fullest extent permissible under the General Corporation Law of Delaware *as is provided in the Acquisition Agreement;* provided that the authorization provided by this resolution is not intended to supersede or be inconsistent with any other resolutions

concerning the indemnification of such individuals with respect to the *Caballero* litigation previously adopted by this Board of Directors. *Id.* (emphasis added).

FN6. The minutes to the April 16, 1985 SICC Board of Directors Meeting state:
The Board discussed the lawsuits filed in the United States District Court for the Southern District of New York by the daughter of Eduardo Caballero ... The non-party directors determined that in their actions regarding the matters mentioned in the complaint, the defendant director, Mr. Anselmo ... acted in good faith and in a manner they reasonably believed to be in the best interests of the corporation [SICC], and upon motion duly made, seconded, and carried (Mr. Anselmo abstaining), it was
RESOLVED that this corporation is authorized to indemnify Reynold V. Anselmo and Julian M. Kaufman for any liability and expenses incurred by such defendants in the defense of said action to the maximum extent permitted by law; and
FURTHER RESOLVED that the corporation pay all legal expenses and costs incurred by said defendant directors in defending said lawsuit as they become due. Plaintiff's Exhibit B.

FN7. The defendants respond that the 1985 Resolution standing alone is insufficient to confer indemnification, and the Resolution must be considered in light of both the 1987 Resolution and Agreement; however, their response is premature because it attacks the merits of Mr. Anselmo's claim.

FN8. The defendants argue that Section 7.6 of the Agreement, supersedes the 1985 Resolution. Their assertion is based on Article VII, Section 7.9 of the Agreement which states as follows:
This Agreement constitutes the entire agreement among the parties to this Agreement, and supersedes all prior agreements and understandings, oral and written, among the parties to this Agreement with respect to the subject matter of this Agreement." Defendant's Exhibit A at 51.
In order to determine whether defendants are correct, Section 7.6 must be examined. By its terms Section 7.6 only supersedes indemnification decisions made after

Exhibit A   246

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

consummation of the acquisition. *See infra* note 3; Article I, Sections 1.1(a); 1.2 (defining "Effective Time"). However, the plaintiff contends that the 1985 Resolution is a decision to indemnify made before the acquisition, so Section 7.6 is irrelevant.

FN9. Delaware Corporation Law Tit. 8, § 145(a) provides: A corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative ... by reason of the fact that he is or was a director, officer, employee or agent of the corporation ... against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation....
Pursuant to Delaware Corporation Law, Tit. 8, § 145(f) a corporation can also grant indemnification rights beyond those provided by Section 145: The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.
General Corporation Law, Limited Partnership Act and Business Trust Act (Michie 1991).

FN10. Although plaintiff has not provided the 1985 version of Article 8, of the SICC by-laws, he asserts that Article 8 of the Restated Certificate of Incorporation of USG is the same as the 1985 version. Article 8 of the USG by-laws states: "This corporation shall, to the fullest extent permitted by Delaware law, as in effect from time to time, indemnify all persons who are or were directors...." Plaintiff's Exhibit C.

FN11. Under Delaware law, while a board

of directors may vote to indemnify its directors on a case-by-case basis, the board may also make mandatory the permissible indemnification rights of § 145 by means of a corporate by-law. *Advanced Mining Systems, Inc. v. Fricke,* 1992 WL 187615 (Del.Ch.) at *1; *see also Hibbert v. Hollywood Park, Inc.,* 457 A.2d 339, 343 (Del.S.Ct.1983); *Heffernan v. Pacific Dunlop GNB Corp.,* 965 F.2d. 369 (7th Cir.1992).

FN12. Indeed, Mr. Anselmo is so determined to avoid the California courts that he is prepared to withdraw his claim based on the 1987 Resolution, as he did with his Section 7.6 claim, and rely on his remaining claims should this court find that his case should be transferred solely by reason of the 1987 Resolution. Plaintiff's Memorandum in Opposition to Motion at 7.

FN13. Courts have also refused to honor forum selection clauses where the clause appears in a contracts or agreement insignificant to the main claim. *Snider,* 672 F.Supp. at 980 (only one of six equally important documents in RICO claim contained forum selection clause); *Lulling v. Barnaby's Family Inns, Inc.,* 482 F.Supp. 318, 321 (E.D.Wis.1980) (forum selection clause found in only one of four contracts, and one which contained clause was not the basic contract).
S.D.N.Y.,1993.
Anselmo v. Univision Station Group, Inc.
Not Reported in F.Supp., 1993 WL 17173 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

1 of 1 DOCUMENT

**BOZELL GROUP, INC., Plaintiff, - against - CARPET CO-OP OF AMERICA ASSOCIATION, INC., d/b/a CARPET ONE, Defendant.**

**00 Civ. 1248 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 15088*

**October 11, 2000, Decided
October 13, 2000, Filed**

**DISPOSITION:** [*1] Motion for costs granted and the case dismissed for lack of personal jurisdiction.

**COUNSEL:** For Plaintiff: ERIC OSTERBERG, ESQ., Of Counsel, BROWN RAYSMAN MILSTEIN FELDER & STEINER, New York, NY.

For Defendant: NELSON L. MITTEN, ESQ., CHARLES S. KRAMER, ESQ., RANDY HAYMAN, ESQ., Of Counsel, RIEZMAN BERGER, St. Louis, Missouri.

GLENN M. KURTZ, ESQ., ALYCIA REGAN-BENENATI, ESQ., Of Counsel, WHITE & CASE, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.,**

Defendant Carpet Co-Op of America Association, Inc., d/b/a/ Carpet One ("Carpet One"), has moved to dismiss for lack of personal jurisdiction pursuant to *Rule 12(b)(6), Fed. R. Civ. P.*, or, in the alternative, for summary judgment pursuant to *Rule 56, Fed. R. Civ. P.* Plaintiff Bozell Group Inc. ("Bozell") opposes the motions and has moved for recovery of costs of service and filing pursuant to *Rule 4, Fed. R. Civ. P.* For the reasons stated below, the motion for costs is granted, and the case is dismissed for lack of personal jurisdiction.

**The Parties**

Bozell is an advertising agency that is incorporated and headquartered in New York.

Carpet One is a Delaware corporation with [*2] its principal place of business in Missouri that operates a nationwide cooperative of retail carpet dealers.

**Background**

The complaint in this action (the "Complaint") was filed on February 18, 2000. Bozell claims indemnity and breach of contract arising out of Carpet One's failure to honor celebrity endorsement contracts Bozell procured in its capacity as Carpet One's national advertising agency.

On May 2, 2000, Bozell filed the motion for costs. Carpet One filed its opposition to Bozell's motion for costs on May 24, 2000, and the motion was deemed fully submitted on May 26, 2000 upon the filing of Bozell's reply memorandum.

On May 9, 2000, Carpet One filed the motion to dismiss or for summary judgment. Bozell filed its opposition on July 10, and Carpet One filed its reply on July 25. The motion was deemed fully submitted on July 27, 2000.

Both the motion for costs and the motion for dismissal or summary judgment will be addressed in this opinion.

**Facts**

Except as otherwise noted, the following are undisputed facts as presented by the parties.

