**EXHIBIT A-14**

# 8

GCG INTERNATIONAL, INC., Plaintiff, - against - KLAUS EBERHARDT and HERBERT MULLER, Defendants.

05 Civ. 2422 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2005 U.S. Dist. LEXIS 23877*

October 17, 2005, Decided
October 17, 2005, Filed

**DISPOSITION:** [*1] Motion to dismiss for lack of personal jurisdiction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action for breach of contract, breach of fiduciary duty, and related claims arising out of an agreement to effectuate a change in control and ownership of a publicly held German corporation in 2001, defendant individuals moved to dismiss for lack of personal jurisdiction and forum non conveniens.

**OVERVIEW:** With the exception of one meeting that took place in London, all of the meetings and negotiations between defendants and plaintiff took place in Germany, and the managed buy-outs (MBO) agreements were executed in Germany. Likewise, most documents relevant to the transaction were written in German and located in Germany. Plaintiff contended that specific jurisdiction existed under *N.Y. C.P.L.R. § 302(a)(1)* as the implementation of defendants' scheme and breaches arose out of defendants' actions in the United States generally, and specifically in New York. The most that could be said of the complaint and supporting papers was that they alleged that, as part of the MBO transaction, some subsidiaries of the company defendants worked for in the United States might have been restructured, and that defendants might have retained the services of a German affiliate of a New York-based investment bank. This was not "transacting business" in New York for purposes of § 302(a)(1). Plaintiff also failed to establish general jurisdiction under *N.Y. C.P.L.R. § 301*; there was no allegation or indication that either defendant ever had any contact with New York in connection with the transaction.

**OUTCOME:** Defendants' motion to dismiss for lack of personal jurisdiction was granted. The court therefore did not address the prong of the motion seeking dismissal for forum non conveniens.

**COUNSEL:** MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, P.C., Attorneys for Plaintiff, By: Kevin Ainsworth, Esq., Seth R. Goldman, Esq., New York, NY.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Attorneys for Defendants, By: Jerome S. Hirsch, Esq., Timothy G. Nelson, Esq., New York, NY.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION:**

### MEMORANDUM DECISION

CHIN, D.J.

This is an action for breach of contract, breach of fiduciary duty, and related claims arising out of an agreement to effectuate a change in control and ownership of a publicly held German corporation in 2001. Before the Court is defendants' motion to dismiss for lack of personal jurisdiction and forum non conveniens. For the reasons that follow, the motion is granted.

### STATEMENT OF THE CASE

For purposes of this motion, the facts as alleged in the complaint are assumed to be true. Additional facts, as to which there does not appear to be a genuine dispute, are drawn from the submissions of the parties.

Case 1:07-cv-03580-DLC    Document 23-15    Filed 06/12/2007    Page 4 of 20

Page 2
2005 U.S. Dist. LEXIS 23877, *

### 1. The Parties

Plaintiff GCG International, Inc. ("GCG"), is a Delaware corporation with its headquarters in [*2] New York City. (Compl. P2). GCG is an entity related to General Capital Group Beteiligungs GmbH ("General Capital"), a German private equity firm specializing in managed buy-outs ("MBOs") n1 and related transactions. (Id. PP2, 6). General Capital is not a party to this lawsuit, but was the entity involved in the transactions at issue. GCG purports to have been assigned General Capital's rights with regard to this lawsuit. (von Stumm Decl. P1). The circumstances of the purported assignment are unclear, as the parties have not informed the Court of when it allegedly occurred, nor have they supplied the Court with a copy of any assignment agreement. The complaint states simply that "[GCG] is the successor in interest to [General Capital]." (Compl. P2). The affidavit of Ferdinand von Stumm states that "[GCG] was assigned rights by [General Capital] against the defendants herein." (von Stumm Aff. P1). For purposes of this motion the Court assumes there was a valid assignment.

---

n1 An MBO, also known as "going private," is "the process by which a publicly held company has its outstanding shares purchased by an individual or by a small group of individuals in order to obtain complete ownership and control." David L. Scott, Wall Street Words 168 (1997); see also http://www.investopedia.com/terms/m/mbo.asp (last visited October 17, 2005).

---

[*3]

Defendant Klaus Eberhardt ("Eberhardt") is a life-long resident and citizen of Germany. (Eberhardt Decl. P1). Since January 1, 2000, Eberhardt has been the chairman of the board of management of Rheinmetall AG ("Rheinmetall"), a German corporation headquartered in Dusseldorf, Germany. (Id. P5; Compl. P3).

Defendant Herbert Muller ("Muller") is also a life-long resident and citizen of Germany. (Muller Decl. P1). Since 1995 he has worked for Rheinmetall in Dusseldorf and currently sits on the board of management. (Id. P5). During the relevant time period he was chief financial officer of Rheinmetall. (Compl. P4).

Eberhardt and Muller are sued as individuals. Rheinmetall is not a party to this lawsuit.

### 2. The Facts

Rheinmetall is a large international corporation with more than 150 subsidiaries in the electronics, defense, and automotive industries. (Compl. P7). In September of 2001, General Capital, believing that Rheinmetall was undervalued, approached Rheinmetall and proposed that it allow General Capital to structure an MBO. (Id. PP7-8). Representatives of General Capital met several times with representatives of Rheinmetall, including defendants Eberhardt [*4] and Muller, and in 2001 General Capital and defendants executed MBO agreements, whereby defendants entered into a partnership and joint venture with General Capital, with each partner entitled to an equal share of the profits. (Compl. PP9-10). In furtherance of the joint venture, General Capital obtained consent of the majority shareholders, developed financial planning such as holding structure and divestment of minority holdings, contacted potential investors (including several large investment banks), and coordinated the due diligence for the transaction. (Compl. PP11-16). The agreements contained no choice-of-law or forum selection clauses.

As part of the MBO transaction, the shares of a group of majority shareholders were to be placed in a holding company, and General Capital and defendants would hold exclusive options to acquire the shares. (Compl. P21). GCG alleges that defendants breached the MBO agreements by secretly entering into agreements with Rheinmetall whereby they secured and exercised options without General Capital's knowledge, "as a result of which they received very significant amounts" of money. (Compl. PP28-30). GCG claims that it is due 50% of the proceeds [*5] from defendants' exercise of their options. (Compl. P31).

With the exception of one meeting in October 2001 that took place in London, all of the meetings and negotiations between defendants and General Capital took place in Germany, and the MBO agreements were executed in Germany. (Eberhardt Decl. P8; Muller Decl. P8). Likewise, most documents relevant to the transaction, including the MBO agreements, are written in German and located in Germany. (Eberhardt Decl. P22; Muller Decl. P22).

