# EXHIBIT A-15

# 11

**GEORGE PIECZENIK, Plaintiff, -against- PETER DOLAN, PAMELA HAY, "JOHN DOES" 1 THROUGH 59, BRISTOL-MYERS SQUIBB CO., CAMBRIDGE ANTIBODY TECHNOLOGY GROUP, DOMANTIS, MEDICAL RESEARCH COUNCIL-LABORATORY OF MOLECULAR BIOLOGY, THE COMMISSIONER OF PATENTS AND TRADEMARKS OF THE UNITED STATES PATENT OFFICE, AN AGENCY OF THE DEPARTMENT OF COMMERCE, and THE COMMISSIONER OF FOOD AND DRUGS, Defendants.**

03 Civ. 6336 (SAS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 23295*

**December 29, 2003, Decided**
**December 30, 2003, Filed**

**SUBSEQUENT HISTORY:** Complaint dismissed at, in part, Motion denied by *Pieczenik v. Cambridge Antibody Tech. Group, 2004 U.S. Dist. LEXIS 4127 (S.D.N.Y., Mar. 16, 2004)*

**PRIOR HISTORY:** *Pieczenik v. Dyax Corp., 265 F.3d 1329, 2001 U.S. App. LEXIS 20497 (Fed. Cir., 2001)*

**DISPOSITION:** [*1] Defendant's motion to dismiss for lack of personal jurisdiction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant council moved to dismiss, for lack of personal jurisdiction and lack of subject matter jurisdiction, plaintiff doctor's action alleging patent infringement.

**OVERVIEW:** The doctor failed to allege facts sufficient to support a finding of personal jurisdiction over the council under N.Y. C.P.L.R. 301. The doctor did not provide any basis upon which to infer that the council was "doing business" in New York. The doctor alleged that council scientists went to New York to speak and present new discoveries and accept awards, but such speaking engagements did not amount to "doing business" in New York. The court also did not have jurisdiction under N.Y. C.P.L.R. 302(a)(1) as to any of the claims. As to the breach of contract claim, the

document assumed for argument's sake to be a contract was negotiated in England, and that did not amount to transacting business in New York. As to patent infringement, the doctor did not allege that the relevant licenses were negotiated or executed in New York. As to the doctor's claims that the council owned unidentified patents that were invalid in light of his own patents, the council was not alleged to have transacted business in New York in connection with those patents. As to his RICO claim, he again failed to allege facts relating to the conspiracy that would suggest a connection between New York and the council.

**OUTCOME:** The motion to dismiss for lack of personal jurisdiction was granted.

**COUNSEL:** George Pieczenik, Plaintiff, Pro se, New York, New York.

For Medical Research Council, Defendant: Stephen S. Rabinowitz, Esq., Pennie & Edmonds LLP, New York, New York.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION:**

2003 U.S. Dist. LEXIS 23295, *

## OPINION AND ORDER

### SHIRA A. SCHEINDLIN, U.S.D.J.:

Dr. George Pieczenik, appearing pro se, commenced this action against numerous defendants alleging patent infringement. Dr. Pieczenik further alleges that patents owned by defendants are invalid in light of his '363 and '448 patents. n1 Defendant MRC now moves to dismiss the action against it on two grounds: (1) lack of personal jurisdiction and (2) lack of subject matter jurisdiction. The MRC also argues that the RICO claims against it should be dismissed under *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons set forth below, the MRC's motion to dismiss for lack of personal jurisdiction is granted. n2

> n1 Pieczenik also alleges that the Medical Research Council Laboratory of Molecular Biology ("MRC"), Cambridge Antibody Technology Group, PLC ("CAT"), and Domantis, Inc. ("Domantis") colluded with Dyax Corp. "to create artificial scientific collaborations and agreements ... to give the impression of Dyax being more than a 'virtual' patent licensing company." Second Amended Complaint ("SAC") P 53 (articulating Racketeer Influenced and Corrupt Organizations, *18 U.S.C. § 1961 et seq.*, ["RICO"] claim). Pieczenik also appears to be alleging that this collusion resulted in a breach of contract by the MRC. See id. P 36.

[*2]

> n2 Because the motion to dismiss based on lack of personal jurisdiction is granted, I will not address subject matter jurisdiction or failure to state a RICO claim.

## I. BACKGROUND

### A. The Moving Defendant

The MRC has its principal place of business in Cambridge, England. Pieczenik alleges that there is personal jurisdiction over the MRC in New York because the MRC: (1) entered into contracts with a New York resident (Pieczenik), n3 (2) sends MRC scientists to speak in New York, n4 (3) granted licenses to New York citizens, n5 (4) uses legal counsel with offices in New York, n6 and (5) has a majority ownership interest in CAT and an undisclosed interest in Domantis. n7

n3 See SAC P 36.

n4 See 11/2/03 Letter to the Court from Dr. George Pieczenik ("11/2 Pl. Ltr.") at 2. Prior to the November 5, 2003 conference, the parties exchanged letters relating to Pieczenik's jurisdictional arguments. The parties agreed at the November 5, 2003 pre-motion conference that the MRC's pre-conference letter of October 30, 2003 should be deemed the motion, and Pieczenik's letter of November 2, 2003 should be considered his opposition papers relating to the MRC's motion. Transcript of November 5, 2003 Pre-Motion Conference ("Tr.") at 24. Due to some of the potentially inflammatory language contained in Pieczenik's letter, the parties' agreed that Pieczenik would redact and resubmit his letter for docketing. Pieczenik resubmitted his letter after this motion was fully submitted on November 26, 2003 (i.e., after the MRC had submitted its reply papers). In addition to redacting the letter as discussed on November 5, he added some new material. See 12/19/03 Letter to the Court from Dr. Pieczenik ("12/19 Pl. Ltr."). For instance, Pieczenik added the following language:

> My condition for removing the MRC from the Amended Complaint is that it put a plaque up on its walls announcing my suggestion of monoclonals to Cesar Milstein, my demonstrating that acrylamide gels resolve by one nucleotide to Fred Sanger, my creation and then reduction to practice of the first combinatorial laboratory at the MRC and their allowing me to work in their laboratories on any experiment I may wish in the future at their expense and preserving my rights.

Id. at 2. Although Pieczenik should have understood from the conference held on November 5, see Tr. at 27, that he was not entitled to append new arguments to his existing letter, because (1) he is proceeding pro se and is therefore entitled to some leeway in his submissions and (2) because the additional information does not relate to the jurisdictional issue, I will consider both letters as plaintiff's opposition for purposes of deciding this motion.

Exhibit A  309

2003 U.S. Dist. LEXIS 23295, *

In violation of my individual rules and procedures, plaintiff also submitted a sur-reply, dated November 26, 2003. See 11/26/03 Letter to the Court from Dr. George Pieczenik ("11/26 Pl. Ltr."). Because the method by which the parties agreed to submit this motion was unorthodox, I will also consider this letter for purposes of this motion.

[*3]

n5 See SAC PP 25-27.

n6 See 11/2 Pl. Ltr. at 3.

n7 See SAC PP 8, 36. Martin Wood disputes this, stating, "The MRC does not own or occupy any premises or operate any facility in the State of New York, has no telephone number, postal address, bank accounts or agent for service of process in the State of New York, and is not licensed to do business in the State of New York." 10/29/03 Declaration of Martin Wood, MRC Technology's Director of Licensing and Agreements ("Wood Decl.") P 4.

**B. Jurisdictional Allegations**

**1. Contract Between Pieczenik and the MRC**

Pieczenik alleges that the MRC signed agreements with a New York resident (Pieczenik), which "gives this Court jurisdiction, thereby." n8 The "contract" is a letter from an MRC employee n9 to Pieczenik, briefly describing the terms of Pieczenik's employment (for several months in 1987 and 1988) as a visiting scientist at the MRC. n10 Specifically, the contract prospectively addressed the filing of patents during the period of Pieczenik's research at the MRC. n11 Both parties entered into the agreement while Pieczenik [*4] was living in **England**. n12 Pieczenik alleges that when he entered into the agreement, he was a New York **resident**. n13 He does not allege that this contract was negotiated in New York, signed by either party in New York, or performed in New York. However, Pieczenik alleges that the contract was faxed to him in New York years later "because [he] didn't have a copy of it." n14

n8 SAC P 36.

n9 This employee is probably Gordon Koch, although that is not evident from the letter that Pieczenik submitted, which is cut off above the

signature line. See 7/20/87 Letter to George Pieczenik from Gordon Koch, MRC employee ("Koch Ltr."), Ex. B to SAC. Attached with the letter is a form filled out by Pieczenik (listing his local address as a hotel in Cambridge and his permanent home address, which is a New York residence) and a document entitled "Notes for the Guidance of Visiting Scientific Workers" dated February 1981, which was signed by Pieczenik in March of 1988. The series of documents apparently all relate to the Koch Letter and Pieczenik's tenure as a visiting scientist and were all signed and negotiated by the parties in England. See Tr. at 22-24. As such, I will consider these documents as a single "contract," entered into in England.

[*5]

n10 See Tr. at 22.

n11 See id.; see also Koch Ltr.

n12 See Tr. at 22.

n13 See 11/2 Pl. Ltr. at 1.

n14 Tr. at 23.

