**EXHIBIT A-16**

# 14

Exhibit A   334

SPENCER TRASK VENTURES, INC. f/k/a SPENCER TRASK SECURITIES,
INC., Plaintiff, -against- ARCHOS S.A. d/b/a ARCHOS TECHNOLOGY,
Defendants.

01 Civ. 1169 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2002 U.S. Dist. LEXIS 4396*

March 15, 2002, Decided
March 18, 2002, Filed

**DISPOSITION:** [*1] Defendant's motion to dismiss the complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiff broker's cause of action against defendant client for breach of contract in relation to a series of corporate finance agreements entered into between the two parties, the client filed a motion to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction.

**OVERVIEW:** The broker and the client entered in agreements involving the parties' efforts to raise capital through a private placement. The broker filed a cause of action, alleging breach of contract. The broker argued that the client was subject to the court's jurisdiction pursuant to *N.Y. C.P.L.R. § 302* because the client transacted business in New York, and pursuant to *N.Y. C.P.L.R. § 301* because the client's contacts with New York provided a basis for general jurisdiction. The client argued the lack of presence in New York, and the lack of "doing business" in New York. The court granted the client's motion to dismiss. The client had no offices, employees, independent contractors, agents, telephone listing, bank accounts, or assets in New York. All products bearing the client's name were sold by its California subsidiary, which was not a party to the action. The client sold its products via the Internet in North America. Only 2.28 percent of the company's sales were direct to New York customers. The court found that a single meeting in New York was neither the birth of the contract, nor was the client representative's main purpose for being in New York to enter into a contract.

**OUTCOME:** The court granted the client's motion to dismiss the broker's complaint. The client did not project itself into the New York market or purposefully avail itself of the privilege of doing business in New York. A handful of phone calls and a single fortuitous meeting were not sufficient to subject it to personal jurisdiction. The client's activity was not continuous or systematic so as to make it reasonable for it to defend a suit in New York.

**COUNSEL:** For SOENCER TRASK VENTURES, INC., plaintiff: Richard A. Roth, Barry M. Bordetsky, Littman, Krooks, Roth & Ball, P.C., New York, NY.

For ARCHOS SA, defendant: Kathleen L. Lowden, Joshua D. Rievman, Hoguet, Newman & Regal, L.L.P., New York, NY.

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION:**

MEMORANDUM and ORDER

LORETTA A. PRESKA, United States District Judge:

Plaintiff, Spencer Trask Ventures ("Spencer Trask"), filed a complaint against defendant Archos S.A.

("Archos") for breach of contract in relation to a series of corporate finance agreements entered into between the two parties. Defendant moves to dismiss the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(2)* for lack of personal jurisdiction. For the reasons stated below, the motion to dismiss is granted. n1

> n1 The following submissions have been considered in deciding this motion: Complaint ("Compl."); Declaration of Albert Hakim ("Hakim Dec."); Memorandum of Law in Support of Defendant's Motion to Dismiss for Personal Jurisdiction ("Deft's Mem."); Declaration of Arnaud de Vienne in Opposition to Defendant's Motion to Dismiss ("de Vienne Dec."); Declaration of Barry M. Bordetsky, Esq. in Opposition to Defendant's Motion to Dismiss ("Bordetsky Dec."); Declaration of J. Michael Metcalf in Support of Defendant's Motion to Dismiss ("Metcalf Dec."); Reply Declaration of Albert Hakim ("Hakim Reply Dec."); Reply Memorandum of Law in Further Support of Archos' Motion to Dismiss ("Deft's Reply Mem.").

[*2]

I. Background

Spencer Trask is a New York corporation with its principal place of business in New York City. (de Vienne Dec., P 1). It is a full service broker/dealer firm that specializes in locating and raising private equity funds for emerging growth and venture capital companies. (Id., P 2). Archos S.A. is a French corporation with its principal place of business in Igny, France. (Hakim Dec., P 2). Archos manufactures portable storage devices for notebook and desktop computers. (Id., P 3).

Archos sought to raise capital through a private placement. (Id., P 8). Spencer Trask contends that in April and May of 2000, Archos had entered into an agreement with Michael Metcalf ("Metcalf") of J.M. Metcalf & Associates LLC to assist Archos with its efforts to raise money. (de Vienne Dec., P 4, Ex. A; Metcalf Dec., P 3). Metcalf then contacted Adam Stern ("Stern"), the Managing Director of the Private Equity Group at Spencer Trask, to see if the company would be interested in aiding Archos' fund raising efforts, (de Vienne Dec., PP 4-5; Metcalf Dec., P 4), who in turn spoke with Arnaud de Vienne ("de Vienne"), another member of Spencer Trask's management team, (de Vienne [*3] Dec., P 6). De Vienne then contacted Albert Hakim ("Hakim"), the Directeur General Adjoint of Archos. (de Vienne Dec., PP 5-6).

A short time later, while Hakim was at the offices of Archos, Inc., Archos' subsidiary located in Irvine, California, he received a telephone call from de Vienne acknowledging receipt of the documents Hakim had sent to Stern. (Hakim Dec., P 8). At that time, de Vienne informed Hakim that he split his time among New York, Paris and Switzerland and had many contacts in France. (Id.). Several days later, de Vienne telephoned Hakim again informing him that he would be traveling to Europe and suggested that they set up a meeting in France. (Id., P 9; de Vienne Dec., P 8).

Throughout May and June, Hakim traveled back and forth between Igny, France and Irvine, California. (Hakim Dec., P 10). During this period there were several calls between Hakim and de Vienne discussing Archos' business, growth and needs for capital. (Id.). The parties also discussed whether Archos sought to raise money in France or the United States and what the tax consequences of each option would be for Henri Crohas ("Crohas"), Archos' President Directeur General. (Id.). [*4]

On June 16, 2000, Hakim received a fax and subsequent e-mail from Roger Baumberger ("Baumberger"), the managing director at Spencer Trask, with a draft Summary Term Sheet ("Term Sheet") (id., P 11, Ex. A), informing Hakim and Crohas that de Vienne would be "visiting with [Archos] shortly to discuss [the Term Sheet]." (Id.).

On June 17, 2000, de Vienne visited Archos in Igny, France and met with Crohas and Hakim to discuss Archos' business and capital needs. n2 (Hakim Dec., P 12; de Vienne Dec., P 9). A few days later, the same men had a breakfast meeting at a hotel in Paris where they discussed the Term Sheet and the particular need to include in it, inter alia, the price-earnings ratio at which the money would be raised. (Hakim Dec., P 13; de Vienne Dec., P 15). At some point during the meeting, Hakim mentioned that he would be in New York in late June to attend a trade show. (Hakim Dec., P 14; de Vienne Dec., P 16). Archos asserts that de Vienne invited Hakim to visit Spencer Trask's offices while he was in New York in order to meet the Spencer Trask team in person. (Hakim Dec., P 14). Spencer Trask asserts that the purpose of the meeting in New York was to conclude [*5] negotiations relating to the Term Sheet. (de Vienne Dec., P 16).

