# EXHIBIT A-18

2003 U.S. Dist. LEXIS 1424, *

dispute can be adequately addressed by an English court."), cert. denied, *526 U.S. 1067, 119 S. Ct. 1459, 143 L. Ed. 2d 545 (1999); Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 130 (2d Cir. 1987)* [*66] (unavailability of RICO treble damages does not render forum inadequate); *Alcoa S.S. Co. v. M/V Nordic Regent, 654 F.2d 147, 159 (2d Cir. 1978)* (en banc) (Maximum recovery of $ 570,000 in foreign forum as opposed to $ 8 million in U.S. forum did not render foreign forum inadequate: "It is abundantly clear . . . that the prospect of a lesser recovery does not justify refusing to dismiss on the ground of forum non conveniens."), cert. denied, *449 U.S. 890, 101 S. Ct. 248, 66 L. Ed. 2d 116 (1980).* Indeed, the motion will be denied only if plaintiff's remedy in the foreign forum is "so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co. v. Reyno, 454 U.S. at 254, 102 S. Ct. at 265;* accord, e.g., *Tsangaris v. Elite, Inc., 1993 U.S. Dist. LEXIS 9235, 92 Civ. 7855, 1993 WL 267425* at *7 (S.D.N.Y. July 9, 1993) (Greek forum found adequate even though plaintiff would "not be able to obtain relief under the Jones Act there"); *Damigos v. Flanders Compania Naviera, S.A. Panama, 716 F. Supp. 104, 109 (S.D.N.Y. 1989)* (Leval, D.J.) ("the seamen's hope to gain the benefits of the Jones Act is not [*67] a strong factor weighing against dismissal").

Moreover, for better or worse, litigation - and demands for high damages - is increasing in Russia. *See,* e.g., Steven Lee Myers, Russians Becoming Litigious: Survivors of Theater Siege Sue, N.Y. Times 12/2/02 at A3 ("In post-Soviet Russia, civil suits seeking compensation for all manner of suffering, much of it economic, have proliferated, driven by an increasingly aggressive bar," and noting that theater siege victims are seeking $ 1 million each).

The remedy in Russia is not so inadequate that it is no remedy at all.

## V. ON BALANCING GILBERT'S PUBLIC AND PRIVATE INTEREST FACTORS, RUSSIA IS THE APPROPRIATE FORUM

### A. Gilbert's Private Interest Factors Strongly Support the Russian Forum

The "private interest factors" relating to "the convenience of the litigants" include "'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and [*68] inexpensive.'" *Iragorri v. United Tech. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001)* (en banc) (quoting *Gulf Oil Corp. v. Gilbert,*

*330 U.S. 501, 508, 67 S. Ct. 839, 843, 91 L. Ed. 1055 (1947));* n34 accord, e.g., *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6, 102 S. Ct. 252, 258 n.6, 70 L. Ed. 2d 419 (1981); Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 500 (2d Cir. 2002); Aguinda v. Texaco, Inc., 303 F.3d 470, 479 (2d Cir. 2002); DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 29-30 (2d Cir. 2002); Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416* a *6 (S.D.N.Y. Mar. 4, 1998)* (Peck, M.J.). "In considering these factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri v. United Tech. Corp., 274 F.3d at 74.* n35

n34 The Supreme Court in Gulf Oil Corp. v. Gilbert also noted that "there may also be questions as to the enforceability of a judgment if one is obtained." *Gulf Oil Corp. v. Gilbert, 330 U.S. at 508, 67 S. Ct. at 843;* accord, e.g., *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232 (2d Cir. 1996); Murray v. British Broad. Corp., 81 F.3d 287, 294 (2d Cir. 1996).*

[*69]

n35 This analysis of the specific burdens of a trial in Russia appears to be entirely academic, given the parties' agreement that any recovery in a Russian trial would not materially exceed the $ 49,000 already paid to plaintiff. The Court has no choice, however, but to pursue this "legal charade." See *Irish Nat'l Ins. Co. v. Aer Lingus Teoranta, 739 F.2d 90, 91 (2d Cir. 1984)* ("The real issue before the district court was not whether the case should be tried in Ireland, but whether it would be tried at all. Nevertheless, . . . the district court proceeded to weigh the merits of a trial in Ireland against a trial in America just as if the former were likely to occur. Although the procedure smacks somewhat of a legal charade, we will proceed on the same assumption.").

"Rather than simply characterizing the case as one in negligence, contract, or some other area of law, the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial [*70] of these issues." *Iragorri v. United Tech. Corp., 274 F.3d at 74.* n36

n36 See also, e.g., *R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 168 (2d Cir. 1991); Overseas Programming Cos. v. Cinematographische Commerz-Anstalt, 684 F.2d 232, 235 (2d Cir. 1982); World Film Servs., Inc. v. RAI Radiotelevisione Italiana S.p.A., 1999 U.S. Dist. LEXIS 985, 97 Civ. 8627, 1999 WL 47206* at *9 (S.D.N.Y. Feb. 3, 1999) (defendant "cannot rely on the location of witnesses with knowledge of the parties' unsuccessful licensing negotiations, since this matter is largely irrelevant to the claims asserted in the complaint").

Private interests will favor dismissal where most of the relevant witnesses and other evidence are located in the foreign forum. See, e.g., *Murray v. British Broad. Corp., 81 F.3d at 294* ) (in copyright action arising out of contract, most of witnesses and physical and documentary evidence was located in England, such that private interests [*71] favored dismissal); *Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir. 1993)* (private interest factors strongly favor dismissal when most witnesses and physical and documentary evidence are located in other forum); *Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1001 (2d Cir.)* ("since all of the Banks' allegedly fraudulent activity occurred in Australia, most relevant documents . . . [and m]ost witnesses and other sources of proof are also located in Australia"), cert. denied, *510 U.S. 945, 114 S. Ct. 386, 126 L. Ed. 2d 334 (1993); see also cases cited below.*

**1. The Location and Availability of Witnesses Strongly Favors Trial in Russia**

"The location of the witnesses [is] always a key factor in forum non conveniens cases . . . ." *Manu Int'l, S.A. v. Avon Prods., Inc., 641 F.2d 62, 66 (2d Cir. 1981).* n37 As detailed below, most of the key witnesses in this case are Russian nationals and there is little, if any, evidence that witnesses located in New York would provide relevant testimony. The location and availability of witnesses thus strongly favors trial in Russia.

n37 Accord, e.g., *Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir. 1978)* ("Perhaps the most significant problem is presented by the inability to bring plaintiff and his alleged co-conspirator here for live cross-examination before a fact-finder, due to their incarceration in Switzerland."); *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416* at *7 (S.D.N.Y. Mar. 4, 1998) (Peck, M.J.) ("If the location of witnesses and

sources of proof are strongly in favor of one forum, the matter likely should be adjudicated there."); *Continental Pac. Shipping, Ltd. v. CIT Group/Equip. Fin., Inc., 1996 U.S. Dist. LEXIS 14736, 96 Civ. 2646, 1996 WL 571855* at *6 (S.D.N.Y. Oct. 7, 1996) ("'The location of relevant witnesses is a 'key factor in forum non conveniens cases.'"); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 169 (S.D.N.Y. 1995)* ("when the greater number and more relevant witnesses are located in a foreign forum, common sense suggests that the litigation proceed in that forum"), aff'd, *104 F.3d 351 (2d Cir. 1996); Studiengesellschaft Kohle MBH v. Shell Oil Co., 1993 U.S. Dist. LEXIS 14131, 93 Civ. 1868, 1993 WL 403340* at *2 (S.D.N.Y. Oct. 8, 1993) ("The convenience of both party and non-party witnesses may be the single most important factor in the [FNC] analysis. . . ."); *Zweig v. National Mort. Bank of Greece, 1993 U.S. Dist. LEXIS 8460, 91 Civ. 5482, 1993 WL 227663* at *3 (S.D.N.Y. June 21, 1993) ("The most significant factor is the convenience of party and non-party witnesses.").

[*72]

**a. The Russian Residence of the Shipmate Witnesses Strongly Favors Trial in Russia**

Eastwind has identified five of Stanislav's Russian shipmates as potential witnesses - the captain, first mate, and three seamen. (See page 6 above.) A threshold issue is whether Stanislav's Russian shipmates could offer relevant testimony.

Plaintiff argues that because defendants have conceded that there were no "eye witnesses" to the accident, n38 none of Stanislav's shipmates could provide relevant testimony. (Dkt. No. 16: Pl. Br. at 4, 7.) This is nonsense. The complaint asserts that, inter alia: (1) "the vessel was unseaworthy in that the . . . pilot ladder was not safe for its intended use"; (2) defendants "were negligent in not securing the pilot ladder in a safe manner"; (3) defendants "violated applicable safety regulations"; (4) defendants "failed to warn Decedent of danger"; (5) "rescue equipment was inadequate and not readily available"; and (6) "rescue efforts were negligently directed and enforced." (Dkt. No. 1: Compl. PP 14-16.) Even if Stanislav's shipmates did not actually see Stanislav fall overboard, they could testify regarding the conditions that allegedly contributed [*73] to his death, including: the duties of Stanislav and other crewmen; the ship's regular on-board procedures for boarding pilots; the state of the ship's equipment, including the pilot's ladder, at the time of the accident; the events leading up to and following the accident;

Stanislav's health and mental state at the time of the accident; and the ship's rescue efforts. "Moreover, even assuming arguendo that [defendant's Russian]-based witnesses were not necessary, [plaintiff] has not identified a single New York-based witness." *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416 at *8 (S.D.N.Y. Mar. 4, 1998) (Peck, M.J.).*

> n38 Defendants responded to an interrogatory as follows:
>
> > There were no witnesses to the alleged accident, although upon information and belief anyone who was aboard ship and/or was involved in search and rescue may have witnessed some of the events prior to and after the event.
>
> (Dkt. No. 34: Eastwind Resp. to Pl's Interrog. No. 21.)

Second, [*74] plaintiff argues that because, "as a matter of law," defendants are strictly liable for the accident that killed Stanislav, there is no need for trial testimony from witnesses to the accident. (Dkt. No. 16: Pl. Br. at 1-2, 7-8.) According to plaintiff, the International Convention for Safety of Life at Sea, 1974 ("SOLAS"), to which Russia, Liberia, and the United States are signatories, "provides that on the rigging of any pilot ladder, the rigging must be supervised by an officer with good visibility." (Pl. Br. at 7, citing Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 5: SOLAS Reg. 17.) In plaintiff's view, the ship must have violated SOLAS Regulation 17, because "the story provided by the deckhand in the vicinity [Miron Nuke], and adopted by the defense on this motion," indicates that no officer was on deck supervising the rigging of the Yellowstone's pilot ladder. (Pl. Br. at 7; see Edelman 7/15/02 Aff. at 2-3.) According to plaintiff, such a "violation would provide absolute liability and certainly would obviate any claim" that Stanislav was contributorily negligent. (Id.) Thus, in plaintiff's view, trial testimony from Stanislav's shipmates regarding the details of [*75] his accident would be superfluous.

