# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUY CARPENTER & COMPANY, LLC and MARSH & McLENNAN COMPANIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JULIAN SAMENGO-TURNER, RON WHYTE, and MARCUS HOPKINS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 07 – CV- 3580 (DC) |

## DEFENDANT RON WHYTE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR EXPEDITED DISCOVERY

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

*Attorneys for defendant Ron Whyte*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF ALLEGATIONS AND COUNTERSTATEMENT OF FACTS ..........................3

DEFENDANTS HAVE NO CONNECTION TO NEW YORK...................................................3

PLAINTIFFS ARE SUBJECT TO THE LAWS OF THE UNITED KINGDOM..........................4

REMEDIES TO GC UNDER ITS INCENTIVE PLAN MUST BE PURSUED IN THE
U.K..................................................................................................................4

THE CONDUCT ALLEGED BY PLAINTIFFS ONLY OCCURRED WITHIN THE
UNITED KINGDOM .........................................................................................5

DEFENDANTS RESPONDED TO GC'S DEMANDS..........................................................6

THE PUBLIC COMMENTS OF MMC'S CEO AND COO CONTRADICT THE
ALLEGATIONS OF IRREPARABLE HARM .................................................................8

PLAINTIFFS' COMPLAINT MUST BE ADDRESSED UNDER ENGLISH LAW .................9

ARGUMENT......................................................................................................10

II.    EXPEDITED DISCOVERY SHOULD BE DENIED UNTIL THE
       SIGNIFICANT JURISDICTIONAL AND VENUE ISSUES ARE RESOLVED ...........10

III.   PLAINTIFFS' APPLICATION SHOULD BE DENIED BECAUSE
       PLAINTIFFS' HAVE FAILED TO DEMONSTRATE THAT THEY WILL
       SUFFER IRREPARABLE INJURY ABSENT EXPEDITED DISCOVERY
       FROM THE DEFENDANTS ...............................................................................12

       A.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY OR A
             CONNECTION BETWEEN  EXPEDITED DISCOVERY AND THE
             AVOIDANCE OF SUCH IRREPARABLE INJURY ...........................................13

       B.    PLAINTIFFS CANNOT SHOW PROBABILITY OF SUCCESS ON
             THE MERITS OR INJURY THAT WILL RESULT WITHOUT
             EXPEDITED DISCOVERY...............................................................................15

CONCLUSION....................................................................................................17

On May 4, 2007, Guy Carpenter & Company, LLC ("GC") and Marsh & McLennan Companies, Inc. ("MMC" and collectively "Plaintiffs") filed this action against United Kingdom residents Julian Samengo-Turner, Ron Whyte, and Marcus Hopkins (collectively "Defendants"). To date, the Complaint has not been served upon Messrs. Samengo-Turner or Hopkins. Despite Plaintiffs' awareness of this lack of service of process, they have filed an Order to Show Cause seeking to compel Defendants to respond to Plaintiffs' discovery requests (including depositions in New York) on an expedited basis. Defendant Ron Whyte submits this initial brief to alert the Court to the obvious defects in Plaintiffs' application.[1]

## PRELIMINARY STATEMENT

Plaintiffs have impermissibly instituted suit in New York, rather than the more appropriate English courts, for a purely tactical reason: to obtain discovery (*i.e.*, depositions) that is not available in the U.K. to support Plaintiffs' anticipated U.K. litigation against Defendants or other parties. Put another way, Plaintiffs are attempting to exploit the means of discovery that are available to litigants in the United States to gain a tactical advantage in an anticipated litigation in a foreign jurisdiction. This Court should not countenance such an abuse of procedure.

Plaintiffs' application seeks discovery from Defendants who have no meaningful contacts with the United States (all live and work in the U.K.) concerning events that occurred in the U.K. The alleged misconduct was not directed to the United States and Plaintiffs do not allege that they suffered injury here. Defendants, likewise, lack the level of forum contacts the relevant jurisdictional statutes require.

---

[1] Defendant expressly reserves all rights related to the assertion of defenses in this matter, including those related to service of process, venue and jurisdiction.

The Complaint, on its face, also confirms the inappropriateness and inconvenience of this forum. Not only do the English courts provide an adequate alternative forum and have jurisdiction over the parties, but rescission and repayment of amounts paid under the incentive compensation plan at issue here must, pursuant to the terms of the plan, be assessed under English law. Basic principles of *forum non conveniens* require litigation of this dispute in England. This Court must resolve these threshold jurisdiction and venue issues before discovery can commence.[2]

Even if the forum and jurisdictional defects are overlooked, Plaintiffs application should still be denied as they have not identified any irreparable injury which would result from the denial of expedited discovery. Plaintiffs do not contend that their ability to prove or recover relief based on the claims in this lawsuit will be harmed absent expedited discovery. Rather, Plaintiffs' entire submission is based upon their unsubstantiated belief that expedited discovery will show that Defendants engaged in activity that might support an as-yet unfiled litigation against them (and possibly others) in the U.K.[3] If this application is denied, Plaintiffs' opportunity to pursue action(s) in the U.K. based on their unsubstantiated beliefs will not be foreclosed. To the contrary, Plaintiff's could initiate such actions at any time.

Moreover, common sense and well-settled precedent dictate that preventing Plaintiffs from improperly attempting to manipulate the means of discovery in different forums does not constitute an "injury", much less an irreparable one. To the contrary, denying Plaintiff's application would correctly place all the parties on a level playing field in the anticipated U.K. litigation.

---

[2]    Defendants are prepared to brief these issues on an expedited basis.

[3]    As explained below, MMC's senior management has publicly described the "defections" in the U.K. as a "temporary blip" and that it is "winning the war" for talent in the broker industry, which belies any suggestion of irreparable injury.

