# EXHIBIT E-1

NOTICE OF SERVICE (?)
OF THE JURISDICTION

Claim Form
(CPR Part 8)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**ROYAL COURTS OF JUSTICE**

| Claim No. | *for court use only* 2007 Folio 945 |
|-----------|------------------------------------------|
| Issue Date | 29/5/07 |



Claimant(s)

(1) Julian Samengo-Turner, 49 Prince of Wales Mansions, Prince of Wales Drive, SW11 4BH.

(2) Ronald Dennis Whyte, 193 Worlds End Lane, Chelsfield, Kent BR6 6AT.

(3) Marcus Hopkins, 1 Belmont Road, London, SW4 0BZ.

Defendant(s)

(1) Marsh Services Limited (formerly Marsh Corporate Services Limited and prior to that J&H Marsh & McLennan (Services) Limited) Company No 03053552 of 1 Tower Place West, Tower Place, London EC3R 5BU.

(2) Guy Carpenter & Company LLC: a company incorporated in Delaware with principal place of business at One Madison Avenue, New York, New York 10010.

(3) Marsh & McLennan Companies Inc: a company incorporated in Delaware with principal place of business at 1166 Avenue of the Americas, New York, New York 10036.



Does or will your claim include any issues under the Human Rights Act 1998.    Yes    No

See Addendum

| Court fee | 400.00 |
|-----------|--------|
| Solicitor's costs | |

The court office at the Admiralty and Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL is open between 10am and 4.30pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N208(CC) Claim form (CPR Part 8) (03.02)                                    Laserform International 3/02

| Claim No. | |
|-----------|--|

Details of claim

The Claimants' claims are for:

1. A Declaration that any claims against them by any of the Defendants arising out of or connected with their employment by the same and/or arising out of and/or connected with the following written contracts:

a. between the First Claimant and the First Defendant dated 17 November 1997, as amended from time to time;

b. between the Second Claimant and the First Defendant dated 19 December 1999, as amended from time to time;

c. between the Third Claimant and the First Defendant dated 10 April 2000, as amended from time to time;

d. between the First Claimant and the Third Defendant, together with such others on behalf of whom it purported to contract, signed by the First Claimant on 16 November 2005;

e. between the Second Claimant and the Third Defendant, together with such others on behalf of whom it purported to contract, signed by the Second Claimant on 16 November 2005;

f. between the Third Claimant and Third Defendant, together with such others on behalf of whom it purported to contract, signed by the Third Claimant on 16 November 2005;

(contracts (d) to (f) being collectively referred to as the "Bonus Contracts")

are:

i. Subject to the exclusive jurisdiction of the Courts of England and Wales pursuant to Section 5 of Council Regulation (EC) 44/2001; and/or

ii. Subject to an exclusive alternatively non-exclusive jurisdiction clause in favour of the jurisdiction of the Courts of England and Wales contained in and/or evidenced by the Bonus Contracts;

and/or

2. A declaration that the jurisdiction clause(s) in the Bonus Contracts purporting to confer jurisdiction on the County of New York, USA is/are invalid pursuant to Section 5 of Council Regulation (EC) 44/2001;

and/or

3. A permanent worldwide anti-suit injunction restraining each and any of the Defendants from the commencement, prosecution and/or continuance of proceedings arising out of or connected with the employment of the Claimants by the Defendants and/or arising out of or connected with any of the contracts listed in paragraph 1 above anywhere other than the jurisdiction of England and Wales, including in particular the proceedings commenced by the Second and Third Defendants against the Claimants in the United States District Court Southern District of New York (Index Number 07 Civ 3580);

on the grounds more particularly set out in the First Witness Statement of Katharine Clare Payne, a copy of which is filed herewith and the contents of which may be deemed incorporated herein.

| Claim No. | |
|---|---|

Statement of Truth

*(I believe) (The Claimant believes) that the facts stated in this claim form are true.

