# EXHIBIT E-2

c.    MSL and/or Guy Carpenter UK and/or the GCFAc unit is/are a *"branch, agency or other establishment"* within the meaning of Art 18(2) of the Regulation. As such, Guy Carpenter and MMC are deemed to be domiciled here for the purposes of Section 5 of the Regulation and are, therefore, obliged to sue the Claimants here in matters relating to their employment.

d.    Further, Art 20(1) of the Regulation, which provides that an employer may only sue its employees in the place of their domicile, is of general application and creates a freestanding right for employees in Member States, irrespective of the domicile of their employers (even if Art 18(2) is not in play).

e.    The New York jurisdiction clause does not catch the claims being advanced in the US Proceedings.

f.    Even if it did, Art 21(1) renders it invalid.

**Text of the Regulation**

53.    The material provisions of the Regulation are these:

> *"Section 1 : General provisions*
> *Art 4*
> *1    If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall, subject to Articles 22 and 23, be determined by the law of that Member State.*
>
> *[Articles 22 and 23 deal with exclusive jurisdiction and jurisdiction agreements respectively]*
> *...*
> *Section 5 : Jurisdiction over individual contracts of employment*
>
> *Art 18*
> *1    In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and*

point 5 of Article 5.

*[Article 5 is not material for these purposes]*

2    *Where an employee enters into an individual contract of employment
with an employer who is not domiciled in a Member State but has a
branch, agency or other establishment in one of the Member States,
the employer shall, in disputes arising out of the operations of the
branch, agency or establishment, be deemed to be domiciled in that
Member State.*

...
Art 20
1    *An employer may bring proceedings only in the courts of the Member
State in which the employee is domiciled.*

...
Art 21
*The provisions of this Section may only be departed from by an agreement on
jurisdiction:*
1    *which is entered into after the dispute has arisen; or*
2    *which allows the employee to bring proceedings in courts other than
those indicated in this Section."*

**A brief history of the employment provisions in the Regulation**

54.    Specific provisions relating to contracts of employment first emerged in the
Lugano convention, which followed rulings in the ECJ on how the general
provisions relating to contracts in the Brussels Convention applied to
employment contracts [see *Jenard/Moller Report* paras 36-44 - 1990 OJ
C/189/57]. The basic rationale behind the rules was to "*secure adequate
protection for the party who from the socioeconomic point of view was to be
regarded as the weaker in the contractual relationship*", that party being the
employee [ibid para 37]. Similar provisions were introduced into the Brussel
Convention on the accession of Spain and Portugal in 1989 [see *De Almeida
Cruz/Desantes Real/Jenard Report* para 23 - 1990 OJ C189/35].

55.    In the Explanatory Memorandum to the Regulation Proposal the following
appears in relation to what is now section 5 of the Regulation :

"*The jurisdiction conferred by this Section is substituted for that conferred by
sections 1 and 2.*

> *The provisions concerning jurisdiction in relation to employment contracts undergo little change of substance but are regrouped in a specific section as is the case for insurance and consumer contracts. ...*
> *Art 18*
> *Art 18(2) applies where the employer, although not domiciled in a Member State, operates a branch, agency or other establishment there. The employer is then presumed to be domiciled in a Member State. This increases the protection given the worker, considered to be the weaker party to the contract. The same protection is already available to the insurance policy-holder and is now extended to the insured and the beneficiary (Art 9(2) and to the consumer Art 1592)), who are again the weaker parties enjoying enhanced protection."*

56.   Thus, the basic scheme is clear : an employee, being regarded as the weaker party in the employee/employer relationship, is afforded special protection, in the same way that special protection is given to insureds and consumers.

57.   The provisions of Section 5 are mandatory and cannot be contracted out of to the benefit of the employer in advance of a dispute arising [see Art 21]. In this way, the protections contained in Section 5 are on a par with the multiple additional protections for employees in English law which have their origin in Community legislation (eg in relation to discrimination, transfer of undertakings, working time, paternity rights and so on) all of which are of mandatory application. Together, all of those rights form a package of protections for employees which are part of the price of an employer doing business in this jurisdiction.

58.   Underlying Section 5 of the Regulation (and the other protections for employees enshrined in English law) is the public policy decision that employees are entitled to special protection in their capacity as such. The Regulation should be construed so as to give effect to that policy.

