# EXHIBIT E-3

103.   In addition:

    a.    The natural party to complain if it is said that the Claimants have acted in breach of their duties as employees is MSL, the party expressly named as their employer in the UK Contracts, yet no proceedings have been commenced in MSL's name. This is also the natural forum in which to sue the Claimants in matters arising out of their employment here. This suggests that New York has been chosen as a result of forum shopping.

    b.    In particular, it appears that New York has been chosen to enable MMC and Guy Carpenter to take advantage of both the expedited disclosure procedure there and the procedure for the taking of oral disclosure by depositions, neither of which is available here (the expedited disclosure ordered going far beyond anything which it might be expected could be ordered in an application for pre-action disclosure in this jurisdiction).

    c.    That MMC and Guy Carpenter wish to subject the Claimants to oral disclosure, with the result that they will, in all likelihood, be cross examined on the same subject matter twice, is itself oppressive [*Omega Group -v- Kozeny* [2002] CLC 132; *Glencore -v- Metro* [2002] CLC 1090].

    d.    Further, in New York the court there has seen fit to make orders (i) against parties who have not been served and who did not appear (ii) requiring attendance outside that jurisdiction and (iii) which require compliance before a jurisdictional challenge can be heard, the practical effect of which may be that the Claimants may be compelled to submit to the jurisdiction before their challenge to it can be heard and/or that a

substantial part of the objective of the US Proceedings will have been achieved, again before the Claimants' jurisdictional challenge can be heard. That is exorbitant and is itself vexatious or oppressive.

e.    There is no legitimate advantage to MMC and Guy Carpenter in pursuing the US Proceedings which it would be unjust to deprive them of by the grant of an anti-suit injunction. This jurisdiction provides an adequate and proper forum in which they can advance such claims as they wish against the Claimants arising out of their employment.

f.    On the contrary, by requiring MMC and Guy Carpenter to proceed here, they are deprived only of the (illegitimate) advantage of the oral disclosure procedure and perhaps down the line the (illegitimate) advantage of seeking punitive damages against the Claimants.

g.    The Claimants, on the other hand, are prejudiced if they are forced to participate in the US Proceedings. Apart from being required to comply with the order of 18 May 2007 before a jurisdictional challenge can be brought on, they are put to inconvenience and expense in having to litigate in a jurisdiction where they are not domiciled.

**Anti-suit injunction if the Regulation is not in play**

104.    The Claimants seek an anti-suit injunction even if the Court is not satisfied that the Regulation governs the position.

105.    In this respect, the Claimants rely on the matters set out above and in addition say:

a.    MMC and Guy Carpenter are suing the Claimants qua employees. Even if the Court was satisfied that an employment relationship did not

exist between them, they should be held to that election and treated as if they were ie by giving effect to Art 20.

b.    Further, the public policy behind the mandatory provisions of Section 5 of the Regulation is equally applicable to claims which arise out of the contract of employment. MMC and Guy Carpenter only have claims against the Claimants by reason of the Claimants' work at the GCFac unit and duties which are said to arise out of their status as employees. That public policy should be enforced even if the contract sued on does not fall literally within the expression "individual contract of employment". The Bonus Contracts are on any view in the nature of contracts of employment, or at least ancillary to the UK Contracts. The same public policy considerations apply.

c.    The Defendants have dictated the contractual structure for the Claimants remuneration arising out of their employment. They should not be able to so organise it so as to contract out of the provision of Section 5 of the Regulation, something which the Regulation expressly prohibits.

d.    If the Court was satisfied that the New York jurisdiction clause is in play, then this is one of those occasions when the Court should decline to give effect to it. The good reason for so declining is that the Regulation prohibits such clauses in contracts of employment and the logical consequence of that policy is that the Court should decline to give effect to such clauses in contracts which are in the nature of or ancillary to contracts of employment.

## The English law and jurisdiction clause

106.   If and so far as may be necessary, the Claimants also rely on the English

jurisdiction clause in Schedule IID. It is not proposed to length what is already a long skeleton by developing that argument on paper. It can be addressed in submissions if needs be.

