# EXHIBIT F

# Application Notice

- You must complete Parts A and B, and Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | High Court of Justice<br>Queen's Bench Division<br>Commercial Court |
|---|---|
| Claim No. | 2007 Folio 945 |
| Warrant no.<br>(if applicable) | |
| Claimant(s)<br>(including ref.) | Julian Samengo-Turner and others |
| Defendant(s)<br>(including ref.) | Marsh Services Limited and others |
| Date | 1 June 2007 |

**You should provide this information for listing the application**

Time estimate  1  (hours)  (mins)

Is this agreed by all parties? Yes ✓   No ☐

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

## Part A

1. Where there is more than one claimant or defendant, specify which claimant or defendant

    I (We) Herbert Smith on behalf of the First and Third Defendants (The claimant)(The defendant)[1]

2. State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)

    Intend to apply for an order (a draft of which is attached) that[2]

    The claimants be ordered to provide the information and documents specified in the draft order

3. Briefly set out why you are seeking the order. Identify any rule or statutory provision

    because[3]

    (1) it would be expedient to make the order sought in support of the pending proceedings between the parties in New York pursuant to section 25(1) of the Civil Jurisdiction and Judgments Act 1982 (2) Alternatively, if the Court grants an anti-suit injunction to restrain the New York proceedings, the Court should make its own order for specific performance of (a) Clause IIE of the Third Defendant's Stock Award Plan ("the Plan") and/or (b) Clause IIA(3) of the Plan and/or (c) the implied obligations owed by the Claimants under their respective employment contracts with the First Defendant.

Error! Reference source not found.

## Part B

I (We) wish to reply on: *tick one:*

the attached (witness statement)(affidavit) [✓]   (the claimant)(the defendant)'s[(1)] statement of case [ ]

evidence in Part C overleaf in support of this application [ ]

**Signed** _____

(Applicant)('s litigation friend)('s solicitor)

**Position or office held** (if signing on behalf of firm, company or corporation): Partner, Herbert Smith LLP

| 4. If you are not already a party to the proceedings, you must provide an address for service of documents | Address to which documents about this claim should be sent (including reference if appropriate)[(4)] |||
|---|---|---|---|
| | Herbert Smith<br>Exchange House<br>Primrose Street<br>London<br>Ref: 2090/3159/30875525 | | *if applicable* |
| | | Tel. no. | 0207 374 8000 |
| | | fax no. | 0207 374 0888 |
| | | DX no. | 28 |
| | Postcode   EC2A 2HS | e-mail | |

Error! Reference source not found.

**Part C**  Claim No. 2007 Folio 945

(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)

I (We) wish to rely on the following evidence in support of this application:

First witness statement of Lynsey Mansfield

**Statement of Truth**

*(I believe)(The applicant believes) that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name............................................................................................................

Name of *(Applicant)('s litigation friend)('s solicitor)

............................................................................................................

Signed

*(Applicant)('s litigation friend)('s solicitor)

Position or office held
(if signing on behalf of firm, company or corporation)

*delete as appropriate        Date   1 June 2007

Error! Reference source not found.

IN THE HIGH COURT OF JUSTICE  Claim No. 2007 Folio 945
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
31 MAY 2007
B E T W E E N:

(1) JULIAN SAMENGO-TURNER
(2) RONALD DENNIS WHYTE
(3) MARCUS HOPKINS

Claimants

-and-

(1) MARSH SERVICES LIMITED
(Formerly MARSH CORPORATE SERVICES LIMITED
and prior to that J&H MARSH & MCLENNAN (SERVICES)
LIMITED)
(2) GUY CARPENTER & COMPANY LLC
(3) MARSH & MCLENNAN COMPANIES INC

Defendants

---

DRAFT ORDER

---

UPON THE APPLICATION of the First and Third Defendants dated 1 June 2007

AND UPON HEARING Counsel for the Claimants and for the First and Third Defendants

IT IS ORDERED as follows:

1. Each of the Claimants do serve on the Defendants' solicitors signed answers to the interrogatories set out in [Schedule A] hereto [i.e. the interrogatories at pages 223 – 224 of exhibit KCP1 to the first witness statement of Katharine Clare Payne] by 4pm on 8 June 2007.

2. The Claimants do forthwith serve the documents specified in the Request for Documents annexed hereto marked Schedule B hereto [i.e. the Request at pages 214 – 219 of exhibit KCP1].

