# Exhibit G-1

IN THE HIGH COURT OF JUSTICE                         Claim No. 2007 Folio 945

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

BETWEEN:

(1)    JULIAN SAMENGO-TURNER

(2)    RONALD DENNIS WHYTE

(3)    MARCUS HOPKINS

**Claimants**

-and-

(1)    MARSH SERVICES LIMITED

(formerly MARSH CORPORATE SERVICE LIMITED
and prior to that J&H MARSH AND MCLENNAN (SERVICES) LIMITED)

(2)    GUY CARPENTER & COMPANY LLC

(3)    MARSH & MCLENNAN COMPANIES INC

**Defendants**

---

## WITNESS STATEMENT OF
## LYNSEY MANSFIELD

---

I, LYNSEY MANSFIELD of Tower Place, London, EC3R 5BU, WILL SAY as follows:

1.    I make this witness statement in support of the Defendants' response to the Claimants' application for an anti-suit injunction and in support of the Defendants' cross-application. I have read the two witness statements of Katharine Clare Payne that were made in support of the Claimants' application and, where relevant, comment on them in this witness statement.

2.    Where the content of this witness statement is within my own knowledge it is true. Where the content is not within my own knowledge it is true to the best of my knowledge, information and belief.

10/8358285_2

1

3.   I am employed by Marsh Services Limited as Head of International HR (excluding the Americas) and Head of HR for the global facultative reinsurance business (which includes the Americas) at Guy Carpenter & Company LLC. I joined Guy Carpenter approximately eighteen months ago. All the human resources professionals working in the Guy Carpenter business in my areas of responsibility report to me. In my role, I am responsible for covering the global facultative reinsurance group, in which all of the Claimants worked before going on garden leave. (I should say that the Guy Carpenter business worldwide is carried on by various Guy Carpenter companies including Guy Carpenter & Company LLC and Guy Carpenter & Co Limited and when I refer to the Guy Carpenter business in this statement I mean the business as a whole rather than any one company.)

4.   I am familiar with the various incentive compensation plans offered by Guy Carpenter and Marsh & McLennan Companies Inc. ("MMC"). I am also involved in the drafting of employment contracts for Guy Carpenter employees in Europe and Asia-Pacific.

**Identity of the Claimants' Employer**

5.   I understand that a fundamental issue in the Claimants' application for an anti-suit injunction is the identity of the Claimants' employer. I understand that the Claimants and their lawyers are arguing, in effect, that the Claimants are employed by a number of companies in the MMC Group all at the same time. I think that is what Ms Payne must mean when she says at paragraph 60 of her first Witness Statement that each of the Defendants (i.e. Marsh Services Limited, Guy Carpenter & Company LLC and Marsh & McLennan Companies Inc.) "stands in the position of the Claimants' employer". However, to my mind as an HR professional, that does not make any sense. They cannot somehow have more than one employer just because another company in a group provides them with some benefits (e.g. stock awards).

6.   I am aware that sometimes employees can have dual employment contract arrangements for tax reasons, reflecting the fact they work for one employer in the UK and work for another employer outside the UK. The Inland Revenue scrutinise such arrangements very carefully because they involve individuals paying less UK tax than they would if they just had a UK employment contract. Because of that, when they are entered into, they are documented very thoroughly with two specific employment contracts dealing with the UK duties and the non-UK duties. The contracts will also make clear that the individuals receive two different salaries and sets of benefits from the two different employers and there is a strict division between their work for each, otherwise the arrangements do not

10/8358285_2

2

work. We do not have dual contracts within the Guy Carpenter business and the Claimants are not employed on that basis.

7.  It is very clear to me that the employer of each of the Claimants is Marsh Services Limited ("MSL"). They are not employed by any other company. You do not need to look any further than their employment contracts to see that (despite the name changes that MSL has gone through). Their employment contracts and subsequent amendments are shown at pages 21 to 28 and 47 to 49 (Mr. Samengo-Turner), 50 to 67 (Mr. Whyte) and 68 to 78 (Mr. Hopkins) of the Exhibit marked "KCP1" referred to in the first Witness Statement of Katharine Payne.

8.  The reason why the Claimants are employed by MSL rather than by one of the operating companies is because they provide their services to different companies in the MMC Group (as Ms Payne says at paragraph 29 of her first Witness Statement). There are several services companies throughout the MMC group. MSL is one and there are others within the UK; however, all Guy Carpenter employees are employed by MSL. I think Ms Payne is implying that because the services of the Claimants are provided to different companies in the MMC Group, somehow that means that they are employed by those companies. However, that could not be further from the truth. The fact that the Claimants provide their services to different companies in the MMC Group is one of the reasons that they are employed by a services company rather than by any of the operating companies. That is very common in large groups, particularly in the insurance industry. It would be incredibly difficult to have a number of different employers of one employee throughout a group -- it would cause all sorts of complicated problems, such as would all the companies pay a small part of their salary and benefits (each accounting to the Inland Revenue for the tax and National Insurance) and would each company have to agree to make decisions affecting their employment, such as disciplining them, approving their holidays, deciding pay rises, making decisions on dismissal? It would be unworkable, and for that reason does not happen at Guy Carpenter. The Claimants only had one employer and that was MSL.

