# Exhibit G-2

to owe all their fiduciary and related duties in accordance with clause II A(3) of the Plan and their contracts of employment with MSL.

28. ***Recruitment of staff by Integro***   In the period since the Claimants gave notice, 14 of the 32 brokers in Guy Carpenter's UK facultative reinsurance group have been recruited or approached by Integro. 5 brokers who had worked under the supervision of the Claimants have given notice and announced that they are leaving to join Integro.

29. The rapid rate at which Guy Carpenter facultative brokers in the UK office have been announcing their resignations, joining Integro or are otherwise being aggressively solicited to join Integro has caused MMC to have serious concerns as to whether the Claimants are complying with their obligations under the Plan not to solicit employees.

30. Integro is apparently intending to recruit around 150 staff. The Defendants have had to invest considerable amounts of management time in meetings and discussions with their remaining staff and to offer them significant enhancements in their remuneration package. The loss of so many people in a short space of time has inevitably caused significant disruption to their business both in the UK and abroad.

31. Moreover, the Defendants cannot be sure that increased remuneration on its own will be enough to prevent further damage to their business by the loss of more brokers. Integro have launched a systematic recruitment campaign and the Defendants need to protect themselves if, as they suspect, the Claimants are assisting Integro, in breach of their own obligations [22].

---

[22] Mansfield 1st WS paragraph 32

32. **Requests for information**   MMC is understandably concerned that the wave of resignations by staff at Guy Carpenter's London office might be the result of recruitment or solicitation by the Claimants, in breach of their obligations under clause I C(1)(f) and/or clause II A(3) of the Plan.

33. MMC has, by means of requests for information and documents pursuant to clause II E of the Plan, sought to ascertain whether the Claimants have been acting in breach of the obligations referred to above.

34. The first request was made in letters to the Claimants dated 5 April 2007.[23] On 11 April 2007 the Claimants' solicitors responded by letter indicating they could not respond to the request at that time because Messrs Whyte and Hopkins were on vacation. However, the Claimants' solicitors stated that they hoped to take detailed instructions from all 3 Claimants by the following week and would revert as soon as they reasonably could thereafter [24]. In subsequent communications from their solicitors the Claimants have, however, persistently failed to provide any answers to the requests [25].

35. **The New York Proceedings**   The New York Proceedings were commenced on 4 May 2007 and were notified to the Claimants' solicitors on 5 May 2007.[26] MMC and Guy Carpenter, not MSL, are claimants in the New York Proceedings.[27] In substance, the New York Proceedings are seeking to enforce the right to disclosure of information under clause II E of the Plan and MMC's right to repayment of the Awards under clause I C(2). The terms of the Claimants' contracts of employment with MSL are not referred to or relied upon in the New York Proceedings.

---

[23] KCP2 pages 4 -6
[24] KCP2 page 10
[25] KCP2 pages 1 - 37
[26] Payne 1st WS paragraph 43
[27] KCP1 pages 101 to 113

36. On 15 May 2007 the Claimants applied for expedited discovery from the New York court. Mr Whyte was served in England (Messrs Samengo-Turner and Hopkins having absented themselves and declining to instruct solicitors to accept service). He instructed New York lawyers to oppose the application and contest jurisdiction. The application was heard on 18 May 2007 and the order for disclosure was made by Judge Cote as matter of urgency in substantially the form it was requested, despite Mr Whyte's lawyers seeking to delay disclosure until after his jurisdiction challenge.

37. Mr Whyte having failed to resist the order of Judge Cote, pending his challenge to jurisdiction (and while threatening to appeal Judge Cote's order[28]), the Defendants then set about seeking to restrain the New York Proceedings through the present English proceedings. They issued proceedings on 25 May 2007, which were first notified to the Defendants' solicitors on 29 May 2007. The Claimant gave notice that they were intending to apply for an order on short notice on 31 May 2007.

38. The Defendants were not given sufficient time to respond to the Claimants' application by that date and undertook not to take any further steps in the New York Proceedings until 6 June 2007, when it is anticipated that the Claimants will renew their application.

