# EXHIBIT H
# (Continued)

**The applications made**

1.  The First and Third Defendants ("MSL") and ("MMC") make their application first on the hypothesis that an anti-suit injunction is not granted and second on the hypothesis that it is. Notably, no application is made for the Second Defendant ("Guy Carpenter"), which is also the Second Plaintiff in the US Proceedings. The Claimants do not know why.

2.  The Claimants resist the applications, on the first hypothesis in full and on the second hypothesis in part. In summary, the Claimants' argument, developed below, is:

**Application (1) : s25 CJJA Interim Relief**

a.  The order sought is for the gathering of evidence and as such is outwith the scope of s25 (see s25(7)(b).

b.  The order sought exceeds that which the Court has power to grant in proceedings in this jurisdiction and as such is outwith the scope of s25 (see s25(1)).

c.  S25 is a not back door by which to circumvent the provisions of the Evidence (Proceedings in Other Jurisdictions) Act 1975 and the provisions of the 1975 Act cannot be enforced via s25.

d.  In short, the Court has no jurisdiction to turn an interlocutory procedural order of the New York Court into an order of this Court.

e.  If s25 is in play, the Court can only grant such relief as it is satisfied on the facts should be granted if proceedings were on foot here. In practice, that raises the same questions as arise in connection with the application made on the hypothesis that an anti-suit injunction is granted.

f.    Even if s25 is in play, it is inexpedient to grant the relief sought.

**Applications 2/3 : Mandatory interlocutory injunction**

g.    Such relief can only be sought on the back of a claim for substantive relief brought in this jurisdiction. The Defendants should either issue such proceedings or undertake to do so forthwith as a condition of the grant of any relief.

h.    The Court should be circumspect in the grant of such relief and if granted it should be the minimum needed to meet the mischief complained of and not the maximum that the Defendants may desire.

i.    The Claimants record that they deny that the Co-operation Clause relied on is enforceable against them and likewise deny the existence of two of the three obligations in respect of which it is said that co-operation is sought. Those questions will be issues for trial.

j.    The Claimants, however, accept the existence of a duty of fidelity as employees (although they deny that it extends to any whistleblowing obligation and there may well be issues as to its scope as regards solicitation of employees).

k.    The Court is not concerned on an application of this kind (in particular one brought on with three days notice) to finally decide the rights of the parties. The Claimants accept that the First and Third Defendants can satisfy the (low) hurdle of a serious issue to tried in connection with the underlying rights relied on.

l.    However, there is no real urgency to the application, no evidence that the Claimants have engaged in wrong doing and in truth the Defendants are engaged in a (more or less admitted) fishing exercise. For those reasons, the Claimants do not accept that there is any

entitlement to the relief sought.

m.   The specific complaint made is that the Claimants are or have been soliciting MSL's employees. Any relief granted should, therefore, (in addition to being contingent on the issue of substantive proceedings here) be limited to that specific complaint - there is no basis at all for any broader relief, still less on an urgent and interlocutory basis.

n.   Notwithstanding that the Claimants dispute that the Defendants are entitled to relief, as a pragmatic way forwards, the Claimants are willing (without conceding anything) to offer to serve on the Defendants documents relating to the solicitation of employees in reasonably defined categories (assuming that the First and Third Defendants either have or are willing to undertake to issue substantive proceedings here and the US Proceedings have come to an end). The categories the Claimants say fall within that description are identified below.

3.   Recognising that the Defendants may wish to push for broader relief than the Claimants are willing to consent to, the Claimants' arguments as to the substance are outlined below in case there is a need to argue them out.

**Application (1) : s25 CJJA 1982 Interim Relief**

4.   This arises on the hypothesis that an anti-suit injunction is not granted and there is no restraint on the prosecution of the US Proceedings.

5.   MMC asks the Court, pursuant to s25 CJJA, to grant it interim relief in the form of an order in identical form to that made on 18 May 2007 in the US Proceedings. That order provided for wide ranging documentary disclosure [Tab 4 : KCP1 pp217-219] and interrogatories [Tab 4 : KCP1 pp221-224] and for each Claimant to attend for depositions in London (the Defendants' US attorneys having recently given notice that they want to take those depositions over 13-15 June 2007 and that they propose to do so for a maximum of 7

hours per Claimant).

6.  In short, MMC asks the Court to "rubber stamp" to the New York Court order of 18 May 2007.

7.  For the reasons which follow, the Claimants say that s25 does not permit the Court to do so (and it would be very surprising if it did so).

