1

Westlaw.

Not Reported in F.Supp.                                        Page 1
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Advanced Portfolio Technologies, Inc. v. Advanced
Portfolio Technologies Ltd.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ADVANCED PORTFOLIO TECHNOLOGIES,
INC., Plaintiff,
v.
ADVANCED PORTFOLIO TECHNOLOGIES
LIMITED and Peter J. Ainsworth, Defendants.
**No. 94 CIV. 5620 (JFK).**

Dec. 28, 1994.

*MEMORANDUM OPINION AND ORDER*
KEENAN, District Judge:
**\*1** Plaintiff Advanced Portfolio Technologies, Inc.
("APT/NY") seeks leave to file a second amended
complaint in this action and to conduct expedited
discovery in advance of a motion for a preliminary
injunction. Plaintiff also seeks leave to dismiss
defendant Peter J. Ainsworth as a defendant without
prejudice. Advanced Portfolio Technologies
Limited ("APT/UK") opposes plaintiff's applications
for leave to file a second amended complaint and for
expedited discovery.

*BACKGROUND*

APT/NY and APT/UK entered into a license
agreement in October 1990, whereby APT/UK
became the exclusive licensee for the APT system in
Europe (excluding France), South Africa, and the
Mideast. The APT system is a computerized stock
portfolio risk management system. APT/NY is suing
APT/UK for APT/UK's alleged failure to pay
royalties due to APT/NY under the license
agreement.

*DISCUSSION*

As an initial matter, this Court grants the motion to
dismiss Peter J. Ainsworth as a defendant without
prejudice.

*I. The Proposed Second Amended Complaint*

The proposed second amended complaint does not
seek to name any new defendants. Rather, it seeks to
add additional causes of action for injunctive relief.
The injunctive relief desired would seek to prevent
APT/UK from transferring assets and to prevent
APT/UK from "purloining" APT/NY's secret
information for competitive uses.

APT/UK opposes the filing of the second amended
complaint. APT/UK states that the Court should
deny plaintiff leave to file the second amended
complaint because the additional relief it seeks-the
injunctions-would be futile because injunctive relief
obtained in the United States is not enforceable in the
United Kingdom.

A. *Standard for a Motion to Amend*

Fed.R.Civ.P. 15 governs the amendment of
pleadings. Under Rule 15(a), leave to amend a
pleading shall be freely granted when justice so
requires, one purpose being to provide maximum
opportunity for each claim to be decided on its merits
rather than on procedural technicalities. *See Federal
Practice and Procedure: Civil* § 1471. The Second
Circuit, in construing Rule 15(a)'s test of "when
justice so requires," has commented that reasons for a
proper denial of leave to amend include undue delay,
bad faith, futility of the amendment, and the resulting
prejudice to the other side. *Richardson Greenshields
Sec. Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987)
(citing *State Teachers Retirement Bd. v. Fluor Corp.,*
654 F.2d 843, 856 (2d Cir.1981) (quoting *Foman v.
Davis,* 371 U.S. 178, 182 (1962))). The Second
Circuit has more recently noted that neither delay,
nor the necessity of further discovery, nor the
expenditure of additional time and resources in
litigating the matters raised by the amendment,
standing alone without a showing of bad faith or
undue prejudice, will justify denial of leave to
amend. *See Block v. First Blood Assocs.,* 988 F.2d
344, 350 (2d Cir.1993) (citing *State Teachers
Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d
Cir.1981)).

**\*2** Defendant claims that the amendments would be
futile. Leave to amend should not be granted where
the complaint as amended would not survive a
motion to dismiss. *See Benfield v. Mocatta Metals*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 2

*Corp.,* No. 91 Civ. 8255 (LTF), 1992 WL 177154, at *1 (S.D.N.Y.); *Deem v. Lockheed Corp.* 749 F.Supp. 1230, 1235 (S.D.N.Y.1989). In deciding whether Plaintiff has a colorable ground for relief, an inquiry similar to a Fed.R.Civ.P. 12(b)(6) should be made. *See Ragin v. Harry MackLowe Real Estate Co.,* 126 F.R.D. 475, 478 (S.D.N.Y.1989); *see also Northwestern Nat'l Ins. Co. v. Alberts,* 717 F.Supp. 148, 153 (S.D.N.Y.1989). Accordingly, the Court must accept the allegations set forth in plaintiff's second amended complaint as true and construe them in the light most favorable to plaintiff. *See Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988); *Arbitron Co. v. Tropicana Prod. Sales, Inc.,* No. 91 Civ. 3697 (PKL), 1993 WL 138965, at *3 (S.D.N.Y.) (citing *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 113 S.Ct. 1387 (March 1, 1993)). Thus, the Court may only deny leave if it appears beyond doubt that plaintiff cannot prove any facts in support of its claim. Further, a trial court has discretion to grant a party leave to amend a complaint even where the amended pleading might ultimately be dismissed. *See Morse/Diesel, Inc.,* 715 F.Supp. at 581 (citing *S.S. Silberblatt Inc. v. East Harlem Pilot Block Bldg., 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42-43 (2d Cir.1979)).

### B. *Analysis*

The Court grants APT/NY's application for leave to file a second amended complaint. Keeping in mind that leave to amend is freely granted, the Court finds that the question of ultimate enforceability of the injunctive relief does not preclude this Court from exercising its discretion to grant the application to amend. Defendant APT/UK does not specifically comment on the viability of the second amended complaint other than to argue that the injunctions, if issued, will not be enforceable in the United Kingdom. The Court notes that, in the license agreement, the parties explicitly submitted to this Court's jurisdiction. Accepting the facts alleged in the second amended complaint as true, the Court does not find that possible inability to enforce the injunctive relief is adequate reason to deny leave to amend.

### II. *Expedited Discovery*

APT/NY additionally seeks expedited discovery in advance of a motion for a preliminary injunction. At a pre-trial conference on November 21, 1994, this

Court gave APT/NY advance permission to make that motion in the event that the Court gave permission to file the second amended complaint. APT/NY claims it needs this expedited discovery for two reasons: 1) that APT/UK fraudulently converted the funds of APT/NY for its own use; and, 2) that APT/UK has used the confidential and propriety information of APT/NY to develop a competing product.

*3 APT/NY seeks four expedited depositions. Specifically, plaintiffs seek to depose the following: APT/UK, by Peter J. Ainsworth; Timothy Wilding, an employee of either APT/UK or of Ainsworth's alleged new entity; Hans Erikson, an employee of DAIS Corp.[FN1]; and Robert Butman, CEO of DAIS Corp. APT/UK opposes this application.

### A. *Standard for Expedited Discovery*

Expedited deposition discovery is made available by Rules 30(a) of the Federal Rules of Civil Procedure. Expedited discovery is often available in cases where preliminary relief is sought. *See e.g., United States Naval Inst. v. Charter Communications,* 875 F.2d 1044, 1046 (2d Cir.1989); *Tetra Sales (U.S.A.) v. T.F.H. Publication, Inc.,* 839 F.2d 881, 882 (2d Cir.1988); *Denny v. I.S. Lab., Inc.,* 737 F.Supp. 247, 248 (S.D.N.Y.1990). In order to be entitled to expedited discovery,

... the plaintiff must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y.1982).

### B. *Analysis*

APT/NY has established that it is entitled to the expedited deposition discovery that it seeks. The two primary reasons APT/NY gives for needing expedited discovery to support a preliminary injunction are that APT/UK fraudulently converted the funds of APT/UK for its own use (apparently the basis for the deposition of APT/UK by Ainsworth and the deposition of Wilding) and that APT/UK has used the confidential and proprietary information of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

APT/NY to develop a competing product (apparently an additional basis for the depositions of Ainsworth and Wilding and also the basis for the depositions of Erikson and Butman).

As an initial matter, the Court does not find that APT/NY has established that APT/UK has purloined any assets or funds belonging to APT/NY. APT/NY states that APT/UK, through Ainsworth, authorized Ainsworth and his wife to each receive a salary of 30,000 pounds a month. APT/NY bases this contention on the previously suppressed recollection of a conversation that Jamie Ridyard, a former employee of APT/UK and current employee of APT/NY, allegedly overheard. This has been conclusively rebutted-Ainsworth and his wife were each receiving 30,000 pounds per year. APT/NY also makes a statement that "Ainsworth gave Ridyard the distinct impression that he [Ainsworth] had already taken royalty money out of APT/UK." The Court does not find that a "distinct impression" of an ex-employee whose recollection has already proved faulty at least once is adequate support for the expedited deposition discovery of Ainsworth and Wilding sought here. Therefore, APT/NY's contention that APT/UK through Ainsworth is fraudulently converting funds does not support the requested expedited discovery.

