**4**

98 Fed. Appx. 47, *; 2004 U.S. App. LEXIS 8547, **

**BASE METAL TRADING LTD; MIKOM; DAVIS INTERNATIONAL, LLC; HOLDEX, LLC; FOSTON MANAGEMENT, LTD; OMNI TRUSTHOUSE, LTD; NEXIS PRODUCTS, LLC; and POLYPROM, LTD, Plaintiffs-Appellants, BASE METAL TRADING, S.A.; ALUCOAL HOLDINGS LTD., Plaintiffs, -v.- RUSSIAN ALUMINUM; RUAL TRADE LTD; SIBIRSKY ALUMINUM PRODUCTS USA CORP. a/k/a SIBIRSKY ALUMINUM (US); SIBIRSKY ALUMINUM (Russia); BAUXAL MANAGEMENT, SA; METCARE MANAGEMENT, SA; UNIMETAL LIMITED, SA; OLEG DERIPASKA; MIKHAIL CHERNOI; BLONDE MANAGEMENT, INC.; BLONDE INVESTMENTS, CORP.; PAN-AMERICAN CORP.; ARNOLD KISLIN; ISKANDER MAKHMUDOV; MOSKOVSKIY DELOVOI MIR BANK; NOVOKUZNETSK ALUMINUM ZAVOD; NEW START GROUP CORP.; VENITOM CORP.; UNIDALE LLC; and INVESTLAND, LLC, Defendants-Appellees.**

03-7466

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*98 Fed. Appx. 47; 2004 U.S. App. LEXIS 8547*

**April 30, 2004, Decided**

**NOTICE:** [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of New York. (Koeltl, J.). *Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, 2003 U.S. Dist. LEXIS 4767 (S.D.N.Y., 2003)*

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellants sought judicial review of a decision by the United States District Court for the Southern District of New York that dismissed their civil RICO, contract, and tortious interference claims on the basis of forum non conveniens. The case arose from allegedly illegal takeovers of aluminum and vanadium production facilities located in Western Siberia and the Northern Ural Mountains, respectively.

**OVERVIEW:** The present court reviewed the district court's application of the three-part test used to determine motions to dismiss on the basis of forum non conveniens. In regards to the forum, appellants' choice of forum was entitled to little deference. None of them had a connection with the federal judicial district in which the case was filed. Additionally, each of the 20 appellees had consented to jurisdiction in Russia. In regards to the adequacy of another forum, appellants had numerous legal options in Russia. Their concerns about violence and false criminal charges in Russia did not rise to the level of gravity at which courts within the present federal circuit had spared parties from returning to a threatening forum. In regards to the charges of corruption in the Russian legal system, it was not the duty of U.S. courts to assume responsibility for supervising the integrity of the judicial system of another sovereign nation. Finally, both the private and public Gilbert factors strongly favored adjudication in Russia.

**OUTCOME:** The judgment of the district court was affirmed.

**COUNSEL:** APPEARING FOR APPELLANTS BASE METAL TRADING LTD. and MIKOM: JAMES BERNARD, of counsel, Stroock, Stroock & Lavan, LLP, New York, NY.

APPEARING FOR APPELLANTS DAVIS INTERNATIONAL, LLC; HOLDEX, LLC; FOSTON MANAGEMENT, LTD.; OMNI TRUSTHOUSE, LTD.; NEXIS PRODUCTS, LLC; and POLYPROM, LTD.: BRUCE MARKS, Marks & Sokolov, LLC, Philadelphia, PA.

APPEARING FOR APPELLEES: MICHAEL D. BURROWS, Winston & Strawn, New York, NY.

98 Fed. Appx. 47, *; 2004 U.S. App. LEXIS 8547, **

**JUDGES:** PRESENT: HON. DENNIS JACOBS, HON. BARRINGTON D. PARKER, Circuit Judges, HON. FREDERIC BLOCK, * District Judge.

* The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

**OPINION:**

[*48] **SUMMARY ORDER**

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court be **AFFIRMED**.

Plaintiffs-Appellants Base Metal Trading, Ltd., Mikom (together, "Aluminum plaintiffs"), [**2] Davis International, LLC, Holdex, LLC, Foston Management, Ltd., Omni Trusthouse, Ltd., Nexis Products, LLC, and Polyprom, Ltd. (together, "Vanadium plaintiffs"), appeal from a judgment [*49] of the United States District court for the Southern District of New York dismissing their claims on the ground of forum non conveniens. Appellants' claims (civil RICO, contract, and tortious interference) arise primarily from the allegedly illegal takeovers of aluminum and vanadium production facilities located in Western Siberia and the Northern Ural Mountains, respectively. It is alleged that the takeovers were accomplished through sham bankruptcy proceedings initiated by the defendant-appellees ("defendants") in Russia. Familiarity is assumed as to the facts, procedural context, and the specification of appellate issues. We affirm for substantially the reasons articulated by the district court.

A decision to dismiss an action on the ground of forum non conveniens is committed to the sound discretion of the district court; our review is limited to addressing clear abuses of that discretion. *Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 70 (2d Cir. 2003).* In [**3] forum non conveniens cases, "discretion is abused . . . when a decision (1) rests either on an error of law or on a clearly erroneous finding of fact, or (2) cannot be located within the range of permissible decisions," or (3) fails to consider all the relevant factors or unreasonably balances those factors. Id. (citations omitted).

A ruling on such a motion proceeds in three steps; the district court must: (i) determine the degree of deference to be accorded the plaintiff's choice of forum; (ii) determine whether an adequate alternative forum to entertain plaintiff's claims exists; and (iii) balance the private and public interest factors identified by the Supreme Court in *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947),* to

determine where the plaintiff's claims ought to be adjudicated. See *Pollux, 329 F.3d at 70* (discussing *Iragorri v. United Technologies Corp., 274 F.3d 65 (2001)* (in banc)). In making these determinations, the district court is free to consider submissions by the parties without converting a forum non conveniens motion into a motion for summary judgment. See *Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 645 (2d Cir. 1956)* [**4] (citing *Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 531-32, 91 L. Ed. 1067, 67 S. Ct. 828 (1947)*) ("In the determination of a motion to dismiss for forum non conveniens, the court may consider affidavits submitted by the moving and opposing parties.").

1. With respect to choice of forum, the district court considered the relevant factors and concluded that plaintiffs' decision to litigate in the Southern District of New York was entitled to "little deference." *Base Metal Trading, S.A. v. Russian Aluminum, 253 F. Supp. 2d 681, 694 (S.D.N.Y. 2003);* see generally, *id. at 693-98.* None of the Aluminum plaintiffs are United States citizens or residents; of the six Vanadium plaintiffs, three are owned by holding companies that are registered in the United States, though no two are in the same state, and none is in the Southern District of New York. Based on extensive submissions by plaintiffs and defendants, Judge Koeltl concluded that "the record . . . pointed to nothing but forum shopping by the plaintiffs." *Base Metal Trading, 253 F. Supp. 2d at 696-97.* The court's conclusion was certainly not a clear abuse [**5] of discretion.

2. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux, 329 F.3d at 75.* In practice, this issue entails three inquiries. Is the defendant amenable to process in the alternative forum? Is the plaintiff able to have his claims adjudicated fairly (i.e. is [*50] the judiciary corrupt)? See, e.g., *Aguinda v. Texaco, Inc., 303 F.3d 470, 478 (2d Cir. 2002).* Can the plaintiff litigate his claims safely and with peace of mind (i.e. free from threats of violence and/or trauma connected with the particular claims)? See, e.g., *Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 147-48 (2d Cir. 2000).* Only where "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all" should a district court deny forum non conveniens dismissal on the ground that the alternative forum is inadequate. *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981);* see also, *Aguinda, 303 F.3d at 476-77.*

Each of [**6] the 20 defendants has consented to jurisdiction in Russia. See *Base Metal Trading, 253 F.*

**5**

**BREINDEL & FERSTENDIG, Plaintiff, -against- WILLIS FABER & DUMAS LIMITED, Defendant.**

**95 Civ. 7905 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 10432*

**July 22, 1996, Decided**
**July 24, 1996, FILED**

**DISPOSITION:** [*1] WFD's motion to dismiss the complaint on the grounds of forum non conveniens denied. WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims. WFD's motion for summary judgment denied without prejudice to renew as against Breindel's negligence and gross negligence claims. Decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits. Stay of discovery lifted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff law firm brought suit against defendant, a London-based reinsurance broker, for legal fees. The broker moved for summary judgment and to dismiss the complaint for forum non conveniens.

