**13**

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Saab v. Citibank, N.A.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Ayoub-Farid Michel SAAB and Fadi Michel Saab,
Plaintiffs,
v.
CITIBANK, N.A., Defendant.
No. 00 CIV. 6784(BSJ).

Nov. 7, 2001.

*Decision & Order*

JONES, District J.
**\*1** On September 8, 2000, Plaintiffs Ayoub-Farid
Michel Saab and Fadi Michel Saab (collectively "the
Saabs") filed suit against Defendant Citibank,
alleging that Citibank failed to use its best efforts, on
behalf of itself and its affiliate, the Saudi American
Bank ("SAMBA"), to carry out a promised private
placement for the Golden Cedar Club Project, a real-
estate development outside Beirut, Lebanon, owned
by Plaintiffs. (Compl.¶  1.) Plaintiffs are brothers,
citizens of Lebanon and residents of Cyprus who
jointly own the property in southern Beirut. (Compl.¶
¶  7, 8, 12.) They allege claims of actual fraud,
constructive fraud, breach of fiduciary duty,
inducement to or participation in breach of fiduciary
duty, intentional misrepresentation, negligent
misrepresentation, breach of oral contract,
promissory estoppel, interference with contractual
relations, interference with economic advantage, and
negligent supervision against Citibank. (Compl. ¶  3
.) On October 23, 2000, Defendant moved to dismiss
the case for forum non conveniens. For reasons
discussed below, Defendant's motion to dismiss is
GRANTED.

I. BACKGROUND

SAMBA was created in 1980 from Citibank's
operations in Saudi Arabia when the Saudi Arabian
government forced Citibank and other foreign banks
to relinquish their controlling interests and to take
minority ownership interests in their Saudi Arabian
banks. Originally, Citibank held a forty percent
interest in SAMBA, the maximum allowable under
Saudi Arabian law. During the events in question,

Citibank held a thirty percent interest in SAMBA.
(Compl.¶  16.)

Upon taking a minority interest, Citibank entered into
a Technical Management Agreement ("Management
Agreement") with SAMBA, pursuant to which
Citibank agreed to provide senior management to
SAMBA, including the appointment of SAMBA's
managing director, as well as training and other
expertise. (Compl.¶  17.) The precise level of control
exerted by Citibank over SAMBA is unclear.
Plaintiffs and Defendant dispute exactly what the
Management Agreement entailed. However, SAMBA
and Citibank were affiliated, and SAMBA
represented that Citibank was its foreign partner.
(Compl.¶  28.) Citibank appointed three members to
the SAMBA board, and James Collins, Chief
Executive and Managing Director of SAMBA during
the events in question, was a longtime Senior Vice
President of Citibank. (*See* Mustill Decl. Ex. D ¶  4;
Compl. ¶ ¶  20, 23.)

In 1994, the Saabs met with Mohamed Amersi, an
attorney at Jones, Day, Reavis & Pogue, who
recommended SAMBA to help them finance a real-
estate project on their jointly-owned property.
(Compl.¶  15.) From September 11 to September 16,
1994, the Saabs met with SAMBA representatives to
negotiate an agreement under which SAMBA would
place shares in the real-estate project with investors.
(Compl.¶  19.) Plaintiffs contend that Citibank was
represented at this meeting by James Collins.
(Compl.¶  20.) As part of its pitch, SAMBA referred
to its previous successful placement of shares in the
Solidere project in Lebanon. (Compl.¶  21.) Plaintiffs
claim that it was Citibank's close association with
SAMBA that made them decide to accept the deal.
(Compl.¶  23.) Stating that it had the resources and
ability to pursue the placement not only through its
head office in Saudi Arabia but also through its Swiss
and United Kingdom subsidiaries, SAMBA asked for
global exclusivity in the real-estate project. (Compl.¶
¶   24-26.) Notably, however, the Placement
Agreement contained an explicit carve-out excluding
the United States. (Compl.¶ ¶  24, 29.)

**\*2** On September 16, 1994, Plaintiffs and SAMBA
entered into a Placement Agreement, under which
SAMBA agreed to market the real-estate venture in
two phases and to use its best efforts to promote the
venture. (Compl.¶   28.) Following the signing,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

SAMBA began due diligence, conducted by Ghazi Dhoot of SAMBA's Corporate Finance and Investor Marketing Department. (Compl.¶ 35.)

Over the next few months, various circumstances led to delays. (Compl.¶ ¶ 36-40.) In January, 1995, SAMBA created a Merchant Banking Group headed by Michael Baker, and the project was shifted over to that Group. This caused further delays, and marketing did not begin until June. (Compl.¶ ¶ 41-44.) While there was early success in finding investors, efforts ground to a halt a month or two later. (Compl.¶ 45.) Dhoot resigned, numerous additional delays ensued, and the placement appeared to stall. (Compl.¶ ¶ 46-59.)

In 1997, Plaintiffs filed suit against SAMBA in London for breach of contract. (Compl.¶ 59.) Claiming that the contract was governed by Saudi Arabian law and that the relevant events were centered around Saudi Arabia, SAMBA moved to dismiss the action. *Saab and Another v. Saudi American Bank,* 1 WLR 1861, 1863 (1999). Plaintiffs argued that the principal breach had been made by the English office of SAMBA and that they had close personal connections to the forum. *Saab,* 1 WLR at 1881-82. They alleged that England was better suited for the witnesses, many of whom were residing in England or were British nationals, and, therefore, the suit was properly brought in England. (Karp Decl. Ex. 2 & 3.) The English court agreed and denied SAMBA's motion. *Saab,* 1 WLR at 1881-82.

Subsequently, on April 12, 2000, SAMBA made a formal offer to settle the proceedings and gave Plaintiffs twenty-one days to accept. Plaintiffs did not accept the offer within the time limit, but, on November 3, 2000, they applied to the court for permission to accept the offer. SAMBA agreed and the court granted permission. Acceptance has not been formally made, but the English court has already stayed the action pending formal acceptance. (Goldsmith Decl. ¶ 8.)

On August 8, 2000, Plaintiffs filed a second action in England against Mohamed Amersi and Jones, Day, Reavis & Pogue relating to those parties' role in the SAMBA deal. (Def.'s Reply Mem. at 3.)

## II. DISCUSSION

A district court has broad discretion when deciding whether to dismiss an action on the ground of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257 (1981); *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991). Although a foreign plaintiff's choice of forum is generally given less deference than the choice of an American plaintiff, *Piper,* 454 U.S. at 256, "some weight must still be given to a foreign plaintiff's choice of forum." *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996). A defendant seeking to dismiss a complaint on the basis of forum non conveniens "must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors ... the balance of convenience tilts strongly in favor of trial in the foreign forum." *Maganlal,* 942 F.2d at 167.

*3 In *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947), the Supreme Court set forth the private and public interest factors that the district courts should consider. Private interests to be considered include "ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil,* 330 U.S. at 508. Public interest factors include administrative difficulties stemming from court congestion; the burden of imposing jury duty on a community with no relation to the litigation; the interest in having "localized controversies decided at home"; and the interest in having issues of foreign law decided by a foreign tribunal. *Id.* at 508-09. "The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice." *Maganlal,* 942 F.2d at 167.

