# EXHIBIT 18-2

1   contractually obligated to cooperate."

2   Over the page on page 44, your Lordship sees at (a):

3   "Defendants worked at Guy Carpenter's UK office.  Defendants were required to give six

4   months' prior notice of termination of employment with Guy Carpenter.  During the

5   ensuing notice period Defendants would remain employed by Guy Carpenter,

6   continue to receive their full salaries and continue to have all the fiduciary and

7   related duties and obligations the plaintiffs as are associated with such

8   employment."

9   My Lord, on 47 and following your Lordship will see that the application is specifically

10  made by reference to schedule 2D.  First paragraph:

11  "Defendants agreed as part of the award to be bound by several restrictive covenants

12  including that during their employment at Guy Carpenter …"

13  Then there is a reference to schedule 2D, the same again, first sentence in the second

14  paragraph, over the page on page 48, your Lordship sees in brackets another

15  reference to schedule 2D, section four.  That is the post-contractual restrictive

16  covenants.  There is a reference then to detrimental activity and again a cross-

17  reference to schedule 2D. On page 51:

18  "The plaintiffs believe Defendants aided in the solicitation and recruitment of some or all

19  of these Guy Carpenter employees who directly or indirectly reported to them.  It

20  cannot be a coincidence that they have left", they say.

21  Over the page on page 52, the sentence beginning:

22  "Rather than aggressively asserting that Defendants have breached their non-solicitation

23  agreements, plaintiffs are diligently requesting in accordance with Defendants

24  contractual obligations which are entirely consistent with their ongoing duties of

25  loyalty as employees that the Defendants provide information. Lastly, at the bottom

26  of the page, it says:

1    "Again, we continue to be employed by them.  We have said we are not working for

2        anyone else.  Therefore it cannot interfere with our obligations.  Defendants have no

3        obligations whatsoever during the normal work day except to provide such

4        information.  Defendants could also continue to have a panoply of obligations to

5        their employer, Guy Carpenter, including the obligation to make themselves

6        available during business hours to provide important information.  It cannot be a

7        meaningful burden for the Defendants to set out what they have been doing during

8        recent months while they have been Guy Carpenter employees."

9    My Lord,  what was said to the New York court was MMC and Guy Carpenter employ the

10        plaintiffs, employ the Claimants.  In their capacity as our employees, they owe us a

11        host of duties.  The Claimants are busy trying to solicitor our other employees and

12        because they are doing that you must grant us some urgent relief.

13    MR JUSTICE STEEL:  That may be justified; it may not.  I do not know.  It is a matter for

14        the American judge.  What is the point here?  Is this prejudice or is this some form

15        of estoppel?  What is the point you are making?

16    MS BLANCHARD:  The broad thrust of what we say is this: under the regulation, in

17        matters relating to their employment, the Claimants are entitled to be sued here.

18        What is happening in America is my clients are being sued by parties claiming to be

19        their employer on the basis that the Claimants work for the US plaintiffs.  That

20        being so, section five of the regulation is in play.

21    MR JUSTICE STEEL:  We will have to look at the regulation, obviously.  That is the

22        crucial thing here.

23    MS BLANCHARD:  We will get to that.  It goes to this also, my Lord, and there are only

24        two more underlying documents to look at: what is being said in this jurisdiction for

25        the Defendants is the bonus contract is not an employment agreement and the

26        Claimants did not work for either Guy Carpenter or MMC.  What we say is that it is

1    simply unacceptable for the Defendants to adopt two diametrically opposed

2    positions.

3    MR JUSTICE STEEL:    Defendants always do that.    They often have diametrically

4    opposed, alternative cases.    That is not of itself particularly surprising.    That is why

5    I asked you the question.    Is this more than prejudice?    Is it estoppel?    What is it?

6    MS BLANCHARD:    It is more than prejudice, my Lord.    This is not about alternative

7    cases.    This is about fundamentally different things being said on both sides of the

8    Atlantic.

9    MR JUSTICE STEEL:    For the purposes of argument I will accept that.    They say here that

10    the employee was MSL.    In America they are saying the employee was Guy

11    Carpenter.    One of them may be wrong.    Both may be wrong, I suppose.

12    MS BLANCHARD:    For the purposes of the regulation, what matters is that my clients are

13    being sued qua employees because it is in matters relating to their contracts of

14    employment that the regulation bites.

