# EXHIBIT 18-4

1    this is about two things.  That the New York proceedings generally and it's about

2    the 18th May Order and whether, and whether or not Your Lordship should restrain

3    us from enforcing the Order when the New York Judge who had all the material

4    before him claimed he wasn't minded to hold up the disclosure pending the

5    jurisdiction challenge, there is an appeal process and an expedition process and a

6    stay process available in the Courts of that State.  So Your Lordship …

7    MR JUSTICE STEEL:   Sorry, you put it on the basis that I might restrain you from

8    enforcing your American Order.  That is not the nature of course of the Application

9    that is being made.

10   MR ROSEN:  Well the Application is wider.  It seeks to …

11   MR JUSTICE STEEL:   Where is the Application?

12   MR ROSEN:  … Well Your Lordship, it's in bundle A at tab 1 …

13   MR JUSTICE STEEL:  Right.

14   MR ROSEN:  … and the interim, that's the claim form, the interim Application is at tab 5

15   and the draft Order provides in para 4 and 5 a general bit about not prosecuting the

16   proceedings which would presumably stop us fighting our submissions on the

17   jurisdiction question and then paragraph 5, the particular Order seeking to prevent

18   us from enforcing the Order of the 18th May so it's divided in, essentially I suppose,

19   two parts, although one is expressed to be a particular bit of the other one.

20   MR JUSTICE STEEL:  Yes I understand.

21   MR ROSEN:  Yes.  The only other authority I wanted to bring to Your Lordship's attention

22   on comity is *OT Africa* [?] at tab 15 where there is a discussion in the …

23   MR JUSTICE STEEL:  Which bundle?

24   MR ROSEN:  … it's the same bundle which was bundle 1.  There was a discussion by

25   Lord Justice Rix, of what are the considerations of comity in the anti-suit injunction

26   context.  What do they require and, very interestingly, he distinguishes as do

1     previously authorities, between different types of anti-suit injunctions and what he

2     says in particular, well, could, would Your Lordship be prepared to read from 63 …

3     MR JUSTICE STEEL:  Sorry, can you just give me the divider number again please?

4     MR ROSEN:  Yes.  Tab 15.  And it's called '*OT Africa*'.  Tab 15 of Authority …

5     MR JUSTICE STEEL:  Oh, somebody's put it in the wrong place, hang on…

6     MR ROSEN:  I've probably given Your Lordship the wrong reference.  Let me start again.

7     Authorities bundle 1…

8     MR JUSTICE STEEL:  Right I am there now.  *OT Africa*, yes. Paragraph?

9     MR ROSEN:  … and it's paragraph 62 to 69, where he categorises different types of case

10     and the guidance from the authorities and the essential point being that there is a

11     division between cases where it's easy to see that the foreign claimant is breaching

12     a jurisdiction clause in a contract and cases where what's alleged is that the foreign

13     proceedings are vexatious or oppressive, but there is no breach of contract involved.

14     In other words, the *forum non conveniens* or other grounds for vexation and

15     oppression case and there is a particular passage cited in paragraph 67, if Your

16     Lordship sees that, from Lord Justice Millet in *The Angelic Grace*.

17     MR JUSTICE STEEL:  Sorry, what do I need to do?

18     MR ROSEN:  The quote from Lord Justice Millet in paragraph 67 …

19     MR JUSTICE STEEL:  Yes, I'm familiar with it.

20     MR ROSEN:  … oh well if Your Lordship's familiar with it then I don't need to remind

21     you of it, but that's one of the main distinctions.

22     MR JUSTICE STEEL:  [inaudible].

23     MR ROSEN:  There it is.  And paragraph 69, the reference to *Turner v Grovitt* in which

24     Lord Hobhouse stated that English law attaches to the High Court of international

25     comity and so on, so I know Your Lordship's very familiar with all that.

26     MR JUSTICE STEEL:  Yes.

1    MR ROSEN:  Now, My Lord, the key submission is that whether or not Your Lordship

2    likes the Order of the 18th May, the only basis upon which Your Lordship could

3    enjoin steps pursuant to it, in our respectful submission, is the regulation.  So that's

4    what I want to tackle first.  I'll deal with questions of discretion and whether or not

5    there's another basis for alleging vexation or oppression or whatever a little bit

6    later.  And so Your Lordship needs a certain amount of background material in

7    regard to the documents.  The first point …

8    MR JUSTICE STEEL:  And the test being they are good arguable case for test purposes.

9    MR ROSEN:  The test being good arguable case depending on the constraints that Your

10    Lordship has before you as to evidence in law and of course the significance of

11    what Your Lordship's been asked to do.

