# EXHIBIT 18-5

1    like English lawyers or even New York lawyers.  We have to look at it on the basis

2    of the jurisprudence as to what that phrase in Article 18 means so that in our

3    respectful submission is why these arguments go absolutely nowhere.  That leaves

4    me with, if Your Lordship can bear it, to look at the complaint and the other

5    document in the United States again.

6    MR JUSTICE STEEL:  No well you are going to have to come back to regulation 44 but

7        [inaudible.

8    MR ROSEN:  I will.

9    MR JUSTICE STEEL:  [inaudible].

10    MR ROSEN:  Now, we're still in, we're still looking at the plan which is in tab 4, bundle

11        A.

12    MR JUSTICE STEEL:  Yes.

13    MR ROSEN:  And there is a point on schedule D but it doesn't matter for present purposes

14        because in our respectful submission cooperation clause which is at 2(e), page 120,

15        is entirely clear.  MMC and Guy Carpenter as party to the plan are entitled to say

16        under A, 2(a)3, at the bottom of page 118, that throughout the notice period you

17        will remain an employee of the company which we say plainly means the company

18        within the group which employs you, with all attentive fiduciary duties including

19        without limitation duties of loyalty and confidentiality in the company.  So we say

20        section 2(e) is clear.  There is an obligation in 2(a)3 which the New York claimants

21        can rely on and for what it's worth, we also say that the detrimental activities at C1,

22        at page 116, it doesn't matter whether they are C1 or schedule 2, they quite plainly

23        are there to mirror obligations not to behave in this detrimental way and we say it

24        would be an absolute nonsense if the quid pro quo for this contract meant that they

25        could, as far as the plan is concerned, flout their obligations by entering into

26        detrimental activities and then just say well all you can do about it is [inaudible]

1    bonus during the rescission period.  That's not what this quid pro quo …

2  MR JUSTICE STEEL:  How does the [inaudible] jurisdiction clause work?

3  MR ROSEN:  That's at page 124.

4  MR JUSTICE STEEL:  124 as against 12, 123.

5  MR ROSEN:  Well as against the non-exclusive English jurisdiction.

6  MR JUSTICE STEEL:  Right.

7  MR ROSEN:  If the, if the claim arises under the plan or the award, because we are

8    enforcing clause 2(e) …

9  MR JUSTICE STEEL:  Right.

10  MR ROSEN:  … then we are squarely within …

11  MR JUSTICE STEEL:  I understand that.

12  MR ROSEN:  … 6 [inaudible], but, but, and there is a big but, as regards UK employees

13    following termination of employment, there is a different scheme …

14  MR JUSTICE STEEL:  Right.

15  MR ROSEN:  … and that provides for the non-exclusive jurisdiction of the English Courts

16    and that's 132.

17  MR JUSTICE STEEL:  [inaudible] if you could just repeating what is there.  I just wonder

18    how does it work?

19  MR ROSEN:  Well if you, if you're seeking to rely on or there's a dispute in relation to

20    schedule 2(d), then that schedule under Clause 6 is English law and non-exclusive

21    English jurisdiction.  If you're seeking to rely on disputes or seeking to enforce the

22    award other than schedule 2(d) then you have section 69.  Your Lordship has in

23    mind there may be an inter-claim between them but the heart of it will be are you

24    making a claim under clause 2(e) which is part of the plan or are you making a

25    claim under schedule 2(d)?  And of course, the key point about 2(d) is that it could

26    fit in with the individual contract of employment.  So it would make, it would make

1      …

2    MR JUSTICE STEEL:   [inaudible] you have a situation in which the cooperation

3        agreement of client both during and after [inaudible] the detrimental activity

4        provision, effectively has a different governing law depending on whether

5        [inaudible].

6    MR ROSEN:  Yes but that would, I mean, governing law isn't really the issue here with

7        respect.

