**EXHIBIT 21-1**

Appeal Ref No _____

**IN THE COURT OF APPEAL**

**ON APPEAL FROM**

**THE HIGH COURT OF JUSTICE**          Claim No. 2007 Folio 945

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

Order of the Honourable Mr Justice Steel of 6 June 2007

B E T W E E N :

(1) JULIAN SAMENGO-TURNER
(2) RONALD DENNIS WHYTE
(3) MARCUS HOPKINS

Claimants/Appellants

-and-

(1) MARSH SERVICES LIMITED
(Formerly MARSH CORPORATE SERVICES LIMITED
and prior to that J&H MARSH & MCLENNAN (SERVICES) LIMITED)
(2) GUY CARPENTER & COMPANY LCC
(3) MARSH & MCLENNAN COMPANIES INC

Defendants/Respondents to Appeal

---

**SKELETON ARGUMENT ON BEHALF OF APPELLANTS**
In support of application for permission to appeal and appeal

---

Note : At the time of writing, the transcript of the Learned Judge's judgment (given ex tempore) is not yet available to the Appellants but is with the Learned Judge for his review. The Learned Judge invited the parties to raise with him in correspondence any major points he had not addressed and it may be that the final version of the judgment differs from the draft. In the meantime, the Appellants rely on their note of the judgment which appears at volume 3 tab 2 of the Appeal Bundle.

References below are to Appeal Bundle [vol/tab/page]

**Introduction**

1. In this matter the Appellants seek permission to appeal from the Order of Mr Justice Steel made on 6 June 2007 in which he dismissed their application for an interim anti-suit injunction to restrain proceedings brought by the Second and Third Respondents (both US companies) against the Appellants in the United States District Court Southern District of New York (Index number 07 Civ 3580) ("the US Proceedings"). The Appellants say that, in short, the US Proceedings are brought by their employers in relation to matters relating to their individual contracts of employment and as such they have a statutory right pursuant to section 5 of Council Regulation (EC) 44/2001 ("the Regulation") to be sued in all matters relating to their employment in this jurisdiction, where they are employed. The material provisions of the Regulation appear in the Appendix to this Skeleton. The Appellants sought an interim anti-suit injunction to enforce that right. In the alternative, the Appellants also sought an anti-suit injunction on the grounds that (a) the US Proceedings are oppressive, vexatious or unconscionable and (b) the relevant contracts contain a jurisdiction clause in favour of this jurisdiction which ought to be enforced.

2. The case presents issues of law, which themselves raise issues of general importance. They are:

    a. What amounts to an "individual contract of employment" and, in particular whether it encompasses an arrangement by which an employee is paid part of his remuneration as an employee in a separate agreement, within the meaning of Art 18(1) of the Regulation

    b. Whether Art 21(1) of the Regulation, which gives each Member State employee a mandatory, statutory protection against proceedings by his employer outside the place of the employee's domicile, should be enforced by anti-suit injunction relief where the employer is not domiciled in a Member State

2

    c.    Whether, if proceedings in a Non-Member State fall outside the express provisions of section 5 of the Regulation but nonetheless involve an Member State employee being sued qua employee, an anti-suit injunction should be granted to restrain those proceedings in favour of proceedings in the place of the employee's domicile on public policy grounds

    d.    Whether an non-exclusive jurisdiction clause in favour of this jurisdiction should be enforced by an anti-suit injunction to restrain proceedings brought in a Non-Member State

3.    The context in which those issues arise, shortly stated, is this. The Appellants are insurance brokers, working in London in the GCFac unit of Marsh & McLennan group ("the MMC Group"). They all resigned in early April 2007 and are at present on garden leave. They intend to start work for a different insurance broking group when that garden leave period expires in October 2007. Their status as employees (as opposed to, for example, self employed contractors) is common ground between the parties. They each have contracts with the First Respondent ("MSL") naming it as their employer ("the UK Contracts").

