# EXHIBIT 21-2

**This action**

41.    The Appellants considered that the order of 18 May 2007 placed them in an invidious position. Although there are procedural avenues to pursue in the US Proceedings, there was no guarantee that they would come to fruition before the time for compliance with the order of 18 May 2007 had passed. Whilst not wishing to be in breach of the order of 18 May 2007, they were advised that there was a risk that compliance would involve a submission to the jurisdiction in New York (which they do not wish to do).

42.    On 25 May 2007, therefore, the Appellants' solicitors invited the Respondents to agree not to prosecute the US Proceedings until jurisdiction had been ruled on here. This action was issued the same day. The agreement sought was not forthcoming and the Appellants issued and served their application for an interim anti-suit injunction on 28 May 2007. The Appellants' application was originally listed to be heard before Mr Justice Underhill (sitting as the vacation Judge) on 31 May 2007. At about 7pm on the night before the hearing the Respondents said they were willing to give undertakings limited in time to 6 June 2007 and the application was adjourned to that date by consent.

*The Respondents' cross application*

43.    In advance of the hearing before the Learned Judge, the Respondents issued a cross application seeking their own interim relief. On the premise that the anti-suit injunction was not granted, MMC sought interim relief under s25 of the Civil Jurisdiction and Judgments Act 1982 ("the CJJA") in the form of an order in identical terms to the New York order of 18 May 2007 (including for the taking of depositions). On the alternative premise that an anti-suit injunction was granted, MMC and MSL sought a mandatory interim injunction seeking compliance with the Co-Operation Clause and to enforce what were said to be the Appellants' duties of fidelity, in particular to enforce what was said to an obligation for each Appellant to whistleblow. The relief sought on that alternative premise was for some of the categories of documentary disclosure ordered in the US Proceedings and for answers to a different set of

interrogatories, but not depositions.

44.   The Appellants, in their skeleton argument in opposition to that application, indicated that the relief sought under s25 of the CJJA was imposed in full (on grounds including that the Court did not have jurisdiction to make an order under that section for the gathering of evidence and would never have jurisdiction to order depositions to be taken in any event). They also indicated that they opposed the injunction application in part, proposing to volunteer to answer reasonable requests for further information and for the provision of documents reasonably requested. The Respondents indicated in a supplemental skeleton served on the morning of the hearing before the Learned Judge that they intended to pursue their cross application in all respects, including seeking an order that the Court make an order in identical terms to that made on 18 May 2007 by the New York Judge.

45.   That application was listed to be heard before the Learned Judge if time permitted. It did not permit and it stands adjourned to a date to be fixed. The Learned Judge at the conclusion of the hearing indicated that, as he then understood matters, he needed persuading that the Respondents' application was of any real urgency. He said that if an early fixture could not be obtained through the usual procedure and a fixture was sought on an urgent basis, a letter would need to be written to him (as the Judge in charge of the list) justifying the same. To date, in so far as the Appellants are aware, no such letter has been written.

### Events subsequent to the hearing on 6 June 2007
*11 and 12 June 2007 hearings in the US Proceedings*

46.   Mr Whyte has lodged an application seeking a stay of the order of 18 May 2007 pending the outcome of these proceedings and/or the outcome of an appeal against it and/or the hearing of his jurisdictional challenge. In that connection, the parties appeared before the New York Judge on 11 June 2007. Before her was the further declaration of Ms Mansfield referred to

above. It says [para 3]:

*"In my prior declaration to the Court dated May 10, 2007, I stated that defendants have been employed by Guy Carpenter. In stating that, I was referring to the fact that defendants have provided services to Guy Carpenter, which was the material issue in relation to the matters before this Court. In that sense only, they can be said to have "worked for" Guy Carpenter. I did not focus on the question of which specific company in the Guy Carpenter group was their employer (in the sense of being party to their employment contracts). In fact, although defendants have throughout their employment provided services to Guy Carpenter, their actual employer has been MSL ... This is clearly shown in the defendants' respective employment contracts which were in any event attached as Exhibits A-C to my May 10 declaration."*

47.  As noted above, New York Judge declined to reconsider her earlier order. She made an order that documents and answers to interrogatories be provided by Mr Whyte by 9pm New York time on 11 June 2007 (2am UK time on 12 June 2007) and that he attend for a deposition on Thursday, 14 June 2007. In the case of Mr Samengo-Turner and Mr Hopkins, she directed that there be an exchange of submissions on the service issue, ending at midday (New York time) on 13 June 2007 and that they attend for depositions on 21 and 22 June 2007.

