# EXHIBIT 24

**IN THE HIGH COURT OF JUSTICE**                    <u>Claim No. 2007 Folio 945</u>
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

          **(1) JULIAN SAMENGO-TURNER**
          **(2) RONALD DENNIS WHYTE**
          **(3) MARCUS HOPKINS**                    <u>Claimants</u>

                **-and-**

          **(1) MARSH SERVICES LIMITED (formerly MARSH**
              **CORPORATE SERVICES LIMITED and prior to**
              **that J&H MARSH & MCLENNAN (SERVICES) LIMITED)**
          **(2) GUY CARPENTER & COMPANY LLC**
          **(3) MARSH & MCLENNAN COMPANIES INC**    <u>Defendants</u>

---

### SKELETON ARGUMENT OF THE DEFENDANTS IN RESPONSE TO THE CLAIMANTS' APPLICATION FOR AN ANTI-SUIT INJUNCTION – *HEARING 6 JUNE 2007*

---

**Overview**

1.    This skeleton argument is in response to the Claimants' application for an anti-suit injunction to restrain the proceedings between the parties pending in the United States District Court Southern District of New York ("**the New York Proceedings**") [1].

2.    The New York Proceedings have been brought by the Second and Third Defendants to enforce the provisions of the 2000 Senior Executive Incentive and

---

[1]  On 1 June 2007, without prejudice to the exclusive jurisdiction of the New York courts, the First and Third Defendants issued a cross-application in the present English proceedings, with a witness statement and skeleton argument in support

Stock Award Plan ("**the Plan**") under which the Third Defendant ("**MMC**") has agreed to pay awards in the form of shares or cash in MMC, subject to certain conditions. The proceedings have been brought in New York pursuant to the exclusive New York jurisdiction clause (clause VI N) in the Plan.

3.    The main argument on which the Claimants' application is based, appears to be that the New York Proceedings should be injoined for the following reasons:

    3.1    Section 5 of Council Regulation No 44/2001 ("**the Regulation**") is engaged [2] because:

        (a)    the New York plaintiffs are the employers of the Claimants for the purpose of Article 20(1) of the Regulation; and

        (b)    the New York Proceedings are "matters relating to an individual contract of employment" within the meaning of Article 18(1) of the Regulation;

    3.2    if Section 5 is engaged:

        (a)    the New York Proceedings are inconsistent with Article 20(1) of the Regulation, which requires proceedings brought by an employer to be brought only in the courts of the Member State in which the employee is domiciled [3]; and

        (b)    the New York jurisdiction clause is invalidated by Article 21(1) of the Regulation, which prevents employers from contracting out of the mandatory provisions of Section 5 in advance of a dispute arising.[4]

4.    The Defendants contend that the Claimants' case is misconceived, for the following main reasons:

---

[2] Claimants' skeleton (application for interim injunction) paragraph 67
[3] Claimants' skeleton paragraphs 81 to 83
[4] Claimants' skeleton paragraph 85

4.1    The New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18 (1) and do not engage Section 5 of the Regulation:

    (a)    the New York Proceedings are not brought by the Claimants' employer - the Claimants' contracts of employment were entered into with the First Defendant ("**MSL**") which is not a party to the New York Proceedings;

    (b)    the Claimants' contracts of employment are separate and distinct from the Plan and the enforcement of clause II E is not dependent on the Claimants' contracts of employment; and

    (c)    the New York Proceedings are brought in relation to, and by way of enforcement of, clause II E of the Plan and the Plan is not a contract of employment;

4.2    Moreover, given that MMC and Guy Carpenter are not and never have been the Claimants' employers, Article 20(1) does not require that proceedings brought by them against the Claimants should be brought in England;

4.3    The Court would not be justified in adopting, as a matter of public policy, a strained construction of the Regulation with the aim of bringing the New York Proceedings within the scope of Article 18(1) or Article 20(1) (to which they would not, on an unstrained construction, be subject):

    (a)    the Plan is in essence an arrangement under which senior executives within the MMC group acquire a discretionary right to receive substantial amounts of shares or cash as a performance incentive, aligning their interests with those of MMC shareholders;

(b)  this involves matters regarding US securities which are naturally fit for New York law and jurisdiction;

(c)  the Plan is very different in nature to a conventional contract of employment and the public policy considerations underlying Section 5 of the Regulation (i.e. the need to protect employees from forum-shopping by employers) are of no relevance here;

