# EXHIBIT
# 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————— x
                                  :
GUY CARPENTER & COMPANY, LLC and   :
MARSH & McLENNAN COMPANIES, INC.,  :   Index No: 07 Civ. 3580
                                  :
                 Plaintiffs,     :   Complaint
                                  :
            - against -        :
                                  :
JULIAN SAMENGO-TURNER, RON WHYTE,  :
and MARCUS HOPKINS,              :
                                :
                 Defendants.    :
                                :
———————————————————————— x

       Plaintiffs Guy Carpenter & Company, LLC, formerly Guy Carpenter & Company,

Inc., ("Guy Carpenter") and Marsh & McLennan Companies, Inc. ("MMC") (collectively

"plaintiffs"), by their attorneys Kramer Levin Naftalis & Frankel LLP, for their complaint

against defendants Julian Samengo-Turner ("Samengo-Turner"), Ron Whyte ("Whyte"), and

Marcus Hopkins ("Hopkins") (collectively, "defendants"), allege as follows:

## Introduction

       1.     This is an action for breach of contract arising out of defendants'

participation in the "Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock

Award Plan" ("the Plan") and their respective violations of the terms and conditions of the

Agreements each defendant executed in connection with the November 1, 2005 awards granted

under the Plan (the "Agreements"). Under the express terms of the Agreements, defendants are

each required to cooperate with Marsh or any of its subsidiaries or affiliates, including Guy

Carpenter, and specifically to "provide to the Company such information relating to [their] work

for the Company or [their] other commercial activities as the Company may from time to time

reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]." Having received from Guy Carpenter written, reasonable requests for information in accordance with this provision, defendants have refused to cooperate. Not only are such refusals unambiguous breaches of defendants' contractual obligations to provide such cooperation, but they are a blatant and unlawful attempt to prevent plaintiffs from determining whether defendants are in compliance with other terms of the Agreements. Specifically, plaintiffs have reason to believe that defendants, directly and/or in concert with other individuals at their announced, next employer, are and have been targeting, soliciting and recruiting numerous Guy Carpenter employees to terminate their employment with Guy Carpenter to join Integro Insurance Brokers. Any such activities constitute separate violations of the Agreements.

2.      Further, under the express terms of the Agreements, defendants are not permitted to engage in Detrimental Activity, which includes employment with or otherwise being interested in a competitor of plaintiffs. Defendants engaged in Detrimental Activity and breached their Agreements by accepting employment with or otherwise becoming interested in Integro Insurance Brokers on or before April 5, 2007. Under the Agreements, defendants therefore are required to return compensation that they received pursuant to the Plan within one year prior to their engaging in such Detrimental Activity. Despite proper written demand, they have failed to do so.

3.      Accordingly, by this action, plaintiffs seek (a) a mandatory injunction ordering defendants to cooperate with plaintiffs in accordance with their contractual obligations under the Agreements and (b) damages proximately caused by defendants' breaches of the Agreements.

KL3 2589853.5

<u>The Parties, Jurisdiction and Venue</u>

4.    MMC is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, New York, New York 10036.  MMC is a public company listed on the New York Stock Exchange and owns a number of the leading risk management and human capital consulting companies, including Marsh, Inc. ("Marsh"), Guy Carpenter, Mercer Human Resource Consulting and Kroll Inc.

5.    Guy Carpenter is a leading risk and reinsurance intermediary and a wholly owned subsidiary of MMC.  Guy Carpenter is a Delaware corporation with its principal place of business at One Madison Avenue, New York, New York 10010.

6.    Upon information and belief, Samengo-Turner is a citizen of the United Kingdom and resides at 17 Kyrle Road, London, SW11 6BD, England.

7.    Upon information and belief, Whyte is a citizen of the United Kingdom who resides at Oak Rise, 193 World's End Lane, Chelsfield, Kent, BR6 6AT, England.

8.    Upon information and belief, Hopkins is a citizen of the United Kingdom who resides at 1 Belmont Road, London, SW4 0BZ, England.

9.    This action for breach of contract arises under the terms of the Agreements.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  MMC and Guy Carpenter are citizens of Delaware and New York and defendants are subjects of a foreign state (the United Kingdom).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    Venue is properly laid in this district pursuant to 28 U.S.C. § 1391 and pursuant to paragraph VI.N of the Agreements.

Defendants' Employment With Plaintiffs

11.    Samengo-Turner's employment with Guy Carpenter commenced on or about September 23, 1991.  On or about April 3, 2007 Samengo-Turner gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Samengo-Turner co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.

12.    Whyte's employment with Guy Carpenter commenced on or about September 20, 1988.  On or about April 3, 2007, Whyte gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Whyte co-led Guy Carpenter's global facultative reinsurance business unit, doing business under the trademark GCFac.

13.    Hopkins's employment with Guy Carpenter commenced on or about April 10, 2000.  On or about April 3, 2007, Hopkins gave notice to Guy Carpenter of his resignation of employment.  At the time such notice was given, Hopkins was head of Guy Carpenter's U.K. facultative reinsurance operation.

14.    Defendants' employment with Guy Carpenter was, and continues to be, governed by their respective employment agreements with plaintiffs.

15.    Under the terms of their respective employment agreements with plaintiffs, defendants are currently in six (6) month "notice periods," meaning that they remain employed by plaintiffs and continue to receive compensation from plaintiffs.  As current

-4-

KL3 2589853.5

employees, defendants also continue to have all the fiduciary and related duties and obligations to plaintiffs that are associated with such employment.

16.     In addition, by the terms of their respective employment agreements with plaintiffs, defendants are not permitted for specific periods of time during and after their notice period to solicit, entice, induce, or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs.

Defendants' Participation in the Plan and Defendants' Obligations Under the Agreements

17.     MMC offers various incentive compensation plans to its employees in order to strengthen the mutuality of interest between MMC and its employees and to provide appropriate incentives for employees to remain with MMC and its subsidiaries or affiliates.

18.     During the course of their employment with plaintiffs, each of the defendants participated in the "Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan."

19.     In connection with the grants of their November 2005 Awards under the Plan, each defendant agreed in writing to abide by the terms and conditions of the Plan as well as the additional terms and conditions set forth in Agreements related to the Plan. (Redacted versions of defendants' Agreements are attached as Exhibits A - C). Throughout the Agreements, MMC and its subsidiaries or affiliates are referred to together as "the Company."

20.     On or about November 1, 2005, Messrs. Samengo-Turner, Whyte and Hopkins were granted Awards under the Plan, which were subject to vesting in specified percentages on various future dates. (*See* Exhibits A - C).

XL3 2589253.5

21.    Messrs. Samengo-Turner, Whyte and Hopkins agreed to the terms of the Awards by executing the Agreements.

22.    As of April 2007, 20% of the Awards granted to each defendant had vested. (*See* Exhibits A - C, Section I.A(1)). Defendants received cash payments of the vested portions of their Awards as follows: Samengo-Turner received £77,110, Whyte received £61,688 and Hopkins received £46,266.

23.    Significantly, the Agreements require each defendant to "provide to the Company such information relating to [their] work for the Company or [their] other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]." (the "Cooperation Clause"). (*See* Exhibits A - C, Section II.E). The Cooperation Clause applies to defendants "during and after [their] employment with the Company." (*See id.*).

24.    Compliance with the Cooperation Clause is mandatory; there is no prerequisite that plaintiffs demonstrate any potential breach of participants' obligations under the Agreement in order to be entitled to the benefits of the Cooperation Clause.

25.    In addition, the Agreements provide for "Cancellation and Rescission" of the Awards granted under the Plan if a defendant engages in any "Detrimental Activity," as defined in the Agreements, during the 12 month period following any vesting of the Award. (*See* Exhibits A - C, Section I.C). Cancellation and Rescission includes return of amounts already distributed to a participant during the one year period preceding any such Detrimental Activity. (*See* Exhibits A - C, Section I.C(2)(a)).

-6-

26.     The definition of Detrimental Activity applicable to defendants is set forth in Schedule II.D of the Agreements, since defendants' principal place of employment at the time they gave notice of their resignations was the United Kingdom. (*See* Exhibits A - C, Section II.D).

27.     According to Schedule II.D of the Agreements, Detrimental Activity includes "enticing, inducing or encouraging an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by doing so." (*See* Exhibits A - C, Schedule II.D, Section 2(a)(iv)).

28.     In addition, Detrimental Activity includes, "to any material extent undertaking, carrying on or being employed, engaged or interested in any capacity in the supply or proposed supply of Competitive Services within the Territory." (*See* Exhibits A - C, Schedule II.D, Section 2(a)(i)). Under Schedule II.D, Competitive Services is defined as "services identical to or competitive with those which at the expiry of the Relevant Period the Company or any Associated Company was supplying or negotiating or actively and directly seeking to supply to a Client for the purpose of a Relevant Business." (*See id.* at Section 5). Relevant Business is defined as "the business of the Company or any Associated Company in which, pursuant to your duties, you were materially involved at any time during the Relevant Period." (*See id.*). Relevant Period "means . . . , where your employment has ended, the period of 12 months ending on the Termination Date." (*See id.*).

XL3 2589853.5

29.    Defendants agreed to independent non-solicitation covenants which are separately enforceable. Under Schedule II.D of the Agreements, defendants agreed not to "[e]ntice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a business which competes with either the supply of Competitive Services or a business which competes with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by so doing." (*See* Exhibits A - C, Schedule II.D, Section 4).

30.    The Agreements further provide that "[t]he Company and [defendants] irrevocably submit to the exclusive jurisdiction and venue of any state or federal court located in the County of New York for the resolution of any dispute over any matter arising from or related to the Award . . . . Moreover, both [defendants] and the Company (i) acknowledge that the forum stated in this Section VI.N has a reasonable relation to this Award and to the relationship between [defendants] and the Company and that the submission to the forum will apply, (ii) waive, to the extent permitted by law, any objection to personal jurisdiction or to the laying of venue of any action or proceeding covered by this Section VI.N and (iii) agree not to commence any such action or proceeding in any forum other than the forum stated in this Section VI.N and (iv) agree that, to the extent permitted by law, a final and non-appealable judgment in any such action or proceeding in any such court will be conclusive and binding on [defendants] and the Company." Defendants also agreed to trial of these claims by the Court "WITHOUT A JURY." (*See* Exhibits A - C, Section VI.N).

K13 2589853.5

31.     The Agreements also provide that "[n]otwithstanding anything to the contrary (except with regard to the Schedule II.D, if applicable), this Agreement shall be governed by the laws of the State of New York, without regard to conflicts or choice of law rules or principles. (*See* Exhibits A - C, Section VI.O).

32.     Schedule II.D, Section 6 provides that Schedule II.D "will be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle any disputes as may arise in connection with this Schedule. The remainder of this Agreement will continue to be governed by the laws of the state of New York." Because the Cooperation Clause in the Agreements is outside the of the scope of Schedule II.D, all disputes concerning that clause must be submitted for adjudication in a New York court and interpreted under New York law, in accordance with Section IV.O of the Agreements.

Defendants' Resignations and Hiring By Integro

33.     Integro Insurance Brokers ("Integro") is an insurance brokerage firm with its principal place of business at 3 Times Square, 9th Floor, New York, New York 10036.