Some time prior to January 1998, Carpet One entered into negotiations with Bozell for a contract under which [*3] Bozell would act as Carpet One's national advertising agent. Representatives of Carpet One discussed the advertising plan with a Bozell representative at a meeting in New York on January 15, 1998 and again on March 15, 1998.

Exhibit A   249

2000 U.S. Dist. LEXIS 15088, *

By agreement, between November 1997 and June 1998, Carpet One paid $ 50,000 per month for Bozell to arrange media buys for Carpet One, to locate and identify actors, celebrities and other talent who might be willing to endorse Carpet One and/or its products, and to perform other advertising services.

The parties dispute whether a final contract was ever formed and whether, once Contract One had approved the celebrity spokespersons Bozell procured, Contract One was required to contract with them directly in writing.

During this period, Bozell negotiated with potential spokespersons with respect to a potential agreement between the spokespersons and Carpet One. In particular, Bozell exchanged drafts of proposed Talent Agreements with representatives of Beatrice Arthur ("Arthur") and Estelle Getty ("Getty"), both most recently of "Golden Girls" fame. Both Arthur and Getty are represented by the William Morris Agency in New York ("WMA"), are members of the Screen [*4] Actors Guild ("SAG"), the union that represents all "principal performers" that act in commercials. Bozell is a party to the SAG 1997 Commercials Contract, which applies whenever a SAG member is employed in a commercial.

The parties disagree as to whether Carpet One ever gave Bozell approval to hire Arthur and Getty as spokespersons for Carpet One's national advertising campaign, but it is undisputed that Carpet One never executed a written contract with Arthur, Getty or their representatives. Neither Arthur nor Getty ever appeared in any advertisements for Carpet One.

On or about May 20, 1998, Carpet One informed Bozell that it wished to terminate the relationship as of May 31, 1998. In May 1998, Bozell claimed that Carpet One owed it certain monies. The parties contest whether Carpet One acknowledged owing Bozell any payments. The parties entered into settlement negotiations and, on or before July 20, 1998, Carpet One paid Bozell $ 295,468.

On or about July 20, 1998, Bozell signed a "Mutual Release" which provided that, in consideration for the $ 295,468, Bozell would forever release Carpet One and its related entities from "any and all actions, causes of actions, lawsuits, claims, [*5] counterclaims, demands . . . WHETHER NOW KNOWN OR UNKNOWN," arising out of the business relationship. (emphasis in original). From this broad release was a narrow "carve-out" exception, which provided in relevant part:

> Notwithstanding the foregoing, if [Arthur, Getty or their representatives] sue Bozell for damages or other relief for any claim

of any kind, arising out of, related to or connected with the negotiations of the proposed Getty/Arthur agreement whereby Getty and Arthur would have been engaged as spokespersons for Carpet One (the "Getty/Arthur Discussions"), Bozell reserves all Claims against ... Carpet One ..., including any claims for costs or attorneys fees or monetary relief of any type, provided, however, that this reservation of Claims only applies in the situation where ... Getty, and/or Arthur [or their representative] bring a lawsuit or claim in a legal proceedings against Bozell. In any such assertion of claims by Bozell against Carpet One, Bozell's damages shall be limited to the amount of damages, including costs and attorneys fees, awarded ... against Bozell.

*Mutual Agreement at 1-2 P 1*(a) (emphasis added).

Subsequently, [*6] SAG initiated an arbitration proceeding in California against Bozell and Carpet One (the "SAG Arbitration") alleging that the Talent Agreements with Arthur and Getty were binding despite the fact that no commercials were made, and seeking various types of relief. Upon receiving the SAG Arbitration, Carpet One notified SAG's counsel that it could not be compelled to arbitration, deemed SAG's claims to be frivolous, and demanded that it be dismissed from any arbitration proceeding. SAG thereafter agreed to and did dismiss Carpet One from the SAG Arbitration.

Bozell continued to participate in the SAG Arbitration and thereafter notified Carpet One of an intent to settle the claims asserted by SAG. Bozell asked Carpet One to participate in the proposed settlement. Carpet One refused. Nonetheless, Bozell settled the claim for $ 212,650, comprising $ 100,000 paid to Arthur and Getty via their representatives, and $ 12,650 to the SAG Producers Pension & Health Plans. In consideration for these payments, the Settlement Agreement between Bozell and SAG provided that SAG would "forever release and discharge Bozell" and its related entities for any claims arising out of the aborted Arthur and [*7] Getty commercials.

Bozell then initiated the instant suit for breach of contract and indemnity against Carpet One for the amount of the SAG settlement. Bozell sent notice of the suit, a request for waiver of service of a summons, and return forms to Carpet One on February 23, 2000. Although Carpet One acknowledged receiving the mailings in late February of 2000, it did not return the waiver forms. Carpet One contends that there is "good

2000 U.S. Dist. LEXIS 15088, *

cause" excusing its failure to waive service. First, Carpet One initially responded to the receipt of the waiver request by offering to settle in a letter sent on March 2, 2000. In that letter, Carpet One contended that the claims were without merit, threatened to move for sanctions, and stated "in light of these problems, specifically the release and jurisdictional problem with New York venue, Carpet Co-Op is not prepared to execute a waiver of summons at this point." Bozell responded with a counteroffer by letter of March 17, 2000, and, in a separate letter, demanded return of the waiver form.

Carpet One wrote to Bozell on March 22, 2000 that it wished to avoid spending attorney's fees on researching waiver of service if there was a chance the matter [*8] would settle or be submitted to arbitration. In that letter, counsel for Carpet One stated "it is my understanding that your statement that my client has an obligation to return a waiver of service form is an overstatement of the law. Further, any 'obligation' which might otherwise exist would not exist where a suit such as yours is involved."

By letter of March 24, 2000, Bozell refused to continue settlement talks because the parties' positions were too far apart and stated "if your client chooses not to arbitrate, please return the waiver of service form." Carpet One claims that it opted not to return the waiver in reliance on this alleged promise from Bozell not to require waiver until the parties had established whether or not the case would proceed in federal court. Nonetheless, Bozell filed formal service and served Carpet One with the Complaint on April 4, 2000, after the 30-day period for return of the waiver forms had expired.

**Discussion**

**I. Costs**

A defendant may be compelled to pay the plaintiff's costs of service under the *Federal Rules of Civil Procedure. Rule 4* provides that:

> An individual, corporation, or association that is subject to service [*9] under subdivision (e), (f), or (h), and that receives notice of an action in the manner provided in this paragraph has a duty to avoid unnecessary costs of serving the summons. To avoid costs, the plaintiff may notify such a defendant of the commencement of the action and request that the defendant waive service of a summons.

*Fed. R. Civ. P. Rule 4(d)(2)*. Subdivision (h) provides guidelines for service on corporations and associations, a category in which Carpet One falls. *Fed. R. Civ. P. Rule 4(h)*. If a defendant fails to comply with a request to waive service of a summons, "the court shall impose the costs subsequently incurred in effecting service on the defendant unless good cause for the failure be shown." Id. These costs include the cost of service as well as a "reasonable attorney's fee" for a motion to collect costs. *Fed. R. Civ. P. Rule 4(d)(5)*. To trigger a defendant's obligation to pay, a plaintiff must, inter alia, (1) send a written notice and waiver request, (2) to an officer or agent of the defendant corporation (3) by first-class mail, including (4) notice of the consequences of failing to comply with the waiver request within 30 days, and (5) a prepaid [*10] reply envelope. *Fed. R. Civ. P. Rule 4(d)(2)(A-G)*.