### 3. Procedural History

GCG commenced this action by filing a complaint in New York State Supreme Court in December of 2004. Defendants removed the case to this Court pursuant to *28 U.S.C. §§ 1441 & 1446* on February 28, 2005. Defendants filed the present motion to **dismiss** for lack of **personal jurisdiction** and forum non conveniens on April 15, 2005.

### DISCUSSION

Case 1:07-cv-03580-DLC    Document 23-15    Filed 06/12/2007    Page 5 of 20

Page 3
2005 U.S. Dist. LEXIS 23877, *

## 1. Personal Jurisdiction

### A) Applicable Law

On a motion to **dismiss** for lack of **personal jurisdiction** filed pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, "the plaintiff bears the burden of demonstrating that the court has jurisdiction [*6] over the defendant." *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)* (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996))*. At the pleadings stage, a plaintiff is required only to make a prima facie showing of jurisdiction. *DiBella v. Hopkins, 187 F. Supp. 2d 192, 198 (S.D.N.Y. 2002)*. Where, as here, there has been no hearing or trial on the merits, "all pleadings and affidavits must be construed in the light most favorable to [plaintiff] and all doubts must be resolved in . . . plaintiff's favor." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)*.

In determining whether jurisdiction over a defendant has been established, the Court may consider matters outside the pleadings without converting the motion to dismiss into a motion for summary judgment. See *Bensusan Restaurant Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996)*, aff'd, *126 F.3d 25 (2d Cir. 1997)*. Moreover, although a plaintiff's allegations are ordinarily accepted as true at the pleadings stage, on a motion to dismiss for lack [*7] of jurisdiction, where "defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction -- and plaintiffs do not counter that evidence -- the allegation may be deemed refuted." *Schenker v. Assicurazioni Generali S.p.A., Consol., 2002 U.S. Dist. LEXIS 12845, No. 98 Civ. 9186 (MBM), 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002)* (citations omitted).

In a diversity action, n2 **personal jurisdiction** is determined by the law of the state in which the district court sits. *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*. In New York, a foreign defendant may be subject to suit under C.P.L.R. § 301, which has been interpreted to permit a court to exercise jurisdiction if the defendant "has engaged in such a continuous and systematic course of 'doing business' . . . as to warrant a finding of its 'presence' in the jurisdiction." *Koehler v. Bank of Bermuda, Ltd., 101 F.3d 863, 865 (2d Cir. 1996)* (citation omitted). Sporadic business activity in New York will not meet this standard; rather, "the court must be able to say from the facts that the [defendant] is present in [*8] the state not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y.2d 28, 33-34, 565 N.E.2d 488, 563 N.Y.S.2d 739 (1990)* (citation omitted).

n2 Complete diversity exists because defendants are citizens of Germany and GCG is a Delaware corporation with its headquarters in New York. (Eberhardt Decl. P1; Muller Decl. P1; Compl. P2). As to the amount in controversy, the complaint simply alleges that plaintiff is owed half of the "significant amounts" that defendants allegedly realized from the exercise of their options. (Compl. PP30-31). It appears, however, that there is a "reasonable probability" that the amount in controversy exceeds $ 75,000, because the complaint alleges that the holding company that held the shares of the majority shareholder group paid $ 29 million for the shares (Compl. P24), and that defendants exercised their options and realized the "significant amounts" when the holding company sold the shares. (Compl. P30). See *Mehlenbacher v. Akzo Nobel Salt, Inc., 216 F.3d 291, 296 (2d Cir. 2000)*; see also Pl. Opp. Br. at 10 ("Defendants benefited . . . in an amount in excess of ten million dollars."). The Court therefore has subject matter jurisdiction under *28 U.S.C. § 1332*.

[*9]

If a foreign defendant has no continuous and systematic presence in New York such that it is subject to general jurisdiction under *C.P.L.R. § 301*, it still may be subject to specific jurisdiction under *C.P.L.R. § 302(a)(1)*. *Section 302(a)(1)* sets forth a two-prong test for determining **personal jurisdiction.** It provides that a court may exercise **personal jurisdiction** over any non-domiciliary "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state," but only "as to a cause of action arising from" the transaction in question. *N.Y.C.P.L.R. § 302(a)(1) (McKinney 2001)*. In other words, a plaintiff seeking to rely on *Section 302(a)(1)* must show first that the defendant transacted to supply goods or services in the state and second that the cause of action arises from that transaction. "Even one instance of purposeful activity directed at New York is sufficient to create jurisdiction, whether or not defendant was physically present in the State, as long as that activity bears a substantial relationship to the cause of action." *Corporate Campaign, Inc. v. Local 7837, United Paperworkers Int'l Union, 265 A.D.2d 274, 697 N.Y.S.2d 37, 39 [*10] (1st Dep't 1999)*.

Finally, any exercise of **personal jurisdiction** under New York statutes must comport with the requisites of due process. See *Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001)*.

Case 1:07-cv-03580-DLC   Document 23-15   Filed 06/12/2007   Page 6 of 20

Page 4
2005 U.S. Dist. LEXIS 23877, *

B) Application

GCG asserts that jurisdiction exists under both *Section 302(a)(1)* (specific jurisdiction) and Section 301 (general jurisdiction). I discuss each in turn.

1. *Section 302(a)(1)*

GCG first contends that specific jurisdiction exists under *Section 302(a)(1)* because "the implementation of Defendants' scheme and breaches arose out of Defendants' actions in the United States generally, and specifically in New York." (Pl. Opp. Br. at 8). GCG argues that (1) the MBO transaction included the restructuring of Rheinmetall subsidiaries in the United States, and that "it is highly likely and GCG understands that many of the contacts in connection with this restructuring . . . occurred in New York" (id.); (2) General Capital was wrongfully replaced as financial advisor by New York-based Goldman, Sachs & Co., a fact that is not alleged in the complaint n3 (id. at 5-6, 9-11); and (3) that "most importantly, the holding company which [*11] held the shares of the majority shareholder group . . . negotiated and then acquired the shares of [Rheinmetall] held by Wyser-Pratte Management, a New York investment fund." (Id. at 9). In sum, GCG argues that "Goldman Sachs, New York investors, New York investment firms, and the capital markets in New York were instrumental in the implementation of the Defendants' conduct that forms the basis of [the] Complaint." (Id. at 10).

> n3 In fact, it appears that defendants actually retained the services of a German affiliate of Goldman Sachs called Goldman Sachs & Co. oHG. (Rutzel Decl. P8).

GCG's contentions in its brief are belied by its own pleadings. As alleged in the complaint, defendants here are two German citizens who live and work in Germany who are being sued for allegedly breaching contracts with a German company that were written in German and negotiated and executed in Germany. Specifically, with respect to their roles in the MBO transaction at issue, the complaint alleges that defendants: had [*12] several meetings with General Capital (Compl. P8); executed MBO agreements and agreed to a joint venture with General Capital in September 2001 (id. PP9-10); jointly (with General Capital) selected German tax and legal advisors (id.. P18); introduced the MBO plan to shareholders and won shareholder approval in November 2001 (id. P23); coordinated a strategy for public relations (id. P25); and breached the MBO agreements by proceeding with the transaction as structured by General Capital while conspiring to deprive General Capital of the benefits of the partnership. (Id. PP28-29).