**2. MRC Scientists Visiting New York**

Pieczenik alleges that the MRC has "always sent scientists to New York to speak and present its discoveries; even Plaintiff's discoveries." n15 Additionally, Pieczenik alleges that the MRC and its scientists have "gotten grants from NY institutions such as the Rockefeller Foundation through out [sic] its whole history. MRC scientists have always presented work, phage antibodies, inter alia, at New York Universities ... and received awards from such institutions." n16

n15 11/2 Pl. Ltr. at 2.

n16 Id.

**3. License Agreements**

Pieczenik alleges that the MRC has licensed rights under its phage display patents in "New York, the United States and the world," thereby infringing and contributing to infringement of his '363 and [*6] '448

patents. n17 The MRC disputes this, alleging that the "MRC has never granted licenses under its phage display patents to any entity located in the State of New York, although some of the MRC's licensees are free to grant sublicenses internationally." n18 Moreover, "apart from one license to a Japanese company, the MRC has licensed its phage display patents only to entities located in the United Kingdom." n19 Finally, the MRC states that it does not "control, direct, or supervise the activities of its licensees in granting sublicenses under the MRC's phage display patents." n20

n17 SAC P 25; see also id. PP 26-27.

n18 Wood Decl. P 5.

n19 Id.

n20 Id.

### 4. Legal Counsel in New York

Pieczenik argues that "having legal council [sic] as agents in New York is grounds for jurisdiction. Several of the MRC patents in this area of phage display and combinatorial libraries have and still use firms with offices in New York, i.e., Katten Muchin Zavis Rosenman, Rogalskyj & Weyand, [*7] et al." n21 The MRC states that "all of the United States patents and patent applications owned or co-owned by the MRC have been prosecuted by patent attorneys or patent agents located in Illinois, Virginia and California and the MRC has never used patent attorneys or agents located in the State of New York for prosecuting its phage display patents." n22

n21 11/2 pl. Ltr. at 2.

n22 Wood Decl. P 5. Even assuming that Pieczenik is correct and the MRC does "still use firms with offices in New York," 11/2 Pl. Ltr. at 3, the fact that a law firm maintains an office in New York is insufficient to confer jurisdiction. This is particularly true where, as here, the law firm in question is not even a New York-based firm.

### 5. Ownership in CAT and Domantis

Pieczenik alleges that the MRC has a "major ownership interest in CAT and undisclosed interest in Domantis." n23 CAT is incorporated in Australia and has its principal place of business in Cambridge, England. n24 Domantis is a Delaware corporation that operates [*8] scientific laboratories in Cambridge, England and has commercial offices in Cambridge, Massachusetts. n25 According to Wood, the MRC owns approximately 1.6% of the shares in CAT and 11% of the shares of Domantis. n26

n23 SAC P 8.

n24 See id. P 7.

n25 See id. P 5.

n26 See Wood Decl. P 5. Pieczenik's contentions regarding the MRC's ownership interest in CAT and Domantis warrant only brief discussion. First, neither CAT nor Domantis is alleged to have any significant ties to New York. Second, even assuming that CAT and Domantis do business in or have engaged in relevant business activities in New York, and assuming that the MRC has a majority ownership in CAT, Pieczenik fails to allege that the MRC exercises any control over the activities of CAT. As the Second Circuit has explained:

Where [] the claim is that the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the State ... For New York courts to have personal jurisdiction in that situation, the subsidiary must be either an "agent" or a "mere department" of the foreign parent ... To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary does all the business which [the parent corporation] could do were it here by its own officials ... In determining whether the subsidiary is a "mere department" of the parent ... the court must consider four factors ... common ownership ...; financial dependency of the subsidiary on the parent corporation; [] the

degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and [] the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

*Jazini v. Nissan Motor Co., 148 F.3d 181, 184-85 (2d Cir. 1998)* (quotation marks and citations omitted) (articulating the basic standard governing the New York presence of a parent through its subsidiary in the context of *section 301 of New York's Civil Practice Law and Rules*); see also Realuyo v. Villa Abrille, 2003 U.S. Dist. LEXIS 11529, No. 01 Civ. 10158, 2003 WL 21537754, at *6 n.3 (S.D.N.Y. July 8, 2003) ("Although a foreign parent corporation may be subject to the Court's long-arm jurisdiction based on the activities of a subsidiary, the subsidiary must [be] an agent or mere department of the corporation."). For the foregoing reasons, Pieczenik's allegations that the MRC holds a majority ownership in CAT and an undisclosed interest in Domantis cannot establish personal jurisdiction over the MRC in New York.

[*9]

## II. LEGAL STANDARD n27

n27 It should be noted that inasmuch as "this case relates to the infringement of patents [it] is [] governed by the law of the Federal Circuit." Hypoxico, Inc. v. Colorado Altitude Training LLC, 2003 U.S. Dist. LEXIS 11862, No. 02 Civ. 6191, 2003 WL 21649437, at *1 (S.D.N.Y. July 14, 2003). The Federal Circuit's approach to evaluating a defendant's motion to dismiss for lack of personal jurisdiction is consistent with that of the Second Circuit. See 2003 U.S. Dist. LEXIS 11862, at *2. Moreover, "when determining a personal jurisdiction case under Federal Circuit law, this Court must first apply the state long-arm statute and then determine whether asserting jurisdiction would violate federal due process." Id.

Upon motion, a court is obligated to dismiss an action against a defendant over which it has no personal jurisdiction. n28 A plaintiff bears the ultimate burden of establishing, by a preponderance of the evidence, that the

court has jurisdiction over the defendant. n29 However, "prior to discovery, [*10] a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." n30 A plaintiff "can make this showing through his own affidavits and supporting materials[,] containing an averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant." n31 Thus, a court may consider materials outside the pleadings, n32 but must credit the plaintiff's averments of jurisdictional facts as true. n33 "Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." n34

n28 See *Fed. R. Civ. P. 12(b)(2)*; see also *In re Ski Train Fire in Kaprun, Austria on November 11, 2000 (Siemens Austria), 230 F. Supp. 2d 403, 406 (S.D.N.Y. 2002).*

n29 See *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).*

[*11]

n30 *Jazini, 148 F.3d at 184* (citations and quotation marks omitted); see also *Koehler v. Bank of Berm., Ltd., 101 F.3d 863, 865 (2d Cir. 1996).*

n31 *Whitaker v. American Telecasting Inc., 261 F.3d 196, 208 (2d Cir. 2001)* (citations and quotation marks omitted).

n32 See *Hsin Ten Enter. USA, Inc. v. Clark Enter., 138 F. Supp. 2d 449, 452 (S.D.N.Y. 2000).*

n33 See *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).*

n34 *A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993)*; see also *Whitaker, 261 F.3d at 208.*

The determination of whether a federal court has personal jurisdiction over a defendant is a two-step

process. First, the court must determine whether the plaintiff has shown that the defendant is subject to personal jurisdiction under the forum state's laws. n35 Second, the court must evaluate whether its assertion of jurisdiction pursuant to the forum state's laws comports with the requirements of [*12] due process. n36

n35 See *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27; *Met Life*, 84 F.3d at 567.

n36 See *Bensusan Rest. Corp.*, 126 F.3d at 27; *Met Life*, 84 F.3d at 567. Because the MRC is not subject to personal jurisdiction under New York's jurisdictional statutes, it is unnecessary to address the constitutional requirements for personal jurisdiction.

III. DISCUSSION

A. *Section 301* n37

n37 Plaintiff fails to identify the statutory provisions on which his jurisdictional arguments are based. Accordingly, I will evaluate his jurisdictional arguments under both *sections 301 and 302*.

Under New York law, a foreign corporation can be sued for all purposes if it is present or "doing business" in the state. n38 Under this test, "a foreign corporation is amenable to suit in New [*13] York if it is 'engaged in such a continuous and systematic course' of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." n39 That is, a "corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action ... if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" n40 "The doing business standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction may be sued in New York on causes of action wholly unrelated to acts done in New York." n41

n38 See *N.Y. C.P.L.R. § 301* (McKinney 2003) (codifying caselaw that utilizes "doing business" standard); *Aerotel Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 191 (S.D.N.Y. 2000) (interpreting *section 301*).

n39 *Aerotel Ltd.*, 100 F. Supp. 2d at 191-92 (quoting *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536, 227 N.E.2d 851, 281 N.Y.S.2d 41 (1967)).

n40 *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985)).

[*14]

n41 *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001) (quotation marks omitted). To determine whether a foreign corporation is doing business in New York, courts have focused on a traditional set of indicia, assessing whether the company: (1) has an office in the state; (2) has any bank accounts or other property in the state; (3) has a phone listing in the state; (4) does public relations work there; and (5) has individuals permanently located in the state to promote its interests. See *Wiwa*, 226 F.3d at 98. While plaintiff does not allege that the MRC has any of these five contacts, this alone does not mean that there is no jurisdiction under *section 301*. See *Met Life*, 84 F.3d at 570 [degrees] ("Contacts with the forum state should not be examined separately or in isolation. There is no talismanic significance to any one contact or set of contacts that a defendant may have with a forum state; courts should assess the defendant's contacts as a whole."); *Landoil Res. Corp. v. Alexander & Alexander, Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) ("The Court must [] analyze a defendant's connections to the forum state 'not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York.'") (quoting Weinstein, Korn & Miller, *New York Civil Practice, P 301.16*, at 3-32)).