> n2 De Vienne contends that while he was traveling in France, Hakim contacted him and requested that they meet at which meeting they discussed only one item of the First Term Sheet, the valuation of the firm. (de Vienne Dec., PP 14-15).

Exhibit A   336

Case 1:07-cv-03580-DLC   Document 23-17   Filed 06/12/2007   Page 5 of 20

Page 3
2002 U.S. Dist. LEXIS 4396, *

On June 26, 2001, while Hakim was in New York for the trade show, he visited Spencer Trask's office for about two hours during which time they discussed Archos and the efforts to raise money. (Hakim Dec., P 15; de Vienne Dec. P 18). According to Archos, at some point during the visit Crohas joined the meeting by telephone from Archos' offices in France in order to discuss personal tax issues that might arise in connection with a private placement. (Hakim Dec., P 15). Spencer Trask asserts that after initial introductions, Crohas joined the meeting from France in order to have a substantive conversation with respect to the Term Sheet. (de Vienne Dec., PP 18-21). Archos contends that at no time during this visit was [*6] there any discussion of the terms upon which Spencer Trask would work for Archos. (Hakim Dec., P 15).

After the trade show Hakim traveled to Archos' California office. (Id., P 16). Archos asserts that on June 30, 2001, Spencer Trask faxed to Hakim in Irvine, California a revised version of the Term Sheet. (Id., P 17; Hakim Reply Dec., P 8). n3 Negotiations apparently continued because it is uncontested that Hakim changed the valuation basis set out on the Summary Term Sheet dated June 27, 2000 from 1999 net income to 2000 net income and faxed it back to Spencer Trask. (Hakim Reply Dec., P 17; de Vienne Dec., Ex. D).

n3 Although Spencer Trask originally asserted that the revised Term Sheet was drafted and forwarded to Hakim in California on June 27, 2000, (de Vienne Dec., P 23, Ex. D), the fax crawl on the document in the form attached to the Complaint as Exhibit A reads "June 30," and plaintiff's counsel acknowledged the error in correspondence with the Court, (Bordetsky Letter dated February 6, 2002).

[*7]

In early July, Spencer Trask sent a follow-up letter to Hakim in California, to which Hakim added a comment, signed and faxed it back to Spencer Trask. n4 (Compl., Ex. B; Hakim Dec., P 17). Spencer Trask asserts the revised Term Sheet was not executed or returned until July 5, 2000, and that on that day the parties executed an engagement letter. (de Vienne Dec., PP 24 & 27, Ex. E).

n4 Spencer Trask asserts that Hakim was in New York after the revised or Second Term Sheet was executed and that Hakim began initial discussions via e-mail with a potential investor, Pechel, while he was in New York. (de Vienne Dec., P 30, Ex. F). However, Hakim asserts on personal knowledge without contradiction that the e-mail was sent to his Archos account and was retrieved while he was in New York for another trade show. More importantly, the e-mail clearly contradicts de Vienne's assertion that "Hakim began initial discussions with Pechel while Mr. Hakim was in New York" (id., emphasis in original) The e-mail simply inquired whether all the parties would be available for a meeting in France some two weeks hence. (Hakim Reply Dec., P 12; de Vienne Dec., Ex. F).

[*8]

On July 12, 2000, Hakim received a list of prospective French investors via fax from de Vienne's office. (Hakim Dec., P 19). In the weeks that followed, Archos asserts that Hakim sent due diligence materials, prepared by Spencer Trask, along with a business plan to potential investors, followed up with several of them by telephone and set up several meetings in France. (Id., PP 22-23; de Vienne Dec., P 29). In early September, Crohas, Hakim, and de Vienne met with several investors in France, including a company called Pechel. (Hakim Dec., P 24). In October of 2000, Archos telephoned Spencer Trask in order to renegotiate the finders fee at which time Spencer Trask drafted a revised finder's fee agreement and forwarded it to Archos. (Compl., Ex. C; de Vienne Dec., P 33, Ex. H). On or about December 28, 2000, Pechel invested approximately four million dollars in Archos. (Hakim Dec., P 25; de Vienne Dec., P 34).

Plaintiff argues that Archos is subject to this court's jurisdiction pursuant to CPLR § 302 because Archos transacted business in New York and pursuant to CPLR § 301 because Archos' contacts with New York provide a basis for general jurisdiction.

Defendant argues that [*9] Archos S.A. has no presence in New York and does not conduct business in New York and that the exercise of jurisdiction over Archos would not comport with due process. Archos S.A. states without contradiction that it has no offices, employees, independent contractors, agents, telephone listing, bank accounts or assets in New York. (Hakim Dec., PP 4-6). Defendant further states without contradiction that all products bearing the name of Archos are sold by Archos' California subsidiary, "Archos, Inc.," not a party to this action. (Hakim Reply Dec., P 14). Archos Technology, although listed as a defendant in the caption is the d/b/a name of Archos, Inc., not Archos S.A., defendant here. (Id., P 15). Also without contradiction, defendant has established that only Archos Inc. sells products via the Internet in North

Case 1:07-cv-03580-DLC     Document 23-17     Filed 06/12/2007     Page 6 of 20

Page 4
2002 U.S. Dist. LEXIS 4396, *

America; only 2.28 percent of the company's sales are direct to New York customers, (id., P 17); that Archos S.A. began selling products on its website but only to European Union countries and other areas outside North America, (id., P 16); and that only Archos, Inc. distributes its products through Ingram Micro, CompUSA and Best Buy, (id., P 17).

II. Discussion

A. [*10] Jurisdiction Under CPLR § 302

Plaintiff bears the burden of establishing jurisdiction over a defendant. *Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)*. Personal jurisdiction in a diversity case is determined first by the law of the state in which the district court sits. *Id. at 240*. If jurisdiction is found under state law, the court must examine whether exercise of that jurisdiction "comports with the requisites of due process." *Louros v. Cyr, 175 F. Supp. 2d 497, 2001 U.S. Dist. LEXIS 4663, 2001 WL 392506, *15* (citing *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)*.

New York's long-arm statute, CPLR § 302(a)(1), provides that a court may exercise personal jurisdiction over a non-domiciliary defendant if (1) the defendant transacts business in New York, and (2) the cause of action arises out of that business activity. *N.Y. CPLR § 302(a)(1)* (McKinney 1990); *Bozell Group, Inc. v. Carpet Co-op of America Ass'n, Inc., 2000 U.S. Dist. LEXIS 15088, No. 00 Civ. 1248 (RWS), 2000 WL 1523282, *6 (S.D.N.Y. Oct. 11, 2000)*.