Plaintiff's argument is meritless. Plaintiff cites decisions holding that in the absence of any showing of negligence, the Jones Act permits recovery for the injury or death of a seaman resulting from a violation of a statutory duty or Coast Guard regulation. (Dkt. No. 16: Pl. Br. at 7, citing *Kernan v. American Dredging Co.,*

*355 U.S. 426, 433, 78 S. Ct. 394, 398, 2 L. Ed. 2d 382 (1958), & Fuszek v. Royal King Fisheries, Inc., 98 F.3d 514, 516-17 (9th Cir. 1996), cert. denied, 520 U.S. 1155, 117 S. Ct. 1334, 137 L. Ed. 2d 494 (1997).)* Yet even if the Court accepted that (1) the Jones Act governed this action, (2) violations of SOLAS Regulation 17 could form the predicate for strict liability recovery under the Jones Act, and (3) defendants violated the SOLAS regulation (all issues disputed by Eastwind, see Dkt. No. 18: Eastwind Reply Br. at 6-8), plaintiff nevertheless would recover nothing absent proof of causation. See, e.g., *Kernan v. American Dredging Co., 355 U.S. at 432-33, 78 S. Ct. at 398* ("In FELA cases based upon violations of [statutory duties], the Court [*76] has held that a violation of [the] statute creates liability under FELA if the resulting defect or insufficiency in equipment contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent."); *Fuszek v. Royal King Fisheries, Inc., 98 F.3d at 517* ("regulatory . . . violation could amount to negligence per se under the Jones Act if five elements were met," including "causation"). In other words, the jury would have to find that defendants' alleged violation of SOLAS Regulation 17 (i.e., failing to provide an officer to supervise the rigging of the pilot ladder) caused Stanislav's accident and death. On-board witnesses to the circumstances of the accident and its aftermath therefore would be indispensable to any trial on this issue. n39

> n39 Assuming that both the Jones Act and the SOLAS regulations governed this action, the burden might be shifted to defendants to prove that defendants' alleged SOLAS violation did not cause Stanislav's accident. Compare *In re Seaboard Shipping Corp., 449 F.2d 132, 136 (2d Cir. 1971)* ("the burden is on a ship in violation of a safety statute . . . to show 'not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been'"), cert. denied, *406 U.S. 949, 92 S. Ct. 2038, 2039, 32 L. Ed. 2d 337 (1972); & Smith v. Mitlof, 130 F. Supp. 2d 578, 581 (S.D.N.Y. 2001)* (once plaintiff proved defendant violated navigational statute or Coast Guard regulation, defendant had burden of proof on causation); with *Wills v. Amerada Hess Corp., 2002 U.S. Dist. LEXIS 1546, 98 Civ. 7126, 2002 WL 140542 at *16-17 (S.D.N.Y. Jan. 31, 2002)* (rule shifting burden of proof to defendant is limited to cases involving ship collisions, distinguishing Seaboard Shipping). Even if the burden shifted to defendants, however, testimony on causation would still be necessary.

2003 U.S. Dist. LEXIS 1424, *

[*77]

Third, plaintiff asserts (apparently in the alternative) that testimony from Stanislav's crewmates is unnecessary because a Kaliningrad resident named Andrej Nikitinskij is willing to travel here to testify that in September 2000, the "M/V Yarmouth," was inspected by the United States Coast Guard in "Douglas, USA," and found to have a "decayed" "storm-ladder" that broke when tested. (Dkt. No. 17: Edelman 7/15/02 Aff. at 9 & Ex. 9: Nikitinskij Statement.) Although Nikitinskij has no personal knowledge of the Yellowstone, he asserts in an unsworn statement, based on "conversations with other seaman who worked on m/v Yellowstone," that the "equipment and deck equipment on boards the both vessels were very similar." (Id.) Plaintiff thus intends to offer Nikitinskij's testimony along with Coast Guard witnesses and records to prove that defendants' negligence caused Stanislav's death. (Edelman 7/15/02 Aff. at 9.) Even assuming that plaintiff's theory has some basis (and that Nikitinskij's testimony was not impermissible hearsay), the jury would still require testimony from the Yellowstone's Russian crew as to the condition of the Yellowstone's pilot ladder. Evidence that another "similar" [*78] ship had a decayed ladder could not, by itself, prove that the Yellowstone's ladder was decayed as well. n40

n40 Indeed, this entire line of evidence has little, if any, relevance to this case. Decay is not a type of product defect that one can presume to apply to all "similar" products. Moreover, Nikitinskij does not personally know the condition of the Yellowstone's ladder, and even if he could testify, the fact that a Kaliningrad resident is (allegedly) willing to travel here hardly favors trial in this District rather than the witness' home forum.

To the extent plaintiff would need an expert to tie this evidence together, the expert's location would be entitled to little weight on this motion. E.g., *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 1998 WL 92416* at *8 (& cases cited therein); *Balaban v. Pettigrew Auction Co., 1997 U.S. Dist. LEXIS 22127, 96 Civ. 3177, 1997 WL 470373* at *4 n.1 (E.D.N.Y. June 27, 1997) ("it has repeatedly been held that 'the convenience of expert witnesses is of 'little or no significance' on a motion to transfer'").

[*79]

Given the importance of the shipmates' testimony, their Russian location strongly favors trial in Russia. Forum non conveniens decisions in this District give great weight to the overseas location of seamen

witnesses. See *Valarezo v. Ecuadorian Line, Inc., 2001 U.S. Dist. LEXIS 8942, 00 Civ. 6387, 2001 WL 740773* at *4 (S.D.N.Y. June 29, 2001) (Granting FNC motion: "The two seamen who witnessed [plaintiff's] fall are citizens and residents of the Philippines . . . . The Port Captain for the vessel, Captain Achilles, is a resident of Ecuador, as is Captain N. Mancayo who assists in recruiting and placing crew members on board . . . . In sum, none of the relevant witnesses are citizens or residents of the United States. On the other hand, six of the key witnesses are residents of Ecuador."); *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 989 (S.D.N.Y. 1990)* ("Witnesses to the event, the treating physicians and the other crewmembers aboard the [ship] are presumably still in the Netherlands, aboard ship, or in Greece. None of these witnesses are subject to the subpoena power of the court. Although the depositions of these witnesses could be substituted at trial, this is [*80] not the optimal way for a jury to decide a case."); *Bastas v. Atlantic Mar. Enter. Corp., 1988 U.S. Dist. LEXIS 4372, No. Civ. A. 86-6962, 1988 WL 48547* at *2 (E.D. Pa. May 13, 1988) (Granting FNC motion: "As seamen are frequently out at sea, witnesses to the accident are more likely to be accessible in Greece, the vessel's home port."); *Cruz v. Maritime Co. of Philippines, 549 F. Supp. 285, 290 (S.D.N.Y. 1982)* (Leval, D.J.) (Granting FNC motion: "The six Philippine crewmen who the parties agree witnessed the accident are more likely to be available to testify in the Philippines than in New York (although it is possible that either forum would be required to take their testimony by deposition)."), aff'd, *702 F.2d 47 (2d Cir. 1983)* (per curiam). n41

n41 In the context of venue transfer motions within the United States under *28 U.S.C. § 1404,* in contrast, courts generally accord little, if any, weight to the availability and convenience of witnesses who are seaman, as they are likely to be at sea, and thus available only by deposition (at their home or on board ship) regardless of the U.S. trial forum. See, e.g., *Lykes Bros. S.S. Co. v. Sugarman, 272 F.2d 679, 682 (2d Cir. 1959)* ("In all probability the testimony of these witnesses who sail the high seas will have to be taken by deposition anyhow, on some occasion when they happen to be available on shore leave."); *Conlon v. Sea-Land Serv., Inc., 1995 U.S. Dist. LEXIS 433, 94 Civ. 0609, 1995 WL 20321* at *5 (S.D.N.Y. Jan. 19, 1995) (Denying § 1404 transfer motion because, inter alia, since non-party witness residing outside this district "is in the merchant marine, it is quite possible in any event that his testimony would have to be taken by way of deposition since he presumably spends much of his time overseas."); *Garza v. Marine*

*Trans. Lines, Inc., 84 Civ. 6610, 1985 WL 6150* at *1 (S.D.N.Y. Apr. 8, 1985) (Denying § 1404 transfer motion because, inter alia, "several [witnesses] are seamen on active duty at sea who are usually deposed on the ship and only infrequently appear at trial to testify; thus, their location does not affect the choice of forum."); *Babbidge v. Apex Oil Co., 676 F. Supp. 517, 519-20 (S.D.N.Y. 1987)* (Denying § 1404 transfer motion in action by seaman under Jones Act regarding accident onboard ship: "A number of these witnesses, who are seamen, are not even in their home state [neither the transferor nor the transferee district], but on vessels traveling to different parts of the world. . . . It is likely that the testimony of many of the seamen in this case will be taken by deposition on their ships. Therefore, the residence of these witnesses should not affect plaintiff's choice of forum."); *Drees v. Lykes Bros. S.S. Co., 500 F. Supp. 15, 17-18 (S.D.N.Y. 1980)* (Denying § 1404 transfer motion in Jones Act action for injury at sea: "When the testimony of seamen is required, . . . the weight given to the convenience of the witnesses may be diminished in view of the fact that their testimony is often in the form of depositions.").

Neither party has cited to the Lykes line of cases, and the Court has not found any cases applying these § 1404 cases regarding seamen witnesses in the FNC context. The seamen here are Russian and their testimony surely can be more easily obtained for use in a trial in Russia. Particularly in the absence of plaintiff's counsel's reliance on the Lykes line of cases, the Court will not consider their effect on this FNC decision.

[*81]

Defendants claim that they currently employ only three of the five shipmate witnesses, and that defendants lack the power to compel even those three to attend a New York trial. (See pages 6-7 above.) The Court need not decide whether the seamen would be willing to voluntarily appear in New York or whether as a practical (as opposed to legal) matter defendants could "convince" them to testify here, since in any event the cost of transporting the shipmate witnesses to New York for trial would, in and of itself, strongly favor trial in Russia. See, e.g., *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232-33 (2d Cir. 1996)* (affirming FNC dismissal based upon the considerable "difficulty, cost, and disruption of requiring the attendance of [British] witnesses in New York"); *Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir.*

*1993)* (affirming FNC dismissal based in part upon the "considerable expense" that would be entailed to compel the appearance of necessary witnesses from Venezuela if case were tried here); *Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1001 (2d [*82] Cir.)* (affirming FNC dismissal where "the [district] court also properly recognized that . . . the cost of bringing [foreign] witnesses to the United States for trial, assuming they are willing, would be prohibitive"), cert. denied, *510 U.S. 945, 114 S. Ct. 386, 126 L. Ed. 2d 334 (1993); Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 1998 WL 92416* at *9 (cost of airline transporting witnesses from Netherlands to New York weighs in favor of FNC dismissal). n42

n42 Accord, e.g., *Beekmans v. J.P. Morgan & Co., 945 F. Supp. 90, 93 (S.D.N.Y. 1996)* (FNC dismissal where none of the witnesses reside in New York and "virtually all of the witnesses and other sources of proof are located in the Netherlands or the United Kingdom"); *Guimond v. Wyndham Hotels & Resorts, 1996 U.S. Dist. LEXIS 7255, 95 Civ. 0428, 1996 WL 281959* at *4 (S.D.N.Y. May 29, 1996) (costs of obtaining attendance of witnesses weighs in favor of trial in Jamaica where witnesses to accident were in Jamaica and none of plaintiff's witnesses reside in the United States); *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 169 (S.D.N.Y. 1995)* ("when the greater number and more relevant witnesses are located in a foreign forum, common sense suggests that the litigation proceed in that forum"), aff'd, *104 F.3d 351 (2d Cir. 1996); Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 989 (S.D.N.Y. 1990)* (FNC dismissal based in part upon defendant's proffer that "it will cost approximately $ 30,000 to transport and lodge all of the [foreign] witnesses" if case was tried in New York.); *Postol v. El-Al Israel Airlines, Ltd., 690 F. Supp. 1361, 1364 (S.D.N.Y. 1988)* (FNC dismissal where "the potential witnesses . . . will also be mainly from Israel and Geneva," and the "expense of bringing over and accommodating willing witnesses would involve a disruption of at least three days work in addition to transportation and lodging costs, and may therefore be prohibitive."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A., 638 F. Supp. 249, 252 (S.D.N.Y. 1986)* (cost of bringing willing and unwilling witnesses to New York "points toward trial in Colombia" because "although witnesses would have to travel were this action tried in either Colombia or in New York, since considerably more of the witnesses are Colombian or Pakistani nationals

and residents than are New York residents, the cost of transporting them would be less were [the] litigation adjudicated in Colombia."); *Doufexis v. Nagos S.S., Inc., 583 F. Supp. 1132, 1134 (S.D.N.Y. 1983)*.

[*83]

### b. The Russian Residence of Any Damages Witnesses Also Favors Trial In Russia

Eastwind asserts that "all sources of proof on plaintiff's claim of pecuniary loss on account of her husband's past and to be expected future contribution to her support are located" in Kaliningrad, adding that plaintiff does not identify any witness in New York who possesses relevant information regarding Stanislav's "health, state of mind or the sums he spent for personal consumption or instead contributed to his wife's support." (Dkt. No. 18: Eastwind Reply Br. at 5.)