Plaintiff's motion for expedited discovery should also be denied because, in reality, it is a motion for summary judgment as a matter of law and Plaintiff has not made—much less attempted to make—a showing that would justify such relief. Specifically, the relief sought by the Complaint includes a mandatory injunction to "immediately provide responses" to written questions which it contends were promulgated in accordance with a so-called "Cooperation Clause" in the Plan. The document requests and interrogatories attached to Plaintiff's application are not designed to assist the Court in determining whether those questions or the answers already provided by Defendants in response thereto are reasonable or appropriate (it is noteworthy that the Plan expressly requires that such determinations be made under U.K. law). Rather, the discovery requests are designed to elicit the ultimate relief sought in the Complaint— answers to the original questions. As there has been no determination as to whether Plaintiffs, as a matter of law, are entitled to such information, this application should be denied.

For these reasons and those more fully explained below, Plaintiffs' application for expedited discovery should be denied.

### SUMMARY OF ALLEGATIONS AND COUNTERSTATEMENT OF FACTS

As Plaintiffs are aware, the Defendants have been traveling extensively since mid-April and two of the three remain on holiday (and unserved) to this very day. Based solely upon the Plaintiffs' Complaint and submission in support of their pending application, Defendant Whyte responds as follows:

**Defendants Have No Connection To New York**

The Complaint makes clear that Defendants have practically nothing to do with the United States. They are not citizens nor residents of the United States; rather they are citizens and residents of the U.K. (Complaint, ¶¶6-8). Defendants, likewise, worked, and continue to work, for GC in the U.K., (Complaint, ¶¶11-13, 26, and Plaintiffs' Declaration of Lynsey

3

Mansfield ("Mansfield Decl."), Exhs. H-J), in accordance with employment contracts they received and executed in the U.K. (Complaint, ¶11-14; Mansfield Decl., Exhs. A-C).

On or about April 3, 2007, Defendants provided GC with the requisite notice of their respective intents to resign, though they each remain employed by GC in the U.K. at this time. (Complaint, ¶¶14, 26). Indeed, each of the Defendants is currently in the midst of what is commonly known in the U.K. as "garden leave," during which they remain employed by GC in the U.K. and continue to receive compensation from GC. (Complaint, ¶¶15; *see, e.g.*, Mansfield Decl., Exhs. A-B at 5).

## Plaintiffs Are Subject To The Laws Of The United Kingdom

Plaintiff GC, a global risk and reinsurance specialist and wholly owned subsidiary of MMC, maintains offices in the United Kingdom and throughout the world. (Complaint, ¶¶2, 9, 13, and Mansfield Decl., ¶¶1-2 and Exh. E, Sched. II.D). GC employed Defendants in the U.K. at all relevant times. (Mansfield Decl., ¶¶5-7).[4] MMC and GC are subject to the laws of the United Kingdom. (Complaint, ¶9).

## Remedies To GC Under Its Incentive Plan Must Be Pursued In The U.K.

During the course of their employment in the U.K., Defendants became eligible for, and were included in, a Senior Executive Incentive and Stock Award Plan (the "Plan") in 2005. (Complaint, ¶18 and Mansfield Decl., Exhs. E-G). The stated purpose of the Plan was to provide additional incentives for Defendants to remain employed with GC in the U.K. (Complaint, ¶20 and Mansfield Decl., Exhs. E-G at 1). Defendants earned certain monies from GC (paid in British pounds) under the Plan in the U.K. (Complaint, *e.g.*, ¶¶20-22 and Mansfield Decl., Exhs. E-G).

---

[4]     Indeed, Ms. Mansfield's Declaration in support of Plaintiffs' application was executed in London. (Mansfield Decl. at 7).

The Plan contains a punitive "Cancellation and Rescission" provision which, as written, may require repayment of amounts earned by employees under the Plan if such employees engage in what the Plan defines as "Detrimental Activity." (Complaint, ¶25 and Mansfield Decl., Exhs. E-G, Sec. I. C.(2)). The definition of Detrimental Activity, for employees of the United Kingdom like the Defendants, is set forth at Clause 2 of Schedule II.D of the Plan document. (Complaint, ¶¶26-27). If cancellation and rescission is attempted by GC concerning U.K. employees, like the Defendants, the Plan mandates that it must first be determined whether any act arises to the level of Detrimental Activity as a matter of English law. (Complaint, ¶32 and Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6). Indeed, the Plan—as drafted by GC—requires Schedule II.D to "be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle *any* disputes as may arise in connection with this Schedule." (*Id.*) (Emphasis added).

The Plan also purports to require GC employees to cooperate with reasonable requests for information, essentially designed to enable GC to determine whether such employees have improperly engaged in Detrimental Activity so as to trigger the cancellation and rescission provisions of the Plan. (Mansfield Decl., Exhs. E-G, Section II.E). The ultimate determination of whether any U.K.-based GC employee engaged in such Detrimental Activity, however, must be determined under English law. (Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

**The Conduct Alleged By Plaintiffs Only Occurred Within The United Kingdom**

Plaintiffs accuse Defendants of engaging in Detrimental Activity because a news article indicated that they had accepted employment with the London office of Integro Insurance

Brokers.[5]  (Complaint, ¶¶33, 37, and Mansfield Decl., Exh. D).  Plaintiffs further accuse Defendants, albeit "upon information and belief," of engaging in Detrimental Activity by soliciting and recruiting U.K.-based GC employees to work for Integro. (Complaint, ¶38).

Before this suit was filed, however, GC's London legal counsel (Herbert Smith LLP) sent letters to each Defendant on or about April 5, 2007, at their respective U.K. residences, with a written demand for information designed to support the existence of Detrimental Activity. (Mansfield Decl., Exh. H-J).  These letters ordered Defendants, under the purported authority of Section II.E of the Plan document, to answer highly intrusive and overbroad questions "to establish whether or not [Defendants] are in compliance with [their] obligations under the Plan and as a GC employee." (*Id*. at 1-2).  GC also demanded that, within six days, each Defendant provide a "written undertaking" that they will strictly comply with their obligations as a GC employee, with their garden leave obligations, and with the Plan.  (*Id*. at 2).  Finally, GC demanded that each Defendant return documents and property claimed to rightfully belong to GC or its clients.  (*Id*.)