*I am duly authorised by the claimant to sign this statement

Full name ___KATHARINE   CLARE   PAYNE_____

Name of *(claimant) ('s solicitor's firm)
___ELBORNE   MITCHELL   SOLICITORS_____

signed ___Payne___    position or office held ___PARTNER___

*(Claimant) ('s solicitor)                    (if signing on behalf of firm, company or corporation)

*delete as appropriate

Elborne Mitchell
One America Square
Crosswall
London
EC3N 2PR

1063   London City
020 7320 9111

Ref: KCP/RHJ/rh/30947

<u>Claim No. Folio</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

B E T W E E N :

(1) JULIAN SAMENGO-TURNER

(2) RONALD DENNIS WHYTE

(3) MARCUS HOPKINS

<u>Claimants</u>

-and-

(1) MARSH SERVICES LIMITED

(Formerly MARSH CORPORATE SERVICES LIMITED

and prior to that J&H MARSH & MCLENNAN (SERVICES) LIMITED)

(2) GUY CARPENTER & COMPANY LCC

(3) MARSH & MCLENNAN COMPANIES INC

<u>Defendants</u>

-------------------------------------------------------------------------

SKELETON ARGUMENT ON BEHALF OF CLAIMANTS

Application for interim anti-suit injunction

-------------------------------------------------------------------------

*Suggested reading and reading time* : In addition to this skeleton argument, the Court is invited to read the First Witness statement of Katharine Payne if there is time [tab 3]. It is estimated that in total about 45 minutes to 1 hour pre-reading time is required.

References below are [tab/page]

**Synopsis**

1.    This action is a CPR Part 8 Claim, issued on 29 May 2007 [tab 1]. The First

Witness Statement of Katharine Payne has been filed in support of it [tab 3]. In it the Claimants claim declaratory and injunctive relief. In short, the Claimants say that, in their capacity as employees of the Defendants, any proceedings against them arising out of that employment must be litigated in this jurisdiction pursuant to section 5 of Council Regulation (EC) 44/2001 ("the Regulation"). Relief is sought in the Claim Form to compel the Defendants to so proceed.

2.    The Defendants' London solicitors, Messrs. Herbert Smith, stated in correspondence on 25 May 2007 with the Claimants' London solicitors, Messrs. Elborne Mitchell, that they had instructions to accept service of the Part 8 Claim for all Defendants [tab 7] and service on all Defendants has been effected at their offices. Acknowlegdements of service have yet to be filed.

3.    On 4 May 2007 the Second and Third Defendants, which are US companies, commenced proceedings against the Claimants arising out of their employment in United States District Court Southern District of New York (Index number 07 Civ 3580) ("the US Proceedings" – [4/101-113]). To date, only the Second Claimant has been served with those proceedings. On 18 May 2007 an order was obtained in the US Proceedings requiring all the Claimants (including the two who have yet to be served) to give disclosure and answer interrogatories by 1 June 2007 and to attend for depositions in London in the period 4 to 8 June 2007, in being in MMC and Guy Carpenter's election to put that back to the week commencing 11 June 2007. The Claimants say that the US Proceedings have been commenced in breach of their entitlement to be sued in this jurisdiction. A challenge to the jurisdiction of the New York Court is on foot in the US Proceedings but the timetable for hearing it presently in place will result in it being heard after the time for compliance with the order of 18 May 2007 has passed.

4.    In correspondence between the London solicitors an undertaking has been sought that the Defendants will not take any substantive steps in the US

Proceedings or seek to enforce the order of 18 May 2007 pending the outcome of this Part 8 Claim [tab 7]. In absence of such an undertaking being forthcoming, the Claimants urgently seek an interim anti-suit injunction restraining the prosecution of the US Proceedings until the Part 8 Claim can be heard. The Claimants do not wish to be in breach of a New York court order but are unable to comply with it without risking being found to have submitted to the jurisdiction of the New York court. Further, if the Claimants are obliged to comply with the order of 18 May 2007 the US Proceedings will have achieved a substantial part of their final object and the Claimants will have been subject to a procedure (depositions) which is itself relied on as one of the grounds why an anti-suit injunction is needed, both of which would render the substantive relief sought in the Claim Form nugatory at least in part. Hence, interim relief in the form of anti-suit injunction is sought to hold the ring for now.