### Art 18(1) : matters relating to individual contracts of employment
*"Individual contracts of employment"*

59.   The expression "individual contracts of employment" is used so as to exclude collective agreements and means the contracts of employment of individuals.

60. The Claimants' case is that the UK Contracts and the Bonus Contracts together make up their individual contracts of employment. The Regulation does not define what is meant by "contract of employment" and that is a matter for national law.

61. Having sued the Claimants in the US Proceedings on the express basis that they employ them, it remains to be seen whether MMC and Guy Carpenter will dispute that they are in an employment relationship with the Claimants. However, if they do, then the Claimants wait to hear how they put their case and in particular how they can claim to be entitled to the benefits of an employment relationship on one side of the Atlantic, whilst disputing that such relationship exists on the other.

62. If it is necessary to enquire further into the nature of the relationship between the Claimants and MMC/Guy Carpenter, then:

   a. There is no reason in principle preventing an employee from having more than one employer at the same time.

   b. An employment contract is, in a classic sense, a contract for service. Although it is MSL who is expressly named as the Claimants' employer, they de facto provide their service to other companies in the MMC group and do not render any service to MSL as such. The practical reality is, therefore, that the Claimants serve more than one master. In particular, the Claimants provide services to the GCFac unit, which is part of Guy Carpenter and under the ultimate ownership and control of MMC.

   c. The terms of the Bonus Contracts are those which are typically found in an employment contract. In particular :

i.      The bonus paid under the Bonus Contracts is a reward for service rendered as an employee. The preamble says it is "*in recognition of your potential future contribution to the success of MMC*" and is payable "*subject to your continued employment*" [clause IA(1)].

ii.     Other terms of the Bonus Contracts - notice of termination of employment, confidentiality, post termination restrictive covenants - are only apposite in the context of an employment relationship.

iii.    The definition of Detrimental Activity includes rendering services other than to the Company (as defined), breach of confidence and soliciting clients or employees. Again, these are only apposite in the context of an employment relationship.

d.     The duties on which MMC and Guy Carpenter rely in the US Proceedings are characteristic of the employment relationship. In particular, MMC and Guy Carpenter have relied on a duty of fidelity which is only said to arise by reason of the employment relationship between the parties.

e.     The Co-operation Clause, together with the assertion that the Claimants continue to be employed by MMC and Guy Carpenter, was relied on in the US Proceedings in support of the application for an order that the Claimants attend depositions in the US. That is, MMC and Guy Carpenter were demanding that the Claimants provide their services as employees to them as their employer by complying with the Co-operation Clause and attending the depositions. As such, MMC and Guy Carpenter were purporting to exercise the degree of control over the Claimants such as an employer might demand.

63. For all those reasons, the UK Contracts and the Bonus Contracts can together be found to be comprise the Claimants' individual contracts of employment within the meaning of Art 18(1).

*"Matters relating to"*

64. In *Swithenbank Foods -v- Bowers* [2002] 2 All ER (Comm) 974, it was held that the expression "matters relating to individual contracts of employment" mean "claims made under individual contracts of employment" [per Judge McGonigal (sitting as a judge of the High Court) at paras 24-26]. In so holding, Judge McGonigal held that a tortious claim in conspiracy, which did not depend upon the employment relationship between the claimant and defendant, was not caught by Art 20 of the Regulation.

65. More recently, in *Albon -v- Naxa Motor* [2007] 2 All ER 719 Lightman J considered the phrase "in respect of a contract" as it appears in CPR 6.20(5). He held :

"[26]   *But in my judgment claims under gateway 6.20(5) are not confined to claims arising under a contract. It extends to claims made 'in respect of a contract' and the formula 'in respect of' (tested by reference to English law) is wider than 'under a contract': see e g Tatam v Reeve [1893] 1 QB 44, [1891–4] All ER Rep 391. The provision in the CPR is in this regard deliberately wider than the provision in its predecessor RSC Ord 11. In this regard, unlike Mr Nathan QC (counsel for the defendants) I do not think that any assistance is obtained from the decision in the Kleinwort Benson case [1997] 4 All ER 641 at 643644 and 648, [1999] 1 AC 153 at 162 and 167. In that case the House of Lords was concerned with ss 16 and 17 of the Civil Jurisdiction and Judgments Act 1982 which (subject to certain modifications) incorporated the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 into the law of the United Kingdom. One modification effected to Title II of the convention was to the following effect: '5. A person domiciled in a part of the United Kingdom may, in another part of the United Kingdom, be sued: (1) in matters relating to a contract, in the courts for the place of performance of the obligation in question . . .' In the context of the formula of words there used, and in particular the reference to the place of performance of the obligation in question, there is postulated the existence of a contract giving rise to an obligation of performance in*