**The balance of convenience**

107.    The Claimants say that the balance of convenience is in favour of granting the injunction sought for the following reasons:

a.    The Claimants may be irremediably prejudiced if they have to comply with the order of 18 May 2007 granted in the US Proceedings in that to do so may result in a finding of a submission to the jurisdiction there.

b.    In the absence of an injunction, the US Proceedings will achieve a substantial part of their objective before the jurisdictional challenge can be heard and the Claimants will be subject to a procedure (oral disclosure) which is itself one of the grounds on which they rely in support of their claim for a permanent injunction.

c.    The Claimants have offered to provide written undertakings to comply with their obligations as employees and remain willing to do so.

d.    No prejudice will be suffered by MMC and Guy Carpenter by the grant of the injunction sought. They are both already aware of the identities of the employees the Claimants are alleged to have solicited and in truth the disclosure order was sought in an attempt to gather evidence to bring further claims against the Claimants, rather than to protect the position of MMC and Guy Carpenter.

e.    Although a jurisdictional challenge is on foot in the US Proceedings, this Court is the natural forum in which to determine whether this Court

is the proper forum for the dispute and prima facie should make its decision before any such ruling in the US Proceedings.

f.   The nature of the Part 8 claims is such that there is unlikely to be any material dispute of fact or the need for either extensive or oral evidence. This being so, subject to the availability of the Court, it can be brought to trial reasonably swiftly, in weeks rather than months. The grant of a short term interim injunction will do no harm to MMC and Guy Carpenter in the interim.

g.   The order already procured for MMC and Guy Carpenter provides them with illegitimate advantages : namely by obliging the Claimants to submit to oral disclosure and to give both oral and written disclosure and answer interrogatories before a jurisdictional challenge can be heard. There is no injustice in depriving them of those illegitimate advantages, in particular on a short term basis.

**Conclusion**

108.   The Court is invited to make the interim injunction sought.

109.   A draft order is attached.

Claire Blanchard

29 May 2007
Essex Court Chambers,
24 Lincoln's Inn Fields,
London,
WC2A 3EG.

Katharine Clare Payne

1st witness statement

Exhibit KCP1

Dated 25 May 2007

On behalf of Claimants

2007

Claim No. Folio 945

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N :

(1) JULIAN SAMENGO-TURNER

(2) RONALD DENNIS WHYTE

(3) MARCUS HOPKINS

Claimants

-and-

(1) MARSH SERVICES LIMITED

(Formerly MARSH CORPORATE SERVICES LIMITED

and prior to that J&H MARSH & MCLENNAN (SERVICES) LIMITED)

(2) GUY CARPENTER & COMPANY LCC

(3) MARSH & MCLENNAN COMPANIES INC

Defendants

FIRST WITNESS STATEMENT OF KATHARINE CLARE PAYNE

I, KATHARINE CLARE PAYNE, solicitor, of One America Square, Crosswall, London, EC3N 2PN, SAY AS FOLLOWS:

## Introduction

1.      I am partner in the firm of Messrs. Elborne Mitchell of One America Square,

1

Crosswall, London, EC3N 2PN. I have conduct of this matter on behalf of the Claimants. I make this witness statement to be filed in support of the Claimants CPR Part 8 Claim claiming declaratory and injunctive relief.

2.    Where the content of this witness statement is within my own knowledge it is true. Where the content of this witness statement is not within my own knowledge it is derived from my conduct of this matter and instructions received and is true to the best of my knowledge, information and belief. Exhibited to this witness statement is exhibit "KCP1" which I will refer to by page number herein.

3.    I will set out the material background, the relief sought and the grounds on which that relief is sought below (the last of which will of course be elaborated on in skeleton arguments, for which this witness statement is not a substitute, in due course). In a nutshell, however, the Claimants are employees of the Defendants, working in this jurisdiction. They all resigned on 3 April 2007, giving six months notice of termination of their employment.

4.    On 4 May 2007 the Second and Third Defendants, which are US entities, commenced proceedings against the Claimants in the United States District Court Southern District of New York (Index number 07 Civ 3580) in respect of that employment ("the US Proceedings"). The Claimants say that, pursuant to the provisions of Section 5 of Council Regulation (EC) 44/2001 ("the Regulation"), any proceedings against them in respect of their employment must be brought in this jurisdiction. The Claimants also say that they are entitled to rely on a jurisdiction clause in favour of this jurisdiction and in addition that this is the proper forum for the adjudication of the dispute between the parties. Accordingly, the Claimants seek a declaration to that effect and a permanent anti-suit injunction restraining the US Proceedings.