3. The Third Claimant, the Second Claimant and the First Claimant do attend for oral depositions at a venue in London on 13, 14 and 15 June 2007 respectively.

*Alternatively to paragraphs 1 – 3 above*

[Upon the First and Third Defendants undertaking to abide by any order the Court may make if the Claimants suffer any loss by reason of this Order that the Court considers the First and/or Third Defendants ought to pay

4. Each of the Claimants do serve on the Defendants' solicitors signed answers to the following interrogatories by 4pm on 8 June 2007.

   (1) Have you communicated with:
       (i) any representatives of Integro Insurance Brokers ("Integro"),
       (ii) any of the other Claimants,
       about plans for the recruitment by Integro of staff for its new insurance and reinsurance unit in London?

   (2) If so, when, where, and with whom have these communications taken place and what was the gist of the communications?

   (3) Have you communicated with:
       (i) any representatives of Integro,
       (ii) any of the other Claimants,
       (iii) any other parties,
       on the subject of Integro's recruitment of staff from Guy Carpenter's global facultative reinsurance business unit?

   (4) If so, when, where, and with whom have these communications taken place and what was the gist of the communications?

   (5) Have you communicated with any employees of MSL on the subject of your recruitment by Integro and/or Integro's new insurance and reinsurance unit?

   (6) If so, when, where, and with whom have these communications taken place and what was the gist of the communications?

2

(7) Have you provided any information to Integro about any employees of MSL in Guy Carpenter's global facultative reinsurance business unit?

(8) If so, what information was provided, to whom, when and in what form?

(9) Have you provided any other information to Integro about Guy Carpenter's business?

(10) If so, what information did you provide, to whom, when and in what form?

(11) Have you communicated with any clients or potential clients of Guy Carpenter or MMC in connection with your departure from Guy Carpenter and/or your recruitment by Integro?

(12) If so, when, where, and with whom have these communications taken place and what was the gist of the communications?

5. Each of the Claimants do forthwith serve on the Defendants' solicitors the categories of documents listed in Schedule B hereto [i.e. the documents listed at pages 217 - 219 of Exhibit KCP1] which are in his possession or under his control, with the exception of the documents identified in paragraphs 1 and 2 of that list.]

6. The Claimants do pay the costs of this application.

Dated the 6 day of June 2007

3

IN THE HIGH COURT OF JUSTICE  
QUEEN'S BENCH DIVISION  
COMMERCIAL COURT  
B E T W E E N:

Claim No. 2007 Folio 945

(1) JULIAN SAMENGO-TURNER  
(2) RONALD DENNIS WHYTE  
(3) MARCUS HOPKINS

<u>Claimants</u>

-and-

(1) MARSH SERVICES LIMITED  
(Formerly MARSH CORPORATE SERVICES LIMITED  
and prior to that J&H MARSH & MCLENNAN (SERVICES) LIMITED)  
(2) GUY CARPENTER & COMPANY LLC  
(3) MARSH & MCLENNAN COMPANIES INC

<u>Defendants</u>

---

**SKELETON ARGUMENT OF THE FIRST DEFENDANT ("MSL") AND THE THIRD DEFENDANT ("MMC") IN SUPPORT OF THEIR CROSS-APPLICATIONS DATED 1 JUNE 2007 - HEARING 6 JUNE 2007**

---

Introduction

1. This skeleton argument relates to the following applications:

    1.1   MMC's application for an order pursuant to section 25 (1) of the Civil Jurisdiction and Judgments Act 1982 requiring the Claimants to provide the documents and information, and to attend for oral depositions, in accordance with the order of Judge Cote made on 18 May 2007 in the pending proceedings in the United States District Court Southern District of New York ("the New York Proceedings");

    1.2   MMC's application for an interim injunction requiring the Claimants to provide the documents and information identified in the draft order attached to the Defendants' Application Notice ("the draft Order") by way of specific performance of their obligation to cooperate with MMC under

1

Clause IIE of the 2000 Senior Executive Incentive and Stock Award Plan ("the Plan")[1];

1.3   MSL's application for an interim injunction requiring the Claimants to provide the documents and information identified in the draft Order, by way of enforcement of their obligations of duty and loyalty which they owe to MSL pursuant to their respective contracts of employment with MSL and pursuant to Clause IIA(3) of the Plan.