9.  I realise that in the US Proceedings, there is reference to the plaintiffs being the employer of the Claimants, but as I have said, that is not the case. This was pleaded in error. I understand from our lawyers that this was of no consequence in the US proceedings as the question of jurisdiction there is determined solely by the provisions of the contract.

**The Stock Award Plan**

10.    The Claimants participated in the Marsh & McLennan Companies Inc. 2000 Employee Incentive and Stock Award Plan (the "Stock Plan"), shown at pages 29 to 46 of the Exhibit marked "KCP1".   MMC offers incentive compensation plans to senior executives employed by companies throughout the MMC Group in order to strengthen the mutuality of interest between them and the shareholders of MMC and to provide appropriate incentives for employees to remain with the MMC Group. I believe that the majority of participants in the Stock Plan are not employed by MMC itself (nor by Guy Carpenter & Co LLC).

11.    Under the Stock Plan, vested awards are paid either in cash or in shares in Marsh & McLennan Companies Inc. which are traded on the New York Stock Exchange. When receiving an award under the Stock Plan, each participant agrees in writing to abide by the terms and conditions of the Stock Plan as well as the additional terms and conditions set out in agreements related to the Plan (the "Agreements").   The Agreements that the Claimants signed in relation to their most recent awards in November 2005 (the "Awards") are at pages 115 to 132 (Mr. Samengo-Turner), 134 to 151 (Mr. Whyte) and 153 to 170 (Mr. Hopkins) of the Exhibit marked "KCP1". My understanding is that the Stock Plan, the Agreements and the Awards are subject to extensive regulation under US law, including regulation by the SEC and the New York Stock Exchange. The extent of the relevant US legislation and regulation is apparent from the wording of the Agreements themselves (such as sections V.B, VI.I, VII and VIII shown at pages 122, 123, 125 and 126 respectively of the Exhibit marked "KCP1"). Because of the need for consistency in respect of awards made to employees of MMC affiliates in many different states and countries, and the necessity of complying with US law in connection with a plan that involves the award of shares of a company listed on the New York Stock Exchange, the governing law stated in the Agreements (at VI.O at page 124 of the Exhibit marked "KCP1") is the law of New York and the jurisdiction for disputes concerning the Agreements is stated to be the exclusive jurisdiction of the New York courts (at VI.N at page 124 of the Exhibit marked "KCP1") (except where specifically provided otherwise, such as in Schedule IID). It would not make any sense if a different governing law applied or if another court outside New York had jurisdiction over a plan that was based on shares of a company headquartered in New York and whose shares trade on the New York Stock Exchange. This is all the more the case when awards are made to employees throughout the global MMC Group in many different countries. Having separate countries with jurisdiction over the same plan would cause huge confusion and potential for problems. MMC has a legitimate interest in ensuring that the Awards are subject to the law of the jurisdiction in which its shares are

10/8358285_2

4

traded and that any disputes concerning the Awards are resolved by one judicial system in that jurisdiction.

12.    It also makes sense to have one central plan awarding shares in the Group's parent company to senior employees who are employed by many different companies within the MMC Group, in many different countries. It helps to ensure that the senior people in those different countries and companies all share a sense of making a collective contribution towards the Group's success as a whole, in addition to their individual remuneration from their own employer and that the plan is interpreted and administered in a uniform manner and not pursuant to the rulings of courts of numerous jurisdictions.

13.    In practical terms, awards under the Stock Plan are administered by MMC in New York and decisions about the grant of awards are made in New York. The final decision is made by the Compensation Committee of the MMC Board of Directors, with input from the local business heads. The original documents signed by the participants in the Stock Plan are usually kept in New York rather than in the participants' own personnel file wherever they are employed. In the case of Guy Carpenter participants in the UK, I do not have any role in the granting of the awards under the Stock Plan, other than being consulted in relation to initial recommendations by local business heads and arranging for the distribution of letters to participants that we receive from MMC. When MMC decides to make an award in the form of cash rather than an award of shares, we are told by MMC how much the payment is and MSL makes the payment through the payroll.

14.    I should mention that I think Ms Payne's description of the Agreement issued in November as a "Bonus Contract" is misleading. Guy Carpenter and most business areas within the MMC Group operate annual cash bonus schemes which are completely separate from the Stock Plan. The annual bonuses are paid in cash to the value of $100,000, with 50% of anything over and above the $100,000 being deferred cash and the remaining 50% provided in stock units. They are paid to a much wider range of employees than receive awards under the Stock Plan. They are paid annually rather than vesting over several years and are paid by the individual's employer rather than provided centrally by MMC.

15.    In the case of the Claimants, they all received substantial annual cash bonuses which were separate from their awards under the Stock Plan. Their bonuses were paid by MSL, as their employer. Decisions on the level of bonus are made by different levels of management, depending on the seniority of the individuals who would be receiving them. For some very senior employees, such as Mr. Samengo-Turner and Mr. Whyte, their bonuses would be

considered by the Executive Committee of Guy Carpenter, International, in New York. Similarly, the Executive Committee would consider the bonuses of other senior employees of other companies in the Guy Carpenter network, although the bonuses would actually be paid by each individual's own employer. Unlike the Stock Plan awards, I manage the annual bonus round for Guy Carpenter and my team in HR take the lead in organising the bonus payments, which are made by MSL.