---

[28] Payne 1st WS para54

**Submission 1**  *The New York Proceedings are not "matters relating to individual contract of employment" within the meaning of Article 18(1)*

39. Before turning to the key point – that MMC and Guy Carpenter are not the Claimants' employer for the purposes of Section 5 of the Regulation - it is necessary to examine Article 18 (1) of the Regulation, which provides:

> "In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section ...."

40. In order to succeed with their application, the Claimants must establish that the New York Proceedings are "matters relating to individual contracts of employment" within the meaning of this provision. If (as the Defendants contend) the New York Proceedings are not "matters relating to individual contracts of employment", they do not engage Section 5 of the Regulation.

41. If the New York Proceedings do not engage Section 5, there is no reason for the English court to decline to give full effect to the exclusive jurisdiction clause in the Plan, in accordance with its normal practice of upholding the parties' choice of jurisdiction[29].

42. The Defendants submit that, for the following reasons, the New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18(1).

43. **First**, in the New York Proceedings MMC and Guy Carpenter are seeking to enforce the provisions of the Plan, in particular, the cooperation clause at clause

---

[29] See *Dicey & Morris: The Conflict of Laws* 14th Edition, Rule 31 paragraph 12-021

Exhibit G - 31        14

IIE. The New York Proceedings are *not* seeking to enforce or rely on the provisions of the Claimants' contracts of employment.

44. The Claimants' contracts of employment were made uniquely with MSL, which is not a party to the New York Proceedings, not with MMC or Guy Carpenter. Contrary to what is suggested in the Claimants' skeleton argument,[30] it does not follow from the fact that the Claimants provide services to other companies in the MMC Group that the Claimants have more than one employer or multiple employment contracts. That is plainly not the case[31].

45. **Second,** the Plan, which is the subject matter of the New York Proceedings and the basis of the plaintiffs' causes of action in those proceedings, is not an "individual contract of employment" or a "matter relating to an individual contract of employment" within the meaning of Article 18(1).

46. As a matter of English domestic law, the hallmark of a contract of employment is the existence of mutual obligations on the part of the employer to provide work and on the part of the employee to carry out that work [32]. The Plan does not include any such obligations. There are various other tests which are sometimes applied to determine whether a contract is a contract of employment (such as the control test, the integration test and the economic reality test). None of these tests comes is satisfied by the terms of the Plan or the relationship between the Claimants and MMC or Guy Carpenter.[33]

---

[30] Claimants' skeleton argument paragraph 62
[31] Mansfield 1st WS paragraphs 5 to 9
[32] See *Nethermere (St Neots) Ltd v Taverna* [1984] IRLR 240; Bowers: *Employment Law* 7th Edition at paragraph 2.06
[33] *Bowers* (ibid) at paragraphs 2.09 to 2.24

Exhibit G - 32         15

47. Contrary to the Claimants' argument[34], it does not follow from the fact that the Plan includes references to terms such as notices of termination, confidentiality and post termination restrictive covenants which are apposite in the context of an employment relationship that the Plan is itself a contract of employment. As noted above, the core terms of a contract of employment are completely absent from the Plan.

48. Moreover, the Plan is not a "matter relating to a contract of employment", applying the criteria invoked by the European Court of Justice. English domestic law is not determinative of the issue whether the Plan is a contract of employment for the purposes of the Regulation. In order to promote the uniform application of the Regulation and the Brussels and Lugano Conventions, the European Court of Justice has repeatedly held[35] that phrases such as "matters relating to individual contracts of employment" are independent concepts with their own Convention/Regulation meaning, independent of national law [36].