**S25 Interim Relief**
*The meaning of interim relief*

8.  S25(7) CJJA 1982 provides:

> *"In this section "interim relief", in relation to the High Court in England and Wales or Northern Ireland, means interim relief of any kind which that court has power to grant in proceedings relating to matters within its jurisdiction, other than:*
>
> *(a)    a warrant for the arrest of property; or*
>
> *(b)    provision for obtaining evidence."*

9.  The New York Court order of 18 May 2007 - being concerned with disclosure and interrogatories - is an order for the obtaining of evidence. As such it is excluded from s25 by sub-paragraph (b). That the nature of the relief sought is in truth evidence gathering is recognised by MMC, given that MMC seeks to bolster its application by reference to the Evidence (Proceedings in Other Jurisdictions) Act 1975 ("1975 Act").

10. Orders for the obtaining of evidence are excluded from s25 precisely because of the 1975 Act [see *Dicey & Morris* para 8-26].

11. The powers contained in the 1975 Act are quite specific and do not arise unless the Court receives a request from the requesting court that they be exercised [s1 1975 Act]. Once the powers do arise, they are circumscribed,

for example in relation to discovery [s2 1975 Act] and the privilege of witnesses [s3 1975 Act]. There is no inherent jurisdiction to supplement the powers given under the 1975 Act [*Boeing Co -v- PPG Industries* [1988] 3 All ER 839 CA; *Re Pan American Airways' Application* [1992] QB 854 CA].

12. The Defendants would have the Court treat s25 CJJA as a back door by which to circumvent the 1975 Act procedure. The Court is invited to find that it has no such jurisdiction and nor should it permit the 1975 Act procedure to be circumvented in that way. Further, the Defendants in terms invite the Court to exceed its powers under s25 by making an order it would not have power to make in proceedings here [Defendants' Skeleton para 6] : the Court can and should decline that invitation.

13. That the New York Court order exceeds that which the Court would have power to grant in proceedings here is a given. In particular, the wide ranging documentary disclosure order and the order for oral disclosure could not be granted in proceedings in this jurisdiction. That the Defendants recognise this is apparent from (a) their reliance on the 1975 Act and (b) the altogether more modest relief they seek in connection with the application they make on the hypothesis that an anti-suit injunction is granted.

14. There is, in short, no power which the Court can exercise which permits it to convert an interim procedural order of a US court into an order of this court.

15. If it matters, if the US Proceedings are not restrained, it is open to the Defendants to attempt to invoke the 1975 Act procedure (such an application being subject to the internal procedures of the New York Court, whatever they may be). Indeed, they could have done so at any time prior to giving the undertakings they gave on 31 May 2007 (assuming that to be procedurally possible in New York given the procedural state of play there), but elected not to. The Defendants rely on their undertakings as the reason why they have not sought to invoke the letters of request procedure [Defendants' Skeleton

footnote 5], but in truth they have never before indicated an intention to do so.

*The basic test*

16.    The basic test for grant of interim relief under s25 is that the Court must first ask itself whether, if proceedings on the merits were brought here, the facts would warrant the grant of the relief sought. Second, the Court must ask itself whether it is otherwise inexpedient to grant the relief sought *Refco -v- ETC* [1999] 1 Lloyd's Rep 159 per Morritt LJ at p170 col 2 & s25(2)].

17.    The Defendants invite the Court to accept that, the New York Court having made an order, this Court should simply follow it. That is the wrong approach. In *Motorola -v- Uzan (No 2)* [2004] 1 WLR, a case concerning the grant of freezing order relief in support of foreign proceedings and a good arguable case could be made out for the grant of such relief, Potter LJ said:

> "102    We do not go so far as to say, and it is not necessary to decide, that there are no circumstances in which the doctrine of abuse of process could be invoked in relation to points omitted to be taken in prior interlocutory proceedings, whether here or abroad. Mr Leggatt argues that, in the context of proceedings under section 25 of the 1982 Act, where (as here) the foreign court in interlocutory proceedings has itself determined that a good arguable case exists against the defendants, that is, or falls to be treated as, a final decision upon that issue for the purposes of the section 25 jurisdiction of this court. We do not think that is correct. The requirement that the claimant must establish that Mareva -type relief would be granted if the substantive proceedings were brought in England requires a decision of the judge based on English procedures and the approach of the English court to the nature and sufficiency of the evidence in a situation where the claimant has come to England to obtain a remedy unavailable to him in the substantive foreign proceedings. It is frequently, indeed usually, the position that section 25 proceedings are brought following issue and service of the foreign proceedings but before there has been any decision of the foreign court which examines the strength or arguability of the claimant's substantive case. However, whether or not that is the position, in our view the English court is required, once issue is joined in the section 25 proceedings, to make a separate exercise of judgment rather than a simple acceptance of the decision of the foreign court in interlocutory proceedings decided on the principles applicable, the evidence then available, and the levels of proof required in that jurisdiction.