**\*4** On the other hand, APT/NY's contention that APT/UK has misused confidential or proprietary information does sufficiently support the requested expedited discovery. Ainsworth admits that he is pursuing the possibility of licensing DAIS Corp.'s "Worldtrack," a competitor of the APT system. APT/NY contends that DAIS Corp.'s system was developed using its confidential and proprietary information. While nothing in the license agreement prevents Ainsworth from competing with APT/NY, and licensing the product of a competitor does not prove a misuse of confidential or proprietary information belonging to APT/NY, APT/NY has produced evidence that the DAIS Corp. system is of very recent vintage and was developed remarkably rapidly for such a complex system. The Court finds that APT/NY has sufficiently supported its need for the expedited depositions of DAIS Corp. employees Erikson and Butman as well as those of Ainsworth and Wilding.

*CONCLUSION*

The application to file a second amended complaint is granted. The application to take four expedited

depositions in advance of a motion for a preliminary injunction is granted.

SO ORDERED.

> FN1. DAIS Corp. is a sublicensee of the APT system. DAIS Corp. has recently developed its own stock portfolio management system known as "Worldtrack" that apparently will compete with the APT system. Ainsworth is now discussing doing business with DAIS Corp.

S.D.N.Y.,1994.
Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.
Not Reported in F.Supp., 1994 WL 719696 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

WestlawUK

2007 WL 2907

Page 1

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

Nigel Peter Albon (trading as N A Carriage Co) v. Naza Motor Trading SDN BHD (A company incorporated with limited liability in Malaysia), Tan Sri Dato Nasimuddin Amin (Male)
Case No: HC05C02150
[2007] EWHC 9 (Ch)

High Court of Justice Chancery Division

Ch D

Before: Mr Justice Lightman

Tuesday 23rd January 2007

**Representation**

Mr David Waksman QC     & Mr Adrian Jack     (instructed by Sheridans      , Whittington House, Alfred Place, London WC1E 7EA) for the Claimant.

Mr Stephen Nathan QC     & Dr Colin Ong     (instructed by Finers Stephens Innocent     , 179 Great Portland Street, London W1W 5LS) for the Respondents.

**Judgment**

Mr Justice Lightman:

**Introduction**

1 The Claimant ("Mr Albon") is a dealer in motor cars resident in England. He trades as "NA Carriage". Mr Albon's wife ("Mrs Albon") is also his bookkeeper and has control of much of the administration of NA Carriage. Mr Albon is in financial difficulties which (it is his case) are occasioned by the defaults by the Defendants in payment of the sums due to him the subject of the claims in this action. The First Defendant ("Naza Motors") is a substantial Malaysian company involved in the motor car business. The Second Defendant ("Mr Nasim") is the principal shareholder in and a director of Naza Motors. Mr

Nasim is a wealthy Malaysian businessman resident in Kuala Lumpur who has a house and other property in London. His children were educated here and he visits England often. I shall refer to Naza Motors and Mr Nasim together as "the Defendants".

2 Mr Albon and Mr Nasim have been close friends and Mr Albon and Naza Motors have had business dealings (including partnership ventures) with each other for many years in England, Malaysia and South Africa. They have now have fallen out in a big way over the disputes the subject of this litigation.

3 In this action, which was commenced on the 10th August 2005, Mr Albon makes four heads of claim:

i) the first is against Naza Motors in respect of alleged overpayments totalling over £5 1/2 million made in the course of performance or intended performance of an oral agreement made between Mr Albon and Naza Motors referred to as the "UK Agreement". The UK Agreement provided that Naza Motors should export cars from Malaysia to the United Kingdom, that Mr Albon should sell those cars here as agent for Naza Motors and that the profit on such sales should be shared between them. Mr Albon contends that the UK Agreement also provided for the sale and export from England to Malaysia of cars by Mr Albon to Naza Motors ("reverse trades"). The repayment of the overpayments is claimed on the grounds that the payments were made without consideration and under the mistake of fact that the monies paid were due and owing. The existence of the UK Agreement is common ground but there are disputes as to when and where it was made, and as to many of its terms (and in particular whether it included provision for reverse trades) and as to whether there has been any overpayment;

ii) the second is against Mr Nasim. It is to recover the same sum as is claimed against Naza Motors in respect of the alleged overpayments. The claim is made against Mr Nasim on the basis that the monies were paid at the direction of Naza Motors to Mr Nasim, that the payments were made without consideration and under the mistake of fact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                      Page 2

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

that the monies paid were due and owing and (quite remarkably and unexplained) that notwithstanding the fact that Mr Albon (who had access to all relevant information) had no such knowledge, Mr Nasim (who did not have such access) did know that the monies were not due and owing. An attempt to justify the grant of permission in respect of this claim was sensibly abandoned by Mr Albon as unmaintainable in the course of the hearing;

iii) the third is against Naza Motors for just over £1 million and arises under what is referred to as "the South African Agreement". This was an oral agreement under which Naza Motors agreed to pay to Mr Albon commission on cars sourced by him from South Africa and supplied to Naza Motors in Malaysia. The primary issue between the parties in respect of this claim is whether the South African Agreement provided for payment as commission of £250 per car, in which case the full commission has been paid, or £1000 per car, in which case the balance of £750 is prima facie payable, subject only to limitation defences;

iv) the fourth (which is referred to as "the Expenses Agreement") is against Mr Nasim for just less than £200,000 and arises from Mr Albon's alleged payment of personal expenses of Mr Nasim in London. The existence of the agreement is in issue as are whether the payments alleged were made pursuant to it, whether any liability under it has already been discharged and as to the existence of limitation defences.

History

4 From 1995 until September 1997 Mr Albon sold and exported cars from England to Naza Motors in Malaysia. (There is apparently a dispute whether Naza Motors owes Mr Albon some £355,909 in respect of this trading period.) In or about September 1997 the Malaysian economy collapsed leaving Naza Motors with a large number of expensive luxury cars imported from Europe which it could not sell in Malaysia. This led to the negotiation of an agreement between Naza Motors and Mr Albon for the export by Naza Motors of those cars to England and the sale of those cars in England by Mr Albon as agent for Naza Motors. The first shipment of cars to England left Malaysia on the 27th November 1997 and arrived in England on the 20th December 1997. The bulk of shipments took place in 1998. The last invoice date for cars supplied from Malaysia (and accordingly the date on which the last car was shipped from Malaysia)

was the 11th August 1999. Mr Albon's evidence is to the effect that the sales by Mr Albon of imported cars started to diminish in 2001 and tailed off completely in 2002 when only seven cars were sold. (I disregard for this purpose the sale this year of a car stolen from HM Customs and Excise and recovered in July this year.)

5 Mr Abdullah, Naza Motors' internal audit manager, came to England to conduct an audit of vehicles delivered as at 15th July 1998. The significance of documents prepared by him is the subject of an acute dispute as is the date of his being sacked by Naza Motors and whether he was biased. In September 1998 Customs and Excise seized some 477 of the cars but later released them. At some date in 1999 Mr Albon once again began selling and exporting cars to Naza Motors in Malaysia. Mr Albon says that reverse trades commenced on the 23rd March 1999. Naza Motors says that they commenced in September 1999. They certainly began in earnest at the end of November 1999.

6 The 10th August 1999 (being 6 years before the filing of the Claim Form) is potentially a significant date for limitation purposes in this action. I do not intend in this judgment to make any finding as to the date when any particular debt crystallised: that must be a matter for the judge at the trial. I intend only to set out what it appears on the evidence and submissions to be the case. Apart from four payments, all payments made by Mr Albon to Mr Nasim pursuant to the UK Agreement were made before this date, but many reverse trades appear to postdate it and there was continuing expenditure by Mr Albon until the end of 2000. The limitation period only began when the debt crystallised. 72 of the 134 payments claimed under the Expenses Agreement predate the 10th August 1999.

7 On the 11th June 2003 Mrs Albon wrote to Mr Nasim requesting him to agree the account which she enclosed.

8 In July 2003 Mr Albon visited and stayed with Mr Nasim in Malaysia. According to the Defendant (but denied by Mr Albon) during this visit and in particular on the 29th July 2003 Mr Albon and Mr Nasim signed a joint venture agreement ("the JVA") at the offices of Naza Motors. The JVA provides for arbitration of all disputes (including the claims between the parties arising out of the UK

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 3

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

Agreement) by arbitration in Malaysia in accordance with Malaysian law and for each party to nominate an arbitrator. Mr Albon states that his signature on the JVA is a forgery. According to Mr Albon (but denied by the Defendants) on the occasion of this visit Mr Nasim pressed Mr Albon to agree the account of dealings between the parties prepared by Mrs Albon. Mrs Albon subsequently sent a series of faxes to Naza Motors chasing them to agree the accounts submitted by her for agreement and in particular faxes dated: (a) the 22nd March 2004 (to which Naza Motors replied that they had hardly started the process of reconciling figures); (b) the 26th May 2004 (to which Naza Motors replied that they had to get their files from their old office); and (3) on the 6th August 2004 (to which there was apparently no reply).