**OVERVIEW:** The broker contended that English courts were more convenient or, in the alternative, that the claims for breach of contract and fiduciary duty, negligent or fraudulent misrepresentation, negligence, and gross negligence should be summarily dismissed. The court held that (1) the unavailability of a jury trial or punitive damages and the lack of opportunity to take pretrial depositions did not render suit in England clearly unsatisfactory; (2) although both parties had a significant interest in having the dispute decided at home, the action involved money owed to a New York law firm for services performed solely in this country; (3) the law firm failed to establish any contractual relationship with or duty owed to it by the broker; and (4) the law firm failed to show that the broker acted as its agent or that

any other relationship existed to give rise to a fiduciary duty.

**OUTCOME:** The court denied dismissal for forum non conveniens and of the negligence claims, granted summary judgment on the breach of contract and fiduciary duty and negligent misrepresentation claims, reserved decision on summary judgment on fraud, and lifted the stay on discovery.

**COUNSEL:** For BREINDEL & FERSTENDIG P.C., plaintiff: Howard Breindel, Breindel & Ferstendig P.C., New York, NY.

For WILLIS FABER & DUMAS LIMITED, defendant: Michael Zweig, Loeb and Loeb, New York, NY.

**JUDGES:** SIDNEY H. STEIN, U.S.D.J. Magistrate Judge Andrew J. Peck

**OPINION BY:** SIDNEY H. STEIN

**OPINION:**

OPINION AND ORDER

SIDNEY H. STEIN, DISTRICT JUDGE:

Plaintiff, a New York City law firm, has brought this action pursuant to the Court's diversity jurisdiction against defendant, a London-based reinsurance broker, for legal fees allegedly due plaintiff for services rendered in this country for several of [*2] defendant's clients located in London and Italy. Defendant has moved: (1) to dismiss the complaint on the ground of forum non conveniens and (2) for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56*. For the reasons that follow, defendant's motion to dismiss for forum non

conveniens is denied, and its motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff Breindel & Ferstendig ("Breindel") is a law firm organized as a New York professional corporation, with its office in New York City. (Compl. P1; Affidavit of Howard Breindel, sworn to on March 14, 1996, at P1.) Defendant Willis Faber & Dumas Ltd. ("WFD") is a British insurance and reinsurance broker with its principal place of business in London, England. (Compl. P2; Declaration of Heather Hunter, sworn to on February 15, 1996, at P2.)

Augusta Assicurazioni S.p.A. ("Augusta"), an Italian insurance company, agreed to insure Bieffe Helmets S.R.L. ("Bieffe") for products liability claims made against Bieffe. (Hunter Decl. P3.) In late 1991, WFD placed a contract of reinsurance for Augusta with several underwriters associated with Lloyd's of London and a number [*3] of London company market insurers (collectively, the "Underwriters"). (Hunter Decl. P3.)

In that same year, the Underwriters retained Solin & Breindel, apparently the predecessor of Breindel, as lead counsel for various products liability claims against Bieffe in this country. (Hunter Decl. P4; Breindel Aff. P23.) WFD took no part in the decision to retain Breindel, but did notify Breindel by letter dated December 20, 1991 of its retention by the Underwriters. (Hunter Decl. PP4, 5.) Additionally, Augusta retained Breindel to represent it with regard to the products liability claims. (Hunter Decl. P4.)

WFD served as a "conduit" between the Underwriters and Breindel -- Breindel would submit to WFD statements regarding fees owed it by the Underwriters; WFD would then determine how much was owed by each underwriter and inform the Underwriters of their respective debts; the Underwriters would then submit payment to WFD; and, finally, WFD would forward payment to Breindel. (Hunter Decl. P7; Breindel Aff. PP28, 32; Declaration of Joanne Whittaker, dated April 4, 1996, at P6.) WFD received no payment or anything else of value from Breindel for these services, and states that it performed [*4] these services solely for the convenience of Augusta, its client. (Hunter Decl. P5; Whittaker Decl. P3; Declaration of Bruce Carruthers, dated April 4, 1996, at P11; Reply Declaration of Heather Hunter, dated April 3, 1996, at PP16, 22.) According to Breindel, this is the usual custom and practice for underwriters associated with Lloyd's (Breindel Aff. PP24-25), but WFD disputes this. (Whittaker Decl. P7; Carruthers Decl. P11; Hunter Reply Decl. P17.)

Breindel states that it "reposed its trust and confidence" in WFD to collect and transmit to Breindel the monies due it. (Breindel Aff. P43.) Breindel also states that it had no control over how and when WFD billed the Underwriters, nor when WFD chose to transfer the monies to Breindel. (Breindel Aff. P43(a)(1)). Breindel further states that it did not know the location or identity of the claims manager of any Underwriter except for that of the lead Underwriter, or how much was paid by each Underwriter, or when. (Breindel Aff. P43(b)).

WFD has distributed to Breindel all payments owed it by the Underwriters. (Hunter Decl. P8; Breindel Aff. P36; Whittaker Decl. P9; Carruthers Decl. P12; Hunter Reply Decl. P21.) However, Breindel states [*5] that WFD performed its function as an intermediary "in a dilatory, negligent, unprofessional and inefficient manner" (Breindel Aff. P36(a)), by, among other things, failing to keep accurate records of its activities and delaying payment of funds provided by Augusta and the Underwriters in order to take advantage of the "float," i.e., the interest that accrued during the delay. (Breindel Aff. PP36(b), 41, 43(c), 46).

WFD also agreed to reimburse Augusta for up to 95% of the deductible amount on Augusta's reinsurance contract, which was $ 200,000. (Hunter Decl. P9; Breindel Decl. PP28-30.) This agreement was reached apparently because of an error made by WFD: while the Bieffe/Augusta insurance contract provided that the $ 200,000 deductible did not apply to legal fees, so that all such fees would be paid by Augusta, the Augusta/Underwriters reinsurance contract brokered by WFD provided that the deductible does apply to legal fees. (Affirmation of David L. Ferstendig, dated March 15, 1996, at PP3-4.) Thus, absent an arrangement between Augusta and WFD, Augusta would be liable for all legal costs incurred rather than just 5% of those costs. (Ferstendig Aff. P5.) WFD states [*6] that it never assumed an obligation to Breindel to pay its legal fees. (Carruthers Decl. P10; Hunter Reply Decl. P19.)

WFD states that it generally did not act as a "conduit" between Breindel and Augusta, but rather that those two entities usually -- although not always -- dealt with one another directly. (Hunter Decl. P10; Whittaker Decl. P4; Hunter Reply Decl. P20; Breindel Aff. P32.) Augusta, however, always made its payments directly to Breindel. (Breindel Aff. P32; Whittaker Decl. P4; Hunter Reply Decl. P20.)

Breindel states that WFD delayed and then ceased reimbursing Augusta for WFD's 95% share of the amounts paid for attorneys' fees up to the deductible amount. (Breindel Aff. P33; Pl.'s ex. P.) As a consequence, Augusta stopped paying Breindel. (Breindel Aff. P33; Pl.'s ex. P.) Augusta currently owes

Breindel $ 68,000, but is unwilling to pay unless it is assured that WFD will reimburse it. (Breindel Aff. P35.)

WFD intends to call as witnesses at trial certain of its employees and persons associated with the Underwriters, all of whom reside and work in London. (Hunter Decl. P12; Hunter Reply Decl. P8.) All of WFD's business records are maintained in or near London. (Hunter [*7] Reply Decl. P7.)

Breindel brought this action on September 11, 1995, and WFD served this motion five and one half months later. By order dated February 28, 1996, Magistrate Judge Leonard Bernikow stayed all discovery pending resolution of this motion.