### A. Deference to Plaintiff's Choice of Forum

There is a strong presumption in favor of a plaintiff's choice of forum; however, the court will give less deference to a plaintiff's choice when that plaintiff is foreign. *Piper,* 454 U.S. at 255-56. This does not mean that no deference will be given to a foreign plaintiff's choice of forum; dismissal for forum non conveniens is the exception, rather than the rule. *Maganlal,* 942 F.2d at 168. In fact, less deference is accorded a foreign plaintiff's choice of forum because it can often be assumed that a United States forum is not the most convenient forum in cases involving foreign plaintiffs. *Piper,* 454 U.S. at 255-56; *Murray,* 81 F.3d at 290. The general rule is that "deference increases as the plaintiff's ties to the forum increase." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 101 (S.D.N.Y.2000). "[T]he greater the plaintiff's ties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

to the plaintiff's chosen forum, the more likely it is that the plaintiff would be inconvenienced by a requirement to bring the claim in a foreign jurisdiction." *Id.* at 102.

Plaintiffs have made no real showing of convenience in this district. As already noted, Plaintiffs themselves are citizens of Lebanon, and at least one plaintiff maintains a home in England, where his wife resides, and where his daughter attended college. (Karp Decl. Ex. 3 ¶ 20.) Plaintiffs argue that the Southern District is more convenient and appropriate because Citibank is the true focus of this litigation and the key witnesses and documents will be found at Citibank. (Pls.' Mem. Opp'n at 6-7.) However, Plaintiffs merely assert the existence of these documents and witnesses without any apparent factual backing. As discussed in more detail below, the location of witnesses and documents in this case actually favors dismissal of this case to a more convenient alternative forum.

Nearly all the alleged events giving rise to Plaintiffs' claims occurred in London, Lebanon or Saudi Arabia. The negotiations and representations by SAMBA took place in London, (Compl.¶¶ 19, 21), and the Placement Agreement was signed there, (Compl.¶ 29). Another relevant meeting took place in Beirut on October 22, 1994. (Compl.¶ 38.) Ghazi Dhoot promoted SAMBA in Saudi Arabia. (Compl.¶ 51.) These are but a few, representative examples. Additionally, most of the documents are in London or Saudi Arabia. (Karp Decl. Ex. 2 ¶ 19.4.) Any resolution of the claims against Citibank will necessarily involve consideration of the allegations lodged against SAMBA, and SAMBA's actions were to be undertaken primarily in London. (Mustill Decl. Ex. D ¶ 4.5; Karp Decl. Ex. 2 ¶¶ 14, 29.6.)

*4 In the initial suit filed against SAMBA in England, Plaintiffs fought tenaciously to keep the case in that forum. (Karp Decl. Ex. 2 & 3; Karp Decl. Ex. 4.) The English trial court agreed and denied SAMBA's motion to move the case to Saudi Arabia. *Saab,* 1 WLR at 1882-83. Moreover, the Complaint in the present case bears a striking similarity to that filed against SAMBA in England. (Mustill Decl. Ex. D.) Because Plaintiffs fail to make any showing of convenience, their choice of forum deserves only "some weight." *Murray,* 81 F.3d at 290.

### B. Adequate Alternate Forum

"Ordinarily, a foreign forum will be adequate when

the defendant is subject to the jurisdiction of that forum." *Maganlal,* 942 F.2d at 167. An agreement by a defendant to submit to the jurisdiction of a foreign forum generally satisfies the requirement that there be an adequate alternate forum. *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74-75 (2d Cir.1998). A British court will be able to extend jurisdiction over Citibank in this case, (Mustill Decl.), and Citibank has agreed to accept jurisdiction in England, (Def.'s Mem. Supp. at 13-14).

The fact that the alternate forum has different laws and provides different causes of action or remedies, or lacks certain causes of action and remedies, does not bar adequacy. *DiRienzo v. Philip Services,* 232 F.3d 49, 57 (2d Cir.2000). The alternate forum is adequate so long as it "permits litigation of the subject matter of the dispute, provides adequate procedural safeguards and the remedy available in the alternative forum is not so inadequate as to amount to no remedy at all." *Id.; see, e.g., Capital Currency Exchange, N.V. v. National Westminster Bank PLC* 155 F.3d 603, 610 (2d Cir.1998); *PT United,* 138 F.3d at 74; *Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 159 (2d Cir.1980) (in banc ).

There can be no doubt that Defendant has shown that England is an adequate alternative forum for this case. (*See* Mustill Decl. ¶¶ 5, 11-29.) Since the court has decided that England, the proposed alternative forum, is adequate, the court must now "balance public and private interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action." *Murray,* 81 F.3d at 293.

### C. Private Interest Factors

1. Ease of Access to Sources of Proof-Documents

Plaintiffs argue that all the relevant documents are in the United States at Citibank's headquarters. (Pls.' Mem. Opp'n at 6-7.) However, the only specific document that Plaintiffs can name is the Management Agreement, which they concede they already possess as a result of the settlement in the English suit they filed against SAMBA. Plaintiffs only demand that document from Citibank because they claim to be unable to reveal its contents due to a confidentiality agreement signed as part of the settlement. (Pls.' Mem. Opp'n at 3 n. 4.) Their other requests for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 4
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

documents in the United States are vague and overly broad, seeking nearly all Citibank documents that have any connection to SAMBA. (Pls.' Mem. Opp'n App. A.) Citibank has already stated that they will provide any requested documents in London, and the SAMBA documents, crucial to proving the claim against Citibank, are available in SAMBA's English office. Thus, this factor weighs in favor of dismissal to a more convenient alternative forum.

### 2. Compulsory Process and Costs of Obtaining Witnesses

**\*5** Plaintiffs claim that three witnesses-James Collins, Michael Baker and Mohamed Amersi-reside in the United States. (Ayoub-Farid Michel Saab Aff. ("Saab Aff.") ¶ 9; Pls.' Mem. Opp'n at 5.) However, Michael Baker denies that he resides in the United States, (Baker Aff.), and it is unclear where Mohamed Amersi resides, (*See* Paterson Decl. Ex. 1). Moreover, both Baker and Amersi are British nationals, and Citibank has specifically secured the agreement of James Collins to appear in England. (Def.'s Reply Mem. at 7, 7 n. 7.) The other witnesses named-Nader Mousli, Ghazi Dhoot, Hafez Alawi, Ali Baruni and Stephen Paine-are either British nationals and/or reside in England, Switzerland, Lebanon or Saudi Arabia. (Saab Aff. ¶ 9; Pls.' Mem. Opp'n at 5; Def.'s Reply Mem. at 7.) All of these witnesses, with the exception of Baruni, were previously named in the SAMBA suit and were then listed by Plaintiffs as capable of appearing in England. (Karp Decl. Ex. 2.) In addition, Citibank has agreed to provide access to all of its employees and documents in London, (Def.'s Reply Mem. at 3), so the costs of producing witnesses and the difficulties associated with compulsory process will be minimized in that forum.

### D. Public Interest Factors

Although the private interests identified by the parties all weigh in favor of dismissal in this case, the court must go on to consider the public interest factors affecting the decision to dismiss as well. *See Blanco v. Banco Industrial de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir.1993)* (*Gulf Oil* "commands inquiry into relevant public interest factors."); *see also Gulf Oil, 330 U.S. at 503.*

### 1. Court Congestion

A district court may properly consider its caseload in

determining the appropriateness of retaining an action. *See Piper, 454 U.S. at 241.* However, the Second Circuit has recently pointed out that, for purposes of a forum non conveniens motion, court congestion is no longer a significant concern in the Southern District of New York. *Guidi v. Inter-Continental Hotels Corp. 224 F.3d 142, 147 n. 5 (2d Cir.2000).* Though it remains a factor to be considered, court congestion does not affect the analysis in this case.