15    MR JUSTICE STEEL:    That is why we need to look at the regulation.

16    MS BLANCHARD:    We will get to the regulation, I promise my Lord, momentarily.

17    MR JUSTICE STEEL:    You wanted to look at some other documents?

18    MS BLANCHARD:    My Lord, only two more.    I wanted to show your Lordship the

19    declaration of Ms Mansfield that was put in in support of the urgent application

20    brought on before the New York judge.    Your Lordship will find that in tab four on

21    page 232.    Picking it up on 233 at four she says:

22    "I submit this declaration in support of plaintiffs' motion for expedited discovery.    As

23    demonstrated below, I believe that Guy Carpenter will be harmed if such expedited

24    discovery is not permitted."

25    She goes on to say:

26    "The Defendants have been employed by Guy Carpenter in the (inaudible) Insurance group

22

1     since."

2   At eight:

3   "The Defendants' employment with Guy Carpenter was and continues to be…"

4   MR JUSTICE STEEL:  This is merely a repetition of what is in the complaint, is it not?

5   MS BLANCHARD:  It is, my Lord.  It is important for the reason we will get to in a

6       moment.  At paragraph eight:

7   "The Defendants' employment with Guy Carpenter was and continues to be governed by

8       employment agreements between each Defendant and Guy Carpenter.  Attached are

9       exhibits A to C."

10  Your Lordship does not have them in the bundle as exhibits A to C but exhibits A to C are

11      the UK contracts.  That is, Ms Mansfield is saying the Claimants are employed by

12      Guy Carpenter under the UK contracts.  At 234, under paragraph nine, she says:

13  "We remain employed and receive therefore salaries, continue to have all the duties."

14  She goes on to verify the complaint as your Lordship would expect in these sorts of

15      proceedings.  On 236 at 23 she refers to schedule 2D and so on.  At 238 she

16      declares on the penalty of perjury under the laws of the United States that the

17      foregoing is true and correct. My Lord,  it will not have been a surprise that the way

18      that the case is put against us in New York is and always has been at the forefront

19      of the way that we put our case for an anti-suit injunction.  The same Ms Mansfield

20      has put in a witness statement in opposition to this application.  Your Lordship has

21      that in tab ten.  Your Lordship can see the full extent of what is said about it in

22      these proceedings in tab ten on page three at paragraph nine.  She says:

23  "I realise in the US proceedings there is a reference to the plaintiffs being the employer but

24      that is not the case.  This was pleaded in error.  I understand from our lawyers that

25      this is of no consequence to the US proceedings as the question of jurisdiction is to

26      be determined solely by reference to the provisions of the contract."

1  My Lord, Ms Mansfield does not say what the error is to start with, because it is pretty

2      plain and obvious that the case as put in the US is deliberately put as being an

3      employment relationship.  What she says there is totally inconsistent with her

4      declaration signed on the penalty and perjury in the US.  Your Lordship has from

5      the Defendants two diametrically opposed statements.  While she says it is of no

6      consequences for questions of jurisdiction, a matter which we do not accept,

7      interestingly what she is not saying is that the categorisation of the relationship is of

8      no consequence for the substantive relief claim.  We would say it is obvious that the

9      case has been put as an employee/employer relationship case because it is a

10     necessary constituent of the cause of action in the States.

11  MR JUSTICE STEEL:  You may be right.  I do not know.  It may be a matter for American

12     law or New York law.  I am not sure which.

13  MS BLANCHARD:  That may be, my Lord, but it is unsatisfactory for the full extent of

14     the explanation before your Lordship in the evidence is that there had been an error

15     unidentified by a person unidentified.  To put at its lowest, that simply is not right.

16  MR JUSTICE STEEL:  Who do you say is your clients' employer?  Do you agree that they

17     are wrong?  I am not quite sure what your case is here.  Who is your employer?

18  MS BLANCHARD:  My Lord, for these purposes we say GC, MMC and MSL together are

19     our employers and that whomsoever in ----

20  MR JUSTICE STEEL:  All three?

21  MS BLANCHARD:  All three of them, yes, my Lord.  Whomsoever in the MMC group

22     seeks to enforce the provisions of the bonus contracts against us is doing so in its

23     capacity as employer.