12    MR JUSTICE STEEL:  Yes.  I follow that.

13    MR ROSEN:  Because in our respectful submission not only is Your Lordship going to be

14    interfering with the exclusive jurisdiction clause and with the Order of the New

15    York Court but it goes a little bit further, sorry, the proceedings of the New York

16    Court, the New York Court has made an Order.  It made it on listening to the

17    Lawyers instructed for Mr Whyte, who I imagine is the most senior of these three

18    very senior executives employed by MSL and a very important part the MMC

19    Group, on very full submissions, having heard those submissions including the

20    jurisdictional objections as outlined by Mr Whyte in the preliminary form.  So the

21    effective of that in terms of interference is very great and in terms of prejudice, in

22    our respectful submission, Your Lordship's seen the skeleton, the background to

23    this matter, is that we have these three very senior executives leaving in a go.  We

24    have a number of those who were directly reported to them or in their immediate

25    group, being approached and joining the proposed competitor.

26    MR JUSTICE STEEL:  I am not sure I have seen much evidence of being approached.  I

1    understand the inference that because they had left.

2  MR ROSEN:  Well …

3  MR JUSTICE STEEL:  I have not seen any evidence, so maybe it does not matter.

4  MR ROSEN:  No, maybe it doesn't matter.  When I say approached, Your Lordship knows

5    our suspicions are that these three, that these three executives assisted the

6    competitor.    Assisted the competitor, and when I say approached, I'm not

7    suggesting to Your Lordship that you should be satisfied that the approach directly

8    was by the executives.  I will submit to Your Lordship that in the absence of pretty

9    prompt responses to our questions which have been hanging in the ether since the

10    5th April and which we made clear on the 17th May we wanted answers to, whatever

11    may be the evidence of breach, or not breach, non-solicitation in the absence of that,

12    there is very good reason to infer that they have assisted the competitor.  Now

13    whether that involves them giving information to the competitor and by the way I

14    don't just include confidential information, any information to assist the competitor

15    and not to assist the employer and the employer's group would be in that category.

16    I'll come to that a little bit later.

17        Now the first matter which we say is quite clear is that the contracts of

18    employment in this case are with MSL.  There can be no serious dispute about that.

19    They're exhibited, as Your Lordship knows, in the bundle.  You've had a look at

20    them.  They have MSL's name, or its previous name, all over them.  They were

21    actually exhibited by Lindsay Mansfield in the New York proceedings

22    notwithstanding that there was an error which we must correct in the way the

23    complaint was put, referring to the parent and leading companies, the US

24    companies, as the employers and referring to Guy Carpenter as an employer, but so

25    far as the contracts of employment are concerned they are all with MSL in many

26    cases under a previous name.  So that's, that is a given.  And to try and go through a

1    tick box process to say that because these very senior gentlemen employed by this

2    English service company were integrated or worked with or reported to, or had

3    reports from other very senior employees in the group of companies for which MSL

4    was one of the service companies, just one, is an entirely futile exercise for the

5    purposes of the contract of employment. It just won't work. Nothing in any of the

6    evidence is inconsistent with MSL, one of the service companies, being party to the

7    contracts of employment and being the employer. So that is our first proposition

8    which I'll seek to make good.

9    Ms Mansfield in her witness statement explains the structure, it's at A10.

10    Your Lordship's probably seen it. It's all set out in our skeleton anyway but I ought

11    to remind you of it. In paragraphs 5 to 9 ending with the statement at the end of 8

12    "The claimants only had one employer and that was MSL". And then referring to

13    the US proceedings in the US proceedings which I'll come to almost [inaudible].

14    So could I just remind Your Lordship of what she said in paragraphs 5 to 8 where

15    she explains the way that this group works and says it's extremely common for

16    large groups of companies to work in this way and our simple submission to Your

17    Lordship is that you can refer as much as you like to the operational roles of

18    employees within the group and who they report to and don't, especially when

19    they're at this level. None of that is inconsistent with the contract of employment.

20    Moreover it cannot be said that the contract of employment is an artificial construct

21    because there are very good reasons for the MMC Group organising its employment

22    in this way and that is what it does.