8    MR JUSTICE STEEL:  [inaudible].

9    MR ROSEN:  One can very easily see that there might be issues as to governing law and

10       no doubt the New York Judge will be addressed on that …

11   MR JUSTICE STEEL:  Right.

12   MR ROSEN:   … and I think Mr Whyte already addresses it in his memorandum in

13       opposition to the expedited Order which he made so, but that's all for the New

14       York Judge to decide.  Your Lordship would have to be satisfied for the purposes of

15       this [inaudible] to whatever might be the good [inaudible] in the case but the New

16       York proceedings are not a claim to which Section 6(n) applies and in our

17       respectful submission, sorry, I didn't, I didn't say that, yes it's roman, I'm sorry the

18       jurisdiction clause is a roman 6 …

19   MR JUSTICE STEEL:  Oh right.

20   MR ROSEN:  … beginning on 122 …

21   MR JUSTICE STEEL:  Yes.

22   MR ROSEN:  … and then "n" on page 124.

23   MR JUSTICE STEEL:  Right.

24   MR ROSEN:  And on that we say for present purposes there's no serious, serious issue at

25       all …

26   MR JUSTICE STEEL:  No.

1   MR ROSEN:  … because if you then go on to look at the complaint again …

2   MR JUSTICE STEEL:  It would help me if you give me page numbers from time to time

3        [inaudible].  What page are you on?  Page 101?

4   MR ROSEN:  That sounds right.

5   MR JUSTICE STEEL:  Yes.

6   MR ROSEN:  I'm sorry, I was going the wrong way.  The introduction makes it plain that

7        what's relied upon is the plan, referred to as the agreements, paragraphs 1 to 3 rely

8        upon breaches of the plan and rely in particular in the top of page 102 on the

9        making of the written reasonable request for information in accordance with the

10       provision namely clause 2(e), the cooperation provision, the defendants have

11       refused to cooperate, and then the [harm] is pleaded in that paragraph at the top of

12       page 102.  I've already drawn Your Lordship's attention to the references to clause

13       6(n) which …

14  MR JUSTICE STEEL:  [inaudible] what is the significance of paragraph 2?

15  MR ROSEN:  The significance is to make it plain by way of an introduction that the claim

16       here is for a failure and refusal to comply with written reasonable requests for

17       information under clause …

18  MR JUSTICE STEEL:  No sorry, the next, the next paragraph.

19  MR ROSEN:  … under the express terms of the agreements, defendants are not permitted

20       to engage in detrimental activity …

21  MR JUSTICE STEEL:  Right.

22  MR ROSEN:  … and they did engage in detrimental activity.:  And again, that's a

23       reference to the agreements.

24  MR JUSTICE STEEL:  Right.

25  MR ROSEN:  But the Orders that were made when we come to it, Your Lordship will see,

26       very heavily relied on clause 2(e), the cooperation provision, and it doesn't matter

1   whether the breaches for this purpose are to be treated as within the body of the

2   award or some separate schedule.  The reliance here is on 6(n) the exclusive

3   jurisdiction as applying to the awards.  And then again, that's pleaded out as I've

4   mentioned to Your Lordship, the exclusive jurisdiction clause, many times.  It is

5   correct that reference is made to schedule 2(d) and Your Lordship will see that from

6   paragraph 26.  The definitions relied on in 2(d) as I've already suggested to Your

7   Lordship would make, it would make no difference whether it's 2(d) or 1(c).  And

8   then, I think if Your Lordship goes to the narrative in paragraphs 39, the cause of

9   action pleaded is clause 2(e).  The correspondence is set out which I've already

10  shown Your Lordship in part, and then there are the two claims for relief.  There

11  might be an argument as to whether or not English law should apply to Schedule

12  2(d) and the Judge may have already intimated a view.  None of this effects, in our

13  respectful submission, the May Order, although as I've told you we're entirely

14  happy for the Judge to be addressed on the basis of Ms Mansfield's correction, and

15  in our respectful submission, none of it takes away from the exclusive jurisdiction

16  of the New York Court.  The argument would be, if all you're relying on is

17  obligations which are governed by English law and non-exclusive jurisdiction, then

18  the whole of your proceedings should be in England and New York is not

19  inappropriate for it.  That will be the argument in a nutshell, if Your Lordship

20  follows me.  That will be the argument.  If, insofar as you have to rely on

21  obligations which are only in schedule 2(d) in breaches of those obligations and

22  that's English law and non-exclusive English jurisdiction, then the whole of your

23  proceedings in New York are inappropriate for venue, and the whole thing should

24  be heard in England, and that's the argument that will no doubt be made to the

25  Judge, or one of the arguments of the jurisdictional challenge.

26        So far as the Order of the 18th May is concerned, Your Lordship's already

1    seen the documents which essentially make the same points as in the complaints as

2    I've already addressed Your Lordship as regards Ms Mansfield's declaration at page

3    232, which she will want to correct, which exhibited the contracts, but referred to

4    the defendants employment with Guy Carpenter.