4.    MSL is a UK company. It is a service company, which transacts no business and exists for the sole purpose of employing staff. In practice, the Appellants work out of the London office of Guy Carpenter & Company Limited ("Guy Carpenter UK"), where they spend the majority of their time and provide their services. Guy Carpenter UK is the entity which actually transacts the business of the GCFac unit in the UK and to which the Appellants provide their services on a day to day basis. About 90% of the business so brokered is placed in the London market. The GCFac unit is part of the business conducted under the banner of Guy Carpenter by the Second Respondent ("Guy Carpenter"). The Appellants reported to various individuals under a chain of command

culminating in the CEO and President of the MMC Group. The Third Respondent ("MMC") is the ultimate US parent and controlling entity of the whole MMC Group. That contractual arrangement is common in the insurance industry in which the Appellants work. It exists for the administrative convenience of the MMC Group and is dictated by it.

5. The Appellants also have contracts, entered into with MMC pursuant to which they are paid a bonus ("the Bonus Contracts"). Those bonuses are treated as emoluments of the Appellants' employment and are paid (by MSL through the payroll) on a PAYE basis. Although the Bonus Contracts do not specify which company is obliged to pay, whether a payment is made and in what amount is fixed by "*the Compensation Committee of the MMC Board of Directors*" [clause IB]. (If it matters, the Appellants also get a bonus under the UK Contracts.) The structure of that arrangement is again dictated by the MMC Group and exists for its convenience.

6. The Bonus Contracts, whilst entered into by MMC, purport to impose obligations on the Appellants to, and create rights against the Appellants in favour of, "*the Company*", which is defined as being "*MMC or any of its subsidiaries or affiliates*". MSL is within that definition. Moreover, it was part of the Respondents' case before the Learned Judge that, for the purposes of certain provisions of the Bonus Contracts, the entity referred to as "*the Company*" can only mean MSL. Thus, it is the Appellants' primary case that the Bonus Contracts and the UK Contracts together make up their contracts of employment. The bonuses paid under the Bonus Contracts are, in short, part of the package of remuneration they receive by reason of being employees. One of the principle ways in which the Learned Judge fell into error was in separating off the Bonus Contracts from the UK Contracts, when what he should have done is look at the position in the round. If he had done so, he would have come to the inescapable conclusion that the Bonus Contracts form part of the Appellants' contracts of employment.

4

7. In the Complaint in the US Proceedings MMC and Guy Carpenter (together "the US Plaintiffs") are seeking to enforce the Bonus Contracts on the express basis that <u>they</u> employ the Appellants [see paragraphs 11-16 of the Complaint : 2/1/104-105; recited at paragraph 27 below]. They also relied on their status as employers, and the duties owed to them by the Appellants qua employees, to obtain an order in the US Proceedings on 18 May 2007 which provides for the Appellants to provide wide ranging documentary disclosure, answers to interrogatories and to attend for depositions. The timetable is for each Appellant to be subject to a seven hour deposition (and for one Appellant may be even longer). The order for depositions was sought and obtained on the basis that, as employees, the Appellants are obliged to provide their services to the US Plaintiffs, on this occasion in the form of attendance at depositions.

8. In response to the Appellants' application for an interim anti-suit injunction, the Respondents' case was that MSL and no other company employs the Appellants. They said that MMC and Guy Carpenter are not and never have been the Appellants' employers. They argued (and the Learned Judge accepted) that the Bonus Contracts are not contracts of employment and as such are outside Section 5 of the Regulation. On that basis, he declined to grant the injunction sought.

9. The explanation given in the Respondents' evidence before the Learned Judge for the apparently contradictory position adopted in the US Proceedings was limited to one sentence in the witness statement of Ms Mansfield, head of HR for various aspects of the MMC Group's business, namely "*This was pleaded in error*" [para 9 : 2/7/3]. The same Ms Mansfield had previously given a sworn declaration in the US Proceedings verifying the content of the Complaint. In oral submission, it was explained for the Respondents that the "*error*" referred to was the statement that the Appellants are employed by Guy Carpenter. The Respondents' counsel told the Learned Judge:

5

> "[The UK Contracts] were actually exhibited to Lindsay Mansfield in the New York Proceedings notwithstanding that there was an error which we must correct in the way the complaint was put, referring to the parent and leading companies, the US companies, as the employers and referring to Guy Carpenter as an employer, but so far as the contracts of employment are concerned they are all with MSL in many cases under a previous name."
> [Transcript p63 from line 20]

> "Can I deal with a comment in paragraph 9 about the reference to Guy Carpenter being the employer in the US Proceedings? Of course that has to be corrected. There is no question at all of it. As I've said, Ms Mansfield exhibited the contracts of employment to her declaration in the US proceedings, no one took the point and this is very loose terminology used in the pleading, it was not picked up. As far as we're concerned, it is of no significance whatsoever to the US Proceedings but that isn't the point. It should be corrected immediately. At the moment we are prohibited from taking any steps in the US proceedings for today but we will be making the correction and drawing it to Judge Cote's attention...."
> [Transcript p64 from line 23]

> "If the draftsman [of the Complaint] had looked at the contracts and looked at the correspondence to which they refer because the complaints and all the other documents refers to this letter as the key letter seeking to instigate the requirement and cooperation and answers to questions, and then they would not have made that error. But we're going to, we're going to have to correct it. I can't emphasise enough to your Lordship that we want to correct it and insofar as necessary, we undertake to correct it, so that if anyone thinks it's of any significance in the New York proceedings they can address the New York Judge on it. ..."
> [Transcript p71 from line 13]

10. The Learned Judge recorded this in his judgment that the "error" would be drawn to the attention of the New York Judge and that the Respondents would be making such amendments as they were entitled to make.

11. Subsequent to the hearing before the Judge, MMC and Guy Carpenter have put in further evidence in the US Proceedings (in the form of a further declaration from Ms Mansfield) to the effect that (a) in so far as she is concerned, the Appellants only "worked for" Guy Carpenter in the sense that they provided services to them and (b) she had not previously focussed on the question of which company in the MMC Group actually employed them. She

6

goes on the say that the actual employer is MSL. Significant by its absence in that explanation (such as it is) is any reference to the services provided to Guy Carpenter UK, the entity which actually transacted the business that the Appellants broked.

12. However, to date, the New York Complaint remains unamended, as does the Memorandum of Law submitted in support of the application which lead to the order of 18 May 2007. There has been no indication that any amendment to either is in prospect (despite what the Learned Judge was told). At a further hearing in the US Proceedings (on 11 June 2007) the New York Judge refused to reconsider the substance of her order of 18 May 2007 in the light of the Respondents' position in this action. She did not consider that anything new was being raised. The Respondents indicated to the New York Judge that they would amend the Complaint if she required it. She apparently did not address the subject of amending the Complaint in her remarks. Thus, the state of play in the US Proceedings is that the Complaint is now the same as it was when this matter came before the Learned Judge and the proceedings have not, as the Learned Judge envisaged, been amended in any way.

13. The underlying allegations which give rise to dispute between the parties are that the Respondents suspect that the Appellants have been or are engaged in soliciting other GCFac unit employees for the benefit of their future employer and that the Appellants have been concerned in the business of a competitor whilst they remain in the employ of the MMC Group. However formulated, those allegations arise out of the Appellants' employment contracts (whatever contracts fall within that definition) and relate to their status as employees. They are the foundation of the US Proceedings. On any common sense basis the Appellants are being sued in New York in matters arising out of their employment and their conduct as employees. The Appellants, therefore, say that section 5 of the Regulation should protect them and that any such proceeding must be brought here.

14. If that is not so, then the MMC Group will have succeeded, by dint of contractual arrangements which it dictates and which exist for its administrative convenience, in contracting out of the mandatory provisions of Section 5 of the Regulation. Art 21(1) of the Regulation prohibits an employer from contracting out of the protection of Section 5 for its benefit. If the Learned Judge's decision stands, that statutory prohibition will have been defeated, perhaps setting a precedent for other sophisticated employers to do so. Such a result would fundamentally undermine the public policy which lies behind Section 5 of the Regulation and as such it should be reversed.