48.  The time table set at the hearing on 11 June 2007 meant that it was impractical for Mr Whyte to comply (the time limit having passed in the small hours here). On the afternoon of 12 June 2007 (New York time), after business hours here, the Respondents sought and obtained a further hearing before the New York Judge seeking sanctions against Mr Whyte for contempt. Whilst she declined to grant sanctions then, she set a further time table which required the provision of documents and answers to interrogatories in time for the opening of business in New York on 13 June 2007. She also ordered, at the Respondents' request, that, after the seven hour deposition of Mr Whyte scheduled for 14 June 2007, they have permission to re-open that deposition in the future.

49.  The present timetable means that Mr Whyte has no practical alternative but to

22

comply with the most recent order given in New York. As regards disclosure and answers to interrogatories he has already done so and he intends to attend for his deposition, all of which has been and will be done without prejudice to his position that the New York Court should not assume jurisdiction and on the express basis that he is not thereby submitting to the jurisdiction of the New York Court.

50.    As noted above, part of the urgency of the application before the Learned Judge was that the time for compliance with the 18 May 2007 order was looming and there was a risk that in complying the Appellants may be taken to have submitted to the jurisdiction of the New York Court. Before the Learned Judge, the Respondents submitted that (a) they did not agree that there was any such risk and (b) they would, in any event, agree that they would not rely compliance with the order as a submission to the jurisdiction.

51.    The Appellants remain concerned not to be in contempt of the orders of the New York Court, which they do not wish to be. At the same time, they do not wish to submit to the jurisdiction of the New York Court both before their jurisdictional challenge is heard there and before their appeal here can be heard. However, as noted above, Mr Whyte at least is presently faced with little practical alternative but to comply.

52.    The Appellants have sought confirmation from the Respondents (in correspondence between London solicitors) that any compliance with the New York orders will not be relied on by them as a submission to the jurisdiction in New York and that they will agree not to prosecute the US Proceedings pending the outcome of the application for permission to appeal (and the appeal if permission is granted). At the time of writing, a response is awaited.

*The QBD action*

53.    On 12 June 2007 the Appellants commenced fresh proceedings against all Respondents seeking declarations that (a) their contracts of employment have

been repudiated and (b) that the covenants in both the Bonus Contracts and the UK Contracts are unenforceable being in unreasonable restraint of trade. They wait to hear whether service of those proceedings will be accepted by the Respondents' London solicitors.

**The issues raised on appeal**

**Issue (1) : What amounts to an "individual contract of employment" and, in particular whether it encompasses an arrangement by which an employee is paid part of his remuneration as an employee in a separate agreement, within the meaning of Art 18(1) of the Regulation**

*Public policy*

54.   The public policy behind Section 5 of the Regulation is that the employee, being the weaker party in the contractual relationship from a socio-economic point of point of view, is entitled to special protection in his capacity as such [Regulation : Recitals 8, 13 & 14;  *Jenard/Moller Report* paras 36-44 - 1990 OJ C/189/57;  *De Almeida Cruz/Desantes Real/Jenard Report*  para 23 - 1990 OJ C189/35; Explanatory Memorandum to the Regulation Proposal; *Cruz/Real/Jenard Report* para 27]. This was common ground before the Learned Judge.

55.   The provisions of the Section 5 of the Regulation cannot be contracted out of in favour of the employer before a dispute has arisen [Art 21(1)]. So, a jurisdiction clause in a contract of employment which purports to permit an employer to sue its employee other than in the place of the employee's domicile is invalid. (One of the Appellants' points in this appeal is that the New York jurisdiction clause in the Bonus Contracts is caught by that prohibition.)

56.   Art 18(2) of the Regulation provides that an employer, domiciled in a Non-Member State, that has a branch, agency or other establishment within a Member State, is deemed to be domiciled in that Member State in disputes arising out of that operation of that branch agency or other establishment. The concept of operation includes the employment of local staff [*Somafar SA -v-*

24

*Saar-Ferngas AG* [1978] ECR 2183 at paras 11-13; *Lloyd's Register -v-Societe Campenon Bernard* [1995] ECR I-961 at paras 16-22]. What this means, in other words, is that an employer cannot escape the mandatory provisions of Section 5 of the Regulation by relying on its domicile as being outside a Member State. This underlines that the protections offered are intended for the benefit of all employees working in Member States, regardless as to the domicile of their employers.

57.    Thus, the basic scheme is clear : an employee, being regarded as the weaker party in the employee/employer relationship, is afforded special protection. In this way, the protections contained in Section 5 are on a par with the multiple additional protections for employees in English law which have their origin in Community legislation (eg in relation to discrimination, transfer of undertakings, working time, paternity rights and so on) all of which are of mandatory application. Together, all of those rights form a package of protections for employees which are part of the price of an employer doing business in this jurisdiction.

58.    Underlying Section 5 of the Regulation (and the other protections for employees enshrined in English law) is the public policy decision that employees are entitled to special protection in their capacity as such. The Regulation should be construed so as to give effect to that policy, if necessary by the adoption of a broad and purposive construction.