(d)  on the contrary, MMC included a New York jurisdiction clause in the Plan for legitimate business reasons, not as a device to circumvent the provisions of the Regulation or as a means of oppression; and

(e)  Mr Whyte has already demonstrated that he is well able to defend himself in New York;

4.4  Given that the New York Proceedings do not engage Section 5 of the Regulation and are not inconsistent with Article 20(1), the Court should as a matter of discretion unhesitatingly give full effect to the New York jurisdiction clause in the Plan and allow the New York Proceedings to continue;

4.5  Even if the Court considers that the New York Proceedings do engage Section 5 of the Regulation and/or are inconsistent with Article 20(1), they are not vexatious, unconscionable or oppressive. The Court should therefore refuse the anti-suit injunction sought by the Claimants.

4

**Facts**

5.  ***The parties***        MMC is a Delaware corporation, headquartered in New York, and is the ultimate parent company of the MMC group of companies. The Second Defendant ("**Guy Carpenter**"), a member of the MMC group, specialises in reinsurance. MSL is an English company which acts as one of the service companies within the MMC group and is the employer of each of the Claimants.[5]

6.  The Claimants are employed by MSL rather than by one of the operating companies because they provide their services to different companies in the MMC group. That is very common arrangement in large corporate groups, particularly in the insurance industry.[6]

7.  At the time that they gave notice of their resignation on 2 April 2007, the First Claimant **Mr Samengo-Turner** and the Second Claimant **Mr Whyte** co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac, and supervised, among others, the Guy Carpenter facultative brokers in the US. The Third Claimant **Mr Hopkins** was head of Guy Carpenter's UK facultative reinsurance operation. Mr. Hopkins reported directly to Mr Samengo-Turner and Mr Whyte.

8.  ***The Plan***        The Claimants are each participants in MMC's Stock Plan [7], a plan offered to senior executives employed by companies in the MMC group in order to strengthen the mutuality of interest between them and the

---

[5] Their employment contracts and subsequent amendments are shown at pages 21 to 28 and 47 to 49 (Mr. Samengo-Turner), 50 to 67 (Mr. White) and 68 to 78 (Mr. Hopkins) of exhibit KCP1 to Katharine Payne's 1st WS.
[6] Lynsey Mansfield 1st WS paragraph 19
[7] In this skeleton, "the Plan" means the 2005 Terms and Conditions, relied on in these proceedings (elsewhere called "the Agreements"). Mr Samengo-Turner's copy of "the Plan" is at KCP1 pages 115 to 132. The 2000 Stock Plan is at pages 29 to 46 of KCP1

shareholders of MMC and to provide appropriate incentives for employees to remain with the MMC group.

9.    Under the Plan, vested awards are paid either in shares in MMC, which are traded on the New York Stock Exchange, or cash. The shares are subject to extensive regulation under US law, including regulation by the SEC and the New York Stock Exchange [8].

10.   The Claimants' description of the Plan as a "**Bonus Contract**" is incorrect. Companies within the MMC group operate annual cash bonus schemes which are completely separate from the Plan. The annual bonuses are paid in cash to the value of $100,000, with 50% of anything over and above the $100,000 being deferred cash and the remaining 50% provided in stock units.

11.   These annual bonuses are paid to a much wider range of employees than receive awards under the Plan. They are paid annually rather than vesting over several years and are paid by the individual's employer rather than provided centrally by MMC. The Claimants each received substantial annual cash bonuses which were separate from their awards under the Plan, paid by MSL, as their employer.

12.   Under the Plan, because of the need for consistency in respect of awards made to employees of MMC affiliates in many different states and countries, and the necessity of complying with US law in connection with a plan that involves the award of shares of a company listed on the New York Stock Exchange, the Plan includes a New York governing law provision and New York exclusive jurisdiction provision [9].

---

[8] See clauses V B, VI I, VII and VIII of the Stock Plan (KCP1 pages 122, 123, 125 and 126)
[9] See clauses VI O and VI N at page KCP1 page 124

13.  It would not make any sense if a different governing law applied or if another court outside New York had jurisdiction over a plan that was based on shares of a company headquartered in New York and whose shares trade on the New York Stock Exchange.