34.     Integro offers "Competitive Services" as defined in the Agreements. (*See* Exhibits A - C, Schedule II.D, Section 5).

35.     Upon information and belief, Integro was founded in May 2005 by three former MMC executives.

36.     At or shortly after the time defendants announced their resignations from Guy Carpenter, plaintiffs learned that defendants were hired by Integro.

37.    On April 5, 2007, at the commencement of defendants' respective six (6) month "notice periods," Integro issued a press release announcing "the formation of an international insurance and reinsurance business unit to be based in London." The press release states that "Integro announced *the hiring* of Julian Samengo-Turner and Ron Whyte, who will lead the new unit and join the board of Integro in the U.K." Further, the press release states that "Messrs. Samengo-Turner and Whyte *formerly* led Guy Carpenter's global facultative reinsurance business unit." Regarding Hopkins, the press release states that Hopkins is "[a]lso joining Integro and its U.K. board" and that Hopkins was "*previously* head of Guy Carpenter's U.K. facultative reinsurance operation." (*See* Exhibit D, emphases added). Similarly, the April 9, 2007 edition of Business Insurance magazine attributes to Integro the announcement that the defendants have "joined" Integro and were "formerly" or "previously" with Guy Carpenter.

38.    Upon information and belief, at least eleven Guy Carpenter employees in the facultative reinsurance group (including the defendants) have been recruited or approached, either directly or indirectly, by Integro. Upon information and belief, defendants aided in the solicitation and recruitment of these Guy Carpenter employees, who directly or indirectly reported to them (including each other).

Defendants' Failure to Cooperate

39.    Upon learning of defendants' hiring by Integro and the solicitation of other Guy Carpenter employees who defendants supervised, counsel for plaintiffs sent letters to each defendant dated April 5, 2007 (the "April 5 letters") seeking information pursuant to Section II.E of the Agreements to ascertain whether defendants were honoring their obligations. Specifically, pursuant to the Cooperation Clauses, plaintiffs requested that defendants answer questions relating to the circumstances surrounding defendants' hiring by Integro and

XL3 2589653.5

defendants' discussions of their hirings with current Guy Carpenter employees in order for plaintiffs "to establish whether or not [defendants] are in compliance with [their] obligations under the Plan and as a GC employee" (the "Requests"). Plaintiffs requested that defendants provide responses to the Requests in the April 5 letters by April 11, 2007. (*See* Exhibits E - G).

40.     Plaintiffs requested that defendants provide responses to the Requests in the April 5 letters by April 11, 2007.

41.     On April 11, 2007, defendants' counsel responded by letter indicating that defendants could not respond to the Requests by April 11, 2007 because Whyte and Hopkins were on vacation. However, defendants' counsel stated that they were "hoping to take detailed instructions from all three clients by mid next week and will revert as soon as we reasonably can thereafter." (*See* Exhibit H).

42.     In subsequent communications by their counsel, including a letter dated April 19, 2007, defendants have failed to provide answers to the Requests or otherwise provide cooperation as required by the Cooperation Clauses. (*See* Exhibit I at 5).

43.     To date, defendants have failed to cooperate and have not responded to the Requests.

Defendants' Failure to Return Cash Received Under the Plan

44.     In the April 5 letters, plaintiffs reminded defendants that "joining Integro" amounts to Detrimental Activity in violation of their Agreements. (*See* Exhibits E - G at 1).

45.     Accordingly, pursuant to Section I.C(2)(b) of the Agreements, plaintiffs requested that defendants: "(a) [r]eturn all cash and/or shares of MMC common stock that [they]

-11-

have not disposed of; and (b) [p]ay to MMC an amount equal to the cash and/or the Fair Market

Value (as defined in the Plan) on the vesting date of the MMC common stock that [they] have

disposed of." (*See* Exhibits E- G).

46.    To date, Defendants have failed to return the cash they received despite

the fact that they have engaged in Detrimental Activity.

<u>First Claim for Relief</u>

47.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 46 of the complaint.

48.    Defendants Samengo-Turner, Whyte and Hopkins have failed to cooperate

as requested by plaintiffs constituting express breaches of Section II.E of their respective

Agreements.

49.    Plaintiffs have no adequate remedy at law.

<u>Second Claim for Relief</u>

50.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 46 of the complaint.

51.    By accepting employment with, "joining," and otherwise becoming

interested in the supply or proposed supply of Competitive Services (as defined in Schedule II.D

of the Agreements) via Integro, Plaintiffs have engaged in Detrimental Activity (as also defined

in Schedule II.D of the Agreements).

KL3 2589853.5

52.     Defendants have failed, in violation of their obligations under the Agreements, to return any of the cash they received under the Plan.

WHEREFORE, Plaintiffs respectfully requests that the Court:

(i)     issue a mandatory injunction ordering defendants to comply with the Cooperation Clauses set forth the Agreements; to immediately provide responses to the Requests set forth in the April 5 letters; and to promptly provide responses to any future Requests made by plaintiffs under the Cooperation Clauses, including without limitation requests for in-person interviews by plaintiffs and their counsel;

(ii)     award to plaintiffs damages for defendants' breach of contract as a result of their failure to return the amounts paid to them under the Agreements: £77,110 from Samengo-Turner, £61,688 from Whyte, and £46,266 from Hopkins, plus interest; and

(iii)     award to plaintiffs the costs and disbursements of this action; and

(iv)     grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         May 4, 2007

                                    Kramer Levin Naftalis & Frankel LLP

                                    By:

                                        Barry H. Berke (BB-1421)
                                        Robert N. Holtzman (RH-9525)
                                        Rachel M. Manne (RM-7151)
                                    1177 Avenue of the Americas
                                    New York, New York  10022
                                    (212) 715-9100
                                    Attorneys for Plaintiffs

KL3 2589855.5                           -13-

# EXHIBIT
# 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————— x
                                              :
GUY CARPENTER & COMPANY, LLC and              :
MARSH & McLENNAN COMPANIES, INC.,             :
                                              :
                      Plaintiffs,             :        07 Civ. 3580 (DC) (KNF)
                                              :
           - against -                        :
                                              :
JULIAN SAMENGO-TURNER, RON WHYTE,             :
and MARCUS HOPKINS,                           :
                                              :
                      Defendants.             :
                                              :
—————————————————————— x


PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR EXPEDITED DISCOVERY


KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036

## Table of Contents

| | Page |
|---|---|
| Table of Authorities | ii |
| Preliminary Statement | 1 |
| Factual Background | 4 |
|    A.   Defendants' Employment With Guy Carpenter and Hiring By Integro | 4 |
|    B.   Defendants' Participation in the Plan and Defendants' Obligations Under the Agreements | 6 |
|    C.   Defendants' Failure to Cooperate | 9 |
| Argument | 10 |
| Conclusion | 14 |

Table of Authorities

Page

Cases

*Ayyash v. Bank Al-Madina*, 233 F.R.D. 325 (S.D.N.Y. 2005) ...................................................... 10

*Renaud v. Gillick*, No. 06-1304, 2007 WL 98465 (W.D. Wash. Jan. 8, 2007) ............................. 10

*Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273 (N.D. Cal. 2002) ...................... 11

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 07 Civ. 22014, 2007
WL 1121734 (S.D.N.Y. Apr. 11, 2007) ............................................................................... 10, 11

Rules

Fed. R. Civ. P. 26(d) 1993 Advisory Committee Note ................................................................ 10

KL3 2591561.4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————— x
                          :
GUY CARPENTER & COMPANY, LLC and  :
MARSH & McLENNAN COMPANIES, INC.,  :
                          :          07 Civ. 3580 (DC) (KNF)
          Plaintiffs,       :
                          :
       - against -       :
                          :
JULIAN SAMENGO-TURNER, RON WHYTE,  :
and MARCUS HOPKINS,            :
                          :
          Defendants.     :
                          :
———————————————————— x

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR EXPEDITED DISCOVERY

Plaintiffs Guy Carpenter & Company, LLC, formerly Guy Carpenter & Company,

Inc., ("Guy Carpenter") and Marsh & McLennan Companies, Inc. ("MMC") (collectively

"plaintiffs"), respectfully submit this memorandum in support of their motion for an order,

pursuant to Federal Rules of Civil Procedure 26, 30, 33 and 34, permitting expedited discovery

in this action and specifically requiring defendants Julian Samengo-Turner ("Samengo-Turner"),

Ron Whyte ("Whyte"), and Marcus Hopkins ("Hopkins") (collectively, "defendants") to respond

on an expedited basis to plaintiffs' First Request for Production of Documents and First Set of

Interrogatories and to appear for depositions promptly thereafter.

#### Preliminary Statement

Defendants are senior facultative reinsurance brokers who recently announced

their resignations from Guy Carpenter and have accepted employment with Integro Insurance

Brokers ("Integro"), a direct competitor of Guy Carpenter. During the course of their

employment with Guy Carpenter, defendants agreed that during and for a specified time after

KL3 2591561.4

their employment with Guy Carpenter they would not recruit, solicit or otherwise encourage

plaintiffs' employees from terminating their employment with plaintiffs to join a competitor.

Despite these explicit obligations, in the weeks following defendants' announcements of their

resignations from Guy Carpenter, four other very experienced Guy Carpenter facultative

reinsurance brokers who worked in Guy Carpenter's U.K. office and reported directly or

indirectly to defendants announced that they would be leaving Guy Carpenter to join Integro.

Numerous other brokers in the same group were approached to do the same – indeed, late last

week, Guy Carpenter learned that three other brokers had been solicited by Integro; one of these

brokers announced his resignation from Guy Carpenter on May 9, 2007 and informed Guy

Carpenter that he is joining Integro. It surely is no mere coincidence that the employees who

have resigned to join Integro or have otherwise been approached by Integro – almost half of the

brokers in the group – were supervised directly or indirectly at Guy Carpenter by defendants. As

the most senior brokers in the facultative group (defendants Samengo-Turner and Whyte were

co-heads of the global facultative group and defendant Hopkins led the U.K. unit), defendants

are well aware of the qualifications and expertise the brokers with whom they worked at Guy

Carpenter could bring to a competitor.

      The rapid rate at which Guy Carpenter facultative brokers in the U.K. office are

announcing their resignations, joining Integro, or are otherwise being aggressively solicited to

join Integro caused Guy Carpenter to have serious concerns – and doubts – as to whether

defendants are complying with their covenants not to solicit such employees. Accordingly,

plaintiffs requested that defendants provide information regarding, among other things, their

recruitment by Integro and discussions they have had with other Guy Carpenter employees since

they decided to leave Guy Carpenter. Defendants, who remain Guy Carpenter employees for the

- 2 -

next six months pursuant to the notice period in their employment contracts, are contractually

obligated to provide such information, having executed agreements with MMC and Guy

Carpenter in connection with their participation in a Long Term Incentive Plan ("LTIP") in

which they agreed to do so.  Defendants also agreed that their obligations with regard to

providing cooperation would be subject to New York law and enforceable exclusively in a state

or federal court located in New York county.  When defendants failed to provide any of the

requested information, plaintiffs commenced this action in this Court pursuant to the parties'

agreement.