In opposition to Bozell's motion, Carpet One takes the position that it is not responsible for the costs of service under this motion because Bozell never made an effort to determine whether the parties could agree upon these costs. This argument need not be addressed in detail. Carpet One has cited no authority for this contention and Rule 4 itself does not refer to any preference for negotiated agreements as to costs. A plaintiff has no burden to seek an out-of-court agreement as to costs to avert the need for a Rule 4 motion.

Moreover, Carpet One contends that its reliance on Bozell's "specific indication" that it would not require waiver is "good cause" excusing the failure to file the waiver form. Yet Bozell did not promise to excuse waiver, and even if it had done so, Rule 4 does not authorize the parties to contract around the waiver of service requirements. A review of the correspondence between counsel submitted as exhibits to the Kramer Affidavit reveals that Bozell stated only, "if your client chooses not to arbitrate, please return the waiver of service form." Carpet One construes this statement as a promise not to require [*11] compliance with a Federal Rule of Civil Procedure. The fact that Bozell "immediately began to institute the process to secure formal service" after the expiration of the period for return of waiver, (Def. Mem. at 4), suggests that Bozell did not intend to excuse any formalities required by the Rules.

Even if Bozell's statement could fairly be construed as a promise not to require waiver of service, the Rules do not authorize the parties to contract around the waiver requirements. The Rules provide that where, as here, the waiver of service and notice of suit are properly sent and received, a defendant who fails to return the waiver form within 30 days "shall" pay a plaintiff's costs. *Fed. R. Civ. P. Rule 4(d)(2)*. n1 Although out of court agreements are

certainly preferable to motions from the perspective of judicial economy, the language of Rule 4 is mandatory. Bozell could not have contracted out of the waiver requirements even if it had so desired.

> n1 Although not argued here, it should be noted that neither of Carpet One's initial defenses -- that the lawsuit lacked merit and that the court did not have jurisdiction -- constitutes "good cause" excusing the failure to return the waiver of service forms under Rule 4. See *Morales v. SI Diamond Technology, Inc., 1999 U.S. Dist. LEXIS 2964, 43 Fed. R. Serv. 3d 1200 (S.D.N.Y. 1999)* (holding that lack of merit in the Complaint is not "good cause" to excuse failure to return waiver form); *Fed. R. Civ. P. Rule 4(d)(1)* ("A defendant who waives service of a summons does not thereby waive any objection to the venue or to the jurisdiction of the court over the person of the defendant.").

[*12]

No good cause having been shown, Carpet One is ordered to reimburse Bozell for its costs of service, including a reasonable attorney's fee for the preparation of the motion for costs, for a total of $ 1,103.00, pursuant to Rule 4(d)(2), (5).

## II. Personal Jurisdiction

In diversity actions such as this one, personal jurisdiction over the parties is determined by the law of the state in which the court sits, in this case New York. *Premier Lending Services v. J.L.J. Assocs., et al., 924 F. Supp. 13 (S.D.N.Y. 1996);* see *Arrowsmith v. United Press Int'l, 320 F.2d 219 (2d Cir. 1963).* New York law provides two mechanisms by which to assert jurisdiction over a defendant, general jurisdiction and personal jurisdiction pursuant to a long-arm statute. In addition, the exercise of personal jurisdiction under New York law is circumscribed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Metro. Life Ins. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996); Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963).* The plaintiff has the burden of proving that the [*13] court has personal jurisdiction over the defendant. See *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)* (citation omitted).

### A. General Jurisdiction

There may be general jurisdiction over a defendant under section 301 of the New York Civil Practice Law and Rules ("CPLR") if the defendant "does business" in New York. CPLR § 301. A defendant should be deemed

to be "doing business" in New York only if the aggregate of the corporation's activity "is such that it may be said that the corporation is present in the State, not occasionally or casually, but with a fair measure of permanence or continuity." *PaineWebber, Inc. v. WHV, Inc., 1995 U.S. Dist. LEXIS 6514, *11, No. 95 Civ. 6514 (LMM), 1995 WL 296398, *4 (S.D.N.Y. May 16, 1995)* (quoting *Laufer v. Ostrow, 55 N.Y.2d 305, 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 (Ct. App. 1982));* see *Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915, 917 (Ct. App. 1917)* (Cardozo, J.).

Typical indicia of an ongoing corporate presence in a state include maintaining a local address and telephone number, property, or employees in the state. See *Landoil Resources Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir. 1980); [*14] PaineWebber, 1995 WL 296398, at *4; Pneuma-Flo Systems, Inc. v. Universal Mach. Corp., 454 F. Supp. 858, 861 (S.D.N.Y. 1978).* Although Carpet One does not have corporate offices or employees in New York, Bozell contends that Carpet One "does business" in New York because it is a nationwide cooperative that is continuously "negotiating agreements . . . purchasing carpet . . . shipping carpet . . . purchasing advertising services and advertising . . . and licensing the Carpet One name to the retailers." (Bozell Mem. at 7.)

However, this allegation is made in a declaration by John Roth, who is a senior partner in Bozell and does not claim to have any personal knowledge of Carpet One's business practices other than its advertising plans with Bozell itself. (See Roth Aff. PP 1, 4, 5.) In fact, Carpet One does not "ship" or "purchase" carpet, own stores or have employees in New York, and licenses its name to independently owned retailers via transactions in Missouri. (Marcarelli Aff. P 4.)

Mere nominal affiliation with independent New York retailers does not give Carpet One a sufficiently permanent presence to justify asserting general jurisdiction [*15] under CPLR § 301. See *Beacon Enterprises, Inc. v. Mary Rose Menzies, 715 F.2d 757 (2d Cir. 1983)* (finding no general jurisdiction where "defendant has no manufacturing facilities, no sales office, no advertising offices, no agents or distributors in the Southern District of New York or elsewhere in the state of New York at this time," despite occasional mail order sales to New York); *Dunn v. Southern Charters, Inc., 506 F. Supp. 564, 567 (E.D.N.Y. 1981)* (solicitation of orders for defendant's products through independent agents and publications insufficient to provide general jurisdiction).

Bozell contends that the two visits to New York by Carpet One executives in January and March of 1998 evidence Carpet One's corporate presence in New York.

Exhibit A   252

2000 U.S. Dist. LEXIS 15088, *

However, two meetings taking place over the course of three months do not confer general jurisdiction. over Carpet One. See *Landoil, 918 F.2d at 1045-46* (holding thirteen short trips over eighteen months insufficient to establish § 301 jurisdiction); *Aquascutum of London, Inc. v. S.S. American Champion, 426 F.2d 205, 211-12 (2d Cir. 1970)* (visits to solicit business in New [*16] York "every few months" insufficient); *Hoffritz For Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57-58 (2d Cir. 1985)* (fifty-four visits to New York to discuss business with plaintiff insufficient); *New World Capital Corp. v. Poole Truck Line, Inc., 612 F. Supp. 166, 172 (S.D.N.Y. 1985)* (eight visits over four years insufficient); *Savoleo v. Couples Hotel, 136 A.D.2d 692, 693, 524 N.Y.S.2d 52, 52 (App. Div. 1988)* ("occasional" business trips to New York insufficient)).