With the exception of the one meeting that took place in London, all of these activities took place in Germany. (Eberhardt Decl. P17; Muller Decl. P17). In fact, apart from alleging that GCG is incorporated in Delaware and headquartered in New York (Compl. P2), an unidentified holding company purchased the shares of a New York investment fund in connection with the MBO (id. P24), and some "United States" investment funds recently purchased shares from the holding company (id. P30), the complaint does not contain a single reference to any activity that took place in the United States [*13] generally, or New York in particular, let alone activity undertaken by defendants. GCG's assertions in its brief that considerations relating to the capital markets in New York played a role in the transaction are not properly considered by the Court on a motion to dismiss. See *Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)* ("Factual allegations contained in legal briefs or memoranda are . . . treated as matters outside the pleadings for purposes of *Rule 12(b)*."); *O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)* ("It is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

But even if these "facts" were properly before the Court, they would be insufficient as a matter of law to establish specific jurisdiction under *Section 302(a)(1)*. That section confers **personal jurisdiction** over defendants who "transact[] . . . business within the state or contract[] anywhere to supply goods or services in the state." *N.Y.C.P.L.R. § 302(a)(1)* (McKinney 2001). The Second Circuit has explained that several factors should be considered [*14] in determining whether a foreign defendant transacts business in New York, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation;
>
> (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship;
>
> (iii) what the choice-of-law clause is in any such contract; and
>
> (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to

supervision by the corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004)* (citation omitted).

Put simply, none of these factors is alleged here. The agreements contain no choice-of-law clause. There is no allegation that any portion of the contracts that were allegedly breached were negotiated or executed in New York, nor that the fiduciary duties that were allegedly breached had any relation to New York, nor that any defendant visited New York for the purpose of meeting with parties to the [*15] contract. Moreover, it appears that GCG was recently incorporated in July 2004 (Hirsch. Decl. Ex. A), thus precluding the possibility -- if it had been pleaded -- that there was ever an on-going contractual relationship between plaintiff and defendants. (See also Eberhardt Decl. at P11; Muller Decl. at P11 (stating that defendants have never done business with GCG)).

In sum, the most that can be said of the complaint and supporting papers is that they allege that, as part of the MBO transaction, some Rheinmetall subsidiaries in the United States may have been restructured, and that defendants may have retained the services of a German affiliate of a New York-based investment bank. This is not "transacting business" in New York for purposes of *Section 302(a)(1)*, which requires an "articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., 362 F.3d at 23.*

### 2. Section 301

Nor has GCC established general jurisdiction under Section 301. Defendants are German citizens and residents with no alleged presence in New York, yet GCG asserts in its brief that "it is highly unlikely [*16] they do not have sufficient contacts [to establish general jurisdiction.]" (Pl. Opp. Br. at 11). If this were an allegation, it would not be a competent one. GCG also asserts that the Court should exercise jurisdiction over Eberhardt and Muller because they served as CEO and CFO, respectively, of a large German corporation with U.S. subsidiaries. (Pl. Opp. Br. 11-13). Again, even if there were a competent allegation that Rheinmetall had a presence in New York, "it is well-settled that where a corporation is doing business in New York, an officer of the corporation does not subject himself[] individually to 301 jurisdiction unless he is doing business in [New York] individually." *United Mizrahi Bank Ltd. v. Sullivan, 2000 U.S. Dist. LEXIS 16157, No. 97 Civ. 9282 (LMM), 2000 WL 1678040, at *3 (S.D.N.Y. Nov. 6, 2000)* (citation omitted). Thus, for the Court to have jurisdiction over defendants under Section 301, "plaintiff must allege that they were doing business as individuals." Id. Assuming for a moment that plaintiff has adequately alleged that defendants were transacting business as individuals, there is no allegation or indication that either defendant -- as opposed to subsidiaries [*17] of the corporation for which they worked -- ever had any contact with New York in connection with this transaction.

### CONCLUSION

Accordingly, the motion to **dismiss** for lack of **personal jurisdiction** is granted. The Court therefore does not address the prong of the motion seeking **dismissal** for forum non conveniens. The Court notes, however, that if it were to reach the issue, it would rule that this case should be litigated in Germany, for many of the same reasons discussed above. n4 The Clerk of Court shall enter judgment **dismissing** the complaint for lack of **personal jurisdiction**, and the Clerk is directed to close this case.

   n4 In this regard, the Court notes that apparently a lawsuit relating to this transaction has in fact been filed in Germany. (Eberhardt Decl. P3; Muller Decl. P3; von Stumm Aff. P2).

SO ORDERED.

Dated: New York, New York

October 17, 2005

DENNY CHIN

United States District Judge

# 9

Exhibit A  295

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
LIZ CLAIBORNE, INC. and L.C. Licensing, Inc.,
Plaintiffs,
v.
MADEMOISELLE KNITWEAR, INC., individually and d/b/a The Mill Ltd. Sweater Factory Outlet; Charles Stefansky; Various John Does, Jane Does and XYZ Companies, Defendants.
No. 96 CIV. 2064 (RWS).

Feb. 10, 1997.
As Amended Feb. 11, 1997.

Lewin & Laytin, P.C. New York City by Harley I. Lewin, Richard B. Verner, G. Roxanne elings, Of Counsel, for Plaintiffs.
Kaye, Scholer, Fierman, Hays & Handler, LLP New York City by John W. Schryber, Ross D. Cooper, Deborah K. Owens, Of Counsel, for Defendants.

OPINION
SWEET, District Judge.
*1 Defendant Mademoiselle Knitwear Inc. ("Defendant" or "Mademoiselle") and Plaintiffs Liz Claiborne, Inc. and L.C. Licensing ("Plaintiffs" or "Claiborne") have made various motions. Upon the parties' submissions and oral argument had before this Court and for the reasons set forth below:

(1) Claiborne's motion to amend the complaint will be granted;

(2) Mademoiselle's motion to compel deposition testimony will be granted in part;

(3) Claiborne's cross-motion for a protective order will be denied, provided, however, that the depositions of Paul Charron and Laurie Keurian will be limited to one-half day, and questions relating to Claiborne's performance of the alleged contracts will be prohibited;

(4) Claiborne's cross-motion to compel discovery will be granted in part and denied in part;

(5) Claiborne's motion to extend the discovery deadline pursuant to Rule 16(b) will be granted, and the deadline extended to February 28, 1997 for the limited purpose of completing outstanding discovery; and

(6) The trial ready date will be adjourned to May 19, 1997.