[*15]

Pieczenik has failed to allege facts sufficient to support a finding of personal jurisdiction over the MRC under *section 301*. Pieczenik does not provide any basis upon which to infer that the MRC is "doing business" in New York. Plaintiff alleges that MRC scientists come to New York to speak and present new discoveries and accept awards, n42 but such speaking engagements do not amount to "doing business" in New York. n43

n42 See 11/2 Pl. Ltr. at 2.

N43 See *Landoil Res. Corp., 918 F.2d at 1044* (finding that sporadic business trips of short duration, made by different employees for purposes of solicitation, were insufficient to establish employer's systematic and continuous presence in New York).

Pieczenik also cryptically argues that "New York has a continuing historical relationship with England, the Queen and her dominions in that New York is not New Amsterdam." n44 The meaning of this statement is not entirely clear, but inasmuch as Pieczenik is asserting that the MRC, as a public [*16] entity established pursuant to Royal Charter, has a continuous presence in New York by virtue of the "historical" relationship between England and New York, he is mistaken.

n44 11/2 Pl. Ltr. at 3.

B. *Section 302(a)(1)*

Under *section 302 (a)(1)* of New York's long-arm statute, n45 a court may exercise personal jurisdiction over a nondomiciliary if "the nondomiciliary [] transact [s] business within the state, [and] the claim against the nondomiciliary [] arises out of that business activity." n46 A nondomiciliary "transacts business" in New York if it "purposefully avails [itself] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." n47 A court's determination of whether a defendant "transacts business" in New York is based on an assessment of the sum of the defendant's activities. n48 The Second Circuit has used the following factors to evaluate whether a defendant is "transacting business" in New York:

(1) whether the defendant has [*17] an on-going contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract requires notices and payments to be sent into the forum state or requires supervision by the corporation in the forum state. n49

n45 *Section 302 (a)(1)* reads, in relevant part: "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." *N.Y. C.P.L.R. § 302 (a)(1)* (McKinney 2003).

n46 *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*. Because jurisdiction under *section 302 (a)(1)* requires consideration of whether a cause of action arose out of a party's transaction of business in New York, it is necessary to "determine the issue of personal jurisdiction separately for each cause of action asserted in the plaintiff's complaint." *Cosmetech Int'l LLC v. Der Kwei Enter. and Co., 943 F. Supp. 311, 317 (S.D.N.Y. 1996)*; see also *Ainbinder v. Potter, 282 F. Supp. 2d 180, 184 (S.D.N.Y. 2003)*.

[*18]

n47 *CutCo Indus., Inc., 806 F.2d at 365* (quoting *McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967))*; see also *Fort Knox Music Inc. v. Baptiste, 203 F.3d 193, 196 (2d Cir. 2000)* ("The statute allows jurisdiction only over a defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'") (quotations marks omitted).

n48 See *Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors, 510 F.2d 870, 873 (2d Cir. 1975)* .

n49 *Hutton v. Priddy's Auction Galleries, Inc., 275 F. Supp. 2d 428, 439 (S.D.N.Y. 2003)* (citing *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996))*.

1. Breach of Contract Between the MRC and Pieczenik

Pieczenik argues that the "contract" between himself (a New York resident) and the MRC provides a basis for this Court to assert jurisdiction over the MRC. n50 His

argument fails because he has not alleged facts [*19] sufficient to support a finding that the MRC transacted business in New York. Assuming, arguendo, that the 1987 Koch letter and accompanying documents form a "contract," this contract was negotiated and entered into by both parties in England. n51 The "contract" does not contain a choice-of-law provision. While, under certain circumstances, a single contact or transaction may be sufficient to satisfy the "transacting business" standard, the formation of a contract in **England**, albeit between an English **citizen** and a New York **resident,** does not amount to "transacting business" in New York. The MRC did not purposefully avail itself of the laws of this forum simply because it entered into an agreement with a New York resident.

n50 For support, Pieczenik relies on *Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L. Ed. 629 (1819)* (invalidating, pursuant to the *Contracts Clause,* state legislature's attempts to change and amend the charter of Dartmouth College). He argues "this contract between Plaintiff and the MRC is ... as valid as the contract creating Dartmouth College by King George III if not more so." 11/2 Pl. Ltr. at 1. But the *Woodward* case does not address whether jurisdiction over a non-domiciliary is proper under New York's jurisdictional statutes. Pieczenik also argues, in a "Memorandum of Law" attached to his Second Amended Complaint, that:

Under the Bush Doctrine, George Bush directed United States armed forces into combat in Panama for the stated purposes of "safeguard [ing] American lives, restore [ing] democracy, preserv[ing] the Panama Canal treaties, and seizing Noriega to face federal drug charges in the United States." *United States v. Noriega, 746 F. Supp. 1506, 1511 (S.D. Fla. 1990).* The jurisdictional power of this Court under this Doctrine reaches all the way across the Atlantic, if not around the world to hold heads of governments under the jurisdiction of the US Courts for crimes committed in the US or against American citizens elsewhere.

Memorandum of Law to SAC P 1. The "Bush Doctrine" argument lacks merit for rather obvious reasons. The assertion of jurisdiction over a foreign military leader for narcotics-related crimes is hardly analogous to the assertion of jurisdiction over a foreign, publicly funded scientific entity for alleged patent infringement claims.

[*20]

n51 This presents a wholly different situation from that involving negotiations conducted in New York. "Preliminary negotiations conducted in New York qualify as a 'transaction of business' if they have 'substantially advanced or were substantively important or essential to the formation' of a contract outside New York." *Ainbinder, 282 F. Supp. 2d at 187.*

### 2. Patent Infringement

Pieczenik claims that the MRC owns, uses, and has filed patents that infringe on his patents. n52 In connection with these activities, the MRC has allegedly licensed rights under its phage display patents in New York, which infringe and contribute to the infringement of his '363 and '448 patents. n53 Pieczenik fails adequately to allege facts conferring jurisdiction over the MRC in New York. He does not allege that the licenses were negotiated in or executed in New York. As the Federal Circuit explained to Pieczenik in a related case, "the grant of licensing rights to a New York corporation does not constitute the transaction of business within the meaning of the New York long- arm statute." n54 [*21] In the absence of forum-specific contacts rising to the level of "transacting business," this Court lacks authority to assert jurisdiction over the MRC as to the patent infringement claims.

n52 See SAC P 24.

n53 See id. PP 25-26.

n54 *Pieczenik v. Dyax Corp., 265 F.3d 1329, 1335 (Fed. Cir. 2001).*

### 3. Patent Invalidity and Inventorship

Pieczenik alleges that the MRC owns unidentified patents that are invalid in light of his '363 and '448 patents. n55 Pieczenik also argues that he is entitled to be added as a named inventor on unidentified patents owned

by the MRC. n56 But Pieczenik does not allege any facts upon which this Court could find jurisdiction over the MRC as to these patents. Specifically, the MRC is not alleged to have transacted business in New York in connection with these patents. Accordingly, there is no basis under *section 302 (a)(1)* to assert personal jurisdiction over the MRC with respect to Pieczenik's claims of patent invalidity or inventorship.

> n55 See id. PP 24, 27, 28; see also *35 U.S.C. § 102(e)*.

[*22]

> n56 See SAC PP 36-37.

### 5. RICO

Pieczenik claims that Dyax, Domantis, the MRC, and CAT have colluded to "give the impression of Dyax being more than a 'virtual' patent licensing company." n57 In addition to allegations that certain unidentified defendants committed mail fraud, n58 Pieczenik asserts that "to the extent that communications were had with potential investors and pharmaceutical houses over ... [the MRC's] telephone [number] the foregoing also constituted wire fraud within the meaning of *18 U.S.C. § 1343*." n59 He does not, however, allege any facts relating to this conspiracy that would suggest a connection between New York and the MRC. In the absence of any forum-related contacts, personal jurisdiction over the MRC as to the RICO claims is lacking.

> n57 Id. P 53.

> n58 See id. P 59.

> n59 Id. P 60.

### C. Section 302 (a)(2)

Under *section 302 (a)(2)*, personal [*23] jurisdiction over a non-domiciliary may be asserted over a defendant that "commits a tortious act within the state." n60 "Second Circuit decisions make it clear that the statutory provision requires that the tortious act itself physically be performed within New York State." n61 Pieczenik does not allege that the MRC engaged in activities in New York as its alleged patent infringement. n62 Thus, Pieczenik has failed to allege that MRC committed a tortious act within New York, and jurisdiction is lacking under *section 302(a)(2)*.

> N60 *N.Y. C.P.L.R. § 302(a)(2)* (McKinney 2003).

> n61 Westvaco Corp. v. Viva Magnetics Ltd., 2002 U.S. Dist. LEXIS 15476, No. 00 Civ. 9399, 2002 WL 1933756, at *2 (S.D.N.Y. Aug. 20, 2002).

> n62 Similarly, Pieczenik does not allege that the MRC acted in New York with respect to the breach of contract or RICO claims.

### B. Section 302(a)(3)

Under *section 302 (a)(3)*, personal jurisdiction may be asserted over a non-domiciliary if the non-domiciliary "commits [*24] a tortious act without the state" injuring a person within New York, and either (i) "regularly does or solicits business, or engages in any other persistent course of conduct," or (ii) "derives substantial revenue from interstate commerce and expects or reasonably should expect the tortious act to have consequences in the state. n63

> n63 *N.Y. C.P.L.R. § 302(a)(3)* (McKinney 2003).