"There is no fixed standard by which to measure the minimal contacts required to sustain jurisdiction [*11] under the provisions of CPLR 302(a)(1)." *Mckee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 381-382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967)*. However, there must be at minimum, "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits of the protections of its laws." *Id.* (citing *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958))*. The existence of a purposeful activity should be considered in the totality of the circumstances, and jurisdiction should not be asserted against a defendant based upon "random" or "fortuitous" contacts. *Burger King v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985)*. It is the "nature and quality" not the number of New York contacts which determine defendant's "purposeful activity." *Bozell, 2000 U.S. Dist. LEXIS 15088, 2000 WL 1523282 at *6*. The requisite minimum contacts must provide a fair warning to the defendant of a possibility of being subject to courts of the forum state. *NCA Holding Corp. v. Ernestus, 1998 U.S. Dist. LEXIS 10298, No. 97 Civ. 1372 (LMM), 1998 WL 388562, [*12] *4 (S.D.N.Y. July 13, 1998)*. The New York Court of Appeals has warned:

> In our enthusiasm to implement the reach of the long-arm statute (CPLR 302), we should not forget that defendants, as a rule, should be subject to suit where they are normally found, that is, at their pre-eminent headquarters, or where they conduct substantial general business activities. Only in a rare case should they be compelled to answer suit in a jurisdiction with which they have the barest of contact.

*McKee, 20 N.Y.2d at 383* (citing *McGee v. International Life Ins. Co., 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957)*.

Plaintiff argues that defendant entered into a contract, the Term Sheet, with plaintiff in New York and that the basis of this suit is that contract. Plaintiff further argues that Archos' single visit to Spencer Trask's office on June 26, 2000, meets the "transacting business" requirement and is sufficient to confer jurisdiction. (Pltff's Mem. at 10-13). In addition, plaintiff argues that Archos' representatives, by making and participating in telephone calls, "projected themselves into the New York [market] for purposes of negotiating" [*13] the Term Sheet that is the basis for the underlying cause of action. (Pltff's Mem. at 14-16).

The mere fact that a non-domiciliary enters into a contract with a company headquartered in New York does not establish the requisite minimum contacts, unless the purpose of the contract is to "project the [non-domiciliary] into the New York market." See, e.g., *PaineWebber Inc. v. WHV, Inc., 1995 U.S. Dist. LEXIS 6514, No. 95 Civ. 0052 (LMM), 1995 WL 296398, *2-4 (S.D.N.Y. May 16, 1995)*. In WHV, the court found that contract negotiations conducted by telephone conference between San Francisco and New York, meetings and the signing of an agreement in New York, and performance of a contract in New York were "random" and "attenuated" events that lacked the requisite "nature and quality" sufficient to rise to the level of "transacting business" and, thus, insufficient under the "totality of the circumstances" to confer jurisdiction. *Id. at *3-4*. The court found that the purpose of the agreement was not to project the defendant into the New York market and that the contacts were "sporadic and insufficient to provide 'fair warning' of the possibility of being subject to the courts of this state. [*14] " *Id.*; see also *PaineWebber, Inc. v. Westgate Group Inc., 748 F. Supp. 115, 119*

Case 1:07-cv-03580-DLC    Document 23-17    Filed 06/12/2007    Page 7 of 20

Page 5
2002 U.S. Dist. LEXIS 4396, *

*(S.D.N.Y. 1990)* (no jurisdiction over Texas defendant because a series of frequent telephone calls and faxes to New York and one meeting in New York were not a means by which defendant projected itself into a business transaction in New York); *Premier Lending Services, Inc. v. J.L.J. Associates, 924 F. Supp. 13, 16-17 (S.D.N.Y. 1996)* (phone calls, fax and mail from New Jersey defendant to New York plaintiff regarding non-New York subject matter not used "as a means of projecting [defendant] into the local commerce").

Considering the "totality of the circumstances" in the present case, it cannot be said that the "nature and quality of the contacts" were greater than those found in WHV, Westgate, or Premier Lending. First, Spencer Trask is a New York corporation suing defendant, Archos, a corporation formed under the laws of France with no permanent presence in New York. Second, the Term Sheet was negotiated during a series of phone calls and correspondence, most of which took place between New York and California and New York and France, and during two meetings [*15] in France. Third, on June 16, 2000, plaintiff sent a draft of the Term Sheet to France on the eve of de Vienne's arrival and prior to the two meetings held in Igny and Paris. Fourth, only one meeting took place in New York. During de Vienne's meeting in Paris with Hakim, de Vienne learned that Hakim would be in New York for a trade show and invited Hakim to visit Spencer Trask's office in New York while he was there. The fact that de Vienne learned of this trip and, thus, Hakim's visit to Spencer Trask's New York office are fortuitous within the meaning of *Burger King*. Finally, even if terms were negotiated during this visit, those actions are insufficient to confer jurisdiction on the basis that Archos "purposefully availed itself" of the privileges of doing business in New York. In fact, the parties were negotiating the terms well before the meeting in New York and continued to change the terms thereafter when they renegotiated the finders fee.

Plaintiff cites to *National Cathode Corp. v. Mexus Co., 855 F. Supp. 644 (S.D.N.Y. 1994)*, and *Nee v. HHM Financial Services, Inc., 661 F. Supp. 1180 (S.D.N.Y. 1994)*, as support for its argument that Hakim's [*16] visit to Spencer Trask's office in New York on June 26, 2000 establishes jurisdiction. However, in *National Cathode*, the defendant initiated the transaction at the trade show by approaching plaintiff's president and expressing an interest in forming a business relationship. The court found "the New York business discussions 'were essential to the birth of the contract and the fiduciary relationship that [had] allegedly been breached.'" *855 F. Supp. at 647* (citing *Nee*; see also *McKee, 20 N.Y.2d at 380* (no jurisdiction where two representatives of the defendant, on a trip to visit distributors in Pennsylvania and New Jersey, stopped by plaintiff's office for approximately two hours to discuss a problem that had arisen with a project that was the subject of a contract); *Bozell, 2000 U.S. Dist. LEXIS 15088, 2000 WL 1523282 at *6* (two trips to New York and a few phone calls did not constitute purposeful availment of New York law and thus no jurisdiction). Likewise in *Nee*, jurisdiction was found where the defendants "met frequently" with plaintiff in New York and visited her apartment twice to discuss investment recommendations, meetings that the court found were "essential to [*17] the existence of the contract." *Nee, 661 F. Supp. at 1184-1185*. Here, Archos' meeting in New York was neither the "birth" of the contract nor was Hakim's main "purpose" for being in New York to enter into a contract.