Plaintiff herself would likely provide much of the relevant damages testimony. Eastwind claims that trial in New York would be inconvenient to plaintiff, both because of plaintiff's travel expenses and the danger to plaintiff's frail health of traveling to New York. (Dkt. No. 13: Eastwind Br. at 4-5, 10.) The Court rejects this argument, as decisions have widely held that on a forum non conveniens motion, "defendants cannot rely on any inconvenience to plaintiff and witnesses whose expenses plaintiff will bear." *Manela v. Garantia Banking Ltd., 940 F. Supp. 584, 592 n.12 (S.D.N.Y. 1996);* accord, e.g., *Jose Armando Bermudez & Co. v. Bermudez Int'l, 2000 U.S. Dist. LEXIS 12354, 99 Civ. 9346, 2000 WL 1225792* [*84] *at *6 n.6 (S.D.N.Y. Aug. 29, 2000)* ("Defendants rely in part on allegations of inconvenience to plaintiff, which should be disregarded."); *Royal Indus. Ltd. v. Kraft Foods, Inc., 926 F. Supp. 407, 417 (S.D.N.Y. 1996)* (Denying FNC motion to dismiss in favor of Russian forum: "nothing prevents a plaintiff from burdening itself with an inconvenient forum. The forum non conveniens doctrine is simply designed to relieve 'oppressiveness and vexation to a defendant,' not a plaintiff. . . . To apply the doctrine differently, and disturb a plaintiff's choice of forum based on that party's self-imposed inconvenience would be paternalistic, to say the least."). n43

n43 See also, e.g., *In re Rezulin Prods. Liab. Litig., 214 F. Supp. 2d 396, 400 (S.D.N.Y. 2002)* ("The contention that litigation otherwise more appropriately located in plaintiff's home province should be retained here for the defendants' convenience does not lie easily in plaintiff's mouth. Surely it would be more convenient for plaintiff to litigate in Quebec than here . . ."); *Close v. Holiday Inns of America, Inc., No. CIV-*

*86-189, 1987 WL 8951 at *2 (W.D.N.Y. Apr. 3, 1987)* ("The plaintiff has evidently calculated that it is worthwhile for her to bring the Ohio witnesses to New York. Because the evidentiary burden and the expense of bringing their proof to New York will be hers to bear, that calculation is hers to make unless the defendants are unduly prejudiced thereby. A defendant cannot rely on any inconvenience to the plaintiff or her witnesses to support its motion for change of venue based on forum non conveniens.").

[*85]

In its original motion papers, Eastwind failed to identify any Russian damages witnesses other than plaintiff. (See generally Dkt. No. 13: Eastwind Br.) In its supplemental papers, however, Eastwind has averred that "A. Kozlov," formerly a representative of Yellowstone's crewing agent, would testify about Stanislav's retirement pension under Russian law, as well as the average working life of a Russian seaman. (Dkt. No. 31: Arralde 12/2/02 Aff. P 9 & Ex. A: Kozlov 11/27/02 Aff. P 3.) Even if Eastwind were able to compel Kozlov's attendance in New York, the cost - in time, money and disruption - of transporting Kozlov to New York would favor trial in Russia. (See cases cited at pages 49-50 & n.42 above.)

The location of damages witnesses slightly favors trial in Russia.

### c. The Location of Defendants' Offices In New York Is Not a Significant Factor

Plaintiff asserts that defendants' shipping operations are based in New York. (See page 8 above.) Even if plaintiff is correct, it is well settled that evidence and witnesses relevant to a particular controversy are not necessarily located at a defendant's headquarters. See, e.g., *Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 129 (2d Cir. 1987)* [*86] (dismissing action despite fact that defendant was a New York corporation, certain of the alleged misrepresentations were made in New York, and certain witnesses and documents were in New York); *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416 at *10 (S.D.N.Y. Mar. 4, 1998)* (Peck, M.J.) ("The fact that [defendant] . . . has its American headquarters here is of no consequence [to FNC decision], since the tort and the resulting damage both occurred elsewhere."); *Beekmans v. J.P. Morgan & Co., 945 F. Supp. 90, 94 & n.2 (S.D.N.Y. 1996)* ("The relevant private factors strongly lean toward dismissal in favor of a Dutch forum. The mere fact that [defendant] is headquartered in New York is simply not significant enough to justify the litigation of this action in the United States."); *Nippon Fire &*

*Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 169 (S.D.N.Y. 1995)* (New York has no interest in "the claim of a foreign-owned subsidiary against an Egyptian shipper for subsequent damage to goods shipped from Louisiana to Egypt," even though plaintiff has a New York office which handles all of its U.S. claims), aff'd [*87] , *104 F.3d 351 (2d Cir. 1996); Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117, 1124-25 (S.D.N.Y. 1992)* ("Remarkably, plaintiffs have failed to point to the existence of any evidence within [the Southern District of New York] that is materially related to plaintiffs' causes of action. While defendants 'do business in New York,' it is evident that the places where they collect, test, heat treat, and process the blood products in question, as well as where they are incorporated, and maintain their principal places of business, are located elsewhere."); *Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana, 638 F. Supp. 249, 253 (S.D.N.Y. 1986)* ("Although both parties maintain offices in New York, there is minimal local interest in this controversy. . . . All of the acts complained of occurred in Colombia, . . . and all parties are foreign. . . . This points toward dismissal because courts should encourage trial of controversies in the localities in which they arise.").

Nevertheless, plaintiff is also correct that in addition to the Yellowstone's crew, certain employees in defendants' management suite may possess relevant information. [*88] Plaintiff, however, has not identified who might have what information. Indeed, since it appears that defendant Mayflower, located in Piraeus, Greece, managed or "operated" the Yellowstone, its management would be most likely to possess relevant information about any ship defects. (See, e.g., Dkt. No. 15: Lekkos 7/1/02 Aff. PP 1, 7 & Exs. D-E; Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. PP 1,6.) n44 Importantly, plaintiff does not explain what particular evidence might be obtained from defendants' New York employees. See *Saab v. Citibank, N.A., 2001 U.S. Dist. LEXIS 18115, 00 Civ. 6784, 2001 WL 1382577 at *3 (S.D.N.Y. Nov. 7, 2001)* ("Plaintiffs argue that the Southern District is more convenient and appropriate because [defendant] is the true focus of this litigation and the key witnesses and documents will be found at [defendant's New York corporate headquarters]. . . . However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing. . . . The location of witnesses and documents in this case actually favors dismissal . . ."), aff'd, *50 Fed. Appx. 469, No. 01-9417, 2002 WL 31317708 (2d Cir. Oct. 16, 2002)*. Further, [*89] Eastwind's counsel has asserted in an affidavit that "it is believed no witness who is available in New York has any knowledge concerning causation or damages." (Dkt. No. 31: Arralde 12/2/02 Aff. P 13).

n44    Mayflower's control over the Yellowstone's day-to-day operations is shown by the following:

(1) immediately after Stanislav's accident, the master of the Yellowstone sent a telex report of the accident to "Capt P. Lekkos" at Mayflower in Greece, with only a "cc" to Eastwind in New York (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 10); (2) Lekkos describes himself as the "ships' operator for Mayflower Ship Management Corporation, responsible for the M/V Yellowstone, when under management by above company" (Dkt. No. 15: Lekkos 7/1/02 Aff. P 1); (3) a report on "Eastwind Transport Ltd." dated November 20, 2001 and submitted by plaintiff states "The Russian vessels are managed out of Piraeus [Greece] by Mayflower Ship Management." (Edelman 7/15/02 Aff. Ex. 6 at 1, 3); (4) excerpts from the website of Eastwind's parent company, submitted by plaintiff, state: "Technical ship management of the Eastwind fleet is provided by [inter alia], Mayflower Ship Management of Piraeus. In particular, the Russian joint-venture vessels are managed by Mayflower, which provides training programs for Russian and FSU seafarers. Eastwind has also opened its own crew recruitment and training company in Kaliningrad." (Edelman 7/15/02 Aff. Ex. 7); (5) the Service Agreement under which Stanislav was employed states that the Yellowstone is "managed by Mayflower" (Lekkos 7/1/02 Aff. Ex. A: Service Agm't at 1); and (6) ship inspectors employed by Mayflower all reside in or near Piraeus (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. P 6).

2003 U.S. Dist. LEXIS 1424, *

[*90]

Accordingly, because the Court may not base its decision on speculation that New York-based witnesses may possess relevant information, the alleged existence of any New York-based witnesses will be deemed at best a neutral factor. n45 See, e.g., *Scottish Air Int'l, Inc. v. British Caledonian Group P.L.C., 81 F.3d 1224, 1233 (2d Cir. 1996)* ("Plaintiff's contention that the district court ignored several potential U.S. witnesses is, on this record, more wishful than real."); *Ioannides v. Marika Mar. Corp., 928 F. Supp. 374, 379 (S.D.N.Y. 1996)* (FNC dismissal despite claim by plaintiff, represented by attorney Edelman, that ship actually owned by local owner: "There is no suggestion anywhere in plaintiff's voluminous papers that there is anyone with knowledge of any of these matters in the United States. . . . Insofar as the case turns on the condition of the ship at the time it was in Piraeus and what transpired there, the bulk of the evidence - including everyone with personal knowledge - is in Greece. While [alleged local owner and executives], as plaintiffs suggest, may have received reports from Piraeus . . ., the bulk of the relevant [*91] evidence regarding the ship . . . is in Greece.").

> n45 Moreover, since any such witnesses would be Eastwind's employees and thus within Eastwind's control, this Court may condition a dismissal on defendants' agreement to make such witnesses available as required by a Russian court. See *Saab v. Citibank, N.A., No. 01-9417, 50 Fed. Appx. 467, 469, 2002 WL 31317708 at *2 (2d Cir. Oct. 16, 2002)* (affirming FNC dismissal based on condition that "defendant has agreed to make all witnesses and documents available to plaintiffs as required by an English court"); *In re Rezulin Prod. Liab. Litig., 214 F. Supp. 2d 396, 400 (S.D.N.Y. 2002)* ("First, as defendants have sought this dismissal in favor of litigation in Canada, it will be conditioned on, inter alia, their undertaking to produce in Quebec at their own expense any witnesses within their control whose presence is necessary for litigation there."); *Bastas v. Atlantic Mar. Enter. Corp., 1988 U.S. Dist. LEXIS 4372, No. Civ. A. 86-6962, 1988 WL 48547 at *2 (E.D. Pa. May 13, 1988)* ("Defendants have agreed to make persons within their control available in Greece, which eases any burden on plaintiff.").

[*92]

**d. The Location of Witnesses in Greece or China Is a Neutral Factor**

As noted in the previous section, witnesses in Mayflower's Greek offices almost certainly possess relevant information. (See pages 53-54 & n.44 above.) However, this is a neutral factor, as it is not clear, despite plaintiff's protestations, that this Court would be any more effective than a Russian court in obtaining discovery from Greek witnesses. Nevertheless, to alleviate any difficulty in obtaining such discovery, this Court will condition any dismissal order on defendants' agreement to make any relevant Greek witnesses they control, such as Captain Lekkos, available in the Russian forum. (See cases discussed at page 55 n.45 above).