**Defendants Responded To GC's Demands**

Through their London-based solicitors, Elborne Mitchell, Defendants denied GC's allegations on April 11, 2007. (Mansfield Decl., Exh. K).  That letter assured GC that—even in the absence of evidence to suggest that they had engaged in Detrimental Activity—Defendants were aware of and intended to abide by their obligations to GC.  (*Id*. at 1).  Elborne Mitchell further advised GC that Defendants could not comply with the unreasonable deadline selected by GC due to their vacation schedules.  (*Id*.).

---

[5]    Although not relevant to the merits of this application, the news article cited by Plaintiffs actually states that Defendants "will join Integro's London – based reinsurance operations this fall," which is, after the conclusion of their garden leave periods.

6

Exhibit B   08

On April 19, 2007, Elborne Mitchell further advised Herbert Smith that:

- Defendants "would be happy to sign written undertakings confirming that they will comply with their garden leave obligations."; and that

- Defendants had no documentation or other property belonging to GC or its clients other than mobile telephone handsets which they offered to return.

(Mansfield Decl., Exh. L at 2). Elborne Mitchell then requested that GC provide a good faith basis— beyond its vague and unsupported assertions—to support its demand for immediate, detailed, comprehensive, and largely unreasonable questioning of the Defendants. (*Id.*).

Hearing no response, Elborne Mitchell wrote to Herbert Smith again on May 1 for additional information in support of GC's oppressive demands. (Defendant's Declaration of John P. Barry ("Barry Decl."), Exhibit 1). By letter dated May 3, Herbert Smith confirmed that GC refused to provide any additional information to support its information demands but, nonetheless, anticipated receiving the Defendants' written responses and undertakings "as soon as possible." (Barry Decl., Exhibit 2). *The very next day*, however, GC filed this lawsuit in the United States District Court for the Southern District of New York. (Complaint at 13).

By letter dated May 17, 2007, (Barry Decl., Exh. 3). Elborne Mitchell proposed to Herbert Smith a written undertaking for each of the Defendants which set forth, in pertinent part, that:

> "I confirm my agreement to remain an employee of Marsh Services Limited ("the Company") until 2 October 2007 and to serve out my notice period on garden leave as requested by the Company. I undertake that while I remain an employee of the Company I will abide by my contractual duty of good faith and fidelity to the Company. I further undertake that during this period of garden leave I will not:
>
> > (A)    Save for the purpose of obtaining legal advice, or save as required or permitted by law, or save with the express permission of the Company.

(1)  disclose or permit to be disclosed to any person firm or company any confidential information of the Company or of any other member of the Group.

(2)  disclose in any way, or use for my own or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any group Company.

(B)  be employed or engaged or otherwise provide services directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance, or mortgage broker or agent without having first gained the written consent of the Company.

(Declaration of John P. Barry, Exh. A)

## The Public Comments of MMC's CEO and COO Contradict The Allegations of Irreparable Harm

In their brief submitted in support of their application for injunctive relief, Plaintiff's contend that:

> "[P]laintiffs believe that at least fourteen Guy Carpenter brokers in the facultative reinsurance group (including the defendants) have been recruited or approached, either directly or indirectly, by Integro . . .
>
> Plaintiffs believe that defendants aided in the solicitation and recruitment of some or all of these Guy Carpenter employees . . . . Guy Carpenter is surely entitled to know if **this assault on its business** has been conducted by lawful means . . . ." (Brief at 11-12; emphasis added)

MMC's President and CEO, Michael Cherkasky, along with its COO, Brian Storms, provided a completely different characterization of these events in a public presentation to the investment community on May 8, 2007:

> "Marsh is now aggressively on the offensive, focusing a disproportionate amount of our effort, energy and resources on accelerating growth. **We are actively recruiting industry leading talent."** (Brian Storms; emphasis added)

8

Exhibit B  10

Obviously, we did have a defection to Integro in the [*sic*] reinsurance. By the way, it's so fascinating is [*sic*] we are not having defections in the brokerage business to Integro. In fact, they are coming the other way. **I think this [defection to Integro in the reinsurance area] is a temporary blip. What is very rewarding is that we are attracting people in the reinsurance business. So it really isn't -- there is a war for talent but it's going both ways and I think, because of Integro's position, they make more of a headline about it than maybe others.**  (Michael Cherkasky; emphasis added)

\* \* \*

**"We are, for the first time in a long time, as we get more and more proactive, aggressively recruiting. I say with great confidence we are winning the war for talent in the brokers business right now. Our business model, the success that we're beginning to see -- we are winning the war for talent.** It's still a pretty irrational market out there; we are seeing competitors offering multi-year deals with lots of guarantees, things that any rational -- we're not going to do. **But in terms of our ability to win the war for talent, it's really going in our favor and as the year progresses, you will see the impact of that.**

(Declaration of John P. Barry, Exh. 4)

## Plaintiffs' Complaint Must Be Addressed Under English Law

The Complaint—on its face—confirms that the parties and the controversy have no meaningful connection to the United States or this Court.  The Complaint essentially asserts that Plaintiffs are entitled to rescission and repayment of roughly £180,000 paid to them in the U.K. under the Plan because Defendants allegedly engaged in Detrimental Activity in the U.K. (Complaint, ¶¶51-52 and *ad dannum* clause, ¶(ii)).[6]  Under the Plan, however, whether any act of the Defendants consitutes Detrimental Activity must be determined pursuant to English law. (Complaint, ¶32 and Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

---

[6]    By letter dated April 19, Defendants U.K. counsel requested that Plaintiffs "provide a breakdown" so that it could assess the basis of Plaintiffs' claims of repayment under the Plan.  Plaintiffs' U.K. counsel has not yet responded to this inquiry.