5.  Typically, anti-suit relief is sought on a final basis and such relief is sought in the Claim Form. However, the Claimants recognise that the Defendants may wish to have more time in which to put in evidence and consider their response to the Claimants' arguments than is available before this application is heard. The Claimants also recognise that only limited Court time may be available on short notice. For those reasons, anti-suit relief is at this stage sought on an interim basis only. (The Claimants are wrong about the Defendants needing time or the Court's availability then the Court may well be in a position to resolve the application once and for all.)

6.  At the time of writing, it is unclear how much of the following will be contentious and it may be that much of what appears below is not in issue in the event.

7.  The submissions in this skeleton address matters in the following order:

    a.    The background facts

b.      Section 5 of the Regulation and how it applies to this case

c.      Reasons why an anti-suit injunction should be granted in this case to give effect to the provisions of the Regulation

d.      Reasons why an anti-suit injunction should be granted even if the Regulation is not in play

## The background facts

### The Defendants

8.      The Defendants are all related entities belonging to the MMC group of companies, being concerned in the business of insurance and reinsurance broking. The First Defendant, "MSL", is a UK service company providing employment services to the MMC group. The Second Defendant, "Guy Carpenter" is the US trading entity for MMC group business trading under what might be described as the Guy Carpenter banner. The Third Defendant, "MMC", is the overall US parent and controlling entity of the MMC group, including MSL and Guy Carpenter.

9.      Included under the Guy Carpenter banner is Guy Carpenter & Company Ltd ("Guy Carpenter UK"), a UK subsidiary of Guy Carpenter, under the ultimate ownership and control of MMC. Guy Carpenter has a global business unit, GCFac, which (as the name suggests) is concerned with facultative reinsurance. All the Claimants were concerned in the GCFac unit as set out next. Guy Carpenter UK is the entity through which the business of the GCFac unit is transacted in this jurisdiction.

### The Claimants and their contracts

10.     All three Claimants resigned their employ on about 3 April 2007 and are currently on six month's garden leave. At the time of their resignations, the First and Second Claimants ("Mr Samengo-Turner" and "Mr Whyte"

respectively) were the joint heads of the GCFac unit. The Third Claimant ("Mr Hopkins") was head of the UK section of the GCFac unit.

11.    All three Claimants have contracts entered into in1998 (Mr Samengo-Turner and Mr Whyte) or 2000 (Mr Hopkins) naming MSL (under one or other of its former names) as their employer ("the UK Contracts"). The UK Contracts have been amended from time to time. The amendments are not material for these purposes. The UK Contracts contain all the terms typically found in a written statement of terms of employment, together with obligations of confidentiality and post termination restrictive covenants. The UK Contracts and their amendments can be found at:

a.    Mr Samengo-Turner [4/21-28 & 47-49]

b.    Mr Whyte [4/50-67]

c.    Mr Hopkins [4/68-78]

12.    All three Claimants have each also signed an additional contract dated 16 November 2005 which provides for them to be paid a bonus ("the Bonus Contracts"). The Bonus Contracts are said to be made pursuant to the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan ("the Plan"). All the Bonus Contracts are identical in their terms (save as to the amount of the bonus). The Bonus Contracts can be found at:

a.    Mr Samengo-Turner [4/115-132]

b.    Mr Whyte [4/134-151]

c.    Mr Hopkins [4/153-170]

13.    MMC is the other named contracting party to the Bonus Contracts. However,

the Bonus Contracts purport to impose obligations on the Claimants to, and purport to create rights against the Claimant in favour of, *"the Company"*, which is defined as *"MMC or any of its subsidiaries or affiliates"* [4/115].