*the country whose courts are to have jurisdiction.*

[27]   *Accordingly the formula of words in r 6.20(5) 'in respect of a contract' does not require that the claim arises under a contract: it requires only that the claim relates to or is connected with the contract. That is the clear and unambiguous meaning of the words used. No reference is necessary for this purpose to authority and none were cited beyond Tatam v Reeve [1893] 1 QB 44, [18914] All ER Rep 391. If such reference were needed, I would find support in a passage which I found after I had reserved judgment in the judgment of Mann CJ in Trustees Exors and Agency Co Ltd v Reilly [1941] VLR 110 at 111: 'The words "in respect of are difficult of definition, but they have the widest possible meaning of any expression intended to convey some connection or relation between the two subject-matters to which the words refer."*

66.   The *Swithenbank* decision is not cited in the *Albon* case.

67.   The Claimants say that the US Proceedings are "matters relating to" their individual contracts of employment, either adopting the more liberal approach to interpretation used in the *Albon* case or on the more restrictive definition given in *Swithenbank*. The Claimants will, if necessary, say the decision in *Swithenbank* is unduly restrictive if it is relied on by the Defendants to assert that the US Proceedings are not matters relating to the Claimants' contracts of employment.

**Art 18(2) : operations of a branch agency or other establishment**
*Branch agency or other establishment*

68.   It is the Claimants' case that MSL and/or Guy Carpenter UK and/or the GCFac unit are each a "branch agency or other establishment" of Guy Carpenter and MMC and that, because the claims against the Claimants arise out of the "operations" of MSL and/or Guy Carpenter UK and/or the GCFac unit, both Guy Carpenter and MMC are deemed to be domiciled here for the purposes of section 5 of the Regulation.

69.   The words "branch agency or other establishment" also appear in Art 5(5) of the Regulation (and appeared in the same form in the Brussels and Lugano

conventions), as well as in the provisions relating to consumers and insureds. Art 5(5) provides:

> "A person domiciled in a Member state may, in another Member State, be sued:
> (5)     as regards a dispute arising out of the operations of a branch, agency or other establishment, in the court for the place in which the branch, agency or other establishment is situated;"

70.    That provision has been considered, both domestically and in the ECJ, on a number of occasions. The words " branch agency or other establishment" should be given the same meaning in Art 18(2) has they bear in Art 5(5) (and elsewhere).

71.    In *Somafar SA -v- Saar-Ferngas AG* (Case 33/78) [1978] ECR 2183 the ECJ, considering Art 5(5), said:

> "11.    Having regard to the fact that the concepts referred to give the right to derogate from the principle of jurisdiction of article 2 of the Convention their interpretation must show without difficulty the special link justifying such derogation. Such special link comprises in the first place the material signs enabling the existence of the branch, agency or other establishment to be easily recognised and in the second place the connection that there is between the local entity and the claim directed against the parent body established in another contracting state.
>
> 12.    As regards the first issue, the concept of branch, agency or other establishment implies a place of business which has the appearance of permanency, such as the extension of a parent body, has a management and is materially equipped to negotiate business with third parties so that the latter, although knowing that there will if necessary be a legal link with the parent body, the head office of which is abroad, do not have to deal directly with such parent body but may transact business at the place of business constituting the extension.
>
> 13.    As regards the second issue the claim in the action must concern the operations of the branch, agency or other establishment. This concept of operations comprises on the one hand actions relating to rights and contractual or non-contractual obligations concerning the management properly so-called of the agency, branch or other establishment itself such as those concerning the situation of the building where such entity