**Background facts**
**The Defendants**

5.     The Defendants are related entities, forming part of the MMC Group. All are
       concerned in the business of insurance and reinsurance broking.

6.     The First Defendant ("MSL") is an English company. As its name suggests, it
       is a service company, providing employment services to certain companies
       within the MMC Group, including being the principal employing company
       within the Marsh & McLennan Companies UK Limited group [see MSL's
       Report and Financial Statements for the year ended 26 December 2005 - p 1-
       20 "KCP1"]. MSL does not itself broke any business.

7.     MSL's immediate parent company is Marsh UK Group Limited, an English
       company. MSL's ultimate parent and controlling entity is the Third Defendant
       ("MMC"), which is a US entity incorporated in Delaware, USA. MMC is the
       ultimate parent of the whole MMC Group.

8.     The Second Defendant ("Guy Carpenter") is the US trading entity for the MMC
       Group business which trades under what might be described as the Guy
       Carpenter banner. Included under that banner is the UK subsidiary Guy
       Carpenter & Co Ltd and the business unit "GCFac", with which the Claimants
       were concerned (see below). MMC is Guy Carpenter's ultimate parent and
       controlling entity.

**The Claimants' contracts**
*Mr Samengo-Turner*

9.     The First Claimant, Mr Samengo-Turner, commenced employment with the
       MSL (under a former name) with effect from 1 January 1998. That followed a
       merger between what had been Marsh & McLennan and Johnson & Higgins
       to form the then new J&H Marsh & McLennan organisation, Mr Samengo-
       Turner previously having been employed by Johnson & Higgins.

10.    Mr Samengo-Turner was issued with a contract of employment dated 17
       November 1997 naming MSL as his employer ["Mr Samengo-Turner's UK

Contract" – pp 21-27 "KCP1"]. Mr Samengo-Turner's UK Contract included these terms:

*"APPOINTMENT*

*...*

*Your employer is J&H Marsh & McLennan (Services) Ltd (hereafter referred to as 'the Company')*

*Where the term "Group" is used in this Agreement, it shall mean Marsh & McLennan Companies Inc, and any subsidiary or associated companies.*

*REMUNERATION*

*...*

*You will be eligible for consideration for an annual cash bonus related to your own performance and the performance of the company. ... Further details are attached.*

*...*

*CONFIDENTIAL INFORMATION AND COPYRIGHT*

*You must neither during nor after your employment with the Company disclose or permit to be disclosed to any person, firm or Company, any confidential information of the Company or of any other member of the Group. Confidential information includes but is not limited to information relating to the Group's clients and prospective clients, insurance markets, technology, know how, technical information, business plans and finances whether or not such information is recorded in documentary form or computer disk or tape.*

*...*

*DISCLOSURE*

*At no time, whether before or after the termination of your employment, are you to disclose in any way, or use for your or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any Group company unless such disclosure or use is required by law, or you have been authorised so to do by your Chief Executive.*

*...*

*COMPETING BUSINESS*

*You must not during your employment with the Company be concerned or interested directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance or mortgage broker or agent or be personally employed or engaged in any of these capacities without having first gained the written consent of the Company.*

*You must not within a period of one year after the termination of your employment, directly or indirectly, either on your own account or for any other person, firm or company, canvass or solicit clients of the Company or any other member of the Group with whom you had contact at any time during 18*

*months preceding termination of your contract.*
*..."*

11.   Mr Samengo-Turner does not presently have to hand a copy of the attachment referred to under the heading "Remuneration" above.

12.   MSL undertook a job regrading exercise in 2004, as a result of which Mr Samengo-Turner was issued with a letter dated 16 September 2004 setting out his then revised benefits and recording his then job title as Managing Director [p28 "KCP1"].