2.   The first of these orders will be appropriate if the Court refuses the Claimants' application for an anti-suit injunction and allows the New York proceedings to continue, in which case the Court should support the New York proceedings by the grant of the order sought. The second and/or third orders would only be necessary if the Court were to grant an anti-suit injunction, bringing the New York proceedings to a halt. In that eventuality, MMC and MSL would seek relief, of a similar nature to that granted in the New York proceedings, by way of substantive proceedings in this jurisdiction. The applications for the second and third orders are made at this stage out of an abundance of caution and to ensure that the Defendants' position is protected without delay, should the Court grant an anti-suit injunction. They are made without prejudice to the Defendants' primary case that the New York court is the appropriate forum for the trial of their claims against the Claimants, in accordance with the exclusive jurisdiction clause in the Plan (Clause VIN[2]).

(1)   Order in support of the NY proceedings

3.   Section 25 of the Civil Jurisdiction and Judgments Act 1982 ("the 1982 Act") empowers the English court to grant interim relief in proceedings in England in

---

[1] KCP1 pages 115 to 170
[2] KCP1 page 162

2

which there is no claim to substantive relief on the merits of a case, in support of proceedings commenced or to be commenced anywhere in the world.[3]

4. If the Court refuses the Claimants' application for an anti-suit injunction, MMC will invite the Court to make an order under section 25 in support of the New York proceedings. The order sought is in substantially the same as the terms of the order made on 18 May 2007 in the New York proceedings, i.e. an order that the Claimants provide the documents listed at pages 217 – 219 of the Exhibit KCP1, that they answer the interrogatories at pages 223 – 224 of Exhibit KCP1 and that they attend for oral depositions in the week between 11 and 15 June 2007.

5. The reason for seeking an equivalent order from the English Court is that its order, unlike the order of 18 May 2007, would be directly enforceable in the jurisdiction where the Claimants are resident and where their assets are located. For this reason, it may well have greater coercive effect than the order of 18 May 2007, with which the Claimants have yet to comply.

6. It should be noted that orders in support of foreign proceedings are a well established feature of English procedural practice. Such orders are commonly made pursuant to the Evidence (Proceedings in Other Jurisdictions) Act 1975, following a letter of request from the foreign court. Thus, the English court would have the power to make an order in the terms of the 18 May 2007, were it requested to do so by the New York court, regardless of whether it would have made such an order in English proceedings. The starting point when considering a letter of request from a foreign court is the principle of comity that it is "our duty and our pleasure to do all we can to assist that court, just as we would expect the [foreign court] to help us in the circumstances."[4] Thus, the fact that a letter of request is issued for the purpose of

---

[3] This is the combined effect of section 25(1) of the 1982 Act and the Civil Jurisdiction and Judgments Act 1982 (Interim Relief) Order 1997.
[4] *Rio Tinto Zinc v Westinghouse Electric* [1978] A.C. 547, 512, 653

3

obtaining pre trial discovery or depositions would not preclude the English court from giving effect to it.[5]

7. The same principle of comity should lead the court to make an order in support of the New York proceedings under section 25 of the 1982 Act in this case.

(2) **Specific performance of Clause IIE of the 2000 Senior Executive Incentive and Stock Award Plan**

8. If, contrary to the Defendants' primary case, the Court accedes to the Claimants' application for an anti-suit injunction, MMC and MSL will seek orders to protect their position in substantive proceedings in England. On this hypothesis, the English Court will have decided, contrary to the Defendants' contentions, that it has exclusive jurisdiction to determine any claims by MMC for the production of documents and information pursuant to the Claimants' obligation of cooperation under Clause IIE of the Plan[6] and/or any claims by MSL pursuant to the Claimants' contracts of employment. MMC and MSL will then have no option but to pursue their available remedies here.

9. In this eventuality, the English Court should grant interim relief on an interim basis as a matter of urgency, essentially for the same reasons as the New York court was persuaded to do,[7] namely the need to ensure that MMC is provided with the information and documents to which it is contractually entitled under the Plan, thereby enabling MMC to find out whether the Claimants have been involved in the solicitation of MSL's employees by Insurance Brokers ("Integro") in breach of the

---

[5] *Refco Capital Markets v Credit Suisse (First Boston) Ltd* [2001] EWCA Civ 1733 at paragraph 30. The Defendants could not apply for a letter of request in New York following the Claimants' application for an anti-suit injunction and the undertaking given on 31 May 2007 not to take any further steps in the New York proceedings until 6 June 2007.
[6] KCP1 page 158
[7] The Plan is governed by New York law (Clause VIO, page 162 of KCP1).