## Stock Awards to the Claimants

16.    The Claimants are part of the group of highly paid, senior executives within Guy Carpenter who were eligible to receive awards under the Stock Plan. The average total remuneration package for each of them is in excess of $1 million each year. In November 2005, as I have mentioned, the Claimants received their most recent Awards under the Stock Plan.

17.    Under the Stock Plan, the Awards were subject to vesting in specified percentages on various future dates over a four year period. As of April 2007, 20% of the Awards granted to each Claimant had vested. The Claimants each received cash for those portions of the Awards upon vesting. These amounts (representing 20% of the total value of the Awards) were paid were as follows: Samengo-Turner (£77,110), Whyte (£61,688), and Hopkins (£46,266).

## The Claimants' resignations and subsequent events

18.    On or about 3 April 2007, each of the Claimants gave notice that he was resigning from his employment with the Guy Carpenter business. Each of them informed me that they would be joining Integro Insurance Brokers ("Integro"), an entity whose principal place of business is in New York.

19.    At the time that they gave notice of their resignation, Mr. Samengo-Turner and Mr. Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac, and supervised, among others, the Guy Carpenter facultative brokers in the US, and Mr. Hopkins was head of Guy Carpenter's UK facultative reinsurance operation. Mr. Hopkins reported directly to Mr. Samengo-Turner and Mr. Whyte.

20.    By the terms of their respective employment contracts with MSL, the Claimants are required to provide six (6) months' notice of termination, meaning that they remain employed by MSL, continue to receive their full salaries and continue to have all the fiduciary and related duties and obligations as employees that are associated with such

10/8358285_2

6

employment. Given that they gave notice on or around 3 April 2007, their six month notice periods will not expire until early October 2007.

21. On 5 April 2007, at the beginning of the Claimants' notice periods, Integro issued a press release (placed on its website) announcing *"the formation of an international insurance and reinsurance business unit to be based in London."* The press release states that *"Integro announced the hiring of Julian Samengo-Turner and Ron Whyte, who will lead the new unit and join the board of Integro in the U.K."* Further, the press release states that *"Messrs. Samengo-Turner and Whyte formerly led Guy Carpenter's global facultative reinsurance business unit."* Regarding Mr. Hopkins, the press release states that Hopkins is *"[a]lso joining Integro and its U.K. board"* and that Hopkins was *"previously head of Guy Carpenter's U.K. facultative reinsurance operation."* These are shown at page 172 of the Exhibit marked "KCP1".

22. On or around 5 April 2007, I was told by Geoff Bromley about a call which had taken place between Mr. Samengo-Turner and Mark Newman. This call is referred to in Herbert Smith's letter to Mr. Samengo-Turner dated 5 April 2007 and Herbert Smith's letter to Elborne Mitchell dated 13 April 2007 at pages 174 to 176 and page 92 respectively of the Exhibit marked "KCP1". This call set alarm bells ringing for us that the Claimants were trying to solicit employees in the Guy Carpenter business to join Integro.

23. On 9 April 2007, Business Insurance magazine (the US insurance industry magazine) attributes to Integro the announcement that the Claimants have "joined" Integro and were "formerly" or "previously" with Guy Carpenter.

24. Prior to the announcement of the Claimants' resignations, there were thirty-two brokers in Guy Carpenter's UK facultative reinsurance group.

25. Based on what we understand from discussions with our facultative brokers, at least fourteen (including the Claimants) have been recruited or approached, either directly or indirectly, by Integro in the last two months.

26. Soon after the Claimants gave notice of their resignations, another senior UK broker in the group, Charles Waddington, who directly reported to Mr. Hopkins, gave notice of termination in order to join Integro.

27. On 23 April 2007, three additional Guy Carpenter facultative reinsurance brokers based in London gave notice of their resignations and announced that they were joining Integro.

The Claimants directly or indirectly supervised these three employees.

28.   On 3 May 2007, I learned from a third party that another three Guy Carpenter facultative reinsurance brokers based in London had received offers of employment from Integro. These three employees are experienced brokers who indirectly reported to the Claimants. On 9 May 2007, one of these three brokers announced his resignation and informed Guy Carpenter that he was joining Integro. We managed to persuade the other two to stay.

29.   So far, in total, including the Claimants, eight Guy Carpenter brokers have given notice of resignation to join Integro. There are now twenty-four brokers in Guy Carpenter's UK facultative reinsurance group rather than the thirty-two who were in the group before the Claimants resigned. Of the other six who we know have been approached by Integro, we believe that we have managed to persuade them to stay with us, at least for now. We have done that by investing a considerable amount of management time in meetings and discussions with them, in the course of which we have had to offer them significant enhancements in their remuneration packages to incentivise them to stay. Those incentives have taken the form of salary increases, immediate lump sum cash payments and Deferred Stock Units. As well as these six employees, we have also tried to protect ourselves against further recruitment by Integro throughout the facultative reinsurance business in which the Claimants worked (improving financial terms for selected employees throughout the UK, Asia, the USA and Europe).