49. It would appear that the European Court has not yet provided any clear guidance as to the meaning of "matters relating to individual contracts of employment" in Article 18(1). However, in *Shenavai v Kreischer* 266/85 [1987] ECR 239, a case under the Brussels Convention concerning the issue of which court had jurisdiction to hear a claim by an architect for the recovery of fees under the Brussels Convention, the European Court held as follows:

> "16. In that connection it should first be observed that contracts of employment, like other contracts for work other than on a self-employed basis, differ from other contracts -- even those for the provision of

---

[34] Skeleton paragraph 62

[35] E.g. in *Weber v Universal Ogden Services Ltd* (Case C-37/00 [2002] All ER (EC) 397 at 417, [2002] ECR I-2013 (paras 38-41)

[36] *Kleinwort Benson Ltd v Glasgow City Council* [1999] AC 153. It follows that authorities such as the decision of Lightman J in *Albon (trading as NA Carriage CO) v Naza Motor Trading Sdn Bhd and another* [2007] 2 All ER 719, a decision on the meaning of CPR 6.20(5), are of very limited, if any, assistance in construing the Regulation

services -- by virtue of certain particularities: **they create a lasting bond which brings the worker to some extent within the organizational framework of the business of the undertaking or employer, and they are linked to the place where the activities are pursued, which determines the application of mandatory rules and collective agreements.** It is on account of those particularities that the court of the place in which the characteristic obligation of such contracts is to be performed is considered best suited to resolving the disputes to which one or more obligations under such contracts may give rise" [Emphasis added].

50. In his advisory Opinion in the same case, Advocate General Mancini referred to "the concept of an employment relationship; in particular ... dealings which are characterised by the economic inferiority of one party."

51. The *Jenard-Moller Report* on the draft Lugano Convention[37] (which first introduced special jurisdictional provisions relating to employment contracts, followed subsequently in the Regulation) states as follows:

> "41. The question whether a contract of employment exists is not settled by the Convention. If the judge to whom the matter has been referred gives an affirmative answer to this question he will have to apply the second part of Article 5(1) which constitutes a specific provision. **Although there is as yet no independent concept of what constitutes a contract of employment, it may be considered that it presupposes a relationship of subordination of the employee to the employer** (see Chapter VI, judgments in *Shenavai v Kreischer* cited earlier, and *Arcado v Havilland*" [Emphasis added].

52. Applying these statements from European jurisprudence to the present case, the Plan is not contract of employment any more than it would be under English law. The Plan is not a contract for work; nor does it bring executives within the organizational framework of the business *(Shenavai v Kreischer)*.

---

[37] Admissible as an aid to the interpretation of the Convention under section 3B of the Civil Jurisdiction and Judgments Act 1988

53. **Third**, there is a "matter relating to an individual contract of employment", within the meaning of Article 18(1), only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee.

54. In *Swithenbank Foods Ltd v Bowers* [2002] 2 All ER 974, the only relevant reported English case on the construction of Section 5 of the Regulation, HH Judge McGonigal (sitting as a High Court Judge) held as follows:

> "24. .... Section 5 should not be construed as conferring jurisdictional advantages on a poor defendant sued by a rich claimant if they happen to be employee and employer. **The reference to 'individual contracts of employment', rather than to the employment relationship generally, indicates that what is relevant is the contract of employment rather than the relationship generally. The contract of employment is relevant, and there is a matter relating to an individual contract of employment, only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee**" [Emphasis added].

55. The Claimants' argument that Article 18(1) is engaged by the New York Proceedings merely because (a) they "de facto" provide their service to other companies in the MMC group[38] and (b) the Plan contains terms that would be apposite in the context of an employment relationship[39], is flatly inconsistent with this authority.

56. **Fourth**, there is no public policy reason why the Court should adopt a strained construction of the Regulation in order to treat the New York Proceedings as "matters relating to individual contracts of employment".

---

[38] Claimants' skeleton para 62(b)
[39] Claimants' skeleton para 62(c)(ii)

Exhibit G - 35      18

57. Recital (13) to the Regulation makes clear that, as previously indicated in the Jenard-Moller report, the special jurisdiction provisions of Article 5 are designed for the protection of the employer as the weaker party. As noted by HH Judge McGonigal in *Swithenbank Foods Ltd v Bowers* [2002] 2 All ER 974:

> "24. The policy behind Section 5 is based on the probability that the employer is financially stronger than the employee. Therefore, if one or other of them has to take proceedings in a foreign court, it should be the employer who has to bear the additional cost and inconvenience involved to ensure, so far as practicable, that the parties are on an equal footing so far as jurisdiction is concerned."