103   *Furthermore we do not think that it should be regarded as per se abusive of the English court's process that points are raised and arguments advanced in the English court which were not deployed before the foreign court. There may be a variety of reasons why that is so, whether because of deliberate omission, accidental oversight, non-availability of evidence, legal advice or tactical decision, none of which in itself involves abuse of this court's process.*

104   *We have been informed that the abuse of process point was one raised by the judge rather than the claimant who, not surprisingly, adopted it for the purposes of final submissions. We readily understand the view of the judge that the five points which he raised were available to be raised in the New York proceedings. It seems to us that all those points were of force and relevance so far as his own decision was concerned. However, they did not in our view amount to good reason to apply the doctrine of abuse of process to the issue whether a good arguable case had been raised for the purposes of relief granted within this jurisdiction."*

18.   Thus, the Court must form its own view.

19.   The combined effect of (a) the Court only being able to exercise such powers as it has connection with proceedings here and (b) the Court having to form its own view on the facts whether the relief would in fact be granted in proceedings here is that the same issues arise in connection with the s25 application as arise in connection with the application for injunctive relief made on the hypothesis that an anti-suit injunction is granted (see below). The Claimants say that the application should (in large measure) fail on that ground for the same reason as alternative applications should fail (see below).

*Expediency*

20.   In the *Motorola* case cited above Potter LJ considered the earlier authorities on the question of expediency and said:

"115   *As the authorities show, there are five particular considerations which the court should bear in mind, when considering the question whether it is inexpedient to make an order. First, whether the making of the order will interfere with the management of the case in the primary court e g*

*where the order is inconsistent with an order in the primary court or overlaps with it. That consideration does not arise in the present case. Second, whether it is the policy in the primary jurisdiction not itself to make worldwide freezing/disclosure orders. Third, whether there is a danger that the orders made will give rise to disharmony or confusion and/or risk of conflicting inconsistent or overlapping orders in other jurisdictions, in particular the courts of the state where the person enjoined resides or where the assets affected are located. If so, then respect for the territorial jurisdiction of that state should discourage the English court from using its unusually wide powers against a foreign defendant. Fourth, whether at the time the order is sought there is likely to be a potential conflict as to jurisdiction rendering it inappropriate and inexpedient to make a worldwide order. Fifth, whether, in a case where jurisdiction is resisted and disobedience to be expected, the court will be making an order which it cannot enforce."*

21.    If (contrary to the Claimants' primary case) the Court finds that the relief sought by the Defendants (a) is within s25 and (b) is otherwise convinced that such relief would be granted if sought in domestic proceedings, then the Claimants invite the Court to find that it would be inexpedient to grant the relief sought because:

a.    The New York Court has already made an order and, on this hypothesis, there is no restraint on it being enforced. Therefore, the order this Court is asked to make will overlap with it in that the Court is asked to make exactly the same order. That may give rise to disharmony or confusion in that what might be required to comply with an order of the New York Court will in any event be different to that made by this Court (bearing in mind that this Court's powers are more limited - in particular with regard to disclosure and oral depositions - than the powers of the New York Court).

b.    The principle purpose of s25 is to enable support to be given to proceedings in other jurisdiction where the relief sought cannot be granted there - either because the court seized lacks the power or jurisdiction over the respondent to the application. The Court is not here being asked to play that supportive role. The Court is being asked

to police an order of the New York Court.

c.    There remain avenues open to the Claimants to challenge the order of the New York Court in New York. Although preparation for pursuing such challenges is advanced, that has been put in abeyance following the hearing on 31 May 2007. It would be wrong for this Court to endorse an order of a foreign court which may yet be set aside in accordance with its own procedures.

### Applications (2) and (3) : General points
#### The need for substantive proceedings here

22.    The injunctive relief sought by the Defendants does not arise out of the substantive relief sought by the Claimants. Leaving aside s225 CJJA, the Court does not have jurisdiction to grant an interim injunction in a vacuum : such relief can only be sought on the back of a claim for substantive relief in this jurisdiction. The Defendants apparently recognise this [see paragraph 2 Defendants' Skeleton].

23.    To date, no such proceedings have been commenced. They need to be either (a) by way of counterclaim in these proceedings (for which permission would be needed and which would in any event be inapposite for the CPR Part 8 procedure) or (b) by way of fresh proceedings commenced by a Claim Form.