**9** On the 25th October 2004 an agreement ("the October Agreement") was signed between (amongst others) (1) Mr Albon; (2) Naza Motors; and (3) Mr Nasim. The October Agreement recited (in clause 2.2) that there existed disputes between Mr Albon and Mr Nasim in respect of various motor vehicle transactions between Mr Nasim, Naza Motors and Mr Albon; provided (in clause 3.4) that certain monies belonging to Mr Albon and Mr Nasim should be held by nominated attorneys pending resolution of the amounts due to either of them in respect of all dealings between them; in clause 3.6 that an independent person should conduct a reconciliation of the sums due between the parties; in clause 3.7 authorised the attorneys to pay the monies held in accordance with the reconciliation arrived at; and provided (in clause 7) that the October Agreement should be governed by South African law. This agreement has no relevance on this application save as an indicator that all parties appeared comfortable with the resolution of disputes in South Africa according to South African law.

**10** On the 12th January 2005 the Inland Revenue served a statutory demand on Mr Albon in the sum of £2.09 million. On the 9th September 2005 the Inland Revenue issued a bankruptcy petition against Mr Albon for the reduced sum of £ 1,070,496 following a payment on account and the giving of credit in respect of the indebtedness. The relevance of this indebtedness is that no disclosure was made of it on the application for permission to serve out of the jurisdiction.

**11** Mr Albon states that he wrote a letter dated the 15th June 2005 to Mr Nasim at the address of Naza Motors headed: "Re Yourself, Naza Motors SND and NA Carriage Co". This letter was in effect a letter before action. It elicited no response. The Defendants deny receipt of the letter. The Claim Form was issued on the 10th August 2005 and the Particulars of Claim are dated the 16th August 2005. On a without notice application, made on paper only by Mr Albon on the 23rd August 2005 supported by a witness statement of his solicitor Mr Daniel, Master Bragge made an order granting him permission to serve the proceedings on the Defendants in Malaysia. On the 28th October 2005 Mr Albon's Malaysian solicitors sent the Claim Form and Particulars of Claim to the Defendants (together with other documents) by way of purported service. Attempts at service were made in November 2005. The Defendants instructed a Malaysian firm of advocates, Shafee & Co, as their solicitors in respect of the claim against them, but on the 24th November 2005 by letter of that date Shafee and Co stated that they had no instructions to accept service on behalf of either of the Defendants. By the 21st November 2005, the Defendants had instructed Messrs Finers Stephens Innocent LLP ("FSI") to act for them here and they lodged an Acknowledgement of Service indicating an intention to defend the claim and contest jurisdiction. This was later withdrawn by consent. On the 18th January 2006 on a further without notice application by Mr Albon Master Bragge made an order for service on the Defendants in Malaysia by alternative means at the offices of Shafee & Co and service by this means took place on the 7th February 2006. On the 13th March 2006 the Defendants made the application now before me to set aside the orders permitting service outside the jurisdiction and for substituted service and seeking a stay.

**12** By his first witness statement dated the 13th March 2006 on behalf of the Defendants Mr Nasim invoked the arbitration clause in the JVA and on the 16th December 2005 the Defendants gave Notice of Dispute as a precursor to arbitration under the JVA. On the 17th February 2006 the Defendants nominated an arbitrator and gave notice of arbitration. In the arbitration proceedings the Defendants seek an account and estimate the value of their claim against Mr Albon to be £15 million. They have not served a Statement of Claim because Mr Albon has refused to nominate an arbitrator. At

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 4

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

present the arbitration is stayed as a result of an anti-arbitration injunction granted to Mr Albon on a without notice application by Warren J on the 22nd May 2006 and extended after a with notice hearing on the 23rd May 2006 until a further hearing of the injunction application or further order.

**The Applications**

**13** There are now before the Court the following applications:
    i) the Defendants' applications of the 13th March 2006 to set aside:
        a) the order of 26th August 2005 permitting service outside the jurisdiction; and
        b) the order of the 13th January 2006 permitting alternative service on the Defendants;

    ii) Naza Motors' application to stay these proceedings under section 9 of the Arbitration Act 1996                   ;
    iii) Mr Albon's application dated the 16th May 2006 to continue the anti-suit injunction against arbitration proceedings in Malaysia (with consequential amendment of the Particulars of Claim);
    iv) Mr Albon's application dated the 23rd March 2006 for inspection of the original of the JVA and for the agreement to be examined and tested by an expert.

**14** By agreement between the parties as the first stage in determining these applications I have heard argument limited to whether the order permitting service outside the jurisdiction ought to be set aside and this judgment is concerned only to resolve that issue. For this purpose I shall leave aside any consideration of the JVA and the arbitration proceedings commenced in Malaysia. I confine my consideration to the questions whether the decision of the Master should stand that this court had jurisdiction and that it should exercise jurisdiction to determine the claims made by Mr Albon in this action. I should recognise at once the very full and expert assistance which I have received from Counsel.

**Relevant Principles**

**15** To obtain the order permitting service outside the jurisdiction, Mr Albon needed to show: (1) a good arguable case that each claim made fell within the one or more of the Gateways under CPR Rule

6.20   which he relied on as applicable. What a good arguable case means depends on the Gateway concerned and whether the issue can or will be revisited at trial. Generally speaking the applicant for permission must show a strong probability that the claim falls within the letter and spirit of the Gateway, and this requirement is strict if once permission is given that issue will never thereafter be investigated; (2) on the merits that there was a serious issue to be tried, that is to say there is a real question to be tried. This is a lesser hurdle than good arguable case; (3) that England is clearly the appropriate forum, that is to say that England is the forum in which the claim can be tried most suitably for the interest of all parties and the ends of justice; and (4) that the court should in its discretion grant permission.

**16** The first issue before me is whether Mr Albon satisfied these requirements on the material before the Master. The second issue is whether on the fuller evidence and full argument available on the inter partes hearing before me the conditions are now satisfied. The court has a discretionary power to waive any procedural irregularity: see CPR 3.10    . Further the court has a curative jurisdiction to cure or allow to be cured purely mechanistic irregularities in the application for permission if there is good reason or cause to do so: see ABCI v Banque Franco-Tunisienne [2002] 1 Lloyds Rep 511 ("ABCI") affirmed [2003] EWCA Civ 205    . The court cannot allow reliance on a new and different Gateway: see Metall Und Rohstaff AG v Donaldson Lufkin [1990] 1 QB 391    at 436 (d)-(e) and Abci    at paragraphs 43, 45 and 68. The most that it can do in that regard is to allow the applicant to make a fresh application for permission at the hearing itself: see Youell v. Kara Mara Shipping [2000] 2 Ll.Rep 202    and Abci    at paragraph 66. The third issue on this application is whether on the application for permission Mr Albon breached his duty to make full and frank disclosure and the consequences of any such breach and in particular whether the order granting permission to serve outside the jurisdiction ought to be set aside.

**17** The bulk of the evidence and argument at this hearing has been addressed to this third issue. The strict obligation or high duty of a party making a without notice application has been authoritatively stated as follows: "To enable the court properly to exercise its discretion the evidence in support of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                                                Page 5

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

application should set out the facts relevant to the court's consideration of the grant of permission with care and in sufficient detail to enable the court to reach a properly informed decision": Dadourian Group International Inc v. Simms [2006] 1 WLR 249      at 256 paragraph 41. The witness statement in support of the application must set out clearly and unambiguously the relevant information. It is not sufficient to include an exhibit a careful examination of which may reveal such information. The witness statement must specifically call attention to the need of the judge to examine any exhibit for this purpose. The ambit of the obligation is confined to material reasonably required by the judge to determine whether or not the court should assume jurisdiction. The court exercises what has been variously referred to as "disciplinary control" and a "regulatory power" in respect of non-disclosure on such an application. For this purpose the court is concerned whether it is satisfied that the claim falls within the letter and spirit of the Gateway relied on and that there is a serious issue to be tried, but it is not further concerned with the merits of the case and who is likely to succeed in the action. Where there have been deficiencies in the evidence, the form of application or presentation on the application for permission, the court is not for that reason obliged to discharge the order granting permission. A wrongful non-disclosure (at any rate if not deliberate) though a serious matter will not automatically require the court to set aside the order granting permission if such a sanction is disproportionate or would be contrary to the overriding objective of dealing with the case justly: a costs or some other sanction may alone be appropriate. (The Defendants conceded at the opening of their submissions and accordingly it was common ground at the hearing that any non-disclosure by Mr Daniel or Mr Albon's application for permission in this case was not deliberate and that he had no deliberate intention to mislead the court. No intimation was given at that stage that a distinction was being drawn between Mr Daniel and Mr Albon or that there was an allegation of a deliberate non-disclosure or of an intention to mislead the court on the part of Mr Albon.) It may not advance the objective of dealing with a case justly to decline jurisdiction if e.g. there are serious questions to be tried arising out of contracts containing (expressly or by implication) English choice of law and jurisdiction clauses and in respect of which England is clearly the proper forum: see MRG (Japan) Ltd v Engelhard Metals Japan Ltd [2004] 1 Lloyd's Rep 731

18 If (and only if) I hold that the Defendants' application to set aside the order granting permission should be refused and that the court has jurisdiction and should otherwise exercise jurisdiction to determine the claims by Mr Albon against the Defendants will it be necessary at a subsequent hearing to focus and hear argument upon two further issues. The first is the legal impact of the JVA and the arbitration proceedings in Malaysia. I must then decide where the issues between Mr Albon and the Defendants should be tried and in particular the issue as to the genuineness or otherwise of the JVA. The choice is between determination in Malaysia by the arbitrators or the Malaysian court or in England by this court. The second is whether the order for alternative substituted service should stand or be set aside.