**DISCUSSION**

A. Forum Non Conveniens

1. Waiver

Breindel argues first that WFD waived its right to move to dismiss for forum non conveniens because of its undue delay in bringing the motion. However, *Fed. R. Civ. P. 12(h)* is not applicable to such a motion. See *Leif Hoegh & Co. v. Alpha Motor Ways, Inc., 534 F. Supp. 624, 626 (S.D.N.Y. 1982); Snam Progetti S.p.A. v. Lauro Lines, 387 F. Supp. 322, 322-23 (S.D.N.Y. 1974).* Moreover, similar periods of delay have been held not to constitute a waiver. See *Nippon Fire & Marine Ins. Co. v. M.V. Egasco Star, 899 F. Supp. 164, 170 (S.D.N.Y. 1995)* (six months); *Snam Progetti, 387 F. Supp. at 323* (five months); cf. *Cerro De Pasco Copper Corp. v. The Alabama, 109 F. Supp. 856, 858 (S.D.N.Y. 1952)* (court did not consider motion to dismiss for forum non conveniens where defendant waited three and a half years before moving). n1

n1 Although the delay in this case does not constitute a waiver, the Court will consider the delay when determining whether the forum is inconvenient. See section A.3 infra.

[*8]

2. An Alternative Forum

The initial inquiry when analyzing a motion to dismiss for forum non conveniens is whether there exists an adequate alternative forum, "because application of the doctrine 'presupposes at least two forums in which the defendant is amenable to process.'" *Murray v. British Broadcasting Corp., 81 F.3d 287, 292 (2d Cir. 1996)* (quoting *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S. Ct. 839, 842, 91 L. Ed. 1055 (1947)); see also Bybee v. Oper der Standt Bonn, 899 F. Supp. 1217, 1222 (S.D.N.Y. 1995).*

This requirement "is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when 'the remedy offered by the other forum is clearly unsatisfactory.'" *Murray, 81 F.3d at 292* (quoting *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22, 102 S. Ct. 252, 265 n.22, 70 L. Ed. 2d 419 (1981)).* Breindel does not dispute that WFD, a London-based entity, is amenable to suit in England.

Rather, Breindel cites three reasons why England is not an adequate forum: the unavailability of a jury trial or punitive damages, and the lack of opportunity to take pretrial depositions. None of these [*9] conditions, however, renders suit in England "clearly unsatisfactory." See *Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 129 (2d Cir. 1987)* (per curiam) (unavailability of treble damages did not make Philippines inadequate forum); *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse, 652 F. Supp. 1289, 1295-96 (S.D.N.Y. 1987)* (unavailability of jury trial does not render **foreign forum** inadequate); *id. at 1296* (where considerable **discovery** had already taken place and where dismissal would be conditioned on movant's consent to **use** products of **discovery** in alternative forum, absence of **discovery** in that **forum** did not render it inadequate); see also *id. at 1295* (procedures in **foreign forum** need not be identical to those in United States to be adequate, so long as they are not "wholly devoid of due process") (internal quotation marks omitted). Accordingly, England is an adequate alternative forum.

3. Application of the Gilbert Factors

Once an alternative forum is identified, the Court must apply the public and private interest factors first set forth in *Gilbert, 330 U.S. at 508-09, 67 S. Ct. at 843,* "to determine whether the convenience of the parties [*10] and the ends of justice would best be served by dismissing the action." *Murray, 81 F.3d at 293.* However, the plaintiff's choice of forum is to be given great deference, see *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 265; Murray, 81 F.3d at 290; Bybee, 899 F. Supp. at 1222,* especially where the plaintiff has chosen its "home forum." *Piper Aircraft, 454 U.S. at 255, 102 S. Ct. at 266;* see *Murray, 81 F.3d at 290.* As this Court has written, "in order to prevail, defendant[] must show that the balance is strongly in favor of litigating in [the alternative forum] in order to overcome the substantial weight accorded plaintiff's choice of forum." *Bybee, 899 F. Supp. at 1222.*

The public interest factors include: (1) "the administrative difficulties flowing from court congestion"; (2) "the local interest in having controversies decided at home"; (3) "the interest in having the trial in a forum that is familiar with the law

1996 U.S. Dist. LEXIS 10432, *

governing the action"; (4) "the avoidance of unnecessary problems in conflict of laws or in the application of foreign law"; and (5) "the unfairness of burdening citizens in an unrelated forum with jury duty." *Murray, 81 F.3d at 293.* [*11]

The parties have not demonstrated that the courts of London are any more or less congested than is the Southern District of New York. Moreover, both localities have a significant interest in having this dispute decided at home -- the action involves money allegedly owed to a New York law firm for services performed solely in this country, which also calls into question transactions in the London insurance market.

As for the applicable law, although WFD argues that certain of Breindel's claims must be analyzed pursuant to English law, it does not identify any conflicts between English law and the law of New York, and indeed has cited solely New York law in seeking summary judgment. In any event, while the Court "makes no pretense that it could" apply English law "as knowledgeably or as efficiently as" an English court, *Bybee, 899 F. Supp. at 1223,* the application of the law of another English common law jurisdiction "does not impose a significant burden on this Court." Gordon v. Long Bay (1980) Ltd., 1995 *U.S. Dist. LEXIS 11721, 94 Civ. 2141 (SHS), 1995 WL 489474,* at *4 (S.D.N.Y. Aug. 16, 1995). Finally, the fifth factor militates slightly toward allowing the suit to be brought in England, because the [*12] parties apparently would not have the right to a jury trial in that event.

The private interest factors include: (1) "the relative ease of access to sources of proof"; (2) "the availability of compulsory process for attendance of unwilling witnesses"; (3) "the cost of obtaining attendance of willing witnesses"; (4) "issues concerning the enforceability of a judgment"; and (5) "all other practical problems that make trial of a case easy, expeditious, and inexpensive -- or the opposite." *Murray, 81 F.3d at 294.*

The private interest factors do not weigh in either party's favor. For example, while all of Breindel's documentary evidence is located in New York, WFD's documents are kept in or near London. Similarly, although many of the witnesses Breindel intends to call are located in New York and are therefore within the subpoena power of this Court, many of the witnesses WFD would call are located in London, and are presumably subject to compulsory process in a London court. In addition, although there is evidence in the record that principals of Augusta would be unwilling to travel from Italy to London for judicial proceedings, there is no reason for the Augusta principals to be [*13] any more or less willing to travel to New York instead of London; accordingly, this factor aids neither party.

The parties have not identified any issues relating to the enforceability of a British judgment in New York or vice-versa, nor have they identified any other issues relating to the relative ease, expeditiousness, or expense of trial in the respective fora.

Moreover, WFD's delay in making this motion of over five months after the complaint was filed and until shortly before discovery was due to close, while not egregious enough to constitute a waiver of the right to move, demonstrates that this forum is not as inconvenient to WFD as it now claims. See *Rodriguez v. Orion Schiffahrts-Gesellschaft Reith & Co., 348 F. Supp. 777, 779 (S.D.N.Y. 1972).* Last, the aspects of the British system that Breindel contends render it inadequate -- especially the absence of trial by jury -- while insufficient to render it "wholly devoid of due process," *ACLI, 652 F. Supp. at 1295* (internal quotation marks omitted), also weigh on the side of denying the motion to dismiss.

In sum, the Gilbert factors do not weigh "strongly in favor" of dismissal. *Bybee, 899 F. Supp. at 1222.* [*14] Accordingly, the motion to dismiss on the grounds of forum non conveniens is denied.

B. Summary Judgment

"Summary judgment may be granted only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (quoting *Fed. R. Civ. P. 56(c)*); see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).* The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen, 64 F.3d at 79* (citations omitted) (quoting *Lund's, Inc. v. Chemical Bank, 870 F.2d 840, 844 (2d Cir. 1989)).*

Breindel has set forth six claims for relief: breach of contract, breach of fiduciary duty, negligent misrepresentation, fraudulent misrepresentation, negligence, and gross negligence. n2 WFD argues that it is entitled to summary judgment on each claim. The Court will discuss each claim in turn in light of the foregoing [*15] standard.

n2 Although Breindel contends that it has also stated claims for conversion and unjust enrichment, they are not pled in the complaint and will not be considered. Although pleadings by a party proceeding pro se ordinarily are construed extremely liberally, see *Haines v.*

*Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 595-96, 30 L. Ed. 2d 652 (1972)* (per curiam); *Pino v. Ryan, 49 F.3d 51, 52-53 (2d Cir. 1995)*, the same does not hold true where the pro se party is an attorney or law firm, see *Leeds v. Meltz, 898 F. Supp. 146, 149 (E.D.N.Y. 1995)*, aff'd, *85 F.3d 51 (2d Cir. 1996)*.