### 2. Local Interest in the Controversy

When most of the events took place in a foreign forum or forums and involve mostly foreign parties, the United States and its citizens have less interest in the resolution of the action than the foreign forum. *See, e.g., Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1234 (2d Cir.1994); Allstate Life Ins. Co. v. Linter Group, Ltd., 994 F.2d 996, 1002 (2d Cir.),* cert. denied, *510 U.S. 945 (1993); Bybee v. Oper Der Standt Bonn, 899 F.Supp. 1217, 1223 (S.D.N.Y.1995).* This community has limited connection to the litigation and would be ill-served by imposing this case on a local jury. Although Citibank's headquarters are in New York, the other major players in this controversy are Lebanese businessmen and a Saudi Arabian bank. The actions in dispute occurred throughout Europe and the Middle East; moreover, the witnesses are nearly all foreign, with the sole exception of Mr. Collins. Though Plaintiff alleges that there are other, unknown witnesses, mere allegations are not sufficient to connect the community to litigation.

**\*6** If the allegations of Plaintiffs regarding Citibank's control of SAMBA are true, they do raise an interest on the part of the United States in ensuring the legitimate practices of banks. As a general proposition, the United States does have a substantive interest in governing its banks according to one set of rules. *Cf., e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F.Supp.2d 282, 292-93 (S.D.N.Y.2000)* (holding that the duties owed by American reinsurance companies must be governed according to one set of rules and that the United States has the greatest substantive interest in determining that standard). This is the only real interest favoring retention of this case in its present forum. However, other circumstances, including the identities of witnesses and parties and the locations of relevant events, demonstrate that there is extremely little local interest in this controversy. Moreover, "a single factor is rarely dispositive," *DiRienzo v. Philip*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Services Corp.,* 232 F.3d at 57.

### 3. Familiarity with the Law

Although "this factor alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate," *Piper,* 454 U.S. at 260 n. 29, the near certainty that the court would have to apply foreign law in this case is a factor favoring dismissal. *See, e.g., Gulf Oil,* 330 U.S. at 509 (finding it more appropriate to have a case heard in a forum "at home with the ... law that must govern the case); *Scottish Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1234 (2d Cir.1996).

### a. Choice of Law-Tort Claims

The choice-of-law provision in the contract between Plaintiffs and SAMBA states, "[t]his agreement and each party's rights and obligations hereunder shall be governed by and construed in accordance with the laws and regulations of the Kingdom of Saudi Arabia." (Goldsmith Decl. Ex. A at 7.) There is no need to decide whether the provision requires Plaintiffs' tort claims to be litigated under Saudi Arabian law because, regardless of whether the provision applies or not, those claims must be analyzed under foreign law. On the one hand, if the court finds that Citibank was a party to the agreement and applies the choice-of-law provision to the tort claims, Saudi Arabian law will apply. On the other hand, if the court analyzes the tort claims under New York choice-of-law principles, English law will apply.

In analyzing tort claims, New York has adopted an "interest analysis," which requires the court to apply the law of the jurisdiction with the greatest interest in the litigation. *Krock v.. Lipsay* 97 F.3d 640, 645 (2d Cir.1996). To determine the greater interest, the court must consider two things: "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." *Id.*
In all interest analyses, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort.... The respective importance of each of those contacts is determined by the nature of the law in question. Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws, whereas those cases concerning loss allocation will turn in significant part on the domiciles of the parties.

*7 *Id.* at 646.

Since the present case entails conduct-regulating laws and the parties are domiciled in different countries, the locus of the tort will be determinative. Plaintiffs claim that New York should be the locus of the tort because decisions regarding the fate of their project were made at Citibank headquarters in New York.[FN1] However, London was the locus of the majority of the actions, from negotiations through promotion of the investment, relevant to the tort claims in this case. The misrepresentations allegedly made by Citibank occurred during negotiations in London, and the alleged tortious injuries were caused, if not directly in England, by SAMBA's English office. Since the alleged fraudulent actions occurred in England, England is the locus of the tort. *See Sussman v. Bank of Israel,* 801 F.Supp. 1068, 1074 (S.D.N.Y.1992). Since England has the greatest interest in this case, under New York law English law would be applied to the tort claims.

> FN1. Citing *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112 (2d Cir.1984), and *Sussman v. Bank of Israel,* 801 F.Supp. 1068 (S.D.N.Y.1992), *aff'd,* 990 F.2d 71 (2d Cir.1993), Plaintiffs also assert that the law of a bank's headquarters must be applied whenever activities occurring within those headquarters are at issue. However, both *Ferer* and *Sussman* are distinguishable because in each case the location of the bank's headquarters was also the locus of the tortious activities.

### b. Choice of Law-Contract Claims

A determination of which law should govern Plaintiffs' contract claims depends on the application of the choice-of-law provision in the contract signed by SAMBA and Plaintiffs. That provision declared Saudi Arabian law as the law governing "this agreement and each party's rights and obligations hereunder." (Goldsmith Decl. Ex. A at 7.) Since Citibank is the defendant in this suit, not SAMBA, the choice-of-law provision would seem inapplicable. However, Plaintiffs are maintaining that Citibank might qualify as a "party" within the meaning of the provision because SAMBA is controlled by Citibank. For the purposes of this motion, however, the court need not decide whether the provision is controlling.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Like the analysis governing the tort claims, here it is sufficient to consider which law would govern in either case.

If the choice-of-law provision is applicable, then Saudi Arabian law would govern the contract claims. If the choice-of-law provision is not applicable, then New York conflicts-of-law rules would apply. New York courts again perform an "interest analysis" and hold that the "the law of the jurisdiction having the greatest interest in the litigation controls." *Wm. Passalacqua Builder's v. Resnick Developers,* 933 F.2d 131, 137 (2d Cir.1991). That interest is determined by inquiry into a number of factors, including "the place of: (1) contracting, (2) negotiation of the contract, (3) performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.*

The place of negotiation and contracting was England. (Compl.¶ ¶ 19, 29.) The place of performance was worldwide, but specifically excluded the United States. (Compl.¶ ¶ 24, 29.) The subject matter of the contract, the project, was located in Lebanon. (Compl.¶ 1.) The citizenship, domiciles, residences and places of incorporation and business of the parties include England, Cyprus, Saudi Arabia, Switzerland and the United States. (Compl. ¶ ¶ 7, 8, 9, 20; Pls.' Mem. Opp'n at 5-6.) Based on these factors, England clearly has a greater interest in this litigation than the United States. Therefore, should the should the choice-of-law provision not apply, English law would be applied to the contract claims.

**\*8** This court is, therefore, being asked to consider a case in which no American law is at issue and all questions would likely be resolved under foreign law. While this court is presumably capable of analyzing both English and Saudi Arabian law, in this case it is appropriate for English courts to decide questions of English law. Moreover, English courts can analyze Saudi Arabian law as easily as American courts. Thus, the factor considering familiarity with the law weighs heavily in favor of dismissal.