24  MR JUSTICE STEEL:  He could not do it in his capacity as employer unless it was.

25  MS BLANCHARD:  Yes, my Lord.

26  MR JUSTICE STEEL:  Anyway, all three are the employers of your clients.  You rightly

1   say there is not much explanation – indeed, there is no explanation – of what the

2   error is.

3   MS BLANCHARD:  No,  my Lord.  Your Lordship can, if I can put it in this way, read

4        between the lines a bit.  The US plaintiffs have pitched their tent in one particular

5        way for the purposes of getting the relief that they wanted.  There is apparently now

6        some recognition that that might cause them a jurisdictional problem here, subject

7        to what your Lordship decides, and for that reason they are now scrambling around,

8        trying to reconstitute it.  What your Lordship does not see is a promise that Ms

9        Mansfield is going to swear a corrective declaration in the US or indeed that the US

10       proceedings are going to be amended so as to turn them into something other than

11       an employment claim.

12  MR JUSTICE STEEL:  I presume you will not know the answer to this question: has the

13       New York judge seen this statement?

14  MS BLANCHARD:  Not as far as I am aware, my Lord.  I suspect if your Lordship is not

15       minded to grant us relief that the New York judge certainly will be seeing it.

16  MR JUSTICE STEEL:  I hope so, yes.  Whether or not an injunction is (inaudible)

17  MS BLANCHARD:  That may be so, my Lord.  It may be right that it goes before the

18       judge in New York anyway.  Anyhow, based on all of that the US plaintiffs

19       obtained an order for expedited discovery and interrogatories that is the matter that

20       prompts us before your Lordship urgently.  That is, Guy Carpenter and MMC said

21       they needed urgent relief to protect their workforce and to enforce the obligations

22       owed by their employees.  To that end the New York court made an order providing

23       for what, from English eyes, is extremely broad disclosure, answers to

24       interrogatories and an order that my clients attend for depositions.  The original

25       time for compliance with the first two was 1 June.  That has gone into abeyance

26       after last week's hearing.

1    MR JUSTICE STEEL:  What, the interrogatories?

2    MS BLANCHARD:  The interrogatories and the written disclosure.

3    MR JUSTICE STEEL:  What do you mean by "written disclosure"?

4    MS BLANCHARD:  As opposed to oral disclosure by ----

5    MR JUSTICE STEEL:  You mean documentary disclosure?

6    MS BLANCHARD:  I do mean documentary disclosure, my Lord, yes.

7    MR JUSTICE STEEL:  That was originally ordered for 1 June.

8    MS BLANCHARD:  Yes, my Lord.

9    MR JUSTICE STEEL:  That has been postponed until when?

10   MS BLANCHARD:  It has not been postponed formally as such.  It has gone into abeyance

11        because the Defendants have given undertakings not to enforce it pending your

12        Lordship's decision.

13   MR JUSTICE STEEL:  Undertakings to who?

14   MS BLANCHARD:  An undertaking that was given to Mr Justice Underhill that no steps

15        would be taken in those proceedings for a week to enable some time to put some

16        evidence in and get the matter on.

17   MR JUSTICE STEEL:  By "enforce" in what sense?  Simply by – perhaps a silly question

18        – going to the US court to complain there has been a failure to comply and therefore

19        a contempt or in some other way?

20   MS BLANCHARD:  Either, my Lord.

21   MR JUSTICE STEEL:  What is meant by "enforce" here?

22   MS BLANCHARD:  It would involve either going to the New York court to complain that

23        there has been a failure to comply or taking such steps as can be taken in New York

24        to compel compliance.

25   MR JUSTICE STEEL:  That is postponed depending on an undertaking not to enforce it,

26        pending what?

1  MS BLANCHARD:  Until 4.30 today, which is when the Defendants' undertakings expire.

2  The order for oral disclosure by way of deposition, in that respect the US plaintiffs

3  have given notice that they wish to depose my clients in London on 13 to 15 June

4  for a maximum of seven hours each.

5  MR JUSTICE STEEL:  13 June?  That is next Wednesday.

6  MS BLANCHARD:  Yes, my Lord, so next week.  I should explain that the matter comes

7  on in this way because we were originally listed before Mr Justice Underhill.  We

8  got some undertakings at the last minute but the Defendants were only willing to

9  give us undertakings until 4.30 today, which is why the matter comes back on.