23    Could I deal with a comment in paragraph 9 about the reference to Guy

24    Carpenter being the employer in the US proceedings? Of course that has to be

25    corrected. There is no question at all of it. As I've said, although Ms Mansfield

26    exhibited the contracts of employment to her declaration in the US proceedings, no

1    one took the point and this is very loose terminology used in the pleading, it was not

2    picked up.  As far as we're concerned, it is of no significance whatsoever to the US

3    proceedings but that isn't the point.  It should be corrected immediately.  At the

4    moment we are prohibited from taking any steps in the US proceedings for today

5    but we will be making the correction and drawing it to Judge Coates' attention.  Of

6    course, if the parties wish to address him as to whether that is of the slightest

7    significance, they're free to do so.

8    MR JUSTICE STEEL:  I don't know what this mistake is.  It is quite a long document, the

9    complaint, I'm not saying that that's…

10    MR ROSEN:  Well we'll come to it.

11    MR JUSTICE STEEL:  But …

12    MR ROSEN:  The complaint is it referring to Guy Carpenter as the employer?

13    MR JUSTICE STEEL:  No, no.  That is one.  There is quite a lot of other material which

14    refers to the underlying, which you now call, employment contract.  Not just the

15    [inaudible] contract.

16    MR ROSEN:  Yeah well the employment contracts are obviously relevant.

17    MR JUSTICE STEEL:  Well they may be, but it's the way it's put.

18    MR ROSEN:  Yeah but I'll take Your Lordship to it.  I believe it's an exercise I've got to

19    do.  They're obviously relevant …

20    MR JUSTICE STEEL:  So you are sticking with the admission as an error.  What is the

21    error?

22    MR ROSEN:  The error is in referring to the employer as Guy Carpenter, whereas the

23    employer is MSL and the contracts which were exhibited, which were referred to

24    and then exhibited by Ms Mansfield are quite clear on that and that has to be

25    corrected.  Now we say it is not of the slightest significance because the basis for

26    the Order made was Clause T(2)(e) of a plan which has an exclusive New York

1    jurisdictional clause.  And that none of the arguments as to restraint of trade are

2    going to make, or any other arguments, are going to make the slightest difference

3    because there is absolutely nothing wrong with the US companies entering into

4    bonus arrangements, the arrangements in the plan, with all the provisions of that

5    plan in relation to someone who is employed by one of the group service

6    companies.

7    MR JUSTICE STEEL:  But if someone undermines my faith in Ms Mansfield.

8    MR ROSEN:  Well I'm not sure it was Ms Mansfield's fault but …

9    MR JUSTICE STEEL:  Well she has, she has made a sworn declaration.

10    MR ROSEN:  She swore a declaration in which she exhibited the employment contracts

11    and verified a complaint which referred to Guy Carpenter as the employer.

12    MR JUSTICE STEEL:  Yes.

13    MR ROSEN:  And that was …

14    MR JUSTICE STEEL:  It is a quite startling mistake.

15    MR ROSEN:  But as far as we're concerned, with great respect to Your Lordship, it's

16    absolutely irrelevant.

17    MR JUSTICE STEEL:  It may be unnecessary to establish who the employer is for the

18    purpose of the American proceedings, I understand that… but as I say, it

19    undermines my faith in what she has to say.

20    MR ROSEN:  Well I am sorry to hear that My Lord but there is not very much I can do

21    about it.

22    MR JUSTICE STEEL:  I mean, she's…

23    MR ROSEN:  I mean most, most of her evidence as regards this section, the identity of the

24    claimants and employers isn't disputed and couldn't possibly be disputed other than

25    for confusion so to speak that it's obviously MSL.

26    MR JUSTICE STEEL:  No it's not just the [inaudible], she actually spells out which in the

1    contracts.

2    MR ROSEN:  Yes but she exhibited those contracts and they're referred to in the US

3         proceedings.  What she didn't do or what wasn't done, I'm not going to refer to.

4         What wasn't done in the New York proceedings was to say the employment

5         contracts are with MSL which is a service company within the MMC Group.

6    MR JUSTICE STEEL:  Yes.

7    MR ROSEN:   The plan which is what we're seeking to enforce, Clause 2(e), the one

8         governed by exclusive New York jurisdiction, is with MMC.  Anyway, we'll come

9         to the plan shortly.