5    Now the argument in relation to the regulation is set out in our skeleton at pages 14

6    and following.  I don't know if Your Lordship wants me to take you through them

7    all?

8    MR JUSTICE STEEL:  I do not know.  You tell me.  You must assume that the Judge

9    [inaudible] ...

10   MR ROSEN:  No of course not.

11   MR JUSTICE STEEL:  ... [inaudible].

12   MR ROSEN:  No of course not.

13   MR JUSTICE STEEL:  Now which [inaudible] are you talking about?

14   MR ROSEN:   This is our skeleton argument in response to the application for the

15   antecedent [inaudible].  Your Lordship may have it in bundle B, tab 4.

16   MR JUSTICE STEEL:  [inaudible] 4th June.

17   MR ROSEN:  It is.

18   MR JUSTICE STEEL:  [inaudible].

19   MR ROSEN:  But not in b(4) obviously.  So, we consider the key point to be that MMC

20   and Guy Carpenter are not the claimants' employer for the purposes of section 5

21   and I'll come to that in a moment but we ought to just run through the argument in

22   stages.  Article 18(1) provides that in matters relating to ...

23   MR JUSTICE STEEL:  Sorry where are you?

24   MR ROSEN:  Top of page 40, paragraph 39.

25   MR JUSTICE STEEL:  Yes.

26   MR ROSEN:   Provides that, this is Article 18(1), provides that matters relating to

1    individual contracts of employment, jurisdiction shall be determined by [inaudible].

2    So the claimants have to establish that the New York proceedings are matters

3    relating to individual contracts of employment within the meaning of the provision

4    and if they're not then they simply don't engage the regulation. We submit that that

5    would be the only reason for the English court to decline to give effect to the

6    exclusive jurisdiction clause in the plan because normally that would be a very very

7    strong reason to simply uphold the parties' choice of jurisdiction. Even if there

8    wasn't exclusive jurisdiction in the plan, of course, then the Applicant would still

9    have to surmount all the other obstacles for anti-suit injunctive brief.

10   MR JUSTICE STEEL: Yes.

11   MR ROSEN: So we say that there are four reasons why the executives fail on Article 18.1.

12   We say first the New York Claimants have tried to enforce the provisions of the

13   plan and in particular the cooperation clause. The New York proceedings are not

14   seeking to enforce or rely on the provisions of the Claimant's contract of

15   employment. I have in mind there is the schedule 2(d) point. Our respectful

16   submission is it doesn't matter. What they are not seeking to do is to enforce the

17   Claimant's contracts of employment; they're seeking to enforce the plan and the

18   plan is not the individual contract of employment.

19   Then we say the Claimants' contracts of employment are made uniquely

20   with MSL, which isn't a party to the New York proceedings, and that contrary to

21   the Claimants' suggestion the fact that the Claimants provided services to other

22   companies in the group, that is, services throughout MMC, and in particular in

23   relation to the Guy Carpenter faculty business, does not mean that they have more

24   than one employer on multiple employment contracts. And we refer to Ms

25   Mansfield for the structure of employment within the group.

26   Just to examine the proposition for one moment, if every executive who was

1   employed by a service company could go through tick boxes to say, "Well actually

2   I'm employed by three or more companies within the group because the service

3   company is there to employ me to provide my services to the group", then it would

4   mean that every executive employed through this mechanism would have a

5   multitude of employers.   In different jurisdictions no doubt and with all the

6   ramifications that that involves.  And that's why we submit, on the first point, that

7   it's an absurd argument.