**Background**

**The Appellants' contracts**

15. At the time of their resignations, the First and Second Appellants ("Mr Samengo-Turner" and "Mr Whyte" respectively) were the joint heads of the GCFac unit. The Third Appellant ("Mr Hopkins") was head of the UK section of the GCFac unit. The UK Contracts to which they are party contain all the terms typically found in a written statement of terms of employment, together with obligations of confidentiality and post termination restrictive covenants. The UK Contracts and their amendments can be found at [Samengo-Turner [2/1/21-28 & 47-49]; Whyte [2/1/50-67]; Hopkins [2/1/68-82]].

16. The Bonus Contracts are said to be made pursuant to the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan ("the Plan"). All the Bonus Contracts are identical in their terms. The Bonus Contracts can be found at [Samengo-Turner [2/1/115-132]; Whyte [2/1/134-151]; Hopkins [2/1/153-170]].

17. The preamble to the Bonus Contracts includes this passage:

> "... In recognition of your potential for future contributions to the success of MMC, this Award is intended to strengthen the mutuality of interest between you and MMC's shareholders and to serve as an appropriate additional incentive to remain with MMC or any of its subsidiaries or affiliates (collectively, the "Company")...."

8

18. MMC is the other named contracting party to the Bonus Contracts. However, the Bonus Contracts purport to impose obligations on the Appellants to, and purport to create rights against the Appellants in favour of, "*the Company*", as defined in the preamble as set out in the previous paragraph.

19. The Bonus Contracts contain both provisions of general application and, at schedule IID, provisions which are specifically applicable to UK employees.

20. The Bonus Contracts contain provision for the bonus awarded to be clawed back in the event that the employee engages in "Detrimental Activity", a term defined in the main body of the Bonus Contracts. The Bonus Contracts also contain provisions typically associated with contracts of employment, including provision for notice of termination of employment, duties of confidentiality and post termination restrictive covenants. The following terms are particularly material:

> "I    AWARD VESTING AND DISTRIBUTION
> A    Award vesting
>      (1)    Scheduled vesting. Subject to your continued employment and to any performance adjustments (as described below), 10% of the aggregate Award will vest on 1 November, 2006, ...
>
> ...
>
> C    Cancellation and Rescission of Award
>      (1)    Detrimental Activity : For the purpose of this Agreement, except to the extent Schedule IID is applicable to you and therefore the definition set forth there governs, "Detrimental Activity" means:
>
>          (a)    the rendering of services, of a type similar to the services you provided to the Company or in a capacity similar to that you were in with the Company, for any person or organisation ...
>
>          ...
>          (b)    activity which results (or if known could result) in termination of your employment for your misappropriation of assets of the Company; wilful misconduct in the performance of your duties; ... breach of fiduciary duty or breach of trust; ...
>
>          ...

9

    *(e) directly or indirectly, soliciting, diverting or taking away, in whole or part, any clients or prospects of the Company, within the two-year period prior to your termination of employment, were solicited or serviced directly or indirectly by you ...*
    *(f) attempting to recruit or solicit ... any employee of the Company who reported to you, ...*
    *(g) breach of your obligations under Section IIA, IIB, IIC, or if applicable, Schedule IID.*
   *The "Rescission Period" with to any Installment means the 12 month period beginning on such Installment's vesting date.*

  (2) <u>Cancellation and Rescission</u>
    *(a) If you engage in any Detrimental Activity prior to or during the Rescission Period with respect to any Installment, ...*
    *(i) that Installment and any future Installments shall be cancelled ...*

...

II COVENANTS
A <u>Notification prior to Voluntary Termination</u>
 (1) *You agree that at any time hereafter while you remain employed by the Company, you will provide 60 days' prior written notice ("The Notice Period") ... of your intention to terminate employment at MMC ...*
 (2) (a) *Throughout the Notice Period, the Company shall have the obligation to pay you your base salary at normal pay intervals and shall continue to provide benefits to you on the same basis as other employees. ...*
 (3) *You will remain obliged to perform any or all of your regular job duties requested of you by the Company during the Notice Period ... Moreover, throughout this Notice Period ... you will remain an employee of the Company with all attendance fiduciary duties, including, without limitation, your duties of loyalty and confidentiality to the Company.*

...