*The meaning of "individual contract of employment"*

59.    This expression is a creature of Community law. There has yet to be an authoritative decision from the ECJ as to its meaning. In broad terms, the existence of a contract of employment may be determined by reference to the provision of services over time for remuneration, control and direction of the services of the employee and integration within the organisation of the employer, although those are not *"hard edged criteria which can be mechanistically applied"* [*Benatti -v- WPP Holdings* [2007] EWCA Civ 263 per

Toulson LJ at para 46-47 dismissing the appeal from *WPP Holdings -v- Benatti* [2006] 2 Lloyd's Rep 610]. This is essentially a question of law, to be determined by reference to the applicable facts. There was a two/one split in *Benatti -v- WPP Holdings* in favour of being able to include the conduct of the parties in that inquiry.

*The relationship of the Bonus Contracts and the UK Contracts*

60.   The Appellants' primary case is that the Bonus Contracts and the UK Contracts together make up their individual contracts of employment. The Learned Judge failed to consider that argument. Had he done so, he should have concluded that the Bonus Contracts and the UK Contracts together make up the Appellants' individual contracts of employment.

61.   The reasons are:

   a.   The Bonus Contracts do not exist in a vacuum and should not be construed as such.

   b.   The Bonus Contracts are inextricably linked to the UK Contracts and parasitic on them. Whether described as collateral, ancillary or subsidiary to the UK Contracts, the Bonus Contracts owe their existence to the UK Contracts and the Appellants' status as employees.

   c.   The Bonus Contracts contain multiple references to the Appellants' employ by the "*Company*" and the rights and obligations that arise by reason of that employment relationship. It is unrealistic and artificial to conclude that the Bonus Contracts are not part of the contractual arrangements governing the Appellants' employ.

   d.   Both MMC and Guy Carpenter claim, in the US Proceedings, to be the "Company" for the purpose of enforcing the Co-Operation Clause, in particular with reference to the obligations said to be owed pursuant to

Schedule IID. The Co-Operation Clause (set out above in full) says (with added emphasis):

*"You agree that both during and after your **employment with the Company** ... you will provide **the Company** such information relating to your work for the Company ... as the **Company** may from time to time reasonably request"*

e.    In seeking to enforce the Co-Operation Clause both MMC and Guy Carpenter are accepting that they are employers for the purpose of that clause.

f.    It was the Respondents' case (before the Learned Judge) that the "Company" referred to in Schedule IID is MSL. On that basis, Schedule IID at least is part of the Appellants' contracts of employments.

g.    Following the Respondents' argument to its logical conclusion, only MSL would be the "Company" for the purposes of the whole Bonus Contracts, it being the only party to whom notice of termination needs to be given [clause IIA(1)], who is obliged to pay salary [clause IIA(2)], who can require the performance of duties during the notice period [clause IIA(3)] and to whom duties are owed qua employee [clause IIG]. This underlines that the Bonus Contracts are part and parcel of the Appellants' contractual arrangement as employees.

h.    However, that is not the case advanced in the US Proceedings. Having cast themselves as the Appellants' employers, the Respondents should be fixed with that election.

i.    Any artificiality about the conclusion that MMC and Guy Carpenter are the Appellants' employers for this purpose is a function of the way the case is put and the obligations relied on in the US Proceedings, and is not a function of any strained construction the Appellants seek to put on the Bonus Contracts. If MMC and Guy Carpenter were to accept that

27

they have no entitlement to enforce the Bonus Contracts (which is the effective result of the case as it was put before the Learned Judge) then this issue would not arise and the US Proceedings would not exist. They choose to attempt to enforce the provisions of the Bonus Contracts and should bear the consequences.

j.    The Learned Judge apparently accepted the Respondents' argument that the identity of the "Company" referred to in the Bonus Contracts is a function of which provision is being looked at. He was wrong to do so as a mater of construction. Further, that conclusion involves the identity of the "Company" in the Co-Operation Clause being MSL for the purposes of the reference to employment and MMC and Guy Carpenter for the purposes of seeking enforcement. That is, it involves the "Company" having different meanings within the same clause. The Learned Judge's construction was wrong for that reason also.

k.    The post contractual behaviour of the parties points towards the Bonus Contracts and the UK Contracts together making up the contracts of employment : see the Complaint, MSL's letters of 3 April 2007 and Messrs. Herbert Smith's letters of 5 April 2007.