14.  This is all the more the case when awards under the Plan are made to employees throughout the global MMC group in many different countries. Having separate countries with jurisdiction over the same plan would cause huge confusion and potential for problems. MMC has a legitimate interest in ensuring that its Plan is subject to the law of the jurisdiction in which its shares are traded and that any disputes concerning the Plan are resolved by one judicial system in that jurisdiction [10].

15.  It also makes sense to have one central plan awarding shares in the Group's parent company to senior employees who are employed by many different companies within the MMC group, in many different countries. It helps to ensure that the senior people in those different countries and companies all share a sense of making a collective contribution towards the Group's success as a whole, in addition to their individual remuneration from their own employer and that the Plan is interpreted and administered in a uniform manner and not pursuant to the rulings of courts of numerous jurisdictions.

16.  In practical terms, the Plan is administered by MMC in New York and decisions about the grant of awards under the Plan are made in New York. The final decision is made by the Compensation Committee of the MMC Board of Directors, with input from the local business heads.  The original documents signed by the participants in the Plan are usually kept in New York rather than in the participants' own personnel file wherever they are employed.

---

[10] Mansfield 1st WS paragraph 11

17.   In the case of Guy Carpenter participants in the UK, MSL does not grant awards under the Plan, although its officers are consulted by MMC before MMC grants awards. When MMC decides to make an award in the form of cash rather than an award of shares, MSL's Human Resources department is told by MMC how much the payment is and MSL makes the payment through its payroll.

18.   The Claimants are part of a group of highly paid, senior executives within Guy Carpenter who were eligible to receive awards under the Plan. The average total remuneration package for each of them is in excess of $1 million each year.

19.   In November 2005, awards were granted under the Plan to each of the Claimants (the **"Awards"**). When receiving his Award, each Claimant agreed in writing to abide by the terms and conditions of the Plan[11].

20.   Under the Plan, the Awards were subject to vesting in specified percentages on various future dates over a four year period. As of April 2007, 20% of the Awards granted to each Claimant had vested. The Claimants each received cash for those portions of the Awards upon vesting. These amounts (representing 20% of the total value of the Awards) were paid were as follows: Mr Samengo-Turner (£77,110), Mr Whyte (£61,688), and Mr Hopkins (£46,266).[12]

21.   The grant of an Award under the Plan is conditional upon the executive in question not engaging in certain "Detrimental Activity" (clause I C)[13]. In the event that the executive engages in Detrimental Activity prior to or during the "Rescission Period" (defined as meaning the 12 month period beginning on each

---

[11] at KCP1 pages 115 to 132 (Mr. Samengo-Turner), 134 to 151 (Mr. Whyte) and 153 to 170 (Mr. Hopkins)
[12] Mansfield 1st WS. paragraph 16
[13] KCP1 page 154

installment's vesting date (clause 1 C(1)), the relevant installments are to be repaid to MMC.

22. It is to be noted that "Detrimental Activity" includes "(f) attempting to recruit or solicit, or aid in the recruitment or solicitation of any employee of the Company who reported to you, directly or indirectly, to terminate his or her employment with the Company for the purpose of working for any actual or prospective competitor of the Company."

23. It should also be noted that there is an alternative definition of Detrimental Activity in Schedule II D to the Plan, which contains[14] a non-exclusive English jurisdiction clause. Schedule II D is, however, only applicable after termination of the Claimants' employment and is accordingly not yet applicable[15].

24. Clause II E of the Plan provides as follows:

> **"E. Cooperation**
> You agree that both during and after your employment with the Company[16], regardless of the reason for your termination, you will provide to the Company such information relating to your work for the Company or your other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether you are in compliance with your obligations under this Agreement."[17]

25. The purpose of seeking information pursuant to this clause would be to assist MMC in discovering whether a senior executive to whom an Award has been paid has been complying with his obligations under the Plan. The provisions of information might well assist MMC in deciding on the appropriate measures to

---

[14] Paragraph 6 of Schedule II D, KCP page 170
[15] Paragraph 1 of Schedule II D, KCP1 page 166
[16] Defined as MMC or any of its subsidiaries or affiliates (page 115)
[17] KCP1 page 158

take in order to protect its position, including the seeking of injunctive relief against the executives.[18]    The discovery that a senior executive has been involved in Detrimental Activity entitles MMC to the return of recent installments of Award.[19]

26.    The "obligations" of the executive accordingly include, on the correct construction of clause II E and the other provisions of the Plan:

26.1    an implied obligation not to engage in Detrimental Activity (clause 1 C(1)), the breach of which triggers the obligation to repay installments of the Awards;

26.2    an obligation to repay the award in the event that the executive is found to have engaged in Detrimental Activity (clause I C(2));

26.3    an obligation under clause II A(3) to perform any or all of the executive's regular job duties requested by the Company during the executive's Notice Period[20] and to observe all the executive's attendant fiduciary duties, including, without limitation, duties of loyalty and confidentiality to the Company during that period (clause II A(3)).