By this motion for expedited discovery, plaintiffs seek to explore as quickly as

possible the extent of defendants' participation in soliciting a large percentage of Guy

Carpenter's U.K.-based facultative brokers.  Without receiving the expedited relief requested

here, consisting of narrowly tailored document requests and interrogatories in addition to

requests for depositions, Guy Carpenter is at risk of losing – through unlawful means – numerous

of its employees to Integro.  Because defendants have failed to comply with their contractual

obligations to provide cooperation and plaintiffs are now threatened with further losses of their

facultative team – losses which no monetary award could ever completely rectify – defendants

have willfully left plaintiffs with no recourse but to request such expedited discovery from this

Court.

Moreover, while the risk of harm to plaintiffs from not receiving the expedited

relief requested is great, defendants will suffer no prejudice in complying with plaintiffs'

requested relief.  Defendants continue to be employed and paid by Guy Carpenter during their

contractual six month notice periods and therefore can provide the required cooperation during

normal business hours.  Guy Carpenter is already paying for their time and they have no other

- 3 -

KL3 2591561.4

required duties for the remainder of their notice period. Further, as noted, defendants are

contractually obligated to cooperate with plaintiffs and, by ignoring plaintiffs' initial requests,

have brought this motion for expedited relief upon themselves.

Accordingly, plaintiffs respectfully request that expedited discovery be permitted

in this action.

## Factual Background

The facts set forth below are contained in the accompanying declaration of

Lynsey Mansfield, Head of International HR, executed on May 10, 2007 ("Mansfield Decl."),

and the accompanying exhibits.

A.    Defendants' Employment With Guy Carpenter and Hiring By Integro

Defendants worked in Guy Carpenter's U.K. office as senior facultative

reinsurance brokers.[1] By the terms of their respective employment agreements, defendants were

required to provide six months prior notice if they elected to terminate their employment with

Guy Carpenter. During the ensuing notice period, defendants would remain employed by Guy

Carpenter, continue to receive their full salaries, and continue to have all the fiduciary and

related duties and obligations to plaintiffs that are associated with such employment. (Mansfield

Decl. ¶ 9 and Exhs. A-C).

On or about April 3, 2007, defendants announced to Guy Carpenter their

resignations and accepted employment with Integro, an insurance brokerage firm that offers

---

[1]    Facultative reinsurance is a reinsurance custom designed by an insurer, broker, and
reinsurer to provide coverage to that insurer for a specific, individual risk that the insurer has
underwritten. Examples of such risks would be a large factory, refinery, or power plant. It may
be contrasted with treaty reinsurance, which covers a wide variety of risk underwritten in a given
year by an insurer. An example of treaty reinsurance would be coverage of all auto insurance
placed by an insurer during the course of a year within certain parameters. (Mansfield Decl. ¶ 2).

KL3 2593561.4

competitive services, and their respective six month notice periods began. (*Id.* ¶ 6). At the time

notice of their resignations was given, defendants Samengo-Turner and Whyte co-led Guy

Carpenter's global facultative reinsurance business unit, doing business under the trademark

GCFac, and Hopkins was head of Guy Carpenter's U.K. facultative reinsurance operation. All of

the Guy Carpenter facultative reinsurance brokers in the U.K. reported directly or indirectly to

defendants. (*Id.*¶ 7).

      Just two days later, on April 5, 2007, and notwithstanding that defendants'

employment was to continue during the six month notice period, Integro issued a press release

announcing "the formation of an international insurance and reinsurance business unit to be

based in London." The press release states that "Integro *announced the hiring of Julian

Samengo-Turner and Ron Whyte*, who will lead the new unit and join the board of Integro in the

U.K." Further, the press release states that "Messrs. Samengo-Turner and Whyte *formerly* led

Guy Carpenter's global facultative reinsurance business unit." Regarding Hopkins, the press

release states that Hopkins is "[a]lso *joining* Integro and its U.K. board" and that Hopkins was

"previously head of Guy Carpenter's U.K. facultative reinsurance operation." (*Id.* ¶ 10 and Exh.

D, emphases added). Similarly, the April 9, 2007 edition of Business Insurance magazine

attributes to Integro the announcement that the defendants have "joined" Integro and were

"formerly" or "previously" with Guy Carpenter. (*Id.* ¶ 11).

      Defendants have reason to believe that at least fourteen Guy Carpenter employees

in its facultative reinsurance group (including the defendants) have been recruited or approached,

either directly or indirectly, by Integro. (*Id.* ¶ 13). Soon after defendants announced their

resignations, another senior U.K. broker in the group, who directly reported to defendant

Hopkins, resigned and joined Integro. (*Id.* ¶ 14). Thereafter, on April 23, 2007, three additional

KL3 2591561.4

Guy Carpenter facultative reinsurance employees based in London gave notice to Guy Carpenter of their resignations, and plaintiffs have since learned that these three employees are joining Integro. (*Id.* ¶ 15). Plaintiffs have reason to believe that defendants aided in the solicitation and recruitment of these Guy Carpenter employees, who directly or indirectly reported to them, and also breached their contractual obligations by encouraging each other to leave Guy Carpenter.

Prior to defendants' resignations from Guy Carpenter, there were approximately thirty-two brokers in Guy Carpenter's U.K. facultative reinsurance group. (*Id.* ¶ 12). In the month of April alone, seven very experienced brokers left Guy Carpenter to join Integro, bringing the total number of brokers to twenty-five. (*Id.* ¶¶ 6, 14-15). Further, Guy Carpenter learned late last week that another three brokers in the group were approached by Integro. (*Id.* ¶ 16). On May 9, 2007, one of these employees announced his resignation from Guy Carpenter and stated that he would be joining Integro. (*Id.*).

B.    Defendants' Participation in the Plan and Defendants' Obligations Under the Agreements

During their employment with Guy Carpenter, defendants participated in the Marsh & McLennan Companies 2000 Senior Executive Incentive and Stock Award Plan (the "Plan"). In connection with November 2005 Awards granted under the Plan, each defendant agreed in writing to abide by the terms and conditions of the Plan as well as the additional terms and conditions set forth in Agreements related to the Plan (the "Agreements"). (*Id.* ¶ 17). Under the Plan, defendants were each granted Awards, which were subject to vesting in specified percentages on various future dates over a four year period. As of April 2007, 20% of the Awards granted to each defendant had vested and defendants had received cash for those portions of the Awards upon vesting. (*Id.* ¶ 19 and Exhs. E-G).

- 6 -

Defendants agreed as part of the Award to be bound by several restrictive covenants, including that during their employment at Guy Carpenter and for one year following their departure they would not solicit, entice, induce or encourage any of plaintiffs' employees to leave plaintiffs and join a company that competes with plaintiffs. (*Id.* ¶ 23 and Exhs. E-G, Schedule II.D). Moreover, under the Agreements defendants each are required to cooperate with MMC and any of its subsidiaries or affiliates, including Guy Carpenter, and specifically to "provide to the Company such information relating to [their] work for the Company or [their] other commercial activities as the Company may from time to time reasonably request in order for the Company to determine whether [they] are in compliance with [their] obligations under [the Plan]" (the "Cooperation Clause"). (*Id.* ¶ 20 and Exhs. E-G). The Cooperation Clause applies to defendants both "during and after [their] employment with the Company." (*Id.* ¶ 21 and Exhs. E-G). Compliance with the Cooperation Clause is mandatory; there is no prerequisite that plaintiffs demonstrate any potential breach of participants' obligations under the Agreements in order to be entitled to the benefits of the Cooperation Clause. (*Id.* ¶ 22).

As such, under the Cooperation Clause plaintiffs are entitled to inquire about defendants' suspected solicitation of Guy Carpenter employees to ascertain their compliance with two non-solicitation provisions in the Agreement. First, defendants agreed in a non-solicitation covenant contained in Schedule II.D of the Agreements that they would not "directly or indirectly . . . [e]ntice, induce or encourage an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved or concerned with either the supply of Competitive Services or a business which competes with either the supply of Competitive Services or a business which competes with the Relevant Business regardless of whether or not that Employee acts in breach of his or her contract of

employment (either written or implied) with the Company or any Associated Company by so doing." (*Id.* ¶ 23 and Exhs. E-G, Schedule II.D, Section 4). Plaintiffs properly may require defendants' cooperation to determine whether they have breached this covenant.

Second, solicitation of plaintiffs' employees within a 12 month period following the vesting of any portion of defendants' Awards constitutes Detrimental Activity under the Agreements, giving plaintiffs the right to cancel and rescind such vested portions of the Awards. (*Id.* ¶ 24). Specifically, Detrimental Activity during the 12 month period following vesting includes, among other things, "enticing, inducing or encouraging an Employee to leave or seek to leave his or her position with the Company or any Associated Company for the purpose of being involved in or concerned with either the supply of Competitive Services or a business which competes with or is similar to a Relevant Business or which plans to compete with a Relevant Business, regardless of whether or not that Employee acts in breach of his or her contract of employment (either written or implied) with the Company or any Associated Company by doing so." (*Id.* ¶ 25 and Exhs. E-G, Schedule II.D, Section 2(a)(iv)).[2] Accordingly, plaintiffs are entitled under the Cooperation Clause to confirm whether defendants are engaged in Detrimental Activity under the Agreements in order to determine whether their vested Awards properly should be cancelled and rescinded for this reason.[3]

---

[2]    The relevant definitions of Competitive Services and Relevant Business are set forth in Schedule II.D of the Agreement.

[3]    Joining or otherwise becoming interested in Integro also constitutes Detrimental Activity under the Agreements. (*Id.* ¶ 25). While not directly relevant to the instant motion, this type of Detrimental Activity is addressed in the Second Claim for Relief asserted in the Complaint.

KL3 2591561.4

C.    Defendants' Failure to Cooperate

Upon learning of defendants' hiring by Integro and the solicitation of other Guy Carpenter employees who defendants supervised, counsel for plaintiffs sent letters to each defendant dated April 5, 2007 (the "April 5 letters") seeking information pursuant to the Cooperation Clauses of the Agreements to ascertain whether defendants were honoring their obligations.  Specifically, pursuant to the Cooperation Clauses, plaintiffs requested that defendants answer questions relating to the circumstances surrounding defendants' hiring by Integro and defendants' discussions regarding their departure with other Guy Carpenter employees in order for plaintiffs "to establish whether or not [defendants] are in compliance with [their] obligations under the Plan and as a GC employee" (the "Requests").  (*Id.* ¶ 28 and Exhs. H-J).

On April 11, 2007, defendants' counsel responded by letter indicating that defendants could not respond to the Requests at that time because Whyte and Hopkins were on vacation.  However, defendants' counsel stated that they were "hoping to take detailed instructions from all three clients by mid next week and will revert as soon as we reasonably can thereafter."  (*Id.* ¶ 29 and Exh. K).

In subsequent communications by their counsel, including a letter dated April 19, 2007, defendants have failed to provide answers to the Requests or otherwise provide cooperation as required by the Cooperation Clauses.  (*Id.* ¶ 30 and Exh. L).  To date, defendants have failed to cooperate and have not responded to the Requests.  (*Id.* ¶ 30).

Paragraph VI.N of the Agreements provides that the provisions of the Agreement (apart from the obligations in the attached Schedule II.D) are subject to construction under New York law and that any alleged breaches can be litigated only in a state or federal court located in

- 9 -

New York county. Defendants also consented to the jurisdiction of those courts for that purpose and waived any right to a jury trial. (*Id.* at Exhs. E-G). Consequently, plaintiffs have brought suit against defendants in this forum.