**B. Long-Arm Jurisdiction**

Second, New York's long-arm statute provides that a court may exercise personal jurisdiction over a non-domiciliary defendant who: (1) transacted business in New York, (2) if the cause of action arises out of the business transacted. CPLR § 302(a)(1); see *PaineWebber, 1995 WL 296398* at *2. Each claim in a cause of action must arise out of the transaction of business or the contract to supply goods or services. See *Morrison v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 501 (S.D.N.Y. 2000)*.

**1. Transacting Business**

A defendant "transacts business" in New York under CPLR § 302 when it has [*17] "purposely availed" itself of the opportunity to conduct business here, and thereby benefits and protections of New York law. *Sterling Nat. Bank and Trust Co. of New York v. Fidelity Mtge. Investors, 510 F.2d 870, 873 (2d Cir. 1975); McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (Ct. App. 1967)* (citing *Hanson v. Denckla, 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (253 (1958))*.

The existence of purposeful activity should be considered in the totality of the circumstances, and jurisdiction should not be asserted against a defendant based upon "random" or "fortuitous" contacts. *Cutco Industries v. Naughton, 806 F.2d 361, 365; see Burger King v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*. It is the "nature and quality," not the number of contacts, that determine whether activity is purposeful. *Standard Enterprises, Inc. v. Bag-It, Inc., 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987)*. As a rule, the "minimum contacts" must provide a defendant with notice that it might be subjected to suit in courts of the forum state. [*18] *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (Ct.*

*App. 1998)* (citing *Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174)*.

It cannot be said that two trips to New York and a few phone calls constitute "purposeful availment" of New York law. See *Cortland Line Co. v. Vincent, 1999 U.S. Dist. LEXIS 7190, *11, No. 98- CV-259, 1999 WL 305369, *3 (N.D.N.Y. May 7, 1999)* (finding no § 302 jurisdiction despite numerous telephone calls and a single trip to New York). The fact that the meetings and calls involved New York was incidental; Carpet One is based in Missouri and planned a nationwide advertising campaign and did not project itself into New York through these contacts. Moreover, there were only two meetings during which Carpet One executives were physically present in New York. The meetings took place three months apart, were not part of a systematic pattern of New York visits, and did not result in any contract being signed. These contacts do not rise to the level of "transacting business" required for § 302 jurisdiction. Cf. *George Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977) [*19]* (finding jurisdiction under § 302(a)(1) when the defendant "was physically present in New York at the time the contract, establishing a continuing relationship between the parties, was negotiated and made . . . .").* n2

n2 Moreover, even if Bozell were acting as Carpet One's agent in negotiating with WMA for Arthur and Getty's appearances, Bozell's conduct in New York could not be attributed to Carpet One in analyzing whether or not Carpet One had sufficient contacts with New York to confer jurisdiction. *Stein v. Microelectronic Packaging, Inc., 1999 U.S. Dist. LEXIS 11375, *16, No. 98 Civ. 8952(MBM), 1999 WL 540443, *5 (S.D.N.Y. July 26, 1999); Laufer, 55 N.Y.2d at 312, 449 N.Y.S.2d at 460*.

**2. Nexus between Contacts with New York and the Asserted Claim**

Even if the contacts asserted here did rise to the level of "transacting business" in New York, the instant claims for breach of contract and indemnity did not "arise out of" those contacts as is required for § 302 jurisdiction. A claim "arises out [*20] of" the transaction of business when there is a "substantial nexus" between the transaction of business and the cause of action sued upon. See *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 31 (2d Cir. 1996); Nassar v. Florida Fleet Sales, 69 F. Supp. 2d 443, 446 (S.D.N.Y. 1999); McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981)* (requiring an

2000 U.S. Dist. LEXIS 15088, *

"articulable nexus" between claims asserted and transaction of business in New York").

Bozell asserts that the requisite nexus stems from the fact that Carpet One's executives visited New York twice to discuss Bozell's advertising strategy in what Bozell claims to have been "important" and "crucial" meetings. Personal jurisdiction based upon meetings in the forum state is warranted only if the meetings are substantial. See *PaineWebber, 1995 WL 296398,* at *3.

Yet even if they were "important" to Carpet One's overall business strategy, these meetings were mere "link[s] in the chain of events leading to the claim[s] for which relief is sought." *Xedit Corp. v. Harvel Indus. Corp., 456 F. Supp. 725, 729 (S.D.N.Y. 1978).* [*21] The claim asserted in this action is that Carpet One must indemnify Bozell for the cost of Bozell's settlement with SAG over the cancelled Arthur and Getty commercials, and that Carpet One breached its contract to Bozell in failing to pay. The meetings gave rise to a marketing plan, which led to Bozell's solicitation of and contracting with Arthur and Getty to appear in Carpet One commercials, an agreement which in turn was repudiated by Carpet One, which led to the initiation and settlement of arbitration against Bozell, which Carpet One refused to join, which, finally, led to the instant claims for indemnity and breach of contract. The two meetings were simply not proximate enough to the acts claimed in this suit for them to confer personal jurisdiction under § 302. See Weinstein, Korn & Miller, *New York Civil Practice § 302.05,* at 3-80) ("The defendants' New York activities must be substantially proximate to the allegedly unlawful acts before the cause of action can be said to arise out of those activities.").

Bozell has not shown that the two claims it asserts in this action arose out of Carpet One's transaction of business in New York. This court has no personal jurisdiction [*22]  over the defendant under CPLR § 302(a)(1).

**Conclusion**

For the foregoing reasons, the motion for costs is granted and the case is dismissed for lack of personal jurisdiction.

It is so ordered.

**New York, NY**
**October 11, 2000**

  **ROBERT W. SWEET**

  **U.S.D.J.**

**4**

**BREINDEL & FERSTENDIG, Plaintiff, -against- WILLIS FABER & DUMAS LIMITED, Defendant.**

**95 Civ. 7905 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 10432*

**July 22, 1996, Decided**
**July 24, 1996, FILED**

**DISPOSITION:** [*1] WFD's motion to dismiss the complaint on the grounds of forum non conveniens denied. WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims. WFD's motion for summary judgment denied without prejudice to renew as against Breindel's negligence and gross negligence claims. Decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits. Stay of discovery lifted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff law firm brought suit against defendant, a London-based reinsurance broker, for legal fees. The broker moved for summary judgment and to dismiss the complaint for forum non conveniens.

**OVERVIEW:** The broker contended that English courts were more convenient or, in the alternative, that the claims for breach of contract and fiduciary duty, negligent or fraudulent misrepresentation, negligence, and gross negligence should be summarily dismissed. The court held that (1) the unavailability of a jury trial or punitive damages and the lack of opportunity to take pretrial depositions did not render suit in England clearly unsatisfactory; (2) although both parties had a significant interest in having the dispute decided at home, the action involved money owed to a New York law firm for services performed solely in this country; (3) the law firm failed to establish any contractual relationship with or duty owed to it by the broker; and (4) the law firm failed to show that the broker acted as its agent or that

any other relationship existed to give rise to a fiduciary duty.