*The Parties*

Plaintiff Liz Claiborne, Inc. is a "jobber" in the garment industry. It contracts for the production of apparel which it designs and ships. L.C. Licensing is a wholly owned subsidiary of Liz Claiborne, Inc. Both entities are Delaware corporations having their principal places of business at 1441 Broadway, New York, New York.

Defendant Mademoiselle, a garment manufacturer, is a New York corporation with its principal place of business at 930 Flushing Avenue, Brooklyn, New York.

Defendant Charles Stefansky is an employee of Mademoiselle.

Shraga Newhouse ("Newhouse") is President of Mademoiselle. Claiborne seeks to amend the complaint to add Newhouse, who was not originally made a party to this action.

*Facts and Prior Proceedings*

The facts and prior proceedings of this case are set forth in the previous opinions of the Court, Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., No. 96 Civ. 2064, 1996 WL 346352 (S.D.N.Y. June 25, 1996), Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 1996 WL 668862 (S.D.N.Y. Nov. 19, 1996), familiarity with which is assumed. The facts relevant to this motion are described below.

On March 21, 1996, Claiborne filed the complaint in this action seeking preliminary and permanent injunctive relief against Mademoiselle, alleging trademark counterfeiting, trademark infringement and unfair competition/false designation of origin arising under the Trademark Act of 1946, 15 U.S.C. § 1051, et seq., as amended by the Trademark Counterfeiting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)  
(Cite as: Not Reported in F.Supp.)

Page 2

Act of 1984, Public Law 98-473 (the "Lanham Act"), and for trade name infringement, unfair competition, unfair trade practices, trademark dilution, fraud, breach of contract and breach of the covenant of good faith and fair dealing under the laws of the State of New York.

Newhouse was not originally named as a defendant in the complaint. Claiborne now contends that Newhouse personally approved the allegedly infringing sales at issue in this action.

*2 On March 4, 1996, the Blouse, Skirt, Sportswear, Children's Wear & Allied Workers' Union, Local 23-25, UNITE (the "Union"), a union representing workers at Mademoiselle, brought an Order to Show Cause to intervene for the purpose of compelling arbitration. By Opinion dated June 23, 1996, the Union's motion was denied.

The parties subsequently made various discovery motions. Several of the motions were disposed of by an order dated October 8, 1996 and an opinion dated November 19, 1996.

In its complaint, Claiborne specifically seeks "an order dissolving any further obligation by plaintiff to order the manufacture of merchandise from or conduct any other business activity with defendants." In the complaint, Claiborne refers to a 1995 agreement between Claiborne and the Union. There is no reference to any other agreement in the complaint.

Mademoiselle has urged an "unclean hands" defense in this action, claiming that Claiborne has manufactured evidence of trademark violations in order to escape its obligations under a number of alleged agreements: the 1995 agreement between Claiborne and the Union (the "Union Agreement"); a 1992 agreement to purchase 1.4 million sweaters per year through 1998 (the "1992 Agreement"); an unspecified agreement to purchase approximately one million lycra sweaters (the "Lycra Agreement"), and perhaps other agreements. Claiborne acknowledges the existence of the first contract, but disputes the existence of the other agreements. While Mademoiselle has asserted an unclean hands defense in this action, it has not asserted a counterclaim for breach of contract.

On December 30, 1996, Claiborne made a motion to amend its complaint to add Shraga Newhouse ("Newhouse"), president of Mademoiselle, as a defendant. The motion to amend was argued on January 15, 1997, at which time it was deemed fully submitted.

By letter dated January 21, 1997, Claiborne moved to extend the discovery deadline and the time for filing of an expert report and adjourn the ready trial date 30 days. On January 15, 1997, Mademoiselle filed a motion to compel two deposition witnesses to testify. On January 23, 1997, Claiborne filed a cross-motion for a protective order and seeking to compel discovery. Oral argument on these motions was heard on January 29, 1997, at which time they were considered fully submitted.[FN1]

> FN1. Issues related to a motion for sanctions and the filing of an expert report were resolved at the hearing. This order resolves all outstanding issues raised by the parties.

*Discussion*

I. *Plaintiff's Motion to Amend the Complaint*

Plaintiffs have moved, pursuant to Rules 15(a) and 21, Fed. R. Civ. P., to amend the complaint to add Newhouse as a defendant.[FN2] Rule 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Rule 21 provides "[p]arties may be dropped or added by order of the court on motion of any party ... at any stage of the action and on such terms as are just."

> FN2. Plaintiffs' amended complaint also dismisses various John Doe, Jane Doe and ABC Company defendants, makes minor wording changes to the two paragraphs and deletes another paragraph. There is no objection to these amendments.

The determination whether to grant or deny a motion to amend is within the discretion of the district court. *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46 (2d Cir. 1983). Absent undue delay, bad faith or dilatory motive in seeking the amendment, or undue prejudice to the opposing party resulting from the amendment, leave to amend should be liberally granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Geoffrey, Inc. v. Tanks R Us, Inc.*, No. CV-91-2521, 1992 WL 402964, *1 (E.D.N.Y. Dec. 30, 1992).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A  297

Not Reported in F.Supp.    Page 3
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*3 Mademoiselle does not dispute that Newhouse is a proper defendant in this action. However, Mademoiselle contends that Claiborne has inexcusably delayed in bringing the instant motion, has brought the motion in bad faith and with a dilatory motive, and that Mademoiselle will suffer prejudice if leave to amend is granted. Specifically, Mademoiselle contends that Claiborne had knowledge of the facts upon which it bases this motion since July 1996 and has no excuse for waiting seven months to seek leave to amend. Mademoiselle speculates that Claiborne's motive is to delay the proceedings to prevent Mademoiselle from having its day in court to clear its name of Claiborne's allegations, which Mademoiselle insists were fabricated. Mademoiselle asserts that the addition of Newhouse as a defendant will prejudice their right to an expeditious trial, because Newhouse may have counterclaims and defenses not available to Mademoiselle, requiring time-consuming motion practice and discovery that otherwise would be unnecessary.

A considerable period of delay between the filing of the original complaint and a motion to amend may be grounds for denying a motion to amend. See _Sanders v. Thrall Car Mfg. Co., 582 F. Supp. 945, 952 (S.D.N.Y. 1983)_, aff'd, _730 F.2d 910 (2d Cir. 1984)_. Ordinarily, such a delay will only be grounds for denying leave to amend when the delay causes prejudice to existing parties to the action. _H.L. Hayden Co. v. Siemens Medical Sys., Inc., 112 F.R.D. 417, 419 (S.D.N.Y. 1986)_.