Pieczenik fails adequately to allege that the MRC regularly does or solicits business in New York or derives substantial revenue from interstate or international commerce. n64 Accordingly, *section 302 (a) (3)* provides no basis for the assertion of personal jurisdiction over the MRC.

> n64 Pieczenik argues that the MRC is not an eleemosynary institution because a website indicates that the MRC is pursuing international financing and collaborations. See 11/26 Pl. Ltr. (citing http://www.britishcouncil.org). Even crediting Pieczenik's allegation as true, as I must, it does not follow from the fact that the MRC is "pursuing international financing and collaborations" that the MRC derives significant revenue from international commerce. Moreover, the website cited by Pieczenik clearly states that the MRC is a "national organisation funded by the UK taxpayer" through "the UK Government" -- more precisely, through "an annual Grant in aid from Parliament via the Office of Science and Technology." http://www.mrc.ac.uk/index/about.htm.

2003 U.S. Dist. LEXIS 23295, *

He further alleges that the MRC generates revenue through CAT and possibly Domantis. More precisely, he says, "One groom can't dance at two weddings at the same time. An eleemosynary institution cannot create a commercial enterprise whose shares are guaranteed by the Bank of New York and still pretend to be a pure research institution on the Cam watching the punts." 11/2 Pl. Ltr. at 1. But Pieczenik contends only that the MRC has a "major ownership interest in CAT and undisclosed interest in Domantis." SAC 8. He fails to allege fact sufficient to support a finding that the MRC derives substantial revenue from international commerce. Accordingly, Pieczenik fails to adequately allege that there is personal jurisdiction over the MRC pursuant to *section 302(a)(3)*.

[*25]

**IV. CONCLUSION**

For the foregoing reasons, the MRC's motion to dismiss for lack of personal jurisdiction is granted. n65 The Clerk of the Court is directed to close this motion and dismiss the case against the MRC.

   n65 Pieczenik requests "leave to amend in order to plead facts that could support a finding of jurisdiction under a conspiracy theory." 11/26 Pl. Ltr. But Pieczenik has been afforded several opportunities to amend his complaint and there is an insufficient basis to permit him to continue to do so ad infinitum. Accordingly, plaintiff's motion to replead jurisdictional facts is denied.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: December 29, 2003

# 12

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Saab v. Citibank, N.A.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Ayoub-Farid Michel SAAB and Fadi Michel Saab,
Plaintiffs,
v.
CITIBANK, N.A., Defendant.
**No. 00 CIV. 6784(BSJ).**

Nov. 7, 2001.

*Decision & Order*
JONES, District J.
**\*1** On September 8, 2000, Plaintiffs Ayoub-Farid
Michel Saab and Fadi Michel Saab (collectively "the
Saabs") filed suit against Defendant Citibank,
alleging that Citibank failed to use its best efforts, on
behalf of itself and its affiliate, the Saudi American
Bank ("SAMBA"), to carry out a promised private
placement for the Golden Cedar Club Project, a real-
estate development outside Beirut, Lebanon, owned
by Plaintiffs. (Compl.¶ 1.) Plaintiffs are brothers,
citizens of Lebanon and residents of Cyprus who
jointly own the property in southern Beirut. (Compl.¶
¶ 7, 8, 12.) They allege claims of actual fraud,
constructive fraud, breach of fiduciary duty,
inducement to or participation in breach of fiduciary
duty, intentional misrepresentation, negligent
misrepresentation, breach of oral contract,
promissory estoppel, interference with contractual
relations, interference with economic advantage, and
negligent supervision against Citibank. (Compl. ¶ 3
.) On October 23, 2000, Defendant moved to dismiss
the case for forum non conveniens. For reasons
discussed below, Defendant's motion to dismiss is
GRANTED.

## I. BACKGROUND

SAMBA was created in 1980 from Citibank's
operations in Saudi Arabia when the Saudi Arabian
government forced Citibank and other foreign banks
to relinquish their controlling interests and to take
minority ownership interests in their Saudi Arabian
banks. Originally, Citibank held a forty percent
interest in SAMBA, the maximum allowable under
Saudi Arabian law. During the events in question,

Citibank held a thirty percent interest in SAMBA.
(Compl.¶ 16.)

Upon taking a minority interest, Citibank entered into
a Technical Management Agreement ("Management
Agreement") with SAMBA, pursuant to which
Citibank agreed to provide senior management to
SAMBA, including the appointment of SAMBA's
managing director, as well as training and other
expertise. (Compl.¶ 17.) The precise level of control
exerted by Citibank over SAMBA is unclear.
Plaintiffs and Defendant dispute exactly what the
Management Agreement entailed. However, SAMBA
and Citibank were affiliated, and SAMBA
represented that Citibank was its foreign partner.
(Compl.¶ 28.) Citibank appointed three members to
the SAMBA board, and James Collins, Chief
Executive and Managing Director of SAMBA during
the events in question, was a longtime Senior Vice
President of Citibank. (*See* Mustill Decl. Ex. D ¶ 4;
Compl. ¶ ¶ 20, 23.)

In 1994, the Saabs met with Mohamed Amersi, an
attorney at Jones, Day, Reavis & Pogue, who
recommended SAMBA to help them finance a real-
estate project on their jointly-owned property.
(Compl.¶ 15.) From September 11 to September 16,
1994, the Saabs met with SAMBA representatives to
negotiate an agreement under which SAMBA would
place shares in the real-estate project with investors.
(Compl.¶ 19.) Plaintiffs contend that Citibank was
represented at this meeting by James Collins.
(Compl.¶ 20.) As part of its pitch, SAMBA referred
to its previous successful placement of shares in the
Solidere project in Lebanon. (Compl.¶ 21.) Plaintiffs
claim that it was Citibank's close association with
SAMBA that made them decide to accept the deal.
(Compl.¶ 23.) Stating that it had the resources and
ability to pursue the placement not only through its
head office in Saudi Arabia but also through its Swiss
and United Kingdom subsidiaries, SAMBA asked for
global exclusivity in the real-estate project. (Compl.¶
¶ 24-26.) Notably, however, the Placement
Agreement contained an explicit carve-out excluding
the United States. (Compl.¶ ¶ 24, 29.)

**\*2** On September 16, 1994, Plaintiffs and SAMBA
entered into a Placement Agreement, under which
SAMBA agreed to market the real-estate venture in
two phases and to use its best efforts to promote the
venture. (Compl.¶ 28.) Following the signing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

SAMBA began due diligence, conducted by Ghazi Dhoot of SAMBA's Corporate Finance and Investor Marketing Department. (Compl.¶ 35.)

Over the next few months, various circumstances led to delays. (Compl.¶ ¶ 36-40.) In January, 1995, SAMBA created a Merchant Banking Group headed by Michael Baker, and the project was shifted over to that Group. This caused further delays, and marketing did not begin until June. (Compl.¶ ¶ 41-44.) While there was early success in finding investors, efforts ground to a halt a month or two later. (Compl.¶ 45.) Dhoot resigned, numerous additional delays ensued, and the placement appeared to stall. (Compl.¶ ¶ 46-59.)

In 1997, Plaintiffs filed suit against SAMBA in London for breach of contract. (Compl.¶ 59.) Claiming that the contract was governed by Saudi Arabian law and that the relevant events were centered around Saudi Arabia, SAMBA moved to dismiss the action. *Saab and Another v. Saudi American Bank,* 1 WLR 1861, 1863 (1999). Plaintiffs argued that the principal breach had been made by the English office of SAMBA and that they had close personal connections to the forum. *Saab,* 1 WLR at 1881-82. They alleged that England was better suited for the witnesses, many of whom were residing in England or were British nationals, and, therefore, the suit was properly brought in England. (Karp Decl. Ex. 2 & 3.) The English court agreed and denied SAMBA's motion. *Saab,* 1 WLR at 1881-82.

Subsequently, on April 12, 2000, SAMBA made a formal offer to settle the proceedings and gave Plaintiffs twenty-one days to accept. Plaintiffs did not accept the offer within the time limit, but, on November 3, 2000, they applied to the court for permission to accept the offer. SAMBA agreed and the court granted permission. Acceptance has not been formally made, but the English court has already stayed the action pending formal acceptance. (Goldsmith Decl. ¶ 8.)

On August 8, 2000, Plaintiffs filed a second action in England against Mohamed Amersi and Jones, Day, Reavis & Pogue relating to those parties' role in the SAMBA deal. (Def.'s Reply Mem. at 3.)

## II. DISCUSSION

A district court has broad discretion when deciding whether to dismiss an action on the ground of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257 (1981); *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991). Although a foreign plaintiff's choice of forum is generally given less deference than the choice of an American plaintiff, *Piper,* 454 U.S. at 256, "some weight must still be given to a foreign plaintiff's choice of forum." *Murray v. British Broadcasting Corp .,* 81 F.3d 287, 290 (2d Cir.1996). A defendant seeking to dismiss a complaint on the basis of forum non conveniens "must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors ... the balance of convenience tilts strongly in favor of trial in the foreign forum." *Maganlal,* 942 F.2d at 167.