Plaintiff argues that the June 26, 2000 meeting and the matters discussed therein were the basis of the revised Term Sheet and that that single meeting establishes personal jurisdiction. (Pltff's Mem. at 13). A court can exercise jurisdiction based on one transaction if a defendant's activities are purposeful and there is a substantial relationship between the transaction and the claim asserted. *Scholastic, Inc. v. Stouffer, 2000 U.S. Dist. LEXIS 11516, No. 99 Civ. 11480 (AGS), 2000 WL 1154252 *4 (S.D.N.Y. Aug. 14, 2000)*; see *American Contract Designers, Inc. v. Cliffside, Inc., 458 F. Supp. 735, 739 (S.D.N.Y. 1978)* (single brief visit to New York may amount to transaction of business); *Mattel, Inc. v. Adventure Apparel, 2001 U.S. Dist. LEXIS 3179, No. 00 Civ. 4085 (RWS), 2001 WL 286728 *3 (S.D.N.Y. Mar. 22, 2001)* ("The fact that there was only one transaction does not vitiate personal jurisdiction due to the nature of the contract, that is, because [defendant's] [*18] activities were purposeful and there was a substantial relationship between the transaction and the claim asserted."). However, "physical presence alone cannot talismanically transform any and all business dealings into business transactions under CPLR § 302." *Presidential Realty Corp. v. Michael Square West, 44 N.Y.2d 672, 673, 405 N.Y.S.2d 37, 376 N.E.2d 198 (1978)*.

Hakim's two-hour visit to Spencer Trask's offices, at de Vienne's invitation while he was in New York to attend a trade show, falls short of the minimum contacts necessary to confer jurisdiction. First, Archos retained Spencer Trask for the purpose of locating investors in France, not New York. Second, the meeting was not part of a systematic pattern of New York visits or "essential to the birth of the contract." Hakim went to New York for the purpose of attending a trade show; when de Vienne learned of this he then invited Hakim to visit Spencer Trask's New York office. As noted above, Hakim's visit to Spencer Trask in New York was a single

Case 1:07-cv-03580-DLC   Document 23-17   Filed 06/12/2007   Page 8 of 20

Page 6
2002 U.S. Dist. LEXIS 4396, *

fortuitous meeting. Prior to this meeting, the provisions of the Term Sheet were negotiated in France after several meetings and modified by correspondence between [*19] the parties from their New York, California, and Igny, France offices. Even if, as Spencer Trask asserts, that the Term Sheet was modified on June 26, 2000, during a single fortuitous meeting in New York, that fact is insufficient to establish jurisdiction.

Plaintiff argues that even absent Hakim's visit, the telephone negotiations should be sufficient to confer jurisdiction. (Pltff's Mem. at 14-16). However, "it is well settled that. . . telephone and mail contacts generally do not constitute 'transacting business' under New York's long-arm statute." *Loudon Plastics, Inc. v. Brenner Tool & Die, Inc.*, 74 F. Supp. 2d 182, 185 (N.D.N.Y. 1999) (finding jurisdiction because contract contained New York forum-selection clause and because the product was to be delivered in New York). In the other cases plaintiff cites, the court had additional substantive contacts, in addition to defendant's telephone calls, for finding jurisdiction. See *Courtroom Television Network v. Focus Media, Inc.*, 264 A.D.2d 351, 353, 695 N.Y.S.2d 17, (1999) (entire performance of contract to occur in New York); *Catsimatidis v. Innovative Travel Group, Inc.*, 650 F. Supp. 748, 752 (S.D.N.Y. 1986) [*20] (substantial performance to occur in New York); *Rutgerswerke AG v. Abex Corp.*, 1995 U.S. Dist. LEXIS 9285, No. 93 Civ. 2914 (JFK), 1995 WL 625701, *5 (S.D.N.Y. Oct. 25, 1995) (New York choice-of-law provision and face-to-face negotiations held in New York).

In the present case, plaintiff's obligation was to locate investors in France. With the exception of the June 26, 2000, visit to New York, all meetings between the parties and with potential investors took place in France. Because Archos did not project itself into the New York market or purposefully avail itself of the privilege of doing business in New York, a handful of phone calls and a single fortuitous meeting are not sufficient to subject it to personal jurisdiction in New York. Accordingly, the motion to dismiss pursuant to CPLR § 302 is granted.

B. General Jurisdiction

A foreign corporation can be sued in New York under CPLR § 301 if it has engaged in a "continuous and systematic" course of doing business such that a finding of its "presence" in the jurisdiction is warranted. *N.Y. CPLR § 301* (McKinney 1990); *J.L.B. Equities Inc. v. Ocwen Financial Corp.*, 131 F. Supp. 2d 544 (S.D.N.Y. 2001). The presence [*21] in the state must be "permanent and continuous" not just "merely occasional of casual." *Hearst Corp. v. Goldberger*, 1997 U.S. Dist. LEXIS 2065, No. 96 Civ. 3620 (PKL)(AJP), 1997 WL 97097, *8 (S.D.N.Y. Feb. 26, 1997) (citations omitted). New York courts will consider the "aggregate of the corporation's activities in the State", *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982), and the "quality and nature of the corporation's contact with the State" to determine if it would "make it reasonable and just" to require a party to defend an action in New York, *id., 55 N.Y.2d at 310*.

Plaintiff argues that the totality of Archos' contacts in New York provide a basis for general jurisdiction pursuant to CPLR § 301. (Pltff's Mem. at 17-19). Plaintiff specifically points to sales by Archos, Inc., Archos' U.S. subsidiary, sales to distributors such as Ingram Micro, CompUSA and Best Buy and to Archos S.A.'s website sales as support for its argument. (Pltff's Mem. at 17-19). However, a foreign manufacturer is not "present" in New York simply because its subsidiary sells its product through a New York distributor. *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998). [*22] Similarly, the fact that a foreign corporation has a website accessible to New York is insufficient to confer jurisdiction under CPLR § 301. *Drucker Cornell v. Assicurazioni Generali S.p.A.*, 2000 U.S. Dist. LEXIS 2922, No. 97 Civ. 2262 (MBM), 2000 WL 284222, *2 (S.D.N.Y. Mar. 16, 2000).

Archos, S.A. does not sell its products directly to New York consumers. It is unconverted that all Archos products are sold through its subsidiary, Archos, Inc., located in California. The sales are direct to distributors and not to consumers. Furthermore, all the sales from Archos S.A.'s website are to consumers outside North America. It cannot be said that Archos S.A.'s activity is "continuous or systematic" such that the "quality and nature" of Archos S.A.'s contacts would make it reasonable for it to defend a suit in New York. The sale of Archos-brand products through its subsidiary to distributors and to website consumers outside of North America does not constitute "doing business" for the purposes of conferring general jurisdiction pursuant to CPLR § 301. Accordingly, the motion to dismiss pursuant to CPLR § 301 is granted.

C. Due Process

The due process clause permits a state to exercise [*23] personal jurisdiction over a non-domiciliary with whom it has "certain minimum contacts. . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Calder v. Jones*, 465 U.S. 783, 788, 104 S. Ct. 1482, 1483, 79 L. Ed. 2d 804 (1984); *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945). "Random" and "sporadic" contacts are not sufficient to satisfy the due process clause. *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183. Even assuming

Case 1:07-cv-03580-DLC   Document 23-17   Filed 06/12/2007   Page 9 of 20

Page 7
2002 U.S. Dist. LEXIS 4396, *

Archos' contacts were sufficient under §§ 301 or 302, the brief two-hour meeting in New York is the essence of "random" and "sporadic." Forcing Archos S.A. to come to New York to defend this case would not comport with the traditional notions of due process. Accordingly, the motion to dismiss is granted.