The parties have also mentioned the possibility of calling Chinese witnesses, including the Chinese pilot (Dkt. No. 13: Eastwind Br. at 9; Dkt. No. 17: Edelman 7/15/02 Aff. at 15), and Eastwind asserts that the Yellowstone was inspected by "superintendents" or inspectors at various ports throughout the world (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. P 6). However, neither side seems to have taken any steps to determine the identity of such [*93] witnesses, much less their availability; indeed, the likelihood that such witnesses will ever be found seems slim. (Id.) And again, it is unclear that this forum's procedure would be more effective than the Russian forum's in obtaining such testimony. n46

> n46 For the same reasons, although neither party has raised the issue, the current location of the Yellowstone in China (Arralde 12/2/02 Aff. Ex. C: Murray Aff. P 2) is a neutral factor. Further, to the extent the parties intend to rely on expert witnesses, the location of such witnesses "is entitled to little weight." *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416 at *8 (S.D.N.Y. Mar. 4, 1998)* (Peck, M.J.); accord, e.g., *Balaban v. Pettigrew Auction Co., 1997 U.S. Dist. LEXIS 22127, 96 Civ. 3177, 1997 WL 470373 at *3 n.1 (E.D.N.Y. June 27, 1997)* ("it has repeatedly been held that 'the convenience of expert witnesses is of 'little or no significance' on a motion to transfer'"); *Brown v. Dow Corning Corp., 1996 U.S. Dist. LEXIS 6607, 93 Civ. 5510, 1996 WL 257614 at *2 (S.D.N.Y. May 15, 1996)* ("since an expert witness is paid for his or her time, 'the convenience of expert witnesses is of little or no significance on a motion to transfer'"); *Total Licensed Care, Inc. v. Aetna Life & Cas., Inc., 1993 U.S. Dist. LEXIS 14360, 92 Civ. 5817, 1993 WL 410456 at *3 (S.D.N.Y. Oct. 13, 1993)*; *Studiengesellschaft Kohle MBH v. Shell Oil Co., 1993 U.S. Dist. LEXIS 14131, 93 Civ. 1868, 1993 WL 403340 at *3 (S.D.N.Y. Oct. 8, 1993)*; *Bernal*

*v. Du Pont de Nemours E.I. & Corp., 1993 U.S. Dist. LEXIS 13308, 93 Civ. 1639, 1993 WL 378790 at \*2 (S.D.N.Y. Sept. 24, 1993); Cento Group, S.p.A., v. OroAmerica, Inc., 822 F. Supp. 1058, 1062 (S.D.N.Y. 1993); Babbidge v. Apex Oil Co., 676 F. Supp. 517, 520 (S.D.N.Y. 1987).*

[\*94]

### 2. The Location of Documents is a Neutral Factor

The ease of access to documentary proof is essentially a neutral factor. "The parties have not submitted any evidence regarding the difficulty involved in bringing the relevant documents to either forum." *Tsangaris v. Elite, Inc., 1993 U.S. Dist. LEXIS 9235, 92 Civ. 7855, 1993 WL 267425 at \*8 (S.D.N.Y. July 9, 1993).* This does not appear to be a document-intensive case. Most of the relevant documents regarding the accident or the condition of the ship appear to be located on board the ship or at Mayflower's offices in Greece. To the extent any documents are located in New York, such documents would, in any event, be in defendants' hands, and could easily be produced in Russia. See *Hughes v. John E. Graham & Sons, 1993 U.S. Dist. LEXIS 5550, No. CIV. A. 93-303, 1993 WL 133814 at \*4 (E.D. La. Apr. 21, 1993)* (Denying § 1404 transfer motion relating to action by seaman for injury aboard ship: "This is not one of those cases where the location of books and records is of paramount importance. A personal injury action such as this does not fall into the category of cases where such numerous documents are expected to be produced that their production [\*95] in another district could prove to be overly burdensome. The liability question in this case should not be much different than the typical negligent injury case, where liability is proven through the testimony of witnesses."); see also *Beekmans v. J.P. Morgan & Co., 945 F. Supp. 90, 94 (S.D.N.Y. 1996)* ("[Plaintiff's] assertion that the Memorandum may have passed through the hands of some individuals in [defendant's] New York office does not, on balance, outweigh the overwhelming inconvenience of continuing litigation in New York as compared to the Netherlands.").

### 3. Translation Costs Slightly Favor Russia

Translation costs can be an important, though not necessarily dispositive, factor in the forum non conveniens analysis. n47 The relative translation burdens in this case slightly favor Russia.

n47 See, e.g., *Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir. 1993)* ("The documentary evidence is in the Spanish language, as would be trial or deposition testimony, requiring translation to English that

would result in significant cost to the parties and delay to the court. This factor militates strongly in favor of Venezuela as a more appropriate forum for this litigation."); *Schertenleib v. Traum, 589 F.2d 1156, 1165 (2d Cir. 1978)* ("Moreover, even if the documents and witnesses could be brought here, there is a serious problem of translation. The only record of [defendant's] allegedly defamatory testimony are French minutes dictated by the Swiss judge from the simultaneous French translation of [defendant's] testimony in English. More to the point, most of the pertinent documents relevant to the underlying dispute are in French. The expense of translation, which is potentially substantial, would be totally avoided if trial is in Geneva."); *Flores v. Southern Peru Copper Corp., 253 F. Supp. 2d 510, 2002 U.S. Dist. LEXIS 13013, 00 Civ. 9812, 2002 WL 1587224 at \*26 (S.D.N.Y. July 16, 2002)* ("The principal fact witnesses, including plaintiffs and the defendant's operating personnel, are in Peru; many of the witnesses, again including plaintiffs, speak only Spanish. . . . If this case were presented to a jury in this Court, the translation requirements alone, of testimony and documents, would double the length of the trial."); *Jose Armando Bermudez & Co. v. Bermudez Int'l, 2000 U.S. Dist. LEXIS 12354, 99 Civ. 9346, 2000 WL 1225792 at \*5 (S.D.N.Y. Aug. 29, 2000)* ("While maintaining the action in this Court may require the translation of certain Spanish documents, the need for such translation 'is not a hardship of sufficient magnitude to justify dismissal.'"); *Tsangaris v. Elite, Inc., 1993 U. S. Dist. LEXIS 9235, 92 Civ. 7855, 1993 WL 267425 at \*8 (S.D.N.Y. July 9, 1993)* ("Defendants, however, have noted that all documents relevant to this case are written in Greek and that translation of these documents would cause 'delays, expenses and difficulties in communication' if this action were to proceed in a New York forum. . . . Because of the time and expense involved in translation, presentation of documentary evidence would be easier in Greek courts than in this Court."); *Zweig v. National Mortg. Bank of Greece, 1993 U.S. Dist. LEXIS 8460, 91 Civ. 5482, 1993 WL 227663 at \*8 (S.D.N.Y. June 21, 1993)* ("Finally, the large amount of translation of documents and testimony that would be required if this litigation remained in New York far outweighs the amount that would be required if the action continues in Greece."); *Petcor v. MEGA BREEZE, 1992 U.S. Dist. LEXIS 14301, No. 91- CV-1387, 1992 WL 245587 at \*4 (N.D.N.Y. Sept. 16, 1992)*

("Nonetheless, the cost of translation is but one of the many factors considered by this court in arriving at its final conclusion. In fact, the savings realized on translation costs by trying the action in this court could be offset by the expense of bringing the witnesses and documents to New York for depositions and trial."); *Karvelis v. Constellation Lines SA, 608 F. Supp. 966, 972 (S.D.N.Y. 1985)* ("Defendants argue that time and money will have to be expended to translate testimony and documents from the Greek. This may be true, but it is not a hardship of sufficient magnitude to justify dismissal."), aff'd, *806 F.2d 49 (2d Cir. 1986)*, cert. denied, *481 U.S. 1015, 107 S. Ct. 1891, 95 L. Ed. 2d 498 (1987).*

[*96]

Because Helga's affidavit submitted on this motion was translated from Russian into English (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 3), the Court assumes that her testimony would have to be translated. By contrast, "A. Kozlov," the crewing agent's representative, submitted an affidavit in English on this motion, and thus would not seem to require an interpreter. (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff.) It is unclear whether the remaining Russian-speaking witnesses would require translation. Although both the Master's initial telex report on the accident and Mr. Nuke's "statement" to investigators are in English (Dkt. No. 15: Lekkos 7/1/02 Aff. Exs. D & E), Kozlov asserts that the Master and First Mate "speak English within the scope of their profession, but not well enough to give testimony in English without the aid of an interpreter," and that Mr. Nuke and the other seamen "speaks only limited English" (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. A: Kozlov Aff. P 1). See *Petcor v. MEGA BREEZE, 1992 U.S. Dist. LEXIS 14301, 1992 WL 245587* at *4 ("Even if all witnesses were willing to testify in New York, the defendant argues that language translation from Greek to English would be needed [*97] for not only the key witnesses, but also for many documents. The court, however, is hesitant to credit this position with the weight that the defendant argues it should be given. Indeed, the majority of the documents supplied to the court, with the exception of the vessel's log, are written in English. From this it can fairly be concluded that the drafters of such documents as well as those individuals who participated in the negotiations and performance thereof, . . . are conversant in English and that translation would not be needed for these witnesses.").

On the other side of the ledger, if the case were litigated in Russia, defendants' documents (including the Service Agreement, statements to investigators, etc.) and the testimony of defendants' New York and Greek

employees would presumably have to be translated into Russian. (See Dkt. No. 17: Edelman 7/15/02 Aff. at 10.) Although defendants - and specifically Mayflower - apparently do business in Kaliningrad on a regular basis, Eastwind has offered no evidence that defendants' back-office managers speak Russian fluently enough to testify in a Kaliningrad court without a translator. Indeed, Captain Lekkos averred that he speaks [*98] English and Greek but failed to mention Russian. (Dkt. No. 31: Arralde 12/2/02 Aff. Ex. B: Lekkos 11/29/02 Aff. P 1.)

Because there are so few documents, and most of the witnesses are Russian, the overall cost of translations slightly favors the Russian forum. See *In re Bridgestone/Firestone, Inc., 190 F. Supp. 2d 1125, 1142 (S.D. Ind. 2002)* ("The best course is to weigh the amount of evidence that must be translated if the trial remains in the U.S. forum against the amount of evidence to be translated if the trial is held in a foreign forum.").

### 4. Russian Judgments are Enforceable in the U.S.

Plaintiff's Russian legal expert asserts that it is "practically impossible" to enforce Russian judgments outside Eastern Europe and the former Soviet Union. (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. P 7.) Judge Kaplan recently rejected the identical argument:

> One of plaintiffs' experts expresses concern that plaintiffs, were they to prevail in Russia, would be forced to "relitigate substantial portions of their case before a U.S. court would honor a Russian judgment against a U.S. bank in this matter." But plaintiffs' expert [*99] is a Russian lawyer with no discernable qualifications in U.S. law. The Uniform Foreign Country Money-Judgments Recognition Act, which has been adopted in New York, insofar as it is relevant here, would permit a court to refuse enforcement to a Russian money judgment only if it concluded that the Russian legal system "does not provide impartial tribunals or procedures compatible with the requirements of due process of law . . . ." In view of [defendant's] staunch assertion here that the Russian legal system provides an adequate alternative forum, it quite likely would be estopped to mount such a challenge to a Russian money judgment in this case. Moreover, at least one U.S. court has recognized and enforced a

Russian custody decree. [*Bliss v. Bliss, 733 A.2d 954 (D.C. App. 1999).]*

*Pavlov v. Bank of New York Co., 135 F. Supp. 2d 426, 435 (S.D.N.Y. 2001)* (fns. omitted), vacated on other grounds, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63516 (2d Cir. Jan. 14, 2002); see also, e.g., *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 139 F.3d 980, 982-83 (2d Cir. 1998)* [*100] (confirming Russian arbitration awards despite claims arbitral panel was corrupt tribunal); *In re Union Carbide Corp. Gas Plant Disaster, 809 F.2d 195, 203-04 (2d Cir.)* (Indian judgment would be enforceable in New York based on adoption of Uniform Foreign Money-Judgments Recognition Act), cert. denied, *484 U.S. 871, 108 S. Ct. 199, 98 L. Ed. 2d 150 (1987).*

Thus, this factor favors transfer to Russia, or at least is a neutral factor.

### 5. The Allegedly Burdensome Procedure in Russian Courts Does Not Favor the New York Forum

Plaintiff's Russian law expert asserts that even were a Russian court to entertain this action, it would be "slow, burdensome and costly," lasting "in practice" one year (and up to four years). (Dkt. No. 17: Edelman 7/15/02 Aff. Ex. 1: Kargopolov 6/6/02 Aff. P 6.) The procedure for serving summonses upon foreign defendants is burdensome and time-consuming. (Id.) All documents would have to be translated into Russian and the translation certified by a notary public. (Id.) Further, Russian courts do not have subpoena power over witnesses (including defendants) or documents outside the jurisdiction. (Id. PP 6, 9.) [*101]

Plaintiff's argument is meritless. While Russian courts may or may not be "slow, burdensome and costly," this Court has no way of comparing the two systems in terms of efficiency or speed; we have, however, already deemed the Russian courts to be an adequate alternate forum (see Point IV above). As for the Russian court's subpoena power, the only relevant witnesses not located in the Russian jurisdiction appear to be employees of defendants. Dismissal here would be conditioned on defendants submitting to the jurisdiction of the Russian court and making their employees available for trial or deposition.