GC also claims that Defendants failed to provide adequate information to Herbert Smith in accordance with Section II.E of the Plan and that an injunction should issue to compel Defendants to supply "discovery" concerning the allegation that they have engaged in Detrimental Activity. (Complaint, ¶¶48-49 and *ad dannum* clause, ¶(i)). Any claim that Defendants engaged in Detrimental Activity, however, must also be brought under English law. (Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

## ARGUMENT

**II.     EXPEDITED DISCOVERY SHOULD BE DENIED UNTIL THE SIGNIFICANT JURISDICTIONAL AND VENUE ISSUES ARE RESOLVED**

GC should not be permitted to force Defendants to expend time, effort, and resources conducting expedited (or even routine) discovery because venue and jurisdiction are so plainly inappropriate here. A review of GC's Complaint makes clear that this matter belongs in the U.K., not New York. By way of example:

- The Defendants are citizens and residents of the U.K. and are subject to the jurisdiction of U.K. courts;

- The Plaintiffs currently employ the Defendants in the U.K. within Plaintiffs' U.K. business operations;

- The likely witnesses in this matter[7] are U.K. residents beyond the Court's compulsory subpoena power;

- Most, if not all, of the anticipated witnesses (including Plaintiffs' affiant, Head of International HR Mansfield) are U.K. residents and certainly the most relevant witnesses all reside in the U.K.

- The cost of obtaining the attendance of the Defendants and voluntary witnesses in New York will be prohibitive;

- Most, if not all, relevant documentation is located in the U.K.;

---

[7] *See* Complaint, ¶38 and Mansfield Decl., Exh. L at 1.

- The Plan awards were paid to and received by Defendants in the U.K. in British pounds;

- Any Detrimental Action committed by Defendants—which is denied—is alleged to have occurred within the U.K. and directed at other U.K. residents within the U.K.;

- The Plan specifically requires English law to be applied over "*any* disputes as may arise in connection with [Schedule II.D]";

- The parties have all retained U.K. legal counsel well prior to the initiation of this lawsuit and U.K. counsel have advanced discussions designed to resolve many, if not all, of the issues in dispute; and

- The U.K. has a vested interest in resolving disputes concerning contracts executed and performed in the U.K. by English citizens.

Thus, Defendants respectfully submit that the significant jurisdictional/venue questions should be definitively resolved before there is any order of discovery or other adjudication with respect to the Complaint. Defendants stand ready to brief these issues on an expedited basis, as they can be decided as a matter of law largely from the face of the Complaint and attached documents. *See Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1194, 167 L.Ed.2d 15 (2007) (if "a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground. . . . and [if] *forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course.").

As a consequence of these significant initial issues, Plaintiffs' request for expedited discovery is entirely inappropriate. *See id.* (court should not burden parties with the "expense and delay" of discovery where "[t]he District Court inevitably would dismiss the case without reaching the merits"). Plaintiffs' application for an order to show cause, therefore, should be denied.

11

III.  **PLAINTIFFS' APPLICATION SHOULD BE DENIED BECAUSE PLAINTIFFS' HAVE FAILED TO DEMONSTRATE THAT THEY WILL SUFFER IRREPARABLE INJURY ABSENT EXPEDITED DISCOVERY FROM THE DEFENDANTS**

To be sure, expedited discovery is appropriate in some cases.  Where, for example, a plaintiff proves that the defendants have incentive and capacity to hide their assets and have indicated disinclination to defend the matter on the merits, an urgent need may exist to obtain information about the possible location of the defendants' assets.  *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005).  Likewise, expedited discovery may be appropriate to bolster a plaintiff's motion for a preliminary injunction.  *See Standard Investment Chartered, Inc. v. NASD*, 07 Civ. 2014 (SWK), 2007 U.S. Dist. LEXIS 27342, *11 (April 11, 2007).  Where, as here, there is no pending preliminary or permanent injunction hearing in this case, or other emergent need, a stricter standard is appropriate.

In those instances, the District Courts commonly consider a plaintiff's request for expedited discovery in light of the following factors:  "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted."  *The Irish Lesbian and Gay Org. v. Giuliani*, 918 F. Supp. 728, 730 (S.D.N.Y. 1996) (citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)).  *Accord Rosecliff, Inc. v. C3, Inc.*, No. 94 Civ. 9104, 1995 WL 3024, at *2 (S.D.N.Y. Jan. 3, 1995); *Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990); *see also Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 151, 152

(E.D.N.C. 1993) (adopting *Notaro* as "compelling").  Plaintiffs, however, have failed to identify facts sufficient to satisfy any of the elements of this standard.

**A.    Plaintiffs Have Not Shown Irreparable Injury Or A Connection Between Expedited Discovery And The Avoidance Of Such Irreparable Injury**

Plaintiffs' Complaint states two basic causes of action: that (1) Defendants must repay a fixed amount of money because they allegedly engaged in Detrimental Activity in the U.K.; and (2) Defendants breached the "cooperation clause" of their U.K. Plan documents by not providing sufficient information concerning their post-employment business activities.  Plaintiffs have not even attempted to argue that these claims are, or could be, the cause of immediate or irreparable harm.  Rather, GC only claims that expedited discovery is necessary because Defendants—"upon information and belief"[8]—participated in the solicitation and recruitment of "a large percentage" of GC's "U.K.-based brokers."  (Pl. Brf. at 3; Mansfield Decl., ¶¶12-16).   The Court should reject this attempt to obtain expedited discovery, including otherwise unavailable depositions, because it is not based upon *any* of causes of the action within the Complaint and MMC's top-levels of management have publicly   described these departures as an inconsequential "temporary blip" and that it is winning the war for talent in the industry.

Indeed, Plaintiffs seek discovery from the Defendants for no purpose other than to gather information to support an anticipated action against Defendants (and possibly others) in the U.K.  Plainly, any lawsuit concerning the alleged solicitation or recruitment of a U.K.-based GC employee would arise under Clause 2(a)(iv) and/or Clause 4 of Section II.D of the Plan document.  As stated, any claim arising under Section II.D may only be determined under U.K. law.  *See* Complaint, Exhs. A-C, Sched. II.D, Clause 6.