14.  The Bonus Contracts contain both provisions of general application and, at schedule IID, provisions which are specifically applicable to UK employees. The Bonus Contracts provide:

> *"D*   *Notice and Non-Solicitation Provisions Applicable to Employees Working in the UK*
> *The terms of the attached schedule IID shall apply if, and only if, notice of termination of your employment with the Company or the termination of your employment is at a time when your principle place of employment for the Company is the United Kingdom... The remaining terms of this Agreement shall continue in effect when Schedule IID is applicable except to the extent those terms are inconsistent with Schedule IID, in which case the terms of Schedule IID shall control."*

15.  The Bonus Contracts contain provision for the bonus awarded to be clawed back in the event that the employee engages in "Detrimental Activity", a term defined in the main body of the Bonus Contracts. The Bonus Contracts also contain provisions typically associated with contracts of employment, including duties of confidentiality and post termination restrictive covenants.

16.  The Bonus Contracts also contain the following term ("the Co-Operation Clause"):

> *"E*   *Cooperation*
> *You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement."*

17.  Notably, the obligation under the Co-Operation Clause is to co-operate with

"the Company".

18.  The Bonus Contracts are putatively subject to New York law and jurisdiction [clause IVN : 4/124].

19.  Schedule IID to the Bonus Contracts, the part specifically applicable to UK employees, contains a revised definition of the term "Detrimental Activity", together with revised post termination restrictive covenants. Those post termination restrictive covenants substantially replicate the post termination restrictive covenants in the UK Contracts.

20.  Schedule IID contains the following law and jurisdiction provision:

> "6    GENERAL
> This Schedule will be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York.
> ..."

**The Claimants' employment in practice**

21.  As noted above, MSL is a service company. It does not itself transact any insurance business. In practice, therefore, the Claimants provided their services to other companies in the MMC group and in particular to Guy Carpenter UK.

**Events after the Claimants resigned**

22.  The Claimants have resigned their employment in order to take up new positions with the Integro group, another insurance and reinsurance broking business, which they propose to do when their garden leave periods come to an end in October 2007. That this was their intention was made plain when they resigned.

23.   Following their resignations, each of the Claimants received a letter from MSL dated 3 April regarding their ongoing obligations [Whyte : 4/79-82; Samengo-Turner : 4/83-85; Hopkins : 4/86-89]. All the letters are in identical terms and refer to the Claimants' employment with "the Company" (a term defined as MSL in the UK Contracts). Each letter provides:

*"You will appreciate that in your capacity within Guy Carpenter & Company Limited, you have had access to and been entrusted with commercially sensitive information about the Company's business and that of its clients. In order to protect the Company's business interests, we must remind you that you are bound by the terms of the contract signed by you.*

*I would also remind you that:*

(i)    *You have a duty of confidence to the Group, which exists both during and after termination of the contract. ...*
(ii)   *for a period of 12 months following the date of your resignation, you have an obligation not to directly or indirectly solicit business from, or in any way deal with the insurance business of any client of the Group with whom you had dealings in the 12 months preceding the date of your resignation.*
(iii)  *for a period of 12 months following the date of your resignation, you have an obligation not to solicit or entice away from the Company or the Group or offer employment or engagement to any employee who is engaged in the business of insurance broking and with whom you have had dealings in the 12 months preceding your resignation.*

*Points (ii) and (iii) above only apply if your actions are in connection with the supply or proposed supply of Competitive Services. Competitive Services are services which compete with those the Company or any other member of the Group was supplying or seeking to supply to clients at the time your employment was terminated for the purpose of the business or businesses with which you were materially involved at any time during the last 12 months following the date of your resignation.*
*We trust you will respect and honour our rights. We are prepared, however, to pursue legal actions and remedies suitable to us, against you and your employer, if these actions become necessary".*

24.   Those letters are of interest because they refer to the Claimants' capacity "within" Guy Carpenter UK and their obligations to "the Group".