*is established or the local engagement of staff to work there. Further it also comprises those relating to undertakings which have been entered into at the above-mentioned place of business in the name of the parent body and which must be performed in the contracting state where the place of business is established and also actions concerning non-contractual obligations arising from the activities in which the branch, agency or other establishment within the above defined meaning, has engaged at the place in which it is established on behalf of the parent body. It is in each case for the court before which the matter comes to find the facts whereon it may be established that an effective place of business exists and to determine the legal position by reference to the concept of 'operations' as above defined."*

72.    The *Somafer* case has been partially overruled *Lloyd's Register -v- Societe Campenon Bernard* (case C-439/93) [1995] ECR I-961, in as much as it purported to require that the obligation in question which was in dispute had to be performed in the place where the branch agency or other establishment was domiciled [so held by the Court of Appeal in *Anton Durbeck -v- Den Norkse Bank* [2003] QB 1160 per Lord Philips MR at para 40]. In the *Lloyd's Register* case the ECJ said:

"16.    *First, the actual wording of article 5(5) of the Convention in no way requires that the undertakings negotiated by a branch should be performed in the contracting state in which it is established in order for them to form part of its operations.*

17.    *Secondly, the interpretation put forward by the appellant in the main proceedings would render article 5(5) almost wholly redundant. Since article 5(1) already allows the plaintiff to bring an action in contract in the courts for the place of performance of the obligation in question, article 5(5) would duplicate that provision if it applied solely to undertakings entered into by a branch which were to be performed in the contracting state in which the branch was established. At the very most it would create a second head of special jurisdiction where, within the contracting state of the branch, the place of performance of the obligation in question was situated in a judicial area other than that of the branch.*

18.    *Thirdly, it should be noted that an ancillary establishment is a place of business which has the appearance of permanency such as the extension of a parent body, has a management and is equipped to negotiate business with third parties so that the latter, although knowing that there will if necessary be a legal link with the parent body, whose seat is in another contracting state, do not have to deal directly*

*with such parent body (see Somafer [1978] ECR 2183, 2192, para 12).*

19.    *A branch, agency or other ancillary establishment within the meaning of article5(5) is therefore an entity capable of being the principal, or even exclusive, interlocutor for third parties in the negotiation of contracts.*

20.    *There does not necessarily have to be a close link between the entity with which a customer conducts negotiations and places an order and the place where the order will be performed. Accordingly, undertakings may form part of the operations of an ancillary establishment within the meaning of article 5(5) of the Convention even though they are to be performed outside the contracting state where it is situated, possibly by another ancillary establishment.*

21.    *That interpretation is, moreover, in conformity with the objective of the special rules of jurisdiction. As the Jenard Report (OJ 1979 C 59, p 22) makes clear, those rules allow the plaintiff to sue the defendant in courts other than those of his domicile because there is a specially close connecting factor between the dispute and the court with jurisdiction to resolve it.*

22.    *In the light of the foregoing considerations, the answer to the question referred by the Cour de Cassation must be that the expression 'dispute arising out of the operations of a branch, agency or other establishment' in article 5(5) of the Convention does not presuppose that the undertakings in question entered into by the branch in the name of its parent body are to be performed in the contracting state in which the branch is established."*

73.    On the Guy Carpenter website [www.guycarp.com] the following appears as part of the description of the GCFac unit [http://www.guycarp.com/portal/extranet/capabilities/gcfac.html;vid=4]:

*"GCFac offers services in all major global markets, through nine dedicated placement centers and a network of more than 25 offices around the world. Wherever clients are, no matter which risks they are insuring, they receive consistently high quality service from GCFac."*

74.    The website also gives a list of worldwide contact numbers, including two in London.

75.    The Claimants' case is that MSL and/or Guy Carpenter UK and/or the GCFac

unit can each be taken to be a branch agency or other establishment of MMC and/or Guy Carpenter within the meaning of Art 18(2). The London office of GCFac unit has, as is apparent from Guy Carpenter's website, "an appearance of permanency as an extension of the parent" and is "equipped to negotiate business with third parties" such that those third parties only need to deal with the London office.

*Operations*

76.    The concept of operations includes the employment of local staff [see *Somafer* para 15 quoted above].

*The deeming provision*

77.    The deeming provision is enshrined in Schedule 1 clause 11 of the Civil Jurisdiction and Judgments Order 2001 [SI 2001/3929].