13.   In 2000, MMC introduced a bonus scheme for senior employees of the MMC Group. On 16 November 2005 MMC issued a document to Mr Samengo-Turner recording his involvement that scheme the preamble to which reads ["the Bonus Contract" – pp 115-132 "KCP1"]:

> *"This document constitutes part of a prospectus covering securities*
> *that been registered under the Securities Act of 1933.*
> *The date of this prospectus is 16 November 2005*
> *MARSH & McLENNAN COMPANIES*
> *2000 SENIOR EXECUTIVE INCENTIVE AND STOCK AWARD PLAN*
> *Terms and Conditions of November 1, 2005*
> *Guy Carpenter Special Long Term Incentive Grant*
>
> *This award ("Award") in the amount of [     ] granted effective November 1,*
> *2005 ("the Grant Date") under the Marsh & McLennan Companies 2000*
> *Senior Executive Incentive and Stock Award Plan ("the Plan") is subject to the*
> *terms and conditions of the Plan and the additional terms and conditions*
> *below ("the Agreement"). At the sole discretion of MMC (as hereinafter*
> *defined) this amount may be paid, subject to the terms set forth below, in*
> *either cash or the equivalent value of readily tradable MMC shares, which*
> *value shall be measured as described below. In recognition of your potential*
> *for future contributions to the success of MMC, this Award is intended to*
> *strengthen the mutuality of interest between you and MMC's shareholders*
> *and to serve as an appropriate additional incentive to remain with MMC or any*
> *of its subsidiaries or affiliates (collectively, the "Company"). For the purposes*
> *of this Agreement, "MMC" means Marsh & McLennan Companies, Inc and*
> *any successor thereto."*

14.   The Claimants have a document entitled "2000 Employee Incentive and Stock

Award Plan" and that appears at pp 29-46 "KCP1". The Claimants do not know whether that is the Plan referred to in the preamble, given that the preamble refers to a <u>Senior Executive</u> incentive plan, not an <u>Employee</u> plan.

15.     The Bonus Contract provides for the sum awarded to be vested over time, starting with 10% on 1 November 2006 and continuing with an additional percentage each 1 January thereafter. The Bonus Contract contains provision for the bonus so paid to be returned in the event that Mr Samengo-Turner engages in what is described as "Detrimental Activity" (a term defined within the body of the Bonus Contract) within a specified period after receiving the bonus.

16.     The Bonus Contract contains both provisions of general application and at Schedule IID provisions which are specifically applicable to UK employees.

17.     Part II of the Bonus Contract (part of the general provisions) materially contains these terms:

> "*II     COVENANTS*
> *A      <u>Notification Prior to Voluntary Termination</u>*
> > ...
> > *(2)     (a)     Throughout the Notice Period, the Company shall have the obligation to pay you your base salary at normal pay intervals ...*
> >
> > ...
> > *(3)     You will remain obligated to perform any or all of your regular job duties requested of you by the Company during this Notice Period ... Moreover, throughout this Notice Period ... you will remain an employee of the Company with all attendant fiduciary duties, including, without limitation, your duties of loyalty and confidentiality to the Company.*
>
> *D      <u>Notice and Non-Solicitation Provisions Applicable to Employees</u>*
> > *<u>Working in the UK</u>*
> > *The terms of the attached schedule IID shall apply if, and only if, notice of termination of your employment with the Company or the termination of your employment is at a time when your principle place of employment for the Company is the United Kingdom... The remaining terms of this Agreement shall continue in effect when Schedule IID is*

*applicable except to the extent those terms are inconsistent with Schedule IID, in which case the terms of Schedule IID shall control.*

E     *Cooperation*
*You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement.*

...

VI     *OTHER PROVISIONS*

...

N     *The Company and you irrevocably submit to the exclusive jurisdiction and venue of any state of federal court located in the county of New York for the resolution of any dispute over any matter arising from or related to the Award. ...*

O     *Notwithstanding anything to the contrary (except with regard to Schedule IID if applicable) this Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles."*

18.     I will refer to clause IIE set out above as the "Co-operation Clause".

19.     Schedule IID materially contains a different definition of "Detrimental Activity" to that which appears in the body of the Bonus Contract. It also contains these terms:

*"4     GENERAL - NON- SOLICITATION AGREEMENT*
*Section IIB(1) of the Agreement (General Non-Solicitation Agreement) will not apply to you, if you are a UK employee on the cessation of your employment. Instead you agree that (except with the prior written consent of the Boar of Directors of the Company) you will not, for a period of 12 months from the date of termination of employment directly or indirectly do or attempt to do anything of the following:*

*- entice, induce or encourage a Client to transfer or remove custom from the Company or any associated Company;*
*- Solicit or accept business from a Client for the supply of Competitive Services*
*-Make known to any person, firm or corporation, the names or addresses of any current employees or customers of the Company of any confidential or sensitive information pertaining to them; or*
*- entice, induce or encourage an Employee to leave or seek to leave*

> *his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a busines which competes with or is similar to a Relevant Business or which plans to compete with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing.*
>
> ...
>
> 6    *GENERAL*
> *This Schedule will be construed in accordance with English Law and the irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York.*
> *..."*

20.  On 20 January 2006 MSL issued Mr Samengo-Turner with an amendment to his UK Contract [pp 47-49 "KCP1"]. That amendment increased his basic salary and introduced revised restrictive covenants. The differences are not material for the purposes of this claim.

21.  The Court may observe that terms of the post termination non-solicitation covenants contained in Mr Samengo-Turner's UK Contract and the Bonus Contract are in very similar terms. The Claimants will say that for the purposes of this claim they are materially the same.

*Mr Whyte*

22.  The Second Claimant, Mr Whyte, commenced employment with the MSL (under a former name) with effect from 1 January 1998. Mr Whyte came into the organisation in the same way as Mr Samengo-Turner.

23.  Mr Whyte was issued with a contract dated 17 November 1997 naming MSL as his employer ["Mr Whyte's UK Contract" – pp 50-56 "KCP1"]. For the purpose of this claim, the terms of that contract are not materially different to those recited above in respect of Mr Samengo-Turner's UK Contract. A further contract was issued to him on 13 December 1999 [pp 57-64 "KCP1"].

24.  On 27 May 2005 MSL issued Mr Whyte with an amendment to his UK Contract [pp 65-67 "KCP1"]. That amendment increased his basic salary and introduced revised restrictive covenants. The differences are not material for the purposes of this claim.

25.  As is the case with Mr Samengo-Turner, Mr Whyte was also issued with a Bonus Contract dated 16 November 2005 [pp 134-151 "KCP1"]. That Bonus Contract is identical to the one issued to Mr Samengo-Turner as to its terms.

*Mr Hopkins*

26.  The Third Claimant, Mr Hopkins commenced employment with MSL under a contract dated 10 April 2000 naming MSL as his employer ["Mr Hopkin's UK Contract" – pp 68-76 "KCP1"]. His position then was described as Senior Vice President in the Facultative Broker Practice Guy Carpenter and Co Ltd. For the purpose of this claim, the terms of that Mr Hopkins' UK Contract are not materially different to those recited above in respect of Mr Samengo-Turner's contract.

27.  As is the case with Mr Samengo-Turner, on 21 June 2005 Mr Hopkins' UK Contract was amended to increase his remuneration and revise the restrictive covenants it incorporated [pp 77-78"KCP1"].

28.  On 16 November 2005 Mr Hopkins was also issued with a Bonus Contract in the same terms as those issued to each of Mr Samengo-Turner and Mr Whyte as to its term [pp 153-170 "KCP1].

*The operation of the contracts*

29.  As noted above, MSL is a service company and its activities are limited to the provision of employment services. In practice, therefore, the Claimants provided their services to other companies in the MMC Group, including Guy Carpenter & Co Ltd.

30.    At the time of their resignations, Mr Samengo-Turner and Mr Whyte were joint heads of GCFac worldwide business unit. Mr Hopkins was head of GCFac UK and worked with them, occupying a position of the head of the property business (one of three specialist sections into which the GCFac UK team is divided). The GCFac unit, as the name suggests, is concerned in the broking of facultative reinsurance. Approximately 90% of the business broked by the Claimants is placed in the London market.

31.    The GCFac unit operates in the UK as part of Guy Carpenter & Co Ltd, which itself is ultimately owned by MMC.

32.    All the Claimants were employed in the London offices of Guy Carpenter & Co Ltd and spent the overwhelming majority of their time there.