4

Claimants' contractual obligations.). If the information and documents indicate that the Claimants have been so acting, MMC may well be put in a position to take steps, including the seeking of restraining orders in the English Court, to prevent the continuation of such activities before further damage is done to Guy Carpenter's facultative reinsurance business in London.

10. The Plan[8] provides for the grant of a substantial award in the form of cash and/or shares in MMC common stock, the grant conditional upon the executive not engaging in certain "Detrimental Activity" (Clause IC). In the event that the executive engages in Detrimental Activity prior to or during the "Rescission Period" (defined as meaning the 12 month period beginning on each installment's vesting date (Clause IC(1)), the relevant installment is to be repaid to MMC (Clause IC(2)).

11. It should be noted that "Detrimental Activity" as defined at Clause IC(1) includes "(f) attempting to recruit or solicit, or aid in the recruitment or solicitation of any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any actual or prospective competitor of the Company."

12. Each of the Claimants was granted Awards, which were subject to vesting in specified percentages on various future dates over a four year period. As of April 2007, 20% of the Awards granted to each Claimant had vested and the Claimants had received cash for those portions of the Awards upon vesting. The amounts paid were as follows: Mr Samengo-Turner £77,110; Mr White £61,668 and Mr Hopkins £46,266.[9]

13. Clause IIE of the Plan[10] provides as follows:

"E Cooperation

---

[8] KCP1 pages 153-170
[9] Mansfield 1st w.s. paragraph 17.
[10] KCP1 page 158

5

> You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement."

14. The purpose of this clause is self-evidently to enable MMC to discover whether a senior executive who is in receipt of an award under the plan has been complying with his obligations under the Plan and thereby to enable MMC to take an informed decision as to the appropriate measures to take in order to protect its position, in the event that the executive is not doing so.

15. The discovery of whether a senior executive has been involved in Detrimental Activity is important, in the context of the Plan, for the reason, inter alia, that, as already noted, such a discovery entitles MMC to the return of installments of the award (Clause IC(2)). It is likely to be inherently difficult for MMC to discover whether an executive has been involved in Detrimental Activity since such involvement would by its very nature probably be conducted covertly, behind MMC's back. Clause IIE is clearly designed to assist MMC in finding out whether there has been any involvement by the executive in Detrimental Activity. The reference to "compliance with your obligations" should accordingly be construed as including non-engagement in Detrimental Activity. If not so construed, Clause IIE would be deprived of useful effect.

16. Thus, the "obligations under this Agreement" of the executive include, on the correct construction of Clause IIE and the other provisions of the Plan:

    16.1 an implied obligation not to engage in Detrimental Activity (Clause IC(1));

    16.2 an obligation to repay the award in the event that the executive is found to have engaged in Detrimental Activity (Clause IC(2));

6

16.3 an obligation under Clause IIA(3) to perform any or all of the executive's regular job duties requested by the Company[11] during the executive's Notice Period[12] and to observe all the executive's attendant fiduciary duties, including, without limitation, duties of loyalty and confidentiality to the Company during that period (Clause IIA(3)).

17. As described in Lynsey Mansfield's first witness statement,[13] the Claimants gave six months' notice on 3 April 2007 and are now on garden leave, receiving their full salary and continuing to owe all their fiduciary and related duties in accordance with Clause II(3) of the Plan.

18. In the period since the Claimants gave notice on 3 April 2007 to leave MSL's employment to join Integro, a competitor of Guy Carpenter, fourteen of the thirty two brokers in Guy Carpenter's UK facultative reinsurance group have been recruited or approached by Integro. Five brokers who had worked under the supervision of the Claimants, have given notice and announced that they are leaving to join Integro. The rapid rate at which Guy Carpenter facultative brokers in the UK office have been announcing their resignations, joining Integro or are otherwise being aggressively solicited to join Integro has caused MMC to have serious concerns as to whether the Claimants are complying with their obligations under the Plan not to solicit employees or are otherwise acting in breach of their obligations under Clause IC(1)(f) and/or IIA(3) of the Plan.