30.   We have also started the process of recruiting to replace the Claimants and the other brokers who have given notice and will be joining Integro, although the process will take time and of course the people we recruit will have to give periods of notice to their current employers. We are of course also having to pay salary and provide benefits to the eight employees who are on garden leave, as well as investing time and money in finding their replacements.

31.   We are used to people leaving from time to time in the ordinary course, but so many employees leaving at the same time has caused enormous disruption to the business both here and abroad, particularly at a time when there are key renewal dates on 1 June, 1 July and 1 September which, other than December, are the busiest months of the year. Because of the problems that losing 25% of the staff has caused, particularly at a senior level, Mark Newman, who is in charge of the Guy Carpenter business in Asia Pacific, has been commuting on a fortnightly basis between Singapore and London to try to run the business and cover for the Claimants. We have also had to take various other steps such as calling

10/8358285_2

8

Exhibit G - 08

back employees from international secondments to fill some of the gaps.

32.   Of course, any retention programme such as the one we have had to embark on is a mixture of "carrot and stick". The increased remuneration we have offered forms the carrot, and the stick comprises a willingness on our part to enforce obligations where employees have breached them.  We cannot be sure that increased remuneration on its own will be enough to prevent further damage to our business by the loss of more brokers. Integro have launched a systematic recruitment campaign against our business, and we must protect ourselves if any of our own employees are helping them in breach of their own obligations. I believe that Integro have said that they intend to recruit around 150 staff.

## Background to the US Proceedings

33.   Guy Carpenter was very concerned about the Claimants' potential involvement in the recruitment or attempted recruitment of the other brokers (and their involvement in each other's recruitment) and that concern resulted in the decision to instruct our solicitors Herbert Smith to write to each of the Claimants on 5 April 2007 (at pages 174 to 184 of the Exhibit marked "KCP1" referred to in the first Witness Statement of Katharine Payne). The resulting correspondence is set out at pages 187 to 193 and pages 261 to 267 of the Exhibit marked "KCP1". Essentially, we were asking the Claimants to comply with their obligation of cooperation under Section IIE of the Agreements by providing information in response to a series of questions. Since receiving that letter from Herbert Smith, and as they have made clear through their solicitors, Elborne Mitchell, the Claimants have continually refused to comply with that obligation. Their refusal to do so led to the decision by Guy Carpenter & Co LLC and MMC to issue proceedings in New York to enforce the terms of the cooperation obligation and to seek repayment of the sums due to MMC as a result of the Claimants engaging in "Detrimental Activity" as defined in the Agreements. Judge Cote who heard the application in the New York proceedings was convinced by the argument that there was a need for expedited discovery given the urgency of the situation and so made the appropriate order. I believe that need for urgent relief still exists given the ongoing threat to the Guy Carpenter business posed by Integro using, we have reason to believe, assistance given by one or more of the Claimants.

34.   I should emphasise that the Claimants' employer, MSL, is not a party to the New York proceedings nor do those proceedings involve suing the Claimants for a breach of their employment contracts.

10/8358283_2

9

35. I would also mention that although the Claimants have been represented by Elborne Mitchell since at least 11 April 2007, they have continually refused to give their solicitors instructions to accept service of proceedings, as shown by the correspondence exhibited to this statement. It is clear that their refusal to give those instructions has been deliberate because they have been able to give instructions to their solicitors on other matters such as correspondence and of course in relation to their application for an anti-suit injunction. Their refusal to cooperate in following the standard protocol when solicitors are acting for a party mirrors their refusal to cooperate in accordance with their obligations under the Stock Plan. It has also caused considerable inconvenience and expense for the plaintiffs in the US proceedings, trying to effect service on individuals who appear determined to avoid being served. Mr. Hopkins for example has been in Australia for several weeks, notwithstanding that he remains an employee of MSL, being paid his salary and in return supposedly being available to work if required. His holiday in Australia was not authorised by MSL. In addition, he should have obtained special authorisation for this holiday as our holiday policy requires that employees may not normally take more than 10 working days' leave at any one time.

I believe the facts stated in this witness statement are true.

**Lynsey Mansfield**

Date:   1 June 2007

10/8158285_2

10

Exhibit G - 10

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION                                    Claim No. 2007 Folio 945

COMMERCIAL COURT

BETWEEN:

(1)    JULIAN SAMENGO-TURNER

(2)    RONALD DENNIS WHYTE

(3)    MARCUS HOPKINS

-and-

Claimants

(1)    MARSH SERVICES LIMITED

(formerly MARSH CORPORATE SERVICE LIMITED
and prior to that J&H MARSH AND MCLENNAN (SERVICES) LIMITED)

(2)    GUY CARPENTER & COMPANY LLC

(3)    MARSH & MCLENNAN COMPANIES INC

Defendants

---

EXHIBIT LM1

---

This is exhibit "LM1" referred to in the First Witness Statement of LYNSEY MANSFIELD dated
this 1st day of June 2007.

Signed: _____

LYNSEY MANSFIELD

-----Original Message-----
From: Colquhoun, Charles [mailto:Charles.Colquhoun@herbertsmith.com]
Sent: 06 May 2007 14:37
To: Kate Payne
Cc: BROWN, ANDREW
Subject: Guy Carpenter

Dear Ms Payne

I refer to our telephone discussion yesterday evening.