58. Having regard to the public policy considerations underlying Section 5, it is important to bear in mind that the terms and circumstances of the Plan are very far removed from the type of employer/employee relationship which led to the inclusion of the special jurisdictional provisions of Section 5, i.e. a relationship characterised by the subordination of the employees and the potential unfairness of exposing employees to proceedings in foreign jurisdictions at the whim of their employer [40].

59. Any employees qualifying for an Award under the Plan (including the three Claimants in this case) will necessarily be individuals with substantial assets and commercial know how. The New York jurisdiction clause was included in the Plan, not to make life difficult for the Claimants, but for perfectly sound and legitimate business reasons of MMC.

---

[40] Compare *Benatti v WPP Holdings Italy SRL* [2007] EWCA Civ 263, where the Court of Appeal (a) took account of the fact that the alleged "employee" was a successful businessman who had signed the consultancy agreement of his own free will, submitting to this jurisdiction; and (b) in the case of Buxton LJ, deplored the fact that the Regulation had "spawned" the jurisdictional challenge.

Exhibit G - 36

19

60. In short, the New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18(1). Accordingly the Claimants' application fails *in limine*.

**Submission 2**   *The New York Proceedings are not proceedings brought by an employer against an employee within the meaning of Article 20(1)*

61. Article 20(1) of the Regulation provides:

    "An employer may bring proceedings" only in the courts of the Member State in which the employee is domiciled."

62. If, as contended above, the New York Proceedings are not "matters relating to individual employment contracts" the application for an anti-suit injunction must necessarily fail, as the New York Proceedings would not be subject to the provisions of Section 5.

63. Even if, however, contrary to the Defendants' first submission, the Court were to hold that the proceedings were "matters relating to individual employment contracts", it would by no means follow that the New York Proceedings were inconsistent with Article 20(1).

64. The point is a short one. Regardless of whether the New York Proceedings are "matters relating to the Claimants' individual contracts of employment" as contended by the Claimants (e.g. because they contain terms apposite to an employment relationship), the New York Proceedings have not been brought by the Claimants' employer, MSL. MMC and Guy Carpenter are not and never have been the Claimants' employers.

Exhibit G - 37

20

65. The Claimants' case requires the Court, in effect, to "pierce the corporate veil" and to treat Guy Carpenter, MSL's co-subsidiary, and MMC, the ultimate parent company of the MMC group, as one and the same entity as MSL, the Claimants' employer, thereby ignoring their separate corporate identities and the fact that it was MSL alone that entered into a contract of employment with each of the Claimants.

66. This approach is contrary to well established authority. The Courts may only "pierce the corporate veil" in certain defined circumstances, in particular where a corporate entity is being used as a device or sham to mask the true facts. These circumstances do not arise, and are not alleged to arise, in the present case.

67. The leading case on "piercing the corporate veil" in a jurisdictional context is *Adams v Cape Industries* [1990] 1 Ch 433, in which the Court refused to pierce the corporate veil and treat the defendants as being present in Texas by reason of the presence of certain related companies. Scott J (whose judgment was upheld by the Court of Appeal) held as follows (at page 536):

> "Mr. Morison described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As Sir Godfray submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities."

68. In the employment field, the Courts have similarly rejected attempts to pierce the corporate veil, in particular in the context of attempts by employees to benefit

Exhibit G - 38

21

from statutory provisions (primarily the Transfer of Undertakings Regulations) that would apply if they were in fact employed by a different group company[41].

69. Moreover, there is no foundation for the Claimants' insinuation that there is something artificial about the institution of proceedings by MMC as opposed to MSL or that the New York Proceedings are the result of forum shopping.[42] MMC and Guy Carpenter are the natural parties to bring proceedings to enforce the terms of the Plan. The New York Proceedings seek relief only under the Plan.

70. For the reasons set out in the first submission, there is no need for the Court to apply a strained interpretation of the Regulation in order to treat the New York Proceedings as inconsistent with Article 20(1) when, on an unstrained reading of the Article, informed by an appreciation of the public policy considerations underlying Section 5, they do not.