24.    The Defendants' application for interim injunctive relief should not be entertained in the absence of either (a) substantive proceedings having been commenced or (b) an undertaking to commence such proceedings forthwith. To date, neither has occurred.

#### The background to the application

25.    The Claimants do not recognise the description of the history of this application as showing that they have "persistently" failed to answer the Defendants' questions [Defendants' Skeleton para 19]. Questions were first

asked in Messrs. Herbert Smith's letters to the Claimants of 5 April 2007 [Tab 4 : KCP1 pp174-184]. Notably, those questions were broader than the Defendants now seek answers to. In their initial reply on 11 April 2007, Messrs. Elborne Mitchell said [Tab 4 : KCP1 p187]:

> "... Our clients are aware of their obligations and intend to abide by them insofar as those obligations are enforceable against them and subject of course to your clients not being in repudiatory breach. Paragraphs 1 and 2 of your letters are couched as subjective futures and warn what might be the consequences of certain activities should they happen. It would appear that you have no evidence of any "Detrimental Activity" and/or breach of confidence or duty having taken place. If this is not the case, you should set out fully what that evidence is, so our clients can have a fair opportunity to address whatever concerns your clients may have.
> Particularly in this regard, we note that you have intimated that Mr Samengo-Turner has attempted to solicit employees of your clients to join Integro. Please advise us of the basis of this allegation and the means by which any evidence in support of it was obtained."

26. Messrs. Elborne Mitchell reverted again on 19 April 2007, asking again for the basis of the allegations that the Claimants have acted in breach of duty [Tab 4 : KCP1 - p191]. That letter included an express statement that the Claimants were willing to sign an undertaking to abide by their garden leave obligations.

27. There followed radio silence from Messrs. Herbert Smith, which rather belies any suggestion of urgency on the part of the Defendants. On 1 May 2007 Messrs. Elborne Mitchell asked for confirmation that the allegations made against the Claimants had been withdrawn [Tab 4 : KCP1 - p262]. This prompted the response only that the Defendants' position remained the same [Tab 4 : KCP1 - p264]. The next day, without warning, proceedings were issued in New York (on the Friday before the Bank Holiday weekend).

28. To date, the Defendants have not taken the Claimants up on their offer (first made on 19 April 2007) to sign a written undertaking to abide by their obligations. In the absence of the same, on 17 May 2007 Messrs. Elborne Mitchell set out the terms of the undertaking the Claimants were prepared to

sign [Tab 4 : KCP1 - pp266-267]. There has been no reply to that letter.

29.  On 18 May 2007, against the background that only one Claimant had been
served with the US Proceedings and he having indicated an intention to
challenge the jurisdiction of the New York Court, the New York Court
nonetheless made the wide ranging order of 18 May 2007. It called for
provision of documents and answers to interrogatories by 1 June 2007. The
parties appeared before Mr Justice Underhill on 31 May 2007 and
undertakings were given by the Defendants. The practical effect of that is that
the order of 18 May 2007 is in abeyance pending the outcome of the
Claimants' application for an anti-suit injunction.

30.  It is, therefore, wrong to characterise the Claimants as having persistently
dodged requests for information. On the contrary, they have (reasonably)
asked for the basis for the questions being asked and furthermore offered to
sign undertakings to comply with their obligations (which they remain willing to
do).

**The substance of what the Court is being asked to do**

31.  In an application made before substantive proceedings of any kind have even
been issued (for the Defendants), the Court is being asked to make a wide
order for the disclosure of documents and provision of information in
circumstances which the Defendants do not purport to have any evidence that
the Claimants have done anything wrong. As such, the application should be
examined with extreme care.

32.  The Defendants assert that, since the Claimants' resignations, other
employees in the GCFac unit have also resigned to join Integro. That is all.
Based on that, the Defendants seek the Court's assistance in support of a
wide ranging fishing exercise, the remit of which far exceeds any issue which
may arise as to the solicitation of employees. The Defendants more or less
admit that they are engaged in a fishing exercise [Defendants' Skeleton para

19 & 25] and that the purpose of their application is to attempt to find evidence (which it may be inferred is presently lacking) to form the basis of future litigation against the Claimants, if necessary in the form of injunctive relief.

33. The Defendants have no evidence that the Claimants are presently engaged in any activity that could harm their business, still less that the Claimants are engaged in conduct which justifies the grant of urgent relief. Furthermore, against the background that the Claimants are willing to sign undertakings to abide by their obligations, injunctive relief in connection with their underlying obligations would be inappropriate in any event.