**The Gateways**

19 Before I consider the position in respect of each of the claims in turn I must say word about the form of the Application Notice on the application to the Master for permission. Mr Albon needed to show a good arguable case that each claim fell within at least one of the (potentially overlapping) Gateways under CPR Rule 6.20     . CPR 6.20      (so far as material) provides that a claim form may be served out of the jurisdiction with the permission of the court if--

"(5) a claim is made in respect of a contract where the contract--
  (a) was made within the jurisdiction;
  ...
  (c) is governed by English law;
(6) a claim is made in respect of a breach of contract committed within the jurisdiction
(15) a claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction."

20 The Application Notice in this regard is by common consent misleading, for it states that the claims in the action are made in respect of three contracts which were made within the jurisdiction and which were governed by English law, namely the UK Agreement, the South African Agreement and the Expenses Agreement. But Mr Albon's case on the application as made in the supporting witness

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                                                    Page 6

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

statement of his solicitor Mr Daniel states that: (1) in case of the UK Agreement the court should grant permission on the grounds set out in CPR Rule 6.20(5)(c)      (agreement governed by English law) and 6.20(6)      (claim in respect of breach committed within the jurisdiction); (2) in case of the South African Agreement the court should grant permission on the ground set out in CPR Rule 6.20(6)      ; (3) in case of the Expenses Agreement on the grounds set out in CPR Rule 6.20(5)(a)      (contract made within the jurisdiction) and (c)      and Rule 6.20(6)      . The Application Notice makes no reference to the claim against Mr Nasim or its relevant Gateway. This misleading statement does not stand alone. There are other such defaults (since cured if curable) e.g. the failure in Mr Daniel's evidence in support of the application for permission to state that Mr Albon believed that his claim had a reasonable prospect of success (see CPR 6.21(1)(b)      ). In a word the application and evidence on the application for permission were prepared and placed before the Master without proper care and attention.

## UK Agreement

21 I turn first to the question whether the permission granted should be set aside so far as it relates to claims in respect of the UK Agreement. In summary Mr Albon's pleaded case in respect of the UK Agreement is as follows: (1) he agreed with Naza Motors: (a) to sell on behalf of Naza Motors cars which Naza Motors exported from Malaysia to England on terms that he should be entitled to be paid and retain a share of the net profits on sale (after deduction of the import price costs and expenses to be ascertained on an audit after the carrying out of the UK Agreement) and should be obliged to pay Naza Motors the sale price less costs and expenses; and (b) Mr Albon would make payments on account of the sums due to Naza Motors and/or would to ship cars to Naza Motors in Malaysia the purchase price for which would be part of the account between the parties under the UK Agreement; (2) the UK Agreement was initially oral but subsequently on the 1st December 1997 was reduced to writing in the form of an unsigned memorandum ("the Memorandum"); (3) between November 1997 and 2000 Mr Albon as agent for Naza Motors sold cars and incurred expenditure and such sales gave rise to the net profit of £ 5,213,241.46; (4) Naza Motors' share of profits was

either £3,388.606 if (as alleged by Mr Albon) it was entitled to 65% of the profits or £3,649,269.02 if (as alleged by the Defendants) it was entitled to 70%; (5) Mr Albon exported from England to Malaysia and sold cars to Naza Motors to the agreed value of £4,817,626; (6) Mr Albon at the direction of Naza Motors paid Mr Nasim £ 20,404,205.39 which involved an overpayment of £ 5,831,494.73 arising as to £753,000 in respect of sales as agent of cars in the United Kingdom and as to the balance of £4,747,000 in respect of cars exported and sold to Naza Motors in Malaysia; (7) Mr Nasim as the controlling mind of Naza Motors knew or should have known that the money was not due and was paid under a mistake of fact; (8) after the ending of the UK Agreement the Defendants was obliged under the terms of the UK Agreement to agree an audited figure for the sums due between the parties but failed to do so and in breach of duty failed to carry out an audit. The relief sought is an order for payment of £5,831,494.73 or £ 5,570,832.66 and interest.

22 In his witness statement in support of the application Mr Daniel, after stating that his witness statement was made from personal knowledge based on instructions and information from Mr Albon and his review of the documents relevant to this matter, went on:

"5. I am informed by the Claimant and his wife and verily believe that the terms of the UK agreement were incorporated in a handwritten document dated 1st December 1997. This provides for profits to be split 35 per cent to the Claimant and 65 per cent to the First Defendant. A copy of the agreement ["the Memorandum"] is now produced and shown to be marked 'AD.1'. Subsequently, I am aware that the Second Defendant has asserted that the profit sharing agreement was 30 per cent to the Claimant and 70 per cent to the First Defendant ....

11. The imports under the UK agreement ended in 1999 .... Whilst the UK agreement was being performed the Claimant sent very substantial sums on account of monies due under the UK agreement. Only a small proportion of these monies were sent to the First Defendant. The rest of the monies were sent to accounts controlled by the Second defendant.

13. ... A lot of the payments to the Defendants and others at their direction is at pages 51-54 [exhibit] AD4.

14. The claim against the First Defendant under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

the UK agreement is one which I believe has reasonable prospects of success. The First Defendant's address is 115 Menara Naza, Jln Raja Muda Abdul Aziz, kg. Baru 50300 Kuala Lumpar, Malaysia. The Court, I submit, should grant permission to serve outside the jurisdiction on the grounds in CPR Rule 6.20(5)(c) and Rule 6.20(6) . The UK agreement is most closely connected with England and should be presumed to be governed by English law. The obligation to pay is one owed to the Claimant in England.

15. Limitation is only an issue in relation to claims over six years old. In relation to those however there are what I submit are acknowledgements of the Claimant's claims sufficient to extend the limitation period."

(This last statement is made in relation to his claims generally and not exclusively in relation to his claims "in respect of the UK Agreement").

**23** The Memorandum is a two page manuscript scrap of paper in the handwriting of Mrs Albon which reads as follows:

"1-12-97

Accept & acknowledge that after the deduction of reasonable selling & processing expenses of imported motor vehicles, both parties to pay their taxes, VAT, & other governmental duties separately.

We also accept & acknowledge, at a prior notice, Naza Motor [ will] can send their auditors from Malaysia to inspect our books for the benefit of Naza --

Both parties accept & acknowledge that on any imported cars, NA Carr would retain 35% of the net profit ([and] after deduction of above) and 65% [illegible] Naza Motors who is the exporter & financier of each consignment."

**24** It is common ground that there was an oral agreement between the parties for the import of cars from Malaysia to England, that in England Mr Albon should sell the cars to customers in England on behalf of Naza Motors and that the profits should be shared between Mr Albon and Naza Motors. Mr Albon performed his services. There is a disagreement whether the UK Agreement was made at Mr Nasim's house in England as contended by Mr Albon, or Malaysia as contended by the Defendants; whether the proper law regulating the agreement was English (as contended by Mr Albon) or Malaysian (as contended by the Defendants); whether (as contended by Mr Albon) the UK

Agreement was an umbrella agreement encompassing cars exported by Mr Albon from England to Naza Motors in Malaysia or whether such exports were the subject of one or more entirely separate agreements; whether Mr Albon's profit share was 35% as he contends or 30% as contended by the Defendants; and whether Mr Albon could sell the imported cars at the best price which he could obtain (as he contends) or only at the price fixed by Mr Nasim (as the Defendants contend). Naza Motors denies that any sum is due to Mr Albon, but (remarkably) they have failed to produce any accounts and refused to disclose the breakdown of their claim in Malaysia.