### 1. Breach of Contract

Breindel, conceding that there is no express contract between it and WFD, asserts that the conduct of the parties has given rise to an "implied-in-fact" contract. Pursuant to New York law, n3 "[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of [*16] the parties as indicated by their conduct." *Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 330 N.E.2d 414, 420, 369 N.Y.S.2d 400, 408 (1975)* (citations omitted); see also *AEB & Assocs. Design Group, Inc. v. Tonka Corp., 853 F. Supp. 724, 731 (S.D.N.Y. 1994); Estate of Argersinger, 168 A.D.2d 757, 758, 564 N.Y.S.2d 214, 215 (3d Dept. 1990).*

> n3 As noted above, although WFD asserts that English law applies to certain of Breindel's claims, both parties rely exclusively on New York law in addressing WFD's motion for summary judgment, and neither party has identified any relevant conflict between New York and English law. Therefore, the Court will apply the law of New York. See *PI. Inc. v. Quality Prods., Inc, 907 F. Supp. 752, 760 n.3 (S.D.N.Y. 1995)*; see also *Wood v. Mid-Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991); Schreiber v. Camm, 848 F. Supp. 1170, 1174 (D.N.J. 1994).*

Breindel has identified the course of conduct that, it claims, gave rise to an implied-in-fact contract between it and WFD. [*17] Normally, however, a contract is implied in fact "when one party seeks to collect the benefit due it in return for a benefit it has conferred on the other party." *Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 1996 WL 306564, at *12 (S.D.N.Y. 1996).* Here, Breindel seeks to hold WFD responsible for perceived defects in WFD's performance "without any corresponding obligation on" Breindel. *Id.* Breindel has failed, in other words, to identify any consideration it has conferred on WFD, and consideration is an element essential to the existence of any contract, whether express or implied-in-fact. See *id.; Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.,*

*726 F. Supp. 1411, 1419 (S.D.N.Y. 1989); Argersinger, 168 A.D.2d at 758, 564 N.Y.S.2d at 215.*

Because there is no evidence in the record that the services allegedly supplied by WFD to Breindel were supported by any consideration, Breindel has failed to show that there is a genuine issue of material fact as to the existence of an implied-in-fact contract between those parties. Accordingly, WFD's motion for summary judgment is granted as against Breindel's breach of contract claim, [*18] and that claim is dismissed.

### 2. Breach of Fiduciary Duty

Pursuant to New York law, "a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Scott v. Dime Sav. Bank of New York, FSB, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995)* (internal quotation marks and alteration omitted), aff'd, *1996 U.S. App. LEXIS 3948, 1996 WL 98782 (2d Cir. Mar. 5, 1996).* To determine the existence of such a relationship, "'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'" *Id.* (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991)*, rev'd on other grounds, *967 F.2d 742 (2d Cir. 1992)).* In order to give rise to a fiduciary relation, the trust and confidence "reposed by one party must be accepted by the other party," *Litton Indus., 767 F. Supp. at 1231*, and must be reposed justifiably. See *In re Windsor Plumbing Supply Co., 170 Bankr. 503, 525 (Bankr. E.D.N.Y. 1994).* In general, a fiduciary duty does not arise from a conventional, [*19] arms-length business relationship "'absent extraordinary circumstances.'" *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992)* (quoting *National Westminster Bank, U.S.A. v. Ross, 130 Bankr. 656, 679 (S.D.N.Y. 1991)*, aff'd sub nom., *Yaeger v. National Westminster, 962 F.2d 1 (2d Cir. 1992));* see also *Oursler v. Women's Interart Center, Inc., 170 A.D.2d 407, 408, 566 N.Y.S.2d 295, 297 (1st Dept. 1991).*

The relationship that exists here is essentially one between an attorney and its clients' agent. Breindel has cited, and the Court has uncovered, no case where such an attenuated and indirect relationship was found to constitute a fiduciary relation. To the contrary, the cases uniformly stand for the proposition that even where a direct business relationship exists between two parties, that alone is insufficient to render the relationship a fiduciary one. See, e.g., *Liebowitz, 927 F. Supp. 688, 1996 WL 306564*, at *20; *Village On Canon v. Bankers Trust Co., 920 F. Supp. 520, 532 (S.D.N.Y. 1996);*

*Northeast Gen. Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 162-64, 624 N.E.2d 129, 131-32, 604 N.Y.S.2d 1, 3-4* [*20] *(1993).*

It follows then that where, as here, there is not a direct business relationship, whatever relation exists is not a fiduciary one, absent special circumstances suggesting otherwise. See *Cumisky v. James River Corp., Civ. A. No. CV-93-1975 (DGT), 1995 WL 520021,* at *7 (E.D.N.Y. Aug. 17, 1995); *Windsor Plumbing Supply, 170 Bankr. at 526.*

Breindel asserts that the Lloyd's Code of Practice, which provides, inter alia, that "insurance brokers shall at all times conduct their business with utmost good faith and integrity" and "shall establish and maintain an adequate system of control over its transactions and records," imposes a fiduciary duty on WFD vis-a-vis Breindel. However, whatever duty these provisions impose on WFD are for the benefit of its clients -- such as Augusta and the Underwriters -- not its clients' attorneys. See *Cumisky, 1995 WL 520021,* at *7.

Moreover, it is unclear whether these provisions impose a fiduciary duty on WFD or instead simply constitute precatory statements of commendable business practices. It is not tenable to infer from those provisions a fiduciary relationship between WFD and its clients, and then to extend that fiduciary [*21] relationship to Breindel -- its clients' attorneys -- and then to impose the sequelae of that designation upon WFD. See id. at *8.

Breindel states that it reposed trust in WFD to invoice the Underwriters and Augusta for Breindel's services, to transfer funds to Breindel, and to keep accurate records, and to perform all these tasks in good faith. It also states that, because it did not know the identity of any of the claims managers at any of the Underwriters except the lead Underwriter, it was forced to rely on WFD's good faith in performing its functions.

Breindel, however, does not deny that Augusta and the Underwriters -- not WFD -- were its clients; that it could have ascertained the identities of the claims managers at any of the Underwriters; and that it at all times knew the identities of the contact persons at Augusta and the lead Underwriter. Nor does Breindel claim that it ever manifested dissatisfaction to its clients with their method of paying their bills; that WFD somehow prevented it from doing so; or that it was obligated to acquiesce in this method simply because it was the "custom and practice" in the London insurance market. See Teachers Ins. and Annuity [*22] *Ass'n of America v. Wometco Enter., Inc., 833 F. Supp. 344, 350 (S.D.N.Y. 1993).* In short, if Breindel reposed trust and confidence in WFD, there is no evidence that this was required, justified, acceptable to WFD, or anything more than a "'unilateral investment of confidence.'" *Litton*

*Indus., 767 F. Supp. at 1231-32* (quoting *United States v. Reed, 601 F. Supp. 685, 715* (S.D.N.Y.), rev'd in part on other grounds, *773 F.2d 477 (2d Cir. 1985)).*

While Breindel correctly notes that the question of whether a fiduciary relationship exists is essentially a factual one, it has produced no evidence from which one might infer such a relationship. As demonstrated above, Breindel has not shown that there existed any contract between it and WFD. Nor has it shown that WFD acted as its agent, or that any other relationship existed between the two entities so as to give rise to a fiduciary duty.

In this respect, the case is similar to *Philan Ins. Ltd. v. Frank B. Hall & Co., 748 F. Supp. 190, 197-98 (S.D.N.Y. 1990),* in which the court was faced with the question of whether a reinsurance intermediary owed a fiduciary duty to the reinsurer or the reinsured in relation to the intermediary's [*23] transfer of premiums from the latter to the former. The court there concluded (1) that the answer depended on "the specific factual situation demonstrating the parties' intent," *id. at 197;* and (2) that the "plaintiffs possessed [and therefore could allege] no facts to support their conclusory allegations" of a fiduciary relation, *id. at 198,* and dismissed plaintiffs' claim. See also *Teachers Ins. and Annuity Ass'n of America, 833 F. Supp. at 350; Compania Sud-Americana de Vapores, 785 F. Supp. at 425-27.*

Here, too, Breindel has produced no evidence to support its claim that the relationship between it and WFD was a fiduciary one. Accordingly, WFD's motion for summary judgment is granted as against Breindel's claim for breach of fiduciary duty, and that claim is dismissed.