### 4. Other Factors

Currently, there is a first-filed action pending before an English court dealing with the same series of transactions and alleging similar claims against the law firm of Jones, Day, Reavis & Pogue and

Mohamed Amersi. (Paterson Decl. Ex. 1.) In the interests of efficiency, the avoidance of duplicative litigation, and consistency of result, this suit would be better off consolidated with the pending English suit, or, at the very least, litigated in the same forum. Plaintiffs, however, chose not to inform this court that such an action was pending. The reasonable inference is that Plaintiffs were aware this court would prefer to defer litigation while a foreign court considered pending litigation on the same issues, particularly since decisions in either court could have a significant impact on the other pending case.

### E. Deference to Pending Foreign Proceeding

Since the court is dismissing this case on grounds of forum non conveniens, the court need not address Defendant's argument that this case should be stayed or dismissed in deference to actions pending in England.

### III. CONCLUSION

Balancing the *Gulf Oil* factors strongly favors England as a more convenient alternative forum in this case. In addition to maintaining close connections to England, Plaintiffs are foreign and, therefore, deserve less deference in their choice of forum. Many of the witnesses reside in England or are British nationals; moreover, Citibank has agreed to produce any required documents and witnesses in England. The alleged events occurred primarily in England, and foreign law will apply to both the tort and contract claims. While court congestion is not a significant factor here, this community has limited interest in the controversy, and it would unfairly burden a local jury to hear this case. Finally, this suit would best be considered in tandem with the suit currently pending in England dealing with the same alleged events that was filed prior to the present suit. For the foregoing reasons, Defendant's motion to dismiss for forum non conveniens is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED:

S.D.N.Y.,2001.
Saab v. Citibank, N.A.
Not Reported in F.Supp.2d, 2001 WL 1382577 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**14**

LEXSEE 1990 U.S. DIST. LEXIS 11862

**STUART I. SPRINGER, Plaintiff, v. KENNETH I. SINGER and KENNETH I. SINGER & COMPANY, P.C., Defendants**

**No. 88 Civ. 2484 (MJL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1990 U.S. Dist. LEXIS 11862*

**August 29, 1990, Decided
September 11, 1990, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff individual filed a five-count complaint against defendants, a corporation and a principal thereof, alleging liability for their failure to give proper advice on tax shelters, which resulted in an unfavorable tax ruling to plaintiff in his effort to use such shelters. Defendants filed a motion to dismiss the complaint due to insufficient service of process.

**OVERVIEW:** A copy of the summons and complaint were inserted in the door handle of the principal's residence, additionally, two copies of the summons were also delivered to the principal at his business office. Because the principal was a nonresident, the court declared that Fed. R. Civ. P. 4(e) was applicable, and it required service to be made under the law of the forum state. Thus, the court analyzed service according to the strictures of N.Y. C.P.L.R. 308, which governed service upon nonresidents who were not designated as agents of the corporation for service of process. The court found that plaintiff's act of leaving a copy of the summons and complaint in the principal's door handle most closely resembled the "nail and mail" method authorized by N.Y. C.P.L.R. 308(3). However, because a copy of the summons and complaint were not mailed to defendant, the service did not meet the requirements of 308(3). Though plaintiff had submitted an affidavit of service, because it only swore to service of the summons upon the principal, and not to service of the complaint upon him, it was insufficient. Service on the corporation failed to satisfy N.Y. C.P.L.R. 311(1), 308.

**OUTCOME:** The court granted defendants' motion to dismiss the complaint filed against it by an individual.

**COUNSEL:** [*1]

DAVIDOFF & MALITO, Attorneys for Plaintiff, New York, New York, BY: MARK E. SPUND, ESQ.

DONALD H. GREENER, P.C., Attorney for Defendants, New York, New York.

**JUDGES:**

Mary Johnson Lowe, United States District Judge.

**OPINION BY:**

LOWE

**OPINION:**

OPINION AND ORDER

Before this Court is defendants' motion to dismiss the complaint in the above-captioned action due to insufficient service of process. For the reasons discussed below, defendants' motion is granted. n1

> n1 Defendants also moved to dismiss Counts II and V of the complaint for failure to state a claim. Since we dismiss the complaint for insufficiency of process, however, we need not determine whether these claims are viable.

BACKGROUND

1990 U.S. Dist. LEXIS 11862, *

Plaintiff Stuart I. Springer, filed this five-count complaint against defendants, Kenneth I. Singer and Kenneth I. Singer & Company, P.C., seeking damages stemming from the purchase of certain tax shelters and a subsequent unfavorable tax ruling by the Internal Revenue Service as to those shelters.

Plaintiff initially attempted service of process on defendants by [*2] leaving a copy of the Summons and Complaint in the handle of the door of defendant Singer's residence at 9 High Point Road, Westport, Connecticut. After defendants made the present motion to dismiss for insufficiency of process, plaintiff attempted again to serve defendants by delivering two copies of a summons to defendant Kenneth I. Singer at his business's New York office. Singer is President of Singer & Company, C.P.A., P.C., which is a corporation organized and existing under the laws of the State of Connecticut, with an office at 342 Madison Avenue, New York, New York. Defendants have since asserted that this subsequent process was insufficient as well.

DISCUSSION

Defendant Singer is a resident of Connecticut. *Rule 4(e) of the Federal Rules of Civil Procedure* authorizes service upon a party not an inhabitant of or not found within the state. That service must be made under the circumstances and in the manner prescribed by the law of the state in which the forum court is located. See *David v. Musler, 713 F.2d 907 (2nd Cir. 1983)*. New York Civil Practice Law and Rules ("CPLR") Section 313 requires that service outside of New York must be made "in the same manner as service [*3] is made within the state." CPLR § 313.

Under CPLR § 308, service upon an individual, who has not designated an agent within the state for service of process, may be made in one of three ways: (1) by delivering the summons to the person personally; (2) by delivering the summons to a person of suitable age and discretion at his actual place of business, dwelling place or usual place of abode and then mailing the summons to the person to be served at his last known residence or at his actual place of business ("leave and mail" method); and (3) where service cannot be made by delivery to the person to be served or to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person, then by affixing the summons to the door of the person's actual place of business, dwelling place or usual place of abode and then mailing the summons to the person to the person at his last known residence or to his actual place of business ("nail and mail" method).

In the instant action, plaintiff's manner of service to Singer -- leaving a copy of the Summons and Complaint in the handle of the door of defendant Singer's residence -- most closely [*4] resembles the "nail and mail" method. The actual service of process attempted however was insufficient since plaintiff only nailed the summons and complaint; he never mailed them.

Plaintiff's subsequent attempt to serve defendant Kenneth I. Singer was also insufficient. *Fed.R.Civ.P. 4(d)* requires that "[t]he summons and complaint shall be served together." Although the form affidavits of service sworn to by Alain Natchev on August 10, 1988 allege that the Summons and Complaint were both served upon Singer, see Affidavit in Opposition to Motion to Dismiss, Exhibit B, a more detailed affidavit of Alain Natchev sworn to on August 5, 1988 and submitted in opposition to defendant's motion to dismiss states only that a copy of the summons was served, see Affidavit in Opposition to Motion to Dismiss. Moreover, Kenneth Singer states by affidavit that he received only two copies of a summons unaccompanied by any other papers. See Affidavit of Kenneth I. Singer. Such service is insufficient under *Fed.R.Civ.R. 4(d)*.