10  MR JUSTICE STEEL:  Mr Justice Underhill was sitting in the Commercial Court, was he?

11  MS BLANCHARD:  He was sitting as the applications judge in the vacation.

12  MR ROSEN:  Your Lordship ought to know it came on at very short notice.  We were

13  served on 29 May.  We gave the undertakings over until today and there was an

14  undertaking from the Claimants that they would lodge all the documents with their

15  solicitors by 4.30 today so in other words the question of whether or not we obtain

16  those documents, as far as this court is concerned, could be determined today on

17  proper notice.

18  MS BLANCHARD:  My Lord, Mr Rosen will get his chance and I am trying to get through

19  this as fast as I can.  We did give some undertakings apropos of documents.  We did

20  not give any undertakings apropos of when the Defendants' cross-application might

21  be heard.  On the contrary, it has been listed to be heard if time permits and we will

22  have to see where we go on that.

23  Anyhow, my Lord, where all of that gets us to is this: there is a short point here.  The

24  Claimants are being sued in America on the basis that they are the employees of

25  Guy Carpenter and MMC.  In America they claim to be entitled to enforce the UK

26  contracts and/or they categorise the bonus contracts as being in the nature of

1     employment contracts.  That we say is enough for the purposes of engaging section

2     five of the regulation and getting to a point where we say your Lordship ought to

3     grant anti-suit relief.

4   My Lord, it cannot be right that the Defendants are entitled to adopt totally inconsistent

5     positions on different sides of the Atlantic for which no explanation is offered to

6     your Lordship.  That is what the Defendants say they are entitled to do.  They say,

7     "Even though I am suing you in the US on the basis that I am your employer, and

8     seeking to enforce obligations that you are only as an employee, at one and the same

9     time in England I can deny that I employ you for the very purpose of depriving you

10    of the rights that arise by reason of your status as an employee as a matter of

11    English law."

12  What they are purporting to do is to pick and choose the proper characterisation as it suits

13    them and they are doing it against the background that they are not promising to

14    change in any way the relief that they are seeking in the US so as to reformulate it,

15    if that were possible, as to something which does not offend against the regulation.

16  My Lord, the Defendants are very keen on questions of comity and your Lordship will hear

17    from them on that.  What we say is that comity requires that the Defendants should

18    be held to their election and, having cast themselves as our employers and used that

19    status to procure orders in New York – it is quite clear from the material that that is

20    what they have done – they should then be stuck with it and that that has the

21    ramifications that it has under the regulation for the purposes of English law.

22  My Lord, your Lordship wants to see the regulation and now is perhaps a convenient

23    moment to show it to you.  Your Lordship has the authorities bundle, volume one,

24    tab 21 ----

25  MR JUSTICE STEEL:  This is not a part of regulation 44 that I have been involved with

26    before, I am afraid.  I have dealt with this wretched regulation for a long time but

1      not on employment proceedings.

2    MS BLANCHARD:  My Lord, if we pick it up in the recitals on page 632, at recital eight it

3        says:

4    "There must be a link between the proceedings to which this regulation applies and the

5        territory of the Member States bound by this regulation.  Accordingly common laws

6        on jurisdiction should in principle apply when the Defendant is domiciled in one of

7        those Member States."

8    At 13 and 14:

9    "In relation to insurance consumer contracts and employment the weaker party should be

10       protected by rules of jurisdiction more favourable to his interests than the general

11       rules provided for.  The autonomy of the parties to a contract other than insurance,

12       consumer or employment contract, where only limited autonomy to determine the

13       courts having jurisdiction is allowed, must be respected subject to the exclusive

14       bounds of jurisdiction laid down in the regulation."

15    If your Lordship then looks at section five which is on page 638, first of all, Article 18:

16    "In matters relating to individual contracts of employment jurisdiction shall be determined

17       by this section without prejudice to Article 4 and point five of Article 5.  2.  Where

18       an employee enters into an individual contract of employment with an employer

19       who is not domiciled in a Member State but has a branch, agency or other

20       establishment in one of the Member States, the employer shall in a dispute arising

21       out of the operations of that branch, agency or establishment, be deemed to be

22       domiciled in the Member State."

23    MR JUSTICE STEEL:  The relevance of that?  For this purpose where one of your clients

24       enters into a contract of employment with MSL, let us say, who is not domiciled in

25       a Member State, but has a branch, agency or other establishment.  Where is MSL

26       domiciled?