10        She then deals, just so that Your Lordship has it in mind, with why the stock plan is

11        also not an artificial construct.  This is paragraphs 10 through to 17 and again in our

12        skeleton we explain why the stock plan is the parent company's plan for its group,

13        it's the senior executives within its group, who are employed by all sorts of

14        companies and why it's subject to US law.  In particular, because it concerns stock

15        options as well as cash, it relates to employees in all sorts of countries, and the idea

16        that for each country in which an employee is based, employed by a particular

17        service company, we should have different stock plans with different governing law

18        and jurisdiction, is one which is likely to cause huge confusion and a potential for…

19        I'm so sorry.

20    MR JUSTICE STEEL:  And do we have that?

21    MR ROSEN:   We have that in the sense that there is a carve-out as regards certain

22        employees in the UK following the termination of their employment.  If you look at

23        the carve-out, the detrimental activities in the carve-out definition are very similar,

24        although not identical, to the detrimental activities.

25    MR JUSTICE STEEL:  They're the same, there's no need to have a carve-out[?].

26    MR ROSEN:  Well someone drafting it.  You can compare them.  They cover virtually the

1   same duties.  None of them are relevant as far as the complaints are, that are made

2   by learned friends are concerned, because everything that we are entitled to ask for

3   information about as …

4   MR JUSTICE STEEL:  It was [inaudible] complaint [inaudible].

5   MR ROSEN:  The complaint is dependent on a suspicion of detrimental activity, grounds

6   for alleging it, and a duty to cooperate.

7   MR JUSTICE STEEL:  Right.

8   MR ROSEN:  And those, and those detrimental activities which we suspect would be

9   detrimental unto both clause 1(c) and schedule 2(d).

10  MR JUSTICE STEEL:  Right.

11  MR ROSEN:  The duty to cooperate …

12  MR JUSTICE STEEL:  As I understand it, the Judge has said that she would consider

13  detrimental activity by reference to English law.  She must therefore take that the

14  relevant provisions of the detrimental activity were within 2(d).

15  MR ROSEN:  Well that was certainly one of Mr Whyte's submissions and looking at the

16  complaint, the complaint refers to Schedule 2(d) rather than to 1(c).

17  MR JUSTICE STEEL:  Right.

18  MR ROSEN:  And that's another matter which is wrong, I'm afraid.

19  MR JUSTICE STEEL:  Why do you say that is wrong?

20  MR ROSEN:  Well because, in our respectful submission, although there isn't much

21  significant difference that we can see, if any, 1(c) applies until the termination.

22  MR JUSTICE STEEL:  That is another mistake by Ms Mansfield.

23  MR ROSEN:  Well the new lawyers may disagree on that.  They may say no, you're

24  wrong, so it's no good me biting[?] the New York laws.  That's a New York case

25  and Ms Mansfield hasn't said that that's an error but it doesn't make any difference

26  to the Application before Your Lordship.  It doesn't make the slightest difference

1     because 2(e) is part of the plan governed by exclusive New York law.  2(e) is a

2     failure to cooperate.  We do not have to prove detrimental activities to inquire of

3     these executives, what they'd been doing as regards Integro and the employees and

4     clients of our business.  Integro is a competitor.  We are entitled to ask them and

5     their obligations as regards detrimental activity are going to be the same for present

6     purposes.   Under 1(c), under schedule 2(d), under implied law, it makes no

7     difference whatsoever.  So that's what she has to say about the plan and then Your

8     Lordship needs to know …

9     MR JUSTICE STEEL:  Can I see the request for her responses?  I have not seen that yet.

10    MR ROSEN:  The request for responses Your Lordship finds those, I think, attached to the

11    Order of… well they're in various places.  In the first Order which was the Order of

12    Mr Justice Underhill, I think there are attached the New York disclosure.

13    MS BLANCHARD: [inaudible]

14    MR ROSEN:  Well, I'm not quite sure what your Lordship's asking for.  My learned friend

15    thinks Your Lordship may be asking for Herbert Smith's letter

16    MR JUSTICE STEEL:  As I understand it the prayer in the complaint has been accepted, to

17    provide responses to the requests and I just wonder what those requests were.

18    MR ROSEN:  Well, can we take you to the stages.  First four in bundle A Your Lordship

19    will have the New York proceedings, interrogatories and disclosure classes at page

20    217 of bundle A behind tab 4.  Does Your Lordship see fifteen classes of

21    documents? To all of which, as against these executives who remain employees

22    within the group, employees of MSL within the group, and subject to the plan, we

23    are entitled, and we don't have to prove that they've solicited or disclosed

24    confidential information.