8   Secondly, we say the plan in any event is not an individual contract of

9   employment, or a matter relating to an individual contract of employment.  The

10  hallmark of a contract of employment is the existence of mutual obligations on the

11  part of the employer to provide work and on the part of the employee to carry out

12  that work.  That is the key to it.  That is the hallmark.  The fact that you operate

13  with others, that there's a stock plan with the group that you report to people in

14  other companies within the group, does not enable you to ignore the contract

15  employment and the mutual obligations which are enshrined in the contract.

16  Whatever may happen in practice and whatever the extent to which you can look at

17  conduct, conduct will not take away from the contract of employment under which

18  there are the mutual obligations unless of course it is simply inconsistent with it.  If

19  what in fact happens as a matter of conduct shows that the contract of employment

20  and the mutual obligations are a sham, or are simply ignored - completely ignored -

21  you are never - you are not paid by the person who has the obligation to pay you

22  under the contract - you do not actually fulfil the functions for which the service

23  contracts employ you.  Then you can say that that is conduct inconsistent with that

24  being the true contract and set of mutual obligations.  That's not this case.

25  There are various other tests which can be applied to determine whether the

26  contract is a contract of employment.  Control, integration, economic reality.  But

1    none of those tests is satisfied by the terms of the plan.  The fact that the plan has

2    terms which are sometimes found in employment contracts does not make it a

3    different employment contract from that under which the executives were employed

4    by MSL.

5         The relationship between the executives and MMC under the plan is the

6    relationship that they have with the group of companies which is going to award

7    them the stock incentives and other benefits.  And the quid pro quo under that

8    agreement does not replace the employment contract.  It is not itself an employment

9    contract.

10        And then, all of these provisions that are relied upon as being apposite to an

11   employment relationship again miss the point.  We are not concerned with whether

12   we can characterise the relationship between the executives and the group, or the

13   parent company of the group, as like an employment relationship.  We're not

14   concerned whether or not the quid pro quo involves some of the obligations that

15   you might find in an employment contract.  We are concerned with 'the contract' of

16   employment and there is only one contract of employment in this case.

17        And then we sat that, applying the criteria under the European

18   jurisprudence, we say the plan is not a matter relating to the contract of

19   employment.  This is an independent concept.  I'm not going to take your Lordship

20   to the authorities.  It probably doesn't matter.  There's nothing between my learned

21   friend and us as regards this principle.  The European Court hasn't yet provided

22   clear guidance but we've got [Shenovi] and we simply quote from the European

23   Court in [Shenovi] paragraph 16.  And I think your Lordship has already seen that

24   in a different case.

25        They we've got the general [inaudible] of the court and the contract of

26   employment presupposing the relationship of subordination of employer to

1    employee which is exactly what we find in the MSL contract of employment. And

2    then we say the plan isn't a contract of employment. It's not a contract for work. It

3    doesn't bring executives within the organisational framework of a separate

4    business. What it is - it's the group holding structure's stock incentive plan which

5    is obviously related to their individual contracts of employment but doesn't replace

6    it.

7  MR JUSTICE STEEL: Yes.

8  MR ROSEN: Third point. The employer, leave aside the question of who it is, is not

9    seeking to rely on the contract of employment for the claim. The Claimants are

10    relying on the plan and we have the <u>Swithenbank</u> decision which your Lordship's

11    already seen which is exactly on the point.

12       Ignore the fact that the four Defendants in this case are the senior executives

13    who are still within the group and earning $1,000,000 a year, the policy of the

14    section is to confer jurisdictional advantages on the employee as regards claims

15    under the individual contracts of employment and not other ancillary relationship or

16    contracts with other companies within the relevant group, including the service

17    company's ultimate parent company.