D <u>Notice and Non-Solicitation Provisions Applicable to Employees Working in the UK</u>
*The terms of the attached schedule IID shall apply if, and only if, notice of termination of your employment with the Company or the termination of your employment is at a time when your principle place of employment for the Company is the United Kingdom... The remaining terms of this Agreement shall continue in effect when Schedule IID is applicable except to the extent those terms are inconsistent with Schedule IID, in which case the terms of Schedule IID shall control.*

E <u>Cooperation</u>
*You agree that both during and after your employment with the*

10

> *Company, regardless of the reason for your termination, you will provide the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement.*
>
> *...*
>
> G   *Non-Exclusivity of Rights*
> *Neither you nor the Company intends to waive or release the applicability of any other employment duties or obligations you and the Company may have or owe to each other, now or hereafter, unless such duties or obligations conflict with those set forth in this Agreement."*

21. The Bonus Contracts are putatively subject to New York law and jurisdiction [clause VI N].

22. Schedule IID to the Bonus Contracts contains a revised definition of the term "Detrimental Activity", together with revised post termination restrictive covenants. The following terms of Schedule IID are particularly material:

> "2   CANCELLATION AND RESCISSION OF THE AWARD
>
> *Following the termination of your employment, the definition of Detrimental Activity set out in this Schedule and the provisions of this Schedule shall apply in place of the definition given in the main body of this Agreement in Section 1(C)(1) ... The Rescission Period remains as set out in the Agreement. ...*
>
> *For the purpose of this Agreement if you are a UK Employee, "Detrimental Activity" means:*
> *(a)   ...*
> > *(i)   to any material extent undertaking, carrying on or being employed, engaged or interested in any capacity in the supply or proposed supply of Competitive Services within the Territory. ...*
> >
> > *...*
> > *(iv)   enticing, inducing or encouraging an Employee to leave or seek to leave his or her position with the Company or any Associated Company ....*
> >
> > *...*
> > *(vi)   any act or omission by you that results (or if known could result) in the termination of your employment by reason of serious default ... This may include but is not limited to ...*

11

> *wilful misconduct in the performance of your duties, ...the nature of a fiduciary duty or breach of trust, conviction of a criminal offence ... other than one which in the opinion of the Company does not affect your position as an employee of the Company.*

3   NOTICE PERIOD

> *If, during your employment, you are a UK employee at any stage, ... the Notice Period ... will be either the period specified in any contract of employment with the Company, or 60 days prior written notice, whichever is the longer ...*
>
> *During the Notice Period the Company will not be under any obligation to provide you with any work, or to require you to undertake any duties for it, and may require you to remain absent from any or all offices of the Group. ... This paragraph is without prejudice to any rights which the Company may have under any contract of employment with you, in relation to its rights during any Notice Period.*

4   GENERAL - NON-SOLICITATION AGREEMENT

> *Section IIB(1) of the Agreement (General Non-Solicitation Agreement) will not apply to you if you are a UK Employee on the cessation of your employment. Instead you agree that ... you will not, for a period of 12 months from the date of termination of employment directly or indirectly do or attempt to do anything of the following:*
>
> *...*
>
> *- entice, induce or encourage any Employee to leave or seek to leave his or her position with the Company or any Associated Company ...*
>
> *...*
>
> *It is expressly agreed that your obligations under clauses 2 and 4 of this Schedule are entirely freestanding and separate....*

5   DEFINITIONS APPLYING TO THIS SCHEDULE

> *...*
>
> *For the purposes of this Schedule only, the Company will be the company in the Group which is your employer.*

6   <u>GENERAL</u>

> *This Schedule will be construed in accordance with English Law and the irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York.*
> *..."*
> *...*

**Events after the Appellants resigned**

23. Following their resignations, each of the Appellants received a letter from MSL dated 3 April regarding their ongoing obligations [2/1/83-89]. All the letters are in identical terms and refer to each Appellant's *"capacity with Guy Carpenter & Company Ltd"*. Notably, those letters contain no reference to either MMC or Guy Carpenter, the latter of which being the company which the Respondents now say was the beneficiary of the Appellants' services.