62.    The Learned Judge considered the Bonus Contracts as stand alone contracts and concluded that they are not contracts of employment. He was wrong to do so. Even as stand alone contracts, the Bonus Contracts have all the essential features of an employment contract:

a.    The Bonus Contracts provide for the payment remuneration (the bonus) in return for services (in the form of work during the notice period, compliance with the Co-Operation Clause and abiding by the covenants).

b.    Other terms of the Bonus Contracts are apposite in the context of an

28

employment relationship : provision for notice of termination of employment, confidentiality, the on-going duty of fidelity and post termination restrictive covenants.

c.   The Bonus Contracts are relied on by the Respondents to exercise control over the Appellants. That has taken the form of (a) demanding compliance with the Co-Operation Clause and (b) demanding that the Appellants attend to be deposed. Besides, in practice, the Appellants provide no services to MSL at all - their services are provided to the GCFac unit, which comes under the umbrella of Guy Carpenter and is in the ultimate ownership and control of MMC. In reality, the Appellants are controlled by Guy Carpenter and ultimately MMC.

d.   The Respondents relied specifically on duties owed qua employee in the context of the application for the order of 18 May 2007 - see the extract above relying on the duty of fidelity and the "panoply" of other duties owed qua employee.

e.   Moreover, the whole impetus behind the US Proceedings is the claim that MMC and Guy Carpenter wish to protect their workforce and stop the solicitation of their employees (whilst at one and the same time maintaining in this action that they have no employees or workforce to protect).

f.   The Respondents are integrated into the organisation of MMC and Guy Carpenter. For example, their business cards refer only the MMC Group and Guy Carpenter (UK), and not to MSL [2/10/2]. Ms Mansfield says in her latest declaration that the Appellants "worked for" Guy Carpenter throughout their employment.

63.   The Learned Judge concluded that he was not persuaded that amending the Complaint would have any material impact on the substantive issues in the

29

New York Proceedings. If it matters, the Appellants say he was wrong to do so. There was no evidence before him on that question and the more obvious inference is that MMC and Guy Carpenter are claiming to be the Appellants' employers for the purposes of the US Proceedings because they must in order to enforce the rights relied on that action.

*Matters relating to individual contracts of employment*

64.    The Learned Judge found that (a) only proceedings in which the employment contracts is sued on are within Art 18 of the Regulation and (b) the US Proceedings do not involve suit on the contracts of employment. The Learned Judge was wrong on both counts.

65.    As to the former point, the Learned Judge relied on the decision in *Swithenbank Foods -v- Bowers* [2002] 2 All ER (Comm) 974. In that case it was held that the expression "matters relating to individual contracts of employment" mean "claims made under individual contracts of employment" [per Judge McGonigal (sitting as a judge of the High Court) at paras 24-26]. In so holding, Judge McGonigal held that a tortious claim in conspiracy, if not depend upon the employment relationship between the claimant and defendant, was not caught by Art 20 of the Regulation.

66.    It is the Appellants' case that they can satisfy the *Swithenbank* test for the reasons elaborated on above. If it matters, the Appellants will say that the decision in *Swithenbank* is too restrictive in its terms : the facts in that case are far removed from this one, in which the Appellants' status as employees is an integral part of the claims advanced in the US Proceedings.

67.    As to the second point, the Complaint at paragraphs 15 and 16 expressly refers to the UK Contracts and avers that the US Plaintiffs are party to them. If, therefore, the Appellants have to show that the UK Contracts are part of the US Proceedings then they can do so.

30

*The New York jurisdiction clause*

68.    The Learned Judge did not consider the Appellants' arguments which arise
with regard to the New York jurisdiction clause if the Regulation is in play. Had
he done so, he should have concluded that the New York jurisdiction clause is
invalidated by Art 21(1) of the Regulation.

*Upshot*

69.    The result is that Section 5 of the Regulation is engaged and the US
Proceedings are in breach of Art 20(1) of the Regulation.

**Issue 2 : Whether Art 21(1) of the Regulation, which gives each Member State
employee a mandatory, statutory protection against proceedings by his
employer outside the place of the employee's domicile, should be enforced by
anti-suit injunction relief where the employer is not domiciled in a Member
State**

70.    Given his earlier conclusions, the Learned Judge did not go on to consider
whether an anti-suit should be granted if the Regulation was engaged. Had he
done so, he should have concluded that such an injunction should be granted
for the reasons which follow. He did consider the question of vexation and
natural forum, in the context that the Regulation was not engaged, and the
reasons why he came to the wrong conclusions about that are considered in
the following paragraphs.