27.    *Notice*                The Claimants gave 6 months' notice of resignation on 3 April 2007 [21]. They intend to take up employment with Integro Insurance Brokers ("**Integro**"), a competitor of Guy Carpenter. Since that date, the Claimants have been on garden leave, receiving their full salary and continuing

---

[18] Expressly contemplated in Clause II H, page 158
[19] Clause I C(1), KCP1 pages 154 - 155
[20] As defined in clause II A (1) and Schedule II D (3). The Claimants' notice periods are each 6 months.
[21] Payne 1st WS paragraph 33

to owe all their fiduciary and related duties in accordance with clause II A(3) of the Plan and their contracts of employment with MSL.

28.  ***Recruitment of staff by Integro***    In the period since the Claimants gave notice, 14 of the 32 brokers in Guy Carpenter's UK facultative reinsurance group have been recruited or approached by Integro. 5 brokers who had worked under the supervision of the Claimants have given notice and announced that they are leaving to join Integro.

29.  The rapid rate at which Guy Carpenter facultative brokers in the UK office have been announcing their resignations, joining Integro or are otherwise being aggressively solicited to join Integro has caused MMC to have serious concerns as to whether the Claimants are complying with their obligations under the Plan not to solicit employees.

30.  Integro is apparently intending to recruit around 150 staff. The Defendants have had to invest considerable amounts of management time in meetings and discussions with their remaining staff and to offer them significant enhancements in their remuneration package. The loss of so many people in a short space of time has inevitably caused significant disruption to their business both in the UK and abroad.

31.  Moreover, the Defendants cannot be sure that increased remuneration on its own will be enough to prevent further damage to their business by the loss of more brokers. Integro have launched a systematic recruitment campaign and the Defendants need to protect themselves if, as they suspect, the Claimants are assisting Integro, in breach of their own obligations [22].

---

[22] Mansfield 1st WS paragraph 32

11

32.    ***Requests for information***        MMC is understandably concerned that the wave of resignations by staff at Guy Carpenter's London office might be the result of recruitment or solicitation by the Claimants, in breach of their obligations under clause 1 C(1)(f) and/or clause II A(3) of the Plan.

33.    MMC has, by means of requests for information and documents pursuant to clause II E of the Plan, sought to ascertain whether the Claimants have been acting in breach of the obligations referred to above.

34.    The first request was made in letters to the Claimants dated 5 April 2007 [23]. On 11 April 2007 the Claimants' solicitors responded by letter indicating they could not respond to the request at that time because Messrs Whyte and Hopkins were on vacation. However, the Claimants' solicitors stated that they hoped to take detailed instructions from all 3 Claimants by the following week and would revert as soon as they reasonably could thereafter [24]. In subsequent communications from their solicitors the Claimants have, however, persistently failed to provide any answers to the requests [25].

35.    ***The New York Proceedings***        The New York Proceedings were commenced on 4 May 2007 and were notified to the Claimants' solicitors on 5 May 2007 [26]. MMC and Guy Carpenter, not MSL, are claimants in the New York Proceedings.[27] In substance, the New York Proceedings are seeking to enforce the right to disclosure of information under clause II E of the Plan and MMC's right to repayment of the Awards under clause I C(2). The terms of the Claimants' contracts of employment with MSL are not referred to or relied upon in the New York Proceedings.

---

[23] KCP2 pages 4 -6
[24] KCP2 page 10
[25] KCP2 pages 1 - 37
[26] Payne 1st WS paragraph 43
[27] KCP1 pages 101 to 113

36.     On 15 May 2007 the Claimants applied for expedited discovery from the New York court. Mr Whyte was served in England (Messrs Samengo-Turner and Hopkins having absented themselves and declining to instruct solicitors to accept service). He instructed New York lawyers to oppose the application and contest jurisdiction. The application was heard on 18 May 2007 and the order for disclosure was made by Judge Cote as matter of urgency in substantially the form it was requested, despite Mr Whyte's lawyers seeking to delay disclosure until after his jurisdiction challenge.