<u>Argument</u>

EXPEDITED DISCOVERY IS NECESSARY
<u>IN THIS CASE AND SHOULD BE GRANTED</u>

Expedited discovery is recognized as a necessary and appropriate means for ensuring the timely and just determination of a dispute where the pace of normal pretrial procedures would prejudice one party or the other. The Federal Rules of Civil Procedure grant the Court broad powers to permit expedited discovery. *See* Fed. R. Civ. P. 26(d) 1993 Advisory Committee Note ("Discovery can begin earlier if authorized . . . by rule, order, or stipulation.").

Courts assess an application for expedited discovery under a "flexible standard of reasonableness and good cause." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (granting plaintiffs' motion for expedited discovery where urgent need for information sought); *see also Renaud v. Gillick*, No. 06-1304, 2007 WL 98465, at *3 (W.D. Wash. Jan. 8, 2007) (expedited discovery found to be reasonable where plaintiffs first "exercised diligence" in attempting to obtain information sought prior to applying for expedited discovery and plaintiffs' requests for such information were unanswered). As Judge Lynch in *Ayyash* stated, "[a]s the [Federal] Rules permit the Court to act by order, but do not elaborate on the basis for taking such action, it seems that the intention of the [Federal Rules] was to confide the matter [of expedited discovery] to the Court's discretion, rather than to impose a specific and rather stringent test." *Id.* (holding that it "makes little sense" to require a party seeking expedited discovery to meet the rigid preliminary injunction standard); *see also Standard Inv. Chartered, Inc. v. Nat'l Ass'n of*

KL3 2591561.4

*Secs. Dealers, Inc.*, 07 Civ. 22014, 2007 WL 1121734, at *5 (S.D.N.Y. Apr. 11, 2007) (affirming

Magistrate Judge's order granting expedited discovery where Magistrate Judge did not apply

strict preliminary injunction-type test); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D.

273, 275-76 (N.D. Cal. 2002) (rejecting argument that party seeking expedited discovery must

demonstrate rigid preliminary injunction-type elements and applying flexible "good cause"

standard which weighs whether "the need for expedited discovery, in consideration of the

administration of justice, outweighs the prejudice to the responding party").

Expedited discovery is more than reasonable in this case -- it is essential. While

plaintiffs have made specific, reasonable requests for information relating to the circumstances

surrounding defendants' hiring by Integro and defendants' conversations with current Guy

Carpenter employees in accordance with the Cooperation Clauses of the Agreements, defendants

have failed to comply with such requests. Meanwhile, plaintiffs have reason to believe that

defendants and/or other former Guy Carpenter or MMC employees are currently soliciting and

recruiting numerous Guy Carpenter employees to terminate their employment with Guy

Carpenter to join Integro. (Mansfield Decl. ¶¶ 13-15). Indeed, as mentioned above, plaintiffs

believe that at least fourteen Guy Carpenter brokers in the facultative reinsurance group

(including the defendants) have been recruited or approached, either directly or indirectly, by

Integro. (*Id.* ¶ 13). Plaintiffs believe that defendants aided in the solicitation and recruitment of

some or all of these Guy Carpenter employees, who directly or indirectly reported to them,

including the four who left Guy Carpenter for Integro within weeks after defendants announced

their resignations. (*Id.* ¶¶ 14-15). It surely cannot be coincidence that the only facultative

brokers Integro has announced hiring to date are defendants and their co-workers at GC Fac. At

the very least, this fact gives plaintiffs every reason to inquire as to the circumstances of those

- 11 -

XL3 25915614

hirings. Rather than aggressively asserting that defendants have breached their non-solicitation agreements, plaintiffs are diligently requesting, in accordance with defendants' contractual obligations (which are entirely consistent with their ongoing duties of loyalty as employees), that defendants provide information to confirm or belie plaintiffs' beliefs about the circumstances. In light of the facts, and the rate by which Guy Carpenter brokers in this group are being recruited, no further delay should be permitted. Guy Carpenter is surely entitled to know if this assault on its business has been conducted by lawful means – or not – particularly when defendants contractually agreed to provide such information for that very purpose.

As noted above, in April 2007 alone the number of Guy Carpenter brokers in its U.K. facultative reinsurance group has dwindled from thirty-two to twenty-five. (*Id.* ¶¶ 12, 14-15). Further, Guy Carpenter learned late last week that another three brokers, who defendants supervised directly or indirectly, were approached by Integro. ¶ 16). On May 9, 2007, one of these three announced his resignation from Guy Carpenter and informed the company that he would be joining Integro. (*Id.*). Accordingly, the risk to plaintiffs of not receiving the requested expedited discovery cannot be understated – each day that plaintiffs are unable to confirm whether defendants' non-solicitation obligations are being met poses increased risks of unlawful losses of valuable employees. The injury caused by such losses cannot be fully remedied by monetary damages. By obtaining the expedited relief requested, plaintiffs aim to prevent such future unlawful solicitations.

By contrast, expedited discovery poses no material hardship for defendants. First, defendants are currently in their six month notice periods, and, as such, remain Guy Carpenter employees and continue to receive their full salaries from Guy Carpenter. They have also asserted – in claimed compliance with their notice obligations – that they are not yet reporting to

- 12 -

work at Integro. Thus, the requested discovery does not – and cannot – interfere with any work obligations they have. Defendants have no obligations whatsoever during the normal workday except to provide such information. Defendants also continue to have a panoply of obligations to their employer, Guy Carpenter, including the obligation to make themselves available during business hours to provide important information. It surely cannot be a meaningful burden for defendants to set out what they have been doing during recent months while they have been Guy Carpenter employees.

Second, defendants should be estopped from claiming prejudice as they have blatantly ignored their contractual obligations to cooperate. Indeed, had defendants cooperated as required in the first instance, they may have been able to avoid the expedited demands now sought by plaintiffs.

Finally, the schedule proposed by plaintiffs is both reasonable and necessary, calling for document production within 7 days of service of those discovery demands, responses to interrogatory requests within 7 days of service of those discovery demands, and depositions on 7 days' notice. The discovery sought by plaintiffs is narrowly tailored to the central issues in the case, focused on obtaining information relating to the circumstances surrounding defendants' hiring by Integro and defendants' discussions of their hirings with current Guy Carpenter employees.[4]

---

[4]    For the Court's convenience, copies of plaintiffs' discovery requests are annexed as Exhs. B-D to the accompanying Declaration of Robert N. Holtzman, dated May 10, 2007.

- 13 -

KL3 2591561.4

<u>Conclusion</u>

For the foregoing reasons, plaintiffs respectfully request that the Court grant

plaintiffs' motion for expedited discovery.

Dated:  New York, New York
        May 15, 2007

                                    Kramer Levin Naftalis & Frankel LLP

                            By: _____
                                    Barry H. Berke (BB-1421)
                                    Robert N. Holtzman (RH-9525)
                                    Rachel M. Manne (RM-7151)

                                    1177 Avenue of the Americas
                                    New York, New York  10036
                                    (212) 715-9100
                                    Attorneys for Plaintiffs

- 14 -

KL3 2591561.4

# EXHIBIT
# 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GUY CARPENTER & COMPANY, LLC and )
MARSH & McLENNAN COMPANIES, INC., )
                              )
       Plaintiffs, )
                              )
v. )
                              )
JULIAN SAMENGO-TURNER, RON )
WHYTE, and MARCUS HOPKINS, )
                              )
       Defendants. )
                              )

Case No. 07 – CV- 3580 (DC)

---

## DEFENDANT RON WHYTE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR EXPEDITED DISCOVERY

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

*Attorneys for defendant Ron Whyte*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

SUMMARY OF ALLEGATIONS AND COUNTERSTATEMENT OF FACTS .........................3

DEFENDANTS HAVE NO CONNECTION TO NEW YORK.....................................3

PLAINTIFFS ARE SUBJECT TO THE LAWS OF THE UNITED KINGDOM.........................4

REMEDIES TO GC UNDER ITS INCENTIVE PLAN MUST BE PURSUED IN THE
 U.K..............................................................................................4

THE CONDUCT ALLEGED BY PLAINTIFFS ONLY OCCURRED WITHIN THE
 UNITED KINGDOM ....................................................................5

DEFENDANTS RESPONDED TO GC'S DEMANDS.................................................6

THE PUBLIC COMMENTS OF MMC'S CEO AND COO CONTRADICT THE
 ALLEGATIONS OF IRREPARABLE HARM .........................................8

PLAINTIFFS' COMPLAINT MUST BE ADDRESSED UNDER ENGLISH LAW .................9

ARGUMENT......................................................................................10

II.    EXPEDITED DISCOVERY SHOULD BE DENIED UNTIL THE
       SIGNIFICANT JURISDICTIONAL AND VENUE ISSUES ARE RESOLVED ...........10

III.   PLAINTIFFS' APPLICATION SHOULD BE DENIED BECAUSE
       PLAINTIFFS' HAVE FAILED TO DEMONSTRATE THAT THEY WILL
       SUFFER IRREPARABLE INJURY ABSENT EXPEDITED DISCOVERY
       FROM THE DEFENDANTS ....................................................12

       A.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY OR A
             CONNECTION BETWEEN  EXPEDITED DISCOVERY AND THE
             AVOIDANCE OF SUCH IRREPARABLE INJURY .........................13

       B.    PLAINTIFFS CANNOT SHOW PROBABILITY OF SUCCESS ON
             THE MERITS OR INJURY THAT WILL RESULT WITHOUT
             EXPEDITED DISCOVERY................................................15

CONCLUSION...................................................................................17

On May 4, 2007, Guy Carpenter & Company, LLC ("GC") and Marsh & McLennan Companies, Inc. ("MMC" and collectively "Plaintiffs") filed this action against United Kingdom residents Julian Samengo-Turner, Ron Whyte, and Marcus Hopkins (collectively "Defendants"). To date, the Complaint has not been served upon Messrs. Samengo-Turner or Hopkins. Despite Plaintiffs' awareness of this lack of service of process, they have filed an Order to Show Cause seeking to compel Defendants to respond to Plaintiffs' discovery requests (including depositions in New York) on an expedited basis. Defendant Ron Whyte submits this initial brief to alert the Court to the obvious defects in Plaintiffs' application.[1]

### PRELIMINARY STATEMENT

Plaintiffs have impermissibly instituted suit in New York, rather than the more appropriate English courts, for a purely tactical reason: to obtain discovery (*i.e.*, depositions) that is not available in the U.K. to support Plaintiffs' anticipated U.K. litigation against Defendants or other parties. Put another way, Plaintiffs are attempting to exploit the means of discovery that are available to litigants in the United States to gain a tactical advantage in an anticipated litigation in a foreign jurisdiction. This Court should not countenance such an abuse of procedure.

Plaintiffs' application seeks discovery from Defendants who have no meaningful contacts with the United States (all live and work in the U.K.) concerning events that occurred in the U.K. The alleged misconduct was not directed to the United States and Plaintiffs do not allege that they suffered injury here. Defendants, likewise, lack the level of forum contacts the relevant jurisdictional statutes require.

---

[1]    Defendant expressly reserves all rights related to the assertion of defenses in this matter, including those related to service of process, venue and jurisdiction.