**OUTCOME:** The court denied dismissal for forum non conveniens and of the negligence claims, granted summary judgment on the breach of contract and fiduciary duty and negligent misrepresentation claims, reserved decision on summary judgment on fraud, and lifted the stay on discovery.

**COUNSEL:** For BREINDEL & FERSTENDIG P.C., plaintiff: Howard Breindel, Breindel & Ferstendig P.C., New York, NY.

For WILLIS FABER & DUMAS LIMITED, defendant: Michael Zweig, Loeb and Loeb, New York, NY.

**JUDGES:** SIDNEY H. STEIN, U.S.D.J. Magistrate Judge Andrew J. Peck

**OPINION BY:** SIDNEY H. STEIN

**OPINION:**

OPINION AND ORDER

SIDNEY H. STEIN, DISTRICT JUDGE:

Plaintiff, a New York City law firm, has brought this action pursuant to the Court's diversity jurisdiction against defendant, a London-based reinsurance broker, for legal fees allegedly due plaintiff for services rendered in this country for several of [*2] defendant's clients located in London and Italy. Defendant has moved: (1) to dismiss the complaint on the ground of forum non conveniens and (2) for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56*. For the reasons that follow, defendant's motion to dismiss for forum non

1996 U.S. Dist. LEXIS 10432, *

conveniens is denied, and its motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff Breindel & Ferstendig ("Breindel") is a law firm organized as a New York professional corporation, with its office in New York City. (Compl. P1; Affidavit of Howard Breindel, sworn to on March 14, 1996, at P1.) Defendant Willis Faber & Dumas Ltd. ("WFD") is a British insurance and reinsurance broker with its principal place of business in London, England. (Compl. P2; Declaration of Heather Hunter, sworn to on February 15, 1996, at P2.)

Augusta Assicurazioni S.p.A. ("Augusta"), an Italian insurance company, agreed to insure Bieffe Helmets S.R.L. ("Bieffe") for products liability claims made against Bieffe. (Hunter Decl. P3.) In late 1991, WFD placed a contract of reinsurance for Augusta with several underwriters associated with Lloyd's of London and a number [*3] of London company market insurers (collectively, the "Underwriters"). (Hunter Decl. P3.)

In that same year, the Underwriters retained Solin & Breindel, apparently the predecessor of Breindel, as lead counsel for various products liability claims against Bieffe in this country. (Hunter Decl. P4; Breindel Aff. P23.) WFD took no part in the decision to retain Breindel, but did notify Breindel by letter dated December 20, 1991 of its retention by the Underwriters. (Hunter Decl. PP4, 5.) Additionally, Augusta retained Breindel to represent it with regard to the products liability claims. (Hunter Decl. P4.)

WFD served as a "conduit" between the Underwriters and Breindel -- Breindel would submit to WFD statements regarding fees owed it by the Underwriters; WFD would then determine how much was owed by each underwriter and inform the Underwriters of their respective debts; the Underwriters would then submit payment to WFD; and, finally, WFD would forward payment to Breindel. (Hunter Decl. P7; Breindel Aff. PP28, 32; Declaration of Joanne Whittaker, dated April 4, 1996, at P6.) WFD received no payment or anything else of value from Breindel for these services, and states that it performed [*4] these services solely for the convenience of Augusta, its client. (Hunter Decl. P5; Whittaker Decl. P3; Declaration of Bruce Carruthers, dated April 4, 1996, at P11; Reply Declaration of Heather Hunter, dated April 3, 1996, at PP16, 22.) According to Breindel, this is the usual custom and practice for underwriters associated with Lloyd's (Breindel Aff. PP24-25), but WFD disputes this. (Whittaker Decl. P7; Carruthers Decl. P11; Hunter Reply Decl. P17.)

Breindel states that it "reposed its trust and confidence" in WFD to collect and transmit to Breindel the monies due it. (Breindel Aff. P43.) Breindel also states that it had no control over how and when WFD billed the Underwriters, nor when WFD chose to transfer the monies to Breindel. (Breindel Aff. P43(a)(1)). Breindel further states that it did not know the location or identity of the claims manager of any Underwriter except for that of the lead Underwriter, or how much was paid by each Underwriter, or when. (Breindel Aff. P43(b)).

WFD has distributed to Breindel all payments owed it by the Underwriters. (Hunter Decl. P8; Breindel Aff. P36; Whittaker Decl. P9; Carruthers Decl. P12; Hunter Reply Decl. P21.) However, Breindel states [*5] that WFD performed its function as an intermediary "in a dilatory, negligent, unprofessional and inefficient manner" (Breindel Aff. P36(a)), by, among other things, failing to keep accurate records of its activities and delaying payment of funds provided by Augusta and the Underwriters in order to take advantage of the "float," i.e., the interest that accrued during the delay. (Breindel Aff. PP36(b), 41, 43(c), 46).

WFD also agreed to reimburse Augusta for up to 95% of the deductible amount on Augusta's reinsurance contract, which was $ 200,000. (Hunter Decl. P9; Breindel Aff. PP28-30.) This agreement was reached apparently because of an error made by WFD: while the Bieffe/Augusta insurance contract provided that the $ 200,000 deductible did not apply to legal fees, so that all such fees would be paid by Augusta, the Augusta/Underwriters reinsurance contract brokered by WFD provided that the deductible does apply to legal fees. (Affirmation of David L. Ferstendig, dated March 15, 1996, at PP3-4.) Thus, absent an arrangement between Augusta and WFD, Augusta would be liable for all legal costs incurred rather than just 5% of those costs. (Ferstendig Aff. P5.) WFD states [*6] that it never assumed an obligation to Breindel to pay its legal fees. (Carruthers Decl. P10; Hunter Reply Decl. P19.)

WFD states that it generally did not act as a "conduit" between Breindel and Augusta, but rather that those two entities usually -- although not always -- dealt with one another directly. (Hunter Decl. P10; Whittaker Decl. P4; Hunter Reply Decl. P20; Breindel Aff. P32.) Augusta, however, always made its payments directly to Breindel. (Breindel Aff. P32; Whittaker Decl. P4; Hunter Reply Decl. P20.)

Breindel states that WFD delayed and then ceased reimbursing Augusta for WFD's 95% share of the amounts paid for attorneys' fees up to the deductible amount. (Breindel Aff. P33; Pl.'s ex. P.) As a consequence, Augusta stopped paying Breindel. (Breindel Aff. P33; Pl.'s ex. P.) Augusta currently owes

Breindel $ 68,000, but is unwilling to pay unless it is assured that WFD will reimburse it. (Breindel Aff. P35.)

WFD intends to call as witnesses at trial certain of its employees and persons associated with the Underwriters, all of whom reside and work in London. (Hunter Decl. P12; Hunter Reply Decl. P8.) All of WFD's business records are maintained in or near London. (Hunter [*7] Reply Decl. P7.)