Here, approximately nine months elapsed from the time Claiborne's complaint was filed in March 21, 1996 until the filing of the motion to amend on December 30, 1996. Arguably, Claiborne had notice of the facts that provide the grounds for a claim against Newhouse in July 1996. Thus, there was a "delay" of approximately five months from the time at which such a motion could have been made until the time it was actually made. While Claiborne may not have filed this motion as expeditiously as possible, the delay here is not sufficiently extreme to overcome the liberal standard for granting leave to amend. The cases cited by Mademoiselle generally involved considerably longer delays than the delay here. See, e.g. _Thrall, 582 F. Supp. at 952_ (denying leave to amend where period of delay was two and one-half years); _Hayden, 112 F.R.D. at 418-19_ (two year interval from filing of complaint to motion to amend).

Moreover, the cases in which leave to amend has been denied involved a more manifest effort to disrupt the expeditious resolution of a case than is evident here. In both _Hayden_ and _Sanders,_ the plaintiffs sought to amend their complaints while previously filed dispositive motions attacking the pleadings were being briefed or sub judice. _Hayden, 112 F.R.D. at 419_; _Sanders, 582 F. Supp. at 951_. In _Sanders,_ the plaintiff twice previously had sought and obtained leave to amend after the filing and briefing of motions to dismiss, thus requiring further briefing on motions already submitted. After granting the second motion, the court warned the plaintiff that further motions to amend would be viewed with disfavor. The court denied the third motion for leave to amend, which was also submitted while a motion to dismiss was sub judice. _Sanders, 582 F. Supp. at 951-52_. In contrast, this is Claiborne's first motion to amend the complaint, there are no dispositive motions pending, and, despite Mademoiselle's assertions, there is no strong pattern of delay attributable solely to the actions of Claiborne. Both parties have been extremely litigious in discovery to date.

*4 With respect to Mademoiselle's assertion of bad faith and dilatory motive, Claiborne has advanced a plausible justification for its delay in seeking leave to amend. In accordance with Rule 15(a), Claiborne sought consent in October 1996 to amend the complaint to add Newhouse as a defendant and add an alternative basis for their unfair competition claims. Such an attempt to obtain consent justifies some delay in filing a motion to amend. See _Journal Publishing Co. v. American Home Ins. Co., 771 F. Supp. 632, 637 (S.D.N.Y. 1991)_ (permitting amendment of complaint after four years where, inter alia, plaintiffs attempted to obtain consent to addition of claims to avoid motion practice). In correspondence between the parties, Mademoiselle objected to the addition of an alternative basis for the unfair competition claim, on the grounds that such a claim is barred by the automatic bankruptcy stay. Claiborne reasonably delayed filing its motion while investigating Mademoiselle's objections to the proposed amended pleadings. Mademoiselle's speculation about nefarious motives for the timing of the motion is insufficient to warrant a denying leave to amend.

Mademoiselle also claims that it will be prejudiced by the addition of Newhouse, because the trial will inevitably be delayed by discovery and motion practice related to Newhouse's potential defenses and counterclaims. Mademoiselle contends that such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A   298

Not Reported in F.Supp.  Page 4
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

delays will exacerbate its already difficult financial position. However, the potential for additional delay is difficult to assess in this case. Claiborne contends that it will move for summary judgment regardless of whether Newhouse is a party. Thus, final resolution of the case will be "delayed" by briefing, argument and judicial consideration of a dispositive motion regardless of the determination of this motion to amend. Newhouse will be able to present his defenses and appropriate counterclaims in conjunction with any summary judgment motion, thus minimizing any additional delay that would result from his addition as a defendant.

Accordingly, Claiborne's motion to amend the complaint will be granted. [FN3]

> FN3. Claiborne has agreed that it will not pursue a claim for breach of the covenant of good faith and fair dealing against Newhouse.

II. *Mademoiselle's Motion to Compel Deposition Testimony*

Mademoiselle has moved to compel two witnesses, Sid Estreicher ("Estreicher") and Richard Owen ("Owen"), to respond to deposition questions that were objected to on grounds other than privilege. Claiborne objected to a variety of questions, at the time asserting primarily that the questions were not relevant. Claiborne now contends that Mademoiselle's questioning in this area is an attempt to obtain discovery for a threatened breach of contract action, and that such improper and abusive discovery is not permitted. Claiborne did not assert these grounds for objection or move for a protective order at the deposition.

Rule 30(c), Fed. R. Civ. P., states that all objections made at the time of deposition shall be noted, but that "the examination shall proceed, with the testimony being taken subject to the objections." Rule 30(d)(1) provides that a deponent may be instructed not to answer "only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to present a motion [to cease an abusive deposition or for a protective order]." Absent a claim of privilege, instructions not to answer questions at a deposition are generally improper. *See National Microsales Corp. v. Chase Manhattan Bank*, 761 F. Supp. 304, 307 (S.D.N.Y. 1991); *Gould Investors v. General Ins. Co.*, 133 F.R.D. 103, 104 (S.D.N.Y. 1990); *see also Furniture World, Inc. v. D.A.C. Thrift Stores*, Inc., 168 F.R.D. 61, 63 (D.N.M. 1996) (under Rule 30(d)(1), question's lack of relevance is not proper ground for instructing witness not to answer).

*5 Most of the questions to which Claiborne objects relate to the existence and terms of alleged agreements between Mademoiselle and Claiborne for the purchase of knit garments. Mademoiselle contends that questions about these agreements are relevant to its "unclean hands" defense, in that the agreements, which Claiborne wished to escape, provided a motivation for Claiborne to manufacture evidence of trademark infringement. Claiborne contends that these agreements, whose existence Claiborne disputes, are not relevant to this case, but only to a "threatened" breach of contract claim by Mademoiselle against Claiborne. They argue that because Mademoiselle has not brought counterclaims on the alleged contracts, discovery in this action relating to the contracts should be barred as abusive.

When the purpose of a discovery request is to gather information in proceedings other than the pending suit, discovery should be denied. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978). While the existence and terms of the various alleged contracts would undoubtedly be relevant to an action for breach of those contracts, their existence and terms are also relevant to Mademoiselle's defense of unclean hands. Mademoiselle contends that Claiborne manufactured evidence and attempted to induce infringing sales in order to avoid its obligations to order merchandise from Mademoiselle. The existence and terms of the alleged contracts are relevant to this defense, in that they make it more likely that Claiborne would be motivated to manufacture evidence that would be grounds for avoidance or dissolution of contractual agreements. *See* Fed. R. Evid. 401 ("'Relevant evidence' means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") [FN4] While the existence of the Union contract, whose existence and terms are not in dispute, may provide evidence of motive, this does not mean that the other alleged agreements are merely cumulative. These agreements, which Mademoiselle asserts were larger than the Union agreement and whose existence Claiborne disputes, could provide greater motive for Claiborne to take the extreme measures that Mademoiselle alleges in its affirmative defense.