*3 In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947), the Supreme Court set forth the private and public interest factors that the district courts should consider. Private interests to be considered include "ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil,* 330 U.S. at 508. Public interest factors include administrative difficulties stemming from court congestion; the burden of imposing jury duty on a community with no relation to the litigation; the interest in having "localized controversies decided at home"; and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508-09. "The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice." *Maganlal,* 942 F.2d at 167.

### A. Deference to Plaintiff's Choice of Forum

There is a strong presumption in favor of a plaintiff's choice of forum; however, the court will give less deference to a plaintiff's choice when that plaintiff is foreign. *Piper,* 454 U.S. at 255-56. This does not mean that no deference will be given to a foreign plaintiff's choice of forum; dismissal for forum non conveniens is the exception, rather than the rule. *Maganlal,* 942 F.2d at 168. In fact, less deference is accorded a foreign plaintiff's choice of forum because it can often be assumed that a United States forum is not the most convenient forum in cases involving foreign plaintiffs. *Piper,* 454 U.S. at 255-56; *Murray,* 81 F.3d at 290. The general rule is that "deference increases as the plaintiff's ties to the forum increase." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 101 (S.D.N.Y.2000). "[T]he greater the plaintiff's ties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." *Id.* at 102.

Plaintiffs have made no real showing of convenience in this district. As already noted, Plaintiffs themselves are citizens of Lebanon, and at least one plaintiff maintains a home in England, where his wife resides, and where his daughter attended college. (Karp Decl. Ex. 3 ¶ 20.) Plaintiffs argue that the Southern District is more convenient and appropriate because Citibank is the true focus of this litigation and the key witnesses and documents will be found at Citibank. (Pls.' Mem. Opp'n at 6-7.) However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing. As discussed in more detail below, the location of witnesses and documents in this case actually favors dismissal of this case to a more convenient alternative forum.

Nearly all the alleged events giving rise to Plaintiffs' claims occurred in London, Lebanon or Saudi Arabia. The negotiations and representations by SAMBA took place in London, (Compl.¶ ¶ 19, 21), and the Placement Agreement was signed there, (Compl.¶ 29). Another relevant meeting took place in Beirut on October 22, 1994. (Compl.¶ 38.) Ghazi Dhoot promoted SAMBA in Saudi Arabia. (Compl.¶ 51.) These are but a few, representative examples. Additionally, most of the documents are in London or Saudi Arabia. (Karp Decl. Ex. 2 ¶ 19.4.) Any resolution of the claims against Citibank will necessarily involve consideration of the allegations lodged against SAMBA, and SAMBA's actions were to be undertaken primarily in London. (Mustill Decl. Ex. D ¶ 4.5; Karp Decl. Ex. 2 ¶ ¶ 14, 29.6.)

*4 In the initial suit filed against SAMBA in England, Plaintiffs fought tenaciously to keep the case in that forum. (Karp Decl. Ex. 2 & 3; Karp Decl. Ex. 4.) The English trial court agreed and denied SAMBA's motion to move the case to Saudi Arabia. *Saab,* 1 WLR at 1882-83. Moreover, the Complaint in the present case bears a striking similarity to that filed against SAMBA in England. (Mustill Decl. Ex. D.) Because Plaintiffs fail to make any showing of convenience, their choice of forum deserves only "some weight." *Murray,* 81 F.3d at 290.

### B. Adequate Alternate Forum

"Ordinarily, a foreign forum will be adequate when

the defendant is subject to the jurisdiction of that forum." *Maganlal,* 942 F.2d at 167. An agreement by a defendant to submit to the jurisdiction of a foreign forum generally satisfies the requirement that there be an adequate alternate forum. *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74-75 (2d Cir.1998). A British court will be able to extend jurisdiction over Citibank in this case, (Mustill Decl.), and Citibank has agreed to accept jurisdiction in England, (Def.'s Mem. Supp. at 13-14).

The fact that the alternate forum has different laws and provides different causes of action or remedies, or lacks certain causes of action and remedies, does not bar adequacy. *DiRienzo v. Philip Services,* 232 F.3d 49, 57 (2d Cir.2000). The alternate forum is adequate so long as it "permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all." *Id.; see, e.g., Capital Currency Exchange, N.V. v. National Westminster Bank PLC* 155 F.3d 603, 610 (2d Cir.1998); *PT United,* 138 F.3d at 74; *Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 159 (2d Cir.1980) (*in banc* ).

There can be no doubt that Defendant has shown that England is an adequate alternative forum for this case. (*See* Mustill Decl. ¶ ¶ 5, 11-29.) Since the court has decided that England, the proposed alternative forum, is adequate, the court must now "balance public and private interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action." *Murray,* 81 F.3d at 293.

### C. Private Interest Factors

1. Ease of Access to Sources of Proof-Documents

Plaintiffs argue that all the relevant documents are in the United States at Citibank's headquarters. (Pls.' Mem. Opp'n at 6-7.) However, the only specific document that Plaintiffs can name is the Management Agreement, which they concede they already possess as a result of the settlement in the English suit they filed against SAMBA. Plaintiffs only demand that document from Citibank because they claim to be unable to reveal its contents due to a confidentiality agreement signed as part of the settlement. (Pls.' Mem. Opp'n at 3 n. 4.) Their other requests for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 4
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

documents in the United States are vague and overly broad, seeking nearly all Citibank documents that have any connection to SAMBA. (Pls.' Mem. Opp'n App. A.) Citibank has already stated that they will provide any requested documents in London, and the SAMBA documents, crucial to proving the claim against Citibank, are available in SAMBA's English office. Thus, this factor weighs in favor of dismissal to a more convenient alternative forum.

### 2. Compulsory Process and Costs of Obtaining Witnesses

**\*5** Plaintiffs claim that three witnesses-James Collins, Michael Baker and Mohamed Amersi-reside in the United States. (Ayoub-Farid Michel Saab Aff. ("Saab Aff.") ¶ 9; Pls.' Mem. Opp'n at 5.) However, Michael Baker denies that he resides in the United States, (Baker Aff.), and it is unclear where Mohamed Amersi resides, (*See* Paterson Decl. Ex. 1). Moreover, both Baker and Amersi are British nationals, and Citibank has specifically secured the agreement of James Collins to appear in England. (Def.'s Reply Mem. at 7, 7 n. 7.) The other witnesses named-Nader Mousli, Ghazi Dhoot, Hafez Alawi, Ali Baruni and Stephen Paine-are either British nationals and/or reside in England, Switzerland, Lebanon or Saudi Arabia. (Saab Aff. ¶ 9; Pls.' Mem. Opp'n at 5; Def.'s Reply Mem. at 7.) All of these witnesses, with the exception of Baruni, were previously named in the SAMBA suit and were then listed by Plaintiffs as capable of appearing in England. (Karp Decl. Ex. 2.) In addition, Citibank has agreed to provide access to all of its employees and documents in London, (Def.'s Reply Mem. at 3), so the costs of producing witnesses and the difficulties associated with compulsory process will be minimized in that forum.

### D. Public Interest Factors

Although the private interests identified by the parties all weigh in favor of dismissal in this case, the court must go on to consider the public interest factors affecting the decision to dismiss as well. *See Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) (*Gulf Oil* "commands inquiry into relevant public interest factors."); *see also Gulf Oil,* 330 U.S. at 503.

### 1. Court Congestion

A district court may properly consider its caseload in

determining the appropriateness of retaining an action. *See Piper,* 454 U.S. at 241. However, the Second Circuit has recently pointed out that, for purposes of a forum non conveniens motion, court congestion is no longer a significant concern in the Southern District of New York. *Guidi v. Inter-Continental Hotels Corp.* 224 F.3d 142, 147 n. 5 (2d Cir.2000). Though it remains a factor to be considered, court congestion does not affect the analysis in this case.

### 2. Local Interest in the Controversy

When most of the events took place in a foreign forum or forums and involve mostly foreign parties, the United States and its citizens have less interest in the resolution of the action than the foreign forum. *See, e.g., Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1234 (2d Cir.1994); *Allstate Life Ins. Co. v. Linter Group, Ltd.,* 994 F.2d 996, 1002 (2d Cir.), *cert. denied,* 510 U.S. 945 (1993); *Bybee v. Oper Der Standt Bonn,* 899 F.Supp. 1217, 1223 (S.D.N.Y.1995). This community has limited connection to the litigation and would be ill-served by imposing this case on a local jury. Although Citibank's headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign, with the sole exception of Mr. Collins. Though Plaintiff alleges that there are other, unknown witnesses, mere allegations are not sufficient to connect the community to litigation.

**\*6** If the allegations of Plaintiffs regarding Citibank's control of SAMBA are true, they do raise an interest on the part of the United States in ensuring the legitimate practices of banks. As a general proposition, the United States does have a substantive interest in governing its banks according to one set of rules. *Cf., e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 292-93 (S.D.N.Y.2000) (holding that the duties owed by American reinsurance companies must be governed according to one set of rules and that the United States has the greatest substantive interest in determining that standard). This is the only real interest favoring retention of this case in its present forum. However, other circumstances, including the identities of witnesses and parties and the locations of relevant events, demonstrate that there is extremely little local interest in this controversy. Moreover, "a single factor is rarely dispositive," *DiRienzo v. Philip*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Like the analysis governing the tort claims, here it is sufficient to consider which law would govern in either case.