III. Conclusion

Defendant's motion to dismiss the complaint is granted. The Clerk of Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

Dated: March 15, 2002

New York, New York

LORETTA A. PRESKA, U.S.D.J.

# 15

All England Commercial Cases/2002/Volume 2 /Swithenbank Foods Ltd v Bowers - [2002] 2 All ER (Comm) 974

[2002] 2 All ER (Comm) 974

# Swithenbank Foods Ltd v Bowers

[2002] EWHC 2257 (QB)
QUEEN'S BENCH DIVISION AT LEEDS (MERCANTILE COURT)

JUDGE McGONIGAL (SITTING AS A JUDGE OF THE HIGH COURT)

21 JUNE, 19 JULY 2002

*Conflict of laws - Jurisdiction - Civil and commercial matters - Contract of employment - Jurisdiction over individual contracts of employment - Claimant alleging breach of contractual duty and conspiracy against defendant employee - Whether statutory provision that employer might bring proceedings only in domicile of employee applicable - Whether court having power to determine under statutory provision each claim included in claim form - Whether permission to serve out of jurisdiction required - Whether service effective - Council Directive (EC) 44/2001, section 5, art 20 - CPR 6.19(1A).*

The claimant issued a claim form against nine defendants alleging breach of duty or conspiracy or both. The first and the third to ninth defendants had been employees of the claimant. The claim form and the particulars of claim were served out of the jurisdiction on the third defendant without the permission of the court in reliance on CPR 6.19(1A). The particulars of claim contained two claims against the third defendant, a tort claim on the basis that he had conspired with the other defendants to unlawfully interfere with the claimant's contractual relationship with a supplier (the conspiracy claim) and a claim that he had acted in breach of his duty of fidelity as an employee in joining the conspiracy and carrying it out (the employment claim). The third defendant applied for an order that the court did not have jurisdiction to try him because he was domiciled in France, the contract related to a contract of employment, and, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters) (OJ 2001 L12 p 1) (the Brussels Regulation), such an action might be commenced only in the courts of the member state in which the defendant was domiciled. In relation to the conspiracy claim, the claimant submitted that section 5 of the Brussels Regulation[a], which included art 20 and which governed 'matters relating to individual contracts of employment', related only to claims in contract brought qua employer. It was held that art 5(3)[b] of the Brussels Regulation gave the English courts jurisdiction over the conspiracy claim unless section 5 applied. As to the employment claim, the claimant conceded that if the claim fell within section 5, then it could not rely upon art 6(1)[c] (which provided for a person who was one of a number of defendants to be sued in the domicile of any one of them provided that the claims were so closely connected that it was expedient to hear and determine then together) to found jurisdiction.

**Held** - (1) Section 5 of the Brussels Regulation, including art 20, related only to jurisdiction over contractual claims under individual employment contracts. It did not relate to proceedings brought qua employer against a defendant qua employee and did not relate to any claim on any basis where the claimant

[2002] 2 All ER (Comm) 974 at 975

happened to be the defendant's employer. Article 5 of the regulation drew a distinction between 'matters relating to a contract' and 'matters relating to a tort', and the heading of section 5 was 'Jurisdiction over individual contracts of employment'. It followed that the phrase 'in matters relating to individual contracts of employment' in that section effectively meant 'where claims are made under individual contracts of

employment'. Where a claimant brought a claim, independently of the contract of employment, against a defendant who was or had been his or her employee, prima facie that claimant should be permitted to bring the claim if the court would have jurisdiction over that claim if the defendant was not or had not been the claimant's employee. The courts would be astute to prevent an employer seeking to dress up a claim under an employment contract as one not made under such a contract, but that was not so in the instant case. Such an interpretation of the phrase 'matters relating to individual contracts of employment' provided a clear test and led to high predictability regarding jurisdiction. Moreover, there was no policy justification for conspirators or other tortfeasors who were employees of the claimant receiving jurisdictional advantages not enjoyed by conspirators or other tortfeasors who were not employees of the claimant. Accordingly, the court had jurisdiction over the conspiracy claim (see [25], [26], below).

(2) The employment claim was expressly based on breaches by the third defendant of implied terms of his contract of employment. Those breaches were pleaded as breaches of the duty of fidelity owed otherwise than under an implied term of the contract. If the pleading were amended to remove the claim based on the implied term, the court would regard the claim as an employment contract claim dressed up as one made outside the contract of employment. As presently pleaded, the employment claim clearly fell within section 5 of the Brussels Regulation and was, therefore, a claim which could only be brought against the third defendant in a French court as provided by art 20. Since the claim fell within section 5, the claimant could not rely on art 6(1). It followed that the court did not have jurisdiction over the employment claim. The third defendant's application would be treated as an application to set aside service of the claim form and particulars of claim: as the claim form and particulars of claim which the claimant had purported to serve on the third defendant in France contained the employment claim, which the court had no power to determine under the Brussels Regulation, the requirement for the permission of the court for service of out of the jurisdiction was not obviated by CPR 6.19(1A). Accordingly, as permission of the court for service out of the jurisdiction had been necessary and had not been obtained, the service on the third defendant was ineffective and would be set aside (see [27]-[29], below).

Notes

For individual contracts of employment and the Brussels Convention, and for service out of the jurisdiction where the permission of the court is not required, see respectively 8(1) *Halsbury's Laws* (4th edn reissue) para 641 and 37 *Halsbury's Laws* (4th edn reissue) para 345.

### Cases referred to in judgment

*Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* Case 21/76 [1978] QB 708, [1977] 3 WLR 479, [1976] ECR 1735, ECJ.

*Shevill v Presse Alliance SA* [1992] 1 All ER 409, [1992] 2 WLR 1, CA; affd.[1996] 3 All ER 929, [1996] AC 959, [1996] 3 WLR 420, HL.

[2002] 2 All ER (Comm) 974 at 976

### Case also cited or referred to in skeleton arguments

*Somafer SA v Saar-Ferngas AG* Case 33/78 [1978] ECR 2183.

### Application

Andrew Foster, the third defendant to claims of breach of contractual duty and conspiracy brought by the claimant, Swithenbank Foods Ltd, applied for an order that the court had no jurisdiction to try the claims against him on the ground that the action related to a contract of employment and that, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters), such an action might be commenced only in the courts of his domicile, France. The facts are set out in the judgment.

*Michael James* (instructed by *Last Cawthra Feather*, Shipley) for Mr Foster.

*Hugh Jory* (instructed by *Walker Morris*, Leeds) for the claimant.