### 6. On Balance, the Private Interest Factors Strongly Favor Dismissal

On balance, and giving great weight to the Russian location of the key witnesses, the evidentiary center of gravity strongly favors trial in Russia. See, e.g., *Capital Currency Exch., N.V. v. National Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998)* (FNC granted

where, inter alia, "most of the witnesses . . . reside in England, and the cost of transporting these witnesses to New York could be enormous."), cert. denied, *526 U.S. 1067, 119 S. Ct. 1459, 143 L. Ed. 2d 545 (1999);* [*102] *Murray v. British Broad. Corp., 81 F.3d 287, 293 (2d Cir. 1996)* (in copyright action arising out of contract, most of witnesses and physical and documentary evidence was located in England, such that private interests favored dismissal); *Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1001 (2d Cir.)* ("since all of the Banks' allegedly fraudulent activity occurred in Australia, most relevant documents . . . [and m]ost witnesses and other sources of proof are also located in Australia"), cert. denied, *510 U.S. 945, 114 S. Ct. 386, 126 L. Ed. 2d 334 (1993);* *In re Union Carbide Corp. Gas Plant Disaster, 809 F.2d 195, 199-200 (2d Cir.)* ("the private interests of the respective parties weigh heavily in favor of dismissal" under FNC, as "the many witnesses and sources of proof are almost entirely located in India, where the accident occurred, and could not be compelled to appear for trial in the United States"), cert. denied, *484 U.S. 871, 108 S. Ct. 199, 98 L. Ed. 2d 150 (1987);* *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 1998 WL 92416 at *8 (S.D.N.Y. Mar. 4, 1998)* (FNC dismissal where [*103] witnesses located in Netherlands and no witnesses located in New York); *Beekmans v. J.P. Morgan & Co., 945 F. Supp. 90, 93 (S.D.N.Y. 1996)* (FNC dismissal where "virtually all of the witnesses and other sources of proof are located in the Netherlands or the United Kingdom"); *Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia, 1997 U.S. Dist. LEXIS 11931, 96 Civ. 1022, 1997 WL 458753 at *5 (S.D.N.Y. Aug. 11, 1997)* (the fact that numerous witnesses and sources of proof are located in Turks & Caicos and none are located in New York weighs in favor of FNC dismissal); *Guimond v. Wyndham Hotels & Resorts, 1996 U.S. Dist. LEXIS 7255, 95 Civ. 0428, 1996 WL 281959 at *3 (S.D.N.Y. May 29, 1996)* (FNC dismissal where almost all witnesses and sources of proof are located in Jamaica and none in New York, even though one witness is located in Tennessee); *Bell v. British Telecom, 1995 U.S. Dist. LEXIS 11457, 95 Civ. 1972, 1995 WL 476684 at *3 (S.D.N.Y. Aug. 9, 1995)* (FNC dismissal where "Scotland offers superior access to documentary, physical and testimonial evidence, and consequently, a trial in Scotland is likely to be more efficient and less expensive than a comparable proceeding in New York"). n48

n48 Accord, e.g., *Becker v. Club Las Velas, 1995 U.S. Dist. LEXIS 6101, 94 Civ. 2412, 1995 WL 267025 at *3 (S.D.N.Y. May 8, 1995)* (FNC dismissal where all of defendant's witnesses are located in Mexico and plaintiff's only non-party

2003 U.S. Dist. LEXIS 1424, *

witnesses are located in the United States outside the court's 100 mile radius subpoena power), aff'd, *101 F.3d 684 (2d Cir. 1996); Penny v. United Fruit Co., 869 F. Supp. 122, 130 (E.D.N.Y. 1994)* (FNC dismissal where "virtually every significant source of proof . . . will be found in England" and no relevant witnesses are located in New York); *Lindner Fund, Inc. v. Polly Peck Int'l PLC, 811 F. Supp. 133, 136 (S.D.N.Y. 1992)* (FNC dismissal where "most of the key witnesses in [the] action . . . are all located in England" and "none of [plaintiff's] documents or witnesses are located in New York"); *Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117, 1125 (S.D.N.Y. 1992)* (FNC dismissal where, although defendants do business in New York, the activities giving rise to plaintiffs' claims, and hence most evidence, occurred outside New York); *Sussman v. Bank of Israel, 801 F. Supp. 1068, 1079 (S.D.N.Y. 1992)* (FNC dismissal where "plaintiffs have not shown that any witnesses with probative evidence to give reside in New York"), aff'd, *990 F.2d 71 (2d Cir. 1993); Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A., 638 F. Supp. 249, 252 (S.D.N.Y. 1986)* (FNC dismissal where "all evidence relating to liability [in the form of witnesses] is located outside New York, and nearly all of it is located outside of the United States").

[*104]

**B. Gilbert's Public Interest Factors Also Favor Russia**

"The Supreme Court has outlined four public interest factors to be weighed in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the 'local interest in having localized controversies decided at home;' and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *DiRienzo v. Philip Servs. Corp., 294 F.3d 21, 31 (2d Cir. 2002)* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S. Ct. 839, 843, 91 L. Ed. 1055 (1947)); accord, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6, 102 S. Ct. 252, 258 n.6, 70 L. Ed. 2d 419 (1981); Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 500 (2d Cir. 2002); Aguinda v. Texaco, Inc., 303 F.3d 470, 480 (2d Cir. 2002); Iragorri v. United Tech. Corp., 274 F.3d 65, 74 (2d Cir. 2001)* (en banc).

**1. The Choice of Law Factor Is Neutral**

The Supreme Court [*105] has counseled that:

> The doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in Gilbert, the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'" *330 U.S., at 509, 67 S. Ct. , at 843.*

*Piper Aircraft Co. v. Reyno, 454 U.S. 235, 251, 102 S. Ct. 252, 263, 70 L. Ed. 2d 419 (1981).* Although "'the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens,'" and the courts "must guard against an excessive reluctance to undertake the task of deciding foreign law," the need to apply foreign law is "relevant" to the forum non conveniens analysis. *Manu Int'l, S.A. v. Avon Prods., Inc., 641 F.2d 62, 67-68 (2d Cir. 1981)* (citation omitted). n49

> n49 Accord, e.g., *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 260 n.29, 102 S. Ct. 252, 268 n. 29, 70 L. Ed. 2d 419 (1981)* ("The need to apply foreign law . . . . alone is not sufficient to warrant dismissal. . . ."); *Alnwick v. European Micro Holdings, Inc., No. 01-7548, 29 Fed. Appx. 781, 784, 2002 WL 407940 at *2 (2d Cir. Mar. 15, 2002)* ("the District Court should keep in mind that 'the need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens.'") (quoting *Manu Int'l, S.A. v. Avon Prods., Inc., 641 F.2d at 67*); *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 492 (2d Cir. 1998)* ("While reluctance to apply foreign law is a valid factor favoring dismissal under Gilbert, standing alone it does not justify dismissal."); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd., 1998 U.S. Dist. LEXIS 12755, 97 Civ. 4646, 1998 WL 512951 at *12 (S.D.N.Y. 1998)* ("While the prospect of applying foreign law is not dispositive in favor of dismissal, . . . it is relevant.") (citation omitted).

[*106]

Contrary to plaintiff's contention (see Dkt. No. 16: Pl's Br. at 12-15), "a district court may dismiss a case on forum non conveniens grounds without first making a choice of law determination." *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 985 (S.D.N.Y. 1990)* (citing *Cruz v. Maritime Co. of Philippines, 702 F.2d 47,*

2003 U.S. Dist. LEXIS 1424, *

*48 (2d Cir. 1983)* (per curiam) ("Maritime choice of law principles are not involved in a forum non conveniens analysis and that the district court's discussion on the subject was therefore unnecessary.")). Although foreign choice of law is one factor favoring dismissal, "it is well established that a court considering a forum non conveniens motion should not engage in a complex conflict of laws inquiry." *PT United Can Co. v. Crown Cork & Seal Co., 1997 U.S. Dist. LEXIS 692, 96 Civ. 3669, 1997 WL 31194 at *10 (S.D.N.Y. Jan. 28, 1997),* aff'd, *138 F.3d 65 (2d Cir. 1998).* "While the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." *Ioannides v. Marika Mar. Corp., 928 F. Supp. 374, 379 (S.D.N.Y. 1996);* [*107] accord, e.g., *Abert Trading, Inc. v. Kipling Belgium N.V/S.A., 2002 U.S. Dist. LEXIS 3109, 00 Civ. 0478, 2002 WL 272408 at *6 (S.D.N.Y. Feb. 26, 2002)* ("While the prospect of applying foreign law is not dispositive in favor of dismissal, . . . it is relevant.") (citation omitted); *Potomac Capital Inv. Corp. v. KLM, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416 at *14 (S.D.N.Y. Mar. 4, 1998)* (Peck, M.J.) ("At this stage of the proceedings, the Court need not definitively determine what law applies, i.e., whether maritime law applies."); *Karlitz v. Regent Int'l Hotels, Ltd., 1997 U.S. Dist. LEXIS 2111, 95 Civ. 10136, 1997 WL 88291 at *4 (S.D.N.Y. Feb. 28, 1997);* *Flynn v. General Motors, Inc., 141 F.R.D. 5, 10 (E.D.N.Y. 1992)* (McLaughlin, C.J.) ("it is not immediately clear which forum's law will apply; nor is it necessary to determine this issue at this time."); *Bybee v. Oper der Standt Bonn, 899 F. Supp. 1217, 1223 (S.D.N.Y. 1995)* ("The need to apply foreign law is a factor that weighs in favor of dismissal."); *Damigos v. Flanders Compania Naviera, S.A. Panama, 716 F. Supp. 104, 108 (S.D.N.Y. 1989)* ("The necessity of conducting conflict of laws [*108] analyses, and the likely need to apply Greek law points toward dismissal.").

In *Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953),* the Supreme Court set forth the factors that are now used in determining choice of law questions in admiralty and maritime cases. See *Romero v. International Terminal Operating Co., 358 U.S. 354, 382, 79 S. Ct. 468, 485, 3 L. Ed. 2d 368 (1959)* (providing that Lauritzen test applies to Jones Act as well as general maritime cases). According to Lauritzen, the following factors are to be balanced to determine which forum's law will apply to any given claim: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured seaman; (4) allegiance of the defendant shipowner; (5) place contract of employment was made; (6) inaccessibility of foreign forum; and (7) the law of the forum. *Lauritzen v. Larsen, 345 U.S. at 583-90, 73 S. Ct. at 928-32.* Later, in *Hellenic Lines Ltd.*

*v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731, 26 L. Ed. 2d 252 (1970),* the Supreme Court added to the list of factors consideration of the shipowner's base of operations. [*109] See *id. at 309, 90 S. Ct. at 1734* (providing that "the list of seven factors in Lauritzen was not intended as exhaustive. . . . The shipowner's base of operations is another factor of importance in determining whether the Jones Act is applicable; and there well may be others."). Ultimately, before applying the Jones Act, the Second Circuit requires evidence that the defendants had "substantial contact" with the United States. See *Sango v. Plovba, 966 F. Supp. 229, 231 (S.D.N.Y. 1997)* ("Use of the Jones Act and the unseaworthiness doctrine is limited to 'suits in which the defendant has some substantial contact with the United States.'") (quoting *Koupetoris v. Konkar Intrepid Corp., 535 F.2d 1392, 1396 (2d Cir. 1976)).*

In this case, only two factors arguably favor application of the Jones Act: (1) the alleged ultimate American ownership of the vessel; and (2) defendants' alleged American "base of operations." (See page 5 above.) Of these two factors, plaintiff has a far better claim as to the first (American ownership) than the second (American base of operations). n50 If the fleet's "base of operations" is strictly defined [*110] as the location from which day-to-day operations are managed, then the base of operations for defendants' Russian fleet appears to be with Mayflower in Greece (see pages 53-54 & n.44 above). See *Fogleman v. ARAMCO (Arabian American Oil Co.), 920 F.2d 278, 284 (5th Cir. 1991)* (for Jones Act purposes, look to day-to-day operations). If, however, base of operations is defined more broadly, then it might be located in New York. See *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 984 (S.D.N.Y. 1990)* ("Various factors determine the base of operations including the location of the shipowner's home office, the location where management and day-to-day operating decisions are made, the country where the ship most frequently calls or generates the most income, and the location of the ship's home port."). n51

---

n50 Ultimate American ownership seems a strong possibility, as Charm, the nominally Liberian owner of the ship, is probably a shell corporation, and, indeed, Eastwind's parent lists the Yellowstone as an asset on its website. See *Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d 86, 92 (2d Cir. 1996)* ("The domicile and base of operations of the shipowner - favors the application of Greek law. Although the nominal shipowner, Caribene, was a Gibraltar corporation, there is little doubt that Caribene was simply a shell corporation. The actual owners of the Star of Alexandria, as distinguished from its paper

owner, were Greek. Both of Caribene's directors are Greek residents, and Palm Navigation, the company that operated the Star of Alexandria, is located in Greece. Therefore, the fifth Lauritzen factor weighs in favor of applying Greek law.") (fns. omitted), cert. denied, *520 U.S. 1274, 117 S. Ct. 2454, 138 L. Ed. 2d 212 (1997)*; *Sigalas v. Lido Mar., Inc., 776 F.2d 1512, 1518 (11th Cir. 1985)* (maritime choice of law analysis: disregarding fact that ship was nominally owned by Liberian corporation, as "over 80% of the stock in the relevant corporations is held by Greeks, who exercise complete control over the day-to-day management of the [vessel]").