---

[8]    Complaint, ¶38.

Thus, Plaintiffs demand for expedited discovery fails because there is plainly no connection whatsoever between the discovery sought and the claims or injuries alleged in the Complaint. *See Giuliani*, 918 F. Supp. at 730 (expedited discovery request denied because, *inter alia*, it was not reasonably tailored "to the specific issues that will have to be determined" in the case and the scope of the requested discovery "did not correspond to the plaintiff's allegations . . . or its claimed need for expeditious relief."). *Accord Ayyash*, 233 F.R.D. at 327 (expedited discovery permitted only after plaintiff "made a strong evidentiary showing of the substantiality of his claims.").

That the purported harm which GC is experiencing in the U.K. is not the injury alleged in the Complaint further demonstrates that GC wants to gather information from Defendants for use in future proceedings in the U.K. Such obvious abuse of the discovery process is entirely impermissible. *See Well-Made Toy Mfg. Corp. v. Lotus Onda Industrial Co., Ltd.*, 2002 U.S. Dist. LEXIS 789, 00 Civ. 9605 (DFE) (S.D.N.Y. Jan. 16, 2002) ("When the purpose of a discovery request is to gather information in proceedings other than the pending suit, discovery should be denied.") (citing *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 1997 WL 53184, *5 (S.D.N.Y. Feb. 11, 1997) and *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, n. 17, 98 S. Ct. 2380, 2390 n. 17, 57 L. Ed. 2d 253 (1978)); *U.S. v. Hooker Chemicals & Plastics Corporation*, 90 F.R.D. 421, 426 (W.D.N.Y. 1981) (discovery not permitted where there is attempt to "exploit the federal litigation discovery process solely to assist litigation in a foreign forum.") (citing *Johnson Foils, Inc. v. Huyck Corp.*, 61 F.R.D. 405, 410 (N.D.N.Y. 1973)).

Plaintiffs' discovery abuse is all the more impermissible because English law does not permit depositions in civil matters. *See, e.g., Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432, *8 (S.D.N.Y July 22, 1996). Although

14

the absence of pretrial depositions does not make England any less adequate of an alternative forum for this case as a matter of law,[9] Plaintiffs' attempt to compel depositions in New York which they will not be entitled to take in England illustrates the impermissable nature of Plaintiffs' application. *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 481 (S.D.N.Y. 2006) (plaintiffs showed "indicia of forum-shopping" where New York lawsuit allowed for "procedural devices not available in England").   Indeed, Plaintiffs have not, and cannot, dispute the obvious fact that they can file all of their various claims together in England right now and obtain essentially the identical written discovery which they seek here.

Finally, Plaintiff arguments of irreparable injury are belied by the public comment of MMC's senior management, including its CEO and COO.   MMC's CEO described the "defection to Integro" as "a temporary blip."  And while the CEO referred to a "war for talent" he proclaimed that "it was going both ways" and that MMC "is winning the war for talent in the brokers market right now." (Barry Decl., Exh. 4)  As the highest levels of MMC's management have characterized the defection as, essentially, inconsequential in public discussions with the investing community, this Court should disregard the contradicting representations contained in their moving papers.

### B.      Plaintiffs Cannot Show Probability Of Success On The Merits Or Injury That Will Result Without Expedited Discovery

In light of the significant jurisdiction and venue issues, it is unlikely that the merits of the matter will be determined outside of an English court.   Indeed, expedited discovery will only

---

[9] *See Breindel*, 1996 U.S. Dist. LEXIS 10432 at *8 ("England is an adequate alternative forum" because "procedures in foreign forum need not be identical to those in United States to be adequate, so long as they are not wholly devoid of due process.") (citing *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse*, 652 F. Supp. 1289, 1295 (S.D.N.Y. 1987) (internal quotation marks omitted)).

serve to needlessly increase the cost of the litigation and distract Defendants from the task of preparing their motion to dismiss.

Likewise, as previously explained, no injury *contemplated by the Complaint* will occur or worsen in the absence of expedited discovery. On the contrary, the Defendants will be harmed if they are forced to travel to New York for depositions, as Plaintiffs have demanded, or otherwise participate in discovery in a case where the Court likely lacks jurisdiction and is the improper venue. *See* Holtzman Decl., Exh. D.

Finally, this motion further prejudices Defendants because it impermissibly provides for the ultimate relief sought by Plaintiffs without a determination on the merits. Specifically, Plaintiffs' First Cause of Action seeks a mandatory injunction compelling the Defendants to provide written responses to all requests for information posed by Plaintiffs and to subject Defendants to depositions by Plaintiffs' counsel. (Complaint, ¶¶48-49 and p. 13, ¶(i)). Putting the threshold jurisdiction/venue issues aside, questions of fact clearly exist concerning, among other things:

- how Plaintiffs can obtain an injunction to compel compliance with Section II.E of the Plan when Section II.H of the Plan clearly indicates that Plaintiffs never intended for an application for injunctive relief to include compliance with Section II.E;

- what are the reasonable limitations of Plaintiffs' information requests under the Plan document;

- whether Plaintiffs can compel any depositions of the Defendants (expedited or not) when neither Section II.E nor English law provide for such depositions;

- how Plaintiffs could be entitled to compel the production of documents from Defendants when Section II.E does not permit or require that remedy; and

- the adequacy of Defendants' previous responses to Plaintiffs (Mansfield Decl., Exhs. K and L).

Nonetheless, Plaintiffs' motion seeks this information from Defendants through expedited depositions, document requests, and interrogatories. If such expedited discovery is

16

granted—without any determination that Defendants have failed to comply with Section II.E of the Plan document or that Plaintiffs are entitled to anything beyond what they have already received—Plaintiffs will have secured the ultimate relief they seek without proving an entitlement to it as a matter of law.