25.   Shortly thereafter, on 5 April 2007, Messrs. Herbert Smith wrote to each of the

Claimants in virtually identical terms. In the letters to Mr Samengo-Turner and Mr Hopkins, Messrs. Herbert Smith stated that they were instructed by [Samengo-Turner : 4/174-176; Hopkins : 4/182-184]:

*"Guy Carpenter and associated companies, including your employer, Marsh Corporate Services Limited, and Marsh & McLennan Companies Inc (together "GC")."*

26.    The letter to Mr Whyte stated that Messrs. Herbert Smith were instructed by [4/178-180]:

*"Guy Carpenter and associated companies, including your employer, J&H Marsh McLennan and Sedgwick, and Marsh and McLennan Companies Inc (together "GC")"*

27.    In the 5 April 2007 letters Messrs. Herbert Smith stated that the Claimants had engaged in "Detrimental Activity" and demanded return of sums paid to the Claimants under the Bonus Contracts. Those letters also referred to the "Co-Operation Clause" at Section IIE of the Bonus Contracts and set out a long list of questions which it was said the Claimants were obliged to answer pursuant to that clause.

28.    In the case of Mr Samengo-Turner and Mr Hopkins, the questions were asked on that basis that:

*"...such information is reasonably requested by GC in order to establish whether or not you are in compliance with your obligations under the Plan and as a GC employee."*

29.    In the case of Mr Whyte it was said that:

*"You have a specific obligation pursuant to Section IIE of the Plan, as well as your general obligations as an employee and director of Guy Carpenter and Company Limited, to provide GC with such information as is reasonably requested by GC in order to establish whether or not you are in compliance with your obligations under the Plan and as a GC employee and director"*

30.    The letters concluded by asking for undertakings and the return of documents. The undertakings asked for were (identical for all Claimants) that:

*"you will strictly comply with your obligations as a GC employee and, in particular, with the obligations referred to in the letter to you dated 3 April 2007 and the obligations set out in the Plan;"*

31.    Finally, the letters ended with the reservation:

for Mr Samengo Turner and Mr Hopkins:

*"You should be aware that our client is also entitled, inter alia, to damages in respect of any breach by you of your obligations and to an injunction to prevent any breach of your ongoing duties as an employee, including those obligations that continue after the end of your employment with GC. Our client's rights in these respects, and generally, are specifically reserved."*

for Mr Whyte:

*"You should be aware that our client is also entitled, inter alia, to damages in respect of any breach by you of your obligations and to an injunction to prevent any breach of your ongoing duties as an employee and/or director, including those obligations that continue after the end of your employment and/or appointment as a director with GC. Our client's rights in these respects, and generally, are specifically reserved."*

32.    The letters of 5 April 2007 are of interest in that (a) the MMC companies referred to are collected together under the abbreviation "GC" and it is "GC" who is said to be the Claimants' employer and (b) the obligations in the Plan are relied on as being part of the Claimants' duties as employees of "GC".

33.    Messrs. Elborne Mitchell replied on 11 April 2007 and there followed further exchanges, resting with a fax from Messrs. Elborne Mitchell on 17 May 2007. Having previously indicated that they were willing to give undertakings to abide by their obligations as employees, the fax of 17 May 2007 set out the

form of undertaking the Claimants were willing to sign [4/99-100]. To date, they have not been taken up on that offer. The Claimants remain willing to sign such an undertaking.

**The US Proceedings**

*The Complaint*

34.     Guy Carpenter and MMC are the Plaintiffs in the US Proceedings, commenced without any prior notice on 4 May 2007. In the Complaint the relief claimed is (a) damages for breach of the Bonus Contracts, particularised as the return of sums paid under the Bonus Contracts and (b) an injunction compelling compliance with the Co-operation clause by way of requiring answers to questions to be provided [Complaint para 3 : 4/102].