**The application of Art 18(2) to this case**

78.    The principle purpose of Art 18(2) appears to be to permit employees employed by non Member State employers to sue their employers in the place where the branch, agency or other establishment in which they are employed is domiciled. It is an application of the policy that employees, in their capacity as such, are afforded special rights in recognition of their position as the weaker party in the employment relationship.

79.    However, the practical effect for these purposes is that both MMC and Guy Carpenter are deemed be domiciled in a Member State. As such, they are bound by Art 20(1) and can only sue the Claimants here.

80.    However, even if that were not so, the Claimants say that Art 20(1) creates a free standing right which binds MMC and Guy Carpenter, whether Art 18(2) is in play or not. This is considered next.

**Art 20(1) : an employer must sue where the employee is domiciled**

81.  The jurisdictional rules contained in the Regulation are principally based on the domicile of the defendant. So, it applies irrespective of the domicile of the claimant and a claimant resident in non Member States can avail itself of its provisions [*Marc Rich -v- Societa Italiana Impianti* (case C-190/89) [1991] ECR I-3855; *The Maciej Rataj* (Case C-406/92) [1999] QB 515; *Universal General Insurance -v- Group Josi Reinsurance* (case C-412/98) [2001] QB [68] . The net effect of this is that, save for specific exceptions, the domicile of the Claimant is irrelevant for the purpose of determining jurisdiction. (Those specific exceptions are in relation to maintenance, jurisdiction agreements and the rights of consumers, insureds and employees to sue in their home courts).

82.  The basic position under the Regulation is that defendants domiciled in Member States are entitled to be sued in the place of their domicile, subject to the exceptions listed in the Regulation (eg in matters relating to a contract the place for the performance of the obligation in question).

83.  In the case of employees, there is a single mandatory rule for claims by employers : an employer must sue in the employee in his home court. There are no exceptions to that rule. The first head of relief sought in the Part 8 Claim Form is a declaration to that effect. The logical result of the ECJ decisions culminating in the *Group Josi* case is that the Defendants, if they wish to sue qua employer, must do so here, irrespective of their domicile.

**The New York jurisdiction clause**

84.  The foundation of all the claims in the US Proceedings are the obligations which are said to arise out of Schedule IID to the Bonus Contracts. As such, they are subject to English law and jurisdiction and the New York jurisdiction clause does not apply.

85.  Even if that were not so, Art 21(1) renders the New York jurisdiction clause invalid. Employers are not permitted to contract out of the mandatory

provisions of Section 5 in advance of a dispute arising.

86.    The putative existence of the New York jurisdiction clause does not, therefore, effect the result.

### Interim anti-suit injunction
#### Principles

87.    The Court will be familiar with the principles governing the grant of interim injunctions and there is no need to recite them here in any detail. At this stage, *American Cyanamid* applies [*Apple Corp -v- Apple Computer* [1992] RPC 70; cf *Natwest Bank -v- Utrecht-America* [2001] 3 All ER 733, which does not undermine the application of those principles in the circumstances of this case]. The Court is, therefore, concerned with the questions whether the Claimants have a reasonable prospect of success at trial in the sense there is a serious issue to be tried and where the balance of convenience lies. (Questions such as adequacy of damages do not sensibly arise in the circumstances of this case.) The Court is not concerned to decide finally whether the arguments advanced for the Claimants below are correct - it is sufficient that they disclose a reasonable prospect of success.

88.    The Court will also be familiar with the basic principles applicable to the grant of anti-suit injunctions. The authorities broadly fall into two categories : those concerned with injunctions to prevent breaches of express contractual rights (such as proceedings commenced in breach of a jurisdiction or an arbitration clause) and those where the foreign proceedings are said to be vexatious, unconscionable or oppressive (an inherently flexible concept), sometimes described as being brought in breach of an equitable right not to be subject to such proceedings. A few key passages from the authorities follow.