**The resignation of the Claimants**

33.    All three Claimants orally resigned on 3 April 2007, giving six month's notice. All three resigned for the purpose of taking up employment with the Integro Group, another insurance and reinsurance broking group and made that known at the time of their resignations.

34.    Since 3 April 2007, all three Claimants have been garden leave. The Claimants intend to begin their new employment when their notice periods expire in October 2007.

35.    Following their resignations, each of the Claimants received a letter from MSL regarding their ongoing obligations [pp 79-89 "KCP1"]. Each letter refers to "*your capacity with Guy Carpenter & Company Limited*". (Guy Carpenter & Company Limited is a UK entity; its ultimate parent is MMC.)

**The US Proceedings**
*Pre-action correspondence*

36.    On 5 April 2007 Integro issued a press release stating that it had recruited the

Claimants [p 172 "KCP1"].

37.    The same day, each of the Claimants received a virtually identical letter from Messrs. Herbert Smith (London office). In the letters to Mr Samengo-Turner and Mr Hopkins, Messrs. Herbert Smith stated that they were instructed by [pp 174-184 "KCP1"]:

   "Guy Carpenter and associated companies, including your employer, Marsh Corporate Services Limited, and Marsh & McLennan Companies Inc."

38.    The letter to Mr Whyte stated that Messrs. Herbert Smith were instructed by [pp 178-180 "KCP1"]:

   "Guy Carpenter and associated companies, including your employer, J&H Marsh McLenna and Sedgwick, and Marsh and McLennan Companies Inc"

39.    That letter also referred to what were said to be Mr Whyte's:

   "... general obligations as an employee and director of Guy Carpenter and Company Limited"

40.    In the 5 April 2007 letters Messrs. Herbert Smith stated that the Claimants had engaged in "Detrimental Activity" and demanded return of sums paid to the Claimants under the Bonus Contracts. Those letters also referred to the "Co-Operation Clause" at Section IIE of the Bonus Contracts and set out a long list of questions which it was said the Claimants were obliged to answer pursuant to that clause. The letter concluded by asking for undertakings and the return of documents.

41.    My firm, by then instructed by the Claimants replied on 11 April 2007 and there followed further exchanges, resting with a fax from my firm on 17 May 2007 [pp 90-100 "KCP1"].

42.    In my firm's letters of 11 and 19 April 2007 is was made clear that the

11

Claimants intended to comply with their obligations as employees and in the 19 April 2007 letter an offer was made to sign written undertakings to that effect. In the absence of a proposal for such an undertaking being forthcoming from Messrs. Herbert Smith, my firm in its letter of 17 May 2007 set out the written undertakings each of the Claimants were prepared to sign. To date, the Claimants' offer to sign such undertakings has not been taken up.

*Commencement of the US Proceedings*

43.    The US Proceedings were commenced, without prior notice on 4 May 2007. Notification of the US Proceedings was first given to me on the evening of 5 May 2007 (the Saturday of the Bank Holiday weekend) when I received a message from my office to telephone Messrs. Herbert Smith. I did so and was asked whether we had instructions to accept service of the US Proceedings. I said we were not so instructed.

44.    The Complaint appears at pp 101-193a "KCP1". The relief sought is (a) an injunction obliging the Claimants to comply with what are said to be their obligations under the Co-operation Clause and (b) return of sums paid under the Bonus Agreements.

45.    The US Plaintiffs are Guy Carpenter and MMC. The Complaint contains these passages:

> *"Defendants' Employment With Plaintiffs*
>
> 11    *Samengo-Turner's employment with Guy Carpenter commenced on or about September 23, 1991. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Samengo-Turner co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.*
>
> 12    *Whyte's employment with Guy Carpenter commenced on or about September 20, 1988. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.*

13    *Hopkins's employment with Guy Carpenter commenced on or about April 10, 2000. On or about April 3, 2007 Hopkins gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Hopkins was head of Guy Carpenter's UK facultative reinsurance operation.*

14    *Defendants' employment with Guy Carpenter was, and continues to be, governed by their respective employment agreements with plaintiffs.*

15    *Under the terms of their respective employment agreements with plaintiffs, defendants are currently in six(6) month "notice periods" meaning they remain employed by plaintiffs and continue to receive compensation from plaintiffs. As current employees, defendants also continue to have fiduciary and related duties and obligations to plaintiffs that are associated with such employment.*

16    *In addition, by the terms of their respective employment agreements with plaintiffs, defendants are not permitted for specific periods of time during and after their notice period to solicit, entice, induce or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs."*

46.    It is apparent, therefore, that Guy Carpenter and MMC are prosecuting the US Proceedings on the basis that they employ the Claimants and are relying on duties said to be owed by the Claimants to them qua employees.