19. MMC has sought to discover by means of requests for information and documents provided pursuant to Clause IIE whether the Claimants have been acting in breach of the obligations referred to above so as to enable it to decide whether to take steps to enforce the covenants, by way of proceedings for an injunction or otherwise. The first

---

[11] Defined in the Plan as meaning MMC, its subsidiaries or affiliates (page 134 of KCP1)
[12] As defined in Clause IIA(1) and Schedule IID (3). The Claimants' notice period is six months.
[13] Paragraph 18 and following.

7

request was made in letters to the Claimants dated 5 April 2007.[14] On 11 April 2007 the Claimants' solicitors responded by letter indicating they could not respond to the request at that time because Messrs White and Hopkins were on vacation. However, the Claimants' solicitors stated that they hoped to take detailed instructions from all three of the Claimants by the following week and would revert as soon as they reasonably could thereafter.[15] In subsequent communications from their solicitors the Claimants have, however, persistently failed to provide any answers to the requests.[16]

20. The information which MMC now seeks from each of the Claimants is as follows:

    20.1    Have you communicated with:
          (i)    any representatives of Integro,
          (ii)   any of the other Claimants,
    on the subject of Integro's plans for the recruitment of staff for its new insurance and reinsurance unit in London?

    20.2    If so, when, where, and with whom did these communications take place and what was the gist of the communications?

    20.3    Have you communicated with:
          (i)    any representatives of Integro,
          (ii)   any of the other Claimants,
          (iii)  any other parties,
    on the subject of Integro's possible or actual recruitment of staff from Guy Carpenter's global facultative reinsurance business unit?

    20.4    If so, when, where, and with whom did these communications take place and what was the gist of the communications?

    20.5    Have you communicated with any employees of MSL on the subject of your recruitment by Integro and/or on the subject of Integro's new insurance and reinsurance unit?

    20.6    If so, when, where, and with whom did these communications take place and what was the gist of the communications?

---

[14] KCP2 pages 4-6
[15] KCP2 page 10
[16] KCP2 pages 1-37

20.7 Have you provided any information to Integro about any employees of MSL in Guy Carpenter's global facultative reinsurance business unit?

20.8 If so, what information was provided, to whom, when and in what form?

20.9 Have you provided any other information to Integro about Guy Carpenter's business?

20.10 If so, what information was provided, to whom, when and in what form?

20.11 Have you communicated with any clients or potential clients of Guy Carpenter or MMC in connection with your departure from Guy Carpenter and/or your recruitment by Integro?

20.12 If so, when where, and with whom did these communications taken place and what was the gist of the communications?

21. These requests for information are plainly "reasonable" within the meaning of Clause IIE. They are narrowly drawn and focused on the executives' possible breaches of the Plan. No valid grounds have been put forward by the Claimants as to why they should not provide such information. The legitimate purpose of the requests is to enable MMC to explore as quickly as possible the possible extent of the Claimants' participation in soliciting a large percentage of Guy Carpenter's UK based facultative brokers.

22. The documents which MMC seeks from the English court are those requested in the New York proceedings and which the Claimants have undertaken (in the order of Underhill J made on 31 May 2007) to lodge with their solicitors, with the exception of the first two categories, which the Defendants will not request if an anti-suit injunction is granted.

23. Given the terms of the Claimants' undertaking to lodge all these documents with their solicitors, they cannot sensibly object to the proposed order for the production of documents on the grounds of any practical difficulty, oppression or lack of clarity. Compliance with the order will simply involve authorising their solicitors to hand

9

over the documents which have already been lodged. Again, no valid reasons have been put forward as to why these documents should not be provided.