We should be grateful if you could confirm as a matter of urgency whether you have instructions to accept service on behalf of Mr Samengo-Turner. If you do not have instructions, we may have to take steps to effect service on Mr Samengo-Turner by other means.

In due course, we should also be grateful if you could confirm if you have instructions from Mr Whyle and Mr Hopkins.

Yours sincerely

Charles Colquhoun

Herbert Smith LLP

29/05/2007

From: Kate Payne [mailto:Payne@Elbornes.com]
Sent: 08 May 2007 11:22
To: Colquhoun, Charles
Subject: RE: Guy Carpenter

Dear Mr Colquhoun
Please be advised that I do not have instructions to accept service on behalf of Mr
Samengo-Turner, Whyte and Hopkins.
Yours sincerely
Kate Payne

2

-----Original Message-----
From: Colquhoun, Charles [mailto:Charles.Colquhoun@herbertsmith.com]
Sent: 08 May 2007 15:33
To: Kate Payne
Cc: BROWN, ANDREW
Subject: RE: Guy Carpenter

Dear Ms Payne

I refer to our telephone discussion on Saturday evening, my email of Sunday (sent at 2.37 pm), my telephone message of Sunday evening and my telephone message of this morning.

Despite your statement on Saturday evening that you would respond to me by email as to whether you had instructions to accept service and my numerous messages, you did not do so until this morning (after Mr Samengo-Turner's departure from the UK on Monday morning).

Further, during both the process server's and my discussions with Mr Samengo-Turner on Saturday evening, he confirmed that his solicitors would accept service on his behalf. He also provided me with your name and confirmed that the relevant documents should be sent to you (although he requested that we also send him a copy of the documents by email). I therefore sought confirmation from you directly that you were indeed instructed to accept service but when we spoke, you said that you had not heard from your clients and so needed to speak to them to take their instructions.

In the circumstances, it is surprising that Mr Samengo-Turner appears to have changed his mind about whether you can accept service on his behalf. Please specifically confirm that Mr Samengo-Turner has instructed you not to accept service.

Please also confirm the current whereabouts of Messrs Samengo-Turner, Whyte and Hopkins.

We reserve the right to bring this email to the attention of the US Court.

Yours sincerely

Charles Colquhoun

Herbert Smith LLP

3

Exhibit G - 14

-----Original Message-----
From: Kate Payne
Sent: 08 May 2007 16:58
To: 'Charles.Colquhoun@herbertsmith.com'
Subject: RE: Guy Carpenter

Dear Mr Colquhoun

I refer to your email of this afternoon. I am responding to put the record straight on the matters which you raise in your email. It was agreed in our conversation on Saturday evening that I would revert to you by email in the event I obtained instructions from Mr Samengo-Turner to accept service of proceedings. As I made clear during our conversation I did not then have instructions to accept service and as I confirmed this morning I remain in that position.

I would add to this that it emerged during our conversation on Saturday evening that before speaking to me on Saturday you had already spoken directly to Mr Samengo-Turner regarding service, conduct which I consider to be totally improper given that you know my firm is acting for him and my firm has been in correspondence with your firm on this matter. I would refer you to Solicitor's Conduct Rule 19 in this respect.

Yours sincerely
Kate Payne

-----Original Message-----
From: Colquhoun, Charles [mailto:Charles.Colquhoun@herbertsmith.com]
Sent: 08 May 2007 18:06
To: Kate Payne
Cc: BROWN, ANDREW
Subject: RE: Guy Carpenter

Dear Ms Payne

For the record, although I appreciate that Herbert Smith as a firm was aware that Elborne Mitchell was acting for Mr Samengo-Turner, I was not personally aware of that until Mr Samengo-Turner told the process server on Saturday that he was represented by solicitors and, at around the same time, I was told by Kramer Levin, Guy Carpenters lawyers in New York, that Elborne Mitchell was the firm that was acting for him. However, Kramer Levin did not know the name of the particular solicitor at Elborne Mitchell who was involved. Given the urgency of the matter and the need to speak to someone over the weekend, I then contacted Mr Samengo-Turner to find out from him who at Elborne Mitchell I should speak to so I could make contact with them. He told me that you were acting for him and so then I called you. I consider that was appropriate in the circumstances.

You say in your email that you remain in the same position that you were in on Saturday - ie you do not have instructions from Mr Samengo-Turner to accept service. However, I asked you in my earlier email today specifically to confirm whether Mr Samengo-Turner has instructed you not to accept service (which is a different thing altogether). It seems that is not the case from your email but I would be grateful if you would clarify the position.