71. In short, since the New York Proceedings are not inconsistent with Article 20(1), there is no valid basis for the Claimants' application to restrain those proceedings. For this additional reason, the Court should dismiss the Claimants' application for an anti-suit injunction.

---

[41] See in particular the judgment of Elias J in *Millam v The Print Factory (1991)Ltd* [2006] IRLR 923, (reversed on other grounds [2007] EWCA Civ 322) "it is only legitimate to pierce the corporate veil and treat the two businesses as one in very exceptional circumstances, and even then only for certain purposes ... In general it must be shown that the subsidiary company is a sham or a façade ..."
[42] Claimants' skeleton paragraph 102a

**Submission 3**     *The Court should not, as a matter of discretion, restrain the New York Proceedings*

72. In order to justify the grant of an anti-suit injunction, the Claimants must establish that the New York Proceedings are unconscionable, vexatious or oppressive [43].

73. If the Court holds either that the New York Proceedings do not engage Section 5 of the Regulation or, even if they do, that they do not infringe Article 20(1), the foundation of the Claimants' case that the Court should, as a matter of discretion, restrain the New York Proceedings falls away. It would not be unconscionable, vexatious or oppressive to allow the New York Proceedings to proceed in accordance with the agreed jurisdiction clause in the Plan.

74. The Claimants' contrary contention, to the effect that the Court should in this situation give effect to the Regulation, even though it is *ex hypothesis* inapplicable[44], is untenable. Such a course would be an affront to both contract and the exclusive jurisdiction clause; and to comity and the power of the New York Courts.

75. Even if the Court holds that the New York Proceedings do engage Section 5 of the Regulation or that they infringe Article 20(1), the proceedings cannot sensibly be characterised as unconscionable, vexatious or oppressive:

   75.1 New York was the agreed forum for disputes arising out of the Plan and is an entirely appropriate forum for the determination of a claims arising out of an agreement which is governed by New York law;

---

[43] *OT Africa Line v Magic Sportswear* [2005] 2 Lloyd's Rep 170
[44] Claimants' skeleton argument paragraph 105

75.2 The New York Proceedings have been brought in good faith in accordance with the New York jurisdiction clause in the Plan;

75.3 The Claimants are in a position to participate in the New York Proceedings – whilst Messrs Samengo-Turner and Hopkins have so far evaded service, Mr Whyte has participated, challenged jurisdiction, opposed the disclosure order and threatened to appeal;

75.4 It would not be oppressive for the Claimants to comply with the order for expedited disclosure, including the order for pre-trial depositions. (Part 34 of the CPR specifically provides for the taking of depositions on the basis of a letter of request from a foreign court, which it would not do if it considered such procedure in and of itself to be oppressive.)

75.5 There is absolutely no foundation for the suggestion that by participating in the New York expedited discovery process, the Claimants would be waiving their objections to the jurisdiction of the New York court. It is entirely possible for a party to participate in the New York Proceedings whilst reserving its position as to jurisdiction.

75.6 The motion to dismiss the New York Proceedings on jurisdictional and *forum non conveniens* grounds is still to be heard, notwithstanding the Mr Whyte's participation in the proceedings to date – and this would make no sense if, by participating, the Claimants automatically submitted to the jurisdiction;

75.7 Restraining the New York Proceedings at this stage, thereby compelling the Defendants to carry on fresh proceedings in this

jurisdiction, would serve no useful purpose and would almost certainly lead to unnecessary duplication and wastage of work and costs;

75.8   The anti-suit jurisdiction should only be exercised with caution and in exceptional circumstances – especially where, on an interim basis, the "balance of convenience" and justice is in favour of respecting and indeed supporting the New York Court's order.

## Conclusion

76.   For the reasons set out above, the Court should dismiss the Claimants' application for an anti-suit injunction.

**ANDREW LENON QC**
1 Essex Court, Temple

**MURRAY ROSEN QC**
Herbert Smith LLP

4 June 2007