34. In *Lawrence David -v- Ashton* [1991] 1 All ER 385 Balcombe LJ said at p 396:

> *"I reiterate: there is no special rule relating to interlocutory injunctions in cases of restraint of trade. The normal rule in the American Cyanamid case, and the exceptions to that rule, apply. A defendant who has entered into a contractual restraint, which is sought to be enforced, should seriously consider, when the matter first comes before the court, offering an appropriate undertaking until the hearing of the action, provided that a speedy hearing of the action can then be fixed, and the plaintiff is likely to be able to pay any damages on his cross-undertaking. It is only if a speedy trial should not be possible that it would then be necessary to have a contest on the interlocutory application. I do not believe that, in this comparatively limited type of case (limited in numbers, that is), the courts of first instance will not be able to arrange for a speedy hearing of the action, and thus avoid time being spent, usually unnecessarily, on contested interlocutory applications."*

35. The Court is, therefore, faced with an application which is (a) a fishing exercise (b) not urgent and (c) unnecessary in the face of the Claimants' offer of undertakings (first made weeks ago). For all those reasons, there is no entitlement to the relief sought. At minimum, all of those matters should act as limiting factors as to the scope of any relief sought.

### The test for mandatory injunctive relief

36. The Claimants concur that the principles applicable when considering whether to grant mandatory injunctive relief are those summarised by Chadwick J in

*Nottingham Building Society -v Eurodynamics Systems* [1993] FSR 468, as endorsed by the Court of Appeal in *Zockoll Group -v- Mercury Communications* [1998] FSR 354.

37.    In *Zockoll* Philips LJ also cited with approval the detailed guidance given in *Films Rover -v- Cannon Films* [1987] 1 WLR 670 per Hoffman J at p680 including this extract [at p365]:

> "In Shepherd Homes -v- Sandham, Megarry J spelled out some of the reasons why mandatory injunctions generally carry a higher risk of injustice if granted at the interlocutory stage: ... a mandatory order usually gives a party the whole of the relief which he claims in the writ and make it unlikely that there will be a trial. One could add other reasons, such as that mandatory injunctions (whether interlocutory or final) are often difficult to formulate with sufficient precision to be enforceable. In addition to all these practical considerations, there is also what might be loosely called a "due process" question. An order requiring someone to do something is usually perceived as a more intrusive exercise that the coercive power of the state than an order requiring him temporarily to refrain from action. The court is therefore more reluctant to make such an order against a party who has not had the benefit of a full hearing at trial."

38.    That passage underlines that (a) the jurisdiction to grant mandatory interim injunctive relief is not to be exercised lightly and (b) the form of any order so made should be minimum necessary to address the perceived injustice to the applicant if it is not granted, not the maximum the applicant may desire.

**Application 2 : mandatory interim injunction for specific performance of co-operation clause**

### Scope of the co-operation clause

*The clause*

39.    The clause provides:

> "You agree that both during and after your employment with the Company, regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably

*request in order for the Company to determine whether you are in compliance with your obligations under this agreement."*

40.   The Co-operation Clause is, on its face, of extraordinary width. In particular :

   a.   It purports to confer rights on *"the Company"*, which is defined as *"MMC or any of its subsidiaries or affiliates"*. In the US Proceedings, the Defendants have interpreted that to mean MMC and Guy Carpenter. In these proceedings, MMC and MSL rely on it.

   b.   It pre-supposes the validity of the underlying obligations relied on, which in some respects the Claimants dispute.

   c.   It is unlimited in time.

   d.   It imposes an unlimited burden on the Claimants in terms of the number and frequency of requests for information or as to what might be required to provide the information sought, save only for the limiting factor of reasonableness.

41.   For those reasons, it should be strictly construed.

**Validity of the terms of the Bonus Contracts**

42.   There are issues as to the validity of the terms relied on by the Defendants. Mr Whyte and Mr Hopkins say that they had a conversation with one Mr Schwarz (MMC's head of legal) before they signed the Bonus Contracts in which he gave them assurances that the letter of the Bonus Contracts would not be relied on. They passed that information to Mr Samengo-Turner. The Claimants also say that their immediate line manager made it clear to them that, if they did not sign the Bonus Contracts, they could not expect to progress in their careers.

43.   The Claimants, therefore, say that the terms relied on against them are not enforceable. The precise legal formulation of who they put their case will to some extent be a function of how the case is pleaded out against them (something which has not yet occurred). However, it may be anticipated that at the very least the Claimants will say that there was an oral collateral agreement that the terms now pressed against them would not be enforced. Those are issues for trial.

**The underlying obligations relied on**

44.   These are identified at paragraph 16 of the Defendants' Skeleton.

45.   The Claimants outline below what they say about those obligations. Final resolution of those matters will have to wait until trial.