**(a) Gateway**

**25** The first question raised is whether Mr Albon showed a good arguable case that his claim in respect of the UK Agreement fell within CPR 6.20(5) . For this purpose it is necessary first to decide the (as yet) unresolved issue whether for the purposes of CPR 6.20(5) a claim "in respect of a contract" must be a contractual claim. If the claim must arise under a contract, I do not think that Mr Albon's claim (as pleaded) satisfies this requirement. It is not pleaded or alleged that there was any term of the UK Agreement requiring repayment of any overpayments (nor is this pleaded or conceded by the Defendants). The right to repayment is pleaded as arising by reason of the fact that overpayment was made under a mistake of fact that the monies were due and owing and accordingly the claim is made in restitution. Whilst the philosophy held sway for many years that a claim for money had and received or in pursuance of an ineffective contract gave rise to a (quasi) contractual obligation to repay (see e.g. Sinclair v. Brougham [1919] AC 398 ) and this view was carried over to and reflected in the construction and application of RSC Order 11 , the predecessor of CPR 6.20 (see e.g. Bowling v. Cox [1926] AC 751 ) and this is echoed in the 2006 White Book (see Part 6.21.34), with the coming of age of the law of restitution based on the principle of unjust enrichment that philosophy has now been consigned to history: see e.g. West Deutsche Landesbank Girozentrale v. Islington BC [1996] AC 669 at 710, 718 and 738 and Kleinwort Benson Ltd v. Glasgow City Council [1999] 1 AC 153 at 167. It is to be noted that there is a separate and distinct Gateway for claims in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 8

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

restitution (see CPR 6.20(15)    ) and permission was neither sought nor granted for service out of the jurisdiction of a claim under that Gateway.

26 But in my judgment claims under Gateway 6.20(5) are not confined to claims arising under a contract. It extends to claims made "in respect of a contract" and the formula "in respect of" (tested by reference to English law) is wider than "under a contract": see e.g. Tatum v. Reeve [1893] 1 QB 44    . The provision in the CPR    is in this regard deliberately wider than the provision in its predecessor RSC Order XI    . In this regard, unlike Mr Nathan (counsel for the Defendants) I do not think that any assistance is obtained from the decision in Kleinwort Benson v. Glasgow City Council [1991] 1 AC 153    at 162 and 167. In that case the House of Lords was concerned with section 16 and 17 of the Civil Jurisdiction and Judgments Act 1982 which (subject to certain modifications) incorporated the Brussels Convention into the law of the United Kingdom. One modification effected to Title 11 of the Convention was to the following effect:
"5. A person domiciled in a part of the United Kingdom may, in another part of the United Kingdom, be sued: (1) in matters relating to a contract, in the courts for the place of performance of the obligation in question; ..."
In the context of the formula of words there used, and in particular the reference to the place of performance of the obligation in question, there is postulated the existence of a contract giving rise to an obligation of performance in the country whose courts are to have jurisdiction.

27 Accordingly the formula of words in CPR 6.20(5)    "in respect of a contract" does not require that the claim arises under a contract: it requires only that the claim relates to or is connected with the contract. That is the clear and unambiguous meaning of the words used. No reference is necessary for this purpose to authority and none were cited beyond Tatum v. Reeve    supra. If such reference were needed, I would find support in a passage which I found after I had reserved judgment in the judgment of Mann CJ in Trustees Executors and Agency Co Ltd v Reilly [1941] VLR 110    at 111:
"The words 'in respect of' are difficult of definition, but they have the widest possible

meaning of any expression intended to convey some connection or relation between the two subject-matters to which the words refer."

28 In my judgment the claim in restitution in this case satisfies this requirement, for the UK Agreement expressly provides for an audit after the carrying out of the agreement and for payments and the supply of cars "on account". It may be that Mr Albon could have pleaded as an implied term of the UK Agreement that Naza Motors should repay any overpayment found to have been made on the audit or account taken after the agreement for provision of services came to an end. He did not however plead. Nor is it suggested by the Defendants that he should have done so. In default of such contractual obligation, a like obligation on the part of Naza Motors must arise in restitution in respect of overpayments made on account under and pursuant to the agreement. Claims in contract and restitution to repayment are (so far as necessary for this purpose) overlapping alternatives. The necessary relationship and connection between the claim and the UK Agreement is established.

(b) Proper Law

29 I must now turn to the next question which is whether the UK Agreement is governed by English law. The relevant law is contained in the Rome Convention    which (so far as is material) has been incorporated in the law of the United Kingdom by the Contracts (Applicable Law) Act 1990    ("the 1990 Act"). The relevant legal principle is that a contract is governed by the law of the country with which it is most closely connected. For this purpose there is a presumption ("the Presumption") that the contract is most closely connected with the country where the party who is to effect the performance which is characteristic of the contract has at the time of conclusion of the contract his habitual residence or, in case of a body corporate or unincorporated, its central administration. If the contract is entered into in the course of the trade or profession of the party who is to effect the performance which is characteristic of the contract, the Presumption is that the contract is most closely connected will be the country in which the principal place of business of that party is situated, or where under the terms of the contract the performance is to be effected through a place of business other than the principal place of business, the country in which that other place of business is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                                    Page 9

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

situated. The Presumption will not apply if the characteristic performance cannot be determined. The Presumption is rebuttable, but is rebutted and should be disregarded only if it appears from the circumstances as a whole that the contract is more closely connected with another country: see Dicey, Morris & Collins, The Conflict of Laws, 14th ed pp.1580 and 1587.

**30** Wherever the UK Agreement was made, there can be no doubt that English law is the law with which the UK Agreement is most closely connected. The Presumption is triggered and not displaced. England was the habitual residence of Mr Albon when he entered into the UK Agreement and the characteristic performance of the UK Agreement was the provision of his agency services in England in return for which he was to be remunerated. There are connecting factors with Malaysia. The cars were to be exported from Malaysia to England. The reverse trades were sales of cars to Malaysia from England. Malaysia was the principal place of business of Naza Motors and Mr Albon had a duty to account and pay to him there any sum due. There is a dispute which I cannot resolve as to where the contract was made. But on balance the closest connection is undoubtedly with England.

**(c) Merits**

**31** I am satisfied that there is a serious issue to be tried. There is no dispute that an agency agreement along the lines of the UK Agreement was entered into. There are no doubt hurdles for Mr Albon to overcome at the trial, most particularly as to the terms providing for reverse trades. There is no reference to that term in the Memorandum. (For this reason, no doubt, it is denigrated by the Defendants as "the hidden agreement".) Mr Albon makes a substantial case that independent of his evidence the parties proceeded on the basis that the reverse sales were "part of the UK Agreement". Mrs Albon supplied to Naza Motors with accounts stating and including the sum due in respect of reverse trades and no objection was taken by Naza Motors to those accounts. There is raised by Naza Motors the defence of limitation. The limitation period commenced when the balance between the parties was to be ascertained after the carrying out of the UK Agreement. But there is a serious issue as to when this period began and as to when the last cars were sold in the UK (the year 2000 given in the Particulars of Claim in the light of Mr Albon's

evidence requires amendment to 2002), when the last cars were transported to Malaysia and when Mr Albon incurred the final item of expenditure in performance of his agency duties. Reviewing the relevant facts and arguments in the light of the parties' submissions, I need only say that Mr Albon has the required prospect of successfully surmounting this hurdle.

**(d) Forum**

**32** The appropriate forum for resolution of the disputes relating to the UK Agreement is plainly here. English law is the proper law. The characteristic performance of the contract (the provision of agency services) was here. Mr Albon had his habitual residence here. Mr Nasim had a house here and had real links to this country. Malaysia had no equivalent connection. As I said above I leave aside at this stage consideration of the JVA and the arbitration proceedings commenced in Malaysia. I leave open the impact of the JVA and those proceedings on my decisions in this judgment.

**(e) Discretion**

**33** Subject only to the question of non-disclosure, I have no doubt that the Master was right in exercising his discretion to grant permission when the application for permission was made and that today the position is the same. The UK Agreement has given rise to disputes which both parties recognise require determination: the only issue is where and how they should be decided.

**(f) Non-Disclosure**

**34** As I have already stated, the issue of non-disclosure has loomed large dwarfing all the other issues in the evidence, documentation and submissions. I have been invited by the Defendants to pursue an elaborate, detailed and time consuming examination of material whose significance and meaning is a matter for the trial, when full evidence and argument can and will be addressed. I did not think that this application called for this exercise on the issue of non-disclosure and for this reason at one stage of the hearing I cut short Mr Nathan's submissions on this issue. But I subsequently decided that any short cut that I might direct in this regard might well in the end complicate rather than simplify the proceedings and I accordingly invited Mr Nathan to complete what he had to say and gave

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907                                                      Page 10

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

consequential directions. I remain of the view however that the time and energy concentrated on this issue has been disproportionate.