3. Negligent Misrepresentation

"Under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes [it] a fiduciary duty." *Stewart v. Jackson & Nash, 976 F.2d 86, 90 (2d Cir. 1992);* see also *Gruntal & Co. v. San Diego Bancorp, 901 F. Supp. 607, 615 (S.D.N.Y. 1995); Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1232 (S.D.N.Y. 1995).* But [*24] see *In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749, 769 (S.D.N.Y. 1996)* (asserting that fiduciary relationship is sufficient but not necessary to support claim for negligent misrepresentation). Because, as noted, Breindel has produced no evidence from which a reasonable trier of fact could conclude that WFD owed it a fiduciary duty, its claim for negligent misrepresentation must fail. Accordingly, WFD's motion for summary judgment is granted as to this claim as well, and it is dismissed.

4. Fraudulent Misrepresentation

To prevail on a claim for fraud pursuant to New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).* A plaintiff may also prove fraud through concealment of information that the defendant was duty-bound to disclose. See id.

Breindel's claim for fraudulent misrepresentation is based on WFD's alleged "omission [*25] and failure to advise [Breindel] that [WFD] was collecting [Breindel's] monies and not timely transferring them to [Breindel]." (Pl.'s Mem. of Law at 36.) The only fact in the record that arguably supports such a claim consists of Breindel's assertion that WFD "collected hundreds of thousands of dollars from [the] Underwriters, belonging to [Breindel] and then delayed the transmission of said funds to [Breindel], to take advantage of the 'float.'" (Breindel Aff. P36(b)).

However, Mr. Breindel fails to establish that he has personal knowledge of this fact as required by *Fed. R. Civ. P. 56(e)*, and Breindel offers no other evidence that would substantiate this claim. Breindel does not, for example, provide the date that any particular payment was made to WFD by the Underwriters and the corresponding date that the same payment was transmitted from WFD to Breindel. Absent such proof, a reasonable trier of fact could not conclude simply from Mr. Breindel's statement that WFD committed fraud against Breindel.

However, before discovery was stayed in this matter, WFD had been ordered to produce documents in its possession, if any, that show when it received payments from the [*26] Underwriters. (Order dated February 15, 1996, at 2.) Counsel for WFD had advised the court that no such documents exist, but that he would verify this information from WFD. (Order dated February 15, 1996, at 2.) It appears that discovery was stayed before counsel for WFD had the opportunity to either verify that no documents existed that are responsive to this request, or to produce the documents if they do, in fact, exist. (Breindel Aff. P46.) Moreover, Breindel had noticed the deposition of a WFD employee with knowledge of the manner in which WFD receives funds from insurers and transmits them to defense counsel such as Breindel (Pl.'s ex. C), but this deposition apparently never took place due to the then-existing stay of discovery.

It appears that permitting discovery to go forward would be essential to permit Breindel to present facts in opposition to WFD's motion for summary judgment motion seeking dismissal of Breindel's fraud claim. Therefore, pursuant to *Fed. R. Civ. P. 56(f)*, decision on the motion for summary judgment with regard to this claim is reserved pending completion of discovery as noted above. Within 60 days of the date of this order, the parties may submit supplemental [*27] affidavits with regard to the fraud claim, after which the Court will make a final determination.

5. Negligence and Gross Negligence

WFD asserts correctly that, pursuant to New York law, "a party may not maintain a claim for negligence if the purported claim is merely a claim for breach of contract." *Eugene Iovine Inc. v. Rudox Engine and Equipment Co., 871 F. Supp. 141, 146 (E.D.N.Y. 1994),* aff'd, *62 F.3d 1412 (2d Cir. 1995).* However, the Court has determined that no contract, express or implied-in-fact, existed between Breindel and WFD, and therefore a negligence claim may lie.

The extent of the parties' briefing on the negligence and gross negligence claims consists of WFD's statement, without citation, that "WFD had no legal duty to Breindel and thus may not be liable to Breindel for negligence." (Def.'s Mem. of Law at 23.) The Court declines to reach the issue in the absence of briefing by the parties. Accordingly, WFD's motion for summary judgment as against Breindel's negligence and gross negligence claims is denied without prejudice to renew.

**CONCLUSION**

For the reasons stated above:

(1) WFD's motion to dismiss the complaint on the grounds of forum [*28] non conveniens is denied.

(2) WFD's motion for summary judgment dismissing the complaint pursuant to *Fed. R. Civ. P. 56* is granted as against Breindel's breach of contract, breach of fiduciary duty, and negligent misrepresentation claims.

(3) WFD's motion for summary judgment is denied without prejudice to renew as against Breindel's negligence and gross negligence claims.

(4) The Court reserves decision on WFD's motion for summary judgment as against Breindel's fraud claim pending renewed discovery and the submission of supplemental affidavits within sixty days of the date of this order.

(5) The stay of discovery is lifted.

DATED: New York, New York

July 22, 1996

SO ORDERED:

1996 U.S. Dist. LEXIS 10432, *

SIDNEY H. STEIN, U.S.D.J.

**6**

D.A. ELIA CONSTRUCTION CORP., DAVID A. ELIA, DANIEL A. ELIA, JOSEPHINE T. ELIA, CHRISTINE A. ELIA, BERNADETTE A. ELIA, ALFRED H. ELIA and ALFRED H. ELIA TRUST, Plaintiffs, -vs- UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant, Counterclaimant and Third-Party Plaintiff, -vs- D.A. ELIA BUILDING CO., INC. and L. ANDREW BERNHEIM, Third-Party Defendants.

94-CV-0190E(H)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

*1997 U.S. Dist. LEXIS 5610*

April 16, 1997, Decided
April 16, 1997, OPINION FILED

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** USF&G's motion for reconsideration of July 30 Decision granted, plaintiffs' request for FRCvP 11 sanctions denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, principal and its shareholders, brought an action alleging that defendant surety breached an agreement by refusing to issue any bonds. The surety filed a counterclaim for losses. The surety moved for reconsideration of a decision which ruled that its counterclaim was waived and/or ruled on by the jury, and that its defense against oral modification was rejected by the jury. Plaintiffs moved for Fed. R. Civ. P. 11 sanctions.

**OVERVIEW:** The master surety agreement (MSA) between the parties obligated the surety to consider requests to issue bonds on behalf of plaintiffs, who in return agreed to indemnification. The court found that although the surety erred by moving for reconsideration of an interlocutory order pursuant to Fed. R. Civ. P. 59(e) and 60(b), that error did not warrant denying the motion without pondering its merits and justice required reconsideration. The court determined that the surety did not waive either its counterclaim or its contention that the MSA could not be modified orally and that the jury did not implicitly rule on either issue. The court ruled that an oral agreement that modified the MSA was enforceable because there was partial performance of the oral agreement that was unequivocally referable to that

agreement. The court concluded that the surety's breach of the oral agreement did not relieve plaintiffs of their obligations under the MSA because the oral agreement was severable from the remainder of the MSA. Thus, the surety was entitled to a judgment of liability on its counterclaim and as the reconsideration motion had merit, plaintiffs were not entitled to sanctions.

**OUTCOME:** The court granted the surety's motion for reconsideration of the decision, ordered that the surety was entitled to a judgment of liability on its counterclaim, and denied plaintiffs' request for sanctions.

**COUNSEL:** For PLAINTIFFS & THIRD-PARTY DEFENDANTS: John J. Giardino, Esq., c/o Giardino & Schober, Buffalo, NY.

For DEFENDANT: J. William Ernstrom, Esq., c/o Ernstrom & Dreste, Rochester, NY.