The only other procedure for service of process by which plaintiff could have perhaps proceeded was under Rule 4(c)(2)(C)(i) which provides that a summons and complaint [*5] may be served upon an individual or corporate defendant "pursuant to the law of the State in which the district court is held for the service of summons or other like process upon such defendant in an action brought in the courts of general jurisdiction of that state." *Fed.R.Civ.P. 4(c)(2)(C)(i)*. The only relevant state procedure for service on an individual is CPLR § 305(b) which provides that:

if the complaint is not served with the summons, the summons shall contain or have attached thereto a notice stating the nature of the action and the relief sought . . . . the sum of money for which judgment may be taken in case of default.

Under § 305(b), a summons served with neither a notice nor a complaint is jurisdictionally defective. *Village of Wellsville v. Atlantic Richfield Co., 608 F.Supp. 497, 498 (W.D.N.Y. 1985)* (citing *Parker v. Mack, 61 N.Y.2d 114, 472 N.Y.S.2d 882 (1984))*. Delivery of a bare summons clearly does not satisfy the requirements of CPLR § 305(b).

Counsel for plaintiff argues that both attempts at service were proper because a phone call from defendants' counsel indicated that defendants had received notice of the lawsuit. The law is clear however that [*6] notice of suit does not remedy otherwise defective service or in any way bar dismissal of an action for insufficiency of service. See *Martin v. New York State Department of Mental Hygiene, 588 F.2d 371, 373 (2nd Cir. 1978); Leab v. Streit, 584 F.Supp. 748, 760*

1990 U.S. Dist. LEXIS 11862, *

(S.D.N.Y. 1984); *Gianna Enterprises v. Miss World (Jersey) Ltd., 551 F.Supp. 1348 (S.D.N.Y. 1982)*. See also *Parker v. Mack, 61 N.Y.2d 114, 472 N.Y.S.2d 882*.

As a final matter, the attempts at service were also defective as to the corporate defendant, Kenneth I. Singer & Company, P.C.. Under CPLR § 311(1), a New York or foreign corporation may only be personally served with process by delivering the summons to "an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." CPLR § 311(1). Service on any individual authorized to receive process for a corporation must be made in the manner prescribed by CPLR § 308, governing service on natural persons. Again, mere delivery of the bare summons to Mr. Singer does not constitute proper service under CPLR § 308 or § 305(b).

Since service of process as to both defendants has [*7] repeatedly been defective, no jurisdiction has been obtained over them. Accordingly, defendants' motion to dismiss the complaint is granted.

It Is So Ordered.

**15**

All England Commercial Cases/2002/Volume 2 /Swithenbank Foods Ltd v Bowers - [2002] 2 All ER (Comm) 974

[2002] 2 All ER (Comm) 974

## Swithenbank Foods Ltd v Bowers

**[2002] EWHC 2257 (QB)**
**QUEEN'S BENCH DIVISION AT LEEDS (MERCANTILE COURT)**

**JUDGE McGONIGAL (SITTING AS A JUDGE OF THE HIGH COURT)**

**21 JUNE, 19 JULY 2002**

*Conflict of laws - Jurisdiction - Civil and commercial matters - Contract of employment - Jurisdiction over individual contracts of employment - Claimant alleging breach of contractual duty and conspiracy against defendant employee - Whether statutory provision that employer might bring proceedings only in domicile of employee applicable - Whether court having power to determine under statutory provision each claim included in claim form - Whether permission to serve out of jurisdiction required - Whether service effective - Council Directive (EC) 44/2001, section 5, art 20 - CPR 6.19(1A).*

The claimant issued a claim form against nine defendants alleging breach of duty or conspiracy or both. The first and the third to ninth defendants had been employees of the claimant. The claim form and the particulars of claim were served out of the jurisdiction on the third defendant without the permission of the court in reliance on CPR 6.19(1A). The particulars of claim contained two claims against the third defendant, a tort claim on the basis that he had conspired with the other defendants to unlawfully interfere with the claimant's contractual relationship with a supplier (the conspiracy claim) and a claim that he had acted in breach of his duty of fidelity as an employee in joining the conspiracy and carrying it out (the employment claim). The third defendant applied for an order that the court did not have jurisdiction to try him because he was domiciled in France, the contract related to a contract of employment, and, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters) (OJ 2001 L12 p 1) (the Brussels Regulation), such an action might be commenced only in the courts of the member state in which the defendant was domiciled. In relation to the conspiracy claim, the claimant submitted that section 5 of the Brussels Regulation[a], which included art 20 and which governed 'matters relating to individual contracts of employment', related only to claims in contract brought qua employer. It was held that art 5(3)[b] of the Brussels Regulation gave the English courts jurisdiction over the conspiracy claim unless section 5 applied. As to the employment claim, the claimant conceded that if the claim fell within section 5, then it could not rely upon art 6(1)[c] (which provided for a person who was one of a number of defendants to be sued in the domicile of any one of them provided that the claims were so closely connected that it was expedient to hear and determine then together) to found jurisdiction.

**Held** - (1) Section 5 of the Brussels Regulation, including art 20, related only to jurisdiction over contractual claims under individual employment contracts. It did not relate to proceedings brought qua employer against a defendant qua employee and did not relate to any claim on any basis where the claimant

*[2002] 2 All ER (Comm) 974 at 975*

happened to be the defendant's employer. Article 5 of the regulation drew a distinction between 'matters relating to a contract' and 'matters relating to a tort', and the heading of section 5 was 'Jurisdiction over individual contracts of employment'. It followed that the phrase 'in matters relating to individual contracts of employment' in that section effectively meant 'where claims are made under individual contracts of

employment'. Where a claimant brought a claim, independently of the contract of employment, against a defendant who was or had been his or her employee, prima facie that claimant should be permitted to bring the claim if the court would have jurisdiction over that claim if the defendant was not or had not been the claimant's employee. The courts would be astute to prevent an employer seeking to dress up a claim under an employment contract as one not made under such a contract, but that was not so in the instant case. Such an interpretation of the phrase 'matters relating to individual contracts of employment' provided a clear test and led to high predictability regarding jurisdiction. Moreover, there was no policy justification for conspirators or other tortfeasors who were employees of the claimant receiving jurisdictional advantages not enjoyed by conspirators or other tortfeasors who were not employees of the claimant. Accordingly, the court had jurisdiction over the conspiracy claim (see [25], [26], below).

(2) The employment claim was expressly based on breaches by the third defendant of implied terms of his contract of employment. Those breaches were pleaded as breaches of the duty of fidelity owed otherwise than under an implied term of the contract. If the pleading were amended to remove the claim based on the implied term, the court would regard the claim as an employment contract claim dressed up as one made outside the contract of employment. As presently pleaded, the employment claim clearly fell within section 5 of the Brussels Regulation and was, therefore, a claim which could only be brought against the third defendant in a French court as provided by art 20. Since the claim fell within section 5, the claimant could not rely on art 6(1). It followed that the court did not have jurisdiction over the employment claim. The third defendant's application would be treated as an application to set aside service of the claim form and particulars of claim: as the claim form and particulars of claim which the claimant had purported to serve on the third defendant in France contained the employment claim, which the court had no power to determine under the Brussels Regulation, the requirement for the permission of the court for service of out of the jurisdiction was not obviated by CPR 6.19(1A). Accordingly, as permission of the court for service out of the jurisdiction had been necessary and had not been obtained, the service on the third defendant was ineffective and would be set aside (see [27]-[29], below).