1    MS BLANCHARD:  MSL is an  English company, my Lord.

2    MR JUSTICE STEEL:  Where does this particular Article take me?

3    MS BLANCHARD:  If we can satisfy your Lordship that the claims in the US are matters

4        relating to individual contracts of employment and that MMC and Guy Carpenter

5        are employers for this purpose, they are deemed to be domiciled here.

6    MR JUSTICE STEEL:  Because they have a branch or agency or establishment here?

7    MS BLANCHARD:  Yes, my Lord.  The easiest way of looking at that branch, agency or

8        other establishment is this: the Claimants were employed in something called the

9        GC FAC Unit and that is a creature of the Guy Carpenter business.  Guy

10       Carpenter's ultimate parent is MMC.  What it does in substance is it gives effect to

11       the public policy underlying the regulation specifically that employers domiciled in

12       non-Member States nonetheless employing employees in the Member States are not

13       entitled to rely on their status as being domiciled outside the Member States to get

14       around the provisions of section five.  It is basically saying, if you are an employee

15       within a Member State, you have the section five rights regardless as to the

16       domicile of your employer.  It is a short way of looking at it.

17   19 deals with where an employer may be sued by an employee and Article 20:

18   "An employer may bring proceedings only in the courts of the Member State in which the

19       employee is domiciled."

20   Two does not affect the right to bring a counterclaim.  At 21:

21   "Provisions of this section may be departed from only by an agreement on jurisdiction that

22       is entered into after the dispute has arisen and which allows the employee to bring

23       proceedings in courts other than those indicated in this section."

24   It is quite straightforward.  Employers must sue their employees in the employees' place of

25       domicile.  That cannot be contracted out of by way of a jurisdiction clause unless

26       the jurisdiction clause is entered into after the dispute has arisen.

1    MR JUSTICE STEEL:  Or?

2    MS BLANCHARD:  Or it cannot be contracted out of ever for employers or claims by

3        employers ----

4    MR JUSTICE STEEL:  The one sided jurisdiction is allowing the employee to bring

5        proceedings (inaudible)

6    MS BLANCHARD:  Yes, my Lord.

7    MR JUSTICE STEEL:  It is rather strange, that.  Okay.  I understand what you mean.

8    MS BLANCHARD:  I do not think the meaning of the section is in issue between my

9        learned friends and I.  The question is whether or not it is engaged by the bonus

10       contract.  Your Lordship will ----

11   MR JUSTICE STEEL:  It all turns on whether it is a matter relating to individual contracts

12       of employment?

13   MS BLANCHARD:  Yes, my Lord. I suppose technically it is two hurdles but I suspect it

14       comes to the same thing, as to whether it is a matter relating to an individual

15       contract of employment and as to whether MMC and Guy Carpenter are employers

16       for this purpose.  While we are on the regulation, I should pause to observe that it is

17       common ground between us that the reason why the regulation is in these terms is

18       to give effect to a public policy that an employee, in his capacity as the weaker party

19       in the employment relationship, is prima  facie entitled to special protection.  One

20       of the points that we make is that the contractual arrangement by which my clients

21       were remunerated is something dictated by the administrative convenience of the

22       MMC group and that a sophisticated employer ought not to be entitled to contract

23       out of the mandatory provisions of section five by way of a contractual landscape

24       that is dictated only by provisions of their own administrative convenience.

25   That brings me to what is a contract of employment for the purposes of the regulation.  The

26       first point that we would make to your Lordship is that your Lordship is not

31

1    construing the bonus contracts in a vacuum. The bonus contracts exist because the

2    UK contracts exist and they owe their existence to the UK contracts. They only

3    exist because my clients are employees. The bonus contracts are by their terms

4    inextricably bound up with the UK contracts. Your Lordship has seen them. There

5    are constant references to employment. In a sense they are parasitic on them. The

6    label is perhaps unimportant, whether one calls the bonus contracts ancillary,

7    subsidiary or collateral, whatever one wants to call them, the fact is that the bonus

8    contracts and the UK contracts together make up my clients' individual contracts of

9    employment.