25    MR JUSTICE STEEL:  Yes.

26    MR ROSEN:  If Your Lordship could next go to the correspondence behind Tab 7 of the

1   same bundle.  Prior to the New York Order, so to be, prior to the New York

2   proceedings, you see a letter from Herbert Smith of the 5th April and there's a list of

3   questions as opposed to documents on page 2 under paragraph 4 to none of which

4   have we had any answers despite reminders, and in paragraph 5 there's a request (a)

5   for an undertaking of which hasn't been offered and Your Lordship will see what's

6   been offered.  It's very different.  We'll come to that no doubt in due course.  And

7   the answer to that at page 10 on the 11th April …

8   MR JUSTICE STEEL:  Sorry, just looking down these questions …

9   MR ROSEN:  Yes.

10   MR JUSTICE STEEL:  … they seem to be aware of the terms of your employment contract

11      with "GC" [inaudible].  That is another mistake is it?

12   MR ROSEN:  No, it's the reference to "GC" in this letter is throughout a reference to Guy

13      Carpenter and associated companies 'including your employer, JH Marsh and

14      McLennan and Sedgwick.  So this letter, I'm happy to say on behalf of those who

15      wrote it, is not a mistake.

16   MR JUSTICE STEEL:  Yes.

17   MR ROSEN:  This letter actually identifies on the 5th April who the employer is and it's a

18      shame that those who drafted the New York proceedings …

19   MR JUSTICE STEEL:  More startling mistakes…

20   MR ROSEN:  Well it does, I …

21   MS BLANCHARD:  My Lord while Your Lordship has that letter open, if you could look

22      at paragraph 3 …

23   MR ROSEN:  I want to ask, I want to ask Your Lordship's intervention in a moment but

24      I'll sit down.

25   MS BLANCHARD:  .. while Your Lordship has the letter open, to save going back, if

26      Your Lordship could look at paragraph 3 it says "And our specific obligations under

1    the plan as well as your obligations as an employee direct of Guy Carpenter a

2    company limited" and so on and so on, "in order to establish whether your

3    compliance with your duties as a GC employee and GC is combined collectively at

4    the beginning of the letter".

5    MR ROSEN:  Yes, that of course, is because Mr Whyte is a director of Guy Carpenter and

6    Company Limited in addition to being an employee of MSL and doesn't take the

7    matter any further.  The point is, Your Lordship, Your Lordship was putting it to

8    me, is it another mistake.  Answer, no, it most certainly isn't because the letter

9    identifies on the 5th April.  Then Your Lordship says, or identifies [inaudible] then

10    Your Lordship says makes it all the more startling that the New York proceedings

11    didn't adopt this formulation and say that within the group, the MMC Group, is

12    your employer MSL, and I've already addressed Your Lordship on that.  If the

13    draftsman had looked at the contracts and looked at the correspondence to which

14    they refer because the complaints and all the other documents refers to this letter as

15    the key letter seeking to instigate the requirement and cooperation and answers to

16    questions, and then they would not have made that error.  But we're going to, we're

17    going to have to correct it.  I can't emphasise enough to Your Lordship that we

18    want to correct it and insofar as necessary, we undertake to correct it, so that if

19    anyone thinks it's of any significance in the New York proceedings they can

20    address the New York Judge on it.  What I wanted to show Your Lordship next is

21    the, is the answer on page 10.  This is the executives' solicitors, I'm just going to

22    refer to them as "the executives" for now and I hope that's an uncontroversial

23    phrase, and you'll see in the third paragraph that they said that two of them were on

24    vacation, I think, and they hoped to take detailed instructions from all three by mid-

25    next week and revert as soon as reasonably can thereafter.  The answer at page 12,

26    paragraph 2, from Herbert Smith was "We accept there'll be a delay but look

1    forward to receiving the requested information from you as soon as possible next

2    week". And then, then what happens is that the executives embark on their own

3    cross-interrogatories as to what's the evidence against them that they are soliciting

4    or disclosing confidential information and so on and so forth. That's 19th April and

5    we will describe that as a "red herring" when we come to our submissions as to why

6    we're entitled to this information anyway. And then at page 18, this is a letter

7    which both Miss Payne and I think my learned friend's skeleton says "No more than

8    that our client's position remains as stated in previous correspondence". What my

9    learned friend says is there was radio silence after the 19th April apart from that first

10   sentence. Would Your Lordship just read the first paragraph?