18       So that's <u>Swithenbank</u> which we commend to your Lordship. And then we

19    say the de facto provision of services to other companies in the group takes matters

20    no further. That is exactly what MSL employed them to do. The contractual

21    obligation that they had to MSL was to do so. And the fact the plan contains terms

22    which would be apposite in the context of employment relationship, we say cannot

23    make it into the contract of employment. That would be flatly inconsistent with the

24    authority. It would mean even though we're not bringing a claim under the

25    individual contract of employment, if there is a different contract with terms that

26    would be apposite then that contract can be treated as replacing the contract of

1    employment. And fourth, there is no public policy and reason why the Court should

2    not restrain from instruction of the regulation in order to treat the New York

3    proceedings as a matter relating to an individual contract. And we refer again to

4    Judge McGonagle as regards policy.

5        The terms and circumstances of the plan, we say, are very far removed from

6    the type of employer/employee relationship or contract which led to the inclusion of

7    the special jurisdiction provisions of Section 5. That's the relationship

8    characterised by subordination of employees and attention on fairness exposing

9    employees to proceedings in foreign jurisdictions at the whim of the employer.

10    That's not this case. The plan is a group plan of parent companies United States

11    stock awards governed by the law of the United States and this isn't a question of

12    subordinate employees being unfairly prejudiced as regards jurisdictional

13    provisions.

14        And then we footnote Bonatti where your Lordship - I think your Lordship's

15    already been taken to Bonatti. But in Lord Justice Buxton's judgement he took

16    account of the fact that the alleged employee was a successful businessman who

17    signed a consultancy agreement of his own free will, submitting to the jurisdiction,

18    and deplored the fact that the regulation had [inaudible] the jurisdictional challenge.

19        In our respectful submission, what this is is essentially an opportunity …

20    MR JUSTICE STEEL: [inaudible] say. Anyway …

21    MR ROSEN: Does your Lordship want to see it or is …

22    MR JUSTICE STEEL: …Well no it is [inaudible] dissenting …

23    MR ROSEN: He dissented on the question of whether or not conduct - post-contract

24    conduct - was admissible. His submission.

25    MR JUSTICE STEEL: He thinks jurisdictional challenge is to be deplored. I rather

26    disagree with that.

1    MR ROSEN:  Well ...

2    MR JUSTICE STEEL:  Yes.

3    MR ROSEN:  It had ...

4    MR JUSTICE STEEL:  He spent more time discussing [inaudible] ...

5    MR ROSEN:  It had certainly reached a size far greater than the current application before

6         your Lordship, even though the current application is not so [inaudible].

7              So we say that employees qualifying for awards under the plan will be

8         individuals with substantial assets and commercial know-how.  The new

9         jurisdiction was included in the plan not to make life difficult for them, as if they're

10        subordinate employees, but for perfectly sound and legitimate business reasons of

11        MMC.  I mean we're talking about an enormous international group of companies

12        and how it deals with stock incentives to its senior executives.  We're not talking

13        about driving subordinate employees to far distant jurisdictions in order to cause

14        them hardship.  And so we say that on the Article (a) ground the application fails -

15        18 - the application fails in timeline.

16             We've then got the Article 20 point because Article 18 just makes Section 5

17        applicable.  So they have to get through that hurdle first.  And then logically they

18        have to rely on Article 21.

19             The domicile part of Article 18 is totally irrelevant in this case.  Absolutely

20        irrelevant.  All your Lordship needs is 18.1 on what the Section applies to and

21        Article 20.

22             And we say that we're not the employer as far as the US companies are

23        concerned.  And I've already I think made all these submissions.  It's an extremely

24        short point.  And despite the executives' best efforts and my learned friend's best

25        efforts you can't make it longer.

26             And we remind your Lordship, for what it's worth, of the authorities on

1    piercing the corporate veil.  Essentially the executives would have to persuade you

2    that the employment contract in this case is a sham and that really they were

3    employed by top companies in the international group which MSL served in the

4    UK.  And so we give your Lordship just an extract from [inaudible] industry.  And

5    then we suggest that there are marriages in other employment fields.  I won't show

6    your Lordship [Elias J. in Milne].  It's footnoted in 41.  I would say just that it

7    appears to the Court that they treat two businesses at one, that they're exceptional

8    circumstances, and even then only for certain purposes.  It must be shown the

9    subsidiary is a sham or a [inaudible].

10        And then in 69 we rely again on the fact that the insinuation, or in fact I

11   think it's now an express allegation, that this is an artifice and forum shopping and

12   constructing contractual arrangements so as to enable into forum shopping, is

13   entirely without substance.  We say MMC and Guy Carpenter, the US companies,

14   are the natural parties to bring the proceedings to enforce the terms of the plan and

15   the New York proceedings simply only utter that plan.