24. Shortly thereafter, on 5 April 2007, Messrs. Herbert Smith (the Respondents' London solicitors) wrote to each of the Appellants in virtually identical terms. The letters referred to Guy Carpenter, MMC and MSL together as *"GC"*. In those letters Messrs. Herbert Smith stated that the Appellants had engaged in Detrimental Activity and demanded return of sums paid to the Appellants under the Bonus Contracts. Those letters also referred to the Co-Operation Clause at Section IIE of the Bonus Contracts and set out a long list of questions which it was said the Appellants were obliged to answer pursuant to that clause. Answers were demanded on the basis that they were required in order to ascertain whether the Appellants were in compliance with their obligations under the Bonus Contracts and as *"GC"* employees. The letters concluded by asking for undertakings that the Appellants would comply with their obligations as *"GC"* employees, including in particular their obligations owed under the Bonus Contracts.

25. Messrs. Elborne Mitchell, by then instructed by the Appellants, replied on 11 April 2007 and there followed further exchanges, resting with a fax from Messrs. Elborne Mitchell on 17 May 2007. Having previously indicated that they were willing to give undertakings to abide by their obligations as employees, the fax of 17 May 2007 set out the form of undertaking the Appellants were willing to sign [2/1/99-100]. To date, they have not been taken up on that offer.

**The US Proceedings**

*The Complaint*

26. The US Proceedings were commenced without any prior notice on 4 May 2007. In the Complaint the relief claimed is (a) damages for breach of the Bonus Contracts, particularised as the return of sums paid under the Bonus Contracts and (b) an injunction compelling compliance with the Co-Operation clause by way of compelling answers to questions to be provided [Complaint para 3 : 2/1/101-113]. The Appellants' position is that, to date, only Mr Whyte has been served with the US Proceedings. The Respondents dispute that. (That issue is currently the subject of an order for the exchange of submissions in the US Proceedings and will be ruled on at some point on or after 13 June 2007.)

27. The Complaint contains these passages:

*"Introduction*
1   *This is an action for breach of contract arising out of the defendants' participation in the [Plan] and their respective violations of the terms and conditions of the [Bonus Contracts]. Under the express terms of the Agreements, defendants are each required to cooperate with Marsh or any of its subsidiaries or affiliates, including Guy Carpenter, and specifically to "provide to the Company such information relating to [their] work for the Company or [their] other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]. Having received from Guy Carpenter written, reasonable requests for information in accordance with this provision, defendants have refused to cooperate. Not only are such refusals unambiguous breaches of defendants contractual obligations to provide such cooperation, but they are a blatant and unlawful attempt to prevent plaintiffs from determining whether defendants are in compliance with other terms of the [Bonus Contracts.] Specifically, plaintiffs have reason to believe that defendant, directly and/or in concern with other individuals at their announced next employer, are and have been targeting, soliciting and recruiting numerous Guy Carpenter employees to terminate their employment with Guy Carpenter to join Integro Insurance Brokers. Any such activities constitute separate violations of the [Bonus Contracts.]*