*Basic principles*

71.    The basic principles for the grant of an anti-suit injunction, at least as regards
matters outside the Regulation, are well known. They were summarised thus
in *Seismic Shipping -v- Total E&P* [2005] 2 Lloyd's Rep 359 per Clarke LJ:

> "*44.    The judge summarised the relevant principles in para 29 of his
> judgment by reference to Andrew Smith J's summary of them, which
> was approved by this court, in Royal Bank of Canada v Centrale
> Raiffeisen-Boerenleenbank [2004] 1 Lloyds Rep 471. They are set out
> in para 8 of the judgment of Evans-Lombe J in this court:
> (i) Under English law a person has no right to be sued in a particular*

31

*forum, domestic or foreign, unless there is some specific factor that gives him that right, but a person may show such a right if he can invoke a contractual provision conferring it on him or if he can point to clearly unconscionable conduct (or the threat of unconscionable conduct) on the part of the party sought to be restrained: Turner v Grovit [2002] 1 WLR 107, 118C at para 25 per Lord Hobhouse.*

*(ii) There will be such unconscionable conduct if the pursuit of foreign proceedings is vexatious or oppressive or interferes with the due process of this Court: South Carolina Insurance Co v Assurantie Maatschappij de Zeven Provincien NV [1987] AC 24 at page 41D; Glencore International AG v Exter Shipping Ltd [2002] 2 All ER (Comm) 1, 14a at para 42.*

*(iii) The fact that there are such concurrent proceedings does not in itself mean that the conduct of either action is vexatious or oppressive or an abuse of court, nor does that in itself justify the grant of an injunction: Socité Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 817 at page 894C; Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd [1999] 1 Lloyds Rep 767 at 781; Airbus Industrie GIE v Patel [1999] 1 AC 119 at 133G/H.*

*(iv) However, the court recognises the undesirable consequences that may result if concurrent actions in respect of the same subject matter proceed in two different countries: that "there may be conflicting judgments of the two courts concerned" or that there "may be an ugly rush to get one action decided ahead of the other in order to create a situation of res judicata or issue estoppel in the latter": see The Abidin Daver [1984] AC 398 at pages 423H-424A per Lord Brandon.*

*(v) The court may conclude that a party is acting vexatiously or oppressively in pursuing foreign proceedings and that he should be ordered not to pursue them if (a) the English court is the natural forum for the trial of the dispute, and (b) justice does not require that the action should be allowed to proceed in the foreign court, and more specifically, that there is no advantage to the party sought to be restrained in pursuing the foreign proceedings of which he would be deprived and of which it would be unjust to deprive him: Sociéte Aerospatiale, ibid at 895D and 896F-G.*

*(vi) In exercising its jurisdiction to grant an injunction, "regard must be had to comity and so the jurisdiction is one which must be exercised with caution": Airbus Industrie, ibid at 133F. Generally speaking in deciding whether or not to order that a party be restrained in the pursuit of foreign proceedings the court will be reluctant to take upon itself the decision whether a foreign forum is an inappropriate one: Turner v Grovit, ibid at para 25."*

*Anti-suit injunctions and the Regulation*

72.    The use of anti-suit injunctions as between Member States on matters governed by the Regulation is no longer permissible [*Gasser -v- MISAT* [2003]

32

ECR I-14693; *Turner -v- Grovit* [2004] ECR I-3565]. If the US Proceedings were proceeding in the court of a Member State, the Appellants would be asking those courts to stay or set aside those proceedings in favour of proceedings here. There is no prohibition on the use of an anti-suit injunction to restrain proceedings brought in a Non-Member State in breach of a right conferred by the Regulation.

*The ECJ decisions culminating in Group Josi*

73.   The jurisdictional rules contained in the Regulation are principally based on the domicile of the defendant. The basic position under the Regulation is that defendants domiciled in Member States are entitled to be sued in the place of their domicile, subject to the exceptions listed in the Regulation (eg in matters relating to a contract the place for the performance of the obligation in question). In the case of employees, there is a single mandatory rule for claims by employers : an employer must sue in the employee in his home court. There are no exceptions to that rule.

74.   The Regulation applies irrespective of the domicile of the claimant and a claimant resident in non Member States can avail itself of its provisions [*Marc Rich -v- Societa Italiana Impianti* (case C-190/89) [1991] ECR I-3855; *The Maciej Rataj* (Case C-406/92) [1999] QB 515; *Universal General Insurance -v- Group Josi Reinsurance* (case C-412/98) [2001] QB [68] . The net effect of this is that, save for specific exceptions, the domicile of the claimant is irrelevant for the purpose of determining jurisdiction. (Those specific exceptions are in relation to maintenance, jurisdiction agreements and the rights of consumers, insureds and employees to sue in their home courts).

75.   Thus, the Respondents, if they wish to sue qua employer, must do so here, irrespective of their domicile. Moreover, the deeming provision of Art 18(2) of the Regulation makes express what would, in any event, the logical conclusion of the decisions culminating in *Group Josi*.