37.     Mr Whyte having failed to resist the order of Judge Cote, pending his challenge to jurisdiction (and while threatening to appeal Judge Cote's order[28]), the Defendants then set about seeking to restrain the New York Proceedings through the present English proceedings. They issued proceedings on 25 May 2007, which were first notified to the Defendants' solicitors on 29 May 2007. The Claimant gave notice that they were intending to apply for an order on short notice on 31 May 2007.

38.     The Defendants were not given sufficient time to respond to the Claimants' application by that date and undertook not to take any further steps in the New York Proceedings until 6 June 2007, when it is anticipated that the Claimants will renew their application.

---
[28] Payne 1st WS para54

**Submission 1**      *The New York Proceedings are not "matters relating to individual contract of employment" within the meaning of Article 18(1)*

39.    Before turning to the key point – that MMC and Guy Carpenter are not the Claimants' employer for the purposes of Section 5 of the Regulation - it is necessary to examine Article 18 (1) of the Regulation, which provides:

>    "In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section ...."

40.    In order to succeed with their application, the Claimants must establish that the New York Proceedings are "matters relating to individual contracts of employment" within the meaning of this provision. If (as the Defendants contend) the New York Proceedings are not "matters relating to individual contracts of employment", they do not engage Section 5 of the Regulation.

41.    If the New York Proceedings do not engage Section 5, there is no reason for the English court to decline to give full effect to the exclusive jurisdiction clause in the Plan, in accordance with its normal practice of upholding the parties' choice of jurisdiction[29].

42.    The Defendants submit that, for the following reasons, the New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18(1).

43.    **First**, in the New York Proceedings MMC and Guy Carpenter are seeking to enforce the provisions of the Plan, in particular, the cooperation clause at clause

---

[29] See *Dicey & Morris: The Conflict of Laws* 14th Edition, Rule 31 paragraph 12-021

14

IIE. The New York Proceedings are *not* seeking to enforce or rely on the provisions of the Claimants' contracts of employment.

44.  The Claimants' contracts of employment were made uniquely with MSL, which is not a party to the New York Proceedings, not with MMC or Guy Carpenter. Contrary to what is suggested in the Claimants' skeleton argument,[30] it does not follow from the fact that the Claimants provide services to other companies in the MMC Group that the Claimants have more than one employer or multiple employment contracts. That is plainly not the case[31].

45.  **Second,** the Plan, which is the subject matter of the New York Proceedings and the basis of the plaintiffs' causes of action in those proceedings, is not an "individual contract of employment" or a "matter relating to an individual contract of employment" within the meaning of Article 18(1).

46.  As a matter of English domestic law, the hallmark of a contract of employment is the existence of mutual obligations on the part of the employer to provide work and on the part of the employee to carry out that work [32]. The Plan does not include any such obligations. There are various other tests which are sometimes applied to determine whether a contract is a contract of employment (such as the control test, the integration test and the economic reality test). None of these tests comes is satisfied by the terms of the Plan or the relationship between the Claimants and MMC or Guy Carpenter.[33]

---

[30] Claimants' skeleton argument paragraph 62
[31] Mansfield 1st WS paragraphs 5 to 9
[32] See *Nethermere (St Neots) Ltd v Taverna* [1984] IRLR 240; *Bowers: Employment Law* 7th Edition at paragraph 2.06
[33] *Bowers* (ibid) at paragraphs 2.09 to 2.24

47. Contrary to the Claimants' argument[34], it does not follow from the fact that the Plan includes references to terms such as notices of termination, confidentiality and post termination restrictive covenants which are apposite in the context of an employment relationship that the Plan is itself a contract of employment. As noted above, the core terms of a contract of employment are completely absent from the Plan.

48. Moreover, the Plan is not a "matter relating to a contract of employment", applying the criteria invoked by the European Court of Justice. English domestic law is not determinative of the issue whether the Plan is a contract of employment for the purposes of the Regulation. In order to promote the uniform application of the Regulation and the Brussels and Lugano Conventions, the European Court of Justice has repeatedly held[35] that phrases such as "matters relating to individual contracts of employment" are independent concepts with their own Convention/Regulation meaning, independent of national law [36].