The Complaint, on its face, also confirms the inappropriateness and inconvenience of this forum. Not only do the English courts provide an adequate alternative forum and have jurisdiction over the parties, but rescission and repayment of amounts paid under the incentive compensation plan at issue here must, pursuant to the terms of the plan, be assessed under English law. Basic principles of *forum non conveniens* require litigation of this dispute in England. This Court must resolve these threshold jurisdiction and venue issues before discovery can commence.[2]

Even if the forum and jurisdictional defects are overlooked, Plaintiffs application should still be denied as they have not identified any irreparable injury which would result from the denial of expedited discovery. Plaintiffs do not contend that their ability to prove or recover relief based on the claims in this lawsuit will be harmed absent expedited discovery. Rather, Plaintiffs' entire submission is based upon their unsubstantiated belief that expedited discovery will show that Defendants engaged in activity that might support an as-yet unfiled litigation against them (and possibly others) in the U.K.[3] If this application is denied, Plaintiffs' opportunity to pursue action(s) in the U.K. based on their unsubstantiated beliefs will not be foreclosed. To the contrary, Plaintiff's could initiate such actions at any time.

Moreover, common sense and well-settled precedent dictate that preventing Plaintiffs from improperly attempting to manipulate the means of discovery in different forums does not constitute an "injury", much less an irreparable one. To the contrary, denying Plaintiff's application would correctly place all the parties on a level playing field in the anticipated U.K. litigation.

---

[2]    Defendants are prepared to brief these issues on an expedited basis.

[3]    As explained below, MMC's senior management has publicly described the "defections" in the U.K. as a "temporary blip" and that it is "winning the war" for talent in the broker industry, which belies any suggestion of irreparable injury.

2

Plaintiff's motion for expedited discovery should also be denied because, in reality, it is a motion for summary judgment as a matter of law and Plaintiff has not made—much less attempted to make—a showing that would justify such relief. Specifically, the relief sought by the Complaint includes a mandatory injunction to "immediately provide responses" to written questions which it contends were promulgated in accordance with a so-called "Cooperation Clause" in the Plan. The document requests and interrogatories attached to Plaintiff's application are not designed to assist the Court in determining whether those questions or the answers already provided by Defendants in response thereto are reasonable or appropriate (it is noteworthy that the Plan expressly requires that such determinations be made under U.K. law). Rather, the discovery requests are designed to elicit the ultimate relief sought in the Complaint—answers to the original questions. As there has been no determination as to whether Plaintiffs, as a matter of law, are entitled to such information, this application should be denied.

For these reasons and those more fully explained below, Plaintiffs' application for expedited discovery should be denied.

## SUMMARY OF ALLEGATIONS AND COUNTERSTATEMENT OF FACTS

As Plaintiffs are aware, the Defendants have been traveling extensively since mid-April and two of the three remain on holiday (and unserved) to this very day. Based solely upon the Plaintiffs' Complaint and submission in support of their pending application, Defendant Whyte responds as follows:

### Defendants Have No Connection To New York

The Complaint makes clear that Defendants have practically nothing to do with the United States. They are not citizens nor residents of the United States; rather they are citizens and residents of the U.K. (Complaint, ¶¶6-8). Defendants, likewise, worked, and continue to work, for GC in the U.K. (Complaint, ¶¶11-13, 26, and Plaintiffs' Declaration of Lynsey

3

Mansfield ("Mansfield Decl."), Exhs. H-J), in accordance with employment contracts they received and executed in the U.K. (Complaint, ¶¶11-14; Mansfield Decl., Exhs. A-C).

On or about April 3, 2007, Defendants provided GC with the requisite notice of their respective intents to resign, though they each remain employed by GC in the U.K. at this time. (Complaint, ¶¶14, 26). Indeed, each of the Defendants is currently in the midst of what is commonly known in the U.K. as "garden leave," during which they remain employed by GC in the U.K. and continue to receive compensation from GC. (Complaint, ¶¶15; *see, e.g.,* Mansfield Decl., Exhs. A-B at 5).

**Plaintiffs Are Subject To The Laws Of The United Kingdom**

Plaintiff GC, a global risk and reinsurance specialist and wholly owned subsidiary of MMC, maintains offices in the United Kingdom and throughout the world. (Complaint, ¶¶2, 9, 13, and Mansfield Decl., ¶¶1-2 and Exh. E, Sched. II.D). GC employed Defendants in the U.K. at all relevant times. (Mansfield Decl., ¶¶5-7).[4] MMC and GC are subject to the laws of the United Kingdom. (Complaint, ¶9).

**Remedies To GC Under Its Incentive Plan Must Be Pursued In The U.K.**

During the course of their employment in the U.K., Defendants became eligible for, and were included in, a Senior Executive Incentive and Stock Award Plan (the "Plan") in 2005. (Complaint, ¶18 and Mansfield Decl., Exhs. E-G). The stated purpose of the Plan was to provide additional incentives for Defendants to remain employed with GC in the U.K. (Complaint, ¶20 and Mansfield Decl., Exhs. E-G at 1). Defendants earned certain monies from GC (paid in British pounds) under the Plan in the U.K. (Complaint, *e.g.,* ¶¶20-22 and Mansfield Decl., Exhs. E-G).

---

[4]     Indeed, Ms. Mansfield's Declaration in support of Plaintiffs' application was executed in London. (Mansfield Decl. at 7).

The Plan contains a punitive "Cancellation and Rescission" provision which, as written, may require repayment of amounts earned by employees under the Plan if such employees engage in what the Plan defines as "Detrimental Activity." (Complaint, ¶25 and Mansfield Decl., Exhs. E-G, Sec. I. C.(2)). The definition of Detrimental Activity, for employees of the United Kingdom like the Defendants, is set forth at Clause 2 of Schedule II.D of the Plan document. (Complaint, ¶¶26-27). If cancellation and rescission is attempted by GC concerning U.K. employees, like the Defendants, the Plan mandates that it must first be determined whether any act arises to the level of Detrimental Activity as a matter of English law. (Complaint, ¶32 and Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6). Indeed, the Plan—as drafted by GC—requires Schedule II.D to "be construed in accordance with English Law and the parties irrevocably submit to the non-exclusive jurisdiction of the English Courts to settle *any* disputes as may arise in connection with this Schedule." (*Id.*) (Emphasis added).

The Plan also purports to require GC employees to cooperate with reasonable requests for information, essentially designed to enable GC to determine whether such employees have improperly engaged in Detrimental Activity so as to trigger the cancellation and rescission provisions of the Plan. (Mansfield Decl., Exhs. E-G, Section II.E). The ultimate determination of whether any U.K.-based GC employee engaged in such Detrimental Activity, however, must be determined under English law. (Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

**The Conduct Alleged By Plaintiffs Only Occurred Within The United Kingdom**

Plaintiffs accuse Defendants of engaging in Detrimental Activity because a news article indicated that they had accepted employment with the London office of Integro Insurance

Brokers.[5]  (Complaint, ¶¶33, 37, and Mansfield Decl., Exh. D).  Plaintiffs further accuse Defendants, albeit "upon information and belief," of engaging in Detrimental Activity by soliciting and recruiting U.K.-based GC employees to work for Integro. (Complaint, ¶38).

Before this suit was filed, however, GC's London legal counsel (Herbert Smith LLP) sent letters to each Defendant on or about April 5, 2007, at their respective U.K. residences, with a written demand for information designed to support the existence of Detrimental Activity. (Mansfield Decl., Exh. H-J).  These letters ordered Defendants, under the purported authority of Section II.E of the Plan document, to answer highly intrusive and overbroad questions "to establish whether or not [Defendants] are in compliance with [their] obligations under the Plan and as a GC employee." (Id. at 1-2).  GC also demanded that, within six days, each Defendant provide a "written undertaking" that they will strictly comply with their obligations as a GC employee, with their garden leave obligations, and with the Plan.  (Id. at 2).  Finally, GC demanded that each Defendant return documents and property claimed to rightfully belong to GC or its clients. (Id.)

### Defendants Responded To GC's Demands

Through their London-based solicitors, Elborne Mitchell, Defendants denied GC's allegations on April 11, 2007.  (Mansfield Decl., Exh. K).  That letter assured GC that—even in the absence of evidence to suggest that they had engaged in Detrimental Activity—Defendants were aware of and intended to abide by their obligations to GC.  (Id. at 1).  Elborne Mitchell further advised GC that Defendants could not comply with the unreasonable deadline selected by GC due to their vacation schedules.  (Id.).

---

[5]     Although not relevant to the merits of this application, the news article cited by Plaintiffs actually states that Defendants "will join Integro's London – based reinsurance operations this fall," which is, after the conclusion of their garden leave periods.

6

On April 19, 2007, Elborne Mitchell further advised Herbert Smith that:

- Defendants "would be happy to sign written undertakings confirming that they will comply with their garden leave obligations."; and that

- Defendants had no documentation or other property belonging to GC or its clients other than mobile telephone handsets which they offered to return.

(Mansfield Decl., Exh. L at 2). Elborne Mitchell then requested that GC provide a good faith basis— beyond its vague and unsupported assertions—to support its demand for immediate, detailed, comprehensive, and largely unreasonable questioning of the Defendants. (*Id.*).

Hearing no response, Elborne Mitchell wrote to Herbert Smith again on May 1 for additional information in support of GC's oppressive demands. (Defendant's Declaration of John P. Barry ("Barry Decl."), Exhibit 1). By letter dated May 3, Herbert Smith confirmed that GC refused to provide any additional information to support its information demands but, nonetheless, anticipated receiving the Defendants' written responses and undertakings "as soon as possible." (Barry Decl., Exhibit 2). *The very next day*, however, GC filed this lawsuit in the United States District Court for the Southern District of New York. (Complaint at 13).

By letter dated May 17, 2007, (Barry Decl., Exh. 3). Elborne Mitchell proposed to Herbert Smith a written undertaking for each of the Defendants which set forth, in pertinent part, that:

> "I confirm my agreement to remain an employee of Marsh Services Limited ("the Company") until 2 October 2007 and to serve out my notice period on garden leave as requested by the Company. I undertake that while I remain an employee of the Company I will abide by my contractual duty of good faith and fidelity to the Company. I further undertake that during this period of garden leave I will not:
>
> > (A) Save for the purpose of obtaining legal advice, or save as required or permitted by law, or save with the express permission of the Company.

7

(1)    disclose or permit to be disclosed to any person firm or company any confidential information of the Company or of any other member of the Group.

(2)    disclose in any way, or use for my own or another's advantage, any of the data, programmes or manuals, or any of the business methods or information of a confidential nature relating to the affairs of any group Company.

(B)    be employed or engaged or otherwise provide services directly or indirectly, except as an employee of the Company, in the business of underwriting or as an insurance, reinsurance, or mortgage broker or agent without having first gained the written consent of the Company.