Breindel brought this action on September 11, 1995, and WFD served this motion five and one half months later. By order dated February 28, 1996, Magistrate Judge Leonard Bernikow stayed all discovery pending resolution of this motion.

**DISCUSSION**

A. Forum Non Conveniens

1. Waiver

Breindel argues first that WFD waived its right to move to dismiss for forum non conveniens because of its undue delay in bringing the motion. However, *Fed. R. Civ. P. 12(h)* is not applicable to such a motion. See *Leif Hoegh & Co. v. Alpha Motor Ways, Inc., 534 F. Supp. 624, 626 (S.D.N.Y. 1982); Snam Progetti S.p.A. v. Lauro Lines, 387 F. Supp. 322, 322-23 (S.D.N.Y. 1974).* Moreover, similar periods of delay have been held not to constitute a waiver. See *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 170 (S.D.N.Y. 1995)* (six months); *Snam Progetti, 387 F. Supp. at 323* (five months); cf. *Cerro De Pasco Copper Corp. v. The Alabama, 109 F. Supp. 856, 858 (S.D.N.Y. 1952)* (court did not consider motion to dismiss for forum non conveniens where defendant waited three and a half years before moving). n1

n1 Although the delay in this case does not constitute a waiver, the Court will consider the delay when determining whether the forum is inconvenient. See section A.3 infra.

[*8]

2. An Alternative Forum

The initial inquiry when analyzing a motion to dismiss for forum non conveniens is whether there exists an adequate alternative forum, "because application of the doctrine 'presupposes at least two forums in which the defendant is amenable to process.'" *Murray v. British Broadcasting Corp., 81 F.3d 287, 292 (2d Cir. 1996)* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S. Ct. 839, 842, 91 L. Ed. 1055 (1947)); see also Bybee v. Oper der Standt Bonn, 899 F. Supp. 1217, 1222 (S.D.N.Y. 1995).*

This requirement "is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'" *Murray, 81 F.3d at 292* (quoting *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22, 102 S. Ct. 252, 265 n.22, 70 L. Ed. 2d 419 (1981)).* Breindel does not dispute that WFD, a London-based entity, is amenable to suit in England.

Rather, Breindel cites three reasons why England is not an adequate forum: the unavailability of a jury trial or punitive damages, and the lack of opportunity to take pretrial depositions. None of these [*9] conditions, however, renders suit in England "clearly unsatisfactory." See *Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 129 (2d Cir. 1987)* (per curiam) (unavailability of treble damages did not make Philippines inadequate forum); *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse, 652 F. Supp. 1289, 1295-96 (S.D.N.Y. 1987)* (unavailability of jury trial does not render **foreign forum** inadequate); *id. at 1296* (where considerable **discovery** had already taken place and where dismissal would be conditioned on movant's consent to **use** products of **discovery** in alternative forum, absence of **discovery** in that **forum** did not render it inadequate); see also *id. at 1295* (procedures in **foreign forum** need not be identical to those in United States to be adequate, so long as they are not "wholly devoid of due process") (internal quotation marks omitted). Accordingly, England is an adequate alternative forum.

3. Application of the Gilbert Factors

Once an alternative forum is identified, the Court must apply the public and private interest factors first set forth in *Gilbert, 330 U.S. at 508-09, 67 S. Ct. at 843,* "to determine whether the convenience of the parties [*10] and the ends of justice would best be served by dismissing the action." *Murray, 81 F.3d at 293.* However, the plaintiff's choice of forum is to be given great deference, see *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 265; Murray, 81 F.3d at 290; Bybee, 899 F. Supp. at 1222,* especially where the plaintiff has chosen its "home forum." *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 266;* see *Murray, 81 F.3d at 290.* As this Court has written, "in order to prevail, defendant[] must show that the balance is strongly in favor of litigating in [the alternative forum] in order to overcome the substantial weight accorded plaintiff's choice of forum." *Bybee, 899 F. Supp. at 1222.*

The public interest factors include: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having controversies decided at home"; (3) "the interest in having the trial in a forum that is familiar with the law

1996 U.S. Dist. LEXIS 10432, *

governing the action"; (4) "the avoidance of unnecessary problems in conflict of laws or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray, 81 F.3d at 293.* [*11]

The parties have not demonstrated that the courts of London are any more or less congested than is the Southern District of New York. Moreover, both localities have a significant interest in having this dispute decided at home -- the action involves money allegedly owed to a New York law firm for services performed solely in this country, which also calls into question transactions in the London insurance market.

As for the applicable law, although WFD argues that certain of Breindel's claims must be analyzed pursuant to English law, it does not identify any conflicts between English law and the law of New York, and indeed has cited solely New York law in seeking summary judgment. In any event, while the Court "makes no pretense that it could" apply English law "as knowledgeably or as efficiently as" an English court, *Bybee, 899 F. Supp. at 1223,* the application of the law of another English common law jurisdiction "does not impose a significant burden on this Court." Gordon v. Long Bay (1980) Ltd., 1995 *U.S. Dist. LEXIS 11721, 94 Civ. 2141 (SHS), 1995 WL 489474,* at *4 (S.D.N.Y. Aug. 16, 1995). Finally, the fifth factor militates slightly toward allowing the suit to be brought in England, because the [*12] parties apparently would not have the right to a jury trial in that event.

The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) "the availability of compulsory process for attendance of unwilling witnesses"; (3) "the cost of obtaining attendance of willing witnesses"; (4) "issues concerning the enforceability of a judgment"; and (5) "all other practical problems that make trial of a case easy, expeditious, and inexpensive -- or the opposite." *Murray, 81 F.3d at 294.*

The private interest factors do not weigh in either party's favor. For example, while all of Breindel's documentary evidence is located in New York, WFD's documents are kept in or near London. Similarly, although many of the witnesses Breindel intends to call are located in New York and are therefore within the subpoena power of this Court, many of the witnesses WFD would call are located in London, and are presumably subject to compulsory process in a London court. In addition, although there is evidence in the record that principals of Augusta would be unwilling to travel from Italy to London for judicial proceedings, there is no reason for the Augusta principals to be [*13] any more or less willing to travel to New York instead of London; accordingly, this factor aids neither party.

The parties have not identified any issues relating to the enforceability of a British judgment in New York or vice-versa, nor have they identified any other issues relating to the relative ease, expeditiousness, or expense of trial in the respective fora.

Moreover, WFD's delay in making this motion of over five months after the complaint was filed and until shortly before discovery was due to close, while not egregious enough to constitute a waiver of the right to move, demonstrates that this forum is not as inconvenient to WFD as it now claims. See *Rodriguez v. Orion Schiffahrts-Gesellschaft Reith & Co., 348 F. Supp. 777, 779 (S.D.N.Y. 1972).* Last, the aspects of the British system that Breindel contends render it inadequate -- especially the absence of trial by jury -- while insufficient to render it "wholly devoid of due process," *ACLI, 652 F. Supp. at 1295* (internal quotation marks omitted), also weigh on the side of denying the motion to dismiss.

In sum, the Gilbert factors do not weigh "strongly in favor" of dismissal. *Bybee, 899 F. Supp. at 1222.* [*14] Accordingly, the motion to dismiss on the grounds of forum non conveniens is denied.