> FN4. The standard for discoverability of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A   299

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 5

information under the Federal Rules of Civil Procedure is lower than the standard for admissibility of evidence under Rule 401, Fed. R. Evid. Rule 26(b), Fed.R.Civ.P., states that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the to the subject matter involved .... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Moreover, Claiborne itself took considerable deposition testimony of Mademoiselle witnesses regarding the existence and terms of the alleged agreements. If Claiborne's inquiry into the existence of the contracts was proper, it is difficult to see how Mademoiselle's inquiry into the same subject matter is improper.

Accordingly, Mademoiselle's motion to compel deposition testimony will be granted. However, no questions regarding Claiborne's performance or breach of the alleged agreements will be permitted. The relevance of such information to the present action, which does not allege breach of contract, is tenuous at best, and treads closer to the prohibition on using discovery in one action to gather information for use in another. The witnesses will answer all other questions, except for those which he or she is directed not to answer on grounds of attorney-client privilege or trade secret. When a witness is so directed, a statement will be placed on the record indicating the time of the allegedly privileged communication, the parties to the communication, and a general statement of the subject matter of the communication.

### III. *Claiborne's Cross Motion for a Protective Order*

*6 Claiborne has also moved for a protective order that would: (1) preclude further questioning of Estreicher and Owen; and (2) quash the depositions of Paul Charron, Claiborne's Chief Executive Officer and Chairman of the Board, and Lori Keurian, Claiborne's Deputy General Counsel. As discussed in Part II of this opinion, the questioning of Estreicher and Owen will proceed.

The deposition of Charron will proceed, but will be limited to one-half day. The deposition of Keurian will also proceed, again limited to one-half day. Moreover, no questioning on Claiborne's performance or non-performance of any alleged contracts will be permitted. The parties are directed to schedule Charron's deposition so as to minimize the disruption of his schedule.

### IV. *Claiborne's Cross Motion to Compel Discovery*

Claiborne has cross-moved to compel responses to requests for admissions and to produce a large number of sweaters for inspection.

With respect to the requests for admissions, Mademoiselle's representations in its January 20, 1997 letter and at page 9 of their "Reply Memorandum in Further Support of Defendants' Motion to Compel and Defendants' Memorandum in Opposition to Plaintiffs' Fourth Motion for a Protective Order and Plaintiffs' First Motion to Compel" to Requests Numbered 10-12 and 17-18 shall be deemed Defendant's response, subject to Federal Rules of Civil Procedure 11, 26(e) and 37. Defendants are ordered to respond to Requests Numbered 4-6, 13-14 and 19-20. With respect to Requests 19-20, Mademoiselle is directed to respond to the requests as clarified in Claiborne's letter of January 13, 1996 at page 6.

Claiborne's motion to compel compliance with their third request for inspection of garments that did not have a Liz Claiborne tag will be denied. Claiborne contends that inspection of these garments is relevant to their claim of unfair competition, which may include a claim that Mademoiselle displayed non-Claiborne goods in close proximity to nearly identical Claiborne goods, thus unfairly trading on Claiborne's good will and reputation. The inspection will be denied, because the inspection of 50,000 garments would be unduly burdensome and not reasonably calculated to provide information relevant to their unfair competition claim that could not be obtained by other means, since the inspection of garments in the factory will provide little information about the retail display of those garments. Claiborne will not be permitted to inspect an enormous number of garments in an effort to rule out every theory upon which it may base its pleaded claims, without a more substantial showing of likelihood that the theory is supportable.

### V. *Scheduling Matters*

In view of outstanding discovery, Claiborne's motion to extend the discovery deadline pursuant to Rule

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A   300

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

16(b) will be granted, and the deadline extended to February 28, 1997 for the limited purpose of completing outstanding discovery.

The trial ready date will be adjourned to May 19, 1997.

*Conclusion*

*7 For the reasons set forth above:

(1) Claiborne's motion to amend the complaint is hereby granted;

(2) Mademoiselle's motion to compel deposition testimony is hereby granted in part, in accordance with this opinion;

(3) Claiborne's cross motion for a protective order is hereby denied, provided, however, that the depositions of Paul Charron and Laurie Keurian will be limited to one-half day, and questions relating to Claiborne's performance of the alleged contracts will be prohibited;

(4) Claiborne's motion to compel discovery is hereby granted in part and denied in part, in accordance with this opinion;

(5) Claiborne's motion to extend the discovery deadline is hereby granted, and the deadline extended to February 28, 1997 for the limited purpose of completing outstanding discovery; and

(6) The trial ready date is hereby adjourned to May 19, 1997.

It is so ordered.

S.D.N.Y.,1997.
Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.
Not Reported in F.Supp., 1997 WL 53184 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit A   301

# 10

Exhibit A  302

LEXSEE 1995 U.S. DIST. LEXIS 6514

PAINEWEBBER INCORPORATED, Plaintiff, - against - WHV, INC. AND
WENTWORTH, HAUSER AND VIOLICH, INC., Defendants.

95 Civ. 0052 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*1995 U.S. Dist. LEXIS 6514*

May 12, 1995, Decided
May 16, 1995, FILED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investment firm brought a breach of contract action against defendants, two corporations, to recover fees the corporations owed the firm for advising one of the corporations in the sale of its assets to the other. The corporations filed a motion to dismiss for lack of personal jurisdiction and improper venue, or alternatively, to transfer the action to the Northern District of California.

**OVERVIEW:** The corporations' sole places of business were in California. The investment firm's New York office became, under a written agreement, the advisor to one of the corporations in its sale of its assets to the other. The court granted the corporations' motion to dismiss for lack of personal jurisdiction. The court held that it did not have personal jurisdiction over the corporations pursuant to the New York Long-Arm Statute, *N.Y. C.P.L.R. 302(a)(1)*, because their telephone calls to New York, their occasional meetings in New York, and the investment firm's execution of the agreement in New York, did not constitute sufficient contacts with New York to constitute transacting business in that state under *N.Y. C.P.L.R. 302(a)(1)*. The court held that the acts of the investment firm as one of the corporation's agent in New York could not form the basis for the exercise of personal jurisdiction in an action between the agent and the principal. The court also held that it lacked personal jurisdiction over the corporations pursuant to the general jurisdictional statute, *N.Y. C.P.L.R. 301*, because the corporations were not doing business in New York with any permanence or continuity.

**OUTCOME:** In the investment firm's breach of contract action against the corporations seeking fees allegedly owed to the investment firm for advising one corporation in the sale of its assets to the other corporation, the court granted the corporations' motion to dismiss the investment firm's action for lack of personal jurisdiction. The court denied the investment firm's motion to transfer venue as moot.