If the choice-of-law provision is applicable, then Saudi Arabian law would govern the contract claims. If the choice-of-law provision is not applicable, then New York conflicts-of-law rules would apply. New York courts again perform an "interest analysis" and hold that the "the law of the jurisdiction having the greatest interest in the litigation controls." *Wm. Passalacqua Builder's v. Resnick Developers, 933 F.2d 131, 137 (2d Cir.1991).* That interest is determined by inquiry into a number of factors, including "the place of: (1) contracting, (2) negotiation of the contract, (3) performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.*

The place of negotiation and contracting was England. (Compl.¶ ¶   19, 29.) The place of performance was worldwide, but specifically excluded the United States. (Compl.¶ ¶   24, 29.) The subject matter of the contract, the project, was located in Lebanon. (Compl.¶   1.) The citizenship, domiciles, residences and places of incorporation and business of the parties include England, Cyprus, Saudi Arabia, Switzerland and the United States. (Compl. ¶ ¶   7, 8, 9, 20; Pls.' Mem. Opp'n at 5-6.) Based on these factors, England clearly has a greater interest in this litigation than the United States. Therefore, should the should the choice-of-law provision not apply, English law would be applied to the contract claims.

*8 This court is, therefore, being asked to consider a case in which no American law is at issue and all questions would likely be resolved under foreign law. While this court is presumably capable of analyzing both English and Saudi Arabian law, in this case it is appropriate for English courts to decide questions of English law. Moreover, English courts can analyze Saudi Arabian law as easily as American courts. Thus, the factor considering familiarity with the law weighs heavily in favor of dismissal.

### 4. Other Factors

Currently, there is a first-filed action pending before an English court dealing with the same series of transactions and alleging similar claims against the law firm of Jones, Day, Reavis & Pogue and

Mohamed Amersi. (Paterson Decl. Ex. 1.) In the interests of efficiency, the avoidance of duplicative litigation, and consistency of result, this suit would be better off consolidated with the pending English suit, or, at the very least, litigated in the same forum. Plaintiffs, however, chose not to inform this court that such an action was pending. The reasonable inference is that Plaintiffs were aware this court would prefer to defer litigation while a foreign court considered pending litigation on the same issues, particularly since decisions in either court could have a significant impact on the other pending case.

### E. Deference to Pending Foreign Proceeding

Since the court is dismissing this case on grounds of forum non conveniens, the court need not address Defendant's argument that this case should be stayed or dismissed in deference to actions pending in England.

### III. CONCLUSION

Balancing the *Gulf Oil* factors strongly favors England as a more convenient alternative forum in this case. In addition to maintaining close connections to England, Plaintiffs are foreign and, therefore, deserve less deference in their choice of forum. Many of the witnesses reside in England or are British nationals; moreover, Citibank has agreed to produce any required documents and witnesses in England. The alleged events occurred primarily in England, and foreign law will apply to both the tort and contract claims. While court congestion is not a significant factor here, this community has limited interest in the controversy, and it would unfairly burden a local jury to hear this case. Finally, this suit would best be considered in tandem with the suit currently pending in England dealing with the same alleged events that was filed prior to the present suit. For the foregoing reasons, Defendant's motion to dismiss for forum non conveniens is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2001.
Saab v. Citibank, N.A.
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 13

**SEMPRA ENERGY TRADING CORP., Plaintiff, -v- ALGOMA STEEL, INC., Defendant.**

**00 Civ. 9227 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 3001*

**March 20, 2001, Decided**
**March 22, 2001, Filed**

**DISPOSITION:** [*1] Defendant's motion granted and case dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant moved to dismiss plaintiff's action for declaratory judgment, on the basis of forum non conveniens.

**OVERVIEW:** Plaintiff brought suit against defendant seeking a declaration that defendant was obligated to pay certain sums of money under an asset management agreement. The suit did not seek a money judgment, because plaintiff had withheld funds in connection with other related transactions. Defendant moved to dismiss on grounds of forum non conveniens, arguing that the suit should have been settled where plaintiff had brought a parallel suit. The court granted the motion to dismiss. It held that the forum in which the action was brought was improper because many of the contacts necessary for the litigation of the matter were present in Canada. Furthermore, the agreement was negotiated in Canada, and contained an Ontario choice of law provision. A **forum** selection **clause** contained in confirmations by the parties did not apply to the dispute over the agreement, so the general rules of forum non conveniens dismissal applied.

**OUTCOME:** Motion to dismiss was granted on basis of forum non conveniens, because **forum** selection **clause** in confirmations between parties did not apply, and many of contacts necessary for the litigation were present in Canada.

**COUNSEL:** For Sempra Energy Trading Corp., Plaintiff: Brian M. Coogan, Esq., Stroock & Stroock & Lavan LLP, New York, NY.

For Algoma Steel, Inc., Defendant: John Brewer, Esq., Fried, Frank, Harris, Shriver & Jacobsen, New York, NY.

For Algoma Steel, Inc., Defendant: Bonnie Steingart, Esq., David Zilberberg, Esq., Of Counsel, Fried, Frank, Harris, Shriver & Jacobsen, New York, NY.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION:**

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

Sempra Energy Trading Corp. ("plaintiff" or "Sempra"), a Delaware corporation with its principal place of business in Connecticut, brought this action against Algoma Steel, Inc. ("defendant" or "Algoma"), a Canadian company incorporated and headquartered in Ontario, seeking a declaration that Algoma is obligated to pay Sempra certain sums of money under a contract (the "Asset Management Agreement" or "AMA"). The suit does not seek a money judgment, however, because Sempra already has possession of the disputed funds, having withheld the sum in controversy from payments otherwise due from Sempra to Algoma in connection with [*2] other, related transactions. Algoma moves to dismiss the suit on grounds of forum non conveniens, arguing that the dispute should more appropriately be settled in Ontario, where Algoma has brought a parallel

suit. For the reasons that follow, the motion is granted and the case dismissed.

FACTS

I. The Asset Management Agreement

Plaintiff Sempra is a Connecticut-based energy trading and management company with offices throughout the world. It provides energy management services to clients through strategic purchases and sales of gas, and negotiation of supply contracts. Sempra does business in Canada through a subsidiary, Sempra Energy Trading (Canada) Limited, with offices in Ontario and Calgary. Defendant Algoma is a Canadian steel manufacturing company. As a producer of steel products, Algoma consumes substantial amounts of natural gas, and in order to fulfill its needs, it purchases natural gas, as well as pipeline capacity and storage facilities to transport and store the gas.

In March 1999, Algoma approached Sempra for assistance in lowering its natural gas costs through the management and trading of Algoma's natural gas supply, storage, transportation and delivery [*3] assets. Negotiations took place over several months between Algoma's Sault Ste. Marie offices and Sempra Canada's offices in Calgary and Ontario, resulting in the execution of an Asset Management Agreement in September 1999. (See Cowan Decl. P 6.) Pursuant to the AMA, Sempra contracted to assist Algoma in the management of its energy assets, principally through the management and negotiation of natural gas supply transactions. In return, Sempra would receive payments in an amount proportional to any savings realized by Algoma as a result of Sempra's efforts. The AMA established two such bases of profit sharing. The first, which is not at issue in this lawsuit, entitled Sempra to a proportion of any savings pursuant to a projected reorganization of Algoma's transportation assets and natural gas suppliers. (See Finley Decl. Ex. B at 3.) The second, which is the subject of the present dispute, entitled Sempra to a share of the revenues or cost savings generated through additional "optimizing transactions." (See id. at 2, 3.)

In addition to these substantive provisions governing the parties obligations, the AMA also contained a merger clause providing that "the terms and conditions [*4] contained in this AMA constitute all of the agreed upon terms" of the AMA and that "no amendments, changes or modifications to this AMA shall be valid" unless in writing and signed by both parties. (Id. at 5.) At the same time, the agreement contemplated both that additional provisions relating to the overall relationship between the parties (the "Venture") might be negotiated, and that particular transactions between the parties would be required to carry out the "optimizing" and other functions

required by its terms. Accordingly, the AMA provided that "additional terms and conditions of the Venture and the terms and conditions of any transactions related to the Venture Assets shall be set forth in supplemental agreements between the parties." (Id.) In effect, the AMA functioned as a kind of master agreement, n1 but the parties clearly contemplated that there would be additional documents, reflecting either future amendments to the AMA or other supplemental agreements governing a variety of separate specific transactions involving Algoma, Sempra and third party energy providers to accomplish its overall goals. The AMA does not contain a forum selection clause, but does provide [*5] that disputes about its interpretation and enforcement would be governed by Ontario law. n2

n1 Sempra's general counsel has testified that the AMA was not a master agreement, per se, and that the parties contemplated, but never actually executed, a master agreement. (See Goldstein Aff. P 8.) Nevertheless, the AMA effectively operated as a master agreement with respect to the optimization activities undertaken by Sempra for the benefit of Algoma.

n2 The parties dispute the nature of the negotiations over the forum selection clause. Sempra's general counsel has testified that there were protracted negotiations over the inclusion of an Ontario forum selection clause, and that the parties agreed to leave the issue open pending the execution of further documents. (See Goldstein Aff. P 8.) Algoma denies that the issue was left open and claims that it refused to agree to a forum selection clause specifying New York as the exclusive forum. (See Def. Mem. at 5.) The dispute is immaterial, since the version of the AMA that was eventually executed contains no such clause, and a merger clause prohibits reference to prior negotiations to fill the gap.