*Cur adv vult*

**19 July 2002. The following judgment was delivered.**

**JUDGE McGONIGAL.**

[1] On 27 March 2002 the claimant issued a claim form against the nine defendants alleging 'breach of duty and/or contract and/or conspiracy'. The claim form stated that the High Court has power to hear the claim under the Civil Jurisdiction and Judgments Act 1982 and added: 'The third defendant is a British national residing in France and will understand the contents of the claim.' The claim form and particulars of claim were served on the third defendant (Mr Foster) in France without any leave of the court in reliance on CPR 6.19 and the statement on the claim form quoted above was intended to comply with CPR 6.19(3).

[2] On 29 May 2002 Mr Foster made an application for an order that the court has no jurisdiction to try the claim against him because he is domiciled in France, the claim relates to a contract of employment and, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction in civil and commercial matters) (OJ 2001 L12 p 1) (the Brussels Regulation), such action may only be commenced in France. It is common ground that Mr Foster is domiciled in France. His application raises the issue of the scope of section 5 of the Brussels Regulation.

[3] The claimant's case as set out in the particulars of claim is as follows. (1) Until the claimant acquired the business and assets of JW Swithenbank Ltd (Swithenbank) from its receivers in January 2000, that company had been owned, controlled and run by the sixth defendant, Mr Paul Kershaw and its Eurosales division had been managed by the fourth defendant, Mr Jonathan Kershaw (a son of Mr Paul Kershaw) and run by its Paris depot manager, Mr Foster, and its sales executive, the first defendant (Mr Bowers). After the claimant's acquisition of the Eurosales division Mr Jonathan Kershaw, Mr Foster and Mr Bowers continued to run the Eurosales division as employees of the claimant. (2) The wholesale division of Swithenbank was managed by Mr Simon Kershaw (a son of Mr Paul Kershaw). Mr Simon Kershaw continued to manage it as an employee of the claimant after its acquisition by the claimant until 12 July 2001 when he ceased to be an employee when the wholesale division was purchased by the second defendant (Burbank Produce Ltd) which is a company owned by Mr Simon Kershaw and his parents. (3) Another division of Swithenbank continued to be

*[2002] 2 All ER (Comm) 974 at 977*

managed after January 2000 by another son of Mr Paul Kershaw, the fifth defendant, Mr Noel Kershaw, as an employee of the claimant. The eighth (Mr Nicholls) and ninth defendants (Mr Thompson) are the former administration manager and chief executive respectively of Swithenbank who became employees of the claimant in January 2000. Mr Paul Kershaw became a consultant with the claimant for 12 months from the time of the acquisition in January 2000. (4) The claimant's case is that (a) the vast majority of its potatoes were sourced from Pom'Alliance, a French co-operative under a 'joint business arrangement'; (b) by 27 April 2001 Mr Jonathan Kershaw and/or Mr Thompson had created, during working hours and using the claimant's equipment, a document to be used to solicit Pom'Alliance to become an investor in a joint venture (known as the ETC project) which the employees of the Eurosales division, Mr Jonathan Kershaw, Mr Foster and Mr Bowers, would join; (c) Mr Jonathan Kershaw and Mr Paul Kershaw approached Mr Bowers to solicit him to join the proposed joint venture; (d) by 12 September 2001 all the defendants, including Mr Foster, had combined with the intention of unlawfully interfering with the claimant's contractual relationship with Pom'Alliance, by soliciting Pom'Alliance to join the proposed joint venture; (e) Pom'Alliance was to be

Exhibit A 345

solicited to join by Mr Jonathan Kershaw and Mr Foster who would do this at a meeting organised with Pom'Alliance on the claimant's business; (f) at that meeting on 14 September 2001 Mr Jonathan Kershaw and Mr Foster solicited Pom'Alliance to join the proposed joint venture; (g) the defendants continued to develop the idea of the proposed joint venture with Pom'Alliance until they were found out by the claimant which investigated what they had been doing, suspended those defendants who were its employees and took the necessary security measures at a cost of about £313,000 which it claims in damages from the defendants.

[4] The case against Mr Foster is contained in the following three paragraphs of the particulars of claim:

> '22. By 12 September 2001, the defendants (Burbank acting through Paul Kershaw and Simon Kershaw who also acted on their own behalves) had combined with the intention of unlawfully interfering with the claimant's contractual relationship with Pom'Alliance and injuring the claimant, by soliciting Pom'Alliance to join the ETC project through Jonathan Kershaw and/or Andrew Foster, who in breach of duty and/or contract would take advantage of a meeting organised with Pom'Alliance on the claimant's business to propose the ETC project. The said combination (save in the case of Burbank, Paul Kershaw and Simon Kershaw) was also a breach of their duty of fidelity and in particular those set out in sub-paras 9(i)-(ix) above ...

> '24. On 14 September 2001, Jonathan Kershaw and Andrew Foster met Mr Luraschi of Pom'Alliance on the claimant's business in France and in breach of duty set out in sub-paras 9(i)-(viii) above solicited Pom'Alliance to join the ETC project ...

> '31. Furthermore, Jonathan Kershaw in breach of duty set out in sub-paras 9(i), (ii), (x) and (xi) above failed to report to the directors of the claimant Andrew Foster's breach of duty in discussing the ETC project with Mr Luraschi during the meeting on 14 September 2001 and Andrew Foster in breach of duty (as set out against Jonathan Kershaw aforesaid) failed to report Jonathan Kershaw.'

The breaches of duty set out in para 9 are pleaded as specific aspects of the duty of fidelity which, according to para 8, those defendants, including Mr Foster, who

*[2002] 2 All ER (Comm) 974 at 978*

were employees of the claimant owed to the claimant as its employees. In the alternative those duties are pleaded as implied terms of their contracts of employment.

[5] These paragraphs contain two claims against Mr Foster: (a) a tort claim on the basis that he conspired with the other defendants to unlawfully interfere with the claimant's contractual relationship with Pom'Alliance (the conspiracy claim); and (b) a claim that he acted in breach of his duty of fidelity as an employee in joining the conspiracy and carrying it out (the employment claim). The conspiracy claim is contained in paras 22 and 24; the employment claim is contained in paras 22, 24 and 31.

[6] The Brussels Regulation came into force on 1 March 2002 (art 76) and applies only to legal proceedings instituted after that date (art 66); it therefore applies to this action started on 27 March 2002. The Brussels Regulation largely supersedes the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 (as set out in Sch 1 to the 1982 Act) (art 69). The Brussels Regulation has direct effect.

[7] The Brussels Regulation is in many respects very similar to the Brussels Convention. Article 2(1) provides that 'subject to this Regulation, persons domiciled in a Member State shall, whatever their

nationality, be sued in the courts of that Member State' and art 3(1) provides that 'Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter'. It is common ground that Mr Foster is domiciled in France. Accordingly, Mr Foster can only be sued in England if the rules in sections 2-7 allow it.