[*111]

n51 Plaintiff's counsel's proof here often resembles the wild accusations (by this same counsel) rejected by other courts in this district. See *Krimizis v. Panoceanic Navigation Corp., 1985 U.S. Dist. LEXIS 13925, 83 Civ. 5667, 1985 WL 3834* at *3 (S.D.N.Y. Nov. 14, 1985) (rejecting "bald assertion" in Edelman affidavit that American citizen related to defendants "is the 'present head of the shipping conglomerate,'" and the conclusory statement that certain parties were "alterego [s]"; plaintiff "fails to establish the existence of evidence of control or beneficial ownership by American citizens or residents of Panoceanic, even upon invoking the claim that Orion is the 'alter-ego' of the Goulandris fleet.").

The "Second Circuit has suggested," without actually holding, "that American ownership alone may be sufficient to establish jurisdiction." See *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 985 & n.2 (S.D.N.Y. 1990)* (citing *Antypas v. Cia. Maritima San Basilio, S.A., 541 F.2d 307, 310 (2d Cir. 1976)* ("It appears that at least some of the stockholders of the [*112] shipowner . . . are American citizens. This contact, in and of itself, has been held sufficient to support jurisdiction under the Jones Act."), cert. denied, *429 U.S. 1098, 97 S. Ct. 1116, 51 L. Ed. 2d 545 (1977)*; *Moncada v. Lemuria Shipping Corp., 491 F.2d 470, 473 (2d Cir.)* ("In Bartholomew we suggested that American ownership alone suffices to establish Jones Act jurisdiction. . . . However, we need not rely upon this ground alone, for there are here additional contacts which, when added to American ownership, make the sum of the contacts substantial."), cert. denied, *417 U.S. 947, 94 S. Ct. 3072, 41 L. Ed. 2d 667 (1974)*; *Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 443 n.4 (2d Cir.), cert. denied, 359 U.S. 1000, 79 S. Ct.*

*1138, 3 L. Ed. 2d 1030 (1959)).* Here, plaintiff has made colorable arguments for both American ownership and American base of operations. On the present record, therefore, the Court concludes that the Jones Act may apply to this case. Cf. *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. at 989-91* (even though FNC "private interest factors point strongly [*113] toward dismissal," denying dismissal to determine "the extent of the defendants' shipping business in the United States and whether the [vessel] has an American base of operations"); *Ioannides v. Marika Mar. Corp., 928 F. Supp. 374, 378-80 (S.D.N.Y. 1996)* (granting FNC motion because private and public factors strongly favored dismissal; even assuming American base of operations, "there is at least a substantial possibility that foreign law will govern," where "case [was] brought on behalf of Greek seamen who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-U.S. ports," parties had Greek forum and choice of law clauses, and some claimants had already settled in Greece); *Tsangaris v. Elite, Inc., 1993 U.S. Dist. LEXIS 9235, 92 Civ. 7855, 1993 WL 267425* at *8-9 (S.D.N.Y. July 9, 1993) (granting FNC motion as private and public factors heavily favored Greek forum; Greek forum selection clause and choice of law clause in contract required Greek law, so Jones Act would not apply; Hellenic Lines was distinguishable because "plaintiffs have failed to show that the defendant [*114] corporations mainly operate out of New York or that any United States domiciliary owns the defendant corporations.").

Accordingly, because it is unclear whether the law to be applied in this case is foreign or U.S. maritime law, the choice of law factor is essentially neutral.

## 2. Russia Has a Strong Interest in This Action, While New York's Interest Is Attenuated

Russia, and particularly Kaliningrad, has a strong interest in this dispute: (1) Stanislav was a resident of Kaliningrad; (2) Stanislav was hired in Kaliningrad; (3) the ship apparently made home port in Kaliningrad; (4) the ship had an all-Russian crew; and (5) plaintiff Helga - Stanislav's widow and beneficiary - resides in Kaliningrad. See, e.g., *Murray v. British Broad. Corp., 81 F.3d 287, 293 (2d Cir. 1996)* (FNC dismissal: "The crux of the matter, therefore, involves a dispute between British citizens over events that took place exclusively in the United Kingdom. . . . The United States thus has virtually no interest in resolving the truly disputed issues."); *Valarezo v. Ecuadorian Line, Inc., 2001 U.S. Dist. LEXIS 8942, 00 Civ. 6387, 2001 WL 740773* at *5 (S.D.N.Y. June 29, 2001) ("There is nothing [*115] local about [plaintiff's] claim and this jurisdiction has no interest in it. Ecuador has a far greater interest in

adjudicating disputes between its own seamen and a foreign-flagged vessel over an incident that occurred on international waters. Dismissal in favor of an Ecuadorian forum is also favored by the burden this case will impose on this court 'relative to the forum's minimal interest in the controversy.'"); *Tsangaris v. Elite, Inc., 1993 U.S. Dist. LEXIS 9235, 92 Civ. 7855, 1993 WL 267425* at *9 (S.D.N.Y. July 9, 1993) ("Plaintiffs have not shown how this Court and the United States have any interest in this action between a Greek seaman and his Greek employer arising out of an incident occurring on the high seas . . . . Greek courts, unlike this Court, have much interest in resolving this dispute which partially involves interpreting a contract executed in Greece between Greek citizens and under Greek law and which determines whether a Greek citizen will be compensated for his injuries."); *Damigos v. Flanders Compania Naviera, S.A. Panama, 716 F. Supp. 104, 109 (S.D.N.Y. 1989)* (Leval, D.J.) ("Greece has a strong interest in the well-being of Greek seamen and Greek vessels, [*116] generally, and in this action in particular. . . . Conversely, the United States has no interest in adjudicating disputes involving Greek seamen employed on Greek flag vessels in foreign waters, and has no interest in this action."); *Doufexis v. Nagos S.S., Inc., 583 F. Supp. 1132, 1134 (S.D.N.Y. 1983)* ("The decedent was Greek and was employed on a Greek flag ship at the time of his death. His widow and children are Greek. It is obvious that Greece has a more substantial interest in the resolution of this dispute.").

By contrast, the action's only connection to this forum is that the ship is allegedly owned by New York residents and defendants allegedly base their shipping operations here, although the Yellowstone appears to have been managed on a day-to-day basis from Greece. The fact that defendants may have their headquarters or base of operations here would ordinarily carry little weight, as the tort and the resulting damage both occurred elsewhere. See cases cited in Point V.B.1., above; see also, e.g., *Alfadda v. Fenn, 159 F.3d 41, 46 (2d Cir. 1998)* ("This case involves a dispute between a Netherlands Antilles corporation and Saudi [*117] Arabian shareholders over the conduct of a French bank. Thus, France has a far greater interest in this litigation than the United States."); *Villar v. Crowley Mar. Corp., 782 F.2d 1478, 1483 (9th Cir. 1986)* (Jones Act suit by family members of a Philippine sailor who drowned in Saudi Arabian waters while working on a Philippines-flagged ship owned by Americans was dismissed for forum non conveniens. "The Philippines has a powerful interest in deciding the controversy because of its strong contacts with both the decedent and the [plaintiffs], and [the] American jurors and court personnel have little interest in this controversy."); *Saab v. Citibank, N.A., 2001 U.S. Dist. LEXIS 18115, 00 Civ. 6784, 2001 WL 1382577* at *5 (S.D.N.Y. Nov. 7, 2001) (FNC dismissal:

"Although [defendant's] headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign . . . . Though Plaintiff alleges that there are other, unknown witnesses, mere allegations are not sufficient to connect the community to litigation."), [*118] aff'd, *50 Fed. Appx. 469, No. 01-9417, 2002 WL 31317708* (2d Cir. Oct. 16, 2002). n52

n52 See also, e.g., *Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974 (2d Cir. 1993)* (upholding FNC dismissal in action between Venezuelan litigants in which the only connection to the local forum was the fact that payments were to be made in dollars in New York); *Abert Trading, Inc. v. Kipling Belgium N.V/S.A., 2002 U.S. Dist. LEXIS 3109, 00 Civ. 0478, 2002 WL 272408* at *5-6 (S.D.N.Y. Feb. 26, 2002) (FNC dismissal: "The Agreement was made for the distribution and sale of Belgium goods which were packed for shipment in Belgium . . . [and] shipped directly from Belgium to Central and South America. . . . The fact that [plaintiff] is a New York corporation does not, by itself, vest this forum (and its jurors) with an interest in this litigation."); *Guimond v. Wyndham Hotels & Resorts, 1996 U.S. Dist. LEXIS 7255, 95 Civ. 0428, 1996 WL 281959* at *5 (S.D.N.Y. May 29, 1996) (FNC dismissal in case involving swimming pool accident in Jamaica, where "the Court is unable to find that New York has even the most attenuated connection to the instant action"); *Becker v. Club Las Velas, 1995 U.S. Dist. LEXIS 6101, 94 Civ. 2412, 1995 WL 267025* at *4 (S.D.N.Y. May 8, 1995) (FNC dismissal in case involving boating accident in Mexico where "New York has no real connection to the action" between New Jersey plaintiffs and Mexican defendant), aff'd, *101 F.3d 684 (2d Cir. 1996); Noto v. CIA Secula di Armanento, 310 F. Supp. 639, 647-48 (S.D.N.Y. 1970)* (Weinfeld, D.J.) (FNC dismissal in case involving the explosion of an Iranian oil tanker where "not a single contact within this district justifies the filing of these lawsuits here").

[*119]

The Court notes that plaintiff's counsel, Paul Edelman, often tries to bring in this Court maritime cases involving foreign plaintiffs injured or killed on foreign vessels in foreign waters, and that most such cases have been dismissed on forum non conveniens grounds. It is

2003 U.S. Dist. LEXIS 1424, *

useful to quote extensively from Judge Kaplan's decision in one such case brought by Mr. Edelman:

> There is a final public interest consideration that bears more than passing mention. This is a case brought on behalf of Greek seamen who shipped aboard a Liberian vessel crewed by a Greek company which, wherever its ownership lay, was engaged exclusively in carrying cargos to and from non-U.S. ports. There are fora and remedies available to plaintiffs under the law of their country of domicile. Three of them already have settled their claims for sums which are substantial, even if they perhaps might seem low by American standards. There seems little justification for opening the courts of the United States - which are paid for by U.S. taxpayers and whose juries are composed of U.S. citizens asked to drop their everyday activities to serve - to claims in these circumstances even if, as plaintiffs [*120] stoutly argue, the ultimate base of operations of the vessel in question was the United States. That no doubt is why judges of this Court repeatedly have dismissed cases like this one - all brought by the same attorney [Edelman] - in favor of Greek fora. E.g., *Damigos, 716 F. Supp. 104; Tsangaris v. Elite Inc., 1993 U.S. Dist. LEXIS 9235, No. 92 Civ. 7855 (RPP), 1993 WL 267425* (S.D.N.Y. July 9, 1993); *Geralis v. Westwind Africa Line, Ltd.*, No. 84 Civ. 4310 (DNE) (S.D.N.Y. Apr. 19, 1989); *Hasakis v. Trade Bulkers, Inc., 690 F. Supp. 260 (S.D.N.Y. 1988); Kassapas v. Arkon Shipping Agency, Inc., 578 F. Supp. 400 (S.D.N.Y. 1984); Doufexis v. Nagos S.S. Inc., 583 F. Supp. 1132 (S.D.N.Y. 1983); Krimizis v. Panoceanic Navigation Corp., 1985 U.S. Dist. LEXIS 13925*, No. 83 Civ. 5667(JFK), *1985 WL 3834* (S.D.N.Y. Nov. 14, 1985).
>
> *Rhoditis* is not to the contrary. The injury there in question occurred in the United States, and the vessel was engaged in carrying cargoes to and from U.S. ports. The interest of the United States in providing a remedy and a forum in that case was far greater than it is here, and it is important [*121] to note that the case did not even involve the question whether a forum non conveniens dismissal was

appropriate. The public interest factors thus weigh heavily in favor of dismissal.