## <u>CONCLUSION</u>

Under the present circumstances, Defendant Ron Whyte respectfully submits that it would be inappropriate for the Court to order expedited discovery in this matter and that the service of process, jurisdiction, and venue issues should be resolved before there is any adjudication with respect to expedited discovery.


Dated: May 17, 2007

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

Exhibit B   19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GUY CARPENTER & COMPANY, LLC and )
MARSH & McLENNAN COMPANIES, INC., )
         )     Case No. 07 - CV- 3580 (DC)
      Plaintiffs, )
         )
v. )
         )     **DECLARATION**
JULIAN SAMENGO-TURNER, RON )
WHYTE, and MARCUS HOPKINS, )
         )
      Defendants. )
         )

---

I, John P. Barry, hereby declare:

1.      I am a member of Proskauer Rose LLP, attorneys for defendant Ron Whyte ("Defendant") in the above-captioned matter. I submit this declaration in opposition to plaintiffs' motion for expedited discovery pursuant to Federal Rules of Civil Procedure 26, 30, 33, and 34.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a letter dated May 1, 2007 from Elborne Mitchell, counsel for Defendant, to Herbert Smith LLP, counsel for plaintiffs.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a facsimile transmission dated May 3, 2007 from Herbert Smith LLP, counsel for plaintiffs, to Elborne Mitchell, counsel for Defendant.

4.      Attached hereto as Exhibit 3 is a true and correct copy of a letter dated May 17, 2007 from Elborne Mitchell, counsel for Defendant, to Herbert Smith LLP, counsel for plaintiffs.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the transcript of Marsh & McLennan Companies, Inc.'s first quarter 2007 Earnings Conference Call, which took place on May 8, 2007.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Dated: Newark, New Jersey
      May 17, 2007

John P. Barry

Exhibit B   21

# Exhibit 1

| | | | | |
|---|---|---|---|---|
| To | Herbert Smith LLP | | Address | One America Square<br>Crosswall<br>London<br>EC3N 2PR |
| Fax No | 0207 098 5417 | | Telephone | **020 7320 9000** |
| From | Elborne Mitchell | | Fax | 020 7320 9111 |
| Our Ref | KCP/RHJ/30947 | | E-mail | lawyers@elbornes.com |
| Your Ref | 2090/3159/30875525 | | Website | www.elbornes.com |
| Date | 01/05/2007 | | DX | 1063 London-City |
| No of Pages | 2 | | Lloyd's Line | 7819-0 |

# Elborne Mitchell
### SOLICITORS

**Our Clients:** Ron Whyte, Julian Samengo-Turner, Marcus Hopkins
**Re:**  Guy Carpenter

Please see attached letter.

1 May 2007

Our Ref    KCP/RHJ/30.947
Your Ref   2090/3159/30875525

| Address | One America Square |
| --- | --- |
| | Crosswall |
| | London |
| | EC3N 2PR |
| Telephone | **020 7320 9000** |
| Fax | 020 7320 9111 |
| E-mail | lawyers@elbornes.com |
| Website | www.elbornes.com |
| DX | 1063 London-City |
| Lloyd's Line | 7819-0 |

**By Fax**

Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS

# Elborne Mitchell
### SOLICITORS

Dear Sirs

**Our Clients:  Ron Whyte, Julian Samengo-Turner, Marcus Hopkins**
**Re:          Guy Carpenter**

We note that we have heard nothing from you in response to our letter of 19 April 2007, sent some ten days ago, nor even the courtesy of an acknowledgement. We find this remarkable given that your original correspondence to our clients requested their urgent responses on a number of detailed matters and written undertakings within a timeframe of two working days, coupled with notification of your client's rights to damages and/or injunctive relief against our clients. We assume from your silence that the various allegations raised against our clients are not now being pursued however please confirm this to us.

Yours faithfully

**Elborne Mitchell**

**Exhibit B   24**

# Exhibit 2

# Herbert Smith

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28
www.herbertsmith.com

Fax

| Pages (incl) | 1 | Date | 3 May 2007 |
|---|---|---|---|
| To Company | Elborne Mitchell Solicitors | F | 020 7320 9111 |
| Your Ref | ES/KCP | Our Ref | 2090/3159/30875525 |
| From | Herbert Smith | D | +44 (0)20 7466 2017 |
| | | F | +44 (0)20 7098 5417 |
| Subject | **Ron Whyte, Julian Samengo-Turner, Marcus Hopkins** | | |

This fax is confidential and may be covered by legal professional privilege. If you are not an addressee and have received this fax in error, please contact us immediately; you should not use the fax or copy its contents to any other person. Thank you. If you do not receive all pages clearly, please contact the sender of this facsimile message directly.

Dear Sirs

Thank you for your letter dated 1 May 2007.

Our client's position remains as stated in previous correspondence. In particular, in our letters to your clients dated 5 April 2007, we made clear that we required responses from your clients to the questions asked in that letter, in accordance with their obligations under the Plan and their general obligations as employees of our client. Your clients remain obliged to answer these questions regardless of whether or not our client provides any further background information to you. Accordingly, we await responses from your clients to these questions as soon as possible.

We note the confirmation regarding documents and other property belonging to GC or its clients and request that the mobile phone handsets are returned to Joanne Thomas as soon as possible. We look forward to receiving, by return, your clients' written undertakings that they will strictly comply with their obligations as GC employees and, in particular, with the obligations referred to in the letters to them dated 3 April 2007 and the obligations set out in the Plan.