35.     The Complaint contains these passages:

"*Introduction*

1       *This is an action for breach of contract arising out of the defendants' participation in the [Plan] and their respective violations of the terms and conditions of the [Bonus Contracts]. Under the express terms of the Agreements, defendants are each required to cooperate with Marsh or any of its subsidiaries or affiliates, including Guy Carpenter, and specifically to "provide to the Company such information relating to [their] work for the Company or [their] other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]. Having received from Guy Carpenter written, reasonable requests for information in accordance with this provision, defendants have refused to cooperate. Not only are such refusals unambiguous breaches of defendants contractual obligations to provide such cooperation, but they are a blatant and unlawful attempt to prevent plaintiffs from determining whether defendants are in compliance with other terms of the [Bonus Contracts.] Specifically, plaintiffs have reason to believe that defendant, directly and/or in concert with other individuals at their announced next employer, are and have been targeting, soliciting and recruiting numerous Guy Carpenter employees to terminate their employment with Guy Carpenter to join Integro Insurance Brokers. Any such activities constitute separate violations of the [Bonus Contracts.]*

2       *Further, under the express terms of the [Bonus Contracts], Defendants*

*are not permitted to engage in Detrimental Activity, which includes employment with or otherwise being interested in a competitor of plaintiffs. Defendants engaged in Detrimental Activity and breached their [Bonus Contracts] by accepting employment with or otherwise becoming interested in Integro Insurance Brokers on or before April 5, 2007. Under the [Bonus Contracts], defendants therefore are required to return compensation they received pursuant to the Plan within one year prior to their engaging in such Detrimental Activity. Despite proper written demand, they have failed to do so.*

...

*<u>Defendants' Employment With Plaintiffs</u>*

11    *Samengo-Turner's employment with Guy Carpenter commenced on or about September 23, 1991. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Samengo-Turner co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.*

12    *Whyte's employment with Guy Carpenter commenced on or about September 20, 1988. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.*

13    *Hopkins's employment with Guy Carpenter commenced on or about April 10, 2000. On or about April 3, 2007 Hopkins gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Hopkins was head of Guy Carpenter's UK facultative reinsurance operation.*

14    *Defendants' employment with Guy Carpenter was, and continues to be, governed by their respective employment agreements with plaintiffs.*

15    *Under the terms of their respective employment agreements with plaintiffs, defendants are currently in six(6) month "notice periods" meaning they remain employed by plaintiffs and continue to receive compensation from plaintiffs. As current employees, defendants also continue to have fiduciary and related duties and obligations to plaintiffs that are associated with such employment.*

16    *In addition, by the terms of their respective employment agreements with plaintiffs, defendants are not permitted for specific periods of time during and after their notice period to solicit, entice, induce or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs."*

36.    It is apparent, therefore, that both MMC and Guy Carpenter are suing the

Claimants in the US Proceedings on the basis that the Claimants are employed by them and in that capacity owe MMC and Guy Carpenter duties qua employer.

37.     The Bonus Contracts do not impose an express obligation on the Claimants not to engage in Detrimental Activity. Rather, the Bonus Contracts provide that if the Claimants engage in Detrimental Activity, then the sums paid under the Bonus Contracts may be clawed back. However, it is apparent from the Complaint that MMC and Guy Carpenter are relying on the Bonus Contracts as imposing an express obligation on the Claimants not to engage in Detrimental Activity and are claiming that it is a breach of Bonus Contracts for them to do so.

38.     In this way, MMC and Guy Carpenter are relying on the definition of Detrimental Activity in Schedule IID in the Bonus Contracts as imposing on the Claimants both pre and post termination obligations, as well as relying on the restrictive covenants expressly set out in Scheduled IID and the Claimants' general duties as employees [Complaint para 28 : 4/107].