89.    In *Societe Aerospatiale -v- Lee Kui Jak* [1987] AC 871 the Privy Council (in a judgment delivered by Lord Goff) held at p895-896:

*"For all these reasons, their Lordships are of the opinion that the long line of English cases concerned with injunctions restraining foreign proceedings still provides useful guidance on the circumstances in which such injunctions may be granted; though of course the law on the subject is in a continuous state of development. They are further of the opinion that the fact that the Scottish principle of forum non conveniens has now been adopted in England and is applicable in cases of stay of proceedings provides no good reason for departing from those principles. ... In the opinion of their Lordships, in a case such as the present where a remedy for a particular wrong is available both in the English (or, as here, the Brunei) court and in a foreign court, the English or Brunei court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive. This presupposes that, as a general rule, the English or Brunei court must conclude that it provides the natural forum for the trial of the action; and further, since the court is concerned with the ends of justice, that account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him. ..."*

90.  More recently, in *Donohue -v- Armco* [2002] 2 Lloyd's Rep 425 Lord Bingham restated those principles and held :

> *"19.  The jurisdiction of the English Court to grant injunctions, both generally and in relation to the conduct of foreign proceedings, has been the subject of consideration by the House of Lords and the Privy Council in a series of decisions in recent years ... Those decisions reveal some development of principle and there has in other decisions (for example, Mercedes Benz A.G. v. Leiduck, [1995] 2 Lloyd's Rep. 117; [1996] A.C. 284) been some divergence of opinion. But certain principles governing the grant of an injunction to restrain a party from commencing or pursuing legal proceedings in a foreign jurisdiction, in cases such as the present, as between the Armco companies and these PCCs, are now beyond dispute. They were identified by Lord Goff of Chieveley giving the opinion of the Judicial Committee of the Privy Council in Aérospatiale (at p. 892):*
> *(1) The jurisdiction is to be exercised when the ends of justice require it.*
> *(2) Where the court decides to grant an injunction restraining proceedings in a foreign court, its order is directed not against the foreign court but against the parties so proceeding or threatening to proceed.*
> *(3) An injunction will only be issued restraining a party who is amenable to the jurisdiction of the court, against whom an injunction*

*will be an effective remedy.*
*(4) Since such an order indirectly affects the foreign court, the jurisdiction is one which must be exercised with caution."*

91. More recently still, the Court of Appeal has twice considered the principles applicable to anti-suit injunctions. In *OT Africa Line -v- Magic Sportswear* [2005] 2 Lloyd's Rep 170 Rix LJ held :

*"Anti-suit injunction*

62. *Under this heading it is necessary, in addition, to take international comity into account and to attach high importance to it. But what do considerations of comity require?*

63. *To some extent such considerations are built into the basic requirements for the principled exercise of the jurisdiction to grant an injunction. The principles have been defined in a series of cases in the House of Lords such as South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV [1986] 2 Lloyds Rep 317; [1987] AC 24, SociéNationale Industrielle Arospatiale v Lee Kui Jak [1987] AC 871, Airbus Industrie GIE v Patel [1999] AC 119, Donohue v Armco and Turner v Grovit. Thus, as Lord Hobhouse's speech in Turner v Grovit makes clear, with which the other members of the House agreed, an injunction will only be granted to restrain unconscionable conduct or (which prima facie might be said to amount to the same thing) conduct in breach of a contractual arbitration or exclusive jurisdiction clause. It is only such conduct which provides the legal or equitable right for the protection of which the injunction can be granted. The underlying principle is one of justice in support of the "ends of justice" (see Aérospatiale at 892, 893). Secondly, to reflect the interests of comity and in recognition of the possibility that an injunction, although directed against a respondent personally, may be regarded as an (albeit indirect) interference in the foreign proceedings, an injunction must be necessary to protect the applicant's legitimate interest in English proceedings.*

92. In *Seismic Shipping -v- Total E&P* [2005] 2 Lloyd's Rep 359 Clarke LJ held:

*"44.    The judge summarised the relevant principles in para 29 of his judgment by reference to Andrew Smith J's summary of them, which was approved by this court, in Royal Bank of Canada v Centrale Raiffeisen-Boerenleenbank [2004] 1 Lloyds Rep 471. They are set out in para 8 of the judgment of Evans-Lombe J in this court:*

*(i) Under English law a person has no right to be sued in a particular forum, domestic or foreign, unless there is some specific factor that gives him that right, but a person may show such a right if he can invoke a contractual provision conferring it on him or if he can point to clearly unconscionable conduct (or the threat of unconscionable conduct) on the part of the party sought to be restrained: Turner v Grovit [2002] 1 WLR 107, 118C at para 25 per Lord Hobhouse.*