*Service of the US Proceedings*

47.    At the time of signing this witness statement, only Mr Whyte has been served with the US Proceedings. He was served at his home in Kent.

*Disclosure application in the US Proceedings*

48.    On 15 May 2007 Guy Carpenter and MMC issued an application against all the Claimants seeking wide ranging disclosure, answers to interrogatories and an order that the Claimants attend in New York for depositions to be taken as oral disclosure [pp 194-238 "KCP 1]. Although the application was framed as being made pursuant to the Co-operation Clause, the substance of the matters that Guy Carpenter and MMC wished to investigate were allegations that the Claimants have been engaged in soliciting former employees, in breach of their duties as employees of Guy Carpenter and MMC. It can

13

reasonably be assumed that such an investigation is a precursor to additional claims being added to the Complaint that the Claimants have acted in breach of their duties as employees.

49.   Messrs. Proskauer Rose LLC, New York attorney's then instructed by Mr Whyte, put in an opposition to that application on 17 May 2007 [pp 239-271 "KCP1"]. It was made clear in that opposition that Mr Whyte did not submit to the jurisdiction of the New York Court and the Court was asked to determine jurisdictional issues before ruling on anything else. There was no appearance entered for either Mr Samengo-Turner or Mr Hopkins, neither having been served with proceedings.

50.   The application was heard on 18 May 2007. It was said to be urgent because it was alleged that the Claimants were then actively engaged in soliciting MMC Group employees.

51.   The assigned judge, Ms Denise Cote, granted the relief sought in substantially the terms it was asked for, save that the judge ordered that the depositions be taken in London [pp 272 "KCP1"]. The time for compliance is fixed for Friday 1 June 2007, save that a longer time has been allowed for the taking of the depositions. (The course of the hearing was that the Judge indicated that she was going to make the order sought, then sent the attorneys out to try to agree the form of the order, after which she made her order. Mr Barry (of Messrs. Proskauer Rose), who appeared for Mr Whyte, made it clear at the outset that he was there only for Mr Whyte.)

52.   The order also included liberty to the Claimants to apply in respect of individual items of disclosure ordered.

53.   The order was made on the express basis that it had to be complied with before any jurisdictional challenge would be entertained because discovery was regarded by the Judge as being an urgent matter. Judge Cote did,

however, indicate that she was minded to apply English law to the question of what constituted "Detrimental Activity".

54.    Messrs. Proskauer Rose are taking necessary steps to appeal the decision, however, there is no guarantee that those appeals will be heard before the deadline for compliance with the order of 18 May 2007. All steps being taken for Mr Whyte in the US Proceedings are expressly subject to reservations that he does not submit to the jurisdiction of the New York Court. No steps are being taken for either Mr Samengo-Turner or Mr Hopkins in New York, neither having been served.

55.    It is also intended to ask the New York court to stay the US Proceedings pending the outcome of this Part 8 Claim.

56.    At the time of signing this witness statement, Mr Whyte is unable to say when his challenges to the order already made in New York will be heard beyond that expedition has been sought.

57.    The Claimants make no comment on the substance of the allegations being made against them in New York, that being immaterial for the purposes of this Part 8 Claim. However, in not doing so the Claimants should not be taken to accept what is being alleged against them in New York.

*The pretrial conference*

58.    What is called a pretrial conference was heard in the US Proceedings on 21 May 2007. That set a timetable for hearing the motion to dismiss the action on jurisdictional grounds, which will result in submissions closing on 15 June 2007, with the motion being heard thereafter.

**Grounds for the relief sought**

**The Regulation**

59.    The material provisions of the Regulation are these (with some commentary