24. The relevant principles to be applied when considering whether to grant a mandatory interim injunction were summarized by Chadwick J. in *Nottingham Building Society v Eurodynamics Systems* [1993] FSR 468 at p. 474:[17]

> "In my view the principles to be applied are these. First, this being an interlocutory matter, the overriding consideration is which course is likely to involve the least risk of injustice if it turns out to be 'wrong' in the sense described by Hoffmann J.
> Secondly, in considering whether to grant a mandatory injunction, the court must keep in mind that an order which requires a party to take some positive step at an interlocutory stage, may well carry a greater risk of injustice if it turns out to have been wrongly made than an order which merely prohibits action, thereby preserving the status quo.
> Thirdly, it is legitimate, where a mandatory injunction is sought, to consider whether the court does feel a high degree of assurance that the plaintiff will be able to establish this right at a trial. That is because the greater the degree of assurance the plaintiff will ultimately establish his right, the less will be the risk of injustice if the injunction is granted.
> But, finally, even where the court is unable to feel any high degree of assurance that the plaintiff will establish his right, there may still be circumstances in which it is appropriate to grant a mandatory injunction at an interlocutory stage. Those circumstances will exist where the risk of injustice if this injunction is refused sufficiently outweigh the risk of injustice if it is granted."

25. The application of these principles to the facts of the case leads compellingly to the conclusion that the Court should grant the order sought. No substantial prejudice would be suffered by the Claimants if it were to turn out that the order was "wrongly" granted (and the Claimants would be protected by MMC's/MSL's cross-undertaking in damages in any event). MMC/MSL would, conversely, potentially suffer very serious and unquantifiable damage if the order were "wrongly" withheld, since the withholding of an order would deprive MMC of the opportunity to discover whether the Claimants have been acting in breach of their obligations under the Plan (including an obligation not to assist with Integro's recruitment of MSL's staff), and,

---

[17] A summary commended by the Court of Appeal in *Zockoll Group Ltd v Mercury Communications Ltd* [1998] FSR 354.

if so, would deprive MMC of the opportunity to put an end to such breaches by, inter alia, seeking injunctive relief against the parties involved in the UK courts. MSL is at risk of losing – through unlawful means - numerous of its employees to Integro. The Court may moreover feel a high degree of assurance that the Defendants will ultimately establish their entitlement to the information and documents sought.

26. In short, the English court should grant an interim injunction for essentially the same reasons as the New York granted urgent expedited discovery, namely the need to avoid the prejudice to the Defendants which would arise from the pace of normal pretrial procedures.

27. The Court should accordingly grant an interim injunction in the terms sought in the draft Order.

(3) Duty of fidelity

28. In addition to their obligations under Clause IIE of the Plan, each of the Claimants owes to MSL the normal implied duties of an employee, both pursuant to Clause II(3) of the Plan and pursuant to their contracts of employment.

29. These duties include a duty to cooperate with MSL and to comply with MSL's reasonable instructions, including instructions to disclose misdeeds on their own part and on the part of other employees.[18] These duties are also owed under the Plan during the Claimants' Notice Period (Clause IIA(3)).

30. Thus, the Claimants are under an implied contractual obligation as employees to provide the information and documents sought by MMC/MSL, in parallel to their express obligation under Clause IIE of the Plan. The Court should grant an interim

---

[18] See *Bowers: Employment Law* 7th Edition, paragraphs 6.03 - 6.07.

11

injunction to enforce this implied obligation for the reasons set out at paragraphs 21 to 25 above.

## Conclusion

31. The jurisdictional dispute should not be allowed distract the Court from the following underlying (and incontrovertible) facts:

    31.1   the Claimants have each agreed, as part of the consideration for the substantial awards payable under the Plan, to provide MMC with information which would enable the Defendants to discover whether they had been acting in breach of their obligations under the Plan;

    31.2   moreover, the Claimants are still employees of MSL, in receipt of salary and under the normal obligations of an employee;

    31.3   MMC/MSL have requested information and documents from the Claimants which would enable them to discover whether the Claimants have been assisting with Integro's solicitation of employees, contrary to their obligations;

    31.4   the Claimants have refused to provide any information or documents at all, without putting forward any valid reason for doing so;

    31.5   the continued failure to provide the information and documents sought may well cause serious and irreparable damage to MMC/MSL by depriving them of the opportunity to prevent the continued haemorrhaging of MSL's employees; no substantial prejudice would be caused to the Claimants by compliance with the orders sought.

12

32. In these circumstances, and for the reasons set out above, the Defendants invite the Court to order the Claimants to produce the requested information and documents either pursuant to paragraphs (1) to (3) of the draft Order or if, contrary to the Defendants' primary case, the Court grants an anti-suit injunction, pursuant to paragraphs (4) and (5) of the draft Order.

ANDREW LENON QC
1 Essex Court,
Temple

MURRAY ROSEN QC
Herbert Smith

1 June 2007

13