Yours sincerely
Charles Colquhoun
Herbert Smith LLP

5

# Herbert Smith

Herbert Smith LLP
Exchange House
Primrose Street
London EC2A 2HS
T +44 (0)20 7374 8000
F +44 (0)20 7374 0888
DX 28
www.herbertsmith.com

**URGENT**

**Fax**

| | | | |
|---|---|---|---|
| Pages (inc) | 1 | | |
| To | Elborne Mitchell Solicitors | Date | 25 May 2007 |
| Company | | F | 020 7320 9111 |
| Your Ref | KCP/RHJ/rh/30,947 | Our Ref | 2090/3159/30875525 |
| From | Herbert Smith | D | +44 (0)20 7466 2017 |
| | | F | +44 (0)20 7098 5417 |
| Subject | Ron Whyte, Julian Samengo-Turner, Marcus Hopkins | | |

This fax is confidential and may be covered by legal professional privilege. If you are not an addressee and have received this fax in error, please contact us immediately; you should not use the fax or copy its contents to any other person. Thank you. If you do not receive all pages clearly, please contact the sender of this facsimile message directly.

Dear Sirs

**Your clients: Ron Whyte, Julian Samengo-Turner, Marcus Hopkins**
**Our Client: Guy Carpenter**

We refer to your fax sent at 11.21 a.m. this morning. You asked for our response by 4 p.m. today on the points raised in that fax. However, we need to take full instructions from our client (including representatives of our client who are based in the US) and so will not be able to reply substantively before 4 p.m. Since Monday is a public holiday, we will respond to you as soon as we are able to do so after Monday.

Please confirm that you will not make any application in the English courts before we have replied to you setting out our client's position on the issues raised in your fax.

In response to your question, we do have instructions to accept service on behalf of Marsh Services Limited, Marsh & McLennan Companies Inc and Guy Carpenter & Co LLC (or any of them), should proceedings be necessary. In turn, we would ask again whether you now have instructions to accept service on behalf of your clients. Since you are able to take instructions from them on correspondence, and contemplate issuing proceedings on their behalf, we do not see why your clients continue to fail to give you instructions to accept service.

Yours faithfully,

*Herbert Smith LLP*

10/3292283_1

6

Exhibit G - 17

IN THE HIGH COURT OF JUSTICE                    Claim No. 2007 Folio 945
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

        (1) JULIAN SAMENGO-TURNER
        (2) RONALD DENNIS WHYTE
        (3) MARCUS HOPKINS                              Claimants

                -and-

        (1) MARSH SERVICES LIMITED (formerly MARSH
            CORPORATE SERVICES LIMITED and prior to
            that J&H MARSH & MCLENNAN (SERVICES) LIMITED)
        (2) GUY CARPENTER & COMPANY LLC
        (3) MARSH & MCLENNAN COMPANIES INC          Defendants

---

## SKELETON ARGUMENT OF THE DEFENDANTS IN RESPONSE TO THE CLAIMANTS' APPLICATION FOR AN ANTI-SUIT INJUNCTION – *HEARING 6 JUNE 2007*

---

## Overview

1.    This skeleton argument is in response to the Claimants' application for an anti-suit injunction to restrain the proceedings between the parties pending in the United States District Court Southern District of New York ("**the New York Proceedings**") [1].

2.    The New York Proceedings have been brought by the Second and Third Defendants to enforce the provisions of the 2000 Senior Executive Incentive and

---

[1] On 1 June 2007, without prejudice to the exclusive jurisdiction of the New York courts, the First and Third Defendants issued a cross-application in the present English proceedings, with a witness statement and skeleton argument in support

Stock Award Plan ("**the Plan**") under which the Third Defendant ("**MMC**") has agreed to pay awards in the form of shares or cash in MMC, subject to certain conditions. The proceedings have been brought in New York pursuant to the exclusive New York jurisdiction clause (clause VI N) in the Plan.

3.   The main argument on which the Claimants' application is based, appears to be that the New York Proceedings should be injoined for the following reasons:

3.1   Section 5 of Council Regulation No 44/2001 ("**the Regulation**") is engaged [2] because:

(a)   the New York plaintiffs are the employers of the Claimants for the purpose of Article 20(1) of the Regulation; and

(b)   the New York Proceedings are "matters relating to an individual contract of employment" within the meaning of Article 18(1) of the Regulation;

3.2   if Section 5 is engaged:

(a)   the New York Proceedings are inconsistent with Article 20(1) of the Regulation, which requires proceedings brought by an employer to be brought only in the courts of the Member State in which the employee is domiciled [3]; and

(b)   the New York jurisdiction clause is invalidated by Article 21(1) of the Regulation, which prevents employers from contracting out of the mandatory provisions of Section 5 in advance of a dispute arising.[4]

4.   The Defendants contend that the Claimants' case is misconceived, for the following main reasons:

---

[2] Claimants' skeleton (application for interim injunction) paragraph 67
[3] Claimants' skeleton paragraphs 81 to 83
[4] Claimants' skeleton paragraph 85

4.1    The New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18 (1) and do not engage Section 5 of the Regulation:

   (a)    the New York Proceedings are not brought by the Claimants' employer - the Claimants' contracts of employment were entered into with the First Defendant ("**MSL**") which is not a party to the New York Proceedings;

   (b)    the Claimants' contracts of employment are separate and distinct from the Plan and the enforcement of clause II E is not dependent on the Claimants' contracts of employment; and

   (c)    the New York Proceedings are brought in relation to, and by way of enforcement of, clause II E of the Plan and the Plan is not a contract of employment;