*Detrimental Activity*

46.   The Bonus Contracts do not contain an express obligation on the Claimants not to engage in "*Detrimental Activity*". Rather, there is provision for bonuses to be repaid in the event that they do engage in Detrimental Activity. The Defendants recognise this and rely on an implied obligation not to engage in Detrimental Activity [Defendants' Skeleton para 16.1].

47.   The Claimants dispute that any such obligation falls to be implied. They wait to hear the basis on which implication is said to arise (which presumably will appear in the future Particulars of Claim).

*Repayment of Bonus*

48.   This is a red herring : in as much as the Claimants are obliged to repay their bonuses, the Defendants already know that. They do not need injunctive relief to find that out.

49.   Furthermore, the Claimants dispute that they can be obliged to pay back their Bonuses, in circumstances in which the claw back provision is a penalty

and/or arises by reason of an underlying obligation which is unenforceable being in unreasonable restraint of trade. For example, Detrimental Activity includes working for a competitor and on a literal reading of the Bonus Contracts (assuming the implied obligation relied on by the Defendants exists), the Claimants will be engaged in Detrimental Activity when they start work on the expiry of their notice periods in October 2007 (because Detrimental Activity is relevant if it happens within a year of a payment made under the Bonus Contract, which period will not expire until January 2008). The Claimants say that is in unreasonable restraint of trade. That and the other points which arise are issues for trial.

*Duties of fidelity*

50.    The Claimants accept that they owe duties of fidelity as employees. This application is not the place to argue about what the scope of that obligation may be with regard to the solicitation of employees.

**Reasonable requests**

51.    The requests for information and documents, as presently formulated, are not reasonable. They are too broad, in some instances incapable of compliance and go far beyond what might be required to ascertain whether the Claimants have acted in breach of their obligations with regard to the solicitation of employees. The Claimants have reformulated the requests below to meet those concerns.

**The balance of justice and injustice**

52.    It is for the Defendants to satisfy the Court that they are prima facie entitled to the relief sought, before questions of the balance of justice come into play. The Claimants say that the Defendants do not raise a case of prima facie entitlement and hence that the second issue, where the balance may lie, does not arise.

53.    However, if it does, as noted, the specific complaint made against the

Claimants is in relation to the solicitation of employees. That being so, there is no injustice to the Defendants in refusing relief under any broader head.

54.   Further, MSL is in a position to take steps to protect its workforce and indeed says it has already done so [Mansfield : para 29]. In the absence of any evidence that the Claimants are now actively seeking to recruit employees, it is difficult to see what continuing effect any historical solicitation may have had and the truth is that the Defendants' interest in finding out about it is not to protect the workforce it has, it is to gather evidence to sue the Claimants. Justice does not oblige the Court to lend itself to the grant of interim mandatory injunctive relief in the hope of uncovering evidence on the basis of which to launch future speculative litigation.

55.   The potential injustice to the Claimants if the relief is granted is that the Defendants may then be in possession of information to which they were never entitled. Further, the Claimants will be put to inconvenience and expense in complying with the relief sought.

56.   However, as noted above, the Claimants are willing to be pragmatic about this and offer a way forwards.

## Application 3 : mandatory interim injunction for specific performance of duty of fidelity

57.   The specific application of the fidelity duty relied on in support of the third ground on which the application is made is a duty on employees to comply with instructions to reveal their own misdeeds and those of other employees. The Claimants deny the existence of such a duty [*Bell -v- Lever Brothers* [1932] AC 161; *Sybron Corp -v Rochem* [1984] CH 112; *RGB Resources -v- Rastogi* [2002] EWHC 2782 (Ch)]. Further, even if it existed, it would be an extreme step to require its enforcement by interlocutory injunction, the application for which is made in the absence of any real urgency.

58.    However, given the limited concession the Claimants are prepared to make, it is perhaps unnecessary to consider this further.

**The documents sought**

59.    As noted above, the Claimants are willing to serve on the Defendants documents relating to the alleged solicitation of employees within reasonable categories (contingent on substantive proceedings being commenced here). They are willing to consent to an order in the form sought in the Application Notice, namely that they serve on the Defendants' solicitors such documents relating to the solicitation of employees within reasonable categories as are within their control.

60.    In any event, any relief Court grants in the form of an order that the Claimants provide documents, should not be in the expansive and draconian form ordered by the New York Court. It should be limited to (a) such documents as the Claimants could be ordered to provide on an application for pre-action disclosure (which, technically, the Defendants' application is not) and (b) such documents as are properly directed at enquiries as to whether the Claimants have complied with their duties with regard to the solicitation of employees. Further, the categories of documents sought should be described with sufficient precision that they are capable of compliance.