35 There are a number of defaults in disclosure by Mr Albon on the application for permission with which I ought to deal. The Memorandum was a very different form of document in three respects from that which the Particulars of Claim and Mr Daniels' witness statement said that it was. (1) It is a copy of a copy and not a copy of the original. Mr Albon maintained until the second day of this hearing that the original had been seized (with other documents) by Customs and Excise and not returned. On the second day of the hearing it was disclosed that the original had indeed been returned with the other documents seized but Mr Albon had never examined what had been returned. (2) The Memorandum sets out only a limited number of the terms which Mr Albon claimed to have agreed with Naza Motors and in particular it made no reference to the fact that the UK Agreement was an umbrella agreement providing for the export of cars by Mr Albon to Naza Motors in Malaysia. The Memorandum only evidenced a limited number of the terms which Mr Albon says were agreed. This contradiction between what appears in the pleading and the evidence is unexplained and will require explanation at any trial. (3) According to a later witness statement of Mr Albon the Memorandum was not executed on the 1st December 1997 after the date of the oral agreement. The first shipments of cars were made in December 1997 at which time the terms were broadly agreed, and at a meeting in London in January 1998 the terms were "firmed up", the oral agreement was made and the Memorandum was executed back dated to the date of the start of importation namely the 1st December 1997. (4) The general statement in the witness statement of Mr Daniel that in relation to claims in the action that were over 6 years old there were acknowledgements of Mr Albon's claim, sufficient to extend the limitation period was not correct in respect of the claims under the UK Agreement. (It is in fact Mr Albon's case that there is no such (otherwise statute barred) claim.)

36 The Defendants' case on non-disclosure has expanded since the first allegation of non-disclosure in their letter of the 22nd December 2005 (non-disclosure of the JVA) and the first witness statement of Ms Amin, Naza Motors' in-house legal adviser of the 13th March 2006 (non-disclosure of

the arbitration clause in the JVA and limitation defences). It is not surprising if Mr Albon may not in his evidence have kept up with the flood of new material and allegations which followed a great part of which is in reality (as I have already said) directed to the issue as to who is likely to succeed in this action. Mr Nathan has conscientiously taken me through a large body of detailed evidence which (he maintains) reveals non-disclosure of a multitude of matters, for example "missing cars" for which (it is alleged) Mr Albon has failed to account, the "true state of the Accounts", and "remittances wrongly claimed". I do not think that it was incumbent on Mr Albon to deal (least of all in any detail) with every allegation of non-disclosure as it arose. For a person now of very limited means to have to meet a case presented in this way by a very wealthy opponent would be oppressive and run foul of the obligation of the court to deal with the case justly ensuring that the parties are on an equal footing and in ways that are proportionate to the financial position of each party. After anxious consideration I have concluded that it is not appropriate on this application to conduct the necessary mini-trial to arrive at findings on the partial evidence before the court on the many issues of non-disclosure raised before me beyond those to which I have referred. Such satellite litigation is to be avoided. This is most particularly the case since in his address to me (as I have already said) Mr Nathan disavowed any suggestion of any intention to mislead on the part of Mr Daniel; and the implication in the circumstances was that there was no such suggestion in respect of Mr Albon. I do not think that it was open to the Defendants at a later stage of the hearing in submissions to allege that Mr Daniels or Mr Albon had such an intention. In any event I find that there was no intention to mislead on the part of Mr Daniel or Mr Albon. In a word having carefully reviewed Mr Nathan's submissions and the evidence on which he relied I do not think that any finding on the issues raised could or should affect the outcome of this application.

37 It is sufficient to express my conclusion on non-disclosure briefly. I have carefully considered the evidence and the parties' submissions. Whilst in no way condoning the slipshod way Mr Albon's solicitor handled the application at the end of the day I think that the Master correctly gave permission in respect of the claims under the UK Agreement and I do not think that any non-disclosure can or should have had any impact

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

on his decision. In the exercise of my curative jurisdiction and my discretion, notwithstanding the mechanistic irregularities and the non-disclosures in respect of the UK claim (and indeed in respect of the other claims), justice requires that I should sustain his decision. To set aside the Master's order on the grounds of the deficiencies in disclosure and the errors and omissions would be disproportionate and contrary to the overriding objective of dealing with the case justly. There are serious issues to be tried: there are claims under the UK Agreement by both parties which both parties have made plain they require to be adjudicated, though there is a dispute as to the appropriate forum. I have decided that English law is the proper law and England is the proper forum. In all the circumstances I therefore refuse the order sought by Naza Motors on their application. This is however a proper case for the imposition of a sanction as to costs. I shall hear argument later as to what that sanction should be.

38 I should mention one novel allegation of non-disclosure made by Mr Nathan. He contends that the existence of the statutory demand and the fact that some £ 1 million was outstanding to the Revenue when the application for permission was made were facts requiring disclosure but undisclosed, for the impecuniosity of Mr Albon and the fact that Mr Albon was likely to be unable to meet any adverse order for costs were relevant when the Master had to decide whether to grant permission and (if so) whether to grant permission conditional e.g. upon the provision of security for payment of costs. I have been referred to no guidance on the question whether such facts should be disclosed. I incline to the view that there are cases where such facts may well be relevant to the exercise of the jurisdiction to subject a foreigner to this exorbitant jurisdiction and where such a condition may be imposed. But I think that the fact is of limited relevance in a case where the claim is so obviously and closely connected with this jurisdiction as it is in the present case, that there is a real issue requiring determination and that the failure to disclose in this case does not carry any real weight on the issue whether permission should be set aside.

(b) South African Agreement

39 I can deal with the claims under the South African Agreement shortly. The Agreement was for

Mr Albon to source motor cars in South Africa for shipment to Naza Motors in Malaysia. Mr Albon says that the agreement provided for payment by Naza Motors to him of £1000 per car so sourced, that through two South African companies managed by a South African Mr Shimoni, Boulders Beach and Danwet D19, he exported 1454 cars to Naza Motors in South Africa and that Naza Motors paid only £250 per car (using the same to discharge Mr Albon's liability to his subagent Mr de Stefano) but failed to pay the balance of £750 There is a dispute where the agreement was made. The only material connection with England is that Mr Albon's habitual residence is here. The only Gateway relied on at the application before the Master was that the breach (the non-payment of the full commission) occurred in England because (whether the proper law was English or South African) the duty of Naza Motors as debtor was to search out and pay Mr Albon at Mr Albon's habitual residence in England and that accordingly Naza Motors failed in its duty here. For this purpose reliance is placed on the presumption that South African law is the same as English law which is not displaced in the absence of expert evidence that South African law is different in this regard from English law.

40 It may well be that this claim falls within the letter of the Gateway. I very much doubt if it falls within the spirit. On the evidence before me it is I think clear that South African law is the proper law of the South African Agreement, however is resolved the question where it was made. The place of making may well be fortuitous in the case such as the present of continuing dealings between the parties. Undoubtedly South Africa is the country with which it is most closely connected. That is the place of performance characteristic of the contract, namely the provision of Mr Albon's services. That fact does not trigger the Presumption (see paragraph 29 above). Indeed the Presumption would favour England as the place of Mr Albon's principal place of business. But the Presumption is rebutted as it is quite clear from the circumstances as a whole that the South African Agreement is more closely connected with South Africa. South Africa is likewise the suitable forum for the resolution of the disputes between the parties according to South African law. (I have already pointed out that the October Agreement provides some indication that the parties were comfortable with the resolution of disputes in South Africa according to South African law.) This remains the position notwithstanding the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907

Page 12

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

trial in England according to English law of the quite distinct claims and issues under the UK Agreement. Naza Motors agrees to submit to the jurisdiction in South Africa. I do not think that there is any need for Naza Motors to go beyond this and enter into any commitment e.g. not to apply for security for costs or not to avail themselves of limitation defences in South Africa. No substantial grounds for doing so have been advanced. Mr Albon could and should have sued in South Africa. If the choice of forum were between England and Malaysia because (for some reason) South Africa were to be discounted, the suitable forum would on balance be Malaysia, Naza Motors home state.

**41** It is unnecessary to explore the issue of non-disclosure in detail. It is sufficient to say that the Master's attention was not properly or adequately directed to a number of highly material facts:

i) Though Mr Albon states in paragraph 16 of his first witness statement dated the 16th May 2006 that invoices were raised at the end of each year, the only invoices prepared in respect of the years 1996 to 2003 are all dated the 5th March 2003 for the full sum of £1000 making no reference to the payment of £250;

ii) Mr Albon never pressed for payment or made any complaint about non-payment of the balance of £750 per car claimed prior to his letter before action dated the 15th June 2005 (which the Defendants deny receiving). These facts went to whether the claimed debt existed. Mr Albon did not refer to this omission or his later proffered improbable explanation for it, namely a desire not to financially embarrass the Defendants;

iii) No reference is made to the availability of a limitation defence in respect of the cars sourced before the 10th August 1999.