**JUDGES:** John T. Elfvin, U.S.D.J.

**OPINION BY:** John T. Elfvin

**OPINION:**

MEMORANDUM and ORDER

Presently before this Court is a motion by defendant United States Fidelity and Guaranty Company ("USF&G"), made pursuant to *Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure* ("FRCvP"), that asks this Court to reconsider certain aspects of its Memorandum and Order dated July 30, 1996 ("the July 30 Decision"). n1 For the reasons set forth below, that

1997 U.S. Dist. LEXIS 5610, *

motion will be granted and, upon reconsideration, USF&G will receive some, but not all, of the relief that it sought prior to the July 30 Decision.

n1 *D.A. Elia Const. Corp., et al. v. U.S. Fidelity and Guaranty Co., 1996 WL 484200.*

[*2]

During the relevant time period, plaintiff D.A. Elia Construction Corp. ("Elia Corp.") was a public works contractor. USF&G is a surety company. From late 1987 until mid-1993, USF&G issued bid, payment and performance bonds on behalf of Elia Corp. During the course of their relationship, Elia Corp. and USF&G executed three "Master Surety Agreements." The third and final Master Surety Agreement ("the MSA") is the only such agreement that is relevant to this decision. The MSA was executed on December 5, 1991 and was signed by, or on behalf of, Elia Corp., its shareholders (plaintiffs David A. Elia, Daniel A. Elia and Alfred H. Elia), the shareholders' spouses (plaintiffs Bernadette A. Elia, Christine A. Elia and Josephine T. Elia), plaintiff Alfred H. Elia Trust n2 and third-party defendant D.A. Elia Building Co., Inc. n3 The MSA obligated USF&G to "consider" requests to issue bonds on behalf of Elia Corp. but gave USF&G complete discretion to deny those requests. In return, the plaintiffs agreed to pay USF&G a fee for each bond issued and further agreed to indemnify USF&G for any and all losses that USF&G incurred as a result of issuing bonds pursuant to the MSA.

n2 The trustees of the Alfred H. Elia Trust are Josephine Elia, Daniel Elia and David Elia.

[*3]

n3 The remaining third-party defendant, L. Andrew Bernheim, signed the first MSA, which was executed on October 10, 1987. A default judgment as to liability was entered against him on May 17, 1996.

The plaintiffs commenced this action March 14, 1994 alleging, *inter alia*, (1) that the parties had entered an oral agreement in June or July 1992 ("the Syracuse Agreement") and (2) that USF&G had breached that agreement in 1993 by refusing to issue any bonds on behalf of Elia Corp. In May 1996 the plaintiffs' claims relating to the Syracuse Agreement were tried before a jury. At trial, the plaintiffs submitted evidence showing the following. n4 First, notwithstanding the MSA provision giving USF&G complete discretion to deny all

bond requests by Elia Corp., by the summer of 1992 USF&G and the plaintiffs had established a $ 10 million "bonding program" for Elia Corp., pursuant to which the corporation was entitled to an aggregate of $ 10 million in bonding at any particular point in time. Second, Elia Corp. suffered a year-end loss of approximately $ 185,000 in 1991. Third, upon learning of that [*4] loss, Jack Dumpert, an agent of USF&G, told Elia Corp. that its bonding program would not be maintained unless additional working capital was invested in Elia Corp. Fourth, at a meeting held in Syracuse in June or July 1992, Dumpert, Kim Brooks (a USF&G Regional Manager) and Clare Corigan (Brooks's assistant) met with David Elia (the Chief Executive Officer of Elia Corp.) to discuss Elia Corp's bonding program. At that meeting, the participants agreed that USF&G would maintain Elia Corp.'s bonding program at $ 10 million if the individual plaintiffs ("the Elias") loaned approximately $ 300,000 to Elia Corp. and subordinated their claims for repayment thereof to any subsequent claim against the corporation by USF&G. It was also agreed that the corporation's bonding program would be increased to $ 15 million if Elia Corp. "termed out" -- *i.e.* converted from a demand note to a term note -- $ 500,000 that the corporation had borrowed from its bank pursuant to a line of credit. Fifth, on July 20, 1993, Dumpert informed Elia Corp. that USF&G would no longer issue bonds on behalf of the corporation. Upon special verdicts, the jury found (1) that the Syracuse Agreement was a legally binding [*5] agreement, (2) that the plaintiffs had fulfilled their obligations under the agreement, (3) that USF&G had breached the agreement and (4) that USF&G's breach had damaged the plaintiffs. (The amount of damages will be determined in a damages trial.) n5

n4 This discussion is a summary of the plaintiffs' version of the relevant events and is not a summary of the jury's findings.

n5 The jury also made a finding as to an insurance claim that is not relevant to this decision.

The instant motion relates to a motion that USF&G made during and after the trial. At the close of the plaintiffs' case, USF&G moved, pursuant to *FRCvP 50*, for judgment as a matter of law on its counterclaim. USF&G's counterclaim relates to ten bonds that USF&G issued on behalf of Elia Corp. pursuant to the MSA. USF&G allegedly sustained losses as a result of issuing those bonds and seeks reimbursement for those losses pursuant to the MSA's indemnification provision. In support of its *FRCvP 50* motion, USF&G argued that it

1997 U.S. Dist. LEXIS 5610, *

was entitled to [*6] judgment as a matter of law on its counterclaim because it was undisputed (1) that USF&G had sustained losses on the bonds, (2) that USF&G had asked the plaintiffs to "place it in funds" -- i.e., indemnify -- it for those losses and (3) that the plaintiffs had refused to place USF&G in funds. USF&G also moved for judgment as a matter of law on the plaintiffs' claims. In support of that aspect of its motion, USF&G argued that the plaintiffs' claims should be dismissed on the ground that the Syracuse Agreement was, at most, n6 an oral modification of the MSA and could not, therefore, have any legal effect because the MSA expressly prohibited oral modifications. This Court reserved decision on that motion, which USF&G renewed at the close of its case and after the jury returned its special verdicts. This Court's ruling on USF&G's motion is contained in the July 30 Decision. With respect to USF&G's counterclaim, this Court held that to the extent that the jury had not "impliedly resolved" the counterclaim against USF&G, USF&G had waived the counterclaim. See July 30 Decision at 3. With respect to USF&G's contention that the plaintiffs' claims failed as a matter of law because the [*7] MSA could not be modified orally, this Court held that the jury had implicitly rejected that argument in finding for the plaintiffs. Ibid. USF&G now contends that those two rulings -- i.e., that its counterclaim was waived and/or ruled on by the jury and that its defense to the plaintiffs' claims was rejected by the jury -- were erroneous.

n6 USF&G has denied that it entered into any type of agreement with the plaintiffs in June or July 1992.

In response, the plaintiffs argue that USF&G's motion should be denied on the ground that it is "procedurally defective" because it was made pursuant to FRCvP 59(e) and 60(b). According to the plaintiffs, those rules may not be used to seek reconsideration of the July 30 Decision, which all sides agree is non-final, n7 because FRCvP 59(e) and 60(b) only apply to final judgments.

n7 The July 30 Decision is interlocutory because it is limited to liability issues. Damages have not yet been determined. See Brown v. U.S. Postal Service, 860 F.2d 884, 886 (9th Cir. 1988) ("[a] district court judgment of liability is not a final judgment where it remains for the district court to assess damages or adjudicate other claims for relief").

[*8]

The plaintiffs are correct in arguing that FRCvP 59(e) and 60(b) do not apply to the July 30 Decision. FRCvP 59(e) authorizes a motion "to alter or amend a judgment." (Emphasis added.) FRCvP 54(a) defines "judgment" as "a decree and any order from which an appeal lies." Inasmuch as no appeal lies from the July 30 Decision, n8 that decision is not a "judgment" within the meaning of FRCvP 59(e). See McCowan v. Sears, Roebuck and Co., 908 F.2d 1099, 1103 (2d Cir.) (FRCvP 59(e) applies only to appealable judgments), cert. denied, 498 U.S. 897, 112 L. Ed. 2d 209, 111 S. Ct. 250 (1990). Similarly, FRCvP 60(b) applies only to final judgments. See Advisory Committee Notes for the 1946 Amendments to FRCvP 60; Burke v. Warren County Sheriff's Dept., 916 F. Supp. 181, 183 (N.D.N.Y. 1996); Wanamaker v. Columbian Rope Co., 907 F. Supp. 522, 526 (N.D.N.Y. 1995). Consequently, USF&G erred by moving for reconsideration of an interlocutory order pursuant to FRCvP 59(e) and 60(b).

n8 Indeed, USF&G initially appealed from the July 30 Decision but later withdrew that appeal after conferring with staff counsel for the United States Court of Appeals for the Second Circuit.