Notes

For individual contracts of employment and the Brussels Convention, and for service out of the jurisdiction where the permission of the court is not required, see respectively 8(1) *Halsbury's Laws* (4th edn reissue) para 641 and 37 *Halsbury's Laws* (4th edn reissue) para 345.

### Cases referred to in judgment

*Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* Case 21/76 [1978] QB 708, [1977] 3 WLR 479, [1976] ECR 1735, ECJ.

*Shevill v Presse Alliance SA* [1992] 1 All ER 409, [1992] 2 WLR 1, CA; *affd.*[1996] 3 All ER 929, [1996] AC 959, [1996] 3 WLR 420, HL.

*[2002] 2 All ER (Comm) 974 at 976*

### Case also cited or referred to in skeleton arguments

*Somafer SA v Saar-Ferngas AG* Case 33/78 [1978] ECR 2183.

### Application

Andrew Foster, the third defendant to claims of breach of contractual duty and conspiracy brought by the claimant, Swithenbank Foods Ltd, applied for an order that the court had no jurisdiction to try the claims against him on the ground that the action related to a contract of employment and that, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters), such an action might be commenced only in the courts of his domicile, France. The facts are set out in the judgment.

*Michael James* (instructed by *Last Cawthra Feather*, Shipley) for Mr Foster.

*Hugh Jory* (instructed by *Walker Morris*, Leeds) for the claimant.

*Cur adv vult*

**19 July 2002. The following judgment was delivered.**

**JUDGE McGONIGAL.**

[1] On 27 March 2002 the claimant issued a claim form against the nine defendants alleging 'breach of duty and/or contract and/or conspiracy'. The claim form stated that the High Court has power to hear the claim under the Civil Jurisdiction and Judgments Act 1982 and added: 'The third defendant is a British national residing in France and will understand the contents of the claim.' The claim form and particulars of claim were served on the third defendant (Mr Foster) in France without any leave of the court in reliance on CPR 6.19 and the statement on the claim form quoted above was intended to comply with CPR 6.19(3).

[2] On 29 May 2002 Mr Foster made an application for an order that the court has no jurisdiction to try the claim against him because he is domiciled in France, the claim relates to a contract of employment and, pursuant to art 20 of Council Regulation (EC) 44/2001 (on jurisdiction in civil and commercial matters) (OJ 2001 L12 p 1) (the Brussels Regulation), such action may only be commenced in France. It is common ground that Mr Foster is domiciled in France. His application raises the issue of the scope of section 5 of the Brussels Regulation.

[3] The claimant's case as set out in the particulars of claim is as follows. (1) Until the claimant acquired the business and assets of JW Swithenbank Ltd (Swithenbank) from its receivers in January 2000, that company had been owned, controlled and run by the sixth defendant, Mr Paul Kershaw and its Eurosales division had been managed by the fourth defendant, Mr Jonathan Kershaw (a son of Mr Paul Kershaw) and run by its Paris depot manager, Mr Foster, and its sales executive, the first defendant (Mr Bowers). After the claimant's acquisition of the Eurosales division Mr Jonathan Kershaw, Mr Foster and Mr Bowers continued to run the Eurosales division as employees of the claimant. (2) The wholesale division of Swithenbank was managed by Mr Simon Kershaw (a son of Mr Paul Kershaw). Mr Simon Kershaw continued to manage it as an employee of the claimant after its acquisition by the claimant until 12 July 2001 when he ceased to be an employee when the wholesale division was purchased by the second defendant (Burbank Produce Ltd) which is a company owned by Mr Simon Kershaw and his parents. (3) Another division of Swithenbank continued to be

*[2002] 2 All ER (Comm) 974 at 977*

managed after January 2000 by another son of Mr Paul Kershaw, the fifth defendant, Mr Noel Kershaw, as an employee of the claimant. The eighth (Mr Nicholls) and ninth defendants (Mr Thompson) are the former administration manager and chief executive respectively of Swithenbank who became employees of the claimant in January 2000. Mr Paul Kershaw became a consultant with the claimant for 12 months from the time of the acquisition in January 2000. (4) The claimant's case is that (a) the vast majority of its potatoes were sourced from Pom'Alliance, a French co-operative under a 'joint business arrangement'; (b) by 27 April 2001 Mr Jonathan Kershaw and Mr Thompson had created, during working hours and using the claimant's equipment, a document to be used to solicit Pom'Alliance to become an investor in a joint venture (known as the ETC project) which the employees of the Eurosales division, Mr Jonathan Kershaw, Mr Foster and Mr Bowers, would join; (c) Mr Jonathan Kershaw and Mr Paul Kershaw approached Mr Bowers to solicit him to join the proposed joint venture; (d) by 12 September 2001 all the defendants, including Mr Foster, had combined with the intention of unlawfully interfering with the claimant's contractual relationship with Pom'Alliance, by soliciting Pom'Alliance to join the proposed joint venture; (e) Pom'Alliance was to be

solicited to join by Mr Jonathan Kershaw and Mr Foster who would do this at a meeting organised with Pom' Alliance on the claimant's business; (f) at that meeting on 14 September 2001 Mr Jonathan Kershaw and Mr Foster solicited Pom'Alliance to join the proposed joint venture; (g) the defendants continued to develop the idea of the proposed joint venture with Pom'Alliance until they were found out by the claimant which investigated what they had been doing, suspended those defendants who were its employees and took the necessary security measures at a cost of about £313,000 which it claims in damages from the defendants.

[4] The case against Mr Foster is contained in the following three paragraphs of the particulars of claim:

'22. By 12 September 2001, the defendants (Burbank acting through Paul Kershaw and Simon Kershaw who also acted on their own behalves) had combined with the intention of unlawfully interfering with the claimant's contractual relationship with Pom'Alliance and injuring the claimant, by soliciting Pom'Alliance to join the ETC project through Jonathan Kershaw and/or Andrew Foster, who in breach of duty and/or contract would take advantage of a meeting organised with Pom'Alliance on the claimant's business to propose the ETC project.  The said combination (save in the case of Burbank, Paul Kershaw and Simon Kershaw) was also a breach of their duty of fidelity and in particular those set out in sub-paras 9(i)-(ix) above ...

'24. On 14 September 2001, Jonathan Kershaw and Andrew Foster met Mr Luraschi of Pom'Alliance on the claimant's business in France and in breach of duty set out in sub-paras 9(i)-(viii) above solicited Pom'Alliance to join the ETC project ...

'31. Furthermore, Jonathan Kershaw in breach of duty set out in sub-paras 9(i), (ii), (x) and (xi) above failed to report to the directors of the claimant Andrew Foster's breach of duty in discussing the ETC project with Mr Luraschi during the meeting on 14 September 2001 and Andrew Foster in breach of duty (as set out against Jonathan Kershaw aforesaid) failed to report Jonathan Kershaw.'

The breaches of duty set out in para 9 are pleaded as specific aspects of the duty of fidelity which, according to para 8, those defendants, including Mr Foster, who

*[2002] 2 All ER (Comm) 974 at 978*

were employees of the claimant owed to the claimant as its employees.  In the alternative those duties are pleaded as implied terms of their contracts of employment.