10    In seeking to enforce obligations under the bonus contracts, MMC and GC are acting qua

11    employer however you look at it. The complaint is we are in breach of our duties as

12    employees and that we are soliciting their other ones. What we say is that it is not

13    the right question to ask, looking at the bonus contract as a stand alone contract: is

14    it a contract of employment because that would be completely artificial and contrary

15    to the basic principle that your Lordship has to construe in its relevant factual

16    matrix. What we invite your Lordship to ask himself is whether the UK contracts

17    with the bonus contracts inextricably bound up together make up the Claimants'

18    individual arrangements as employees. The answer to that, my Lord, we say is yes.

19

20    Furthermore, your Lordship sees in the complaint in America GC and MMC are trying to

21    take advantage of the UK contracts. Ms Mansfield's declaration says that the

22    Claimants' employment with MMC and Guy Carpenter is governed by the UK

23    contracts. Even if one is on the Defendants' case we fall within it.

24    My Lord, if we have to go further than that and satisfy some broader test, looking at

25    questions of control, remuneration and so on, we say we can do that anyway. In

26    that respect, I invite your Lordship to take the authorities bundle, volume two,

1    ominously, and go to tab 20 because there is some guidance on this more or less hot

2    off the press really, first of all in tab 20 at first instance, a decision of this court by

3    Mr Justice Field.  I pause to observe there were actions in this case both in Italy and

4    in England and there was a preliminary row about whether the status of Mr Bonatti

5    was that of an employee or a self-employed contractor.  Your Lordship will know

6    that typically, when one is arguing about whether something is a contract of

7    employment or not, the row is are they employees or are they self-employed.  That

8    is normally how it arises.

9    If your Lordship goes forward to page 622, paragraph 65, Mr Justice Field is quoting from

10   the Chevenai case in ECR.  I should pause to observe we accept that section five is

11   a creature of Community law and as such what is meant by a contract of

12   employment or an employer is a creature of Community law.

13   MR JUSTICE STEEL:  Article five for this purpose being ----?

14   MS BLANCHARD:  Section five.

15   MR JUSTICE STEEL:  Is that right?  He is referring to Article five.

16   MS BLANCHARD:  He is dealing with Article five.  My Lord, how it arises is this ----

17   MR JUSTICE STEEL:  I do not have this in my head.  I have just forgotten what Article

18   five says.

19   MS BLANCHARD:  Article five is a place for performance of the obligation in question.

20   To go back a bit, the early decisions from the ECJ about Article five in connection

21   with contracts of employment were concerned with where is the place of the

22   performance of the obligation in question.  In the Bonatti case, both Article five and

23   section five were engaged.  The point that I was making to your Lordship – my

24   learned friends have made this point in their skeleton and I am accepting it – is that

25   the concept of a contract of employment is a creature of Community law.  The ECJ

26   has yet to rule definitively on what that means.  However, at paragraph 65 Mr

1    Justice Field quotes the <u>Chevenai</u> case which is the case my learned friends

2    referred to. As to such guidance that there is, there are a few more but this is the

3    important one, as to what is meant by a contract of employment. He quotes from

4    <u>Chevenai</u> and he says:

5    "It should be observed that contracts of employment like other contracts differ by virtue of

6    certain particularities. They create a lasting bond which brings the worker to some

7    extent within the organisational framework of the business, of the undertaking of

8    the employer and they are linked to the place where the activities are pursued,

9    which determines the application of monetary rules and collective agreements. It is

10    on account of those particularities that the court in the place in which the

11    characteristic obligation of such contracts is to be performed is considered best

12    suited to resolving the disputes."

13    He then refers to the <u>Laurie Blom</u> case:

14    "The question whether a trainee teacher was a worker."

15    There, the ECJ said:

16    "The concept of 'worker' must be defined in accordance with the objective criteria which

17    distinguish the employment relationship by reference to rights and duties of the

18    persons concerned. The essential feature of an employment relationship however is

19    that for a certain period of time the person performs services for and under the

20    direction of another person in return for which he receives remuneration."

21    At 69 he set out what he considered to be the relevant matters for him to consider. First of

22    all, provision of services by one party over a period of time. Secondly, control or

23    direction. Thirdly, integration to some extent.

24    "In applying these broad criteria, I think regard must be had particularly to the terms of the

25    contract. The conduct of the parties is relevant too. Further, in recognition of the

26    fact that the exercise is one of fact and degree and quite different relationships may

1    share to a considerable extent the same criteria, the court should use as reference

2    points a paradigm of a contract of employment and a paradigm of a contract for

3    services. The court should also keep in mind the underlying policy of section five,

4    the protection of parties to a contract who are weaker from a socio-economic point

5    of view than the other party."