11   MR JUSTICE STEEL:  So at page 18?

12   MR ROSEN:  We're at page 18.

13   MR JUSTICE STEEL:  Yes.

14   MR ROSEN:  And that actually makes the point that irrespective of what evidence there

15       may or may not be as regards breaches of fidelity and so on, your clients remain

16       obliged to answer the questions regardless of whether we provide further

17       background information. These are top executives earning over a billion dollars a

18       year who have announced that they're going to join a major competitor and that is

19       shortly found, followed by a number of other defections from those with whom they

20       were very close and we are entitled to ask those questions and we have been asking

21       them since the 3rd April and they are determined not to answer them. And Your

22       Lordship will see soon what they're prepared to do which is a very, very narrow

23       offer, essentially to tell us of their part in solicitation of GC FAC employees who

24       directly reported to them and revelations of confidential information. Well it's just

25       not good enough and that's why the New York proceedings went on under the

26       exclusive jurisdiction clause to rely on clause 2(e) of the plan. At page 24 Your

1    Lordship will see that on the 17th May we were told, at the end of the second

2    paragraph, that they have appointed [Robson Rhodes?] and no doubt Robson

3    Rhodes are well able to represent these executives in the New York proceedings.

4    So that's a little bit about the background and what I would like to do now with

5    Your Lordship's leave is just run through the documents and then address Your

6    Lordship on what this is all about in terms of the regulation which is really the heart

7    of the Application, in our respectful submission, without the regulation applying

8    these proceedings can go nowhere.

9        Does Your Lordship have bundle A, first of all the plan?  Now, these, the

10    plan is called, I think, "Bonus Contract" by the executives.  The one I think we used

11    was the one beginning at page 115 at tab 4.  I have been reminded I must come back

12    to the correspondence when, for Your Lordship to see the undertaking that these

13    executives have offered but that's later on.  So the plan is at page 115 and we begin

14    with the definitions in the, so to speak, the preamble, reference to the [inaudible],

15    essentially to this plan, on these terms and conditions, that's what it essentially is,

16    and MMC means Marsh & McLennan Companies and any successor Inc, and any

17    successor thereto.  So that's MMC and of course the reference to companies being

18    within that group should be read with the reference on page 131 which I think is

19    right at the, towards the end of schedule 2(d), which is the group means MMC, the

20    company and any associated company, for the purpose of the Schedule only the

21    company will be the company in the group which is your employer.  So it's quite

22    plain on the face of the document that it does not connote the entire group, the

23    employer of the beneficiary, of the executive who's the beneficiary of the Order.

24  MR JUSTICE STEEL:  Well for the purpose of this schedules, yes.

25  MR ROSEN:  Well, the schedule is, well exactly.  The schedule is part of the agreement …

26  MR JUSTICE STEEL:   No, but this is, for the purposes of this schedule which I

73

1    understand you say does not apply …

2    MR ROSEN:  Yes.

3    MR JUSTICE STEEL:  For this schedule only, the company [inaudible- crosstalk] …so

4    otherwise then this schedule which it does not deal with [inaudible].

5    MR ROSEN:  No, it doesn't, but what the schedule does is to make it plain that there is a

6    difference of, for the purposes of the schedule of course, between the group and the

7    employer and that is a distinction which is generally applicable.  The trouble is the

8    construction of clause 2(a), the suggestion in the first line of 2(a)2 that while you

9    remain by the company …

10    MR JUSTICE STEEL:  Sorry where are you now?

11    MR ROSEN:  I'm on page 118.

12    MR JUSTICE STEEL:  There I am there, yes.

13    MR ROSEN:  The suggestion that while you remain employed by the company means that

14    you are employed not by the relevant service company in the group, but that you are

15    employed by every company in the group or as I think my learned friend was

16    pressed to tell Your Lordship, by at least MMC, Guy Carpenter and MSL which is

17    an entirely new, I think, new suggestion on the part of the executives and what that

18    means is employed within the group.  It quite plainly doesn't turn the very careful

19    contractual situation with the service companies, very widespread structure and one

20    which was adopted in this group for a very good reason, it doesn't turn it into a

21    dead letter and say well now in fact you are an employee of every company in the

22    group.  What it plainly means is employed within the group, the company being

23    defined as all the companies in the group.