16        So whilst acknowledging the Schedule 2 point, in our respectful submission

17   none of that helps to bring the New York claim within the regulation.  And we say

18   there is no need for restraint interpretation.  The unrestrained reading of the article

19   is fine and the New York proceedings are not inconsistent with Article 21.

20        So whatever else you can say about the New York proceedings, in our

21   respectful submission you can't say that which the executives have to say, namely

22   they are within the regulation.  There isn't a case for it.  There isn't a good arguable

23   case.  There's no case at all.  It's a very ingenious ploy to avoid the New York

24   proceedings and the New York quarter.

25        So can I move on to what is the point of the application?  It can't possibly

26   be to stop the New York Court deciding its jurisdiction.  So what it has to be is to

1    obtain a stay on the order which the New York Court found fit to make on 18 May.

2         Now in our respectful submission, to go down the path of enjoying the US
3    Claimants from enforcing that order is a very dangerous course indeed.  On any
4    footing the New York Court had before it the necessary material.  It could take a
5    view on the service issues and it could take a view on the timetable and the
6    necessity and urgency for the application.  There is one fly in that ointment, which
7    is the question of employer, which in our respectful submission is of no significance
8    at all as regards the order made and which we will undertake to the Court to correct
9    so that the parties can address the New York District Judge if they consider it makes
10   any difference at all.

11        My learned friend suggested that there might be a difference as regards
12   unreasonable restraint of trade.  Unreasonable restraint popped up yesterday
13   afternoon in Ms Payne's third witness statement, which was I think some very
14   considerable time after the controversy in relation to the New York proceedings
15   arose. I am not sure if your Lordship's read it.  It actually has a - right.  Well let me
16   just tell your Lordship.  It's not clear what restraint of trade under which system
17   abroad is relied upon, but at present what we are doing is enforcing obligations
18   during the currency of the contract - duty to cooperate - which is going to be the
19   same whether it's English or New York drawn as far as we're concerned, and which
20   can be found expressed throughout the agreement.

21        What's suggested is, if you're not the employer then you might not be able
22   to enforce those provisions of the plan.  We regard that as utterly fanciful.  But if
23   the New York Judge thinks there's anything in it at all then the New York Judge
24   will be able to re-visit the order.  But we think it's nonsense.  If a group, and the
25   holding company group, enter into a stock incentive plan with senior executives on
26   a quid pro quo and during the currency of that plan there are various obligations not

1    to do things and not to cooperate, it obviously has an interest in it.  It is the parent

2    company to whom services, or to its group, services are being rendered by these

3    particular executives through service companies.  So it's nonsense.  It hasn't been

4    spelt out.  If it's going to be spelt out it can be spelt out in New York.

5         There is another point made by Ms Payne and we regard it as quite

6    outrageous.  It's a Greek ship owner's defence.  She says that before they signed the

7    awards, saying that they'd read them and so on, they were given an assurance that

8    the covenants in the awards wouldn't be enforced against them by very senior

9    people, the Claimants.  It is an invention.  We categorically deny it but it is a

10   measure of what the executives will do to avoid their obligations.

11        Your Lordship, I'm not sure if your Lordship has yet read it.  I think Ms

12   Payne - remember your Lordship …

13   MR JUSTICE STEEL:  Payne 3.

14   MR ROSEN:  Payne 3.  Can I just show it to your Lordship?

15   MR JUSTICE STEEL:  Well you're welcome to but …

16   MR ROSEN:  I think your Lordship had this at A12.

17   MR JUSTICE STEEL:  Yes.

18   MR ROSEN:  And it's - this is its first appearance in this dispute.  It's paragraphs 13

19        through to 18.

20   MR JUSTICE STEEL:  Well I should not understand your [inaudible] regarding this point.

21        Do I need to request an adjournment?

22   MR ROSEN:  Well …

23   MR JUSTICE STEEL:  My point here is I don't understand your …

24   MR ROSEN:  … I'd quite like to show your Lordship what the New York Court's going to

25        have to consider.