2   *Further, under the express terms of the [Bonus Contracts]. Defendants*

14

> are not permitted to engage in Detrimental Activity, which includes employment with or otherwise being interested in a competitor of plaintiffs. Defendants engaged in Detrimental Activity and breached their [Bonus Contracts] by accepting employment with or otherwise becoming interested in Integro Insurance Brokers on or before April 5, 2007. Under the [Bonus Contracts], defendants therefore are required to return compensation they received pursuant to the Plan within one year prior to their engaging in such Detrimental Activity. Despite proper written demand, they have failed to do so.
>
> ...
>
> <u>Defendants' Employment With Plaintiffs</u>
>
> 11   Samengo-Turner's employment with Guy Carpenter commenced on or about September 23, 1991. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Samengo-Turner co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.
>
> 12   Whyte's employment with Guy Carpenter commenced on or about September 20, 1988. On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.
>
> 13   Hopkins's employment with Guy Carpenter commenced on or about April 10, 2000. On or about April 3, 2007 Hopkins gave notice to Guy Carpenter of his resignation of employment. At the time such notice was given, Hopkins was head of Guy Carpenter's UK facultative reinsurance operation.
>
> 14   Defendants' employment with Guy Carpenter was, and continues to be, governed by their respective employment agreements with plaintiffs.
>
> 15   Under the terms of their respective employment agreements with plaintiffs, defendants are currently in six(6) month "notice periods" meaning they remain employed by plaintiffs and continue to receive compensation from plaintiffs. As current employees, defendants also continue to have fiduciary and related duties and obligations to plaintiffs that are associated with such employment.
>
> 16   In addition, by the terms of their respective employment agreements with plaintiffs, defendants are not permitted for specific periods of time during and after their notice period to solicit, entice, induce or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs."

28. The Complaint is unambiguous in that MMC and Guy Carpenter are suing on the basis that they employ the Appellants and that as such, the Appellants owe them duties qua employee. The "employment agreements" referred to in paragraphs 15 and 16 of the Complaint are the UK Contracts. That MMC and Guy Carpenter claim to be party to the same is unambiguously expressed in those paragraphs. The basis for that assertion is a mystery.

29. The Complaint goes on to aver that the definition of Detrimental Activity that applies is that appearing in Schedule IID and goes on to ask for "information" relating to whether or not the Appellants have complied with their obligations in sections 2 and 4 of Schedule IID [Complaint paras 26-29]. Thus, although the claims in the US Proceedings are framed as arising under the Co-Operation Clause, the underlying obligations in respect of which co-operation is sought all appear in Schedule IID to the Bonus Contracts, that is, in that part of the Bonus Contracts which is expressly subject to English law and jurisdiction.

30. Before the Learned Judge the Respondents' case was that Schedule IID does not apply until after the Appellants' employment has terminated and that until that happens, the definition of Detrimental Activity as it appears in the main body of the Bonus Contracts applies. It was also their case before the Learned Judge that the "Company" referred to in Schedule IID is MSL. The logical consequence of this would be that only MSL could enforce the obligations in Schedule IID.

31. It would appear, therefore, that the Respondents' English lawyers are at odds with their New York counterparts. Be that as it may, the Complaint remains as originally drafted.

32. It will apparent that it is part of the Complaint that the Bonus Contracts impose a positive obligation on the Appellants not to engage in Detrimental Activity, although no such express term appears in those contracts. Before the Learned Judge the Respondents' case was that such an obligation falls to be implied.

The Appellants dispute this. However, the practical effect of the Respondents' argument (if correct) is that :

a. The Bonus Contracts contain an implied 12 month non-compete provision, linked in time to the last bonus paid under the Bonus Contracts (which was January 2007). If that were correct, the Appellants would be prohibited from taking up employment with their new employer until January 2008. There is no such obligation in the UK Contracts.

b. The Bonus Contracts contain post contractual restrictive covenants which are drafted in broader terms, and hence are more onerous than, those that appear in the UK Contracts.

33. Thus, on the Respondents' case, the Bonus Contracts (which the Respondents say are not contracts of employment) in fact impose more onerous obligations on the Appellants qua employees than the UK Contracts.

*The disclosure order of 18 May 2007*

34. MMC and Guy Carpenter made their application for expedited disclosure, oral and written, and interrogatories on 15 May 2007 [Interrogatories : [2/1/221-224]; written disclosure request : [2/1/214-219]; oral disclosure (deposition) request : [2/1/226-230]]. In respect of the depositions, an order was asked for that the Appellants attend in New York to be deposed.