33

*The decision in Owusu*

76.   In *Owusu -v- Jackson* [2005] QB 801 the ECJ decided that a Member State is not permitted to decline mandatory jurisdiction which arises under the Regulation on forum non conveniens grounds, even if the forum conveniens is a Non-Member State. Arguably, therefore, the Court is obliged to assume jurisdiction in the circumstances of this case, given that the jurisdictional provision of Art 20(1) is mandatory. At minimum, the logical result of that decision is that the Court ought to assume jurisdiction, policing that assumption of jurisdiction by an anti-suit injunction if necessary, where (as here) the mandatory provisions of the Regulation are in play.

77.   What the Court is being asked to do, therefore, is the enforce the jurisdictional provisions of Section 5 by way of anti-suit injunction in the absence of the Appellants having any other effective remedy.

*Application of this principles to this case : invasion of express right*

78.   The first way the Appellants put their case is that, having an express (statutory) right to be sued only here by their employer [Art 20], the Court should enforce that right by the grant of an anti-suit injunction. That the Appellants' rights derive from statute and are of mandatory application puts (or ought to put) them in a stronger position than a party having a contractual jurisdiction agreement, given that there are no circumstances in which the Court can decline to give effect to Art 20(1) of the Regulation. Such proceedings are by definition vexatious, unconscionable or oppressive (always assuming that those concepts have any role to play) and questions of natural forum do not arise. The Court should have no hesitation, whether for reasons of comity or otherwise, in enforcing Art 20(1) of the Regulation.

79.   To put it another way, the effect of Art 20 is to write into the contracts of employment an exclusive jurisdiction clause in favour of this jurisdiction for claims by employers which cannot be contracted out of, which the Court should enforce in the usual way [*The Angelic Grace* [1995] 1 Lloyd's Rep 87;

34

*Donohue -v- Armco* [2002] 1 Lloyd's Rep 425; *Natwest Bank -v- Utretcht-America* [2001] 3 All ER 733].

80.   If the Appellants have to go further, then (a) this is the natural forum for the dispute and (b) the US Proceedings are vexatious, unconscionable or oppressive.

81.   The Learned Judge found that, whilst *"it well may be that this is the natural forum for employment disputes"*, he could not find that the US Proceedings were vexatious. It is implicit in that conclusion and he reasons he gave that he considered that New York is the natural forum for disputes arising under the Bonus Contracts. He reached that conclusion in the context of considering whether an anti-suit injunction should be granted if the Regulation is not engaged. He was, in any event, wrong to so find. The reasons are:

a.   Having found that this is the natural forum for employment disputes, the Learned Judge should have looked to the reality of the situation in the US Proceedings and concluded that the US Proceedings comprise an employment dispute. The underlying allegations in the US Proceedings all relate to the Appellants' alleged solicitation of employees and involvement in the business of a competitor. That is an employment dispute.

b.   The Appellants are employed here, by (the Respondents say) an English company. The employees the Appellants are alleged to have solicited are likewise so employed. The intention is that the Appellants will continue to work here for their new employer. In short, beyond that MMC and Guy Carpenter have offices there, the dispute has nothing whatever to do with New York.

c.   The reasons relied on by the Respondents for having New York jurisdiction (essentially that Bonus Contracts are given to employees in

35

numerous jurisdictions and there is a need to centrally administer to
them) are of no application to (i) proceedings specifically brought with
reference to Schedule IID which contains an English jurisdiction clause
and (ii) the matters in dispute in the US Proceedings.

82.    The Learned Judge found that the US Proceedings were not vexatious
because the Bonus Contracts have a close association with administration in
New York and there is a need for there to be coherent strategy across MMC.
Again, that conclusion was reached in the context of his decision on the
Appellants' application for an anti-suit injunction on the basis that the
Regulation is not engaged. He was, in any event, wrong to so conclude. In
addition, in so doing, he failed to consider the arguments relied on by the
Appellants in support of their case that the US Proceedings are oppressive,
vexatious or unconscionable.

83.    Had the Judge not fallen into error and had he considered the Appellants'
arguments he should have concluded:

a.    The natural party within the MMC Group to complain if the Appellants
are said to have acted in breach of their obligations as employees is
that company which the MMC Group says is their employer (namely
MSL). No proceedings have been commenced in MSL's name and it is
not party to the US Proceedings. No proceedings have been
commenced on the UK Contracts and this suggests that the Bonus
Contracts have been deliberately chosen so that New York jurisdiction
may be invoked (action akin to forum shopping).

b.    In particular, it appears that New York has been chosen to enable MMC
and Guy Carpenter to take advantage of both the expedited disclosure
procedure there and the procedure for the taking of oral disclosure by
depositions, neither of which is available here (the expedited disclosure
ordered going far beyond anything which it might be expected could be

36

ordered in an application for pre-action disclosure in this jurisdiction).