49. It would appear that the European Court has not yet provided any clear guidance as to the meaning of "matters relating to individual contracts of employment" in Article 18(1). However, in *Shenavai v Kreischer* 266/85 [1987] ECR 239, a case under the Brussels Convention concerning the issue of which court had jurisdiction to hear a claim by an architect for the recovery of fees under the Brussels Convention, the European Court held as follows:

> "16. In that connection it should first be observed that contracts of employment, like other contracts for work other than on a self-employed basis, differ from other contracts -- even those for the provision of

---

[34] Skeleton paragraph 62
[35] E.g. in Weber v *Universal Ogden Services Ltd* (Case C-37/00 [2002] All ER (EC) 397 at 417, [2002] ECR I-2013 (paras 38-41)
[36] *Kleinwort Benson Ltd v Glasgow City Council* [1999] AC 153. It follows that authorities such as the decision of Lightman J in *Albon (trading as NA Carriage CO) v Naza Motor Trading Sdn Bhd and another* [2007] 2 All ER 719, a decision on the meaning of CPR 6.20(5), are of very limited, if any, assistance in construing the Regulation

services -- by virtue of certain particularities: **they create a lasting bond which brings the worker to some extent within the organizational framework of the business of the undertaking or employer, and they are linked to the place where the activities are pursued, which determines the application of mandatory rules and collective agreements.** It is on account of those particularities that the court of the place in which the characteristic obligation of such contracts is to be performed is considered best suited to resolving the disputes to which one or more obligations under such contracts may give rise" [Emphasis added].

50. In his advisory Opinion in the same case, Advocate General Mancini referred to "the concept of an employment relationship; in particular … dealings which are characterised by the economic inferiority of one party."

51. The *Jenard-Moller Report* on the draft Lugano Convention[37] (which first introduced special jurisdictional provisions relating to employment contracts, followed subsequently in the Regulation) states as follows:

> "41. The question whether a contract of employment exists is not settled by the Convention. If the judge to whom the matter has been referred gives an affirmative answer to this question he will have to apply the second part of Article 5(1) which constitutes a specific provision. **Although there is as yet no independent concept of what constitutes a contract of employment, it may be considered that it presupposes a relationship of subordination of the employee to the employer** (see Chapter VI, judgments in *Shenavai v Kreischer* cited earlier, and *Arcado v Havilland*" [Emphasis added].

52. Applying these statements from European jurisprudence to the present case, the Plan is not contract of employment any more than it would be under English law. The Plan is not a contract for work; nor does it bring executives within the organizational framework of the business *(Shenavai v Kreischer).*

---

[37] Admissible as an aid to the interpretation of the Convention under section 3B of the Civil Jurisdiction and Judgments Act 1988

53.   **Third**, there is a "matter relating to an individual contract of employment", within the meaning of Article 18(1), only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee.

54.   In *Swithenbank Foods Ltd v Bowers* [2002] 2 All ER 974, the only relevant reported English case on the construction of Section 5 of the Regulation, HH Judge McGonigal (sitting as a High Court Judge) held as follows:

> "24.   .... Section 5 should not be construed as conferring jurisdictional advantages on a poor defendant sued by a rich claimant if they happen to be employee and employer. **The reference to 'individual contracts of employment', rather than to the employment relationship generally, indicates that what is relevant is the contract of employment rather than the relationship generally. The contract of employment is relevant, and there is a matter relating to an individual contract of employment, only if the employer is seeking to rely on that contract of employment in order to bring his claim against the employee**" [Emphasis added].

55.   The Claimants' argument that Article 18(1) is engaged by the New York Proceedings merely because (a) they "de facto" provide their service to other companies in the MMC group[38] and (b) the Plan contains terms that would be apposite in the context of an employment relationship[39], is flatly inconsistent with this authority.

56.   **Fourth**, there is no public policy reason why the Court should adopt a strained construction of the Regulation in order to treat the New York Proceedings as "matters relating to individual contracts of employment".