(Declaration of John P. Barry, Exh. A)

## The Public Comments of MMC's CEO and COO Contradict The Allegations of Irreparable Harm

In their brief submitted in support of their application for injunctive relief, Plaintiff's contend that:

> "[P]laintiffs believe that at least fourteen Guy Carpenter brokers in the facultative reinsurance group (including the defendants) have been recruited or approached, either directly or indirectly, by Integro . . .
>
> Plaintiffs believe that defendants aided in the solicitation and recruitment of some or all of these Guy Carpenter employees . . . . Guy Carpenter is surely entitled to know if **this assault on its business** has been conducted by lawful means . . . ." (Brief at 11-12; emphasis added)

MMC's President and CEO, Michael Cherkasky, along with its COO, Brian Storms, provided a completely different characterization of these events in a public presentation to the investment community on May 8, 2007:

> "Marsh is now aggressively on the offensive, focusing a disproportionate amount of our effort, energy and resources on accelerating growth. **We are actively recruiting industry leading talent.**" (Brian Storms; emphasis added)

8

Obviously, we did have a defection to Integro in the [*sic*] reinsurance. By the way, it's so fascinating is [*sic*] we are not having defections in the brokerage business to Integro. In fact, they are coming the other way. **I think this [defection to Integro in the reinsurance area] is a temporary blip. What is very rewarding is that we are attracting people in the reinsurance business. So it really isn't -- there is a war for talent but it's going both ways and I think, because of Integro's position, they make more of a headline about it than maybe others.** (Michael Cherkasky; emphasis added)

\* \* \*

"We are, for the first time in a long time, as we get more and more proactive, aggressively recruiting. I say with great confidence we are winning the war for talent in the brokers business right now. Our business model, the success that we're beginning to see -- we are winning the war for talent. It's still a pretty irrational market out there; we are seeing competitors offering multi-year deals with lots of guarantees, things that any rational -- we're not going to do. **But in terms of our ability to win the war for talent, it's really going in our favor and as the year progresses, you will see the impact of that.**

(Declaration of John P. Barry, Exh. 4)

## Plaintiffs' Complaint Must Be Addressed Under English Law

The Complaint—on its face—confirms that the parties and the controversy have no meaningful connection to the United States or this Court. The Complaint essentially asserts that Plaintiffs are entitled to rescission and repayment of roughly £180,000 paid to them in the U.K. under the Plan because Defendants allegedly engaged in Detrimental Activity in the U.K. (Complaint, ¶¶51-52 and *ad dannum* clause, ¶(ii)).[6] Under the Plan, however, whether any act of the Defendants consitutes Detrimental Activity must be determined pursuant to English law. (Complaint, ¶32 and Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

---

[6]    By letter dated April 19, Defendants U.K. counsel requested that Plaintiffs "provide a breakdown" so that it could assess the basis of Plaintiffs' claims of repayment under the Plan. Plaintiffs' U.K. counsel has not yet responded to this inquiry.

GC also claims that Defendants failed to provide adequate information to Herbert Smith in accordance with Section II.E of the Plan and that an injunction should issue to compel Defendants to supply "discovery" concerning the allegation that they have engaged in Detrimental Activity. (Complaint, ¶¶48-49 and *ad dannum* clause, ¶(i)). Any claim that Defendants engaged in Detrimental Activity, however, must also be brought under English law. (Mansfield Decl., Exhs. E-G, Schedule II.D, Clause 6).

## ARGUMENT

**II. EXPEDITED DISCOVERY SHOULD BE DENIED UNTIL THE SIGNIFICANT JURISDICTIONAL AND VENUE ISSUES ARE RESOLVED**

GC should not be permitted to force Defendants to expend time, effort, and resources conducting expedited (or even routine) discovery because venue and jurisdiction are so plainly inappropriate here. A review of GC's Complaint makes clear that this matter belongs in the U.K., not New York. By way of example:

- The Defendants are citizens and residents of the U.K. and are subject to the jurisdiction of U.K. courts;

- The Plaintiffs currently employ the Defendants in the U.K. within Plaintiffs' U.K. business operations;

- The likely witnesses in this matter[7] are U.K. residents beyond the Court's compulsory subpoena power;

- Most, if not all, of the anticipated witnesses (including Plaintiffs' affiant, Head of International HR Mansfield) are U.K. residents and certainly the most relevant witnesses all reside in the U.K.

- The cost of obtaining the attendance of the Defendants and voluntary witnesses in New York will be prohibitive;

- Most, if not all, relevant documentation is located in the U.K.;

---

[7] *See* Complaint, ¶38 and Mansfield Decl., Exh. L at 1.

10

- The Plan awards were paid to and received by Defendants in the U.K. in British pounds;

- Any Detrimental Action committed by Defendants—which is denied—is alleged to have occurred within the U.K. and directed at other U.K. residents within the U.K.;

- The Plan specifically requires English law to be applied over "*any* disputes as may arise in connection with [Schedule II.D]";

- The parties have all retained U.K. legal counsel well prior to the initiation of this lawsuit and U.K. counsel have advanced discussions designed to resolve many, if not all, of the issues in dispute; and

- The U.K. has a vested interest in resolving disputes concerning contracts executed and performed in the U.K. by English citizens.

Thus, Defendants respectfully submit that the significant jurisdictional/venue questions should be definitively resolved before there is any order of discovery or other adjudication with respect to the Complaint. Defendants stand ready to brief these issues on an expedited basis, as they can be decided as a matter of law largely from the face of the Complaint and attached documents. *See Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1194, 167 L.Ed.2d 15 (2007) (if "a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground. . . . and [if] *forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course.").

As a consequence of these significant initial issues, Plaintiffs' request for expedited discovery is entirely inappropriate. *See id.* (court should not burden parties with the "expense and delay" of discovery where "[t]he District Court inevitably would dismiss the case without reaching the merits"). Plaintiffs' application for an order to show cause, therefore, should be denied.

11

III.    **PLAINTIFFS' APPLICATION SHOULD BE DENIED BECAUSE PLAINTIFFS' HAVE FAILED TO DEMONSTRATE THAT THEY WILL SUFFER IRREPARABLE INJURY ABSENT EXPEDITED DISCOVERY FROM THE DEFENDANTS**

To be sure, expedited discovery is appropriate in some cases. Where, for example, a plaintiff proves that the defendants have incentive and capacity to hide their assets and have indicated disinclination to defend the matter on the merits, an urgent need may exist to obtain information about the possible location of the defendants' assets. *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). Likewise, expedited discovery may be appropriate to bolster a plaintiff's motion for a preliminary injunction. *See Standard Investment Chartered, Inc. v. NASD*, 07 Civ. 2014 (SWK), 2007 U.S. Dist. LEXIS 27342, *11 (April 11, 2007). Where, as here, there is no pending preliminary or permanent injunction hearing in this case, or other emergent need, a stricter standard is appropriate.

In those instances, the District Courts commonly consider a plaintiff's request for expedited discovery in light of the following factors: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *The Irish Lesbian and Gay Org. v. Giuliani*, 918 F. Supp. 728, 730 (S.D.N.Y. 1996) (citing *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)). *Accord Rosecliff, Inc. v. C3, Inc.*, No. 94 Civ. 9104, 1995 WL 3024, at *2 (S.D.N.Y. Jan. 3, 1995); *Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990); *see also Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 151, 152

(E.D.N.C. 1993) (adopting *Notaro* as "compelling"). Plaintiffs, however, have failed to identify facts sufficient to satisfy any of the elements of this standard.

### A.    Plaintiffs Have Not Shown Irreparable Injury Or A Connection Between Expedited Discovery And The Avoidance Of Such Irreparable Injury

Plaintiffs' Complaint states two basic causes of action: that (1) Defendants must repay a fixed amount of money because they allegedly engaged in Detrimental Activity in the U.K.; and (2) Defendants breached the "cooperation clause" of their U.K. Plan documents by not providing sufficient information concerning their post-employment business activities. Plaintiffs have not even attempted to argue that these claims are, or could be, the cause of immediate or irreparable harm. Rather, GC only claims that expedited discovery is necessary because Defendants—"upon information and belief"[8]—participated in the solicitation and recruitment of "a large percentage" of GC's "U.K.-based brokers." (Pl. Brf. at 3; Mansfield Decl., ¶¶12-16). The Court should reject this attempt to obtain expedited discovery, including otherwise unavailable depositions, because it is not based upon *any* of causes of the action within the Complaint and MMC's top-levels of management have publicly described these departures as an inconsequential "temporary blip" and that it is winning the war for talent in the industry.

Indeed, Plaintiffs seek discovery from the Defendants for no purpose other than to gather information to support an anticipated action against Defendants (and possibly others) in the U.K. Plainly, any lawsuit concerning the alleged solicitation or recruitment of a U.K.-based GC employee would arise under Clause 2(a)(iv) and/or Clause 4 of Section II.D of the Plan document. As stated, any claim arising under Section II.D may only be determined under U.K. law. *See* Complaint, Exhs. A-C, Sched. II.D, Clause 6.

---

[8]    Complaint, ¶38.

13

Thus, Plaintiffs demand for expedited discovery fails because there is plainly no connection whatsoever between the discovery sought and the claims or injuries alleged in the Complaint. *See Giuliani*, 918 F. Supp. at 730 (expedited discovery request denied because, *inter alia*, it was not reasonably tailored "to the specific issues that will have to be determined" in the case and the scope of the requested discovery "did not correspond to the plaintiff's allegations . . . or its claimed need for expeditious relief."). *Accord Ayyash*, 233 F.R.D. at 327 (expedited discovery permitted only after plaintiff "made a strong evidentiary showing of the substantiality of his claims.").

That the purported harm which GC is experiencing in the U.K. is not the injury alleged in the Complaint further demonstrates that GC wants to gather information from Defendants for use in future proceedings in the U.K. Such obvious abuse of the discovery process is entirely impermissible. *See Well-Made Toy Mfg. Corp. v. Lotus Onda Industrial Co., Ltd.*, 2002 U.S. Dist. LEXIS 789, 00 Civ. 9605 (DFE) (S.D.N.Y. Jan. 16, 2002) ("When the purpose of a discovery request is to gather information in proceedings other than the pending suit, discovery should be denied.") (citing *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 1997 WL 53184, *5 (S.D.N.Y. Feb. 11, 1997) and *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, n. 17, 98 S. Ct. 2380, 2390 n. 17, 57 L. Ed. 2d 253 (1978)); *U.S. v. Hooker Chemicals & Plastics Corporation*, 90 F.R.D. 421, 426 (W.D.N.Y. 1981) (discovery not permitted where there is attempt to "exploit the federal litigation discovery process solely to assist litigation in a foreign forum.") (citing *Johnson Foils, Inc. v. Huyck Corp.*, 61 F.R.D. 405, 410 (N.D.N.Y. 1973)).

Plaintiffs' discovery abuse is all the more impermissible because English law does not permit depositions in civil matters. *See, e.g., Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, 95 Civ. 7905 (SHS), 1996 U.S. Dist. LEXIS 10432, *8 (S.D.N.Y July 22, 1996). Although

14

the absence of pretrial depositions does not make England any less adequate of an alternative forum for this case as a matter of law,[9] Plaintiffs' attempt to compel depositions in New York which they will not be entitled to take in England illustrates the impermissable nature of Plaintiffs' application. *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 481 (S.D.N.Y. 2006) (plaintiffs showed "indicia of forum-shopping" where New York lawsuit allowed for "procedural devices not available in England"). Indeed, Plaintiffs have not, and cannot, dispute the obvious fact that they can file all of their various claims together in England right now and obtain essentially the identical written discovery which they seek here.