B. Summary Judgment

"Summary judgment may be granted only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (quoting *Fed. R. Civ. P. 56(c))*; see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen, 64 F.3d at 79* (citations omitted) (quoting *Lund's, Inc. v. Chemical Bank, 870 F.2d 840, 844 (2d Cir. 1989)).*

Breindel has set forth six claims for relief: breach of contract, breach of fiduciary duty, negligent misrepresentation, fraudulent misrepresentation, negligence, and gross negligence. [n2] WFD argues that it is entitled to summary judgment on each claim. The Court will discuss each claim in turn in light of the foregoing [*15] standard.

n2 Although Breindel contends that it has also stated claims for conversion and unjust enrichment, they are not pled in the complaint and will not be considered. Although pleadings by a party proceeding pro se ordinarily are construed extremely liberally, see *Haines v.*

*Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 595-96, 30 L. Ed. 2d 652 (1972) (per curiam); Pino v. Ryan, 49 F.3d 51, 52-53 (2d Cir. 1995),* the same does not hold true where the pro se party is an attorney or law firm, see *Leeds v. Meltz, 898 F. Supp. 146, 149 (E.D.N.Y. 1995),* aff'd, *85 F.3d 51 (2d Cir. 1996).*

### 1. Breach of Contract

Breindel, conceding that there is no express contract between it and WFD, asserts that the conduct of the parties has given rise to an "implied-in-fact" contract. Pursuant to New York law, n3 "[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of [*16] the parties as indicated by their conduct." *Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 330 N.E.2d 414, 420, 369 N.Y.S.2d 400, 408 (1975)* (citations omitted); see also *AEB & Assocs. Design Group, Inc. v. Tonka Corp., 853 F. Supp. 724, 731 (S.D.N.Y. 1994); Estate of Argersinger, 168 A.D.2d 757, 758, 564 N.Y.S.2d 214, 215 (3d Dept. 1990).*

> n3 As noted above, although WFD asserts that English law applies to certain of Breindel's claims, both parties rely exclusively on New York law in addressing WFD's motion for summary judgment, and neither party has identified any relevant conflict between New York and English law. Therefore, the Court will apply the law of New York. See *PI. Inc. v. Quality Prods., Inc, 907 F. Supp. 752, 760 n.3 (S.D.N.Y. 1995);* see also *Wood v. Mid-Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991); Schreiber v. Camm, 848 F. Supp. 1170, 1174 (D.N.J. 1994).*

Breindel has identified the course of conduct that, it claims, gave rise to an implied-in-fact contract between it and WFD. [*17] Normally, however, a contract is implied in fact "when one party seeks to collect the benefit due it in return for a benefit it has conferred on the other party." *Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 1996 WL 306564,* at *12 (S.D.N.Y. 1996). Here, Breindel seeks to hold WFD responsible for perceived defects in WFD's performance "without any corresponding obligation on" Breindel. Id. Breindel has failed, in other words, to identify any consideration it has conferred on WFD, and consideration is an element essential to the existence of any contract, whether express or implied-in-fact. See id.; *Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.,*

*726 F. Supp. 1411, 1419 (S.D.N.Y. 1989); Argersinger, 168 A.D.2d at 758, 564 N.Y.S.2d at 215.*

Because there is no evidence in the record that the services allegedly supplied by WFD to Breindel were supported by any consideration, Breindel has failed to show that there is a genuine issue of material fact as to the existence of an implied-in-fact contract between those parties. Accordingly, WFD's motion for summary judgment is granted as against Breindel's breach of contract claim, [*18] and that claim is dismissed.

### 2. Breach of Fiduciary Duty

Pursuant to New York law, "a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Scott v. Dime Sav. Bank of New York, FSB, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995)* (internal quotation marks and alteration omitted), aff'd, *1996 U.S. App. LEXIS 3948, 1996 WL 98782* (2d Cir. Mar. 5, 1996). To determine the existence of such a relationship, "'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'" Id. (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991),* rev'd on other grounds, *967 F.2d 742 (2d Cir. 1992)).* In order to give rise to a fiduciary relation, the trust and confidence "reposed by one party must be accepted by the other party," *Litton Indus., 767 F. Supp. at 1231,* and must be reposed justifiably. See *In re Windsor Plumbing Supply Co., 170 Bankr. 503, 525 (Bankr. E.D.N.Y. 1994).* In general, a fiduciary duty does not arise from a conventional, [*19] arms-length business relationship "'absent extraordinary circumstances.'" *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992)* (quoting *National Westminster Bank, U.S.A. v. Ross, 130 Bankr. 656, 679 (S.D.N.Y. 1991),* aff'd sub nom., *Yaeger v. National Westminster, 962 F.2d 1 (2d Cir. 1992));* see also *Oursler v. Women's Interart Center, Inc., 170 A.D.2d 407, 408, 566 N.Y.S.2d 295, 297 (1st Dept. 1991).*

The relationship that exists here is essentially one between an attorney and its clients' agent. Breindel has cited, and the Court has uncovered, no case where such an attenuated and indirect relationship was found to constitute a fiduciary relation. To the contrary, the cases uniformly stand for the proposition that even where a direct business relationship exists between two parties, that alone is insufficient to render the relationship a fiduciary one. See, e.g., *Liebowitz, 927 F. Supp. 688, 1996 WL 306564,* at *20; *Village On Canon v. Bankers Trust Co., 920 F. Supp. 520, 532 (S.D.N.Y. 1996);*

1996 U.S. Dist. LEXIS 10432, *

*Northeast Gen. Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 162-64, 624 N.E.2d 129, 131-32, 604 N.Y.S.2d 1, 3-4* [*20] *(1993).*

It follows then that where, as here, there is not a direct business relationship, whatever relation exists is not a fiduciary one, absent special circumstances suggesting otherwise. *See Cumisky v. James River Corp., Civ. A. No. CV-93-1975 (DGT), 1995 WL 520021,* at *7 (E.D.N.Y. Aug. 17, 1995); *Windsor Plumbing Supply, 170 Bankr. at 526.*

Breindel asserts that the Lloyd's Code of Practice, which provides, inter alia, that "insurance brokers shall at all times conduct their business with utmost good faith and integrity" and "shall establish and maintain an adequate system of control over its transactions and records," imposes a fiduciary duty on WFD vis-a-vis Breindel. However, whatever duty these provisions impose on WFD are for the benefit of its clients -- such as Augusta and the Underwriters -- not its clients' attorneys. *See Cumisky, 1995 WL 520021,* at *7.*

Moreover, it is unclear whether these provisions impose a fiduciary duty on WFD or instead simply constitute precatory statements of commendable business practices. It is not tenable to infer from those provisions a fiduciary relationship between WFD and its clients, and then to extend that fiduciary [*21] relationship to Breindel -- its clients' attorneys -- and then to impose the sequelae of that designation upon WFD. *See id.* at *8.*

Breindel states that it reposed trust in WFD to invoice the Underwriters and Augusta for Breindel's services, to transfer funds to Breindel, and to keep accurate records, and to perform all these tasks in good faith. It also states that, because it did not know the identity of any of the claims managers at any of the Underwriters except the lead Underwriter, it was forced to rely on WFD's good faith in performing its functions.