**COUNSEL:** [*1] For PAINEWEBBER, INCORPORATED, plaintiff: Lewis R. Clayton, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

For WENTWORTH, HAUSER AND VIOLICH, INC., a State of Washington Corporation, defendant: Martin S. Hyman, Golenbock, Eiseeman, Assor & Bell, New York, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION:**

MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiff, PaineWebber Incorporated ("PaineWebber"), brought this action for breach of contract against defendants WHV, Inc. ("WHV") and Wentworth, Hauser and Violich, Inc. ("Wentworth") (collectively "Defendants"). Defendants now move to dismiss the complaint for lack of personal jurisdiction and improper venue pursuant to *Fed. R. Civ. P. 12(b)(2)* and *12(b)(3)* and *28 U.S.C. § 1391*. In the alternative,

Case 1:07-cv-03580-DLC    Document 23-15    Filed 06/12/2007    Page 17 of 20

Page 2
1995 U.S. Dist. LEXIS 6514, *

Defendants seek to transfer the action to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below Defendants' motion is granted and the case dismissed for lack of personal jurisdiction.

### I. Facts

The following are the uncontested facts as presented by the parties. PaineWebber is a Delaware corporation involved in the investment business with offices in a number of states including New York and California. WHV is a California corporation with its principal place of business in San Francisco, California. (Violich Decl. P 3.) Wentworth is a Washington corporation having a sole place of business in San [*2] Francisco, California. (Donahoe Aff. PP 2-3.) WHV and Wentworth have never had a place of business outside of California; have never maintained any business, representatives, offices, agents or employees in the State of New York; and have never advertised at any time in New York. (Id. at PP 4-7; Donahoe Aff. PP 4-5.)

In 1989, Kent Penwell ("Penwell"), an employee at PaineWebber's San Francisco office, at his own initiative, contacted Bradford Hearsh ("Hearsh"), a managing director at PaineWebber in New York, and informed him that WHV might be interested in selling its assets. (Violich Aff. P 8.) As a result, Hearsh initiated a contact with WHV and flew to San Francisco on more than one occasion in 1989 to negotiate a contract between PaineWebber and WHV regarding the sale of WHV's assets. (Id. at P 9.) The negotiations were conducted in person in San Francisco and during telephone conferences between San Francisco and New York. (Hearsh Aff. P 7; Violich P 10.) WHV's representative never went to New York for negotiations. (Violich Aff. P 10.)

Following the negotiations, PaineWebber presented a letter agreement ("Agreement") to WHV (Ex. A attached to Hearsh Aff.), which WHV [*3] signed in San Francisco (Violich Aff. P 9), and PaineWebber signed in New York. (Hearsh Aff. P 7.) According to the Agreement, PaineWebber was to act as a financial adviser and an exclusive agent for purposes of sale of WHV stock and/or assets. (Ex. A attached to Hearsh Aff. at 1.) During the duration of the Agreement, PaineWebber researched the market and prepared a marketing brochure and a list of potential buyers. (Hearsh Aff. PP 9-10.) Most of the work was done in PaineWebber's New York office. (Id. at P 11.) During the term of PaineWebber's engagement, WHV's representatives had meetings with PaineWebber in New York on three occasions. (Id. at P 14.)

In 1993, WHV started negotiations with Laird, Norton Trust Company ("Laird"), a Washington state corporation, for the purchase of WHV's assets. (Ex. B to Hearsh Aff.; Hearsh Aff. P 4.) Laird incorporated a subsidiary, Wentworth, on September 20, 1993 and on or about April 24, 1994, Wentworth purchased substantially all of WHV's assets. (Hearsh Aff. P 4.) PaineWebber assisted WHV in this transaction by preparing financial models evaluating the transaction and analyzing the purchase contract. (Id. at P 15.)

Defendants are [*4] members of PaineWebber's "wrap-free" program in which PaineWebber markets the services of certain investment managers to PaineWebber's clients. (Hearsh Aff. P 6.) This program is based in, and managed from, PaineWebber's office in Weehawken, New Jersey. (Fox Decl. PP 4-5.)

PaineWebber brought this action for breach of contract alleging Defendants refusal to pay fees owed to PaineWebber for services performed under the Agreement.

### II. Personal Jurisdiction

Defendants move for dismissal of the action arguing insufficient contacts with New York state and lack of personal jurisdiction.

Subject matter jurisdiction in this action is based on the diversity of citizenship. In a diversity action, a court must apply the jurisdictional provisions of the forum state to determine whether personal jurisdiction exists over a nonresident defendant. See *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 222-25 (2d Cir. 1963) (en banc)). The Court must apply New York's long-arm jurisdiction statute (New York Civil Practice Law and Rules (C.P.L.R.) § 302) or general jurisdiction statute (C.P.L.R. § 301), and construe the pleadings [*5] and affidavits in the light most favorable to the plaintiff. See *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

#### A. New York Long-Arm Jurisdiction

Under *New York C.P.L.R. § 302(a)(1)*, jurisdiction is proper when: (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business. *United States Theatre Corp. v. Gunwyn/Lansburgh Ltd.*, 825 F. Supp. 594, 595 (S.D.N.Y. 1993) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (Ct. App. 1981)).

A defendant is "transacting business" when it has "purposefully availed" itself of conducting business in New York thus invoking the benefits and protection of New York laws. *McKee Electric Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (Ct. App. 1967) (citing *Hanson v. Denckla*, 357 U.S. 235,

*253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)).* A court must look at the totality of circumstances to determine the existence of purposeful activity and may not subject the defendant to jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *Cutco Industries [*6] v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986); see also, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* It is the "nature and quality" and not the amount of New York contacts which determine the purposeful activity. *Standard Enterprises, Inc. v. Bag-It, Inc. 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987).* The requisite "minimum contacts" must provide a fair warning to the defendant of a possibility of being subject to courts of the forum state. *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (Ct. App. 1988) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)).*

PaineWebber argues that the negotiation of the Agreement during telephone conferences held between San Francisco and New York, the execution of the Agreement by PaineWebber in New York, the performance of the Agreement in New York, and three visits of WHV representatives to PaineWebber's office in New York amount to "transacting business" in New York. The Court disagrees.

WHV's telephone calls to, and occasional meetings in, New York lack the requisite "nature and quality." Telephone calls [*7] are insignificant for purposes of jurisdiction except when defendants use the telephone to actively participate in business transactions in New York. *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)* (finding jurisdiction over a defendant who participated in an auction by telephone); *PaineWebber, Inc. v. Westgate Group, Inc., 748 F. Supp. 115, 119 (S.D.N.Y. 1990)* (finding frequent phone calls and telecopies to PaineWebber's office in New York insufficient for jurisdictional purposes when the defendant did not intend to transact business in New York); *United States Theatre, 825 F. Supp. at 596* (finding defendant's "substantial" communication with the plaintiff in New York insufficient to find jurisdiction when the defendant never intended to do business in New York).