[*6]

II. The Specific Transactions

A. The Replacement of Algoma's Gas Supplier

The present dispute between the parties under the AMA relates to the replacement of the natural gas previously supplied to Algoma by Pan Canadian Petroleum Limited ("Pan Canadian"). According to Algoma, in December of 1999, Pan Canadian, a Canadian company, terminated its long-term natural gas contract with Algoma. (See Def. Mem. at 5.) With Sempra's assistance, Pan Canadian was then replaced by

2001 U.S. Dist. LEXIS 3001, *

Renaissance Energy Limited ("Renaissance"), another Canadian company, as a supplier of gas and transportation to Algoma. (See Cowan Decl. P 10.) Sempra, unsurprisingly, characterizes this transaction as one designed to save money for Algoma by negotiating the replacement of Algoma's long-term Pan Canadian natural gas service with a lower cost asset, and insists that it is therefore entitled to a proportion of the savings under the AMA in connection with the transaction. Algoma, in contrast, argues that the replacement of Pan Canadian by Renaissance was not a transaction designed to save money, but to find a new supplier of natural gas due to Pan Canadian's unexpected termination of its contract [*7] with Algoma. Sempra apparently received seven monthly payments from Algoma in satisfaction of this purported obligation (Pl. Mem. at 6). Subsequently, Algoma stopped paying and advised Sempra that the replacement of Pan Canadian by Renaissance was not an "optimizing transaction" under the AMA, and that Sempra was not entitled to payment. (See Cowan Decl. P 11 & Ex. B.) Thus the instant lawsuit concerns what exactly the parties understood as "optimizing transactions" and whether that term encompassed the replacement of Pan Canadian by Renaissance as Algoma's supplier of natural gas.

B. The Gas Sale Transactions

Under the AMA, Sempra's role was to match Algoma's energy assets with fluctuating market conditions, something which Algoma, as a steel company, did not have the industry expertise or knowledge to do. In addition to renegotiating gas supply contracts, there were several additional ways that Sempra sought to save Algoma the greatest amount of cost on its natural gas assets. One of the principal methods to achieve these cost savings was for Sempra to buy gas from Algoma when it had an oversupply, and then, using Algoma's transportation assets, to resell that gas at particular [*8] location where it enjoyed a premium. (See Storfer Aff. P 3.) Such transactions would result in either a net profit or a cost savings to Algoma, and under a formula contained within the AMA, Sempra would be entitled to a share of these profits or savings. (Id.)

Algoma argues that the gas sales transactions contemplated by the AMA were distinct from, and were intended to be distinct from, the replacement of Algoma's long-term natural gas contract supplier. Sempra argues, however, that the replacement of Algoma's gas supplier and the gas sales transactions were merely a different means of achieving the single purpose of the AMA, namely to reduce Algoma's costs of energy. On this theory, Sempra claims that it undertook to optimize Algoma's energy assets in a variety of ways. The gas sales trades were one of those means, and would not have occurred in the absence of the relationship established pursuant to the AMA. (See Storfer Aff. P 4.) Sempra insists that this is why the AMA expressly provided for additional terms and conditions to be set forth in supplemental agreements.

Each of the gas sales trades was documented through confirmations generated by Sempra. The confirmations [*9] contained a number of terms not contained in the AMA. One such term was a cross-default provision that gave certain rights to each party in the event of the default of any obligation owed by one party to the other. In particular, the confirmations created a broad right of set-off in the event of such a default:

> If a default occurs, the performing party may (at its election) from time to time set off any or all amounts which the defaulting party owes to it (whether under this transaction or otherwise and whether or not then due) . . . .

(Storfer Aff. Ex. A; emphasis added.) Additionally, the confirmations contained a forum selection provision that clearly establishes New York as the exclusive forum for any litigation between the parties arising from the transactions described in the confirmations:

> Each party submits to the exclusive jurisdiction of the state and federal courts located in New York City, Borough of Manhattan, for any action or proceeding relating to this agreement, and expressly waives any objection it may have to such jurisdiction or the convenience of such forum.

(Id.)

III. The Present Dispute

The present dispute arises [*10] from a disagreement over whether Sempra's role in the Pan Canadian/Renaissance transaction warranted payment under the provisions of the AMA relating to "optimizing transactions." Sempra, asserting that Algoma had defaulted on its payment obligations under the AMA, invoked its rights under the cross-default and set-off provisions contained in the confirmations and withheld $ 1,042,814.71 million for payments otherwise owed to Algoma under the natural gas transactions in satisfaction of this obligation. (See Finley Decl. Ex. D.) On November 2, 2000, Algoma advised Sempra that it had

done so unlawfully, and threatened legal action action if it did not remit the appropriate amount by the close of business on the next day. (See id.) Sempra did not comply with this request. Thus, on November 7, 2000, Algoma's outside counsel advised Sempra that it intended to commence an action for recovery in Toronto, Ontario, and would move to compel Sempra to remit the disputed amount into court pending resolution of the dispute if Sempra did not do so voluntarily by November 10, 2000. (See id.)

In a pre-emptive move, Sempra filed this action in the Supreme Court of the State of New York, [*11] County of New York on November 9, 2000, seeking declaratory judgment on the issue of Algoma's liabilities under the AMA, and requesting attorneys' fees. (See Zilberberg Decl. Ex. A.) On December 5, 2000, Algoma removed this case the United States District Court for the Southern District of New York pursuant to *28 U.S.C. § 1446*(b). (See id. Ex. B.)

DISCUSSION

I. The Parties' Contentions

Algoma argues that this case should be dismissed on the grounds of forum non conveniens, because all relevant contacts are in Ontario and none are in New York. Algoma points out that Sempra asks this Court to adjudicate the rights of the parties under a contract, the AMA, that was negotiated in Ontario between a Canadian manufacturer and Sempra's Canadian subsidiary, as a result of the replacement of one of the manufacturer's Canadian gas supplier by another.

The standards for forum non conveniens are familiar. The threshold inquiry is whether an adequate forum exists elsewhere. See *Alfadda v. Fenn, 159 F.3d 41, 45 (2d Cir. 1996)* (noting that an alternative forum is adequate if the defendant is subject to service of process there and the [*12] forum permits litigation of the subject matter in dispute). If an adequate forum does exist, a Court must weigh public and private interest factors relevant to determining whether the plaintiff's chosen forum is an inappropriate forum. See *Gulf Air Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947)*. Private interest factors include (1) the ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive. See id. Public interest factors include (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community. See *id. at 508-09*.

All the factors in this case point towards dismissal on the basis of forum non conveniens. Ontario courts clearly provide an adequate forum to resolve the present dispute. The AMA was negotiated between Algoma's Sault Ste. Marie offices and Sempra Canada's offices in Calgary and Ontario. (See Cowan Decl. P 6.) Three of the four individuals primarily involved in these [*13] negotiations are Canadian residents (see id.), and the fourth, although not a Canadian resident, is Sempra's general counsel. (See Goldstein Aff. P 2.) Thus the relevant witnesses and documents are primarily located in Ontario or elsewhere in Canada, not in New York. In addition, the central issue in dispute is whether the replacement of one Canadian natural gas supplier, Pan Canadian, with another, Renaissance, was an "optimizing transaction" under terms of the AMA. Thus, key non-party witnesses and documents relating to the actions of these companies are located in Canada, outside of the subpoena power of this Court. An Ontario forum is consistent with the intent of the parties since the parties failed to agree upon a New York **forum clause,** but included an Ontario choice of law provision. Ontario courts have an interest in applying Ontario law, which will apply to this dispute. The dispute thus appears to be entirely Canadian in nature.

Sempra does not dispute this description of the relevant contacts, nor does it seriously dispute that, absent a **forum** selection **clause,** a **forum** non conveniens motion would and should be granted. n3 Sempra argues, however, that the case is [*14] governed by a **forum** selection **clause** contained in the confirmations (which constitute the contract between the parties relative to the gas sale transactions), providing that any disputes "relating to this agreement" shall be litigated in New York. Sempra is correct, and Algoma in its turn does not seriously dispute, that under both New York and federal law, parties to a contract have the right to agree on a forum for settling disputes, and, at least in litigation between sophisticated business entities, a valid **forum** selection **clause** will trump the usual considerations governing forum non conveniens. See *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972)* ("The choice of forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling reason it should be honored by the parties and enforced by the courts."); *Brooke Group Ltd. v. J.C.H. Syndicate 488, 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 481, 663 N.E.2d 635 (1996)* (adopting the M/S Bremen standard).

n3 Plaintiff does argue in a footnote that even a straightforward application of the Gilbert factors would cut in its favor. (See Pl. Mem. at 5 n. 11.) This contention is, however, as unpersuasive as its relegation to a short footnote

would suggest. Unsurprisingly, given the nature of the dispute, the bulk of the evidence and witnesses are located in Canada. Whether or not the the availability of non-party discovery is more limited in Ontario than in a federal district court, as Sempra argues, is not determinative in deciding a forum non conveniens motion. See *Scottish Air Int'l v. British Caledonian Group, 81 F.3d 1224, 1234 (2d Cir. 1996)* ("Some inconvenience or the unavailability of beneficial litigation procedures similar to those available in federal district court does not render an alternative forum inadequate"). What is relevant is that only an Ontario court could compel such testimony in the first place. For the reasons stated in the text, it seems clear that a straightforward application of the Gilbert factors favors Algoma.