[8] Section 2 of the Brussels Regulation is headed 'Special Jurisdiction'. Articles 5 and 6 of that section provide as follows:

*'Article 5*

A person domiciled in a Member State may, in another Member State, be sued ...

3. in matters relating to tort, *delict* or *quasi-delict*, in the courts for the place where the harmful event occurred or may occur ...

*Article 6*

A person domiciled in a Member State may also be sued:

1. where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings ...'

[9] Subject to the question whether it is a matter 'relating to an individual contract of employment' (see [11]-[26], below) the conspiracy claim is within the jurisdiction of the English court if 'the harmful event occurred' in England. The similar phrase in art 5(3) of the Brussels Convention has been held to give a claimant the option to sue either in the country where the damage occurred or in the country where the event giving rise to the damage occurred (see *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* Case 21/76 [1978] QB 708, [1977] 3 WLR 479, [1976] ECR 1735). The claimant seeks to recover the cost of an investigation (which took place both in England and in France) of a conspiracy (which took place in both countries). There is no allegation that Mr Foster did anything pursuant to the alleged conspiracy outside France but the harmful event is the conspiracy, not the particular acts of individual conspirators, and the

*[2002] 2 All ER (Comm) 974 at 979*

investigation was of the conspiracy as a whole. In *Shevill v Presse Alliance SA* [1992] 1 All ER 409, [1992] 2 WLR 1 the Court of Appeal held that the English courts had jurisdiction under art 5(3) of the Brussels Convention in relation to a libel claim where the libel concerned was published both in France and in England. I find, therefore, that the English courts have jurisdiction over the conspiracy claim by virtue of art 5(3) of the Brussels Regulation unless section 5 applies to that claim.

[10] Even if I am wrong on that, the English courts have jurisdiction (subject to section 5) over the conspiracy claim by virtue of art 6(1) of the Brussels Regulation. The other defendants are domiciled in England and the conspiracy claim against Mr Foster is the same conspiracy claim advanced against those other defendants. There could not be a closer connection.

[11] However, Mr Michael James, counsel for Mr Foster, submitted that the conspiracy claim (a) cannot be heard in the English courts because it relates to Mr Foster's contract of employment so that only the French courts have jurisdiction under art 20, and (b) cannot be heard under arts 5(3) or 6(1) because the only exceptions to the exclusive jurisdiction conferred in this case on the French court by section 5 of the Brussels Regulation are in arts 4 and 5(5) which are referred to in art 18(1); but (c) can only be heard by the French courts. Mr Hugh Jory for the claimant submitted that the jurisdiction conferred by section 5 applies only to claims brought qua employer and that section 5 applies only to contract claims.

[12] The full text of section 5 is as follows:

**'Jurisdiction over individual contracts of employment**

*Article 18*

    1. In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

    2. Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

*Article 19*

    An employer domiciled in a Member State may be sued:

    1. in the courts of the Member State where he is domiciled; or

    2. in another Member State: (a) in the courts for the place where the employee habitually carries out his work or in the courts for the last place where he did so, or (b) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

*Article 20*

    1. An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

    2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

*[2002] 2 All ER (Comm) 974 at 980*

**Article 21**

The provisions of this Section may be departed from only by an agreement on jurisdiction:

1. which is entered into after the dispute has arisen; or

2. which allows the employee to bring proceedings in courts other than those indicated in this Section.'

Section 5 includes provisions regarding jurisdiction in matters relating to individual contracts of employment which were contained in arts 5(1) and 17 of the Brussels Convention.

[13] There are parts of the preamble to the Brussels Regulation which must be taken into consideration. These are recitals (11)-(15) which read as follows:

'(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

'(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.

'(13) In relation to insurance, consumer contracts and employment, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules provide for.

'(14) The autonomy of the parties to a contract, other than an insurance, consumer or employment contract, where only limited autonomy to determine the courts having jurisdiction is allowed, must be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

'(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States. There must be a clear and effective mechanism for resolving cases of *lis pendens* and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously.'

Exhibit A 349

Page 8

[14] Where parties to an alleged tort, such as conspiracy, are domiciled in different member states there is an obvious tension between the principle that jurisdiction is generally based on the defendant's domicile (recital (11)) and the need to minimise the possibility of concurrent proceedings with the danger of irreconcilable judgments (recital (15)). In resolving that tension when the defendant is an employee the court must have regard to the policy set out in recital (13).

[15] Mr James for Mr Foster submitted that the conspiracy claim relates to Mr Foster's contract of employment and that in the phrase 'matters relating to individual contracts of employment' one could read 'matters' as 'claims'. He referred to recital (13) of the preamble and argued that, if tortious claims connected with employment were outside section 5, employers could get round section 5 by framing claims in tort rather than in contract. He pointed out that in

*[2002] 2 All ER (Comm) 974 at 981*

this case the same alleged facts found both a claim in conspiracy and a claim for breach of Mr Foster's contract of employment.

[16] Mr Jory submitted that section 5 (including art 20) relates only to jurisdiction over contractual claims under individual employment contracts, that it relates only to proceedings brought qua employer against a defendant qua employee and that it does not relate to any claim on any basis where the claimant happens to be the defendant's employer. As to recital (13) of the preamble he submitted that the words 'in relation to ... employment' was a reference to section 5 and should not be given a wider meaning than 'in matters relating to individual contracts of employment'. He further submitted that the reference to the weaker party's interests is consistent with the considerations in art 6 and does not exclude them. The reference is not to the weaker party's preferences or envisaged strategic advantages but to his legitimate interests which are the same as the interests of justice which are the basis of art 6(1).

[17] The wording of section 5 indicates that it is concerned to protect the employee as the weaker party (see recital (13) of the preamble) in two ways. First it is concerned to prevent employers taking unfair advantage of an employee when the terms of the employment contract are negotiated or, more often, presented to the employee. Article 21 prevents the employer from obtaining the employee's agreement to a different jurisdiction from that of the employee's domicile when the contract of employment is being negotiated. Secondly section 5 is concerned to give the employee jurisdictional advantage if a dispute arises. Section 5 of the Brussels Regulation gives the employee a choice of jurisdiction in which to sue the employer (arts 18(2) and 19) but limits the employer to bringing proceedings only in the courts of the member state in which the employee is domiciled (art 20). I accept Mr Jory's submission that 'employment' in recital (13) of the preamble is a reference to section 5 of the Brussels Regulation and does not enlarge the meaning of the phrase 'in matters relating to individual contracts of employment' in art 18(1).