*Ioannides v. Marika Mar. Corp., 928 F. Supp. 374, 380 (S.D.N.Y. 1996)* (emphasis added). Here, too, the fact that Russia has a strong interest in this action, and any New York interest is attenuated at best, strongly favors FNC dismissal.

**3. The Court Administration Factor Favors Russia**

Considerations of court congestion favor neither party, as there is no evidence that this Court is more congested than Russian courts. See, e.g., *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 500 (2d Cir. 2002)* ("Court congestion is no more a problem in the Ukraine than it is here. . . . "); *DiRienzo v. Philip Services Corp., 294 F.3d 21, 31 (2d Cir. 2002)* ("Ontario courts, like the Southern District of New York, suffer from congestion."); *Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 147 n.5 (2d Cir. 2000)* (The "criterion regarding the administrative and legal problems of the chosen court [*122] has no application here. Although the district court noted that the Southern District of New York is 'heavily overburdened,' the recent filling of all judicial vacancies and the resulting full complement of judges for the District makes this concern of little or no present significance."). n53

> n53 Accord, e.g., *Saab v. Citibank, N.A., 2001 U.S. Dist. LEXIS 18115, 00 Civ. 6784, 2001 WL 1382577* at *5 (S.D.N.Y. Nov. 7, 2001) ("Though it remains a factor to be considered, court congestion does not affect the analysis in this case."), aff'd, *50 Fed. Appx. 469, No. 01-9417, 2002 WL 31317708* (2d Cir. Oct. 16, 2002); *Ingram Micro, Inc. v. Airoute Cargo Express, Inc., 2001 U.S. Dist. LEXIS 2912, 99 Civ. 12480, 2001 WL 282696* at *5 (S.D.N.Y. Mar. 22, 2001) (finding relative court congestion to be neutral factor where defendant "offered no evidence that [Ontario courts are] any less busy" than courts of this district).

Nevertheless, plaintiff's overseas location and multiple layers of representation are likely to cause pretrial and trial [*123] inefficiencies. Plaintiff is currently represented by three levels of counsel: Lithuanian/Russian, Greek, and American. (See pages 8-9 & n.9 & page 10 n.11 above.) Plaintiff's American counsel has admitted that he has never spoken directly to his "client," and was retained by overseas counsel. (Dkt.

2003 U.S. Dist. LEXIS 1424, *

No. 12: 5/31/02 Hearing Tr. at 19.) Pretrial administration of this action is likely to be complicated by the fact that American counsel, in order to communicate with his client, will have to deal with several layers of intermediary lawyers. n54 Trial in Russia, involving only one plaintiff's lawyer, likely will be far more efficient. n55

    n54 As an illustration, this Court recently learned that plaintiff did not receive her $ 49,000 benefit check until nearly two months after it was delivered to plaintiff's American counsel. Determining the cause of the delay required affidavits from three sets of attorneys. (See page 10 n.11 above.) This does not bode well for an efficient pretrial management of this action. See *Cuevas v. Reading & Bates Corp.*, 577 F. Supp. 462, 466 (S.D. Tex. 1983) (Choice of law analysis. "The Philippine courts are substantially more accessible to these Plaintiffs than are the courts of this nation. This fact has been strikingly illustrated in the present litigation by the apparent inability of attorney for Plaintiffs to communicate effectively with his clients. . . . "), aff'd, 770 F.2d 1371 (5th Cir. 1985).
[*124]

    n55 The court administration factor is compounded by the fact that trial will require translation of a certain amount of testimony. See *Transunion Corp. v. Pepsico, Inc.*, 640 F. Supp. 1211, 1216 (S.D.N.Y. 1986) ("While certainly not decisive, language may be a barrier to swift adjudication in this District. . . . Many of the witnesses who reside in the Philippines speak Tagalog, a Philippines dialect, as their primary language."), aff'd, 811 F.2d 127 (2d Cir. 1987); *Flores v. Southern Peru Copper Corp.*, 253 F. Supp. 2d 510, 2002 U.S. Dist. LEXIS 13013, 00 Civ. 9812, 2002 WL 1587224 at *28 (S.D.N.Y. July 16, 2002) ("public interest factors strongly counsel dismissing this action in favor of Peru," because, inter alia, "the testimony and documents would pose formidable translation requirements").

### 4. The Jury Duty Factor Strongly Favors Russia

    As the Supreme Court observed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), "jury duty is a burden that ought not to be imposed upon the people of a community which has no relation [*125] to the litigation." *Id.* at 508-09, 67 S. Ct.

at 843. This action's connection to this forum is far too attenuated to justify burdening our citizens with jury duty. See, e.g., *Trigano v. Bain & Co.*, No. 97-7475, 182 F.3d 901 (table), 1999 WL 464991 at *1 (2d Cir. June 29, 1999) (FNC dismissal upheld where contract executed in France and most witnesses were in France, not New York, and no actions were taken in New York; "The interest in having local disputes settled locally, in avoiding complications of applying foreign law, and in avoiding burdening New York jurors with a case that has no impact on their community all weigh heavily against New York as a forum in this case."); *Alfadda v. Fenn*, 159 F.3d 41, 46-47 (2d Cir. 1998) ("The interest in protecting jurors from sitting on cases with no relevance to their own community weighs heavily in favor of France. This suit involves . . . plaintiffs' investment in a Netherlands Antilles holding company that owned a French-licensed bank. . . . Thus, French jurors have a more significant interest in this case than American jurors."); *Pavlov v. Bank of New York Co.*, 135 F. Supp. 2d 426, 437 (S.D.N.Y. 2001) [*126] ("This is a private dispute about monetary loss allegedly suffered by depositors in a Russian bank. There is little justification for imposing it on U.S. courts and jurors."), vacated on other grounds, No. 01-7434, 25 Fed. Appx. 70, 2002 WL 63516 (2d Cir. Jan. 14, 2002); *Potomac Capital Inv. Corp. v. KLM*, 1998 U.S. Dist. LEXIS 2343, 97 Civ. 8141, 1998 WL 92416 at *11 (S.D.N.Y. Mar. 4, 1998) (Peck, M.J.); *Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia*, 1997 U.S. Dist. LEXIS 11931, 96 Civ. 1022, 1997 WL 458753 at *6 (S.D.N.Y. Aug. 11, 1997) ("to require New York's citizens to serve as jurors merely because some wire transfers passed through [defendant's] New York branch would be inappropriate"); *MTS Secs., Inc. v. Creditanstalt-Bankverein*, 1997 U.S. Dist. LEXIS 6683, No. 96- CV-0567E, 1997 WL 251482 at *6 (W.D.N.Y. May 1, 1997) ("because Austria has a far greater interest in [the] case than does the United States, the burdens of jury duty should fall upon Austrian citizens and the burdens of administering this case should fall on Austrian courts"); *Guimond v. Wyndham Hotels & Resorts*, 1996 U.S. Dist. LEXIS 7255, 95 Civ. 0428, 1996 WL 281959 at *5 (S.D.N.Y. May 29, 1996) (Since "the Court is unable to find that [*127] New York has even the most attenuated connection to the instant action . . . [,] it would be unjust to require New York's citizens to serve as jurors in an action so wholly devoid of local interest."). n56

    n56 Accord, e.g., *Beekmans v. J.P. Morgan & Co.*, 945 F. Supp. 90, 95 (S.D.N.Y. 1996) ("The Court and the jurors of this country ought not to be burdened with deciding a case with so little relation to the United States."); *Bell v. British Telecom*, 1995 U.S. Dist. LEXIS 11457, 95 Civ.

2003 U.S. Dist. LEXIS 1424, *

*1972*, 1995 WL 476684 at *3 (S.D.N.Y. Aug. 9, 1995) ("The courts in this District, already laden with litigation, and the New York community, have no interest in settling a dispute between Nevada residents and a British corporation arising out of an incident that occurred in Scotland."); *Doe v. Hyland Therapeutics Div., 807 F. Supp. 1117, 1128 (S.D.N.Y. 1992)* ("Tenuous contacts do not justify the significant administrative costs that stand to be levied upon this Court, or the burden of jury duty expected to be thrust upon a community substantially distanced from the controversy. . . . That this Court sits in 'one of the busiest districts in the country,' . . . is undeniable, making this one of the 'congested centers' of litigation referred to in Gilbert. . . . The need to guard our docket from disputes with little connection to this forum is clear. . . .") (citations omitted); *Noto v. Cia Secula di Armanento, 310 F. Supp. 639, 649 (S.D.N.Y. 1970)* ("The plaintiffs' asserted claims have no relationship to or contact with this district. . . . The doctrine of forum non conveniens protects not only the immediate defendant from harassing and vexatious litigation, but also other litigants and the community at large from unwarranted imposition upon the local courts' jurisdiction."); *Gazis v. John S. Latsis (USA) Inc., 729 F. Supp. 979, 989 (S.D.N.Y. 1990)* ("The Supreme Court has severely discouraged the adjudication of disputes that have only a minimal contact with this country since it hampers the courts' ability to give speedy relief to those parties properly before them.").

[*128]

### C. Balancing the Private and Public Interest Factors Strongly Favors Trial in Russia

The Court concludes that the private and public interest factors, balanced together, weigh strongly in favor of trial of this action in Russia. n57

n57 Indeed, the private convenience and public interest factors weigh so heavily in favor of trial in Russia that the action should be dismissed even if, contrary to my recommendation, Judge Wood were to hold that

the plaintiff's choice of forum should be granted strong, rather than diminished, deference.

### CONCLUSION

Accordingly, Eastwind's forum non conveniens motion should be GRANTED and the case dismissed without prejudice on defendants' filing of the undertaking (consent to suit in Russia, waiver of statute of limitations defense, and agreement to make defendants' witnesses available in Russia) called for in this Report and Recommendation.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* [*129] and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6*. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993),* cert. denied, *513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.),* cert. denied, *506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);* [*130] *McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).*

Dated: New York, New York

February 3, 2003

Respectfully submitted,

**Andrew J. Peck**

United States Magistrate Judge

# 17

**WELL-MADE TOY MFG. CORP., Plaintiff, - against - LOTUS ONDA INDUSTRIAL CO., LTD. and LILLIAN VERNON CORPORATION, Defendants.**

**00 Civ. 9605 (DFE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 789*

**January 16, 2002, Decided
January 17, 2002, Filed**

**DISPOSITION:**    [*1]    Lotus Onda's motion for summary judgment granted. Plaintiff's belated motion to compel further discovery denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, toy maker and patent holder, sued defendants, a domestic import corporation and a foreign manufacturer, for copyright infringement under *17 U.S.C.S. § 101* et seq. The foreign manufacturer moved to dismiss. The toy maker moved to compel further discovery.

**OVERVIEW:** The toy maker held a patent for a fabric design. The foreign manufacturer made toy doll strollers, using fabric with the copyrighted design, that it sold to the importer in Hong Kong, which the importer then shipped to the United States. First, the court noted that the strollers were sold by the manufacturer in Hong Kong, and the copyright laws generally did not have extra-territorial application. Applying that principle, the manufacturer could not be liable for direct infringement given the absence of a predicate act in the States. Second, sending samples directly to the United States did not constitute an act of direct infringement. Third, there was no basis for finding the manufacturer vicariously liable, since the manufacturer never had control over, or a financial stake in, the importer. Fourth, there was no basis for contributory infringement by the manufacturer who had neither actual nor constructive knowledge that the importer was infringing a copyright. Plus, the importer had replaced the fabric before it sold any of the strollers. Finally, because the request for additional discovery sought information about matters other than the subject lawsuit, it was denied.