Yours faithfully

*Herbert Smith LLP*

**Exhibit B  26**

# Exhibit 3

17 May 2007

| | | | Address | One America Square |
| --- | --- | --- | --- | --- |
| Our Ref | KCP/RHJ/30.947 | | | Crosswall |
| Your Ref | 2090/3159/30875525 | | | London |
| | | | | EC3N 2PR |

Our Ref    KCP/RHJ/30.947
Your Ref    2090/3159/30875525

**By Fax 0207 098 5417**

Herbert Smith LLP
Exchange House
Primrose Street
London
EC2A 2HS

| | |
| --- | --- |
| Address | One America Square |
| | Crosswall |
| | London |
| | EC3N 2PR |
| Telephone | 020 7320 9000 |
| Fax | 020 7320 9111 |
| E-mail | lawyers@elbornes.com |
| Website | www.elbornes.com |
| DX | 1063 London-City |
| Lloyd's Line | 7819-0 |

# Elborne Mitchell
### SOLICITORS

Dear Sirs

**Our Clients:  Ron Whyte, Julian Samengo-Turner, Marcus Hopkins**
**Re:         Guy Carpenter**

We refer to the previous correspondence between us resting with your letter of 3 May 2007.

Since that letter your clients have of course issued against our clients in the US Federal Court District of New York seeking a mandatory injunction that our clients comply with clause IIE of the Plan and seeking repayment of sums said to be due under the Plan.  We should place on record that we do not accept that New York is an appropriate forum for the claims your clients have chosen to bring or that your clients are entitled to the relief sought.  Our clients' position is reserved generally in relation to those proceedings and as you are no doubt aware, we have appointed New York attorneys Proskauer Rose to deal with this matter further in New York.

We would comment, however, that we find it remarkable that your clients consider it appropriate to seek relief on an expedited basis in the New York courts, on the basis of alleged breaches by our clients of their contractual obligations, while making no mention of the fact that our clients have offered to provide written undertakings to comply with their garden leave obligations.  Indeed, that this offer has been sitting on the table since 19 April 2007 but was not responded to, nor was our letter even acknowledged in any way, until 3 May 2007 (the day before the issue of the New York proceedings) and even then in response to our chasing letter to you.

As the offer has been made and remains open and as you have not put forward the terms of undertakings sought by your client, we set out below the terms of undertakings which we would be prepared to recommend to our clients: -

"I confirm my agreement to remain an employee of Marsh Services Limited ("the Company") until 2 October 2007 and to serve out my notice period on garden leave as requested by the Company. I undertake that while I remain an employee of the Company I will abide by my contractual duty of good faith and fidelity to the Company. I further undertake that during this period of garden leave I will not:

Regulated by the Law Society
Timothy Brentnall (senior partner)  Timothy Akeroyd  Alexandra Booth  Jonathan Bruce  Timothy Goodger
Philip Greig  Rosalind Jones  Roger Miles  Kate Payne  Andrew Pincott  Edmund Stanley  Peter Tribe

Exhibit B   28

(A)    Save for the purpose of obtaining legal advice, or save as required or permitted by law, or save with the express permission of the Company:

(1) disclose or permit to be disclosed to any person, firm or company any confidential information of the Company or of any other member of the Group,

(2) disclose in any way, or use for my own or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any group Company.

(B)    be employed or engaged or otherwise provide services directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance, or mortgage broker or agent without having first gained the written consent of the Company.

This undertaking is conditional upon the Company undertaking:

(A)    to continue to pay the full remuneration and benefits to which I am entitled under my contract of employment during the remainder of my notice period

(B)    not to claim damages from me arising out of any failure on my part to undertake work pursuant to my contract of employment during the remainder of my notice period."

We should be grateful for your confirmation by return that these terms are acceptable to you, whereupon we will try to contact our clients to obtain their instructions although you will appreciate that this may be difficult given that two of our clients are on holiday.

Yours faithfully

**Elborne Mitchell**

# Exhibit 4

**Q1 2007 Marsh & McLennan Companies, Inc. Earnings Conference Call - Final**
8 May 2007
Voxant FD (FAIR DISCLOSURE) WIRE

OPERATOR: Welcome to MMC's conference call. First-quarter 2007 financial results and supplemental information were issued earlier this morning. They are available at MMC's Web site at www.mmc.com.

Before we begin, I would like to remind you that remarks made today may include statements relating to future events or results which are forward looking statements as that term is defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to inherent risks and uncertainties. In particular, references during this conference call to anticipated or expected results of operations for 2007 are forward-looking statements and MMC's actual results may be affected by a variety of factors. Please refer to MMC's most recent SEC filings, as well as the Company's earnings release, which are available on the MMC Web site, for additional information on factors that could cause actual results to differ materially from those expressed or implied in any forward-looking statements made today.

I will now turn the conference over to Mr. Michael Cherkasky, President and CEO of MMC. Please go ahead, sir.

MICHAEL CHERKASKY, PRESIDENT, CEO, MARSH & MCLENNAN COMPANIES, INC.: Thank you and good morning, everyone. Thanks for joining us for MMC's first-quarter 2007 conference call. I'm Michael Cherkasky. Joining us today are Matt Bartley, our CFO, and Brian Storms, COO of Marsh. Also with us is Mike Bischoff, head of Investor Relations.

I'm going to talk about key elements of the quarter. Brian will then update you on Marsh. Matt will then follow. Then we will take some questions.

Let me first start by saying that I like where MMC is today and I like our quarter. MMC is doing what we said we would do at our Investor Day in December. Our margin is up, our operating income is up, our revenues are up, our financial flexibility is increasing, and our expenses are under control. At the same time, our transformation of this company is on track and is and will continue to make us a more profitable, a more reliable company. In the areas where we had some revenue shortfalls, they are limited, and we believe temporary.

MMC's first-quarter performance illustrates the diversification, strength and potential of MMC. This is a theme we've talked about in the past and will come back to later this morning.

MMC's revenues were $2.8 billion in this year's first quarter, an increase of 5% compared with last year, 1% on an underlying basis. Excellent expense control allowed us to leverage our revenue growth into a 15% increase in operating income to $387 million; 22% growth in pretax income to $335 million; and a 10% increase in margin to 13.8%. This is MMC's highest level of profitability in all three categories since the second quarter of 2004.