39.     Although, therefore, the claims in the US Proceedings are framed as arising under the Co-Operation Clause (which does not appear in Schedule IID), the underlying obligations in respect of which co-operation is sought all appear in Schedule IID to the Bonus Contracts. The "co-operation" sought is in the form of an investigation into whether the Claimants have complied with the obligations appearing in Schedule IID. That is, the US Proceedings have as their object an investigation into whether the Claimants have complied with obligations which are expressly subject to English law and jurisdiction.

*The disclosure order of 18 May 2007*

40.     MMC and Guy Carpenter made their application for expedited disclosure, oral and written, and interrogatories on 15 May 2007 [Interrogatories : [4/221-224]; written disclosure request : [4/214-219]; oral disclosure (deposition) request :

[4/226-230]. In respect of the depositions, an order was asked for that the
Claimants attend in New York to be deposed.

41.    In their Memorandum of Law in support of that application MMC and Guy
Carpenter continue to rely on their status as the Claimants' employer. The
Memorandum of Law contains these passages:

> *"Preliminary Statement*
> *Defendants are senior facultative reinsurance brokers who recently*
> *announced their resignation from Guy carpenter and have accepted*
> *employment with Integro Insurance Brokers ("Integro"), a direct competitor of*
> *Guy Carpenter. During the course of their employment with Guy Carpenter,*
> *defendants agreed that during and for a specified time after their employment*
> *with Guy Carpenter they would not recruit, solicit or otherwise encourage*
> *plaintiffs' employees from terminating their employment with plaintiffs to join a*
> *competitor. Despite these explicit obligations, in the weeks following*
> *defendants' announcements of their resignations from Guy Carpenter, four*
> *other very experienced Guy Carpenter facultative reinsurance brokers who*
> *worked in Guy Carpenter's UK office and reported directly or indirectly to*
> *defendants announced that they would be leaving Guy Carpenter to join*
> *Integro. ....*
> *The rapid rate at which Guy Carpenter facultative brokers in the UK office are*
> *announcing their resignations, joining Integro, or are otherwise being*
> *aggressively solicited to join Integro caused Guy Carpenter to have serious*
> *concerns - and doubts - as to whether defendants are complying with their*
> *covenants not to solicit such employees. Accordingly, plaintiffs requested that*
> *defendants provide information regarding, among other things, their*
> *recruitment by Integro and discussions they have had with other Guy*
> *Carpenter employees since they decided to leave Guy Carpenter.*
> *Defendants, who remain Guy Carpenter employees for the next six months*
> *pursuant to the notice period in their employment contracts, are contractually*
> *obligated to provide such information, having executed agreements with MMC*
> *and Guy Carpenter in connection with their participation in [the Plan] in which*
> *they agreed to do so. ...*
>
> *...*
> *Argument*
> *...*
> *By contrast, expedited discovery poses no material hardship for the*
> *defendants. First, defendants are currently in their six month notice periods,*
> *and, as such, remain Guy Carpenter employees and continue to receive their*
> *full salaries from Guy Carpenter. They have also asserted - in claimed*
> *compliance with their notice obligations - that they are not yet reporting to*
> *work at Integro. Thus, the requested discovery does not - and cannot -*
> *interfere with any work obligation they have. Defendants have no obligations*

> *whatsoever during the normal workday except to provide such information. Defendants also have a panoply of obligations to their employer, Guy Carpenter, including the obligation to make themselves available during business hours to provide important information. It surely cannot be a meaningful burden for defendants to set out what they have been doing during recent months while they have been Guy Carpenter employees."*

42.    The disclosure application was supported by the declaration of Lynsey Mansfield, head of international HR at Guy Carpenter [4/232-238]. That declaration includes these passages:

> *"8    Defendants' employment with Guy Carpenter was, and continues to be, governed by employment agreements between each defendant and Guy Carpenter. Attached to this declaration as Exhibits A-C ... are the defendants respective employment agreements with applicable amendments thereto.*
>
> *9    By the terms of their respective employment agreements, defendants are required to provide six (6) months notice of termination, meaning that they remain employed by Guy Carpenter, continue to receive their full salaries and continue to have all the fiduciary and related duties and obligations to the plaintiffs that are associated with such employment. (Exhibits A-C). Given that they gave notice on April 3, 2007, their six month notice periods will not expire until October 2007."*