*(ii) There will be such unconscionable conduct if the pursuit of foreign proceedings is vexatious or oppressive or interferes with the due process of this Court: South Carolina Insurance Co v Assurantie Maatschappij de Zeven Provincien NV [1987] AC 24 at page 41D; Glencore International AG v Exter Shipping Ltd [2002] 2 All ER (Comm) 1, 14a at para 42.*

*(iii) The fact that there are such concurrent proceedings does not in itself mean that the conduct of either action is vexatious or oppressive or an abuse of court, nor does that in itself justify the grant of an injunction: Socité Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 817 at page 894C; Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd [1999] 1 Lloyds Rep 767 at 781; Airbus Industrie GIE v Patel [1999] 1 AC 119 at 133G/H.*

*(iv) However, the court recognises the undesirable consequences that may result if concurrent actions in respect of the same subject matter proceed in two different countries: that "there may be conflicting judgments of the two courts concerned" or that there "may be an ugly rush to get one action decided ahead of the other in order to create a situation of res judicata or issue estoppel in the latter": see The Abidin Daver [1984] AC 398 at pages 423H-424A per Lord Brandon.*

*(v) The court may conclude that a party is acting vexatiously or oppressively in pursuing foreign proceedings and that he should be ordered not to pursue them if (a) the English court is the natural forum for the trial of the dispute, and (b) justice does not require that the action should be allowed to proceed in the foreign court, and more specifically, that there is no advantage to the party sought to be restrained in pursuing the foreign proceedings of which he would be deprived and of which it would be unjust to deprive him: Sociéte Aerospatiale, ibid at 895D and 896F-G.*

*(vi) In exercising its jurisdiction to grant an injunction, "regard must be had to comity and so the jurisdiction is one which must be exercised with caution": Airbus Industrie, ibid at 133F. Generally speaking in deciding whether or not to order that a party be restrained in the pursuit of foreign proceedings the court will be reluctant to take upon itself the decision whether a foreign forum is an inappropriate one: Turner v*

*Grovit, ibid at para 25."*

### The use of anti-suit injunctions and the Regulation

*Generally*

93.    The use of anti-suit injunctions as between Member States in matters covered by the Regulation has essentially fallen out of use. The position was helpfully summarised in the judgment of Lord Hoffman in *West Tankers Inc -v- RAS Riunione - "The Front Comor"* [2007] UKHL 4; [2007] 1 All ER (Comm) 794, the case in which the House of Lords referred to the ECJ the question of whether anti-suit injunctions can nonetheless still be employed in support of arbitration. (The House of Lords are in favour of the continued use of anti-suit injunctions in connection with arbitration, the view of the ECJ is awaited.) Lord Hoffman said:

> "10.    *Gasser GmbH v MISAT Srl (Case C-116/02) [2003] ECR I-14693 (which decides that a court of a Member State on which exclusive jurisdiction has been conferred pursuant to article 23 cannot issue an injunction to restrain a party from prosecuting proceedings before a court of another Member State if that court was first seised of the dispute) and Turner v Grovit (Case C-159/02) [2004] ECR I - 3565 (which decides that a court of a Member State may not issue an injunction to restrain a party from commencing or prosecuting proceedings in another Member State which has jurisdiction under the Regulation, on the ground that those proceedings have been commenced in bad faith) are both based upon the proposition that the Regulation provides a complete set of uniform rules for the allocation of jurisdiction between Member States and that the courts of each Member State have to trust the courts of other Member States to apply those rules correctly.*
>
> 11.    *Thus in Gasser GmbH v MISAT Srl (Case C-116/02) [2003] ECR I-14693, article 27 required the court of exclusive jurisdiction to stay proceedings until the court first seised had applied article 23 and refused jurisdiction. In Turner v Grovit(Case C-159/02) [2004] ECR I - 3565 the one court had to trust the other to dismiss the proceedings on the ground that they had been brought in bad faith. In each case, the court which had granted the injunction had been purporting to act pursuant to a jurisdiction within the scope of the Regulation."*

94.    In this case, neither MMC nor Guy Carpenter is domiciled in a Member State

(subject to being deemed to be so) and the reasoning in the *Gasser* and *Turner* cases does not apply [*Beazley -v- Horizon* [2005] 1 LRIR 231].