4.2    Moreover, given that MMC and Guy Carpenter are not and never have been the Claimants' employers, Article 20(1) does not require that proceedings brought by them against the Claimants should be brought in England;

4.3    The Court would not be justified in adopting, as a matter of public policy, a strained construction of the Regulation with the aim of bringing the New York Proceedings within the scope of Article 18(1) or Article 20(1) (to which they would not, on an unstrained construction, be subject):

   (a)    the Plan is in essence an arrangement under which senior executives within the MMC group acquire a discretionary right to receive substantial amounts of shares or cash as a performance incentive, aligning their interests with those of MMC shareholders;

(b)    this involves matters regarding US securities which are naturally fit for New York law and jurisdiction;

(c)    the Plan is very different in nature to a conventional contract of employment and the public policy considerations underlying Section 5 of the Regulation (i.e. the need to protect employees from forum-shopping by employers) are of no relevance here;

(d)    on the contrary, MMC included a New York jurisdiction clause in the Plan for legitimate business reasons, not as a device to circumvent the provisions of the Regulation or as a means of oppression; and

(e)    Mr Whyte has already demonstrated that he is well able to defend himself in New York;

4.4    Given that the New York Proceedings do not engage Section 5 of the Regulation and are not inconsistent with Article 20(1), the Court should as a matter of discretion unhesitatingly give full effect to the New York jurisdiction clause in the Plan and allow the New York Proceedings to continue;

4.5    Even if the Court considers that the New York Proceedings do engage Section 5 of the Regulation and/or are inconsistent with Article 20(1), they are not vexatious, unconscionable or oppressive. The Court should therefore refuse the anti-suit injunction sought by the Claimants.

**Facts**

5.     ***The parties***        MMC is a Delaware corporation, headquartered in New York, and is the ultimate parent company of the MMC group of companies. The Second Defendant ("**Guy Carpenter**"), a member of the MMC group, specialises in reinsurance. MSL is an English company which acts as one of the service companies within the MMC group and is the employer of each of the Claimants.[5]

6.     The Claimants are employed by MSL rather than by one of the operating companies because they provide their services to different companies in the MMC group. That is very common arrangement in large corporate groups, particularly in the insurance industry.[6]

7.     At the time that they gave notice of their resignation on 2 April 2007, the First Claimant **Mr Samengo-Turner** and the Second Claimant **Mr Whyte** co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac, and supervised, among others, the Guy Carpenter facultative brokers in the US. The Third Claimant **Mr Hopkins** was head of Guy Carpenter's UK facultative reinsurance operation.  Mr. Hopkins reported directly to Mr Samengo-Turner and Mr Whyte.

8.     ***The Plan***        The Claimants are each participants in MMC's Stock Plan [7], a plan offered to senior executives employed by companies in the MMC group in order to strengthen the mutuality of interest between them and the

---

[5] Their employment contracts and subsequent amendments are shown at pages 21 to 28 and 47 to 49 (Mr. Samengo-Turner), 50 to 67 (Mr. White) and 68 to 78 (Mr. Hopkins) of exhibit KCP1 to Katharine Payne's 1st WS.
[6] Lynsey Mansfield 1st WS paragraph 19
[7] In this skeleton, "the Plan" means the 2005 Terms and Conditions, relied on in these proceedings (elsewhere called "the Agreements"). Mr Samengo-Turner's copy of "the Plan" is at KCP1 pages 115 to 132. The 2000 Stock Plan is at pages 29 to 46 of KCP1

shareholders of MMC and to provide appropriate incentives for employees to remain with the MMC group.

9.    Under the Plan, vested awards are paid either in shares in MMC, which are traded on the New York Stock Exchange, or cash. The shares are subject to extensive regulation under US law, including regulation by the SEC and the New York Stock Exchange [8].

10.   The Claimants' description of the Plan as a *"Bonus Contract"* is incorrect. Companies within the MMC group operate annual cash bonus schemes which are completely separate from the Plan. The annual bonuses are paid in cash to the value of $100,000, with 50% of anything over and above the $100,000 being deferred cash and the remaining 50% provided in stock units.

11.   These annual bonuses are paid to a much wider range of employees than receive awards under the Plan. They are paid annually rather than vesting over several years and are paid by the individual's employer rather than provided centrally by MMC. The Claimants each received substantial annual cash bonuses which were separate from their awards under the Plan, paid by MSL, as their employer.

12.   Under the Plan, because of the need for consistency in respect of awards made to employees of MMC affiliates in many different states and countries, and the necessity of complying with US law in connection with a plan that involves the award of shares of a company listed on the New York Stock Exchange, the Plan includes a New York governing law provision and New York exclusive jurisdiction provision [9].

---

[8] See clauses V B, VI I, VII and VIII of the Stock Plan (KCP1 pages 122, 123, 125 and 126)
[9] See clauses VI O and VI N at page KCP1 page 124

13.  It would not make any sense if a different governing law applied or if another court outside New York had jurisdiction over a plan that was based on shares of a company headquartered in New York and whose shares trade on the New York Stock Exchange.