61.    The categories of documents ordered to be provided in New York appear at pp217-219 KCP1 [tab 4]. The Defendants limit themselves to categories 3 to 15. Those categories (in bold type) and the Claimants' objections to them appear next.

62.    It is nothing to the point that the Claimants gave undertakings in connection with documents before Mr Justice Underhill. They were not thereby waiving any objection to the disclosure sought. It is still less to the point to say that the Claimants have not given "*valid reasons*" as to why the documents sought should not be provided [Defendants' Skeleton para 23] - this is the first

occasion on which they have been called on to do so.

**(3) : all documents concerning Integro's recruitment or solicitation of defendants, including but not limited to communications between each defendant and Integro and communications among defendants**

63.  It is not a breach of the Claimants' fiduciary duties to permit themselves to be recruited or solicited by Integro. The Defendants are not entitled to any documents generated in connection with the same.

**(4) All documents concerning in-person meetings or interviews (whether formal or informal) between each defendant and Integro**

64.  See 3.

**(5) All documents concerning communications between each defendant and any client of Guy Carpenter concerning (a) defendants' resignations from Guy Carpenter or hiring by Integro or (b) the possibility of any client using Integro for its faculative brokerage business**

65.  It is not a breach of the Claimants' duties of fidelity to inform any client that they have resigned, or that they are going to work for Integro. Besides, there was a press release to that effect shortly after they resigned and there is nothing secret about it. (a) is therefore impermissible.

66.  The Claimants object to (b) on the ground that it is unconnected with the solicitation of employees.

67.  If broader relief is granted, (b) should be amended to refer to the business of the GCFac unit (which is where they were employed). Guy Carpenter is a broad church and has numerous business and clients. The Claimants cannot be expected to identify the class said to comprise "any client of Guy Carpenter".

**(6) All documents concerning communications between each defendant and current or former Guy Carpenter or MMC employees concerning Integro**

68.    This request is so broad as to be incapable of compliance. The class of persons within the expression "current or former Guy Carpenter or MMC employees" is potentially vast and it is impossible for the Claimants to know who the members of the class are.

69.    Further, it is far too broad in that it encompasses any number of possible scenarios, most of them not capable of amounting to a breach of any underlying obligation. The documents this category is aimed at are adequately met by category 11.

**(7) All documents concerning in-person meetings or interviews (whether or informal) relating to potential employment (of anyone) with Integro between each defendant and current or former Guy Carpenter or MMC employees**

70.    Again - this is far too broad. The documents this category is aimed at are adequately met by category 11.

**(8) All documents concerning in-person meetings or interview (whether formal or informal) between Integro and current or former Guy Carpenter or MMC employee relating to potential employment with Integro**

71.    Apart from again being too broad, this request does not relate to any activity by the Claimants. It is impermissible.

**(9) All documents concerning defendant Samengo-Turner's conversation with Mark Newman of Guy Carpenter, on or about 13 April 2007, concerning Integro**

72.    The Claimants have no specific objection to this request.

**(10) All documents concerning communications among defendants concerning the recruitment or potential hiring by Integro of current or former Guy Carpenter or MMC employees**

73.   The Claimants have no specific objection to this request, provided that it is amended to refer to employees working in the GCFac unit as at 3 April 2007.

**(11) All documents concerning communications between each defendant and Integro regarding the recruitment or potential hiring by Integro of current or former Guy Carpenter or MMC employees**

74.   The Claimants have no specific objection to this request, provided that it is amended to refer to employees working in the GCFac unit as at 3 April 2007.

**(12) All documents concerning communications between each defendant and Integro about Guy Carpenter's facultative reinsurance group**

75.   This request does not relate to the solicitation of employees.

76.   In any event, this request is far too broad - a deal of information about the GCFac unit is publicly available, both in the form of written promotional materials and on its website. The only interest the Defendants could be concerned to protect here is as to whether the Claimants have divulged confidential information.

77.   If this category is ordered, it should be limited to any document in which confidential information is revealed. Further, what is within the scope of confidential information should be defined. (An injunction would not normally be granted restraining the use of confidential information unless a definition of it is given : *Lawrence David -v- Ashton* cited above applying *Littlewood Organisation -v- Harris* [1978] 1 All ER 1026]).

**(13) All documents concerning work done by defendants by Integro to date or plans for work to be done for Integro during defendants' Guy Carpenter notice period**

78.   This request does not relate to the solicitation of employees but the Claimants have no specific objection to this request.