**42** There is no countervailing consideration requiring a trial of the issues relating to the South African Agreement in England. I would accordingly hold that permission should not have been granted. I set aside the order granting permission. This relief is both just and proportionate.

**(c) Expenses Agreement**

**43** The pleaded case in respect of the Expenses Agreement is very short. It is pleaded that: (1) Mr Albon made various payments on Mr Nasim's behalf at Mr Nasim's request; (2) Mr Nasim made

various payments to Mr Albon, but the sum of £ 193,820.92 has not been reimbursed to Mr Albon; and (3) a separate schedule would be served showing the outstanding sums. None was served though Mr Daniel exhibited AD2 to his witness statement. The relief claimed is payment of £ 193,820.92. Mr Daniel's witness statement states that: (1) Mr Albon regularly paid various expenses of Mr Nasim who had a house in England and educated his children here; (2) payments are set out on pages 55-56 of AD2; and (3) as regards any possible limitation defence, there had been payments on account. These payments on account were unparticularised and it is now conceded that there never were any.

**44** AD2 is headed "Personal Expenditure Paid On Behalf of Nasim". Under this heading are four columns headed respectively, Date, Payment to, Total and Explanation. The dates (and accordingly the payments) commenced on the 12th March 1998 and ended on the 25th November 2001. A large number of the explanations proffered are unilluminating and afford no explanation of the payments made. Most particularly inscrutable are the many explanations that "contras" or set-offs were made in respect of payments made by Mr Albon to e.g. "Naza Motors", "Naza Inv" and "Naza". Mr Daniels says nothing about the repayments or the "contras".

**45** Turning to the hurdles to the grant of permission by the Master in respect of the claims under this agreement I am satisfied that the requirement of each of the Gateways on which Mr Albon relied are satisfied, namely that the agreement was made in England, that the agreement was governed by English law and that the breach alleged occurred here. Further if there is to be any litigation to recover payments made England was clearly the suitable forum. But in my view the Master was sorely misled as to the merits in respect of two critical facts. First the claims in respect of half the payments made (namely made before the 11th August 1999) were statute barred: there was no basis for the statement that there had been acknowledgements and payments on account. Secondly the Master's attention was not drawn to the matter of the "credits" and the set-offs available. These failings are the more significant by reason of the further non-disclosures that Mr Albon never provided Mr Nasim with the relevant pages of AD2 or any equivalent nor even suggested that Mr Nasim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2907 (Ch D), [2007] 2 All E.R. 719, [2007] 1 Lloyd's Rep. 297, [2007] 1 All E.R. (Comm) 795, [2007] EWHC 9

owed him any money in respect of this expenditure at any time prior to the letter before action (a letter the Defendants deny receiving). The non-disclosures went to the heart of the application. If these matters had been drawn to the attention of the Master he would and should have refused permission to serve outside the jurisdiction any claim under the Expenses Agreement. On that ground I should and do set aside the grant of permission. This sanction is in my view both proportionate and in accordance with the overriding objective. I should add (though this is unnecessary for my decision) that I am in nowise reassured as to the merits of any part of this claim by the further evidence adduced since the hearing before the Master (e.g. paragraph 19 of the third witness statement of Mr Daniel). I am not satisfied that (without more) the off-setting is rendered ineffective by the alleged overpayments by Mr Albon to Naza Motors.

46 I accordingly set aside the grant of permission to pursue any claims under the Expenses Agreement.

Crown Copyright.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1996 WL 101277 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Anti-Monopoly, Inc. v. Hasbro, Inc.
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
ANTI-MONOPOLY, INC., Plaintiff,
v.
HASBRO, INC., Defendant.
**No. 94Civ.2120(LMM)(AJP).**

March 7, 1996.

Carl E. Person, New York City, for Anti-Monopoly, Inc.
David Berger, Palo Alto, CA, Neil R. Stoll, New York City, for Kmart Corp.

OPINION AND ORDER

PECK, United States Magistrate Judge:

*1 In this antitrust action by Anti-Monopoly, Inc. against major game manufacturer Hasbro, Inc. (the manufacturer of, among other games, "Monopoly"), defendant Hasbro seeks a stay of discovery relating to plaintiff's "secondary-line" Robinson-Patman Act claims until Judge McKenna rules on Hasbro's recently filed motion for judgment on the pleadings on those claims for plaintiff's lack of antitrust standing. For the reasons set forth below, Hasbro's pending motion for judgment on the pleadings provides "good cause" for the stay of discovery, which is granted.

FACTS

*Anti-Monopoly's Complaint*

Anti-Monopoly's amended complaint (hereafter, "complaint") is summarized in Judge McKenna's prior Opinion granting in part defendants' motion to dismiss the complaint, familiarity with which is assumed. *Anti-Monopoly, Inc. v. Hasbro, Inc.,* 94 Civ. 2120, 1995 WL 380300 (S.D.N.Y. June 27, 1995). Plaintiff Anti-Monopoly, which possesses less than 1% of the market for family board games, developed and marketed a family board game called "Anti-Monopoly." *Id.* at *1. Defendant Hasbro is the leading manufacturer of family board games with more than 80% of the market. *Id.* The complaint also

named retailers Toys "R" Us and K-Mart as defendants, *id.,* but plaintiff has subsequently settled with both of them. (*See* Declaration of Marthe Larosiliere, dated February 22, 1996 [hereafter "Larosiliere Dec."], Exs. A(3)-(4).)

After Judge McKenna's June 1995 decision, the following claims survived against Hasbro: (1) Count I -- violation of § 2 of the Sherman Act "by monopolizing, wilfully attempting to monopolize, and combining and conspiring to monopolize, the manufacturing and sale of family board games" (1996 WL 380300 at *4-5); (2) Count III -- tortious interference with advantageous business relationships under New York law (*id.* at *6-7); (3) Count VI -- Hasbro's violation of § 7 of the Clayton Act by acquiring competitors where the effect has been to substantially lessen competition and to create a monopoly (*id.* at *8); (4) Count VII -- violation of the Robinson-Patman Act (§ 2 of the Clayton Act) by "'providing substantial discounts, terms and services to major family board game retailers which are not made available on equal terms to competing smaller family board game retailers and wholesalers and which are not either cost justified or otherwise permitted under § 2.'" (*id.* at *8, quoting complaint; *see also id.* at *9; (5) Count VIII -- violation of § 1 of the Sherman Act through illegal contracts, conspiracies and combinations to restrain trade (*id.* at *9-10); and (6) Count IX -- violation of § 3 of the Clayton Act by selling to K-Mart, Toys "R" Us and others on terms which require them not to buy from Anti-Monopoly and other small competitors (*id.* at *3).

This motion relates to Count VII of the complaint, plaintiff's Robinson-Patman Act claims for price discrimination. *See id.* at *8-9. Plaintiff has alleged both a primary-line and secondary-line Robinson-Patman Act claim. Finding that the amended complaint alleged that Hasbro "prices its products below an appropriate measure of its costs," as required by the case law under the Robinson-Patman Act, the Court upheld the claim. *Id.* at *9. The Court noted, however, that "[b]ecause the Court agrees that Anti-Monopoly has stated a claim for primary-line injury, the Court does not address at this time Anti-Monopoly's claim that it has suffered a secondary-line injury." *Id.*

*2 Hasbro has now moved before Judge McKenna to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 101277 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

dismiss plaintiff's secondary-line Robinson-Patman Act claim for lack of standing. That motion, which is pending, provides the linchpin for Hasbro's motion to stay discovery.

Because the difference between primary and secondary-line injury is the key to these motions, I quote Judge McKenna's explanation of primary and secondary-line cases:

Two classes of plaintiffs are recognized to have standing to bring a Robinson-Patman claim. Direct competitors of the predator are said to suffer primary-line injury when they are unable to match the predator's prices and must either sell at a loss or lose market share. Competitors of the favored purchasers are said to suffer secondary-line injuries when they are forced to compete in the same market as the purchasers who are enjoying the benefit of lower overhead for the same product. Anti-Monopoly has argued that it has suffered both types of injuries.

*Id.* at *9.

### Anti-Monopoly's Discovery Requests

After the initial pretrial conference on August 9, 1995, by Order dated August 16, 1995, the Court set a cutoff date of March 15, 1996 for fact discovery and May 10, 1996 for expert discovery. The Court notes that the parties had proposed, and the Court rejected, a much more leisurely schedule -- fact discovery through September 1996 and expert discovery through March 30, 1997. (*See* 8/9/95 "Proposed Joint Discovery Plan.")