[*9]

That error does not warrant denying the motion without considering its merits, however, because it is well-settled that a district court has the discretion to reconsider and, if appropriate, revise an interlocutory order at any time prior to final judgment. See Partmar Corp. v. Paramount Corp., 347 U.S. 89, 100, 98 L. Ed. 532, 74 S. Ct. 414 (1954); Fayetteville Investors v. Commercial Builders, 936 F.2d 1462, 1469 (4th Cir. 1991); Riggs v. Scrivner, Inc., 927 F.2d 1146, 1148 (10th Cir.), cert. denied, 502 U.S. 867, 116 L. Ed. 2d 156, 112 S. Ct. 196 (1991); Acha v. Beame, 570 F.2d 57, 63 (2d Cir. 1978); FRCvP 54(b) (interlocutory orders are "subject to revision at any time before the entry of [a final judgment]"). n9 The standard to be applied when reconsidering an interlocutory order is set forth in the Advisory Committee Notes for the 1946 Amendments to FRCvP 60: "Interlocutory judgments are * * * left subject to the complete power of the court rendering them to afford such relief from them as justice requires." (Emphasis added.) See also Burke, at 183 (applying the "as justice so requires" standard); Wanamaker, at 527 (same). n10 [*10] As discussed infra, justice requires that this Court reconsider the July 30 Decision.

n9 USF&G's motion should have been made pursuant to FRCvP 54(b). Nevertheless, USF&G's failure to cite the correct rule in its

1997 U.S. Dist. LEXIS 5610, *

motion papers does not prejudice its right to seek reconsideration of the July 30 Decision. *See* 6A James Wm. Moore, *Moore's Federal Practice* (2d ed. 1996) P59.12[1], at 59-264: "It is clear that a party is not bound by the caption given to its motion. If the motion is timely, and properly states the grounds therefor, the district court should grant the appropriate relief, regardless of how the motion is styled." *Accord, Krome v. Merrill Lynch & Co., Inc., 110 F.R.D. 693, 694 (S.D.N.Y. 1986).*

n10 Although district courts have broad discretion to revise interlocutory orders "as justice so requires," "the major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atlantic Airways v. Nat. Mediation Bd., 956 F.2d 1245, 1255* (2d Cir.) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478, at 790), *cert. denied, 506 U.S. 820, 121 L. Ed. 2d 34, 113 S. Ct. 67 (1992).*

[*11]

It is clear from the trial transcript ("Tr.") that USF&G did not waive either its counterclaim or its contention that the MSA could not be modified orally. *See* Tr. at 968-978, 1096-1097. It is equally clear that the jury did not implicitly rule on either issue. Indeed, this Court specifically told the jury that it was not being called upon to make a determination as to those issues. *See id.* at 1308-1309. Rather than send those issues to the jury, this Court determined that the issues were questions of law that should be ruled on by the Court. *See id.* at 1292-1294. Consequently, this Court should have examined those issues on the merits in its July 30 Decision.

This Court will first consider USF&G's contention that the Syracuse Agreement had no legal, binding effect because the MSA provided that it could not be modified orally. Paragraph XI(A) of the MSA provides:

"There shall be no waiver, modification or change of the terms of this AGREEMENT without the written approval of an officer of [USF&G]." Pl. Exh. 4.

The plaintiffs have contended n11 that the above provision does not apply to the Syracuse Agreement

because that agreement was not a waiver, modification [*12] or change in the terms of the MSA, but was instead a separate, stand-alone agreement. This Court disagrees. The MSA gave USF&G complete discretion to deny all bonding requests from Elia Corp. The Syracuse Agreement obligated USF&G to maintain, and then increase, the level of bonding that Elia Corp. had been receiving. Thus, following the Syracuse Agreement USF&G was no longer free to decline all bonding requests from Elia Corp. -- a right that it had enjoyed under the MSA. The Syracuse Agreement was, therefore, a modification of the MSA. *See National Westminster Bank, U.S.A. v. Ross, 130 Bankr. 656, 677 (S.D.N.Y. 1991)* (holding that oral agreements were modifications of written loan agreements containing "no oral modification" clauses where the oral agreements did not have "any significance except in the context of, and in relation to, the Loan Agreements" and where the purpose of the oral agreements was to "realize a forbearance by the Bank of one or more of its rights under the Loan Agreements"), *aff'd, 962 F.2d 1 (2d Cir. 1992).* n12 Consequently, this Court must determine whether the "no oral modification" provision in the MSA renders the Syracuse Agreement unenforceable. [*13]

n11 The plaintiffs made this argument in opposition to a motion for summary judgment that USF&G made in April 1994. As stated *supra*, the plaintiffs' opposition to the instant motion was limited to the procedural propriety of the motion.

n12 At trial, the plaintiffs' former counsel arguably admitted that the Syracuse Agreement was a modification of the MSA.

"THE COURT: The MSA would have been *modified* by this agreement [the Syracuse Agreement] only to the effect that in lieu of giving to USF&G, a one hundred percent right to say no as to any proposed surety situation, they had an obligation to be ongoing.

"Mr. Giardino: And ongoing at a specific level of bonding.

"THE COURT: Yeah. Five ten.

"Mr. Giardino: Right.

"THE COURT: That's the only effect?

"Mr. Giardino: Right.

"THE COURT: That if the jury found that that was so, then the Jury, per se, would be saying, well that [the Syracuse Agreement] *did effect a change in the MSA*, despite the very strong argument that it can only be [changed] in writing.

"Mr. Giardino: That's right." Tr. at 1290-1291 (emphasis added).

[*14]

The general rule in New York n13 is that a written agreement such as the MSA that expressly states that it can be modified only in writing cannot be modified orally. *See Towers Charter & Marine v. Cadillac Ins. Co., 894 F.2d 516, 522 (2d Cir. 1990).* That rule, which stems from section 15-301(1) of New York's General Obligations Law, n14 is, however, subject to two exceptions: partial performance and estoppel. Because this Court has determined that the facts of this case satisfy the first exception, the second exception will not be discussed.

n13 Both sides agree that New York law applies to the plaintiffs' claims and USF&G's counterclaim.

n14 "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." *N.Y.Gen.Obl.Law § 15-301(1).*

In order to satisfy the [*15] partial performance exception, the plaintiffs must show (1) that there was an agreement to modify the MSA and (2) partial performance of that agreement that is "unequivocally referable" to the agreement. *Rose v. Spa Rlty. Assoc., 42 N.Y.2d 338, 343-344, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977); Gallo v. Swan Optical Corp., 79 A.D.2d 697, 434 N.Y.S.2d 275, 276* (App. Div. 2d Dep't 1980); *Towers, at 521-522; Grandonico v. Consortium Com.*

*Intern., Inc., 566 F. Supp. 1288, 1291-1292 (S.D.N.Y. 1983).* The jury's special verdicts establish that there was in fact an agreement to modify the MSA (the Syracuse Agreement), so the only open question is whether there was partial performance of the Syracuse Agreement that was unequivocally referable to that agreement.

"Unequivocally referable" is a difficult standard to meet. If the conduct at issue was compatible with the written agreement or had a number of possible explanations consistent therewith, the standard is not met. *See Rose,* at 927-928; *Wheeler v. Reynolds, 66 N.Y. 227, 231-232 (1876); Towers,* at 522. Instead, the party's (or parties') partial performance "must be such as will admit of no other possible explanation except one [*16] pointing directly to the existence of the oral agreement claimed." *Bright Radio Lab v. Coastal Commercial Corp., 4 A.D.2d 491, 166 N.Y.S.2d 906, 910* (App. Div. 1st Dep't 1957), *aff'd, 4 N.Y.2d 1021, 177 N.Y.S.2d 526, 152 N.E.2d 543 (1958).* Thus, the partial performance must, in effect, prove that the parties did in fact enter an oral agreement.

The plaintiffs argue that they did several things that meet this standard. First, in July and August 1992 the Elias loaned Elia Corp. a total of $ 291,554 pursuant to four "Subordinated Demand Notes" ("the Notes"). Although consistent with the plaintiffs' principal obligation under the Syracuse Agreement, loaning Elia Corp. $ 291,554 has too many possible explanations to be "unequivocally referable" to that agreement. For example, the Elias could have loaned that money to Elia Corp. to satisfy a portion of a $ 386,434.45 judgment that International Process Systems, Inc. held against Elia Corp. in July 1992 n15 or simply because the corporation required additional working capital to remain operational. n16 *See Towers,* at 522 (where the plaintiff had agreed to borrow $ 1.4 million from the defendant to purchase a luxury yacht, [*17] the plaintiff's expenditures of more than $ 1.0 million to refurbish the yacht were not "unequivocally referable" to an alleged agreement to modify the original loan agreement because the loan agreement did not preclude such expenditures); *National Westminster Bank,* at 676 (infusing capital into the defendant's corporation had "too many possible explanations" to be "unequivocally referable" to an oral modification of the written agreement at issue). Second, the plaintiffs point to the fact that Elia Corp. converted $ 500,000 that it owed on its line of credit into a ten-year term loan from the Small Business Administration. That also falls short of being unequivocally referable to the Syracuse Agreement because Elia Corp. could have "termed out" $ 500,000 of its line of credit for any number of reasons that had nothing to do with the Syracuse Agreement.