[5] These paragraphs contain two claims against Mr Foster: (a) a tort claim on the basis that he conspired with the other defendants to unlawfully interfere with the claimant's contractual relationship with Pom'Alliance (the conspiracy claim); and (b) a claim that he acted in breach of his duty of fidelity as an employee in joining the conspiracy and carrying it out (the employment claim). The conspiracy claim is contained in paras 22 and 24; the employment claim is contained in paras 22, 24 and 31.

[6] The Brussels Regulation came into force on 1 March 2002 (art 76) and applies only to legal proceedings instituted after that date (art 66); it therefore applies to this action started on 27 March 2002.  The Brussels Regulation largely supersedes the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 (as set out in Sch 1 to the 1982 Act) (art 69).  The Brussels Regulation has direct effect.

[7] The Brussels Regulation is in many respects very similar to the Brussels Convention.  Article 2(1) provides that 'subject to this Regulation, persons domiciled in a Member State shall, whatever their

nationality, be sued in the courts of that Member State' and art 3(1) provides that 'Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter'. It is common ground that Mr Foster is domiciled in France. Accordingly, Mr Foster can only be sued in England if the rules in sections 2-7 allow it.

[8] Section 2 of the Brussels Regulation is headed 'Special Jurisdiction'. Articles 5 and 6 of that section provide as follows:

*'Article 5*

A person domiciled in a Member State may, in another Member State, be sued ...

3. in matters relating to tort, *delict* or *quasi-delict*, in the courts for the place where the harmful event occurred or may occur ...

*Article 6*

A person domiciled in a Member State may also be sued:

1. where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings ...'

[9] Subject to the question whether it is a matter 'relating to an individual contract of employment' (see [11]-[26], below) the conspiracy claim is within the jurisdiction of the English court if 'the harmful event occurred' in England. The similar phrase in art 5(3) of the Brussels Convention has been held to give a claimant the option to sue either in the country where the damage occurred or in the country where the event giving rise to the damage occurred (see *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* Case 21/76 [1978] QB 708, [1977] 3 WLR 479, [1976] ECR 1735). The claimant seeks to recover the cost of an investigation (which took place both in England and in France) of a conspiracy (which took place in both countries). There is no allegation that Mr Foster did anything pursuant to the alleged conspiracy outside France but the harmful event is the conspiracy, not the particular acts of individual conspirators, and the
*[2002] 2 All ER (Comm) 974 at 979*

investigation was of the conspiracy as a whole. In *Shevill v Presse Alliance SA* [1992] 1 All ER 409, [1992] 2 WLR 1 the Court of Appeal held that the English courts had jurisdiction under art 5(3) of the Brussels Convention in relation to a libel claim where the libel concerned was published both in France and in England. I find, therefore, that the English courts have jurisdiction over the conspiracy claim by virtue of art 5(3) of the Brussels Regulation unless section 5 applies to that claim.

[10] Even if I am wrong on that, the English courts have jurisdiction (subject to section 5) over the conspiracy claim by virtue of art 6(1) of the Brussels Regulation. The other defendants are domiciled in England and the conspiracy claim against Mr Foster is the same conspiracy claim advanced against those other defendants. There could not be a closer connection.

[11] However, Mr Michael James, counsel for Mr Foster, submitted that the conspiracy claim (a) cannot be heard in the English courts because it relates to Mr Foster's contract of employment so that only the French courts have jurisdiction under art 20, and (b) cannot be heard under arts 5(3) or 6(1) because the only exceptions to the exclusive jurisdiction conferred in this case on the French court by section 5 of the Brussels Regulation are in arts 4 and 5(5) which are referred to in art 18(1); but (c) can only be heard by the French courts.  Mr Hugh Jory for the claimant submitted that the jurisdiction conferred by section 5 applies only to claims brought qua employer and that section 5 applies only to contract claims.

[12] The full text of section 5 is as follows:

**'Jurisdiction over individual contracts of employment**

*Article 18*

1. In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

2. Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

*Article 19*

An employer domiciled in a Member State may be sued:

1. in the courts of the Member State where he is domiciled; or

2. in another Member State: (a) in the courts for the place where the employee habitually carries out his work or in the courts for the last place where he did so, or (b) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

*Article 20*

1. An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

*[2002] 2 All ER (Comm) 974 at 980*

**Article 21**

The provisions of this Section may be departed from only by an agreement on jurisdiction:

1. which is entered into after the dispute has arisen; or

2. which allows the employee to bring proceedings in courts other than those indicated in this Section.'

Section 5 includes provisions regarding jurisdiction in matters relating to individual contracts of employment which were contained in arts 5(1) and 17 of the Brussels Convention.

[13] There are parts of the preamble to the Brussels Regulation which must be taken into consideration. These are recitals (11)-(15) which read as follows:

'(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

'(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.

'(13) In relation to insurance, consumer contracts and employment, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules provide for.

'(14) The autonomy of the parties to a contract, other than an insurance, consumer or employment contract, where only limited autonomy to determine the courts having jurisdiction is allowed, must be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

'(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States. There must be a clear and effective mechanism for resolving cases of *lis pendens* and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously.'

[14] Where parties to an alleged tort, such as conspiracy, are domiciled in different member states there is an obvious tension between the principle that jurisdiction is generally based on the defendant's domicile (recital (11)) and the need to minimise the possibility of concurrent proceedings with the danger of irreconcilable judgments (recital (15)). In resolving that tension when the defendant is an employee the court must have regard to the policy set out in recital (13).

[15] Mr James for Mr Foster submitted that the conspiracy claim relates to Mr Foster's contract of employment and that in the phrase 'matters relating to individual contracts of employment' one could read 'matters' as 'claims'. He referred to recital (13) of the preamble and argued that, if tortious claims connected with employment were outside section 5, employers could get round section 5 by framing claims in tort rather than in contract. He pointed out that in

*[2002] 2 All ER (Comm) 974 at 981*

this case the same alleged facts found both a claim in conspiracy and a claim for breach of Mr Foster's contract of employment.

[16] Mr Jory submitted that section 5 (including art 20) relates only to jurisdiction over contractual claims under individual employment contracts, that it relates only to proceedings brought qua employer against a defendant qua employee and that it does not relate to any claim on any basis where the claimant happens to be the defendant's employer. As to recital (13) of the preamble he submitted that the words 'in relation to ... employment' was a reference to section 5 and should not be given a wider meaning than 'in matters relating to individual contracts of employment'. He further submitted that the reference to the weaker party's interests is consistent with the considerations in art 6 and does not exclude them. The reference is not to the weaker party's preferences or envisaged strategic advantages but to his legitimate interests which are the same as the interests of justice which are the basis of art 6(1).

[17] The wording of section 5 indicates that it is concerned to protect the employee as the weaker party (see recital (13) of the preamble) in two ways. First it is concerned to prevent employers taking unfair advantage of an employee when the terms of the employment contract are negotiated or, more often, presented to the employee. Article 21 prevents the employer from obtaining the employee's agreement to a different jurisdiction from that of the employee's domicile when the contract of employment is being negotiated. Secondly section 5 is concerned to give the employee jurisdictional advantage if a dispute arises. Section 5 of the Brussels Regulation gives the employee a choice of jurisdiction in which to sue the employer (arts 18(2) and 19) but limits the employer to bringing proceedings only in the courts of the member state in which the employee is domiciled (art 20). I accept Mr Jory's submission that 'employment' in recital (13) of the preamble is a reference to section 5 of the Brussels Regulation and does not enlarge the meaning of the phrase 'in matters relating to individual contracts of employment' in art 18(1).