6  On the facts of that case, Mr Justice Field decided there was not an employment contract

7    there. The matter then went to the Court of Appeal which is in the next tab, tab 21.

8    This is the judgment that might be described as hot off the press, 28 March of this

9    year. I show your Lordship first of all the judgment of Lord Justice Toulson,

10    picking it up at paragraph 37, he there deals with questions of burden and standard

11    of proof and the Bonds decision. I am not sure there is anything between my

12    friends and I on that so we may not need to look at that. If your Lordship goes

13    forwards to paragraph 46, Lord Justice Toulson set out the criteria identified by Mr

14    Justice Field and at 47 he says that these are not hard edged criteria which can be

15    mechanistically applied.

16  "For example, in the case of a person with a non-executive role, there may be degrees of

17    control and degrees of integration within the organisational framework of the

18    company. As the judge rightly observed, applying these broad criteria regardless

19    we have particularly to the terms of the contract."

20  MR JUSTICE STEEL: This is all on the facts. I do not get anything in principle out of it.

21  MS BLANCHARD: Only this, my Lord: I can short circuit it. It may be that there is

22    nothing between us. There was a two to one majority in the Court of Appeal in the

23    Bonatti case that your Lordship can look at as well as all the factual matrix existing

24    when the contract was entered into, the conduct of the parties and how they have

25    treated it and how it is executed for the purposes of determining what its character

26    is. It was two to one. Lord Justice Cookson was against it. Lord Justice Toulson

1       and Sir Anthony Clark, MR, were in favour of it.

2 My Lord, against that broad framework of what is a contract of employment, if your

3       Lordship has to go through that exercise – and we say your Lordship does not

4       because it is enough to look at the bonus contracts and the UK contracts together –

5       the position is that the bonus contracts provide for remuneration to be paid in return

6       for services rendered as an employee.  The payments made to the Claimants under

7       the bonus contracts are treated as an emolument of their employment for the

8       purposes of UK tax.  That is, they are paid on a PAYE basis.

9 Your Lordship has already seen in clause 2(a)(iii) in the bonus contracts that there is a

10       specific obligation to provide services.  There is also the cooperation clause which

11       is another service and the covenants.  That we undertake to curtail our behaviour

12       pursuant to the covenants is a further service and furthermore the payments under

13       the bonus contracts are conditional on our continued employment.  If your Lordship

14       is looking for services and remuneration, your Lordship can tick that box.  If your

15       Lordship then asks,  "Where is the control?" the practical reality is that my clients

16       did not provide any services to MSL.  MSL is a service company.  It does not itself

17       broke any insurance or reinsurance business.  Its sole function is to be an employer.

18       What that means is that my clients rendered their services to other companies in the

19       Guy Carpenter group and furthermore that they were under the control of others

20       than MSL.

21 If your Lordship has the bundle, I would like to show your Lordship a short passage from

22       the third witness statement of Ms Payne at tab 12, paragraph 22.  She is setting out

23       here how the employment worked in practice:

24 "The Claimants have not applied their minds to the identity of their employer prior to these

25       proceedings having been initiated but if asked they would have said they work for

26       GCFAC. The first and second Claimants are part of GCFAC senior management to

1  whom the third Claimant reported directly.  The Claimants never identified MSL as

2  being their employer.  The first and second Claimants operated under a chain of

3  command emanating directly from Mr Turkaski, the CEO and President of the

4  MMC group in the following way: the first and second Claimants reported to Geoff

5  Bromley, head of GCFAC, Europe and Asia."

6  My Lord, I should pause there.  There is a mistake in the title in that Mr Bromley, Mr

7  Newhouse and Mr Spiller have these titles as head of GC, Europe and Asia, head of

8  GC America and head of Guy Carpenter and president of CEO of Guy Carpenter

9  MLC—i.e., there is no "FAC" in their titles.  The "FAC" comes out and if we have

10  to file a corrected witness statement of course we can do that and we apologise for

11  the mistake.