24    MR JUSTICE STEEL:  I mean what is all the more surprising is that it is for the purpose of

25    schedule 2(d) only that the company is treated as the member of the group that is

26    the employer.

1   MR ROSEN:  Yeah because for the purposes of this scheme, you don't need to worry

2       about it.  There is a distinction between the entire group and the particular

3       employer.

4   MR JUSTICE STEEL:  For the purposes of schedule.

5   MR ROSEN:  Of schedule, of schedule 2 only.

6   MR JUSTICE STEEL:  Yes.

7   MR ROSEN:  As Your Lordship said.  The plan is then a plan that for the group …

8   MR JUSTICE STEEL:  Right.

9   MR ROSEN:  …… and the reference to being employed by the group because company

10      [inaudible], well it's all the companies, does not turn you into an employee of every

11      single company in the group because everyone knows you've got an employer,

12      namely the company by which you are in fact employed as referred to in schedule

13      2(d) only.

14  MR JUSTICE STEEL:  Well what does "company" mean in the next sentence?  In the next

15      sub clause.

16  MR ROSEN:  Well in …

17  MR JUSTICE STEEL:  It means something different does it?

18  MR ROSEN:  Sorry, sub clause, quite possibly.

19  MR JUSTICE STEEL:  [inaudible] the company shall have the obligation to pay

20      [inaudible].

21  MR ROSEN:  Yes.

22  MR JUSTICE STEEL:  That is a different company?

23  MR ROSEN:  No.  It's, it's, as I say, the relevant employee within the group of companies,

24      is the employee, the fact that the bonus scheme provides for obligations on the part

25      of the whole group, does not turn the whole group into the employer.

26  MR JUSTICE STEEL:  But I mean the obligation to pay the base salary whether by one

1 company or another does not really have any relationship to [inaudible].  Why is it

2 there at all?

3 MR ROSEN:  Um.

4 MR JUSTICE STEEL:  This is all, all the [inaudible] share of employment.  [inaudible]

5 MR ROSEN:  Well we don't need …

6 MR JUSTICE STEEL:  … bonus scheme, all you have to say is if you behave properly and

7 do not act detrimentally, you will get another thirty to seventy thousand pounds.

8 MR ROSEN:  Well the, the, is Your Lordship asking why have covenants, a scheme of

9 covenants in the scheme, in the plan?  The answer is you have a scheme of

10 covenants with a quid pro quo because you want to make sure that those who are

11 going to receive their bonuses, behave themselves.

12 MR JUSTICE STEEL:  It is nothing to do with them behaving themselves.  It is the

13 companies who have the obligation to pay [inaudible].

14 MR ROSEN:  That's because, the, the, quid pro quo is that during your notice period, you

15 remain bound in various ways and you oblige yourself not to behave in other ways

16 and the group, the quid pro quo is the group will pay you "X".

17 MR JUSTICE STEEL:  Yes.

18 MR ROSEN:  Now, in the normal way …

19 MR JUSTICE STEEL:  [inaudible] the employer will pay the salary.

20 MR ROSEN:  The employer is a service company within the group.  There is a possibility

21 that the UK service company doesn't pay in which case the group is obliged to pay

22 but, but you can't simply have a group bonus plan which has only obligations one

23 way and doesn't record what's supposed to happen during the relevant period.  But

24 what it doesn't do and can't possibly do, is turn the entire group or the companies in

25 this group, into the executives employers when they are employed …

26 MR JUSTICE STEEL:  [inaudible].

1    MR ROSEN:  Yeah well Your Lordship's got it but it's not the most beautiful scheme plan

2        in terms of drafting that I've ever seen but then I'm not a great expert in these plans

3        so it may be that this is how one does them.  I mean certainly those who drafted it

4        would have a great more expertise than I would.  The point of reference to this is

5        really just to suggest to Your Lordship that there is a duty of cooperation which

6        quite plainly is the cause of action in the New York proceedings and we'll look at

7        those in a moment.  I'm not suggesting that the plan is totally unrelated to the

8        executives employment by MSL within the group.  I mean that would be absurd.