26   MR JUSTICE STEEL:  Right.

1   MR ROSEN:  And my point is that the New York Court will consider these points.

2   MR JUSTICE STEEL:   I am not sure.  They may do but it is not being suggested against

3      you.   The one reason to issue the anti-suit injunction is that the New York

4      proceedings are bound to fail because it is relying upon the cooperation clause to

5      which the Claimants are not bound.

6   MR ROSEN:  Well it appears both in the witness statement and in my learned friend's

7      skeleton.

8   MR JUSTICE STEEL:  Well that could be.  I am just saying that that point is not …

9   MR ROSEN:  And …

10   MR JUSTICE STEEL:  …advanced.

11   MR ROSEN:  … but if it's not.  If it's not advanced …

12   MR JUSTICE STEEL:  Then I need not trouble you with that.

13   MR ROSEN:  Then I - then I shut up.

14      Now, can I next address your Lordship, and I'm coming to the end of my

15      submissions, on questions of balance of convenience and discretion?

16   MR JUSTICE STEEL:  Now this is on the premise that …

17   MR ROSEN:  That you're against me.

18   MR JUSTICE STEEL:  Section - I believe that Section 5 applies.

19   MR ROSEN:  Yes.

20   MR JUSTICE STEEL:  Yes.

21   MR ROSEN:  Your Lordship has my submissions on comity and we say that it's a matter

22      for the New York Court.

23   MR JUSTICE STEEL:  Right.

24   MR ROSEN:  Would your Lordship give me one minute?

25      Our first submission is that the US companies are entitled in any event to

26      answers and documents dealing with their enquiries.  Their enquiries are made to

1     protect their business.  They are made against persons who on any view have a duty

2     to cooperate, and on any view those persons can be properly suspected of assisting -

3     suspected of assisting - Integro who they have joined.  We don't allege that that is a

4     matter which can be proved.

5  MR JUSTICE STEEL:  Well again, and I think it is, although it is not conceded that the

6     sort of cooperation you are seeking falls within the schedule of cooperation clause

7     …

8  MR ROSEN:  Yes.

9  MR JUSTICE STEEL:  … it is not suggested that that isn't arguable.  Nor is it, as I

10     understand it, suggested that the complaint there has been assistance is itself not

11     arguable.

12  MR ROSEN:  No it …

13  MR JUSTICE STEEL:  Unless I have misunderstood it.

14  MR ROSEN:  It isn't.

15  MR JUSTICE STEEL:  No.

16  MR ROSEN:  It isn't suggested but what appears to have been suggested in the strategy so

17     far is that what we can ask about must go directly and be defined by reference to

18     breaches of obligations of fidelity such as solicitation of employees on a

19     confidential basis.  In that role we're entitled to ask these executives, whilst they

20     remain with the group and under the duty of cooperation, we are entitled to ask

21     them for any information or documents which go to suspicions of assistance to

22     Integro.

23  MR JUSTICE STEEL:  No, you were not agreeing with that.  You could ask any

24     reasonable question.

25  MR ROSEN:  We can ask any reasonable question.  Now these questions …

26  MR JUSTICE STEEL:  On your analysis.

1   MR ROSEN:  These questions all go to our business …

2   MR JUSTICE STEEL:  …It would have to be related to work or commercial activities.

3   MR ROSEN:  Yes of course.  These questions all go to our business and the competition of

4        the business, Integro.  If these gentleman have given any information to our

5        competitors they're not assisting us, they're assisting the competitors.

6   MR JUSTICE STEEL:  I am not - assuming you are right about Section 5.  I am sorry, let

7        me start that again.  I am not giving any hostages to fortune as to what is the proper

8        approach to your other application if that …

9   MR ROSEN:  No of course not.

10  MR JUSTICE STEEL:  … if that needs to be dealt with.  But for the moment I am not

11       quite sure where we are going on this.  There is no dispute, at least which I could

12       resolve, and nor is there a suggestion that I can, as to what the proper meaning of

13       the cooperation clause is.

14  MR ROSEN:  I'm not asking your Lordship to.  I'm dealing with the balance of prejudice

15       for justice.