35. In their Memorandum of Law in support of that application MMC and Guy Carpenter continue to rely on their status as the Appellants' employer [2/4/38-54]. The Memorandum of Law contains these passages:

<u>"Preliminary Statement</u>
*Defendants are senior facultative reinsurance brokers who recently announced their resignation from Guy Carpenter and have accepted employment with Integro Insurance Brokers ("Integro"), a direct competitor of Guy Carpenter. During the course of their employment with Guy Carpenter,*

17

> defendants agreed that during and for a specified time after their employment with Guy Carpenter they would not recruit, solicit or otherwise encourage plaintiffs' employees from terminating their employment with plaintiffs to join a competitor. Despite these explicit obligations, in the weeks following defendants' announcements of their resignations from Guy Carpenter, four other very experienced Guy Carpenter facultative reinsurance brokers who worked in Guy Carpenter's UK office and reported directly or indirectly to defendants announced that they would be leaving Guy Carpenter to join Integro. ....
>
> The rapid rate at which Guy Carpenter facultative brokers in the UK office are announcing their resignations, joining Integro, or are otherwise being aggressively solicited to join Integro caused Guy Carpenter to have serious concerns - and doubts - as to whether defendants are complying with their covenants not to solicit such employees. Accordingly, plaintiffs requested that defendants provide information regarding, among other things, their recruitment by Integro and discussions they have had with other Guy Carpenter employees since they decided to leave Guy Carpenter. Defendants, who remain Guy Carpenter employees for the next six months pursuant to the notice period in their employment contracts, are contractually obligated to provide such information, having executed agreements with MMC and Guy Carpenter in connection with their participation in [the Plan] in which they agreed to do so. ...
>
> ...
>
> <u>Argument</u>
>
> ...
>
> By contrast, expedited discovery poses no material hardship for the defendants. First, defendants are currently in their six month notice periods, and, as such, remain Guy Carpenter employees and continue to receive their full salaries from Guy Carpenter. They have also asserted - in claimed compliance with their notice obligations - that they are not yet reporting to work at Integro. Thus, the requested discovery does not - and cannot - interfere with any work obligation they have. Defendants have no obligations whatsoever during the normal workday except to provide such information. Defendants also have a panoply of obligations to their employer, Guy Carpenter, including the obligation to make themselves available during business hours to provide important information. It surely cannot be a meaningful burden for defendants to set out what they have been doing during recent months while they have been Guy Carpenter employees."

36. The disclosure application was supported by the declaration of Lynsey Mansfield, head of international HR at Guy Carpenter [2/1/232-238]. That declaration includes these passages:

> "8    Defendants' employment with Guy Carpenter was, and continues to be, governed by employment agreements between each defendant and

18

> *Guy Carpenter. Attached to this declaration as Exhibits A-C ... are the defendants respective employment agreements with applicable amendments thereto.*
>
> 9   *By the terms of their respective employment agreements, defendants are required to provide six (6) months notice of termination, meaning that they remain employed by Guy Carpenter, continue to receive their full salaries and continue to have all the fiduciary and related duties and obligations to the plaintiffs that are associated with such employment. (Exhibits A-C). Given that they gave notice on April 3, 2007, their six month notice periods will not expire until October 2007."*

37.   Exhibits A to C to Ms Mansfield's Declaration are the UK Contracts.

38.   US attorney's attended the hearing of the application for Mr Whyte only, being the only Appellant as yet served with the Complaint [2/1/239-259]. That appearance was expressly subject to a reservation on jurisdiction. The position adopted for Mr Whyte was that he wished to challenge the jurisdiction of the New York Court and that his challenge should be heard before any disclosure order was made.

39.   The Judge made the order in substantially the terms it was sought against all three Appellants. She was evidently unconcerned that two of the three Claimants have yet to be served with proceedings and that none of them are presently in the jurisdiction of New York. Directions have also been given for hearing Mr Whyte's jurisdictional challenge which will result in it being heard some time after 15 June 2007, ie after the time for compliance with the order of 18 May 2007.

40.   As noted above, one of the heads of substantive relief sought in the US Proceedings is enforcement of the Co-Operation Clause. The effect of the order of 18 May 2007 is that the US Plaintiffs have been granted that substantive relief (a) before two of the three Appellants have been served with proceedings, (b) before any jurisdictional challenge can be heard and (c) before there is any hearing on the merits of that claim.