c.    That MMC and Guy Carpenter wish to subject the Appellants to oral disclosure, with the result that they will, in all likelihood, be cross examined on the same subject matter twice, is itself oppressive [*Omega Group -v- Kozeny* [2002] CLC 132; *Glencore -v- Metro* [2002] CLC 1090]. Notice has been given for the Respondents that they wish to depose the Appellants for seven hours each and in the case of Mr Whyte the Respondents may later reopen that deposition if they wish.

d.    Further, in New York the court there has seen fit to make orders (i) against parties who have not been served and who did not appear (ii) requiring attendance outside that jurisdiction and (iii) which require compliance before a jurisdictional challenge can be heard, the practical effect of which is that the Appellants may be compelled to run the risk of a submission to the jurisdiction before their challenge to it can be heard and/or that a substantial part of the objective of the US Proceedings will have been achieved, again before the Appellants' jurisdictional challenge can be heard. That is exorbitant and is itself vexatious or oppressive.

e.    Moreover, the Learned Judge, in his judgment, appeared to envisage that, MMC having made an application for interim relief under the CJJA, that application would now proceed and issues as to whether disclosure, answer to interrogatories and depositions should be provided would be determined here. What is actually happening is that the Respondents are aggressively seeking enforcement of the New York orders in New York, most recently by seeking sanctions against Mr Whyte for contempt (although the New York Judge did not then acceded to that request).

f.    There is no legitimate advantage to MMC and Guy Carpenter in

37

pursuing the US Proceedings which it would be unjust to deprive them of by the grant of an anti-suit injunction. This jurisdiction provides an adequate and proper forum in which they can advance such claims as they wish against the Appellants arising out of their employment.

g.    On the contrary, by requiring MMC and Guy Carpenter to proceed here, they are deprived only of the (illegitimate) advantage of the oral disclosure procedure and perhaps down the line the (illegitimate) advantage of seeking punitive damages against the Appellants.

h.    The Appellants, on the other hand, are prejudiced if they are forced to participate in the US Proceedings. Apart from being required to comply with the order of 18 May 2007 before a jurisdictional challenge can be brought on and being the subject of oppressive procedures, they are put to inconvenience and expense in having to litigate in a jurisdiction where they are not domiciled.

i.    The Contracts Applicable Law Act 1990 (enacting the Rome Convention) prohibits an employer, by the use of a choice of law clause, from depriving an employee of the mandatory rights he has according to the law of the in the place where he works [Rome Convention Art 20]. As noted above, the Respondents' argument is that the Bonus Contracts impose more onerous obligations on the Appellants than the UK Contracts. The Appellants say that, under English law, such restrictions would be in unreasonable restraint of trade. Hence, the US Proceedings have as part of their object, by the application of New York law, the enforcement of provisions which are unenforceable here. That itself is unconscionable and oppressive.

38

**Issue 3 : Whether, if proceedings in a non-member State fall outside the express provisions of section 5 of the Regulation but nonetheless involve an member state employee being sued qua employee, an anti-suit injunction should be granted to restrain those proceedings in favour of proceedings in the place of the employee's domicile on public policy grounds**

*The Appellants's primary case*

84.     The Appellants' primary case is that, even if Section 5 of the Regulation is not engaged, an injunction should nonetheless be granted to restrain the US Proceedings on public policy grounds. The Learned Judge did not consider that argument. Had he done so, he should have found that an injunction should be granted on that basis. The reasons are:

   a.     Whatever gloss is put on the US Proceedings by the Respondents, the practical reality is that the Appellants are being sued qua employee for their activities and alleged breach of duties owed in that capacity. The Regulation is intended to see to it that such proceedings are brought in the courts of the employee's domicile.

   b.     The Respondents dictate the contractual scheme to which the Appellants are subject and do so for reasons of their own administrative convenience. The Appellants gain no benefit from being paid part of their remuneration by MSL pursuant to the UK Contracts and part via the Bonus Contracts. The Respondents should not be entitled to so organise their affairs as to contract out of the mandatory provisions of the Regulation and frustrate its effect.

   c.     The public policy behind the mandatory provisions of Section 5 of the Regulation is equally applicable to claims which arise out of the contract of employment. MMC and Guy Carpenter only have claims against the Appellants by reason of their work at the GCFac unit and duties which are said to arise out of their status as employees. That public policy

39

should be enforced even if the contract sued on does not fall literally within the expression "individual contract of employment". The Bonus Contracts are on any view in the nature of contracts of employment, or at least ancillary to the UK Contracts. The same public policy considerations apply.

*US Proceedings vexatious, oppressive and unconscionable*

85.   That England is the natural forum and the US Proceedings are vexatious, unconscionable and oppressive has already been addressed above. As noted, the Judge rejected those arguments and was wrong for the reasons given above.

86.   On this hypothesis, the New York jurisdiction clause is prima facie valid. However, (a) the underlying obligations relied on in the US Proceedings are in Schedule IID and as such outside the New York jurisdiction clause and (b) this is one of those occasions on which a jurisdiction clause should not be enforced (if it applies).