---

[38] Claimants' skeleton para 62(b)
[39] Claimants' skeleton para 62(c)(ii)

57.   Recital (13) to the Regulation makes clear that, as previously indicated in the Jenard-Moller report, the special jurisdiction provisions of Article 5 are designed for the protection of the employer as the weaker party. As noted by HH Judge McGonigal in *Swithenbank Foods Ltd v Bowers* [2002] 2 All ER 974:

> "24.    The policy behind Section 5 is based on the probability that the employer is financially stronger than the employee. Therefore, if one or other of them has to take proceedings in a foreign court, it should be the employer who has to bear the additional cost and inconvenience involved to ensure, so far as practicable, that the parties are on an equal footing so far as jurisdiction is concerned."

58.   Having regard to the public policy considerations underlying Section 5, it is important to bear in mind that the terms and circumstances of the Plan are very far removed from the type of employer/employee relationship which led to the inclusion of the special jurisdictional provisions of Section 5, i.e. a relationship characterised by the subordination of the employees and the potential unfairness of exposing employees to proceedings in foreign jurisdictions at the whim of their employer [40].

59.   Any employees qualifying for an Award under the Plan (including the three Claimants in this case) will necessarily be individuals with substantial assets and commercial know how. The New York jurisdiction clause was included in the Plan, not to make life difficult for the Claimants, but for perfectly sound and legitimate business reasons of MMC.

---

[40] Compare *Benatti v WPP Holdings Italy SRL* [2007] EWCA Civ 263, where the Court of Appeal (a) took account of the fact that the alleged "employee" was a successful businessman who had signed the consultancy agreement of his own free will, submitting to this jurisdiction; and (b) in the case of Buxton LJ, deplored the fact that the Regulation had "spawned" the jurisdictional challenge.

60.    In short, the New York Proceedings are not "matters relating to individual contracts of employment" within the meaning of Article 18(1). Accordingly the Claimants' application fails *in limine*.

**Submission 2**    *The New York Proceedings are not proceedings brought by an employer against an employee within the meaning of Article 20(1)*

61.    Article 20(1) of the Regulation provides:

"An employer may bring proceedings" only in the courts of the Member State in which the employee is domiciled."

62.    If, as contended above, the New York Proceedings are not "matters relating to individual employment contracts" the application for an anti-suit injunction must necessarily fail, as the New York Proceedings would not be subject to the provisions of Section 5.

63.    Even if, however, contrary to the Defendants' first submission, the Court were to hold that the proceedings were "matters relating to individual employment contracts", it would by no means follow that the New York Proceedings were inconsistent with Article 20(1).

64.    The point is a short one. Regardless of whether the New York Proceedings are "matters relating to the Claimants' individual contracts of employment" as contended by the Claimants (e.g. because they contain terms apposite to an employment relationship), the New York Proceedings have not been brought by the Claimants' employer, MSL. MMC and Guy Carpenter are not and never have been the Claimants' employers.

65.    The Claimants' case requires the Court, in effect, to "pierce the corporate veil" and to treat Guy Carpenter, MSL's co-subsidiary, and MMC, the ultimate parent company of the MMC group, as one and the same entity as MSL, the Claimants' employer, thereby ignoring their separate corporate identities and the fact that it was MSL alone that entered into a contract of employment with each of the Claimants.

66.    This approach is contrary to well established authority. The Courts may only "pierce the corporate veil" in certain defined circumstances, in particular where a corporate entity is being used as a device or sham to mask the true facts. These circumstances do not arise, and are not alleged to arise, in the present case.

67.    The leading case on "piercing the corporate veil" in a jurisdictional context is *Adams v Cape Industries* [1990] 1 Ch 433, in which the Court refused to pierce the corporate veil and treat the defendants as being present in Texas by reason of the presence of certain related companies. Scott J (whose judgment was upheld by the Court of Appeal) held as follows (at page 536):

> "Mr. Morison described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As Sir Godfray submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities."

68.    In the employment field, the Courts have similarly rejected attempts to pierce the corporate veil, in particular in the context of attempts by employees to benefit

21

from statutory provisions (primarily the Transfer of Undertakings Regulations) that would apply if they were in fact employed by a different group company[41].

69.    Moreover, there is no foundation for the Claimants' insinuation that there is something artificial about the institution of proceedings by MMC as opposed to MSL or that the New York Proceedings are the result of forum shopping.[42] MMC and Guy Carpenter are the natural parties to bring proceedings to enforce the terms of the Plan. The New York Proceedings seek relief only under the Plan.