Finally, Plaintiff arguments of irreparable injury are belied by the public comment of MMC's senior management, including its CEO and COO. MMC's CEO described the "defection to Integro" as "a temporary blip." And while the CEO referred to a "war for talent" he proclaimed that "it was going both ways" and that MMC "is winning the war for talent in the brokers market right now." (Barry Decl., Exh. 4) As the highest levels of MMC's management have characterized the defection as, essentially, inconsequential in public discussions with the investing community, this Court should disregard the contradicting representations contained in their moving papers.

**B.     Plaintiffs Cannot Show Probability Of Success On The Merits Or Injury That Will Result Without Expedited Discovery**

In light of the significant jurisdiction and venue issues, it is unlikely that the merits of the matter will be determined outside of an English court. Indeed, expedited discovery will only

---

[9] *See Breindel*, 1996 U.S. Dist. LEXIS 10432 at *8 ("England is an adequate alternative forum" because "procedures in foreign forum need not be identical to those in United States to be adequate, so long as they are not wholly devoid of due process.") (citing *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse*, 652 F. Supp. 1289, 1295 (S.D.N.Y. 1987) (internal quotation marks omitted)).

serve to needlessly increase the cost of the litigation and distract Defendants from the task of preparing their motion to dismiss.

Likewise, as previously explained, no injury *contemplated by the Complaint* will occur or worsen in the absence of expedited discovery. On the contrary, the Defendants will be harmed if they are forced to travel to New York for depositions, as Plaintiffs have demanded, or otherwise participate in discovery in a case where the Court likely lacks jurisdiction and is the improper venue. *See* Holtzman Decl., Exh. D.

Finally, this motion further prejudices Defendants because it impermissibly provides for the ultimate relief sought by Plaintiffs without a determination on the merits. Specifically, Plaintiffs' First Cause of Action seeks a mandatory injunction compelling the Defendants to provide written responses to all requests for information posed by Plaintiffs and to subject Defendants to depositions by Plaintiffs' counsel. (Complaint, ¶¶48-49 and p. 13, ¶(i)). Putting the threshold jurisdiction/venue issues aside, questions of fact clearly exist concerning, among other things:

- how Plaintiffs can obtain an injunction to compel compliance with Section II.E of the Plan when Section II.H of the Plan clearly indicates that Plaintiffs never intended for an application for injunctive relief to include compliance with Section II.E;

- what are the reasonable limitations of Plaintiffs' information requests under the Plan document;

- whether Plaintiffs can compel any depositions of the Defendants (expedited or not) when neither Section II.E nor English law provide for such depositions;

- how Plaintiffs could be entitled to compel the production of documents from Defendants when Section II.E does not permit or require that remedy; and

- the adequacy of Defendants' previous responses to Plaintiffs (Mansfield Decl., Exhs. K and L).

Nonetheless, Plaintiffs' motion seeks this information from Defendants through expedited depositions, document requests, and interrogatories. If such expedited discovery is

16

granted—without any determination that Defendants have failed to comply with Section II.E of the Plan document or that Plaintiffs are entitled to anything beyond what they have already received—Plaintiffs will have secured the ultimate relief they seek without proving an entitlement to it as a matter of law.

## CONCLUSION

Under the present circumstances, Defendant Ron Whyte respectfully submits that it would be inappropriate for the Court to order expedited discovery in this matter and that the service of process, jurisdiction, and venue issues should be resolved before there is any adjudication with respect to expedited discovery.

Dated: May 17, 2007

John P. Barry (JB 6489)
Mark A. Saloman (MS 5764)
Proskauer Rose LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299 (Fax)

17

# EXHIBIT
# 8

ORIGINAL  *(notes)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x

GUY CARPENTER & COMPANY, LLC and
MARSH & McLENNAN COMPANIES, INC.,

                    Plaintiffs,

          - against -

JULIAN SAMENGO-TURNER, RON WHYTE,
and MARCUS HOPKINS,

                    Defendants.
-------------------------------------------x

07 Civ. 3580 (DC) (KNF)

**ORDER TO SHOW CAUSE**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/24/07

Upon ~~reading and filing~~ *review of* the complaint of plaintiff Guy Carpenter & Company, LLC and Marsh & McLennan Companies, Inc., the declaration of Robert N. Holtzman, Esq., dated May 15, 2007 with exhibits, ~~and~~ the declaration of Lynsey Mansfield, dated May 10, 2007 with exhibits, ~~it is hereby~~ *the submission of the defendants, and consideration of the parties' arguments at a May 18, 2007 conference, it is*

Ordered that defendants Julian Samengo-Turner, Ron Whyte and Marcus Hopkins show cause before this Court on the ___ day of _____, 2007 at _____, or as soon thereafter as counsel can be heard, in Room 11B, United States Courthouse, 500 Pearl Street, New York, New York, why plaintiffs' motion for expedited relief should not be granted, pursuant to Federal Rules of Civil Procedure 26, 30, 33 and 34;

Ordered that defendants are required to serve any papers in opposition to plaintiffs' motion by ___ on _____, 2007; and that plaintiffs shall serve reply papers in further support of plaintiffs' motion by ___ on _____, 2007; and it is further

*Ordered that expedited discovery may proceed on the schedule described at the conference.*

*Denise Cote*
*May 24, 2007*

KL3 2591492.1

# EXHIBIT
# 9

1

75LMCARC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GUY CARPENTER & COMPANY, LLC;
     and MARSH & McLENNAN
 4   COMPANIES, INC.,

 5              Plaintiffs,

 6        v.                              07 Civ. 3580 (DLC)

 7   JULIAN SAMENGO-TURNER; RON
     WHYTE and MARCUS HOPKINS,
 8
                Defendants.
 9
     ------------------------------x
10                                        New York, N.Y.
                                          May 18, 2007
11                                        11:20 a.m.

12   Before:

13                     HON. DENISE COTE,

14                                        District Judge

15                     APPEARANCES

16   KRAMER LEVIN NAFTALIS & FRANKEL
          Attorneys for Plaintiffs
17   BY:  ROBERT HOLTZMAN
          BARRY BERKE
18
     PROSKAUER ROSE
19        Attorneys for Defendants
     BY:  JOHN BARRY
20        MARK SALOMAN