Breindel, however, does not deny that Augusta and the Underwriters -- not WFD -- were its clients; that it could have ascertained the identities of the claims managers at any of the Underwriters; and that it at all times knew the identities of the contact persons at Augusta and the lead Underwriter. Nor does Breindel claim that it ever manifested dissatisfaction to its clients with their method of paying their bills; that WFD somehow prevented it from doing so; or that it was obligated to acquiesce in this method simply because it was the "custom and practice" in the London insurance market. *See Teachers Ins. and Annuity* [*22] *Ass'n of America v. Wometco Enter., Inc., 833 F. Supp. 344, 350 (S.D.N.Y. 1993).* In short, if Breindel reposed trust and confidence in WFD, there is no evidence that this was required, justified, acceptable to WFD, or anything more than a "'unilateral investment of confidence.'" *Litton*

*Indus., 767 F. Supp. at 1231-32* (quoting *United States v. Reed, 601 F. Supp. 685, 715* (S.D.N.Y.), rev'd in part on other grounds, *773 F.2d 477 (2d Cir. 1985)).*

While Breindel correctly notes that the question of whether a fiduciary relationship exists is essentially a factual one, it has produced no evidence from which one might infer such a relationship. As demonstrated above, Breindel has not shown that there existed any contract between it and WFD. Nor has it shown that WFD acted as its agent, or that any other relationship existed between the two entities so as to give rise to a fiduciary duty.

In this respect, the case is similar to *Philan Ins. Ltd. v. Frank B. Hall & Co., 748 F. Supp. 190, 197-98 (S.D.N.Y. 1990),* in which the court was faced with the question of whether a reinsurance intermediary owed a fiduciary duty to the reinsurer or the reinsured in relation to the intermediary's [*23] transfer of premiums from the latter to the former. The court there concluded (1) that the answer depended on "the specific factual situation demonstrating the parties' intent," *id. at 197;* and (2) that the "plaintiffs possessed [and therefore could allege] no facts to support their conclusory allegations" of a fiduciary relation, *id. at 198,* and dismissed plaintiffs' claim. See also *Teachers Ins. and Annuity Ass'n of America, 833 F. Supp. at 350; Compania Sud-Americana de Vapores, 785 F. Supp. at 425-27.*

Here, too, Breindel has produced no evidence to support its claim that the relationship between it and WFD was a fiduciary one. Accordingly, WFD's motion for summary judgment is granted as against Breindel's claim for breach of fiduciary duty, and that claim is dismissed.

### 3. Negligent Misrepresentation

"Under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes [it] a fiduciary duty." *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992); see also Gruntal & Co. v. San Diego Bancorp, 901 F. Supp. 607, 615 (S.D.N.Y. 1995); Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1232 (S.D.N.Y. 1995).* But [*24] see *In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749, 769 (S.D.N.Y. 1996)* (asserting that fiduciary relationship is sufficient but not necessary to support claim for negligent misrepresentation). Because, as noted, Breindel has produced no evidence from which a reasonable trier of fact could conclude that WFD owed it a fiduciary duty, its claim for negligent misrepresentation must fail. Accordingly, WFD's motion for summary judgment is granted as to this claim as well, and it is dismissed.

### 4. Fraudulent Misrepresentation

Exhibit A   261

1996 U.S. Dist. LEXIS 10432, *

To prevail on a claim for fraud pursuant to New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).* A plaintiff may also prove fraud through concealment of information that the defendant was duty-bound to disclose. See id.

Breindel's claim for fraudulent misrepresentation is based on WFD's alleged "omission [*25] and failure to advise [Breindel] that [WFD] was collecting [Breindel's] monies and not timely transferring them to [Breindel]." (Pl.'s Mem. of Law at 36.) The only fact in the record that arguably supports such a claim consists of Breindel's assertion that WFD "collected hundreds of thousands of dollars from [the] Underwriters, belonging to [Breindel] and then delayed the transmission of said funds to [Breindel], to take advantage of the 'float.'" (Breindel Aff. P36(b)).

However, Mr. Breindel fails to establish that he has personal knowledge of this fact as required by *Fed. R. Civ. P. 56(e)*, and Breindel offers no other evidence that would substantiate this claim. Breindel does not, for example, provide the date that any particular payment was made to WFD by the Underwriters and the corresponding date that the same payment was transmitted from WFD to Breindel. Absent such proof, a reasonable trier of fact could not conclude simply from Mr. Breindel's statement that WFD committed fraud against Breindel.

However, before discovery was stayed in this matter, WFD had been ordered to produce documents in its possession, if any, that show when it received payments from the [*26] Underwriters. (Order dated February 15, 1996, at 2.) Counsel for WFD had advised the court that no such documents exist, but that he would verify this information from WFD. (Order dated February 15, 1996, at 2.) It appears that discovery was stayed before counsel for WFD had the opportunity to either verify that no documents existed that are responsive to this request, or to produce the documents if they do, in fact, exist. (Breindel Aff. P46.) Moreover, Breindel had noticed the deposition of a WFD employee with knowledge of the manner in which WFD receives funds from insurers and transmits them to defense counsel such as Breindel (Pl.'s ex. C), but this deposition apparently never took place due to the then-existing stay of discovery.

It appears that permitting discovery to go forward would be essential to permit Breindel to present facts in opposition to WFD's motion for summary judgment motion seeking dismissal of Breindel's fraud claim. Therefore, pursuant to *Fed. R. Civ. P. 56(f)*, decision on the motion for summary judgment with regard to this claim is reserved pending completion of discovery as noted above. Within 60 days of the date of this order, the parties may submit supplemental [*27] affidavits with regard to the fraud claim, after which the Court will make a final determination.

5. Negligence and Gross Negligence

WFD asserts correctly that, pursuant to New York law, "a party may not maintain a claim for negligence if the purported claim is merely a claim for breach of contract." *Eugene Iovine Inc. v. Rudox Engine and Equipment Co., 871 F. Supp. 141, 146 (E.D.N.Y. 1994),* aff'd, *62 F.3d 1412 (2d Cir. 1995).* However, the Court has determined that no contract, express or implied-in-fact, existed between Breindel and WFD, and therefore a negligence claim may lie.

The extent of the parties' briefing on the negligence and gross negligence claims consists of WFD's statement, without citation, that "WFD had no legal duty to Breindel and thus may not be liable to Breindel for negligence." (Def.'s Mem. of Law at 23.) The Court declines to reach the issue in the absence of briefing by the parties. Accordingly, WFD's motion for summary judgment as against Breindel's negligence and gross negligence claims is denied without prejudice to renew.

**CONCLUSION**

For the reasons stated above:

(1) WFD's motion to dismiss the complaint on the grounds of forum [*28] non conveniens is denied.

(2) WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* is granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims.

(3) WFD's motion for summary judgment is denied without prejudice to renew as against Breindel's negligence and gross negligence claims.

(4) The Court reserves decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits within sixty days of the date of this order.

(5) The stay of discovery is lifted.

DATED: New York, New York

July 22, 1996

SO ORDERED:

1996 U.S. Dist. LEXIS 10432, *

SIDNEY H. STEIN, U.S.D.J.