Similarly, occasional meetings in the forum state that are exploratory, unproductive or insubstantial are insufficient to establish requisite contacts with the state. *PaineWebber, 748 F. Supp. at 115* (finding a meeting in New York insufficient to meet the "transacting business" standard when a purchase agreement modified at the meeting was negotiated in [*8] Texas); *Pryor v. Haisfield, 1990 U.S. Dist. LEXIS 14197, 1990 WL 165687 (S.D.N.Y.)* (exploratory meetings in New York when defendant contracted for services to be performed in New York insufficient); *Saudi Computer Aided Translation v. Weidner Comm., 663 F. Supp. 1104 (S.D.N.Y. 1987)* (an unproductive and insubstantial meeting in New York may be insufficient to constitute transacting business).

In the instant case, WHV's telephone communications with PaineWebber were used to complete contract negotiations initiated by PaineWebber and commenced in San Francisco. The purpose of the communications was not to project WHV into the New York market but to obtain services to sell WHV's stock or assets. WHV representatives never came to New York to negotiate the contract. In fact, during the three-year duration of the Agreement, WHV representatives came to New York only for three minor meetings. These meetings did not involve contract negotiations, no contracts were signed, and the March 2, 1993 meeting was unproductive since it did not, as planned, result in the expansion of PaineWebber's efforts to sell WHV. (Hearsh Aff. P 14.) These events were no more than "random" and "attenuated."

The fact that PaineWebber [*9] signed and performed the Agreement in New York with full knowledge of WHV does not bring WHV's random contacts with the State up to the level of "purposeful availment". The signing of the Agreement by PaineWebber in New York is not dispositive as to WHV when WHV signed the Agreement in California. *Standard Wine & Liquor Co. v. Bombay Spirits Co., 20 N.Y.2d 13, 281 N.Y.S.2d 299, 228 N.E.2d 367 (Ct. App. 1967).* In Standard Wine, the court found the signing of the contract in New York by the plaintiff insignificant when the defendant, who had no offices, telephone number, employees or business accounts in the State, signed the contract in Scotland.

The fact that PaineWebber performed services for WHV in New York is also not sufficient to subject WHV to New York jurisdiction. When the defendant contracts for services to be performed in New York but does not seek out a New York forum and connections with New York, as WHV did here, it may not, without more, be subjected to personal jurisdiction. *Pryor v. Haisfield, 1990 U.S. Dist. LEXIS 14197, 1990 WL 165687 (S.D.N.Y.).*

PaineWebber also relies on the language of C.P.L.R § 302(a)(1) that "a court may exercise personal jurisdiction over any non-domiciliary [*10] . . . who in person or through an agent: transacts any business within the state . . ." PaineWebber argues that it was WHV's agent in New York. This is irrelevant to this motion. Even if PaineWebber were WHV's agent in New York, which the Court need not decide for this motion, the acts of an agent may not be used to subject the defendant to

jurisdiction when the suit is between the agent and the principal. *Laufer v. Ostrow, 55 N.Y.2d 305, 312, 449 N.Y.S.2d 456, 434 N.E.2d 692 (Ct. App. 1982).*

In short, PaineWebber initiated discussions with WHV, WHV did not solicit PaineWebber's services regarding the sale of WHV's assets, did not travel to New York to negotiate or execute the Agreement, did not request that services be performed in New York, and did not seek business or sale of its assets in New York. In fact, WHV sold its assets to a Washington corporation. The location of PaineWebber in New York was irrelevant to WHV. The services could have been equally well performed by PaineWebber or any other investment corporation located elsewhere in the country. Under the circumstances, WHV's contacts with New York were sporadic and insufficient to provide "fair warning" of the possibility [*11] of being subject to the courts of this state. This Court has no personal jurisdiction over WHV under C.P.L.R. 302(1)(a).

The Court can have personal jurisdiction over Wentworth, the other defendant in this case, only if there is jurisdiction over WHV. This is because PaineWebber's only allegation regarding Wentworth is that Wentworth is a mere continuation of WHV and its successor in liability and jurisdiction. As decided above, the Court has no jurisdiction over WHV under C.P.L.R. § 302(1)(a) and, therefore, has no jurisdiction over Wentworth.

### B. General Jurisdiction

Under *New York C.P.L.R. § 301*, New York courts have jurisdiction over nonresident defendants, including corporations, if the defendant has been "doing business" in the state. A defendant corporation is "doing business" if the aggregate of the corporation's activity "is such that it may be said that the corporation is present in the State 'not occasionally or casually, but with a fair measure of permanence or continuity.'" *Laufer, 449 N.Y.S.2d at 458* (quoting *Tauza Susquehanna Coal Co., 220 N.Y. 259, 267 (1917)).*

The classic indicia of doing business in New York include maintaining a local address and [*12] telephone number, bank accounts or property, and employees or representatives in the State. *Pneuma-Flo Systems, Inc. v. Universal Mach. Corp., 454 F. Supp. 858, 861 (S.D.N.Y. 1978).* PaineWebber does not allege that WHV or Wentworth ever exhibited any of the above indicia. In fact, PaineWebber does not explicitly argue jurisdiction under C.P.L.R. § 301. It does argue, however, that Defendants had contacts with the State by participating in PaineWebber's "wrapfree" program in which PaineWebber offered Defendant's services to PaineWebber's customers. Since the cause of action in this case does not arise out of the "wrap-free" program, Defendants' contacts with the State under this program may only be relevant under C.P.L.R. § 301.

PaineWebber neither alleges nor shows that Defendants solicited New York customers and business through the "wrap-free" program. Nor does PaineWebber allege that Defendants performed services for PaineWebber's New York customers or that the program had any significant contact with the State. In fact, Defendants assert that the program is distributed and managed from New Jersey. (Fox Decl. PP 4-5.) PaineWebber's only allegation is that Defendants made [*13] approximately $ 1 million through the program. (Hearsh Aff. P 6.) The amount of money made by a defendant is not indicative, without more, of whether the defendant was doing business in New York. See *Nordic Bank PLC v. Trend Group, Ltd., 619 F. Supp. 542, 565-566 (S.D.N.Y. 1985).* In Nordic Bank, the court found that, even though defendants marketed in excess of $ 100 million of commercial paper through brokerage firms, the contacts with New York were sporadic and limited.

Defendants' contacts with New York were not sufficiently continuous and permanent to amount to "doing business" in the State. Jurisdiction under C.P.L.R. § 301 is not present.

### III. Conclusion

For the reasons set out above, Defendants' motion is granted and the action is dismissed for lack of personal jurisdiction over Defendants. The alternative motion to transfer the action pursuant to *28 U.S.C. § 1404 (a)* is denied as moot.

Dated: May 12, 1995
New York, New York

SO ORDERED.

LAWRENCE M. McKENNA

U.S.D.J.