[*15]

The real question separating the parties, therefore, is the scope of the **forum** selection **clause, and whether that clause** governs this dispute. If the clause applies, the case should be adjudicated in New York, and the motion should be denied; if the clause does not apply, ordinary forum non conveniens standards dictate dismissal of the present action, and adjudication in Ontario.

II. The Scope of the **Forum** Selection **Clause**

Sempra sets forth two related arguments as to why the **forum clause** in the confirmations should control jurisdiction in this case. First, Sempra insists that the clause constitutes a further specification of terms as contemplated by the AMA itself. Sempra argues that the confirmations, in effect, constitute a supplement to the AMA, fleshing out its terms, and adding a **forum** selection **clause** that now governs disputes arising under the AMA. (See Pl. Mem. at 15.)

This argument, however, is unpersuasive. The AMA is a separate, over-arching agreement that establishes the relationship between the parties and the goals of that relationship. The AMA clearly contemplates that there will be separate individual transactions of various sorts that will carry [*16] out its overall goals. The language of the AMA contemplates both "additional terms and conditions of the Venture" and "terms and conditions of any transactions related to the Venture Assets." (Finley Decl. Ex. B at 5.) Sempra invokes this language from the AMA to argue that the **forum** selection **clauses** contained in the confirmations were understood as additional terms and conditions of the AMA. However, it is not self-evident why these, or indeed any other, provisions in the confirmations should be considered additional terms of the AMA rather than simply part of the terms and conditions governing distinct individual

transactions undertaken to further the parties' business relationship. See, e.g., *DeSola Group, Inc. v. Coors Brewing Co., 199 A.D.2d 141, 605 N.Y.S.2d 83* (1st Dep't 1993) (**forum** selection **clause** contained within a marketing research agreement did not govern a separate oral agreement for the provision of marketing services).

To the contrary, the language and context of the confirmations suggests that the cross-default, set-off and forum-selection provisions were in fact terms designed to govern the gas sale transactions themselves rather than the overall [*17] relationship documented by the AMA. The confirmations do not on their face purport to amend the AMA, and indeed do not refer to the AMA at all. n4 Instead, they seem to govern only specific transactions for sales of natural gas. Notably, there are many confirmations, and each one contains the same **forum** selection **clause,** a measure that would hardly be necessary if any single one of them established forum and other related terms for every dispute under the AMA, but a natural practice if each confirmation is understood to embody the terms governing only one particular purchase and sale of gas. Moreover, in addition to the choice of **forum clause** highlighted by the plaintiff, the confirmations have a New York choice of law clause, which on Sempra's theory would not merely supply a term left open (like the **forum** selection **clause)** but would actually override a specifically-agreed Ontario choice of law provision in the AMA.

> n4 In contrast, the confirmations conspicuously do incorporate by reference "Sempra's general terms and conditions for the purchase and sale of natural gas (1/98), a copy of which has previously been forwarded to counterpart." (Storfer Aff. Ex. A at p. 4.) This provision further evidences the fact that the confirmations are standard forms relating to Sempra's gas sale transactions, and have no specific reference to the AMA with Algoma.

[*18]

Most importantly, we must look to the language of the **forum clause** itself, which refers to "any action or proceeding relating to this agreement." (See Storfer Aff. Ex. A (emphasis added).) This would be odd language to use in order to supplement or amend the AMA to provide a **forum clause** that was intentionally omitted from the main text of the earlier agreement. A supplemental agreement that was intended to amend a term expressly omitted from an earlier agreement would be expected to refer explicitly to the earlier agreement, utilize its particular terminology, and specify that it modifies or expands the terms of that agreement for all purposes. In contrast, "this agreement" is a phrase used elsewhere in

the confirmations to refer to the very specific terms of the particular sale of gas (see P 9.3 of the confirmations, defining for purposes of "this agreement" terms that are relevant only to the gas sale contract itself, and that do not appear in the AMA). Grammatically, moreover, "this" agreement can only refer back to the "agreement" identified in the opening words of each confirmation: "We are pleased to confirm the verbal agreement of [date] between [Sempra and [*19] Algoma]" for a particular purchase of gas to be delivered on a particular date. (Storfer Aff. Ex. A.) n5

> n5 The confirmations do include language providing that "This transaction together with all other transactions between us form a single agreement between the parties." (Id. at p. 4.) Whatever this language is intended to mean, Sempra does not rely on it or refer to it as a basis for concluding that the confirmations are intended to amend the AMA.

For the purposes of this motion, the Court assumes that the **forum** selection **clauses** in the confirmations are binding on their own terms. Even though the clauses appear to be boilerplate terms buried within a number of form terms, Algoma signed the confirmations. The parties to these transactions are sophisticated business entities, and as such they are expected to read the fine print of agreements to which they subscribe. See *M/S Bremen, 407 U.S. at 12*. However, it is one thing to say that Algoma signed each confirmation, and therefore is bound [*20] by the terms contained within it, and quite another to say that Algoma should have interpreted the terms contained within these confirmations as having broader effects on the parties' relationship than they explicitly purport to have or than a recipient would reasonably interpret them to have. To hold that the **forum clauses** contained within the confirmations apply to the parties' dispute over the interpretation of the AMA regarding payment for the Pan Canadian/Renaissance transaction would require precisely such a strained reading of the parties' language of the confirmations. Therefore, properly read, the **forum** selection **clauses** only apply to the gas sale transactions themselves.

Second, Sempra argues that even if the clauses are read this narrowly, they still apply here, because this dispute concerns whether Sempra permissibly set off its claimed entitlement from Algoma under the AMA against the amounts due from Algoma to it under the transactions governed by the confirmations. Sempra claims that the set-off and cross-default provisions at issue are broad, applying by their own terms "in addition to, and not in limitation or exclusion of" any other rights. Moreover, Sempra insists [*21] that for Algoma to get a

money judgment, it would have to sue on the gas contracts, and thus presumably in New York, since it is not entitled to any money at all under the AMA - the question about the AMA is whether Algoma owes money to Sempra, not vice versa.

But there really is no dispute "relating to" the gas sale transactions. Sempra does not dispute that it owes money to Algoma in connection with those transactions, and the parties have called our attention to no dispute regarding the amounts due. Nor is there any dispute that, under the contract embodied in the confirmations, Sempra is entitled to set off any amount owed it by Algoma before paying. (See Letter from Paul C. Finley to the Court dated March 6, 2001 (stipulating that "Algoma will not seek any additional relief in the Ontario Action premised on any claim that Sempra's purported exercise of its set-off rights was an improper or wrongful act").) The only dispute between the parties is about the AMA itself, and whether a separate transaction, not one documented by the confirmations, is an "optimizing transaction" within the meaning of the AMA that entitles Sempra to a fee. The parties essentially disagree about [*22] whether Sempra is entitled to compensation under the AMA for its role in the replacement of Pan Canadian as Algoma's supplier of natural gas. As discussed above, this is a dispute as to which all the usual forum non conveniens factors point to a dismissal in favor of litigation in Ontario. If such litigation is decided in favor of Sempra, there is no need for further action, since Sempra already has the fee to which it is entitled; if it loses, there is no reason to expect Sempra not to pay what it owes, and no lawsuit in New York will be necessary.

This is not to suggest that the set-off and cross-default provisions of the confirmations are ineffective. If Algoma owed some undisputed debt to Sempra, the contracts provide that Sempra would be entitled to the set-off. But the combination of the set-off and the **forum** selection **clauses** cannot operate to hijack any dispute that may exist between Algoma and Sempra, related or unrelated, and turn a dispute about some other contract or tort that would otherwise be litigated elsewhere into a dispute "relating to" the agreement to sell gas. See *Anselmo v. Univision Station Group, Inc., 1993 U.S. Dist. LEXIS 428, No. 92 Civ. 1471, 1993 Wl 17173*, at *2 [*23] (S.D.N.Y. Jan. 15, 1993) (noting that the phrase "relating to" encompasses claims not explicitly grounded in the contract only if the claims "grow out of the contractual relationship" or if "the 'gist' of those claims is a breach of that relationship"). n6 The **forum clause** only applies, by its terms, to disputes "relating to this agreement," that is, to the particular gas sale transaction documented by each confirmation, and the present dispute simply cannot be construed as one of those.

**Exhibit A   332**

2001 U.S. Dist. LEXIS 3001, *

n6 Sempra cites no case for any jurisdiction interpreting a **forum**-selection **clause** in a contract containing a set-off provision as operating in such a dramatic fashion to dictate the forum for all disputes between the parties.

Since the dispute between the parties is not governed by the **forum** selection **clause** in the confirmations, the ordinary rules of forum non conveniens apply, and for the reasons set forth above, those rules require litigation in Ontario, and not in New York.

CONCLUSION

For the foregoing reasons, [*24] the defendant's motion is granted and the case is dismissed.

SO ORDERED:

Dated: New York, New York

March 20, 2001

GERARD E. LYNCH

United States District Judge