[18] That phrase may well cover situations where there is no contract of employment. Mr James drew my attention to the Giuliano and Lagarde Report on the Rome Convention (OJ 1980 C282 p 1). Article 6 of the Rome Convention on the Law Applicable to Contractual Obligations 1980 (as set out in Sch 1 to the Contracts (Applicable Law) Act 1990) uses the same phrase 'individual contracts of employment' and prevents a choice of governing law from depriving the employee of the protection afforded by the mandatory rules of the law which would normally be applicable in the absence of any such choice. In that report (at p 25) the authors comment that the 'wording of Article 6 speaks of "contract of employment" instead of "employment relationship" as in the original preliminary draft' and express the view (at pp 25-26) that 'individual contract of employment' covers void contracts and de facto employment relationships.

[19] It appears from this that those who negotiated the Rome Convention considered that 'employment relationship' was too broad a term and that there was a decision to limit the provisions in that convention to the narrower phrase of 'matters relating to individual contracts of employment'. The extension of meaning suggested by Giuliano and Lagarde is an extension to cover circumstances, other than the making of an

Exhibit A  350

individual contract of employment, by which the relationship of employment/employee was or may have been initially established. There may be good policy reasons to construe 'matters relating to individual contracts of employment' sufficiently widely to cover disputes where there are disputes about the employment relationship but possibly no contract of employment but I do not think it is permissible to

[2002] 2 All ER (Comm) 974 at 982

construe it as if it read 'matters relating to an individual employment relationship' when a choice has been made to use a different phrase.

[20] The issue for decision here is whether a tort claim of conspiracy against Mr Foster, founded on the allegation that he and Mr Jonathan Kershaw took advantage of a meeting with Pom'Alliance, which they arranged and attended as employees of the claimant, to solicit Pom'Alliance to participate in the proposed joint venture, is a matter related to an individual contract of employment. The same facts are pleaded as the foundation for a claim that Mr Foster was in breach of his contract of employment. It could be said that, if Mr Foster had not been an employee holding the position he held, he would not have been a conspirator since his value as a conspirator was, on the facts as alleged, that he had an existing relationship with Pom'Alliance in his capacity as an employee of the claimant.

[21] Recital (11) of the preamble to the Brussels Regulation says that the rules of jurisdiction should be 'highly predictable'. It would not be possible to achieve that if the answer to the question whether a tort claim against an employee did or did not fall within the exclusive jurisdiction conferred by art 20 depended on the extent to which the fact that the defendant was an employee of the claimant was a material element in the events giving rise to the claim.

[22] The usual explanation for the reference to *individual* contracts of employment is to exclude collective bargaining agreements. One reason for this is that, if a collective bargaining agreement covers employees in more than one jurisdiction, there would be a multiplicity of proceedings. Recital (15) of the preamble makes it clear that the Brussels Regulation is intended 'to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States'. If a claim is made under an individual contract of employment there can only be one employee defendant and, therefore, no need for concurrent proceedings with the possibility of irreconcilable judgments. If a claim is made against an employee otherwise than under an individual contract of employment, there is the possibility of co-defendants and, therefore, the possibility of concurrent proceedings and irreconcilable judgments.

[23] Mr James relied on the express references to arts 4 and 5(5) in art 18(1) as an indication that art 6 cannot apply 'in matters relating to individual contracts of employment'. If that phrase is limited to claims based on such contracts then there is little need for art 6. A single claim cannot be brought against more than one employee or against employees and non-employees. The danger of irreconcilable judgments is confined to situations where the same facts are the basis for a series of claims against a number of employees domiciled in more than one member state. The lack of a reference to art 6 supports the narrow interpretation of 'matters relating to individual contracts of employment'.

[24] The policy behind section 5 is based on the probability that the employer is financially stronger than the employee. Therefore, if one or other of them has to take proceedings in a foreign court, it should be the employer who has to bear the additional cost and inconvenience involved to ensure, so far as practicable, that the parties are on an equal footing so far as jurisdiction is concerned. The advantage is given to the employee as a member of a class, namely employees, and that advantage should be confined to cases where his status as an employee is legally relevant. Section 5 should not be construed as conferring jurisdictional advantages on a poor defendant sued by a rich claimant if they happen to be employee and employer. The reference to 'individual contracts of employment', rather than to the employment relationship generally, indicates that what is relevant is the contract of employment rather than the relationship generally. The contract of employment is relevant, and there is a matter relating to an

*[2002] 2 All ER (Comm) 974 at 983*

individual contract of employment, only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee.

**[25]** I can see no justification of policy for conspirators, or any other tortfeasors, who are employees of the claimant being given jurisdictional advantages not enjoyed by conspirators or other tortfeasors who are not employees of the claimant. I accept Mr Jory's submission that section 5 is limited to claims in contract. Article 5 of the Brussels Regulation draws a distinction between 'matters relating to a contract' and 'matters relating to tort' and the heading of section 5 is 'Jurisdiction over individual contracts of employment'.

**[26]** Accordingly, in my view the phrase 'in matters relating to individual contracts of employment' effectively means 'where claims are made under individual contracts of employment'. I express no view on the question whether it bears an extended meaning as suggested in [19], above. If a claimant brings to the court a claim against a defendant who is or was his employee which is made independently of the contract of employment, prima facie he should be permitted to bring it in that court if the court would have jurisdiction over that claim if the defendant was not the claimant's employer. If an employer sought to dress up a claim under an employment contract as one not made under such a contract no doubt the courts would be astute to prevent him. But that is not this case. To interpret the phrase in this way provides a clear test and leads to high predictability regarding jurisdiction.

**[27]** I turn, therefore, to the employment claim. This is expressly based on breaches by Mr Foster of implied terms of his contact of employment. Those breaches are pleaded as breaches of the duty of fidelity owed otherwise than under an implied term of the contract. If the pleading were amended to remove the claim based on the implied term this would, in my view, be a case where the court would regard the claim as an employment contract claim dressed up as one made outside the contract of employment. As presently pleaded the employment claim is a claim which falls clearly within section 5 of the Brussels Regulation and, therefore, a claim which can only be brought against Mr Foster in a French court as provided by art 20 of the Brussels Regulation. Mr Jory conceded that, if a claim falls within section 5, then the claimant cannot rely on art 6(1) in order to found jurisdiction.

**[28]** The application as framed is that this court has no jurisdiction, as suggested by the wording of CPR Pt 11. I have found that it does have jurisdiction over the conspiracy claim but not over the employment claim. I will treat the application as it had been drafted as an application to set aside service of the claim form and particulars of claim.

**[29]** Mr James relied on CPR 6.19(1A) which permits service of the claim form out of the jurisdiction without permission of the court only 'where each claim included in the claim form made against the defendant to be served is a claim which the court has power to determine under the Judgments Regulation' which is a reference to what I have termed 'the Brussels Regulation'. The claim form and the particulars of claim in this action which the claimant purported to serve on Mr Foster in France contained the employment claim against Mr Foster which the court has no power to determine under the Brussels Regulation. The permission of the court was, therefore, required for service of the claim form and particulars of claim on Mr Foster. No permission was obtained. Service of those documents on Mr Foster was, therefore, ineffective and must be set aside.

*Application allowed.*

Gareth Williams Barrister.