**OUTCOME:** The court granted summary judgment to the foreign manufacturer and denied the toy maker's motion to compel further discovery.

**COUNSEL:** For WELL-MADE TOY MFG., CORP., plaintiff: Gerard F. Dunne, Law Office of Gerald F. Dunne, P.C., New York, NY.

For LOTUS ONDA INDUSTRIAL CO., LTD., LILLIAN VERNON CORPORATION, defendants: Nelson M. Stern, New York, NY.

**JUDGES:** DOUGLAS F. EATON, United States Magistrate Judge.

**OPINION BY:** DOUGLAS F. EATON

**OPINION:**

MEMORANDUM AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

Well-Made Toy Corp. ("Plaintiff"), a New York corporation with its principal place of business in Queens, has brought this copyright infringement action against two defendants, the Lillian Vernon Corporation ("Lillian Vernon"), a Delaware corporation with its principal place of business in Rye, New York, and Lotus Onda Industrial Co., Ltd. ("Lotus Onda"), a Hong Kong corporation with its principal place of business in Hong Kong. Plaintiff's suit arises under the copyright statute, *17 U.S.C. § 101* et seq.; it invokes the jurisdiction of our court pursuant to *28 U.S.C. § 1338*(a).

Plaintiff manufactures and sells "soft sculpture plush toys and dolls, [*2] " some of which "are created and designed by Well-Made." (Cplt. P9.) In 1997, Plaintiff

Exhibit A  392

received a U.S. copyright for "an original design[] of printed fabric . . . known as 'Quilted Hearts.'" (Copyright Registration is attached to Cplt.) In 2000, Lotus Onda made toy doll strollers in Hong Kong; the fabric carried the design copyrighted by Plaintiff. Lotus Onda sold the strollers in Hong Kong to Lillian Vernon, which then shipped the strollers to its inventory in the U.S.

Plaintiff served the complaint on Lillian Vernon on January 5, 2001, and served Lotus Onda by serving its president, Daniel Chan, on February 8, 2001 "while he was temporarily in New York to attend the Toy Fair." (3/29/01 letter from Nelson Stern to Judge Koeltl.) Both defendants are represented by the same law office. Counts II and III were dismissed by stipulation dated April 4 and so ordered by Judge Koeltl on April 9, 2001.

Judge Koeltl's 4/11/01 Scheduling Order provided: "No procedural motions shall be filed or heard after 6/20/01. All discovery shall be commenced in time to be completed by 7/13/01." Discovery included document production, at least five depositions of Lillian Vernon employees, and a deposition [*3] of Lotus Onda's president on May 7, 2001. On May 29, the attorneys signed a consent form to transfer the case to me pursuant to *28 U.S.C. § 636*(c).

On June 11, 2001, Lotus Onda served a motion for summary judgment as to defendant Lotus Onda, with an affidavit of Daniel Chan, an affirmation of Gerald D. Stern, a Local Civil Rule 56.1 statement and a memorandum of law. On July 5, Plaintiff filed a declaration of Gerard F. Dunne with Exhibits, a reply 56.1 statement and a memorandum of law less than five pages long. Lotus Onda served a reply memorandum of law on July 9, 2001.

Well after the 6/20/01 deadline for procedural motions, Plaintiff served a letter motion dated July 4, 2001, complaining that Lotus Onda's president had refused to answer some questions two months earlier. Defense counsel replied by letter dated July 10, 2001.

Direct Infringement

A finding of direct (or "primary") infringement under the U.S. copyright law must be based, at least in part, on a predicate infringing act in the United States. "It is well established that the copyright laws generally do not have extra-territorial application." *Update Art, Inc. v. Modiin Publishing, Ltd., 843 F.2d 67, 73 (2d Cir. 1988).* [*4] Applying that principle to the facts of this case, Lotus Onda cannot be found liable for direct infringement given the absence of a predicate act in the U.S.

Lotus Onda sent some samples directly to Lillian Vernon in the U.S. Plaintiff cites no authority that samples constitute an act of direct infringement. After

Lillian Vernon placed an order, the strollers were delivered to Lillian Vernon in Hong Kong. Plaintiff does not dispute the following portions of Lotus Onda's Rule 56.1 statement:

6. Defendant Lotus Onda had bought the fabric in the open market in Hong Kong from its regular Hong Kong fabric supplier.

7. Defendant Lotus Onda sold the strollers to defendant Lillian Vernon in Hong Kong.

8. The orders from Lillian Vernon were received and filled in Hong Kong which is where the goods were delivered by defendant Lotus Onda to defendant Lillian Vernon.

9. The buyer arranged for shipment of the strollers to its warehouse in the United States at Virginia Beach, VA.

10. Defendant Lotus Onda did not make any of the strollers in the United States . . . .

* * *

14. There is no distributorship or similar arrangement between the defendants.

15. Defendant Lotus Onda is not the [*5] parent of defendant Lillian Vernon or even a shareholder.

16. The two defendants are not affiliates.

Third-party Liability

In *Ez-Tixz, Inc. v. Hit-Tix, Inc., 919 F. Supp. 728 (S.D.N.Y. 1996),* Judge Koeltl outlined the copyright law governing third-party liability:

. . . There are two doctrines that establish third-party liability in copyright law: contributory infringement and vicarious liability.

Contributory infringement liability is based upon the defendant's relationship to the direct infringement: if the defendant was implicated in the acts constituting the direct infringement it may be held liable for contributory infringement. "One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may

2002 U.S. Dist. LEXIS 789, *

be held liable as a "contributory infringer.'" . . . Constructive knowledge is sufficient to establish liability. . . .

In contrast, vicarious liability rests not on the defendant's relationship to the direct infringement but rather on the defendant's relationship to the direct infringer. . . . There are only two elements of vicarious liability: (1) the ability to control the infringer [*6] and (2) a financial interest in the infringing activities.

*919 F. Supp. 728, 732-33.* (citations omitted).

In the case at bar, there is no vicarious liability; it is not alleged that Lotus Onda ever had control over Lillian Vernon or a financial stake in that company.

Thus, the only remaining theory for imposing liability upon Lotus Onda would be contributory infringement. That would require actual or constructive knowledge, that Lotus Onda knew, or should have known, that Lillian Vernon was infringing a copyright. The complaint asserts that Lotus Onda "induced" the infringement and acted "with knowledge." But Lotus Onda denies it had any knowledge of the copyright until it was informed by Lillian Vernon that Plaintiff had complained:

18. Neither of the defendants had any knowledge of plaintiff's alleged copyright or use of the fabric until defendant Lillian Vernon received a letter from plaintiff's lawyer on November 15, 2000, which defendant Lillian Vernon referred to defendant Lotus Onda.

(Def. 56.1 St. P 18.) Plaintiff's response is:

Well-Made does not contest this assertion for purposes of the summary judgment motion.

(Pl. [*7] Reply to 56.1 St. P 18.)

"Grant or denial of summary judgment dismissing claims of contributory liability turns on the ability of the plaintiff to allege sufficient knowledge on the part of the defendant." *Livnat v. Shai Bar Lavi, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* at *4 (S.D.N.Y. Feb. 2, 1998)(Sweet, J.) Plaintiff relies entirely on *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co., 782 F. Supp. 763 (W.D.N.Y. 1991).* In that case, however, Gerolsteiner shipped the product through its agent (Miller & Co.) into the U.S. Moreover, before Gerolsteiner and Miller broke with plaintiff, Gerolsteiner knew that plaintiff was claiming a U.S. copyright; Gerolsteiner agreed to change its labels by adding the notation "Copr. 1988 FAMG," and FAMG was the acronym for plaintiff's corporate predecessor. *Id. at 766.*

In the case at bar, the following is undisputed. (See Dunne Decl., Exh. JJ and Exh. V.) Plaintiff did not notify either of the defendants about its copyright until it sent a letter by Airborne Express to Lillian Vernon on November 13, 2000. Lillian Vernon faxed the letter to Lotus Onda sometime on November 15; it was 13 hours later according to Hong [*8] Kong time, and therefore Lotus Onda probably did not read it until November 16.

Plaintiff tries to salvage its case by asserting that Lotus Onda, after being informed that the fabric was copyrighted, "continued to induce and contribute to the sales of strollers bearing the accused fabric. . ." (Pl. Reply to 56.1 St. P 20) However, as evidence to support this conclusory statement, Plaintiff offers only a partially legible copy of a Purchase Order from Lillian Vernon to Lotus Onda, ordering 1,148 strollers for $ 12,628. (Dunne Decl., Exh. II.) On the order, Lillian Vernon wrote: "Item must be ready by 11/15 or we will not accept shipment. Will ship by air." The clear implication of the first sentence is that Lotus Onda was required to have this batch of strollers ready on or before November 15. This was before Lotus Onda received notice about Plaintiff's copyright. Plaintiff does not dispute that all of the strollers were delivered to Lillian Vernon in Hong Kong. (Pl. Reply to 56.1 St. P 8.) A purchase order by itself is not proof of shipment. However, on December 21, Lotus Onda shipped 1,150 sets of replacement fabric for $ 920. (Dunne Decl., Exh. W.) Because the number of sets is [*9] nearly identical, it seems clear that Lillian Vernon did ship the 1,148 strollers from Hong Kong to the U.S. But there is no evidence that Lillian Vernon sold any of those 1,148 strollers before receiving and installing non-infringing replacement fabric.

Plaintiff does not dispute Lotus Onda's 56.1 Statement, PP 21 and 22:

21. After learning of plaintiff's copyright, defendant Lotus Onda ceased to sell the stroller with the fabric in issue.

22. Defendant Lotus Onda also arranged to send to defendant Lillian Vernon replacement fabric for the strollers that were still in Lillian Vernon's inventory.

2002 U.S. Dist. LEXIS 789, *

Plaintiff merely complains that Lotus Onda waited until December 21 until sending the replacement fabric. The five-week delay seems immaterial. As noted above, Plaintiff offers no evidence that Lillian Vernon sold any of the 1,148 strollers before receiving and installing the replacement fabric.

Given the undisputed facts in this case, there is no conduct by Lotus Onda that would support a finding of contributory liability, even if a jury were to find that Lillian Vernon infringed Plaintiff's copyright. *See R&R Recreation Products, Inc. v. Joan Cook Incorporated, 1992 U.S. Dist. LEXIS 5176, 1992 WL 88171*, at *3 (S.D.N.Y. 1992)(Martin, J.) [*10] (participation in the infringing activity must be "substantial").

In sum, Plaintiff has not provided "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *R & R Recreation, 1992 U.S. Dist. LEXIS 5176* at *2, quoting *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. Thus Lotus Onda is entitled to summary judgment.

Motion to Compel Further Discovery

Plaintiff took the deposition of Mr. Chan in New York on May 7, 2001. By letter dated July 4, Plaintiff requests that I compel Lotus Onda to produce various documents and answers to questions that were not provided at Mr. Chan's deposition. I deny the motion for two reasons. It was served after Judge Koeltl's June 20 deadline for procedural motions. Moreover, it appears that Plaintiff was merely seeking to learn about other U.S. companies it could sue. "When the purpose of a discovery request is to gather information in proceedings other than the pending suit, discovery should be denied." *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 1997 U.S. Dist. LEXIS 1272, 1997 WL 53184, *5 (S.D.N.Y. Feb. 11, 1997) (Sweet, J.), citing* [*11] *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 352, n. 17, 98 S. Ct. 2380, 2390 n. 17, 57 L. Ed. 2d 253 (1978)*.

Lotus Onda's motion for summary judgment is granted. Plaintiff's belated motion to compel further discovery is denied. Upon receipt of this Memorandum and Order, the attorneys for Plaintiff and for Lillian Vernon should place a conference call to my law clerks at (212) 805-6175 to set deadlines (for service of Plaintiff's portions of the pre-trial order, and then Lillian Vernon's portions, and then the joint pre-trial order) and also to set a firm trial date.

DOUGLAS F. EATON

United States Magistrate Judge

Dated: New York, New York

January 16, 2002