Our Consulting segment, made up of Mercer HR and Mercer Specialty, continued to show very strong growth in both revenue and profitability. This segment grew revenues 13% and is on track to do more than $4.5 billion in annual revenues this year. At the same time, we boosted our operating profits 22% year-over-year and our margin grew to 12.2%, over a 100 basis points improvement from last year's full-year margin. The MMC Consulting segment is a big business, with good growth and solid margin improvement that has a terrific future in large, addressable markets.

**Exhibit B   31**

courses for our top 300 global leaders and our top 1,000 client-facing colleagues designed to align them with our strategy and enhance their consultative sales and client relationship-management skills.

On the IT side briefly, we also continue to re-architect and integrate our global data and application infrastructure with a regular stream of new tools and applications coming online in the first quarter. We are rapidly deploying a series of these tools that will enable us to drive straight through processing from opportunity management and inception of a client service agreement to risk and data capture, electric placement, and policy data management, and finally to billing. One set of data, one unified view of the client, one process flow. The implications for productivity, cycle times and accuracy are dramatic, and it will be the first time in Marsh's history that we've had a unified view of the client and one set of data on an integrated database. All in all, we are making tremendous progress on the IT front, upgrading systems and enhancing our ability to monitor and manage the business.

As I hope you can see, we asked a lot from our colleagues, and we are extremely proud of how they met the challenge and shouldered the load. The aggressive pace we chose over this past quarter put us dramatically closer to our strategic and operational goals. We have more to do, but we strongly believe that the first quarter of 2007 was the high-water mark in terms of sheer volume of concurrent change. With the large-scale transformation initiatives mostly behind us -- segmentation, geographic restructuring, wholesale leadership upgrades, new compensation plans -- we don't foresee anything of similar magnitude on the horizon.

More importantly, with our foundation strong and secure, Marsh is now aggressively on the offensive, focusing a disproportionate amount of our effort, energy and resources on accelerating growth. We are actively recruiting industry-leading talent. We are bringing innovative new-risk solutions to the market. We are investing in high-growth sectors. We are reasserting our scale and reach for the benefit of our clients, and we are meeting our clients' highest expectations with a differentiated approach to risk management. The bottom line is that we've never been more committed to our strategy, more clear in our direction, or confident in our ability to execute. Our clients, colleagues and markets continue to validate this approach.

Ultimately, we remain confident and wholly committed to the goals we laid out last December. As you will recall, we are targeting 3% to 5% organic compound growth in revenue over the next three years, and I said, with lower growth in 2007, accelerating in successive years as our growth priorities begin to take hold.

Thanks for listening. Now back over to you, Mike.

MICHAEL CHERKASKY: Thank you, Brian. Matt?

MATTHEW BARTLEY, CFO, MARSH & MCLENNAN COMPANIES, INC.: Thank you, Mike.

Let me begin by highlighting the expanded new information disclosed in the supplemental schedule in this morning's press release. On the bottom half of Page 8, you will see a significant amount of information that we are reporting for the first time, consistent with the commitment we made at Investor Day last December to enhance the disclosure of our financial and operating performance metrics. You can see that we are providing information, quarterly information, beginning with the first quarter of last year and through Q1 of this year on the geographic composition of Marsh's revenues, as well as line-of-business analysis, again by quarter, for each of Kroll and Mercer Human Resource Consulting.

MEYER SHIELDS: Okay, thanks. As a follow-up, there has been a few significant headlines of I guess employee defections, whether it's Integro facultative re or Beecher Carlson in Atlanta. Can you give us an update in terms of the turnover you're seeing from client-facing folks and how that compares to previous years and quarters?

MICHAEL CHERKASKY: Yes. First, I'm going to handle the reinsurance. Obviously, we did have a defection to Integro in the reinsurance. By the way, it's so fascinating is we are not having defections in the brokerage business to Integro. In fact, they are coming the other way. I think this is a temporary blip. What is very rewarding is that we are attracting people in the reinsurance business. So it really isn't -- there is a war for talent but it's going both ways and I think, because of Integro's position, they make more of a headline about it than maybe others.

Brian, on the brokerage business?

BRIAN STORMS: Yes, a very positive story to tell there as well. I mean, obviously, we measure very carefully our voluntary turnover rates. Our voluntary turnover rates I'm happy to report in the first quarter were down at historically low levels.

We are, for the first time in a long time, as we get more and more proactive, aggressively recruiting. I say with great confidence we are winning the war for talent in the brokers business right now. Our business model, the success that we're beginning to see -- we are winning the war for talent. It's still a pretty irrational market out there; we are seeing competitors offering multi-year deals with lots of guarantees, things that any rational -- we're not going to do. But in terms of our ability to win the war for talent, it's really going in our favor and as the year progresses, you will see the impact of that.

MEYER SHIELDS: Okay, thank you very much.

OPERATOR: Terry Shu, JPMorgan.

TERRY SHU, ANALYST, JPMORGAN: I don't know whether you touched on it. In the quarter, I'm guessing that you did not benefit from higher commission rates? It was a question about contingents but actually the underlying rates. Were you able to get higher commission rates to offset the lost contingents? Was there a trend towards that or is it still out there?

BRIAN STORMS: This is Brian. If you look at our rates, which is not just commissions, it's fees, a large percentage of our big client book is a fee business, those have been pretty consistent throughout the quarter. We are not seeing any change in the overall level that we charge clients. What we are seeing is expansion of services, which unrelates to brokerage commissions, but as it relates to that issue, no, there has been no change.

TERRY SHU: The other point is the headwinds from the declining property/casualty premium rates. I think, because the industry is at record profitability, we're probably looking at a soft rate environment for the foreseeable future. All of the big brokers are talking about improving margins. Is it not a very difficult challenge, as we look ahead, to be able to do that when you're going to continue to see headwinds from declining rates?

MICHAEL CHERKASKY: Well, first thing before I turn it over to Brian, you know, we at MMC don't think that market conditions like that are an excuse for not performing the way we said we will perform. It's not an excuse. There are a lot of different ways to win. We in fact positioned ourselves -- which we