43.    Exhibits A to C to Ms Mansfield's Declaration are the UK Contracts.

44.    The papers filed for MMC and Guy Carpenter in the US Proceedings make no attempt to analyse how the UK Contracts and Bonus Contracts fit together, or as to how either MMC or Guy Carpenter might be described as their employer, or as to how Guy Carpenter (which is a named party to neither) derives any rights under either contract. Indeed, there is no reference to MSL anywhere in the papers filed for MMC and Guy Carpenter in the US Proceedings. However, what is clear is that MMC and Guy Carpenter rely on both the UK Contracts and Bonus Contracts as suits them and rely on both as being contracts of employment, giving rise to duties on the part of the Claimants qua employees, both express (in Schedule IID) and implied.

45.    Moreover, the Claimants obligation to provide their services to Guy Carpenter

during business hours was specifically relied on in support of the application for an order that the Claimants makes themselves available in New York to be deposed. That is, Guy Carpenter was demanding that the Claimants fulfill their duties as its employees by making themselves available for the work required of them.

46.     As is the case with the relief claimed in the Complaint, it is apparent that what MMC and Guy Carpenter are seeking to investigate by way of expedited disclosure is compliance with obligations which arise under Schedule IID.

47.     An appearance was entered for Mr Whyte only (being the only Claimant as yet to be served with the US Proceedings) in response to the application for expedited disclosure [4/239-257]. That appearance was to the effect that the New York Court should decline jurisdiction and that the jurisdictional challenge should be heard before any order for disclosure was considered.

48.     The Judge made the order in substantially the terms it was sought against all three Claimants. That (a) two of the three Claimants have yet to be served with proceedings, (b) that none of them are presently in the jurisdiction of New York and (c) a jurisdictional challenge had been indicated were evidently not regarded as reasons to refuse the application. Directions have also been given for hearing Mr Whyte's jurisdictional challenge which will result in it being heard some time after 15 June 2007, ie after the time for compliance with the order of 18 May 2007.

49.     Such procedural avenues as are available to him are being pursued for Mr Whyte in the US Proceedings but there is no guarantee that they will come to fruition before the time for compliance with the order of 18 May 2007 has passed.

50.     This places the Claimants in a difficult position. They do not wish to flout an order of the New York Court. However, if they comply they run the risk that

they will be found to have submitted to the jurisdiction, which they do not wish to do. There is also the risk that the substantive relief sought in these proceedings will be rendered nugatory, at least in part, because the one of the principle objects of the US Proceedings will have been fulfilled and the Claimants will have been subject to a procedure (oral disclosure) which is itself one of the grounds on which an injunction is sought. Hence, this application is being made urgently.

## The Regulation

51.   The primary way in which the Claimants put their case is that, pursuant to the Regulation, they have an inviolate right to be sued in all matters relating to their employment in this jurisdiction, being the place of their employ. In essence, the Claimants say that the effect of the Regulation is to create a statutory right to the effect that claims by employers must be brought against them in the place of their domicile, which cannot be contracted out of and which the Court is obliged to enforce. Looking at it another way, the effect of the Regulation is to write into every contract of employment for an English employee an exclusive jurisdiction clause in favour of this jurisdiction which the Court can and, arguably, must enforce.

52.   The outline of the argument, developed below, is:

a.   Each of the Defendants stands in the position of the Claimants' employer, their UK Contracts and Bonus Contracts together making up the totality of the terms of the Claimants' employment. Indeed, Guy Carpenter and MMC are expressly suing on that basis in the US Proceedings and are seeking to enforce obligations which are characteristic only of an employer/employee relationship.

b.   The claims being brought in the US Proceedings are "*matters relating to individual contracts of employment*" within the meaning of Art 18(1) of the Regulation.

17