95.    What the Court is being asked to do, therefore, is to enforce the provisions of Section 5 by the mechanism of an anti-suit injunction in the absence of the Claimants having any other effective remedy. The New York Court of course has no obligation to have regard to the Regulation, still less can it be relied on to apply it. MMC and Guy Carpenter could not choose to sue the Claimants in any Member State other than this one and any other Member State seized of such proceedings would be obliged to decline jurisdiction. Following the reasoning in the line of cases culminating in *Group Josi*, that MMC and Guy Carpenter are not domiciled in Member States does not effect the entitlement of the Claimants to be sued here in accordance with the Regulation.

96.    Moreover, the ECJ has decided that a Member State is not permitted to decline mandatory jurisdiction which arises under the Regulation on forum non conveniens grounds, even if the forum conveniens is not a Member State [*Owusu -v- Jackson* [2005] QB 801]. It is for this reason that the Claimants say that the Court arguably must assume jurisdiction in the circumstances of this case, given that the jurisdictional provision of Art 20(1) is mandatory. At minimum, the logical result of the *Owusu* decision is that the Court can properly assume jurisdiction, policing that assumption of jurisdiction by an anti-suit injunction if necessary, where (as here) the mandatory provisions of the Regulation are in play.

*Application to this case : invasion of express right*

97.    The first way the Claimants put their case is that, having an express right to be sued only here by their employer [Art 20], the Court should enforce that right by the grant of an anti-suit injunction without reference to concepts of unconscionability, vexation or oppression. The practice is to enforce express agreements in favour of this jurisdiction unless there is a strong reason not to do so [*The Angelic Grace* [1995] 1 Lloyd's Rep 87; *Donohue -v- Armco* [2002]

1 Lloyd's Rep 425; *Natwest Bank -v- Utretcht-America* [2001] 3 All ER 733].

98.  That the Claimants' rights derive from statute and are of mandatory application puts them in an even stronger position than a party having a contractual jurisdiction agreement, given that there are no circumstances in which the Court can decline to give effect to Art 20(1) of the Regulation.

99.  To put it another way, the effect of Art 20 is to write into the contracts of employment an exclusive jurisdiction clause in favour of this jurisdiction for claims by employers which cannot be contracted out of, which the Court should enforce in the usual way.

*Application to this case : vexation, unconscionability and oppression*

100.  If the Claimants do have to satisfy a test that the foreign proceedings are vexatious, unconscionable or oppressive, then their case is that they can do so.

101.  First, England is the natural forum for the dispute. Specifically:

a.    This is the forum in which the Regulation dictates proceedings against the Claimants arising out of their employment must be brought.

b.    Schedule IID to the Bonus Contracts is subject to English law and jurisdiction. The obligations which MMC and Guy Carpenter seek to enforce in the US Proceedings arise out of Schedule IID and hence are subject to English law.

c.    This is the natural forum for claims arising out of the Claimants' employment. The Claimants are party to the UK Contracts with a UK entity (MSL) and spent the vast majority of their working time in

London. The acts about which MMC and Guy Carpenter are complaining - namely Detrimental Activity in the form of taking up alternative employment and the solicitation of employees - are said to have taken place here. The employees it is claimed the Claimants solicited work in London [See MMC/Guy Carpenter Memorandum of Law p6].

d.    MSL, being the only party expressly named as an employer, would be obliged to bring any proceedings against the Claimants here.

e.    In short, beyond that MMC and Guy Carpenter are domiciled there, the claims made against the Claimants in the US Proceedings have no connection whatever with that jurisdiction. Indeed, they have no connection whatever with any jurisdiction other than this one.

102.    Second, the US Proceedings are by definition unconscionable, vexatious or oppressive because they undermine the public policy behind the exclusive jurisdiction provisions in Section 5 of the Regulation and are in contravention of the mandatory provisions of the Regulation. The Regulations are designed to regulate proceedings against all employees who have the protection of being employed in Member States. MMC and Guy Carpenter choose to do business here (through various entities in this jurisdiction) and must be taken to be bound by the jurisdictional provisions of the Regulation (as much as they are bound by all the other mandatory employment protections which exist as part of English law). They choose to pay the Claimants a bonus for their employment under the mechanism of the Bonus Contracts. They ought not to be entitled to use it as a mechanism to contract out of provisions which are of mandatory application and which expressly provide (in Art 21(1)) that they cannot be contracted out of to the benefit of employers.