14.  This is all the more the case when awards under the Plan are made to employees throughout the global MMC group in many different countries. Having separate countries with jurisdiction over the same plan would cause huge confusion and potential for problems. MMC has a legitimate interest in ensuring that its Plan is subject to the law of the jurisdiction in which its shares are traded and that any disputes concerning the Plan are resolved by one judicial system in that jurisdiction [10].

15.  It also makes sense to have one central plan awarding shares in the Group's parent company to senior employees who are employed by many different companies within the MMC group, in many different countries. It helps to ensure that the senior people in those different countries and companies all share a sense of making a collective contribution towards the Group's success as a whole, in addition to their individual remuneration from their own employer and that the Plan is interpreted and administered in a uniform manner and not pursuant to the rulings of courts of numerous jurisdictions.

16.  In practical terms, the Plan is administered by MMC in New York and decisions about the grant of awards under the Plan are made in New York. The final decision is made by the Compensation Committee of the MMC Board of Directors, with input from the local business heads. The original documents signed by the participants in the Plan are usually kept in New York rather than in the participants' own personnel file wherever they are employed.

---

[10] Mansfield 1st WS paragraph 11

17. In the case of Guy Carpenter participants in the UK, MSL does not grant awards under the Plan, although its officers are consulted by MMC before MMC grants awards. When MMC decides to make an award in the form of cash rather than an award of shares, MSL's Human Resources department is told by MMC how much the payment is and MSL makes the payment through its payroll.

18. The Claimants are part of a group of highly paid, senior executives within Guy Carpenter who were eligible to receive awards under the Plan. The average total remuneration package for each of them is in excess of $1 million each year.

19. In November 2005, awards were granted under the Plan to each of the Claimants (the **"Awards"**). When receiving his Award, each Claimant agreed in writing to abide by the terms and conditions of the Plan[11].

20. Under the Plan, the Awards were subject to vesting in specified percentages on various future dates over a four year period. As of April 2007, 20% of the Awards granted to each Claimant had vested. The Claimants each received cash for those portions of the Awards upon vesting. These amounts (representing 20% of the total value of the Awards) were paid were as follows: Mr Samengo-Turner (£77,110), Mr Whyte (£61,688), and Mr Hopkins (£46,266). [12]

21. The grant of an Award under the Plan is conditional upon the executive in question not engaging in certain "Detrimental Activity" (clause I C) [13]. In the event that the executive engages in Detrimental Activity prior to or during the "Rescission Period" (defined as meaning the 12 month period beginning on each

---

[11] at KCP1 pages 115 to 132 (Mr. Samengo-Turner), 134 to 151 (Mr. Whyte) and 153 to 170 (Mr. Hopkins)
[12] Mansfield 1st WS. paragraph 16
[13] KCP1 page 154

installment's vesting date (clause 1 C(1)), the relevant installments are to be repaid to MMC.

22.     It is to be noted that "Detrimental Activity" includes "(f) attempting to recruit or solicit, or aid in the recruitment or solicitation of any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any actual or prospective competitor of the Company."

23.     It should also be noted that there is an alternative definition of Detrimental Activity in Schedule II D to the Plan, which contains[14] a non-exclusive English jurisdiction clause. Schedule II D is, however, only applicable after termination of the Claimants' employment and is accordingly not yet applicable[15].

24.     Clause II E of the Plan provides as follows:

> "E. **Cooperation**
> You agree that both during and after your employment with the Company[16], regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement."[17]

25.     The purpose of seeking information pursuant to this clause would be to assist MMC in discovering whether a senior executive to whom an Award has been paid has been complying with his obligations under the Plan. The provisions of information might well assist MMC in deciding on the appropriate measures to

---

[14] Paragraph 6 of Schedule II D, KCP page 170
[15] Paragraph 1 of Schedule II D, KCP1 page 166
[16] Defined as MMC or any of its subsidiaries or affiliates (page 115)
[17] KCP1 page 158

take in order to protect its position, including the seeking of injunctive relief against the executives.[18] The discovery that a senior executive has been involved in Detrimental Activity entitles MMC to the return of recent installments of Award.[19]

26.    The "obligations" of the executive accordingly include, on the correct construction of clause II E and the other provisions of the Plan:

    26.1    an implied obligation not to engage in Detrimental Activity (clause 1 C(1)), the breach of which triggers the obligation to repay installments of the Awards;

    26.2    an obligation to repay the award in the event that the executive is found to have engaged in Detrimental Activity (clause I C(2));

    26.3    an obligation under clause II A(3) to perform any or all of the executive's regular job duties requested by the Company during the executive's Notice Period[20] and to observe all the executive's attendant fiduciary duties, including, without limitation, duties of loyalty and confidentiality to the Company during that period (clause II A(3)).

27.    *Notice*        The Claimants gave 6 months' notice of resignation on 3 April 2007 [21]. They intend to take up employment with Integro Insurance Brokers ("**Integro**"), a competitor of Guy Carpenter. Since that date, the Claimants have been on garden leave, receiving their full salary and continuing

---

[18] Expressly contemplated in Clause II H, page 158
[19] Clause I C(1), KCP1 pages 154 - 155
[20] As defined in clause II A (1) and Schedule II D (3). The Claimants' notice periods are each 6 months.
[21] Payne 1st WS paragraph 33