**(14) All documents concerning the business of the plaintiffs, including without limitation all documents containing confidential information or concerning employees of plaintiffs that are currently in their possession or control or were in their possession or control at any time after 3 April 2007**

79.   This request is not aimed at the solicitation of employees.

80.   Further, the request is again too broad : there is much information about the Defendants' business which is in the public domain.

81.   In the course of conducting his reasonable search (in accordance with his undertaking) Mr Hopkins came across a few documents which are or arguably are the property of his employer. Those documents have today been returned to the Defendants' solicitors.

**(15) All documents concerning communications by defendant(s) to Integro of any confidential information of or relating to Guy Carpenter or MMC or any of their clients**

82.   This request does not relate to the solicitation of employees.

83.   In any event, this request is too broad and lacks definition. If ordered, confidential information should be defined and the information should relate to the business of the GCFac unit and its clients.

**The interrogatories asked**

84.   The Claimants object to being ordered to answer questions at this stage.
There is no pre-action interrogatories procedure and there is no evidence that
the Claimants are presently engaged in any wrongdoing, such that needs to
be urgently addressed.

85.   If (contrary to the Claimants' primary case) the Court is minded to grant relief
in the form of an order that the Claimants answer questions, then the Court is
invited to find that the questions should be limited to those which can properly
be described as directed at finding out whether the Claimants have acted in
breach of their duties with respect to the solicitation of employees. The
questions posed presently go further than that. Even if expanded to
reasonable questions concerned with whether the Claimants have complied
with any broader duty of fidelity, the questions posed still exceed what might
be permissible.

86.   The questions asked, together with the Claimants' amendments in
strikethrough and underline, appear next.

87.   In substance, the Claimants make the same objections as they make in
relation to the disclosure requests : the questions are too broad and
overlapping. As such they are either (a) not necessary to elicit the information
the Defendants seek in relation to solicitation of employees or (b) incapable of
compliance. Again, what is meant by confidential information should be
defined.

88.   The questions :

a.    ~~Have you communicated with:~~

i.    ~~any representatives of Integro,~~

ii.      ~~any of the other Claimants,~~

~~on the subject of  Integro's plans for the recruitment of staff for its new insurance and reinsurance unit in London?~~

b.      ~~If so, when, where, and with whom did these communications take place and what was the gist of the communications?~~

c.      Have you communicated with:

i.      any representatives of Integro,

ii.      any of the other Claimants,

iii.      any other parties,

on the subject of Integro's possible or actual recruitment of staff, <u>meaning staff you reported to you directly or indirectly and who worked at the GCFac unit as at 3 April 2007,</u> from Guy Carpenter's global facultative reinsurance business unit?

d.      If so, when, where, and with whom did these communications take place and what was the gist of the communications?

e.      ~~Have you communicated with any employees of MSL on the subject of your recruitment by Integro and/or on the subject of Integro's new insurance and reinsurance unit?~~

f.      ~~If so, when, where, and with whom did these communications take place and what was the gist of the communications?~~

g.   Have you provided any <u>confidential</u> information to Integro about any employees, <u>employees meaning employees who reported to you directly or indirectly</u> <u>and who worked at the GCFac unit as at 3 April 2007,</u> of MSL in Guy Carpenter's global facultative reinsurance business unit?

h.   If so, what <u>confidential</u> information was provided, to whom, when and in what form?

i.   ~~Have you provided any other information to Integro about Guy Carpenter's business ?~~

j.   ~~If so, what information was provided, to whom, when and in what form?~~

k.   ~~Have you communicated with any clients or potential clients of Guy Carpenter or MMC in connection with your departure from Guy Carpenter and/or your recruitment by Integro?~~

l.   ~~If so, when where, and with whom did these communications taken place and what was the gist of the communications?~~

89.   If the Court is minded to order wider questions to be answered, then they should be reformulated to relate to confidential information, the business of the GCFac unit, the GCFac unit employees (who reported to the Claimants directly or indirectly and who were employed as at 3 April 2007, when the Claimants resigned) and the GCFac unit clients.

**Form of any injunction granted**

**Undertaking in damages**

90.   This should be in the standard form (the draft in the Application Notice is slightly different), by way of undertaking from the First and Third Defendants that:

*if the court later finds that this order has caused loss to the Claimants, and decides that the Claimants should be compensated for that loss, the First and Third Defendants will comply with any order the court may make*

### Undertaking to issue proceedings

91.    As noted above, if substantive proceedings are not on foot by the time of the hearing, then an undertaking should be forthcoming to issue them forthwith.

### Costs

92.    The Defendants should pay for the costs of their fishing expedition.

Claire Blanchard

5 June 2007

Essex Court Chambers,

24 Lincoln's Inn Fields,

London,

WC2A 3EG.