In late December 1995, plaintiff served Requests to Admit and a Second Set of Interrogatories on defendant Hasbro, seeking discovery in support of plaintiff's secondary-line Robinson-Patman Act claim. (Larosiliere Dec. Exs. F-G.) In late January, plaintiff served a Second Set of Requests to Admit, containing requests 201-431, all of which appear directed at the secondary-line claim. (*Id.* Ex. I.) That same day, plaintiff served its Second Request for Production of Documents, including 12 requests directed at plaintiff's secondary-line claim. (*Id.* Ex. J.)

### ANALYSIS

Pursuant to Rule 26(c), it is clear that the Court has the discretion to stay discovery for "good cause," and that good cause may be shown where a party has

filed (or sought leave to file) a dispositive motion such as a motion to dismiss. This is especially so where the stay is for a "short" period of time and the opposing party (here, plaintiff) will not be prejudiced by the stay. *See, e.g., In re Towers Financial Corp. Noteholders Litigation,* 93 Civ. 0810, --- WL --------- (S.D.N.Y. Jan. 29, 1996) (Peck, M.J.); *American Booksellers Assoc., Inc. v. Houghton Miflin Co.,* 94 Civ. 8566, 1995 WL 72376 at *1 (S.D.N.Y. Feb. 22, 1995); *Gandler v. Nazarov,* 94 Civ. 2272, 1994 WL 702004 at *4 (S.D.N.Y. Dec. 14, 1994); *Chrysler Corp. v. Century Power Corp.,* 137 F.R.D. 209, 211 (S.D.N.Y. 1991); 2 M. Silberberg, *Civil Practice in the Southern District of New York* § 24.04 at 24-8 (and cases cited therein) (1995).

### The Breadth and Burden of the Requested Discovery

*3 Two related factors that the courts consider in deciding a motion for a stay of discovery are the breadth of the discovery sought and the burden of responding to it. *E.g., American Booksellers v. Houghton Miflin,* 1995 WL 72376 at *1; *Chrysler v. Century,* 137 F.R.D. at 211. Here, plaintiff's secondary-line discovery requests are quite extensive. They involve almost 300 Requests to Admit, as well as 14 interrogatories and 12 document requests. (*See* Hasbro's Brief at 4-5 & nn.7-8, 10; *see also* Berger 2/29/96 Letter to the Court at 1-2.) These requests will be totally unnecessary if Hasbro's motion for judgment on the pleadings as to the secondary-line Robinson-Patman Act claim is granted. (The Court is relying on Hasbro's assertion that these requests only relate to the secondary-line claim, which has not been challenged by plaintiff.)

### There Is No Prejudice to Plaintiff from a Stay of Discovery

Another factor that the courts consider is whether the party opposing the stay would be unfairly prejudiced by a stay. *E.g., Gandler v. Nazarov,* 1994 WL 702004 at *4; *Chrysler v. Century,* 137 F.R.D. at 211.

Plaintiff will not be prejudiced by a stay here. Plaintiff argues that "The requested stay would destroy the accelerated time schedule for discovery under which the parties and the Court have been working, and almost reached." (Person 2/26/96 Letter to the Court, at 1.) It is true that fact discovery is scheduled to be completed by March 15, 1996. The Court notes, however, that the parties originally

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1996 WL 101277 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

proposed that fact discovery run through September 1996 (and expert discovery through March 30, 1997.) The deadlines were accelerated only because this Court believes in running a "rocket docket" and suggested that the parties could condense and expedite their discovery schedule, to which they agreed. The Court has every reason to believe that Hasbro's motion will be decided, and if it is denied that the additional fact and expert discovery needed will be conducted, before the original March 30, 1997 cutoff date.

Plaintiff's second prejudice argument is that:
Plaintiff cannot afford to call witnesses for some of the needed discovery, and then have to go through the process again for the Robinson-Patman type discovery, if a stay is granted. This means additional preparation time, additional travel time to and from the depositions, and other problems associated with bifurcated discovery especially of third-party witnesses, including re-noticing them at this late date in discovery.

(Person 2/26/96 Letter at 1.) However, as of this date, less than two weeks before the scheduled March 15, 1996 close of fact discovery, plaintiff has noticed only three depositions of senior Hasbro executives (Messrs. Hassenfeld, Dittomassi and Wilson), and no non-party depositions. (*See* Berger 2/29/96 Letter to the Court at 3.) Further, Hasbro contends that these three senior executives do not "have specific or detailed knowledge of pricing issues." (*Id.*) Thus, according to Hasbro, if their motion for judgment on the pleadings were denied, no depositions would be repeated. (*Id.*) Even if Hasbro were incorrect and these three depositions would need to be reopened, any extra cost to plaintiff is more than outweighed by the expense to Hasbro (and to plaintiff) of conducting discovery on a claim that may be dismissed as legally insufficient. Moreover, the "additional travel time to and from the depositions" is a factor that, if necessary, can be obviated in other ways later (*e.g.*, by agreement or order that the depositions occur in New York when the witness is in New York for business reasons, or permitting telephonic depositions, etc.). It is premature to decide what cost protection, if any, plaintiff will be given later. But it is clear that there is no prejudice to plaintiff from the stay.

*Hasbro's Motion For Judgment on the Pleadings has "Substantial Grounds"*

*4 The third and final factor the courts examine is the strength of the dispositive motion that is the basis for the discovery stay application. ·*E.g., Gandler v. Nazarov,* 1994 WL 702004 at *4 (stay granted where motion to dismiss "is potentially dispositive, and *appears to be not unfounded in the law*") (emphasis added); *Chrysler v. Century,* 137 F.R.D. at 211 (motions to dismiss "*appear to have substantial grounds*") (emphasis added).

From the Court's preliminary look at Hasbro's motion for judgment on the pleadings, the motion is "not unfounded in the law" and "appears to have substantial grounds."

Plaintiff's secondary-line standing argument appears to be that Hasbro's price discrimination has put small retailers out of business, and that plaintiff sold or would have sold its game to these retailers if they had not gone out of business. (*See* Larosiliere Dec. Ex. D: Plf's 1994 Brief Opposing Motion to Dismiss, at 16.) In *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762 (2d Cir.), *cert. denied,* 116 S. Ct. 381 (1995), the Second Circuit dismissed a similar Robinson-Patman Act claim for lack of standing, holding:
It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing....
Although the [plaintiff] distributors undoubtedly suffered injury as a result of the alleged antitrust violation, the injury suffered by the distributors is derivative of the injury suffered by Seven-Up Brooklyn. Thus, ... it was not the distributors that suffered direct antitrust injury, but Seven-Up Brooklyn. Therefore, the proper party to bring the antitrust action on these facts was Seven-Up Brooklyn....

55 F.3d at 766-67. Hasbro argues that the party suffering direct antitrust injury here, and thus the party with standing, are the small retailers allegedly forced out of business by Hasbro's price discrimination, and any injury suffered by plaintiff is derivative and not antitrust injury.

Hasbro also cites two district court decisions that held that a competing manufacturer (like plaintiff here) has no antitrust standing to bring a secondary-line claim under Sections 2(d) and 2(e) of the Robinson-Patman Act for a competitor's providing discriminatory allowances or services to customers. *Ashkanazy v. I. Rokeach & Sons, Inc.,* 757 F. Supp. 1527, 1553-54 (N.D. Ill. 1991); *Frito-Lay, Inc. v. Bachman Co.,* 659 F. Supp. 1129, 1140-41 (S.D.N.Y. 1986).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1996 WL 101277 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Plaintiff distinguishes these cases and relies on certain "target area" cases. (*See* Larosiliere Dec. Ex. D: Plf's 1994 Brief at 16-19.) The Court need not decide whether Anti-Monopoly or Hasbro is correct -- that motion is before Judge McKenna. The Court's reading of the parties' prior briefs on this issue, and the cases cited above, however, makes clear that not only does Hasbro's motion to dismiss "appear not unfounded on the law" but indeed it "appears to have substantial grounds."

CONCLUSION

**\*5** All of the factors relied on by the courts support a stay of discovery. Accordingly, for the reasons set forth above, the Court grants Hasbro's motion to stay fact and expert discovery that relates solely to plaintiff's secondary-line Robinson-Patman Act claim. The stay will be lifted without further Court order if Judge McKenna denies Hasbro's motion for judgment on the pleadings as to the secondary-line claim.

SO ORDERED.

S.D.N.Y.,1996.
Anti-Monopoly, Inc. v. Hasbro, Inc.
Not Reported in F.Supp., 1996 WL 101277 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.