1997 U.S. Dist. LEXIS 5610, *

n15 Most of the $ 291,554 was loaned to Elia Corp. on July 23, 1992. Elia Corp. satisfied the $ 386,434.45 judgment on that same day.

n16 In a memorandum dated May 8, 1992, David Elia wrote that Elia Corp. needed "an additional $ 430,000 of working capital." Def. Exh. 58 at 3.

[*18]

The plaintiffs' final argument is bottomed on the fact that each of the Notes contains the following provision:

"The maker and holder of this note agrees that all payments on this note shall be subordinated to any and all losses and expenses caused by any and all bonds issued by USF&G past, present or future, on behalf of the maker and that no principal payment may be made on this note while such bonds are outstanding and/or without the express written authorization of USF&G." *See* Pl. Exhs. 15, 16, 19 & 20.

The above provision mirrors a provision in a "Subordinated Demand Note" form (Pl. Exh. 14) that Dumpert faxed to David Elia on July 21, 1996. This Court can think of no reason why the Elias would insert such a subordination provision in the four Notes unless they had agreed to do so as part of the Syracuse Agreement. The Elias were simply lending money to their corporation. Making their rights under the Notes subordinate to the rights of USF&G was, quite obviously, contrary to their own interests. The MSA did not require them to take that action. Indeed, the MSA does not even address loans to Elia Corp. The only plausible explanation for the plaintiffs' actions [*19] is that the Syracuse Agreement required them to subordinate their rights to seek repayment of the Notes. USF&G has not offered an alternative explanation. Thus, because there is only one explanation for the Elias' actions, those actions were unequivocally referable to the Syracuse Agreement. Consequently, that agreement is enforceable and USF&G's contention that the agreement was legally ineffective fails as a matter of law. n17

n17 USF&G also argues that its alleged promise to maintain and increase Elia Corp.'s bonding program had to be in writing because it was a "promise to answer for the debt . . . of another person." *N.Y.Gen.Obl.Law § 5-701(a)(2)*. That argument fails as a matter of law because

USF&G's promise was made directly to Elia Corp. *See Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1472 fn. 4 (S.D.N.Y. 1992)* (promise to issue surety bonds need not be in writing if the promise is made directly to the principal).

Turning to USF&G's counterclaim, the MSA's indemnification clause provides, in [*20] pertinent part:

"(A) UNDERSIGNED shall exonerate, indemnify, and keep indemnified SURETY from and against any and all liabilities, losses and expenses of whatsoever kind or nature (including but not limited to, interest, court costs and counsel fees) imposed upon, sustained, or incurred by SURETY by reason of: (1) SURETY having executed, provided or procured BOND(S) in behalf of PRINCIPAL * * *;

"(B) in order to exonerate or indemnify SURETY, UNDERSIGNED shall upon demand of surety, place SURETY in funds before SURETY makes any payment * * *." Pl. Exh. 4.

The plaintiffs do not dispute (1) that USF&G has demanded that it be placed in funds for losses that it allegedly has incurred as a result of issuing bonds on behalf of Elia Corp. and (2) that the plaintiffs have refused to comply with that demand. Instead, the plaintiffs contend n18 that, by breaching the Syracuse Agreement, USF&G relieved the plaintiffs of their obligations under the MSA, including their indemnity obligations. That position is based on the well-settled principle that, if one party to a contract materially breaches the contract, the other party is discharged of its obligations under the contract. [*21] *See Emigrant Ind. Sav. Bank v. Willow Builders, Inc., 290 N.Y. 133, 144, 48 N.E.2d 293 (1943); Refinement Intern. Co. v. Eastbourne N.V., 815 F. Supp. 738, 742 (S.D.N.Y. 1993), aff'd, 25 F.3d 105 (2d Cir. 1994)*. If applicable, that principle warrants dismissal of USF&G's counterclaim because the jury found that USF&G "unjustifiably failed to perform" -- i.e., breached -- its obligations under the Syracuse Agreement. Because that agreement was simply a modification of the MSA, the MSA was the only agreement in effect between the plaintiffs and USF&G. Thus, the jury's finding that USF&G breached the Syracuse Agreement is equivalent to a finding that USF&G breached the MSA.

n18 The plaintiffs' former counsel voiced this position during trial. *See, e.g.*, Tr. at 1279-1280, 1284, 1286-1290.

As pointed out by USF&G, however, its breach of the Syracuse Agreement did not relieve the plaintiffs of their obligations under the MSA if the Syracuse Agreement can be "severed" from the rest of the [*22] MSA. "Whether a contract is entire [*i.e.*, non-severable] or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." *Christian v. Christian, 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 365 N.E.2d 849 (1977). Accord Rudman v. Cowles Communications, Inc., 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); Prospero Associates v. Burroughs Corp., 714 F.2d 1022, 1026 (10th Cir. 1983)* (applying New York law); *Refinement*, at 742; *Nederlandse, etc. v. Grand Pre-Stressed Corp., 466 F. Supp. 846, 852 (E.D.N.Y.), aff'd, 614 F.2d 1289 (2d Cir. 1979).* The "test" for severability is whether "'the parties gave a single assent to the whole transaction or * * * assented separately to separate things.'" *Rhine v. New York Life Insurance Co., 248 A.D. 120, 135, 289 N.Y.S. 117* (1st Dep't) (quoting 2 Williston, *Contracts* (1920 ed.) § 863), *aff'd, 273 N.Y. 1, 6 N.E.2d 74 (1936). Accord, Rudman*, at 13; *First Savings & L. Ass'n v. American Home Assur. Co., 35 A.D.2d 344, 316 N.Y.S.2d 233, 234* (App. [*23] Div. 1st Dep't 1970), *aff'd, 29 N.Y.2d 297, 327 N.Y.S.2d 609, 277 N.E.2d 638 (1971); American Surety Company of New York v. Rosenthal, 206 Misc. 485, 133 N.Y.S.2d 870, 874 (Sup. Ct. New York Co. 1954); Prospero*, at 1026.

Applying the foregoing principles to the facts of the instant case, this Court holds that the Syracuse Agreement is severable from the remainder of the MSA. As discussed *supra*, when the parties executed the MSA, USF&G agreed to consider bond requests from Elia Corp. and the plaintiffs agreed to pay USF&G a fee for each bond issued and further agreed that they would indemnify USF&G for any losses that it incurred as a result of issuing bonds pursuant to the MSA. When the parties executed the Syracuse Agreement, USF&G agreed to maintain and possibly increase Elia Corp.'s

bonding program and the plaintiffs agreed to loan approximately $ 300,000 to Elia Corp. pursuant to subordinated notes and to term out $ 500,000 that it had borrowed on its line of credit. Significantly, there is no evidence in the record demonstrating that the parties intended the Syracuse Agreement to affect the plaintiffs' indemnification obligations under the MSA. Indeed, there [*24] is no evidence suggesting that the parties even thought about the plaintiffs' indemnification obligations when they assented to the Syracuse Agreement. n19 Consequently, the rights and obligations to which the parties assented when they executed the MSA are severable from the rights and obligations embodied in the Syracuse Agreement. USF&G is, therefore, entitled to a judgment of liability on its counterclaim, with damages to be determined in a separate trial.

n19 Notably, David Elia did not even mention those obligations when he testified about the circumstances that led to the Syracuse Agreement.

Finally, the plaintiffs have requested sanctions pursuant to *FRCvP 11* on the ground that USF&G's motion for reconsideration was brought to harass the plaintiffs and cause them additional litigation expense. As the preceding discussion makes abundantly clear, the defendants' motion has considerable merit. The plaintiffs' motion for sanctions will, therefore, be denied.

Accordingly, it is hereby **ORDERED** that [*25] USF&G's motion for reconsideration of the July 30 Decision is granted, that the plaintiffs' claims are not to be dismissed on the ground that USF&G could not be modified orally, that USF&G is entitled to a judgment of liability on its counterclaim and that the plaintiffs' request for *FRCvP 11* sanctions is denied.

DATED: Buffalo, N.Y.

April 16, 1997

John T. Elfvin

U.S.D.J.