[18] That phrase may well cover situations where there is no contract of employment. Mr James drew my attention to the Giuliano and Lagarde Report on the Rome Convention (OJ 1980 C282 p 1). Article 6 of the Rome Convention on the Law Applicable to Contractual Obligations 1980 (as set out in Sch 1 to the Contracts (Applicable Law) Act 1990) uses the same phrase 'individual contracts of employment' and prevents a choice of governing law from depriving the employee of the protection afforded by the mandatory rules of the law which would normally be applicable in the absence of any such choice. In that report (at p 25) the authors comment that the 'wording of Article 6 speaks of "contract of employment" instead of "employment relationship" as in the original preliminary draft' and express the view (at pp 25-26) that 'individual contract of employment' covers void contracts and de facto employment relationships.

[19] It appears from this that those who negotiated the Rome Convention considered that 'employment relationship' was too broad a term and that there was a decision to limit the provisions in that convention to the narrower phrase of 'matters relating to individual contracts of employment'. The extension of meaning suggested by Giuliano and Lagarde is an extension to cover circumstances, other than the making of an

individual contract of employment, by which the relationship of employment/employee was or may have been initially established.  There may be good policy reasons to construe 'matters relating to individual contracts of employment' sufficiently widely to cover disputes where there are disputes about the employment relationship but possibly no contract of employment but I do not think it is permissible to

*[2002] 2 All ER (Comm) 974 at 982*

construe it as if it read 'matters relating to an individual employment relationship' when a choice has been made to use a different phrase.

[20] The issue for decision here is whether a tort claim of conspiracy against Mr Foster, founded on the allegation that he and Mr Jonathan Kershaw took advantage of a meeting with Pom'Alliance, which they arranged and attended as employees of the claimant, to solicit Pom'Alliance to participate in the proposed joint venture, is a matter related to an individual contract of employment.  The same facts are pleaded as the foundation for a claim that Mr Foster was in breach of his contract of employment.  It could be said that, if Mr Foster had not been an employee holding the position he held, he would not have been a conspirator since his value as a conspirator was, on the facts as alleged, that he had an existing relationship with Pom'Alliance in his capacity as an employee of the claimant.

[21] Recital (11) of the preamble to the Brussels Regulation says that the rules of jurisdiction should be 'highly predictable'.  It would not be possible to achieve that if the answer to the question whether a tort claim against an employee did or did not fall within the exclusive jurisdiction conferred by art 20 depended on the extent to which the fact that the defendant was an employee of the claimant was a material element in the events giving rise to the claim.

[22] The usual explanation for the reference to *individual* contracts of employment is to exclude collective bargaining agreements.  One reason for this is that, if a collective bargaining agreement covers employees in more than one jurisdiction, there would be a multiplicity of proceedings.  Recital (15) of the preamble makes it clear that the Brussels Regulation is intended 'to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States'.  If a claim is made under an individual contract of employment there can only be one employee defendant and, therefore, no need for concurrent proceedings with the possibility of irreconcilable judgments.  If a claim is made against an employee otherwise than under an individual contract of employment, there is the possibility of co-defendants and, therefore, the possibility of concurrent proceedings and irreconcilable judgments.

[23] Mr James relied on the express references to arts 4 and 5(5) in art 18(1) as an indication that art 6 cannot apply 'in matters relating to individual contracts of employment'.  If that phrase is limited to claims based on such contracts then there is little need for art 6.  A single claim cannot be brought against more than one employee or against employees and non-employees.  The danger of irreconcilable judgments is confined to situations where the same facts are the basis for a series of claims against a number of employees domiciled in more than one member state.  The lack of a reference to art 6 supports the narrow interpretation of 'matters relating to individual contracts of employment'.

[24] The policy behind section 5 is based on the probability that the employer is financially stronger than the employee.  Therefore, if one or other of them has to take proceedings in a foreign court, it should be the employer who has to bear the additional cost and inconvenience involved to ensure, so far as practicable, that the parties are on an equal footing so far as jurisdiction is concerned.  The advantage is given to the employee as a member of a class, namely employees, and that advantage should be confined to cases where his status as an employee is legally relevant.  Section 5 should not be construed as conferring jurisdictional advantages on a poor defendant sued by a rich claimant if they happen to be employee and employer.  The reference to 'individual contracts of employment', rather than to the employment relationship generally, indicates that what is relevant is the contract of employment rather than the relationship generally.  The contract of employment is relevant, and there is a matter relating to an

*[2002] 2 All ER (Comm) 974 at 983*

individual contract of employment, only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee.

[25] I can see no justification of policy for conspirators, or any other tortfeasors, who are employees of the claimant being given jurisdictional advantages not enjoyed by conspirators or other tortfeasors who are not employees of the claimant. I accept Mr Jory's submission that section 5 is limited to claims in contract. Article 5 of the Brussels Regulation draws a distinction between 'matters relating to a contract' and 'matters relating to tort' and the heading of section 5 is 'Jurisdiction over individual contracts of employment'.

[26] Accordingly, in my view the phrase 'in matters relating to individual contracts of employment' effectively means 'where claims are made under individual contracts of employment'. I express no view on the question whether it bears an extended meaning as suggested in [19], above. If a claimant brings to the court a claim against a defendant who is or was his employee which is made independently of the contract of employment, prima facie he should be permitted to bring it in that court if the court would have jurisdiction over that claim if the defendant was not the claimant's employer. If an employer sought to dress up a claim under an employment contract as one not made under such a contract no doubt the courts would be astute to prevent him. But that is not this case. To interpret the phrase in this way provides a clear test and leads to high predictability regarding jurisdiction.

[27] I turn, therefore, to the employment claim. This is expressly based on breaches by Mr Foster of implied terms of his contact of employment. Those breaches are pleaded as breaches of the duty of fidelity owed otherwise than under an implied term of the contract. If the pleading were amended to remove the claim based on the implied term this would, in my view, be a case where the court would regard the claim as an employment contract claim dressed up as one made outside the contract of employment. As presently pleaded the employment claim is a claim which falls clearly within section 5 of the Brussels Regulation and, therefore, a claim which can only be brought against Mr Foster in a French court as provided by art 20 of the Brussels Regulation. Mr Jory conceded that, if a claim falls within section 5, then the claimant cannot rely on art 6(1) in order to found jurisdiction.

[28] The application as framed is that this court has no jurisdiction, as suggested by the wording of CPR Pt 11. I have found that it does have jurisdiction over the conspiracy claim but not over the employment claim. I will treat the application as it had been drafted as an application to set aside service of the claim form and particulars of claim.

[29] Mr James relied on CPR 6.19(1A) which permits service of the claim form out of the jurisdiction without permission of the court only 'where each claim included in the claim form made against the defendant to be served is a claim which the court has power to determine under the Judgments Regulation' which is a reference to what I have termed 'the Brussels Regulation'. The claim form and the particulars of claim in this action which the claimant purported to serve on Mr Foster in France contained the employment claim against Mr Foster which the court has no power to determine under the Brussels Regulation. The permission of the court was, therefore, required for service of the claim form and particulars of claim on Mr Foster. No permission was obtained. Service of those documents on Mr Foster was, therefore, ineffective and must be set aside.

*Application allowed.*

Gareth Williams  Barrister.