12  The practical reality is that if one asks who is controlling my clients in the conduct of their

13  employment, it is these very senior people and not MSL.  One can test it in this

14  way: if my clients had said, "I am not going to follow that instruction because you

15  are not MSL, my employer" one might imagine that their careers at Guy Carpenter

16  would be very short indeed.  If your Lordship is looking for control, he can find that

17  as well.  If your Lordship is looking for integration in a real sense my clients

18  worked, regarded themselves as working and indeed are described as having

19  worked within the GCFAC unit which is a creature of the Guy Carpenter business.

20  Your Lordship has in tab 13 in exhibit PCP3, at page two, my clients' business

21  cards, which are perhaps of interest.  Mr Samengo Turner, head of GCFAC

22  Worldwide, Guy Carpenter & Company Limited, MMC Marsh and McLellan

23  companies.  Your Lordship sees it is the same for Mr Whyte and for Mr Hopkins.

24  Your Lordship does not see here a reference to MSL.  If one asks the question are

25  my clients integrated into the Guy Carpenter business, the answer is yes.

26  All three elements that were identified in the <u>Bonatti</u> case are present.  Then, if one comes

1    to consider the express terms of the bonus contracts, the definition of the employer

2    given in them covers MMC and Guy Carpenter.  The obligations that arise out of

3    them – I am not going to go over it again – are in the nature of obligations that an

4    employee might owe.  It is only in the context of that relationship that the restrictive

5    covenant, the obligation to provide services etc., is apposite.  In as much as your

6    Lordship is looking at post-contractual behaviour, which we say your Lordship can,

7    your Lordship can look for a start at the US proceedings from which the view as to

8    the status of the relationship there is quite clear.  Then there are also some other

9    letters which I do not want to take time on at the moment, both from MSL and both

10   from the Defendants' solicitors, which refer to the Claimants' status as employees

11   of GC.

12 If one parks the argument that you look at the bonus contracts and the UK contracts

13   together and you look at the bonus contracts on their own and asks the question: are

14   they contracts of employment on the Bonatti basis, yes.  We invite your Lordship

15   so to find.  If that is right, the claims in the US are necessarily matters relating to

16   individual contracts of employment.

17 There is, if it matters, an English decision on that which I will show your Lordship briefly.

18   It is in authorities bundle, volume one, at tab 11, which is I believe the only English

19   decision on the meaning of the expression "individual contracts of employment".  It

20   is material perhaps to look at paragraph 24.  What was happening in this case was

21   the Defendants were being sued by their former employers, partly for breach of

22   duties of fidelity and partly because it was alleged there was an unlawful

23   conspiracy.  The argument was whether the unlawful conspiracy claim was

24   protected by section five or not.  At 24 the judge says:

25 "The policy behind section five is based on a probability that the employer is financially

26   stronger than the employee.  Therefore, if one of them has to take proceedings in a

1   foreign court, it should be the employer who has to bear the additional costs and

2   inconvenience. The advantage is that given to the employees as a member of a

3   class they, the employees, and that advantage will be confined to cases where status

4   as an employee is legally relevant. Section five should not be construed as

5   conferring jurisdictional advantages on a poor defendant sued by a rich claimant if

6   they happen to be employee …".

7   MR JUSTICE STEEL:  I have read to the end of the paragraph.

8   MS BLANCHARD:  My Lord, I am grateful. If your Lordship could look at paragraph 26,

9   even looking at that what might be described as quite a narrow test, we say we

10  satisfy that and also it is of interest that the judge in that case that the court should

11  be astute to see to it that cases that are really about employment relationships are

12  not dressed up as something else. What is really happening in America is we are

13  being sued because we are employees. Where that gets us to My Lord is this: is that

14  if your Lordship is satisfied that the US proceedings are matters relating to an

15  individual contract of employment and there is an employment relationship, what

16  your Lordship should do, we say, is to enforce the right arising under section five of

17  the regulation and do so by way of an anti-suit injunction in circumstances in which

18  my clients have no other effective remedy in the circumstances of this case.

19      My Lord will know that if this was an argument between one member state

20  or another I obviously wouldn't be here because I would be in the other member

21  state inviting it to decline jurisdiction. I cannot do that. The New York Court isn't

22  bound by the regulation and is not obliged to apply it and therefore My Lord, if my

23  client's rights, which are enshrined in statute and which cannot be contracted out of

24  are to be protected, the only effective way to do that we say is to grant an anti-suit

25  injunction. My Lord the domicile of the US Plaintiffs is irrelevant for these

26  purposes. First of all Your Lordship has the dealing provision …