9        Of course it has a relationship.  Of course it does and you may describe it as

10       ancillary to it or part of it or parallel with it.  It doesn't really matter.  Obviously it

11       has a relationship.  It doesn't make the US companies who are enforcing it, the

12       employer of the executive.  In our respectful submission it is an absurd contention

13       and when you look at Mr …

14   MR JUSTICE STEEL:  Yes I think I got that point.

15   MR ROSEN:  Yep.  When you look at Miss Payne's latest witness statement, the one of

16       yesterday, where she tries to tell us who the employer actually is, I think Your

17       Lordship saw this in paragraph 22 [inaudible], in practise, the first question you say

18       …

19   MR JUSTICE STEEL:  [inaudible].

20   MR ROSEN:  This is Miss Payne's, I'm not sure if it went into the bundle but if it…

21   MR JUSTICE STEEL:  [inaudible].

22   MR ROSEN:  … well A, try A, tab 12, please.  I'm so sorry.  I never got the bundle so.

23   MR JUSTICE STEEL:  Yes… Where are you?

24   MR ROSEN:  Paragraph 22.

25   MR JUSTICE STEEL:  Yes.

26   MR ROSEN:  This ends up, Your Lordship read it this morning, this ends up in paragraph

1    27 by saying the claimants consider themselves to be working for the GC FAC

2    organisation.  Well of course they were working for the GC FAC organisation.

3    They were in communication working operationally with very senior executives in

4    the group and they were working on the GC FAC side of the group.  There's no

5    doubt at all about that.  It is absurd that these very senior executives didn't know

6    that their employment contracts were with MSL and it makes no difference even if

7    they didn't' know.

8  MR JUSTICE STEEL:  Ms Mansfield makes exactly the same mistake [inaudible].

9  MR ROSEN:  Well she's not, she's not ....

10  MR JUSTICE STEEL:  She holds herself out as a Human Resources genius.

11  MR ROSEN:  Well she's, she's, she's not the lawyer and she's not the lady who was the

12    subject of that very contract.  These senior gentlemen have been employed by the

13    service company for many years and have been remunerated by …

14  MR JUSTICE STEEL:  Anyway [inaudible].  I understand [inaudible] is that they are not

15    employees of the entire group.  [inaudible] any other point at this stage.

16  MR ROSEN:  No, the point I'm making is they can only have been employees of MSL …

17  MR JUSTICE STEEL:  Right.

18  MR ROSEN:  … because there is no other alternative and what Miss Payne doesn't say is

19    who else was their employer …

20  MR JUSTICE STEEL:  Right.

21  MR ROSEN:  … and Your Lordship got from my learned friend this morning on her feet,

22    it was at least MMC, Guy Carpenter and MSL.

23  MR JUSTICE STEEL:  Well that is her alternative case.  I mean [inaudible] as I

24    understand it, is that for the purposes of section 5, one has to in a sense treat the

25    bonus agreement of piggy-backing on the employment contract and that any dispute

26    that arises after the [inaudible] bonus agreement which itself contains a large

1   amount of material relating to the terms of employment is a dispute which falls

2   within section 5.

3   MR ROSEN:  Well that won't work for two reasons.

4   MR JUSTICE STEEL:  [inaudible].

5   MR ROSEN:  And it won't work for two reasons.  First of all, she has a double hurdle.

6   She has to say that those suing in New York are the employer because that's the

7   requirement of Article 20 and then she has to say that it is a matter in relation to the

8   individual contract of employment and the fact that these gentlemen worked within

9   a large group and that they had an employment relationship with the group and that

10   they operated with others in the group, does not mean that they have an individual

11   contract of employment with the group.  Moreover, if the claim is made under

12   clause 2(e) of the plan, then although in ordinary English [parliaments], it plainly

13   relates to, it has a relationship with the individual contract of employment ...

14   MR JUSTICE STEEL:  Right.

15   MR ROSEN:  ... it is, on the basis of the jurisprudence, still not within Article 18 of the

16   regulation.  It is still not a matter in relation to the individual contract of

17   employment because as the only English authority [inaudible] at tab 11, [inaudible

18   v Black Foods] having considered the European jurisprudence, the learned Judge in

19   that case said in paragraph 26 "Accordingly, in my view, the phrase and matters

20   relating to individual contracts [inaudible] where claims are made under the

21   individual contracts of employment" and this is not a claim made under the

22   individual contracts of employment.  It may be a claim which has a relationship

23   with the individual contract of employment but that's not this autonomous phrase's

24   correct definition.  And this Authority, in our respectful submission, is [inaudible]

25   and the learned Judge considers the jurisprudence the background in the reports and

26   so on as regards the definition of this autonomous phrase and we can't look at it