16  MR JUSTICE STEEL:  Right.

17  MR ROSEN:  If your Lordship grants the order against me in relation to the May - I'm just

18       dealing with the 18 May order - then presumably the executives will continue not to

19       comply with it.  I will not be able to ask the English Court or the New York Court

20       to go through some way of enforcing it, whether it's Section 25 or a letter of request

21       that goes.  I will then have to come before the English Court and simply ask the

22       English Court, whilst reserving my position on New York exclusive jurisdiction, to

23       make the same orders.  That's where we will be.  That's why I introduce it to your

24       Lordship, as where we will go as a practical consideration.

25         In the meantime these Defendants say, "Well, we haven't complied with the

26       New York order but if we do comply", this is what they say is the prejudice, "then

1    we will be taken, or there is a risk that we'll be taken, to have submitted to the New

2    York Court's jurisdiction".

3         Now we say, as regards that contention, that it is nonsense.  First of all there

4    is no suggestion that complying with the order has some - amounts to some sort of

5    legal waiver of the objections to jurisdiction which have already been made by Mr

6    Whyte and will no doubt be made by Mr Hopkins and so on.

7    MR JUSTICE STEEL:  Hang on there.  I do not think there is any evidence of that Mr

8        Rosen.

9    MR ROSEN:  No, the evidence is that they believe there's a risk.

10   MR JUSTICE STEEL:  Yes?

11   MR ROSEN:  That complying with the order will be a submission.

12   MR JUSTICE STEEL:  Well I meant, by evidence I meant there is no evidence from the

13       New York Lawyer on this topic.

14   MR ROSEN:  No.  No.  No.  But we can dispose of it very quickly for two reasons.  First

15   of all, if there is any law saying that by complying with an order whilst making your

16   jurisdiction application you are submitting or waiving then one would expect to see

17   it.  And there is none.

18        Secondly, the motion to dismiss the New York proceedings on jurisdictional

19   and forum non conveniens grounds is still to be heard, notwithstanding whatever is

20   happening on complying or not complying with the order.  It would make no sense

21   at all if Mr Whyte, for example, went on doing what he's doing, which is a form of

22   participation in the proceedings, if that amounted to a submission.  So there's a

23   certain amount of evidence that you can take steps in the United States without

24   waiving your jurisdictional objection, in particular if you are actually applying to

25   have the proceedings dismissed on forum non conveniens or other jurisdiction

26   based grounds.  But ..

1  MR JUSTICE STEEL:  Well fortunately now I agree with you but the difficulty arises in

2      relation to substantive depositions.  Now what is the status of those depositions?

3      Has there been any evidence in the American proceedings, and if they are in the

4      United States, on what basis the defendant who has been deposed has not submitted

5      to the restrictions.

6  MR ROSEN:  Well he makes his …

7  MR JUSTICE STEEL:  [inaudible – crosstalk]

8  MR ROSEN:  He makes his …

9  MR JUSTICE STEEL:  [inaudible] problems about it …

10  MR ROSEN:  Well I - yes, I see what your Lordship's saying.  He makes his jurisdictional

11      challenge and he then …

12  MR JUSTICE STEEL:  No, he cannot make that until he is deposed.

13  MR ROSEN:  He's issued it and we've got a timetable for it.

14  MR JUSTICE STEEL:  All right, yes.

15  MR ROSEN:  But apparently the Judge says, "You're going to have to be deposed first".

16  MR JUSTICE STEEL:  Right.  Now what is the status of the depositions then?

17  MR ROSEN:  Well if the jurisdictional challenge succeeds then those depositions cannot

18      be used in those proceedings.

19  MR JUSTICE STEEL:  Well they could use them in any other proceedings.

20  MR ROSEN:  Well it's information which the employer will have obtained to which the

21      employer is entitled.

22  MR JUSTICE STEEL:  That may be right.

23  MR ROSEN:  You know that's the - that's the balancing exercise.  I mean it may be that

24      what your Lordship's saying is that …

25  MR JUSTICE STEEL:  I think - I would be surprised if the New York Court would take

26      the view that if somebody who has been deposed who is a Defendant has not