**Issue 4 : Whether a non-exclusive jurisdiction clause in favour of this jurisdiction should be enforced by an anti-suit injunction to restrain proceedings brought in a Non-Member State**

87.   This is a short point. Schedule IID contains a non-exclusive English jurisdiction clause. Art 23 of the Regulation applies to it and pursuant to that provision this Court has jurisdiction in matters relating to Schedule IID. The Court should enforce that jurisdiction by restraining proceedings brought in breach of it in a Non-Member State.

**Balance of convenience**

88.   It was common ground before the Learned Judge that he was to apply a balance of convenience test. He did not consider that test in his judgment. Had he done so (assuming that test is still of relevance in the context of this appeal), he should have concluded that the balance of convenience is in

40

favour of granting the injunction sought for the following reasons:

a.      The Appellants may be irremediably prejudiced if they have to comply
        with the orders granted in the US Proceedings in that (i) that results in
        them being subject to oppressive procedures and (ii) involves running
        the risk of a submission to the jurisdiction there.

b.      In the absence of an injunction, the US Proceedings will achieve a
        substantial part of their objective before the jurisdictional challenge can
        be heard and the Appellants will be subject to a procedure (oral
        disclosure) which is itself one of the grounds on which they rely in
        support of their claim for a permanent injunction.

c.      The Appellants have offered to provide written undertakings to comply
        with their obligations as employees and remain willing to do so. (The
        Appellants have recently indicated in correspondence that they consider
        the Respondents to be in repudiatory breach of their contracts of
        employment and as such, they are at an end. That issue will arise in the
        QBD action referred to above. The Appellants have indicated that they
        are willing, on an ad hoc basis, the continue to behave as if on garden
        leave (with its attendant obligations) pending the outcome of that
        litigation. A response to that suggestion is awaited.)

d.      No prejudice will be suffered by MMC and Guy Carpenter by the grant
        of the injunction sought. They are both already aware of the identities of
        the employees the Appellants are alleged to have solicited and in truth
        the disclosure order was sought in an attempt to gather evidence to
        bring further claims against the Appellants, rather than to protect the
        position of MMC and Guy Carpenter.

e.      Although a jurisdictional challenge is on foot in the US Proceedings, this
        Court is the natural forum in which to determine whether this Court is

41

the proper forum for the dispute and prima facie should make its decision before any such ruling in the US Proceedings.

f.    The nature of the Part 8 claims is such that there is unlikely to be any material dispute of fact or the need for either extensive or oral evidence. This being so, subject to the availability of the Court, it can be brought to trial reasonably swiftly, in weeks rather than months. The grant of a short term interim injunction will do no harm to MMC and Guy Carpenter in the interim. This presupposes that there will indeed be a trial, although the practical result may be that the outcome of this appeal determines the issue once and for all.

g.    The order already procured for MMC and Guy Carpenter provides them with illegitimate advantages : namely by obliging the Appellants to submit to oral disclosure and to give both oral and written disclosure and answer interrogatories before a jurisdictional challenge can be heard. There is no injustice in depriving them of those illegitimate advantages, in particular on a short term basis.

**Discretion**

89.    In as much as the Learned Judge's decision was a function of the exercise of his discretion, then he should have exercised it to grant the relief sought for all the reasons given above.

**Permission to appeal**

90.    The Court is invited to grant permission to appeal because:

a.    The issues raised are questions of law, involving no dispute of fact;

b.    The issues raised are of importance and potentially effect a whole group of employees (namely those employed in like contractual arrangements to those existing in this case);

42

c.    The Learned Judge was wrong in his key conclusions and failed to consider significant aspects of the Appellants' case;

d.    The Learned Judge recorded in his judgment that the US Proceedings would be subject to "amendments" (assuming the Respondents were entitled to make them) and that has not occurred;

e.    The Learned Judge apparently envisaged that, MMC having sought relief here, the question of whether the Appellants should provide disclosure, answers to interrogatories and attend depositions would be determined here, whereas the Respondents are aggressively seeking to enforce the orders of the New York Court in New York;

f.    The appeal has a reasonable prospect of success.

## Other orders sought

### Expedition

91.    The current timetable for compliance with the New York Order of 18 May 2007 is set out above.

92.    The matter is, therefore, urgent, and expedition is requested.

### Fresh evidence

93.    The Appellants have served the 4th witness statement of Ms Payne which contains an update of events in the US Proceedings since the hearing before the Learned Judge and exhibits the documents filed there since that time. The Appellants ask for permission to admit it.

Andrew Hochhauser QC

Claire Blanchard

14 June 2007

43

Essex Court Chambers,

24 Lincoln's Inn Fields,

London,

WC2A 3EG.