70.    For the reasons set out in the first submission, there is no need for the Court to apply a strained interpretation of the Regulation in order to treat the New York Proceedings as inconsistent with Article 20(1) when, on an unstrained reading of the Article, informed by an appreciation of the public policy considerations underlying Section 5, they do not.

71.    In short, since the New York Proceedings are not inconsistent with Article 20(1), there is no valid basis for the Claimants' application to restrain those proceedings. For this additional reason, the Court should dismiss the Claimants' application for an anti-suit injunction.

---

[41] See in particular the judgment of Elias J in *Millam v The Print Factory (1991)Ltd* [2006] IRLR 923, (reversed on other grounds [2007] EWCA Civ 322) "it is only legitimate to pierce the corporate veil and treat the two businesses as one in very exceptional circumstances, and even then only for certain purposes ... In general it must be shown that the subsidiary company is a sham or a façade ..."
[42] Claimants' skeleton paragraph 102a

**Submission 3**    *The Court should not, as a matter of discretion, restrain the New York Proceedings*

72.    In order to justify the grant of an anti-suit injunction, the Claimants must establish that the New York Proceedings are unconscionable, vexatious or oppressive [43].

73.    If the Court holds either that the New York Proceedings do not engage Section 5 of the Regulation or, even if they do, that they do not infringe Article 20(1), the foundation of the Claimants' case that the Court should, as a matter of discretion, restrain the New York Proceedings falls away. It would not be unconscionable, vexatious or oppressive to allow the New York Proceedings to proceed in accordance with the agreed jurisdiction clause in the Plan.

74.    The Claimants' contrary contention, to the effect that the Court should in this situation give effect to the Regulation, even though it is *ex hypothesis* inapplicable[44], is untenable. Such a course would be an affront to both contract and the exclusive jurisdiction clause; and to comity and the power of the New York Courts.

75.    Even if the Court holds that the New York Proceedings do engage Section 5 of the Regulation or that they infringe Article 20(1), the proceedings cannot sensibly be characterised as unconscionable, vexatious or oppressive:

   75.1    New York was the agreed forum for disputes arising out of the Plan and is an entirely appropriate forum for the determination of a claims arising out of an agreement which is governed by New York law;

---

[43] *OT Africa Line v Magic Sportswear* [2005] 2 Lloyd's Rep 170
[44] Claimants' skeleton argument paragraph 105

75.2    The New York Proceedings have been brought in good faith in accordance with the New York jurisdiction clause in the Plan;

75.3    The Claimants are in a position to participate in the New York Proceedings – whilst Messrs Samengo-Turner and Hopkins have so far evaded service, Mr Whyte has participated, challenged jurisdiction, opposed the disclosure order and threatened to appeal;

75.4    It would not be oppressive for the Claimants to comply with the order for expedited disclosure, including the order for pre-trial depositions. (Part 34 of the CPR specifically provides for the taking of depositions on the basis of a letter of request from a foreign court, which it would not do if it considered such procedure in and of itself to be oppressive.)

75.5    There is absolutely no foundation for the suggestion that by participating in the New York expedited discovery process, the Claimants would be waiving their objections to the jurisdiction of the New York court. It is entirely possible for a party to participate in the New York Proceedings whilst reserving its position as to jurisdiction.

75.6    The motion to dismiss the New York Proceedings on jurisdictional and *forum non conveniens* grounds is still to be heard, notwithstanding the Mr Whyte's participation in the proceedings to date – and this would make no sense if, by participating, the Claimants automatically submitted to the jurisdiction;

75.7    Restraining the New York Proceedings at this stage, thereby compelling the Defendants to carry on fresh proceedings in this

jurisdiction, would serve no useful purpose and would almost certainly lead to unnecessary duplication and wastage of work and costs;

75.8    The anti-suit jurisdiction should only be exercised with caution and in exceptional circumstances – especially where, on an interim basis, the "balance of convenience" and justice is in favour of respecting and indeed supporting the New York Court's order.

**Conclusion**

76.    For the reasons set out above, the Court should dismiss the Claimants' application for an anti-suit injunction.

**ANDREW LENON QC**                                      **MURRAY ROSEN QC**

**1 Essex Court, Temple**                                **Herbert Smith LLP**

**4 June 2007**