21

22

23

24

25
```

2

75LMCARC

1          (In the robing room)

2          THE COURT:  We had an initial conference this morning

3    pursuant to the plaintiffs' request for expedited discovery.

4    There is subject matter jurisdiction in this case, basis of

5    diversity.  This is a contract action pursuant to a contract

6    between at least one of the plaintiffs and the defendants.

7          The defendants are going to bring a motion based on

8    forum non conveniens on May 24 that will be opposed on June 8

9    and replied to on June 15.  The defendants may add additional

10   arguments to that motion addressed to other issues that they'd

11   like to press as a basis for dismissal of this case or transfer

12   to England, and they'll investigate those issues and decide

13   whether or not to include additional issues besides the forum

14   non conveniens argument in their May 24 submission.

15         The parties have been meeting and conferring with

16   respect to expedited discovery.  I had indicated that I was

17   going to order expedited discovery but wanted to give them an

18   opportunity to try to narrow the disputes.

19         I'll take a report from plaintiffs' counsel.

20         MR. HOLTZMAN:  Defendants' counsel has come to us with

21   just one specific issue regarding the discovery requests today,

22   and then we can address that.  They have also asked that the

23   depositions not proceed in New York, but instead take place in

24   London, and have objected to the proposed time frame.  To

25   remind your Honor, we had proposed in our papers that we

3

75LMCARC

1    permitted be able to serve immediately our discovery requests,

2    which we are prepared to do and responses be called for within

3    seven days.

4         THE COURT:   There is no objection to that, you're

5    saying?

6         MR. HOLTZMAN:   Mr. Barry has indicated that they would

7    like 14 days to respond to those.   They've also asked that

8    depositions occur within 14 days thereafter.   We would like a

9    tighter schedule than that, your Honor:

10        THE COURT:   If I understand, the plaintiffs want to

11   respond with written responses within 14 days and have the

12   depositions occur within 28 days, but in London?

13        MR. BARRY:   That's correct, your Honor.   I think you

14   might have said plaintiffs.   That was defendants.   And I

15   believe we had an agreement about the 14-day schedule in terms

16   of the document, the written responses, is that correct.

17        MR. BERKE:   That was only if we could resolve the

18   other issues that we were unable to do, which is the timing of

19   the depositions.

20        THE COURT:   There is no dispute with respect to the

21   substance of the questions that need to be answered, am I

22   correct?

23        MR. BARRY:   No, your Honor, there is a dispute on

24   that.   I think counsel is just first framing the timing issues

25   for the Court.

4

75LMCARC

1    THE COURT:  What's the dispute on the substance of the

2    questions?

3    MR. BARRY:  Your Honor, primarily, we think the

4    questions should be designed to focus in obviously on the

5    cooperation clause and whether or not the defendants violated

6    the cooperation clause.  And to that end a number of these

7    requests are not designed to elicit information as to whether

8    the defendants violated that clause but, instead, what they are

9    designed to do is they go to the potential terms and

10   conditions, compensation, information, and the like of their

11   potential employment with Integro, which would start after the

12   garden leave period.  We don't think that's something that is

13   germane to the issues for which they are seeking expedited

14   discovery.

15   THE COURT:  Can you show me the document that is at

16   issue here?

17   MR. HOLTZMAN:  Our requests are Exhibit B to my

18   declaration, your Honor.

19   THE COURT:  Can defense counsel identify a question

20   that puts in concrete terms the objection they have?

21   MR. HOLTZMAN:  Sure.

22   MR. BARRY:  Sure, your Honor.  Just starting with

23   request No. 1, which pertains to information concerning

24   compensation, salary, bonus, stock and other noncash

25   compensation, electronic or otherwise, that any type of offer

5

75LMCARC

1   they have received from Integro in that regard, we -- it

2   doesn't have any bearing on whether or not they violated the

3   cooperation clause.

4        MR. HOLTZMAN:  Your Honor, we should be permitted to

5   understand what their relationship with Integro is, we need to

6   know whether they are being paid by Integro.  We need to know

7   what their contractual obligations are.

8        THE COURT:  Why are the terms of the offer of no

9   employment relevant?

10        MR. HOLTZMAN:  We need to understand what their

11  relationship with Integro is.  Under our second cause of action

12  they have engaged in detrimental activity, and therefore we are

13  entitled to rescind their awards if they have become employed

14  by or otherwise interested in Integro.  That's the language of

15  the agreement.  We need to understand whether those things

16  happened, have they become employed by Integro.  That's where

17  we need to understand our compensation terms, to determine

18  whether or not they are interested in Integro at that point.

19        MR. BERKE:  There may be two components.  One is not

20  only the timing of the payments, but, two, are the payments of

21  such a nature that it appears they are being compensated for a

22  period of time which they are supposed to have an undivided

23  loyalty to Marsh while they are being paid prior to the garden

24  leave.

25        THE COURT:  So the six-month notice period is up early

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

75LMCARC

1    October.  So, for instance, if in the period between October

2    and December this year they were getting an unusually large

3    payment, it would be, in effect -- could be interpreted under

4    plaintiffs' view of the world as compensation for the six-month

5    period when they weren't supposed to be employed.

6             MR. HOLTZMAN:  Correct, your Honor.

7             THE COURT:  So I'll allow request No. 1 to be modified

8    so that this period of expedited discovery includes discovery

9    of any compensation for this calendar year.  This is my

10   proposal with respect to the schedule which was the first issue

11   presented to me, and that is I will give 14 days to respond.

12   That is by June 1 at noon, New York time.  I think the

13   deposition should occur within seven days thereafter, but may

14   occur at the plaintiffs' discretion within two weeks

15   thereafter, which would be June 15.  But if the plaintiff wants

16   to take the depositions the week of June 4, so be it.  But if

17   they consent to take them the week of June 11, so be it.

18             Why can't we have these depositions done in London?

19             MR. HOLTZMAN:  We could take them in London, your

20   Honor.  We had offered to pay their airfare to come here to do

21   them because counsel is here.  We can take them in London if

22   your Honor prefers.

23             THE COURT:  I think we should do the depositions in

24   London, make it easier for London counsel to participate.

25             MR. BARRY:  Two issues.  At least two of the

7

75LMCARC

1    defendants are out of the country on holiday.  Would they then

2    pay for them to return to London to take their depositions?

3    This is something that they are being required to do in the

4    course of their employment and they've already expended money

5    to make -- they have already traveled and have done that and it

6    would be an expense to return there.

7              THE COURT:  Do you know what their travel arrangements

8    are right now?

9              MR. BARRY:  I do not, Judge.

10             THE COURT:  Why don't we put that issue aside until

11   you have more information about what tickets they actually have

12   and what are the financial burdens of changing those tickets,

13   if any.  And for those two people New York may be more

14   convenient.  Who knows where they are.  If they are in the

15   Grand Canyon right now --

16             MR. BARRY:  We can go to the Grand Canyon.

17             THE COURT:  I expect you'll be able to work that out.

18   But if you can't, I'll be available to you.

19             MR. BARRY:  Your Honor, with respect to the

20   depositions, could there be a time limit on the depositions?

21   We are talking about some relatively simple issues in terms of

22   whether they've answered in terms of the cooperation clause.

23   We don't think these should be depositions that should be

24   dragged on for more than a few hours.

25             THE COURT:  Have you discussed that with plaintiffs'

SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

75LMCARC

1  counsel?

2          MR. BARRY:  No, we actually haven't done that.

3          THE COURT:  I am going to ask you to have a meet and

4  confer process with respect to any issues before you raise a

5  dispute with me.

6          And I have time for one more issue if you want.  Is

7  there any other dispute you've had a meet and confer about and

8  been unable to resolve?

9          MR. HOLTZMAN:  Those are the only issues that have

10 been raised at this time.

11         MR. BARRY:  I would just say, your Honor, you

12 mentioned beforehand that we could, once we have an opportunity

13 to speak with our clients, to the extent we have any more

14 issues with the particular requests, as we understand the case

15 and the facts and understand these requests in their proper

16 context, we would confer with plaintiffs' counsel first.  And

17 if we weren't able to resolve that, we would bring it to your

18 Honor's attention to try to address it that way, but hopefully

19 we could resolve it between counsel.

20         THE COURT:  That's right.  I should have put that on

21 the record earlier.  Defense counsel just arrived in the case

22 and have had these papers in terms of the requests for

23 discovery only a few days, since Tuesday.  And so they had

24 wanted additional time to consult with their clients about some

25 of these discovery requests.  And so until Monday I believe was

9

75LMCARC

1   their request, so I said if after that consultation this

2   weekend or Monday they had additional issues they wanted to

3   raise about the scope of the discovery requests, they could

4   raise those with plaintiffs' counsel; and if they were

5   unresolved after that process could bring them before me again.

6           Is there anything else that plaintiffs' counsel wish

7   to place on the record?

8           MR. HOLTZMAN:  Just a clarification of that ruling,

9   your Honor.  We had understood that to be --

10          THE COURT:  I said it's about the scope of the

11  requests.

12          MR. HOLTZMAN:  Would that include a wholesale

13  objection to the requests?

14          THE COURT:  I said about the scope of the requests.

15          MR. HOLTZMAN:  Very good, your Honor.

16          THE COURT:  Does the defense counsel wish to place

17  anything else on the record?

18          MR. BARRY:  Your Honor, without speaking with our

19  clients, we have nothing else to put on the record at this

20  time.

21          THE COURT:  Thank you very much.  Good luck.

22                          o0o

23

24

25

# EXHIBIT
# 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
:
GUY CARPENTER & COMPANY, LLC and :
MARSH & McLENNAN COMPANIES, INC., :
:                    07 Civ. 3580 (DC) (KNF)
Plaintiffs, :
:                    **PLAINTIFFS' FIRST REQUEST**
- against - :                    **FOR PRODUCTION OF**
:                    **DOCUMENTS**
JULIAN SAMENGO-TURNER, RON WHYTE, :
and MARCUS HOPKINS, :
:
Defendants. :
:
------------------------------------------------------ x

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 34 of the Federal Rules

of Civil Procedure and 26.3 of the Local Civil Rules of the United States District Court for the

Southern District of New York, plaintiffs Guy Carpenter & Company, LLC, formerly Guy

Carpenter & Company, Inc., and Marsh & McLennan Companies, Inc., request that defendants

Julian Samengo-Turner, Ron Whyte and Marcus Hopkins produce and make available for

inspection and copying at the offices of Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of

the Americas, New York, New York 10036, on or before June 1, 2007 at 12:00 p.m., all

documents and things designated below which are in their possession, custody or control or in

the possession, custody, or control of any of their representatives, attorneys, or agents.

## DEFINITIONS AND INSTRUCTIONS

A.    Pursuant to Rule 26.3(a) of the Local Civil Rules of the United States

District Court for the Southern District of New York, the definitions and rules of construction set

forth in Local Civil Rules 26.3(c) and (d) are deemed to be incorporated by reference in these

requests.

KL3 2591227.3

B.      The term "document," as defined in Local Civil Rule 26.3(c) and Rule 34(a) of the Federal Rules of Civil Procedure, is intended to be given the broadest possible scope.  It includes the original and all copies, including all copies which are different in any way from the original (whether by interlineation, receipt stamp, notation, indication of copy sent or received or otherwise), regardless of location, including all handwritten, typed, printed, xeroxed, photographed, recorded, transcribed, punched, taped, filed or graphic matter, and any form of communication or representation.  The term also includes all information stored in a computer system although not yet printed out, all information stored on computer hard drives, all information stored on floppy diskettes, all information stored on computer tape backups, all information stored on CD-ROM and all information stored on e-mail.

C.      This request is to be deemed a continuing request, and documents that are responsive, but which are discovered subsequent to an initial production, should nevertheless be promptly produced in the same manner, and at the same address, as the initial production.

D.      If there are no documents responsive to a category in this request, so state in writing.

E.      If any document called for by this request is withheld under a claim of privilege, furnish a list in accordance with Local Civil Rule 26.2(a), setting forth for each such document:  (i) the nature of the privilege (including attorney work-product) that is being claimed; (ii) the type of the document (e.g., letter, memo, handwritten notes); (iii) the general subject matter of the document; (iv) the date of the document; and (v) such other information as is sufficient to identify the document for a subpoena <u>duces tecum</u>, including, where appropriate, the

KL3 2591227.3

author of the document, the addressee of the document, and, where not apparent, the relationship of the author and addressee to each other.

  F. If you are unable to locate any document requested, identify any individual who you believe is likely to possess any information regarding the present location of the document.

  G. "Complaint" means the Complaint in this action, dated May 4, 2007.

  H. "Defendants" means Julian Samengo-Turner, Ron Whyte and/or Marcus Hopkins, and anyone else acting under their control or on their behalf.

  I. "Integro" means Integro Insurance Brokers together with each of its past and present corporate affiliates, parents, subsidiaries, employees, agents, and anyone else acting under its control or on its behalf.

  J. "Guy Carpenter" means Guy Carpenter LLC together with each of its past and present corporate affiliates, parents, subsidiaries, employees, agents, and anyone else acting under its control or on its behalf.

  K. "MMC" mean Marsh & McLennan Companies, Inc. together with each of its past and present corporate affiliates, parents, subsidiaries, employees, agents, and anyone else acting under its control or on its behalf.

  L. Unless otherwise indicated, the time frame for these requests is September 1, 2006 through the present.

- 3 -

## DOCUMENTS REQUESTED

1.    All documents concerning defendants' hiring by Integro, including but not limited to each defendant's offer letter from Integro or employment contract with Integro reflecting defendant's job titles, duties and responsibilities at Integro, and/or defendants' compensation from Integro (including without limitation salary, bonus, stock and other non-cash compensation); notes, correspondence (electronic or otherwise), and other documentation reflecting defendants' discussions and negotiations with Integro; and any drafts of the foregoing; provided that documents concerning compensation from Integro are limited to compensation paid or granted to defendants in 2007.

2.    All documents concerning each defendants' resignation from Guy Carpenter, including but not limited to communications between (a) each defendant and (b) Integro or any person relating to the reasons for defendants' departure from Guy Carpenter.

3.    All documents concerning Integro's recruitment or solicitation of defendants, including but not limited to communications between each defendant and Integro and communications among defendants.

4.    All documents concerning in-person meetings or interviews (whether formal or informal) between each defendant and Integro.

5.    All documents concerning communications between each defendant and any client of Guy Carpenter concerning (a) defendants' resignations from Guy Carpenter or hiring by Integro or (b) the possibility of any client using Integro for its facultative brokerage business.

- 4 -

6.    All documents concerning communications between each defendant and current or former Guy Carpenter or MMC employees concerning Integro.

7.    All documents concerning in-person meetings or interviews (whether formal or informal) relating to potential employment (of anyone) with Integro between each defendant and current or former Guy Carpenter or MMC employees.

8.    All documents concerning in-person meetings or interviews (whether formal or informal) between Integro and current or former Guy Carpenter or MMC employee relating to potential employment with Integro.

9.    All documents concerning defendant Samengo-Turner's conversation with Mark Newman of Guy Carpenter, on or about April 3, 2007, concerning Integro.

10.    All documents concerning communications among defendants concerning the recruitment or potential hiring by Integro of current or former Guy Carpenter or MMC employees.

11.    All documents concerning communications between each defendant and Integro regarding the recruitment or potential hiring by Integro of current or former Guy Carpenter or MMC employees.

12.    All documents concerning communications between each defendant and Integro about Guy Carpenter's facultative reinsurance group.

13.    All documents concerning work done by defendants for Integro to date or plans for work to be done for Integro during defendants' Guy Carpenter notice period.

- 5 -

KL3 2591227.3

14.    All documents concerning the business of plaintiffs, including without limitation all documents containing confidential information or concerning employees of plaintiffs that are currently in their possession or control or were in their possession or control at any time after April 3, 2007.

15.    All documents concerning communications by defendant(s) to Integro of any confidential documents or information of or relating to Guy Carpenter or MMC or any of their clients.

Dated: New York, New York
May 18, 2007

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _Rachel M. Manne_

Barry H. Berke (BB-1421)
Robert N. Holtzman (RH-9525)
Rachel M. Manne (RM-7151)
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100

Attorneys for Plaintiffs

To:    John Barry, Esq.
Proskauer Rose LLP
One Newark Center
Newark, NJ 07071-5211
973-274-6081

Attorneys for Defendants

- 6 -

KL3 2591227.3